Timothy J. Eckstein, 018321
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
teckstein@omlaw.com
jbendor@omlaw.com

A. Dami Animashaun (pro hac vice application to be filed)
Katherine Chamblee-Ryan (pro hac vice application to be filed)
CIVIL RIGHTS CORPS
910 17th Street NW, Second Floor
Washington, D.C. 20002
(202) 656-5189
dami@civilrightscorps.org
katie@civilrightscorps.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs and Mark Pascale, on behalf of themselves and all others similarly situated; Taja Collier, <br><br> Plaintiffs, <br> v. <br><br> William Montgomery, in his official capacity as County Attorney of Maricopa County; Maricopa County; Treatment Assessment Screening Center, Inc., <br><br> Defendants. | No. _____ <br><br> **CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

## OVERVIEW

1.     The Maricopa County Attorney's Office (MCAO) and the Treatment Assessment Screening Center (TASC) jointly operate a possession of marijuana diversion program[1] that penalizes the poor because of their poverty.

---

[1]    This diversion program is referred to in the Complaint as "the possession of marijuana diversion program," "the marijuana diversion program," and "the program."

2.      In a "diversion" program, participants undergo a period of supervision and must meet certain requirements to avoid criminal prosecution and conviction.

3.      The programs are generally "a functional equivalent of a sentence to pretrial probation . . . and [are] staffed with paraprofessionals overseeing individuals in what [is] in effect a probationary-type of supervision and control."[2]

4.      In principle, the programs are "intended to relieve overburdened courts and crowded jails, and to spare low-risk offenders from the devastating consequences of a criminal record."[3]

5.      But in Maricopa County, they serve another purpose: to make money for those who operate the program, including the MCAO.[4]

6.      Between 2006 and 2016, MCAO collected nearly $15 million in revenue by diverting threatened prosecutions to TASC.[5]

7.      The length of time a person spends in the diversion program and whether the person ultimately completes the program and avoids felony criminal prosecution depends on whether she can pay the program's required fees.

---

[2] S. Rep. No. 93–1021, at 36–37 (1974) (describing the operation of two pretrial diversion programs).

[3] Shalia Dewan & Andrew W. Lehren, *No Money, No Mercy: After a Crime, the Price of a Second Chance*, N.Y. Times (Dec. 12, 2016), https://www.nytimes.com/2016/12/12/us/crime-criminal-justice-reform-diversion.html.

[4] *See* Megan Cassidy, *If Prop. 205 Passes, Maricopa County Attorney's Office Funds From Marijuana Diversion Program Would Dry Up*, Ariz. Republic (Oct. 26, 2016), https://www.azcentral.com/story/news/local/phoenix/2016/10/26/prop-205-marijuana-diversion-tasc-dry-up-county-attorney-bill-montgomery-millions/92795924; Ray Stern, *If Prop 205 Passes, the Maricopa County Attorney's Budget is Likely to Take a Hit*, Phoenix New Times (Oct. 31, 2016), https://www.phoenixnewtimes.com/news/if-prop-205-passes-the-maricopa-county-attorneys-budget-is-likely-to-take-a-hit-8782184; Ray Stern, *Potential Marijuana Legalization in Arizona Threatens TASC Drug Treatment Firm's Funding*, Phoenix New Times (Jan. 26, 2016), https://www.phoenixnewtimes.com/news/potential-marijuana-legalization-in-arizona-threatens-tasc-drug-treatment-firms-funding-7999610.

[5] *See* Cassidy, *supra* note 4.

2

8. In order to complete the program and avoid felony criminal prosecution, participants in the marijuana diversion program must pay a fee of $950 or $1000.

9. Participants must also pay $15 or $17 for drug and alcohol tests up to three times each week.

10. The program is two-tiered: people who meet program requirements—completing a three-hour drug education seminar and routine drug and alcohol testing—and are wealthy enough to pay the program fees complete the program in 90 days and are no longer subject to felony criminal prosecution.

11. But participants who cannot pay the program fees are forced to stay in the program for at least six months or until they can pay off the money owed to MCAO and TASC, even if they have satisfied every program requirement other than payment.

12. During the "pay-only"[6] period, participants are subject to all of the diversion program's requirements.

13. These requirements include reporting to a TASC location, as often as three times per week, so that the participant's urine can be collected and tested.

14. Participants who remain on diversion solely because of their inability to pay program fees must also continue to pay $15 or $17 each time they are required to submit to a drug and alcohol test.

15. The perverse result is that poor people are ultimately charged more money—potentially hundreds of dollars more—than are similarly situated participants who can afford to pay to finish the program in 90 days.

---

[6] "Pay-only" refers to a period of criminal supervision during which the person is supervised only because she has not paid all of her debt. This "extremely muscular form of debt collection," which "masquerades as supervision," is becoming increasingly common. Human Rights Watch, *Profiting from Probation: America's 'Offender Funded' Probation Industry* (Feb. 5, 2014), https://www.hrw.org/report/2014/02/05/profiting-probation/americas-offender-funded-probation-industry.

3

16.     They also remain subject to felony criminal prosecution during the additional time they are forced to remain in the diversion program.

17.     In addition, participants are not allowed to complete certain program requirements if they cannot afford to pay for them.

18.     For example, if a participant cannot pay the $15 or $17 fee for a drug and alcohol test, she is not allowed to take the required test at all.

19.     Therefore, if a participant reports for a drug and alcohol test without the required fee, she will be turned away and can be referred for felony prosecution for failing to complete a mandatory drug and alcohol test.

20.     In other words, an unpaid drug and alcohol test is a failed test.

21.     If a participant misses too many drug and alcohol tests—even if she missed them solely because she could not afford to pay for them—she will be failed out of the diversion program and prosecuted for felony possession of marijuana.

22.     MCAO and TASC enforce these policies even when they know that diversion participants are poor or even homeless, and even when they know that participants are sacrificing basic necessities to pay fees.

23.     Diversion participants who alert TASC employees that they cannot afford the required fees are told that they will be failed from the program if they do not pay and to do whatever it takes to get the money.

24.     For example, Plaintiff Marc Pascale is a 60-year-old man with degenerative disc disease, which has left him physically unable to work.

25.     TASC refused to waive his program and drug and alcohol testing fees even after he repeatedly told them that he could not afford to pay the fees.

26.     Mr. Pascale's case manager repeatedly told him to borrow money to pay the fees or else he would fail the program, lose the money he had already paid in program and drug and alcohol testing fees, and be prosecuted for felony criminal possession of marijuana.

7728046

27.     Plaintiff Taja Collier emailed her case manager at TASC to tell her that she was homeless and could not afford to pay for drug and alcohol testing.

28.     Ms. Collier's case manager responded that if she did not test, she would be issued a notice of violation and her case would be sent back to court, where she would be prosecuted for felony criminal possession of marijuana.

29.     As a result, Ms. Collier sold her blood plasma to pay for drug and alcohol tests.

30.     Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 to redress violations of Named Plaintiffs', class members', and Plaintiff Collier's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

31.     Named Plaintiffs Deshawn Briggs and Mark Pascale, as well as the class members whose interests they represent, seek monetary damages against Defendants for violation of these rights.

32.     Plaintiff Taja Collier seeks monetary damages and injunctive relief on her own behalf.

## PARTIES

### Plaintiffs

33.     Plaintiff **Deshawn Briggs** is a 28-year-old African American man. He is a resident of Maricopa County, Arizona. Mr. Briggs spent six months in Defendants' marijuana diversion program solely because he was unable to pay the program fees within 90 days. He represents himself and a class of similarly situated people subject to Defendants' unlawful policies, practices, and customs.

34.     Plaintiff **Marc Pascale** is a 60-year-old white man. He is a resident of Maricopa County, Arizona. Mr. Pascale spent more than seven months in Defendants' marijuana diversion program solely because he was unable to pay the program fees in 90 days. He represents himself and a class of similarly situated people subject to Defendants' unlawful policies, practices, and customs.

7728046

35.     Plaintiff **Taja Collier** is a 21-year-old African American woman. She is a resident of Maricopa County, Arizona. Ms. Collier was willing to meet all diversion requirements, but she could not afford to pay for drug and alcohol testing, particularly during a month when she was homeless and sleeping in parks. After Ms. Collier could not afford to pay for several drug and alcohol tests, she was failed out of the diversion program and was prosecuted for felony possession of marijuana. Ms. Collier was prosecuted for felony marijuana possession and was once again diverted into Defendants' program.  Ms. Collier brings this suit on her own behalf.

**Defendants**

36.     Defendant **Bill Montgomery** is the elected County Attorney for Maricopa County, Arizona. Defendant Montgomery is the chief official responsible for the enforcement and prosecution of felonies within Maricopa County. Defendant Montgomery is also responsible for operating and administering the deferred prosecution programs in Maricopa County. Defendant Montgomery is the final policymaker for Maricopa County on matters relating to diversion programs, including the marijuana diversion program at issue in this lawsuit. He is sued in his official capacity.

37.     Defendant **Maricopa County, Arizona**[7] is a political subdivision formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes. Defendant Maricopa County can sue and be sued in its own name. Maricopa County is liable for the practices and policies of Defendants Montgomery and TASC. The County has and continues to acquiesce in the administration of the TASC drug diversion program, including the marijuana diversion program at issue in this lawsuit.

38.     Defendant **Treatment Assessment Screening Center** ("TASC") is a private, non-profit, 501(c)(3) corporation headquartered in Phoenix, Arizona.

---

[7]  Defendant Montgomery, in his official capacity, acts on behalf of and is the final policymaker for Maricopa County with respect to the conduct described in this lawsuit. If this is correct, naming Maricopa County as a defendant is redundant.

6

Defendant TASC has contracted and continues to contract with MCAO to operate, administer, and supervise the marijuana diversion program at issue in this lawsuit. Defendant TASC supervises all people whose prosecutions for simple possession of marijuana have been diverted. Defendant TASC acts under the color of law in its administration and supervision of the County's marijuana diversion program.

## JURISDICTION

39.     This action arises under 42 U.S.C. § 1983 and the Constitution of the United States. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

40.     Venue is proper under 28 U.S.C. § 1391(b). All Defendants' official places of business are located within this District. The events giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

### I.    Defendants' Unlawful Policies

### Marijuana Possession Prosecutions in Maricopa County

41.     In Arizona, possession of any amount of marijuana—even trace amounts—can be prosecuted as a felony.[8]

42.     Defendant County Attorney Bill Montgomery has aggressively opposed legalization measures as well as efforts to reduce simple possession of marijuana to a misdemeanor.

---

[8]  *See* Ariz. Rev. Stat. Ann. § 13-3405(B)(1) (providing that possession of "an amount of marijuana not possessed for sale having a weight of less than two pounds is guilty of a class 6 felony"). Arizona is the only state in the nation where any amount of marijuana, no matter how small, can draw a felony charge. *See* Jacon Sullum, *Explaining His Cannabis Conversion, John Boehner Cites a Marijuana Myth*, Reason (Apr. 12, 2018), http://reason.com/blog/2018/04/12/explaining-his-cannabis-conversion-john/print.

7728046

43.     In 2016, Defendant Montgomery successfully advocated against the passage of Proposition 205, a ballot initiative that would have made recreational marijuana use legal in Arizona.

44.     Defendant Montgomery made numerous public statements and participated in public debates attacking the initiative and advocating for its failure.

45.     During a public debate on marijuana legalization, Defendant Montgomery told a Vietnam veteran, who admitted to using medical marijuana for back pain and occasional recreation use, "I have no respect for you. … [Y]ou're an enemy."

46.     Defendant Montgomery has also worked to narrow Arizona's medical marijuana laws.

47.     For example, when Defendant Montgomery learned that doctors were able to stop a five-year-old's seizures by using a marijuana extract, he threatened the child's parents with felony prosecution, arguing that extracts were not covered by the state's medical marijuana allowance.[9]

48.     Drug possession charges represent an overwhelming proportion of the charges filed by MCAO.

49.     Possession of marijuana is the MCAO's most commonly prosecuted offense; it amounts to approximately 15 percent of total prosecutions.[10]

50.     And more broadly, more than 45 percent of MCAO's prosecutions are for drug possession.[11]

---

[9] Evan Wyloge, *Court Rules Medical Marijuana Patients Can Use Extracts*, Ariz. Capitol Times (Mar. 22, 2014), https://azcapitoltimes.com/news/2014/03/22/az-medical-marijuana-patients-can-use-cannabis-extract-court-rules-bill-montgomery.

[10] *See* Maricopa County Attorney's Office, 2016 Annual Report, at 43, *available at* https://www.maricopacountyattorney.org/ArchiveCenter/View-File/Item/88. The year 2016 is the most recent for which MCAO has published this charging data.

[11] *Id.* (calculated by adding the percentage of the total offenses charged represented by each type of drug charge listed).

8

51.     Between 2006 and 2016, MCAO made nearly $15 million from diverting threatened prosecutions to TASC.[12]

**The Possession of Marijuana Diversion Program**

52.     For most people who are arrested in Maricopa County for simple possession of marijuana, the only way to avoid a felony criminal prosecution is to complete the diversion program offered by MCAO.

53.     To operate, administer, and supervise participants in the program, MCAO has contracted with TASC, a private non-profit company.

54.     More than 15,000 people participated in MCAO and TASC's marijuana diversion program between 2011 and 2017.[13]

55.     Over that same time period, the marijuana diversion program accounted for approximately three quarters of TASC's total intakes for drug diversion.[14]

56.     People arrested for simple possession of marijuana or marijuana paraphernalia can enter the diversion program either before or after criminal charges are filed.

57.     People who enter into the marijuana diversion program post-filing have charges filed against them prior to enrolling in the program.

58.     The charges are suspended while the person completes the program.

59.     If the person successfully completes the program, MCAO dismisses the case.

---

[12]  Cassidy, *supra* note 4.
[13]  *See id.* (providing the number of participants who enrolled in the program between 2011 and 2015); Letter from Bill Montgomery, County Attorney, Maricopa County, to Elizabeth Ortiz, Executive Director, Arizona Prosecuting Attorneys' Advisory Council (Aug. 8, 2017) (providing the number of participants who enrolled in the program from July 1, 2016 through June 30, 2017).
[14]  *See* Cassidy, *supra* note 4; Letter from Bill Montgomery, County Attorney, Maricopa County, to Elizabeth Ortiz, Executive Director, Arizona Prosecuting Attorneys' Advisory Council (Aug. 8, 2017).

7728046

60.     If the person fails to complete the program, MCAO reinstates prosecution.

61.     People can also enter the program before any criminal charges are filed in court.

62.     People who enter the marijuana diversion program pre-filing are sent a letter from MCAO.

63.     The letter informs the person that she is facing class 6 felony charges and offers two options: criminal prosecution or the TASC marijuana diversion program.

64.     The letter warns, "If convicted of a class 6 felony, you could receive a maximum sentence of 2 years in prison and a maximum fine of $150,000 plus 80% surcharge."

65.     The letter also warns that a class 1 misdemeanor conviction could result in "a maximum sentence of six months in jail and a maximum fine of $2,500.00 plus 80% surcharge."

66.     The threats in this letter are false.

67.     Under Arizona law, jail or prison time is prohibited for a first or second offense of simple possession of marijuana.

68.     Instead, for people in this category, the law requires drug treatment and a maximum penalty of probation. *See* Ariz. Rev. Stat. § 13-901.01(A), (D), (H)(1).

69.     The pre-filing diversion program generally only includes people with no prior convictions.

70.     Accordingly, the vast majority of people who receive the pre-filing letter threatening jail time are ineligible to be jailed as a matter of state law.

71.     The letter's representation that its recipients could be fined $150,000 plus an 80% surcharge are false as well.[15]

---

[15]  A person convicted of possession of marijuana can be fined $750 or three times the value of the marijuana involved. *See* Ariz. Rev. Stat. § 13-3405(D). $150,000 is the maximum fine allowable for any felony. *See* Ariz. Rev. Stat. § 13-801(a). No person

10

72.     After delivering these false threats, the letter explains the basic requirements of the marijuana diversion program and provides a deadline and contact information to sign up for the program.

73.     If a person in the pre-filing category completes the diversion program, MCAO will not file charges against her.

74.     Failing the program results in criminal prosecution.[16]

75.     Participants who do not complete the diversion program and whose cases are prosecuted have little hope of avoiding felony criminal prosecution and conviction because people who enroll in the marijuana diversion program—whether pre- or post-filing—are first required to sign a statement admitting their guilt.

76.     A TASC employee tells participants exactly what to write in the statement of facts.

77.     The following information must be written into the statement:

      a.  Date and location of the offense;

      b.  The full name of the substance possessed;

      c.  That the participant possessed a usable amount of the substance; and

      d.  The facts of the offense, which must read, "the [name of the drug] was found in [where the drug was found] in my possession."

78.     This signed statement of facts can be used against a person if she fails to complete the marijuana diversion program and is criminally prosecuted. *See State v. Gill*, 391 P.3d 1193, 1197 (Ariz. 2017) (holding that a written admission contained in a statement of facts obtained by a TASC representative was admissible at trial).

---

accused of a crime involving $150,000 worth of marijuana would be eligible for TASC.

[16] When a person in the pre-filing group fails diversion, the prosecutor will file charges in the case. When a person in the post-filing group fails diversion, the prosecutor will move to reinstate the prosecution. As a matter of policy, practice, and custom, for both pre- and post-filing participants, TASC sends the participant a final warning letter before the participant is failed from the program.

11

**The Cost of Avoiding Prosecution**

79.     Once enrolled in the marijuana diversion program, the requirements for the pre- and post-filing participants are the same.

80.     For both groups of participants, avoiding prosecution costs money.

81.     To complete the program, all participants must:

    a.  Pay program fees—$950 or $1000—in full;

    b.  Pay for and pass routine drug and alcohol tests for 90 days; and

    c.  Complete a three-hour drug education seminar.

82.     The mandatory $950 or $1000 program fee includes:

    a.  A $150 admission fee;

    b.  A $650 "drug fund" fee;

    c.  A $150 TASC fee; and

    d.  A $50 booking fee, which applies only to participants who were arrested and booked.

83.     All of these fees must be paid in person by debit card or with a money order.

84.     Participants are not allowed to pay by any other means, including with credit or cash.

85.     Defendants require that participants pay the $150 admission fee at the program orientation.

86.     If a participant is unable to pay the $150 admission fee at orientation because she cannot afford it, Defendants allow her to pay $75 at orientation and the other $75 during the program.

87.     If a participant is allowed to attend orientation without making a payment up front, she may be told to return with the money the same day or be failed from the program and face felony prosecution.

12

7728046

88.     In addition to the $950 or $1000 in fees, participants must pay to take drug and alcohol tests at TASC.

89.     Each drug and alcohol test costs $15 or $17, depending on the method of payment.

90.     Participants are called to drug test at least once—and often multiple times—each week.

91.     Records obtained as part of the preliminary investigation for this lawsuit revealed that participants may be required to test as many as nine times per month.

92.     Thus, on top of the $1000 in program fees, diversion participants pay at least $60—but up to $153—each month for drug and alcohol tests.

93.     Participants who complete the three program requirements—including full payment of fees—within 90 days are deemed to have successfully completed the program and are no longer subject to felony criminal prosecution.

94.     However, as a matter of policy, practice, and custom, people who cannot afford to pay the program fees in full within 90 days are not released from the program—even if they meet program requirements and have never tested positive for marijuana (or any other drug, including alcohol).

95.     Instead, participants who cannot afford to pay these fees must remain in the supervision program for a minimum of six months.

96.     If these participants are not able to pay the program fees by the end of six months, they must remain in the program until they do.

97.     Defendants do not assess a person's ability to pay before refusing to consider her for program completion after 90 days solely because she has not finished paying the required fees.

98.     Nor do Defendants assess a person's ability to pay before they require her to remain on diversion until all fees are paid.

7728046

99.    People who are forced to stay on diversion solely because they cannot afford to pay program fees must continue to submit to one or more drug and alcohol tests weekly—under the threat of criminal prosecution.

100.    The stalls in which participants submit urine for drug alcohol testing frequently include glass panels so that a TASC employee can watch participants while they urinate.

101.    In at least one TASC location, the bathroom where participants submit urine for testing includes multiple mirrors so that a TASC employee can watch the participant urinate from multiple angles.

102.    Participants who remain on diversion solely because they could not pay to complete the program must also complete all of the requirements attendant to the drug and alcohol tests.

103.    For example, these participants must call TASC every day—or consult a phone application—seven days a week, to determine whether they are required to report to a TASC location during a certain time period that day so that TASC can collect and test their urine.

104.    If a participant does not call daily, this can be counted as a missed drug and alcohol test and she can be sanctioned, which could potentially result in felony prosecution.

105.    Participants are also not permitted to drink "excessive amounts of fluids," since doing so can dilute a urine sample.

106.    People who remain on diversion because they cannot afford to pay program fees are also still forced to pay $15 or $17 for each drug and alcohol test.

107.    As a result, these participants may ultimately have to pay hundreds of dollars more than people wealthy enough to pay the $950 or $1000 program fee within 90 days—in addition to remaining subject to felony criminal prosecution for months longer.

14

7728046

**Defendants' Refusal to Waive Fees for the Poor**

108.   As a matter of policy, practice, and custom, Defendants do not reduce or waive the $950 or $1000 program fee for any person, regardless of financial circumstances.

109.   Defendants contend that they allow for reductions of drug and alcohol testing fees to $7 instead of $15 per test for participants who cannot afford them—but these reductions are almost never granted in practice.

110.   At the outset, Defendants do not assess participants' ability to pay before charging them in full for tests.

111.   But even when Defendants are aware that a participant is indigent and unable to pay without sacrificing basic necessities, Defendants require the participant to pay the full $15 or $17 to test.

112.   One TASC employee interviewed by investigators for undersigned counsel stated that reduced drug and alcohol testing fees are reserved for people who can demonstrate that they have basically zero income.

113.   Another TASC employee explained that fee reductions are "very difficult" to get and that "it rarely happens."

114.   As one TASC employee explained, drug and alcohol testing is "strictly fee for service."

115.   When participants tell TASC case managers that they are struggling to pay, the case managers recommend they borrow money from friends or family because they will be failed from the program and prosecuted if they do not pay.

**Defendants Do Not Allow Participants to Take Drug and Alcohol Tests Unless They Pay for Them**

116.   As a matter of policy, practice, and custom, Defendants do not allow diversion participants to take the program's mandatory drug and alcohol tests unless they can pay for them at the time of the test.

15

7728046

117.   As a result, poor people are forced to extend their time on the program for failing to take mandatory drug and alcohol tests—solely because they could not afford to pay for them.

118.   People who cannot afford to take drug and alcohol tests may also fail the program altogether.

119.   Missed drug and alcohol tests are counted as "violations"—even when a person only missed the test because she could not afford to pay for it.

120.   A person who accrues too many of these violations will be failed by TASC and referred to the MCAO for prosecution.

121.   When this happens, a person faces felony prosecution solely because of her inability to pay.

122.   No one at TASC assesses a person's ability to pay before referring her for prosecution because she did not pay for drug and alcohol tests.

123.   Nor does anyone at MCAO assess ability to pay before prosecuting people who have failed diversion solely because of their inability to pay for drug and alcohol tests.

**The "User-Funded" Model**

124.   Defendants MCAO and TASC advertise the diversion program as "user-funded."

125.   According to MCAO, "user-funded" means that "the [person entering the program] typically bears the costs of the initial assessment and the assigned treatment."

126.   A brochure published by MCAO describing its felony pretrial diversion programs notes that "defendants … bear the costs of the program."[17]

127.   Defendant TASC's website explains that the diversion program "is fully funded by the clients we serve."[18]

---

[17]  Maricopa County Attorney's Office, Felony Pretrial Intervention Program (2018).
[18]  *Diversion*, TASC, http://www.tascsolutions.org/tasc-services/diversion (last visited Aug. 22, 2018).

16

7728046

128.   Defendant TASC is responsible for collecting fees from the people enrolled in the diversion program.

129.   Defendant TASC keeps a portion of the money it collects.

130.   The $650 "drug fund fee" that Defendant TASC collects from each participant is deposited to MCAO.

131.   MCAO does not publicly disclose how it spends the money it receives from the program.

132.   In addition to collecting fees, the Contract between Defendants MCAO and TASC makes Defendant TASC responsible for most of the day-to-day operations of the possession of marijuana diversion program.

133.   This includes administering drug and alcohol tests, tracking participants' attendance and participation, and determining whether a participant has completed the program requirements.

134.   MCAO's duties under the Contract are to assess the appropriateness of referrals to the program and to send qualified participants to Defendant TASC.

135.   The Contract does not require the MCAO to pay Defendant TASC any money.

136.   Instead, the Contract provides that the program's participants alone will pay Defendant TASC, and "no public monies will be expended pursuant to [the Contract]."[19]

137.   The Contract does provide that, "[a]t his option, the County Attorney may utilize monies accumulated in the Drug Diversion Fund to satisfy the costs associated with this agreement if the participant is indigent and unable to pay the costs associated with the … diversion program."[20]

---

[19]  MCAO & TASC, Behavior Specific Adult Diversion Program Contract, at 1 (Mar. 22, 2016, effective through Sept. 30, 2018).

[20]  *Id.*

17

138.   But there is no requirement that MCAO make such payments. [21]

139.   Between 2006 and 2016, MCAO made nearly $15 million in fees from participants in the marijuana diversion program.[22]

140.   Defendant TASC has also benefited financially from operating the marijuana diversion program.

141.   Defendant TASC's net assets were approximately $18 million in 2016.[23]

142.   In 2014, TASC paid its CEO $281,165 and its former CEO $963,358.[24]

143.   In 2015, TASC paid its CEO $321,347.[25]

144.   In 2016, TASC paid its CEO $308,720.[26]

**Plaintiffs**

**Class Representatives Deshawn Briggs and Mark Pascale**

145.   Class representatives **Deshawn Briggs** and **Mark Pascale** were both required to remain in the pretrial diversion program for more than double the time required of similarly situated (but wealthier) participants solely because they were unable to pay program fees.

146.   Plaintiff Deshawn Briggs was arrested for simple possession of marijuana in December 2015.

147.   Mr. Briggs had no prior criminal record

148.   He was not addicted to marijuana.

149.   On or around January 13, 2016, Mr. Briggs received a letter from MCAO.

150.   The letter stated that he had two options with respect to his marijuana arrest: he could face prosecution and conviction with a punishment of two years in jail

---

[21]  The Contract states, "[U]nder no circumstances is the County liable for any fees or costs related to [the] Contract." *Id.*
[22]  Cassidy, *supra* note 4.
[23]  *See* IRS Form 990, filed by TASC for 2016, at 1.
[24]  *See* IRS Form 990, filed by TASC for 2014, at 7.
[25]  *See* IRS Form 990, filed by TASC for 2015, at 7.
[26]  *See* IRS Form 990, filed by TASC for 2016, at 7.

18

7728046

and a fine of up to $150,000 plus an 80% surcharge—or he could participate in the TASC pretrial diversion program.

151. The claims in the letter Mr. Briggs received were false.

152. Because this was Mr. Briggs' first offense, under Arizona law, he could not receive jail or prison time if convicted of simple possession of marijuana.

153. Mr. Briggs also did not face a $150,000 fine.

154. Mr. Briggs did not know that he could not receive jail time for conviction of marijuana possession since it was his first offense.

155. He also did not know that he could not be fined $150,000.

156. Mr. Briggs chose to participate in the pretrial diversion program because he did not want to go to jail and thought the diversion program was the only way to avoid two years of incarceration and a six-figure fine.

157. Mr. Briggs followed the instructions given in the letter and contacted TASC to enroll in the program.

158. A TASC employee told Mr. Briggs to appear for orientation and bring a $150 intake fee.

159. At the orientation, a TASC employee informed Mr. Briggs of the program requirements and fees.

160. The TASC employee told Mr. Briggs that he would have to submit to and pass random drug and alcohol tests for 90 days, complete a three-hour drug education class, and pay his program fees of $1000 in full within that 90-day period.

161. The TASC employee told Mr. Briggs that the program would either last for 90 days or six months.

162. The employee told him that if he tested clean, attended the class, and paid his program fees in full, then he would complete the program in 90 days.

7728046

163.    If he did not complete any of the three requirements in the first 90 days, including payment of fees in full, he would have to stay in the program for an additional three months or be prosecuted for a felony.

164.    The TASC Employee did not ask Mr. Briggs whether he would be able to pay the program and drug and alcohol testing fees.

165.    Mr. Briggs was told to sign a "statement of facts" as a condition of entry into the program.

166.    The statement of facts stated that Mr. Briggs possessed a usable quantity of marijuana.

167.    Mr. Briggs did not consult with an attorney before signing the statement because he could not afford one.

168.    Because of this, Mr. Briggs believed that if he failed to meet the program's requirements—including paying the necessary fees—he would go to jail.

169.    Mr. Briggs passed all of his drug tests during the first 90 days of the program.

170.    During that time period, Mr. Briggs was required to report for drug and alcohol testing up to three times each week.

171.    Mr. Briggs was forced to pay each time he reported for a drug and alcohol test, even though he was struggling to pay for basic necessities.

172.    Mr. Briggs also completed the required three-hour drug education seminar during his first 90 days on the program.

173.     However, in that first 90 days, Mr. Briggs could not afford to pay the $1000 fee.

174.    At the time, Mr. Briggs worked part time at a Walmart, where he made $10 an hour.

175.    His monthly pay was less than $1000.

176.   Mr. Briggs also has disabilities caused by spinal meningitis that limit his ability to work.

177.   During the first 90 days of the program, Mr. Briggs was only able to pay $421 toward the $1000 balance.

178.   Mr. Briggs made those payments in small installments.

179.   He paid one $75 installment toward his $150 orientation fee on February 29, 2016.

180.   He paid the second installment on April 14, 2016.

181.   On that same date, Mr. Briggs paid another $95 toward his balance.

182.   On May 5, 2016, Mr. Briggs paid $170 toward his balance.

183.   On May 11, 2016, he paid another $16.

184.   During that same time period, Mr. Briggs paid approximately $195 for drug and alcohol tests.

185.   Despite meeting all other program requirements, Mr. Briggs was not considered for program completion because he had not paid the $1000 fee in full.

186.   Instead, Mr. Briggs was required to remain on diversion, and remained subject to felony criminal prosecution.

187.   Mr. Briggs was also required to report to drug and alcohol testing once to three times each week.

188.   After the first 90 days on the program, Mr. Briggs reported for and passed 15 drug and alcohol tests.

189.   These additional drug and alcohol tests cost Mr. Briggs approximately $225.

190.   Mr. Briggs also continued to make payments against his balance.

191.   On June 16, 2016, Mr. Briggs paid $170.

192.   On July 14, 2016, he paid $70.

193.   On August 18, 2016, he paid $50.

21

194. Finally, on August 25, 2016, Mr. Briggs paid a final installment of $275.

195. When Mr. Briggs made this final payment, a TASC employee told Mr. Briggs that had successfully completed the program and that he should return to the TASC office the next day to receive his certificate of completion.

196. Mr. Briggs returned to the TASC offices the following day and received a certification of completion from TASC.

197. Plaintiff **Mark Pascale** is a 60-year-old man.

198. Mr. Pascale lives in Maricopa County, Arizona with his 15-year-old son, for whom he is the sole provider.

199. Mr. Pascale is disabled; he suffers from degenerative disc disease in his neck and back.

200. To manage his symptoms, Mr. Pascale takes an anti-epileptic drug, an anti-convulsant drug, and morphine every day.

201. Because of his illness, Mr. Pascale has been physically unable to work since 2008.

202. That year, Mr. Pascale filed for bankruptcy.

203. Mr. Pascale's only stable source of income comes from federal disability benefits.

204. Mr. Pascale also receives nutritional assistance benefits and, in the past, has received assistance from government programs to pay his utility bills.

205. In May 2017, a police officer found a small amount of marijuana in Mr. Pascale's car.

206. Mr. Pascale was not arrested, but he received a criminal summons in the mail in October 2017, stating that he was being charged with possession or use of marijuana, a class 6 felony.

207. At his first court appearance, Mr. Pascale agreed to enroll in the marijuana diversion program.

7728046

208.    Mr. Pascale was not addicted to marijuana.

209.    Mr. Pascale attended an orientation for the program on November 21, 2017.

210.    Mr. Pascale could not afford to pay the $150 application fee that TASC requires at orientation.

211.    A TASC employee agreed to allow Mr. Pascale to pay $75 up front instead of $150 to attend the orientation.

212.    The remaining $75 was added to Mr. Pascale's bill, and he was required to pay it before he could complete the diversion program.

213.    During the orientation, a TASC employee told Mr. Pascale that he could complete the program in 90 days if he did not fail any drug and alcohol tests and paid all required fees in full.

214.    When Mr. Pascale reported for his first mandatory drug and alcohol test, he told his case worker at TASC that he could not afford to pay the $950 in program fees.[27]

215.    He also told her that he could not afford to pay $15 or $17 for drug and alcohol testing weekly or multiple times each week.

216.    Mr. Pascale's case worker told him that there was no way to waive or reduce the program fees.

217.    However, she explained, his drug and alcohol testing fees could potentially be reduced to $7 per test instead of $15 per test.

218.    The case worker gave Mr. Pascale a financial information form to complete.

219.    On the form, Mr. Pascale marked that he was disabled and worked zero hours per week.

---

[27]  Because Mr. Pascale was not arrested, he did not have to pay the $50 booking fee.

23

7728046

220.   He listed his income as $920 per month, explaining that he received disability benefits.

221.   The case worker told Mr. Pascale that he did not qualify for reduced drug and alcohol testing fees because he owned a computer and was paying for internet service, which are "luxuries."

222.   Mr. Pascale therefore had to pay the full $15 for each required drug and alcohol test.

223.   These payments, made out of his disability income, made it difficult for Mr. Pascale to pay for basic necessities for himself and his son, including food, shelter, medication, and clothing.

224.   r. Pascale was tested at least once per week, but as often as three times per week.

225.   At least once each month, Mr. Pascale would be asked to submit to additional drug and alcohol testing because he had tested positive for opiates due to the prescription medications he takes.

226.   Mr. Pascale had provided his case worker with information and documentation about the prescription medications that he takes (including morphine), but even so, she ordered the extra testing.

227.   Mr. Pascale had to pay for these additional tests as well.

228.   Mr. Pascale frequently emphasized to his case worker that he did not have the money to pay for drug and alcohol tests.

229.   The case worker told Mr. Pascale that he had to pay in order to be tested and suggested he borrow money.

230.   Mr. Pascale often skipped paying bills to keep up with the fees.

231.   After 90 days had passed, Mr. Pascale had met all non-monetary program requirements and had never failed a drug and alcohol test.

232.   He had not, however, finished paying the $950 he owed in program fees.

7728046

233.    As a result, Mr. Pascale was required to remain on diversion until all of the fees were paid.

234.    During this time, he was still required to submit to and pay for drug and alcohol testing up to three times each week.

235.    Mr. Pascale made his final payment—and submitted to and passed his final drug and alcohol test—on June 29, 2018, more than seven months after he had entered the program.

236.    When Mr. Pascale told his case worker that he had paid his program fees in full, she told him that he had successfully completed the program and issued a certificate of completion dated July 5, 2018.

**Individual Plaintiff Taja Collier**

237.    Plaintiff Taja Collier is a 21-year-old African American woman.

238.    On October 7, 2016, Ms. Collier was riding in a car with friends when the car was pulled over by a police officer for making an improper turn.

239.    The officer searched the car's occupants and found a small cylinder in Ms. Collier's purse that contained trace amounts of marijuana.

240.    The amount of marijuana in the container was so small that the police officer did not weigh it.

241.    Ms. Collier was placed under arrest for possession of marijuana.

242.    Ms. Collier had no prior criminal record.

243.    Ms. Collier was not addicted to marijuana.

244.    In early Spring 2017, Ms. Collier received a letter from MCAO.

245.    The letter gave her two choices: she could face felony charges for marijuana possession, or she could agree to participate in the TASC diversion program.

246.    The letter warned Ms. Collier that if convicted, she could be sentenced to two years in jail and a fine of up to $150,000, plus an 80% surcharge.

247.    These threats were false.

7728046

248. Because this was Ms. Collier's first offense, under Arizona law, she could not receive jail or prison time if convicted of simple possession of marijuana.

249. Nor was Ms. Collier eligible for a $150,000 fine.

250. But Ms. Collier believed the threats in the letter.

251. She decided to enroll in the TASC diversion program because she did not want to be fined $150,000 or spend two years in prison.

252. At the time of her arrest, Mr. Collier was a sophomore at Central Arizona College, where she studied social work.

253. Central Arizona College is located in Casa Grande, Arizona, which is almost an hour away from Phoenix.

254. When Ms. Collier learned that the TASC diversion program required drug and alcohol testing in Phoenix multiple times each week, she decided she could not go back to college while she was on the TASC program.

255. Ms. Collier did not have a car or money to make such a long trip so frequently.

256. She had to stop attending school and move to Phoenix in order to participate in the diversion program.

257. Ms. Collier was told that she would need to pay $150 at the orientation in order to start the program.

258. She planned to start the program on June 22, 2017.

259. That week, however, Ms. Collier realized she would not be able to come up with the $150 required to start the program.

260. Ms. Collier had recently started a job working part-time at a Target.

261. Ms. Collier made around minimum wage and worked approximately 16 hours per week.

262. However, she had not yet received her first paycheck.

26

7728046

263.   Ms. Collier called TASC's main office to tell them that she could not afford to pay the $150 fee.

264.   No one called her back.

265.   At 6:51 a.m. on the morning her orientation was set to begin, Ms. Collier sent an email to the general email address for the possession of marijuana diversion program.

266.   The email read, "Hi, my name is Taja Collier. I called the office to reschedule my appointment 2 days ago and have not received a call back. I left a message for the corporate office and nod [sic] I'm sending this email. I had an appointment today at 8:45 and I do not have 150 because I get my first check next week. I do not want my file sent back to the court system."

267.   Later the same day, Ms. Collier reached a TASC employee by phone and rescheduled her orientation for July 6, 2017.

268.   Several days later, however, on June 25, 2017, Ms. Collier learned that she would not be paid until after July 9, 2017.

269.   Ms. Collier wrote again to the email address for the possession of marijuana diversion program and informed TASC that she needed to reschedule the orientation for after she got paid.

270.   A TASC employee rescheduled Ms. Collier's orientation for July 13, 2017.

271.   The employee did not tell her that she could start the program even if she did not pay.

272.   The employee also did not tell her that she could apply for a fee waiver or a fee reduction.

273.   On July 13, 2017, Ms. Collier paid $150 to TASC and attended the mandatory orientation.

7728046

274.    Shortly after her orientation, Ms. Collier was informed by the case manager that had been assigned to her that she had to submit to a drug and alcohol test and that she had to pay for the test in order to take it.

275.    Ms. Collier was willing to take the mandatory test, but she could not afford the $15 or $17 fee to pay for it.

276.    Ms. Collier again emailed the address for the possession of marijuana diversion program.

277.    In her email, Ms. Collier pleaded: "I won't be able to come up with the fee money until next Friday. I keep calling [my case manager] to figure out what my next steps should be. Is there anyway [sic] I can change case managers or get some assistance?"

278.    No one responded to the email.

279.    Nor did anyone call Ms. Collier to follow up.

280.    Ultimately, Ms. Collier could not take the test because she could not afford to pay for it.

281.    To pay for her drug tests going forward, Ms. Collier began to sell her own blood plasma whenever she was called to test.

282.    Whenever Ms. Collier would learn that she had a drug test, she would schedule a blood plasma sale so that she could pay for the test.

283.    Ms. Collier made $20 to $35 each time she sold her blood plasma.

284.    However, according to the blood plasma center's rules, a person is only allowed to sell blood plasma twice each week.

285.    Therefore, weeks when Ms. Collier was called to drug test more than twice were especially difficult for her to manage.

286.    After she sold her blood plasma, Ms. Collier often felt fatigued and dizzy, like she couldn't breathe or might black out.

7728046

287.   But she continued to sell her blood plasma because it was the only way she could pay for the drug tests.

288.   Ms. Collier told her case manager at TASC that she sold her blood plasma to pay for drug tests.

289.   The case manager never told her that she could take the tests without paying for them at the time of the test.

290.   The case manager also never told her that she could apply for a reduced fee.

291.   At times, even after selling her blood plasma, Ms. Collier could not afford to take drug and alcohol tests at TASC.

292.   When this happened, Ms. Collier could not take required drug and alcohol tests because she was not allowed to test if she could not pay for it.

293.   Instead, Ms. Collier would try to contact her case manager to tell her that she could not afford to pay to test.

294.   Frequently, Ms. Collier's case manager would not answer her phone or respond to emails, and Ms. Collier would try to reach her by calling TASC's corporate office.

295.   In September 2017, Ms. Collier became homeless.

296.   She remained homeless for approximately one month.

297.   While she was homeless, Ms. Collier slept in public parks.

298.   On September 20, 2017, Ms. Collier emailed her case manager.

299.   She explained, "I have been homeless for the passed [sic] week so money has been really tight. … It has been really tough."

300.   Ms. Collier also told her case manager in the email that she planned to start Job Corps and that she would be able to pay for drug and alcohol tests once she started.

301.   Ms. Collier's case manager responded five days later.

29

7728046

302. In her email, the case manager replied:

> "Sorry to hear that you are going through this. I am hoping things get better for you. I also noticed that since you are on your FINAL NOTICE, any missed test past this point will result in program termination. So I am happy to hear that you are going to do whatever is possible to test next time you are required to test. Good Luck and hope everything works out for you."

303. Again, the case manager did not suggest that Ms. Collier could take the tests without paying for them.

304. Nor did she invite her to apply for a reduced fee.

305. Shortly after this exchange, Ms. Collier was issued another violation because she did not take drug and alcohol tests solely because she could not afford to pay for them.

306. On October 10, 2017, TASC reported to MCAO that Ms. Collier had failed the diversion program.

307. In its reasons for failing Ms. Collier, TASC listed that Ms. Collier had not submitted to mandatory drug and alcohol tests.

308. As described above, Ms. Collier did not take these tests solely because she could not afford to pay for them.

309. TASC also stated that Ms. Collier was being failed because she had not paid the required TASC fee and had not paid the required drug fund assessment fee.[28]

---

[28] In addition, TASC stated that Ms. Collier had not attended the program's mandatory seminar. However, participants are required to take this seminar before they can successfully complete the program; they are not required to take it at a specific time. Ms. Collier would not have been failed from the diversion program solely because she had not yet completed the seminar. The only other reason TASC provided for failing Ms. Collier was that she did not respond to a non-compliance letter she received on August 7, 2017. But Ms. Collier was in contact with her case manager after receiving this letter and explained that she could not afford to pay for drug and alcohol tests. In addition, TASC does not have a policy, practice, or custom of failing diversion participants who do not respond to a letter.

30

310.    On December 8, 2017, MCAO filed felony charges against Ms. Collier for possession of marijuana.

311.    Ms. Collier's preliminary hearing was on January 22, 2018.

312.    On that same date, Ms. Collier agreed to re-enroll in the TASC possession of marijuana diversion program.

313.    Ms. Collier's prosecution was suspended for two years to allow her to complete TASC.

314.    Ms. Collier knew that she would struggle to pay for diversion.

315.    But she decided to re-enroll because—based on the false threats in the letter that she received from MCAO—she believed that she would go to jail if she did not complete diversion.

316.    To re-enter the program, Ms. Collier was again required to pay the $150 admissions fee.

317.    Ms. Collier paid $148 toward that amount on March 13, 2018.

318.    Ms. Collier paid the remaining $2 on May 24, 2018.

319.    Since that time, Ms. Collier has made payments of between $8 and $20.

320.    Ms. Collier still must pay $667 to TASC before she can complete the program.

321.    Ms. Collier is still required to submit to drug and alcohol testing—at $15 or $17 per test—one to three times each week.

322.    TASC still will not allow Ms. Collier to complete drug and alcohol tests unless she pays for them.

323.    Ms. Collier therefore continues to sell her blood plasma whenever she knows she is going to be drug tested so that she can pay for the tests.

324.    On August 17, 2018, Ms. Collier sent an e-mail to her case manager.

325.    Ms. Collier wrote:

> "Tasc has really been putting a big strain on my pockets. …
> I am very concerned that I will end up homeless again

7728046

trying to sacrifice rent for tasc as this is putting Me [sic] in a bad space. I have been donating plasma whenever I have to test to get the money I need to pay for it, but I am afraid it is affecting my health. I am willing to test whenever I'm required but I cannot afford the fees. Is there anyway [sic] that I can test without having to pay for it?"

326.    Ms. Collier's case worker replied, "You have to pay for the program in order to complete the program.  I understand that this is cost effective [sic] but in order for you to have you [sic] felony dismissed with prejudice you will have to complete all program requirement [sic] which includes paying all fees associated with the program."[29]

## CLASS ACTION ALLEGATIONS

327.    The named Plaintiffs bring this case as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

328.    The Class is defined as: All people who, since August 23, 2016, and until the trial of this case, (1) were enrolled in the marijuana diversion program operated by Defendants TASC and MCAO; (2) satisfied all program requirements in the first 90 days of the program other than payment of program fees; and (3) were not considered for successful completion after 90 days solely because they were unable to pay the required fees.

329.    The class members are readily ascertainable: the names and relevant records of the class members are in Defendants' possession.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

330.    On information and belief, the Class includes at least several hundred members.

---

[29]  In her response, the case worker also suggested that Ms. Collier could apply for insurance to alleviate the costs of one of the mandatory treatment classes. This would do nothing to relieve the costs of program fees or the fees for drug and alcohol tests.

7728046

331.    During the 2017 fiscal year (July 1, 2016 through July 30, 2017), there were 2687 admittances to the possession of marijuana diversion program.

332.    The marijuana diversion program has maintained similar numbers of admittances in its last several years of operation.

333.    Therefore, there were likely at least 2500 admittances in the 2018 fiscal year.

334.    Thus, if even a small percentage of the people admitted to TASC since August 23, 2016 meet the requirements for the Class, the Class would number in the hundreds.

335.    Moreover, on information and belief, a large majority of those arrested and prosecuted for marijuana possession in Maricopa County are deemed indigent for the purposes of appointment of counsel.

**Commonality: Fed. R. Civ. P. 23(a)(2)**

336.    The Class members' claims raise common issues of fact and law.

337.    Those common questions include, but are not limited to:

a.   Whether Defendants have a policy, practice, and custom of refusing to consider diversion participants for program completion after 90 days and beyond solely because they cannot afford to pay the required fees, without inquiring into those participants' ability to pay;

b.   Whether Defendants have a policy, practice, and custom of requiring diversion participants who have not paid the required fees to remain on diversion supervision until they have done so, without inquiring into those participants' ability to pay;

c.   Whether Defendants' diversion extension policies (in subparagraphs (a) and (b)) violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution;

7728046

d.  Whether Defendants have a policy, practice, and custom of requiring diversion participants who remain on diversion solely due to inability to pay to continue to submit to and pay for random drug and alcohol tests; and

e.  Whether Defendants' policy of continuing this mandatory drug and alcohol testing for participants who remain on the diversion program solely due to inability to pay violates the Fourth Amendment to the U.S. Constitution.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

338.   The Named Plaintiffs' claims are typical of the claims of the members of the Class, and they have the same interests in this case as all other members of the Class that they represent.

339.   The determination whether the Defendants' scheme of policies, practices, and customs is unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other class member.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

340.   Named Plaintiffs are capable of fairly and adequately protecting the interests of the Class because Named Plaintiffs do not have any interests antagonistic to the Class.

341.   There are no known conflicts of interest among class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

342.   Plaintiffs' counsel are experienced in civil rights litigation and have successfully litigated a number of civil rights class action cases.

343.   Many of those cases, like this one, involve unconstitutional penalties based solely on wealth status.

34

**Fed. R. Civ. P. 23(b)(3)**

344.    Class treatment under Rule 23(b)(3) is appropriate because the common questions of law and fact overwhelmingly predominate in this case.

345.    For every Named Plaintiff, as well as for the members of the Class, this case turns on what the Defendants' policies and practices are and on whether those policies are lawful.

346.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Class.

347.    Moreover, the question of liability can therefore be determined on a class-wide basis.

348.    To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was subjected to the unlawful scheme and the amount of money coerced from them.

349.    Determining damages for individual class members can thus typically be handled in a ministerial fashion based on easily verifiable records in the Defendants' possession.

350.    If need be, individual hearings on class members' specific damages based on special circumstances and particular hardships caused by Defendants' scheme can be held after class-wide liability is determined.

## CLAIMS FOR RELIEF

### Count One: Wealth-Based Discrimination in Violation of the Fourteenth Amendment

*Brought under 42 U.S.C. § 1983 by Named Plaintiffs Deshawn Briggs and Mark Pascale on behalf of themselves and all others similarly situated against all Defendants for damages; and by Plaintiff Taja Collier on her own behalf against Defendant TASC for injunctive relief.*

351.    Defendants, acting in concert under color of state law, enacted, enforced, and continue to enforce a policy, practice, and custom of subjecting diversion

participants to longer terms of diversion supervision, which include in-person reporting, drug and alcohol testing requirements, and increased payments, solely because of their inability to pay fees associated with the program.

352.   This policy, practice, and custom of penalizing individuals based solely on wealth status violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution.

353.   As a direct and proximate cause of Defendants' unlawful policy, practice, and custom, Plaintiffs have suffered violations of their constitutional rights and thus are entitled to compensatory damages for their injuries.

354.   Defendant TASC's actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiffs' constitutional rights. Accordingly, Plaintiffs are entitled to recover punitive damages—in addition to compensatory damages—against Defendant TASC.

355.   Plaintiff Collier is still a participant in Defendants' diversion program and cannot afford to pay the fees required to successfully complete the program.

356.   Ms. Collier seeks to enjoin Defendant TASC from forcing her to remain on diversion solely because she cannot afford to pay the fees necessary to successfully complete the diversion program.

**Count Two: Unreasonable Searches and Seizures in Violation of the Fourth and Fourteenth Amendments**

*Brought under 42 U.S.C. § 1983 by Named Plaintiffs Deshawn Briggs and Mark Pascale on behalf of themselves and all others similarly situated against all Defendants for damages; and by Plaintiff Taja Collier on her own behalf against Defendant TASC for injunctive relief.*

357.   Defendants, acting in concert under color of state law, enacted, enforced, and continue to enforce a policy, practice, and custom of requiring urinalysis to test for drug and alcohol consumption for individuals who remain on the marijuana diversion program solely because they were unable to pay the required fees.

36

7728046

358.    This policy, practice, and custom violates the right to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution.

359.    As a direct and proximate cause of Defendants' unlawful policy, practice, and custom, Plaintiffs have suffered violations of their bodily liberty and integrity and are entitled to compensatory damages for their injuries.

360.    Defendant TASC's actions were knowing, willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiffs' constitutional rights. Accordingly, Plaintiffs are entitled to recover punitive damages—in addition to compensatory damages—against Defendant TASC.

361.    Plaintiff Collier is still a participant in Defendants' diversion program and cannot afford to pay the fees required to successfully complete the program.

362.    Plaintiff Collier therefore requests that this Court enjoin Defendant TASC from requiring her to take drug and alcohol tests solely because she cannot afford to pay the fees necessary to successfully complete the diversion program.

### Count Three: Wealth-Based Discrimination in Violation of the Fourteenth Amendment

*Brought under 42 U.S.C. § 1983 by Plaintiff Taja Collier on her own behalf against all Defendants for damages and against Defendant TASC for injunctive relief.*

363.    Defendants, acting in concert under color of state law, enacted, enforced, and continue to enforce a policy, practice, and custom of not allowing participants in Defendants' diversion program to complete drug and alcohol tests unless those participants can pay for them at the time of the test.

364.    Defendants, acting in concert under color of state law, also enacted, enforced, and continue to enforce a policy, practice, and custom of failing participants from the program because those participants were not permitted to take drug and alcohol tests solely because they were unable to afford them.

7728046

365.    These policies, practices, and customs penalized Plaintiff Collier based solely on her wealth status in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution.

366.    As a direct and proximate cause of Defendants' unlawful policies, practices, and customs, Plaintiff Collier suffered violations of her constitutional rights and thus is entitled to compensatory damages for her injuries.

367.    Defendant TASC's actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiff Collier's constitutional rights. Accordingly, she is entitled to recover punitive damages—in addition to compensatory damages—against Defendant TASC.

368.    Plaintiff Collier is still a participant in Defendants' diversion program and cannot afford to pay the program's fees or the fees required to take drug and alcohol tests.

369.    Plaintiff Collier therefore seeks to enjoin Defendant TASC from refusing to allow her to take drug and alcohol tests solely because she is unable to pay for them.

370.    Plaintiff Collier also seeks to enjoin Defendant TASC from terminating her from the diversion program because she did not take drug and alcohol tests solely because she could not afford them.

### REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs demand a jury trial for all issues so appropriate and request this Court to issue the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Named Plaintiffs Deshawn Briggs and Mark Pascale as representatives of the Class and Named Plaintiffs' counsel as counsel for the Class;

7728046

B.      A judgment compensating the Plaintiffs and the Class of similarly situated individuals for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct in an amount to be determined at trial;

C.      A judgment granting the punitive damages authorized by statute based on Defendant TASC's willful and egregious violations of the law;

D.      A judgment enjoining Defendant TASC from further unconstitutional conduct against Plaintiff Taja Collier;

E.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964; and

F.      Such other and further relief as the Court deems just and proper.

DATED this 23rd day of August, 2018.

OSBORN MALEDON, P.A.


By s/ Joshua D. Bendor
Timothy J. Eckstein
Joshua D. Bendor
2929 N. Central Ave., Suite 2100
Phoenix, Arizona  85012-2793


CIVIL RIGHTS CORPS

A. Dami Animashaun* (pro hac vice application to be filed)
Katherine Chamblee-Ryan** (pro hac vice application to be filed)
910 17th Street NW, Second Floor
Washington, D.C. 20002

Attorneys for Plaintiffs

*Admitted to practice solely in New York. Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c), with supervision by Alec Karakatsanis, a member of the D.C. Bar.

**Admitted to practice in New York, Georgia, and Alabama. Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c), with supervision by Alec Karakatsanis, a member of the D.C. Bar.

7728046