**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs, et al., | No. CV-18-02684-PHX-EJM |
| Plaintiffs, | **ORDER** |
| v. | |
| William Montgomery, et al., | |
| Defendants. | |

Pending before the Court are Defendants Maricopa County and Maricopa County Attorney William Montgomery's Motion to Dismiss (Doc. 34) and Defendant Treatment Assessment Screening Center, Inc.'s Motion to Dismiss (Doc. 36). All appropriate responses and replies have been filed, and the Court heard oral arguments from the parties on May 22, 2019. For the reasons explained below, the Court will deny the motions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed their first amended class action complaint ("FAC") on October 12, 2018. (Doc. 20). Plaintiffs allege civil rights claims pursuant to 28 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution and seek monetary damages and injunctive relief. Plaintiffs are four named individuals who represent themselves and a class of similarly situated people. *Id.* at 6–7. Plaintiffs' allegations concern a marijuana deferred prosecution program ("MDPP" or "the program") operated by the Maricopa County Attorney's Office ("MCAO") and Treatment Assessment Screening Center ("TASC"). *Id.* ¶ 47. Plaintiffs also allege Defendant Bill Montgomery,

1    the elected County Attorney ("CA") for Maricopa County, is liable in his official capacity

2    for his role in operating and administering the diversion program, and that Montgomery is

3    the final policymaker for Maricopa County on matters relating to diversion programs. *Id.*

4    ¶ 45.

5        Plaintiffs allege that Defendants "jointly operate a possession of marijuana

6    diversion program that penalizes the poor because of their poverty." *Id.* ¶ 1. Specifically,

7    Plaintiffs' complaint alleges that:

> 7. The length of time a person spends in the diversion program and whether the person ultimately completes the program and avoids felony criminal prosecution depends on whether she can pay the program's required fees.
>
> 8. In order to complete the program and avoid felony criminal prosecution, participants in the marijuana diversion program must pay a fee of $950 or $1000.
>
> 9. Participants must also pay $15 or $17 for each drug and alcohol test; they may be required to take as many as three or four tests each week.
>
> 10. The program is two-tiered: people who meet program requirements—completing a three-hour drug education seminar and routine drug and alcohol testing—and are wealthy enough to pay the $950 or $1000 program fee complete the program in 90 days and are no longer subject to felony criminal prosecution.
>
> 11. But participants who cannot pay the program fees are forced to stay in the program for at least six months and until they can pay off the money owed to MCAO and TASC, even if they have satisfied every program requirement other than payment.
>
> 12. During the "pay-only" period, participants remain subject to felony criminal prosecution during the additional time they are forced to remain in the diversion program.
>
> 13. These participants also remain subject to all of the diversion program's requirements.
>
> 14. These requirements include reporting to a TASC location, as often as four times per week, so that the participant's urine can be collected and tested.
>
> 15. Participants who remain on diversion solely because of their inability to pay program fees must also continue to pay $15 or $17 each time they are required to submit to a drug and alcohol test.

16. The perverse result is that poor people are ultimately charged more money—potentially hundreds of dollars more—than similarly situated participants who can afford to pay to finish the program in 90 days.

17. Participants who cannot afford to pay for diversion may also be terminated from the program altogether and referred for felony prosecution.

18. This can happen in at least two ways.

19. First, Defendants require diversion participants to make a minimum monthly payment towards the $950 or $1000 program fees at a rate set by Defendant TASC.

20. A participant who fails to pay the minimum monthly payment set by Defendant TASC can be terminated from the program and prosecuted.

21. Defendants do not inquire into a participant's ability to pay before setting the minimum monthly fee.

22. Defendants' policy does not include any exception for participants who do not pay the minimum monthly amount solely because they cannot afford it.

23. Second, participants are not allowed to take the drug and alcohol tests the program requires if they cannot afford to pay for them.

24. For example, if a participant cannot pay the $15 or $17 fee for a drug and alcohol test, she is not allowed to take the test at all.

25. Therefore, if a participant reports for a drug and alcohol test without the required fee, she will be turned away, and she will receive a violation for missing the test.

26. In other words, an unpaid drug and alcohol test is a failed test.

27. If a participant misses too many drug and alcohol tests—even if she missed them solely because she could not afford to pay for them—she will be failed out of the diversion program and prosecuted for felony possession of marijuana.

28. Defendants enforce these policies even when they know that diversion participants are poor or even homeless, and even when they know that participants are sacrificing basic necessities to pay fees.

. . .

30. Diversion participants who alert TASC employees that they cannot afford the required fees are told that they will be failed from the program if they do not pay and to do whatever it takes

- 3 -

to get the money.

*Id.* at 2–5 (footnote omitted).

Plaintiffs state five claims for relief: 1) wealth-based discrimination in violation of the Fourteenth Amendment by Plaintiffs Briggs and Pascale and others similarly situated against all Defendants for monetary damages; 2) wealth-based discrimination in violation of the Fourteenth Amendment by Plaintiff Stephens and others similarly situated against all Defendants for injunctive relief, and by Plaintiff Collier on her own behalf against Defendant TASC for injunctive relief; 3) wealth-based discrimination in violation of the Fourteenth Amendment by Plaintiff Collier against all Defendants for damages and against Defendant TASC for injunctive relief; 4) unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments by Plaintiffs Briggs and Pascale and others similarly situated against all Defendants for damages; and 5) unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments by Plaintiff Stephens and others similarly situated against all Defendants for injunctive relief, and by Plaintiff Collier on her own behalf against Defendant TASC for injunctive relief. (Doc. 20 at 47–51).

On November 20, 2018 Defendant TASC filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 36). TASC alleges that: "(1) TASC cannot be liable for any of the harm Plaintiffs allege; (2) even if TASC could be liable to Plaintiffs, Plaintiffs' substantive claims (alleging violations of the Fourth and Fourteenth Amendments) fail as a matter of law; and (3) even if Plaintiffs had a substantive claim for relief, Plaintiff Briggs' claims are time-barred." *Id.* at 1. TASC further states that at a minimum, Plaintiffs should be required to amend their complaint to clarify their claims and eliminate immaterial allegations in compliance with Fed. R. Civ. P. 8. *Id.*

Also on November 20, 2018, Defendants Maricopa County and William Montgomery ("the County Defendants") filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Doc. 34). The County Defendants allege that dismissal is warranted for the following reasons:

(1) Because the County Attorney acts as a State official, not a

County official, when he establishes and implements a marijuana deferred prosecution program, Plaintiffs' § 1983 *Monell* liability claims/requests for relief against the County and County Attorney must be dismissed [Counts 1–5];

(2) 11th Amendment sovereign immunity bars § 1983 damages claims against the County Attorney in his capacity as a State official; further, the County Attorney in his capacity as a State official is not a "person" for purposes of § 1983. Plaintiffs' § 1983 damages claims against him thus must be dismissed [Counts 1, 3 and 4];

(3) Because the County Attorney's policies and practices in establishing and implementing a marijuana deferred prosecution program are prosecutorial functions, absolute prosecutorial immunity bars Plaintiffs' § 1983 damages claims against the County Attorney [Counts 1, 3 and 4], requiring concomitant dismissal of Plaintiffs' redundant § 1983 damages claims asserted against the County;

(4) Plaintiff Briggs' claims [Counts 1 and 4] are statutorily time-barred; and

(5) For the reasons set forth in Part IV of TASC's Motion to Dismiss, Plaintiffs fail to state claims for relief for alleged wealth discrimination under the 14th Amendment's Due Process and Equal Protection Clauses or for alleged unreasonable search and seizure under the 4th Amendment, as a matter of law [Counts 1–5].

*Id.* at 1.[1] The County Defendants join in parts IV and V of Defendant TASC's motion to dismiss. *Id.*

## II.   STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 12(b)(6), the Court may grant a motion to dismiss when the plaintiff fails to state a claim upon which relief can be granted. A complaint must contain a "short and plain statement of the grounds for the court's jurisdiction," a "short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought." Fed. R. Civ. P. 8(a). While Rule 8 does not demand factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

---

[1] The County Defendants later withdrew their absolute prosecutorial immunity argument. *See* Doc. 81.

A dismissal for failure to state a claim "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (internal citation omitted); *see also Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (Rule 12(b)(6) dismissal motion "can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim."). However, "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To survive a motion to dismiss under Rule 12(b)(6), a pleading must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim must be plausible, allowing the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Ashcroft*, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

"In adjudicating a Rule 12(b)(6) motion to dismiss, . . . a court does not resolve factual disputes between the parties on an undeveloped record. Instead, the issue is whether the pleading states a sufficient claim to warrant allowing the [plaintiffs] to attempt to prove their case." *Coleman v. City of Mesa*, 230 Ariz. 352, 363 (2012); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)"), *overruling on other grounds recognized by Jack Loumena v. Walter P. Hammon,* 2015 WL 7180679 (N.D. Cal. Nov. 16, 2015). Thus, Defendants' motions do not require the Court to make factual determinations regarding Plaintiffs' indigency, or whether Plaintiffs have proved that Defendants have a policy or policies that unconstitutionally discriminate

against indigents. The Court only considers whether Plaintiffs have sufficiently stated their claims to justify allowing those claims to move forward.

The Court must view the complaint in the light most favorable to the nonmoving party, with every doubt resolved on his behalf, and with that party's allegations taken as true. *See Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir. 1990). Generally, the court only considers the face of the complaint when deciding a motion under Rule 12(b)(6). *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). Consideration of matters outside the pleading converts the Rule 12(b)(6) motion to a Rule 56 motion for summary judgment, unless one of two exceptions are met:

> First, a court may consider material which is properly submitted as part of the complaint on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity . . . is not contested and the plaintiff's complaint necessarily relies on them. Second, under Fed. R. Evid. 201, a court may take judicial notice of matters of public record.

*Lee*, 250 F.3d at 688–89 (internal quotations and citations omitted); *see also Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("documents not attached to a complaint may be considered if no party questions their authenticity and the complaint relies on those documents."). The Court "may take judicial notice of court filings, as they are matters of public record, and '[i]t is also well established that a federal district court can take judicial notice of its own records.'" *Baca ex rel. Nominal Defendant Insight Enterprises, Inc. v. Crown*, 2010 WL 2812712, at *2 (D. Ariz. July 12, 2010) *aff'd sub nom. Baca v. Crown*, 458 F. App'x 694 (9th Cir. 2011) (citations omitted). "[While a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment . . . a court may not take judicial notice of a fact that is subject to reasonable dispute." *Lee*, 250 F.3d at 689. Here, the Court previously ruled that it shall take judicial notice of Exhibits B–F attached to the County Defendants' motion to dismiss and that by so doing the Court does not convert the motion to dismiss into a motion for summary judgment.

## III.    DISCUSSION

Plaintiffs seek relief pursuant to 28 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). "Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "To prevail on a claim under § 1983, a plaintiff must show that (1) acts by the defendants, (2) under color of state law, (3) deprived him of federal rights, privileges, or immunities, and (4) caused him damage." *Platt v. Moore*, 2018 WL 2058136, at *2 (D. Ariz. Mar. 15, 2018) (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005)), *appeal filed* April 12, 2019.

Plaintiffs' claims concern a class of persons that Plaintiffs refer to as "pay-only participants"[2]—persons who cannot afford to pay the MDPP fee within 90 days and are required to stay on the program longer. Plaintiffs challenge three policies that apply to indigent diversion program participants and allegedly caused the constitutional violations at issue in this suit:

> 1) participants who are unable to pay minimum monthly payments or fees for mandatory urine tests are terminated from the program (the "wealth-based termination policy"); 2) participants who cannot afford to pay the program fees in 90 days are subject to longer terms of intrusive supervision than similarly-situated participants who are able to pay (the "wealth-based extended supervision policy"); and 3) participants who are supervised in the program solely due to their inability to pay program fees are subject to routine suspicionless urine testing for drugs and alcohol (the "wealth-based extended urine testing policy").

(Doc. 45 at 3–4) (internal citations omitted).

### A. Defendant Treatment Assessment Screening Center, Inc.'s Motion to Dismiss

#### i.  Policy, Decision, or Custom

---

[2] "'Pay-only' refers to a period of criminal supervision during which the person is supervised only because she has not paid all of her debt." (Doc. 20 at 3 n.6).

- 8 -

TASC first argues that it cannot be liable as an entity because it has not established any policies that Plaintiffs may be challenging. TASC further states that Plaintiffs have failed to allege any facts regarding policies that TASC adopted, or any custom that TASC had the discretion to implement, that is so persistent and widespread that it became a permanent and well-settled entity policy. (Doc. 36 at 7).

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court held that local governments and local government officials sued in their official capacity are "persons" for purposes of § 1983 and may be held liable for constitutional violations arising from a government policy or custom. In *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012), the Ninth Circuit held that *Monell* also applies to suits against private entities. "To create liability under § 1983, the constitutional violation must be caused by a policy, practice, or custom of the entity, or be the result of an order by a policy-making officer." *Id.* at 1139 (internal quotations and citations omitted); *Monell*, 436 U.S. at 690–91 (local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.").

Thus, to state a claim against TASC under *Monell* and *Tsao*, Plaintiffs must show that (1) TASC acted under color of state law, and (2) that the alleged constitutional violation was caused by a policy or custom. *Tsao*, 698 F.3d at 1139. The Court finds that Plaintiffs have pled enough facts to state a claim for entity liability against TASC sufficient to survive a motion to dismiss.

First, Plaintiffs have sufficiently pled that TASC acted under color of state law via its agreement with MCAO to operate the MDPP.[3] The FAC alleges that MCAO and TASC

---

[3] The court considers four tests to determine "whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion

jointly operate the MDPP, that TASC has a contract with MCAO to operate, administer, and supervise the program, and that TASC supervises all people whose prosecutions for simple possession of marijuana have been diverted. (Doc. 20 ¶¶ 1, 47, 67).

The second thing that Plaintiffs must show is that TASC had a policy, custom, or pattern that was the actionable cause of Plaintiffs' injuries. *Tsao*, 698 F.3d at 1143. A policy may be either formal or informal: "'Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Monell*, 436 U.S. at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)). As this Court explained in *Milke v. City of Phoenix*, 2016 WL 5339693, at *15 (D. Ariz. Jan. 8, 2016),

> An informal policy . . . exists when a plaintiff can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law. To be viable, a plaintiff must do more than point to a single constitutional deprivation, a random act, or an isolated event. Instead, a plaintiff . . . must show a pattern of similar incidents in order for the factfinder to conclude that the alleged informal policy was so permanent and well settled as to carry the force of law.

(internal quotations and citations omitted). Thus, even if TASC does not have an official policy, liability may be established "by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Here, the FAC alleges both formal and informal policies. Plaintiffs specifically reference the MDPP client contract, which includes a provision stating that program participants may be terminated and referred for prosecution for failure to pay the program fees or failure to test as scheduled. (Doc. 20 ¶¶ 139, 140). The FAC also alleges informal

---

test; and (4) the governmental nexus test." *Tsao*, 698 F.3d at 1140 (internal quotations and citation omitted). Because neither party argues this point, the Court will not address it further here.

policies or practices: no one at TASC assesses a person's ability to pay before referring the person back for prosecution because they could not pay for urine tests; no one at MCAO assesses ability to pay before prosecuting people who have failed diversion solely because of their inability to pay; Defendants do not waive the program fee for anyone regardless of financial circumstances; and Defendants contend that they allow for reduced fees for urine screens, but in practice these reductions are almost never granted. (Doc. 20 at ¶¶ 151–154).

Accordingly, the Court rejects TASC's argument that Plaintiffs have failed to plead a persistent and widespread custom or practice such that it constitutes a permanent and well-settled entity policy. (Doc. 36 at 8–9). TASC notes that neither Briggs nor Stephens have alleged that they made any statements to TASC regarding their alleged inability to pay; Pascale states that TASC deferred payment for his orientation fee and found him ineligible for a reduction in testing fees; and Collier is the only plaintiff who alleges she told TASC she could not pay and was not invited to apply for a reduction or waiver. TASC contends that these allegations are insufficient to establish a persistent and widespread practice. However, Plaintiffs state that they are not arguing that the indigent are entitled to fee waivers; they are challenging TASC's policies of requiring program participants to remain on the program longer when they cannot afford to pay the program fee, and the requirement that pay-only participants must also continue to pay for additional urine screenings as long as they do remain on the program. Further, Plaintiffs are seeking to have this matter certified as a class action. While the existence of a persistent and widespread practice, policy, or custom will require discovery for Plaintiffs to prove their claims and to establish a class, at this early stage in the proceedings, the FAC states sufficient allegations to survive a motion to dismiss. *See Milke*, 2016 WL 5339693 at *18 ("A *Monell* claim must be based on more than 'a single constitutional deprivation, a random act, or an isolated event.' There must be 'a pattern of similar incidents.'" (quoting *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015)).

Finally, the Court rejects TASC's argument that it has no authority to establish policies regarding the development or implementation of the MDPP because deferred

prosecution programs are established by the state legislature and the Arizona Prosecuting Attorneys' Advisory Council ("APAAC") establishes the program guidelines. (Doc. 36 at 8). These issues are discussed further below in the County Defendants' motion to dismiss, but the Court notes that Plaintiffs do not challenge the establishment of the program generally—Plaintiffs challenge the three specific policies detailed above, and Plaintiffs have pled that none of these policies were set by state law—they were jointly enacted by the CA/MCAO and TASC.[4]

Accordingly, accepting Plaintiffs' allegations as true, as the Court must on a motion to dismiss, Plaintiffs have sufficiently pled a § 1983 claim for entity liability against TASC based on the three challenged policies.

### ii. Qualified Immunity

TASC alternatively argues that because Plaintiffs cannot bring a claim for entity liability against it, to the extent Plaintiffs assert an individual claim against it, TASC is shielded by qualified immunity. Plaintiffs contend that qualified immunity does not apply because qualified immunity only protects individual employees, not corporate entities like TASC.

"Qualified immunity is an immunity from suit." *Trevino v. Gates*, 99 F.3d 911, 916 (9th Cir. 1996). It "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme Court has "described the doctrine's purposes as protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Richardson v. McKnight*, 521 U.S. 399, 407–08 (1997) (internal quotations and citation omitted).

---

[4] TASC further alleges that the CA is the final policymaker for Maricopa County on matters relating to diversion programs, and because the CA acts on behalf of the State, Plaintiffs' allegations concern State policies. (Doc. 36 at 8). This argument is addressed in section B(i) below.

Here, TASC relies on the Supreme Court's decision in *Filarsky v. Delia*, 566 U.S. 377 (2012) for its argument that qualified immunity extends to non-government employees working in close proximation with public employees. In *Filarsky*, the Court held that a private attorney temporarily retained by the city was entitled to seek qualified immunity. 566 U.S. 377. The Court found that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis[,]" and noted that "[a]ffording immunity not only to public employees but also to others acting on behalf of the government similarly serves to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." *Id.* at 389–90 (internal quotations and citations omitted). The Court also distinguished its prior decision in *Richardson*, 521 U.S. 399, where it held that guards employed by a privately-run prison facility were not entitled to seek qualified immunity. The Court explained that "*Richardson* was a self-consciously 'narrow[ ]' decision" and "was not meant to foreclose all claims of immunity by private individuals." *Filarsky*, 566 U.S. at 393. Rather, "the particular circumstances of that case—'a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms'—combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under § 1983." *Id.* (quoting *Richardson*, 521 U.S. at 413).

The Court finds that this case is more like *Richardson* than *Filarsky*. Here, like in *Richardson*, "the most important special government immunity-producing concern— unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a [deferred prosecution program]." *Richardson*, 521 U.S. at 409. "In other words, marketplace pressures provide [TASC] with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id.* at 410. Further, TASC is a private entity that entered into a contract with Maricopa County to "assume a major lengthy

administrative task . . . with limited direct supervision by the government" and undertook that task for profit and likely in competition with other providers of drug rehabilitation services. *See also Halvorsen v. Baird*, 146 F.3d 680, 685–86 (9th Cir. 1998) (finding that private firm providing municipality with involuntary commitment services for inebriates was not entitled to qualified immunity under *Richardson* and noting that whether a firm is for-profit or not-for-profit is immaterial because both compete for municipal contracts and both have incentives to display effective performance). This case is clearly unlike *Filarsky*, where the Supreme Court found qualified immunity for a private attorney retained by the city for a limited period of time to assist with one aspect of an investigation.[5]

The Court also notes that Plaintiffs' claims are against TASC as an entity, not individual TASC employees. The Ninth Circuit has specifically rejected an expansion of *Filarsky* to include immunity for all service contractors. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016). In *Gomez*, the court noted that *Filarsky* "did not establish any new theory," and although it provided a broad reading of qualified immunity, it was "applicable only in the context of § 1983 qualified immunity from personal tort liability[,]" and thus was not available for Telephone Consumer Protection Act claims against the defendant company. *Id.* at 881. The court emphasized that "[w]here immunity lies, an injured party with an otherwise meritorious tort claim is denied compensation, which contravenes the basic tenet that individuals be held accountable for their wrongful conduct. Accordingly, immunity must

---

[5] TASC also relies on *Filarsky's* reasoning that:

> Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct . . . Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity.

566 U.S. at 391. This is of no moment, however, because Plaintiffs' claims are against TASC and the County Defendants as entities, not individual employees. And, as discussed further in section B below, the Court finds that the CA acted for the county, not the state, and that Plaintiffs have sufficiently pled a *Monell* claim against the county.

- 14 -

be extended with the utmost care." *Id.* at 882 (internal quotations and citation omitted).

The Court also finds the other cases TASC relies upon distinguishable. In *Young v. Cty. of Hawaii,* 947 F. Supp. 2d 1087 (D. Haw. 2013), *aff'd,* 578 F. App'x 728 (9th Cir. 2014), the court held that a humane society officer qualified for qualified immunity where the humane society was an independent contractor hired by the county to carry out its animal control program. The court noted that "private defendants are not covered by immunity unless 'firmly rooted tradition' and 'special policy concerns involved in suing government officials' warrant immunity." *Id.* (quoting *Richardson,* 521 U.S. at 404). In *Young,* the officer was "duly appointed by law to execute search warrants and perform law enforcement functions like those of the police." *Id.* at 1108. Further, special policy concerns supported granting immunity because "[a]nimal control officers, like police officers, should be encouraged to perform their public duties without 'unwarranted timidity' that may decrease their effectiveness in responding to public danger." *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 814 (1982)). The court also distinguished the special policy concerns at issue in *Richardson,* noting that there, "the prison performed its task 'independently, with relatively less ongoing direct state supervision[,]' . . . [and s]uch freedom allowed the private contractor prison to respond to market pressures to adjust employee behavior." *Id.* at 1109. In contrast, in *Young,* there was "close government collaboration and supervision that restrict[ed] [the humane society's] ability to respond as a private firm to market pressures." *Id.* Accordingly, the court concluded that the officer was protected by qualified immunity because of the police department's collaboration with the humane society and its supervision over the humane society's work. *Id.*[6]

In the present case, there is no "firmly rooted tradition" that would support extending qualified immunity to TASC as a private entity operating a diversion program— TASC is not performing a traditional prosecutorial function of determining who to

---

[6] Defendants also cite *Fabrikant v. French,* 691 F.3d 193 (2d Cir. 2012) (court found private animal rescue organization and its employees acted under color of state law and were entitled to qualified immunity) and *Herrera v. Santa Fe Pub. Sch.,* 41 F. Supp. 3d 1027 (D. N.M. 2014) (court applied qualified immunity to private school security company based on Tenth Circuit precedent), but both are out of circuit cases that are not binding on this Court.

prosecute; it is carrying out the day to day operations of the program. Further, there is no evidence of "close government collaboration and supervision" by the county defendants over TASC's work. TASC's main argument in its motion is that none of the three policies that Plaintiffs challenge exist, and if they do, the responsibility falls on the shoulders of the CA. But there is no evidence before the Court at this time suggesting that the CA closely supervises TASC in its day to day operations, such as meeting with program participants, collecting payments, or administering urine screens.

In sum, the Court finds that the FAC states claims against TASC as a private entity, not individual TASC employees, making qualified immunity inapplicable here. Further, the principles that supported an extension of qualified immunity in *Filarsky* and *Young* are not present here.

### iii. Punitive Damages Claim

TASC contends that even if Plaintiffs could state a claim against it, the Court should strike the punitive damages claim based on *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). In *Newport*, the Supreme Court held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." 453 U.S. at 271. The Court notes that TASC fails to make a meaningful argument on this point and simply cites *Newport* without any explanation. Plaintiffs maintain that punitive damages are warranted and that *Newport* is inapplicable to cases of private entity liability.

Based on TASC's lack of argument on this issue, and because this case is still in the early stages and discovery may reveal evidence sufficient to warrant a punitive damages award, the Court declines to dismiss Plaintiff's punitive damages claim at this time. *See Arredondo v. Ortiz*, 365 F.3d 778, 781 (9th Cir. 2004) ("Normally we decline to address an issue that is simply mentioned but not argued.").

### iv. Failure to State a Claim

#### a. *Wealth discrimination*

TASC argues that Plaintiffs fail to state a claim for wealth-based discrimination under the Fourteenth Amendment because the indigent are not a suspect class and wealth

is not a fundamental right.

"The Due Process Clause of the Fourteenth Amendment imposes procedural constraints on governmental decisions that deprive individuals of liberty or property interests." *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1190 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016). "Thus, the first question in any case in which a violation of procedural due process is alleged is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest." *Id.* at 1190–91. "The property interests that due process protects extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Id.* at 1191 (citation omitted).

"The Equal Protection Clause of the Fourteenth Amendment prohibits the government from denying equal protection of the laws." *Buffin v. City and Cty. of San Francisco*, 2018 WL 424362, * 7 (N.D. Cal. Jan. 16, 2018). "While Equal Protection is typically used to analyze government actions that draw a distinction among people based on specific characteristics, it is also used if the government discriminates among people as to the exercise of a fundamental right." *Id.*

Financial need alone does not identify a suspect class for purposes of equal protection analysis. *Maher v. Roe*, 432 U.S. 464, 471 (1977) ("In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods or services."); *see also Rodriguez v. Cook*, 169 F.3d 1176, 1179 (9th Cir. 1999) ("indigent prisoners are not a suspect class"). Thus, "where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 24 (1973).

Claims alleging "categorically worse treatment for the indigent" require a "hybrid analysis of equal protection and due process principles." *Walker v. City of Calhoun, GA*, 901 F.3d 1245, 1261 (11th Cir. 2018), *cert. denied sub nom. Walker v. City of Calhoun, Ga.*, 139 S. Ct. 1446 (2019). In *Bearden v. Georgia*, 461 U.S. 660, 665 (1983), the Supreme Court explained that "[d]ue process and equal protection principles converge in the Court's

analysis in these cases." Thus, "we generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question of whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection clause." *Id.* In *Bearden*, the Supreme Court held that the trial court erred in automatically revoking probation when the petitioner could not pay his fine without first determining that the petitioner had not made sufficient bona fide efforts to pay or that there were no adequate alternate forms of punishment. 461 U.S. at 662. The Court noted that there was substantial similarity between the question of whether considering indigent status in revoking probation violates the Equal Protection Clause and the due process question of whether it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine. *Id.* at 665–66. Thus,

> the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . ."

*Id.* at 666–67 (quoting *Williams v. Illinois*, 399 U.S. 235, 260 (1970) (Harlan, J., concurring)); *see also MacFarlane v. Walter*, 179 F.3d 1131, 1139 (9th Cir. 1999) ("*Bearden* delineated the factors to be balanced in examining an equal protection claim involving a lack of financial resources and the working of the criminal justice system"), *cert. granted*, *opinion vacated sub nom. Lehman v. MacFarlane*, 529 U.S. 1106 (2000).

"Both defendants granted probation and those accepted into preprosecution diversion programs have a 'conditional liberty' interest—freedom from imprisonment or freedom from prosecution and the possibility of a criminal record and imprisonment— which may not be revoked in violation of the procedural and substantive requirements of due process." *State v. Jimenez*, 111 N.M. 782, 786 (1991) (citing *Black v. Romano*, 471 U.S. 606, 610 (1985)). "Similarly, the different treatment of individuals in the criminal justice system based on ability to pay restitution as a condition of either probation or

preprosecution diversion invokes the same concerns for a defendant's right to equal protection." *Id.* (citing *Bearden*, 461 U.S. at 664). However, while "*Bearden* requires the sentencing court to consider, before revoking probation for a nonwilful failure to pay a fine or restitution, whether alternatives to *imprisonment* are adequate to serve the relevant state interests in deterrence and punishment . . . different considerations apply to termination of a preprosecution diversion agreement." *Id.* at 787. "A defendant accepted into a diversion program has a protected liberty interest in remaining free from prosecution . . . The relevant alternatives in such a case, therefore, are not alternatives to imprisonment but alternatives to termination from diversion and consequent prosecution." *Id.*

Here, the Plaintiffs "have a 'conditional liberty' interest . . . [in] freedom from prosecution and the possibility of a criminal record and imprisonment." *Jimenez*, 111 N.M. at 786. And, this interest can be impacted to a great extent: when pay-only participants are required to stay in the program beyond 90 days solely because of inability to pay the program fee, they remain subject to all of the program terms including prohibitions on alcohol use, leaving the county or the state, and taking any prescription medication without reporting it to TASC, plus the required urine screens. (Doc. 20 ¶ 118). Moreover, participants live in fear of the ultimate consequence of being terminated from the program, referred for felony prosecution, and sentenced to prison. While TASC argues that Plaintiffs have not been absolutely deprived of the ability to complete the program, Plaintiffs have indeed been absolutely deprived of the ability to complete the program in 90 days like other, wealthier participants solely because they are unable to pay the program fee. *See Walker*, 901 F.3d at 1261–62 (district court was wrong to apply heightened scrutiny because pursuant to *Rodriguez* and the cases following it, "differential treatment by wealth is impermissible only where it results in a *total* deprivation of a benefit *because* of poverty[,]" and under the standing bail order, indigents suffered no absolute deprivation— "they must merely wait some appropriate amount of time to receive the same benefit as the more affluent.").

Defendants contend that the program fees are rationally related to a legitimate

government interest because the state has an interest in having program participants, rather than taxpayers, fund the program. (Doc. 36 at 12). However, Plaintiffs' claim is not, as Defendants suggest, that the indigent are automatically entitled to fee waivers, or that the initial fee determination must consider the individual's financial status. (Doc. 36 at 13); *see Rodriguez*, 169 F.3d at 1180 ("the Constitution only requires waiver of filing fees in a narrow category of cases where the litigant has a 'fundamental interest at stake.'" (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 117 S. Ct. 555, 562 (1996))). Rather, Plaintiffs are challenging the three specific policies about how the program fees are enforced against those who cannot afford to pay them. (Doc. 67 at 20). Plaintiffs admit that it would be rational for Defendants to create a payment plan and enforce it with civil debt-collection remedies if needed, but the challenged policy is not just a payment plan, it requires individuals to remain in the program and subject to all of its other terms and conditions.[7] *Id.* Plaintiffs do not object to a payment schedule; they object to the onerous conditions and extending the risk of prosecution. (Doc. 87 at 31).

Defendants further state that additional program interests include rehabilitation, holding the offender accountable, and relieving the burden on the judicial system. (Doc. 36 at 10). However, none of these proffered reasons explains why participants who are unable to pay the program fee within 90 days must stay on the program longer and to continue to abide by all of the program rules, rather than being allowed to complete all of the non-monetary program requirements and set up an extended payment plan until the fee is paid off.[8] And, as Plaintiffs note, "no rehabilitative or retributive interest is served by terminating people who, but for their poverty, would have successfully completed the program and avoided prosecution." (Doc. 67 at 21).

---

[7] At oral argument, counsel for Plaintiffs explained that you have to call TASC every day to see if you are required to report for a urine screen, and you can be tested up to four times a week, with a cost of $15–17 each time. (Doc. 87 at 23). "So actually in a perverse way, just because you're poor and you couldn't pay the fees for 90 days, you ultimately have to pay more to complete diversion than somebody who had the money to get off diversion faster." (Doc. 87 at 23:17-20).

[8] As Plaintiffs' counsel stated, "[j]ust because of the size of someone's pocketbook doesn't change what kind of rehabilitation you need." (Doc. 87 at 30:2-4).

While the Court is not persuaded that there is a rational connection between the government's purpose and the means of effectuating that purpose, or that no adequate alternative measures exist, the Court need not make a definitive finding on these issues at this juncture. Plaintiffs have sufficiently pled a prima facie case of wealth discrimination based on the policies that subject participants who are unable to pay the program fee to a longer period of time in the MDPP and all of the conditions that come along with it, including the urine screenings and the required fees for those screenings, and the ultimate possibility of being failed from the program and referred for felony prosecution solely because they are unable to pay the fees within 90 days. *See Williams*, 399 U.S. at 241–42 ("[o]nce the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency."); *see also Mueller v. State*, 837 N.E.2d 198, 204 (Ind. Ct. App. 2005) ("Completely foreclosing a benefit that the State offers to defendants . . . based solely on an inability to pay a fee or fine, violates the Fourteenth Amendment . . . the argument that the fees help offset the cost of running the pretrial diversion program is not sufficient to establish a rational basis for distinguishing between the indigent and those able to pay the fees."); *Moody v. State*, 716 So.2d 562, 565 (Miss. 1998) (citing *Bearden* and holding that "an indigent's equal protection rights are violated when all potential defendants are offered one way to avoid prosecution and that one way is to pay a fine, and there is no determination as to an individual's ability to pay such a fine . . . The automatic nature of the fine is what makes it discriminating to the poor, in that only the poor will face jail time."); *Jimenez*, 111 N.M. at 784 (holding that under *Bearden*, "the state may terminate a diversion agreement, even if the sole ground is the defendant's nonwilful failure to make restitution, but only if there are no adequate alternatives to termination which will meet the state's legitimate penological interests.").

Further, while TASC contends that Plaintiffs' conclusory allegation of inability to pay is insufficient for an equal protection claim and that Plaintiffs must show that they

made all reasonable efforts to pay but were unable to do so through no fault of their own, the Court rejects TASC's characterization of Plaintiffs' claims as "conclusory." Plaintiffs have pled their financial circumstances in sufficient detail[9] to support their claim that "because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit[]"—the opportunity to complete the program in 90 days like other, wealthier participants and thereby be free of the conditions required for staying on the program as well as the fear of being failed from the program, prosecuted, and jailed. *San Antonio Indep. Sch. Dist.*, 411 U.S. at 20; *see also Bearden*, 461 U.S. at 668 (distinguishing situations where the probationer has willfully refused to pay or has failed to make sufficient bona fide efforts to seek employment or borrow money—such situations "may reflect an insufficient concern for paying the debt" and the state is then "justified in revoking probation and using imprisonment as an appropriate penalty for the offense.").

Finally, the Court finds the decision in *Walker*, 901 F.3d 1245, distinguishable. There, the Eleventh Circuit considered a standing bail order whereby arrestees were released immediately if they were able to post bail, but arrestees who did not post bail immediately were held for 48 hours until a bail hearing took place. Arrestees who could prove indigency at the hearing were released on a recognizance bond. The court found that the claim was properly analyzed under a hybrid due process and equal protection framework—while the Eighth Amendment prohibits excessive bail, plaintiff challenged "not the amount and conditions of bail *per se*, but the process by which those terms are set, which [plaintiff] alleges invidiously discriminate against the indigent." *Id.* at 1258–60. The court concluded that under the standing bail order, indigents suffered no absolute deprivation—"they must merely wait some appropriate amount of time to receive the same benefit as the more affluent." *Id.* at 1261–62. Here, like in *Walker*, Plaintiffs do not challenge the amount of the program fees per se, but the method of how the fees are collected. But unlike *Walker*, in the present matter Plaintiffs are not merely waiting "some

---

[9] *See* FAC (Doc. 20 ¶¶ 31–36, 215–17, 240–45, 260–62, 271, 307–10, 342–43, 348, 359, 363, 377–81, 407, 409).

- 22 -

appropriate amount of time to receive the same benefit as the more affluent." The *Walker* court found that a 48-hour detention period was reasonable for those unable to immediately post bail, but here, Plaintiffs are required to spend double the amount of time or more on diversion simply because they are unable to pay. Extending an individual's time in the program by several months can hardly be considered appropriate even under the standard of rational basis review.

"The *sine qua non* of a *Bearden*-. . . style claim . . . is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse solely because of [their] lack of financial resources,—and not for some legitimate State interest—will be able to make out such a claim." *Walker*, 901 F.3d at 1260 (internal quotations and citation omitted). The FAC makes sufficient allegations, if taken as true, to support such a claim.[10] *See Mueller*, 837 N.E.2d at 205 ("The concept that our criminal justice system should be operated as far [*sic*] as reasonably possible without regard to a defendant's financial resources is axiomatic and beyond dispute. Allowing some defendants and not others to completely avoid prosecution and a potential criminal conviction, based solely on their respective abilities to pay certain fees, violates this fundamental principle."); *San Antonio Indep. Sch. Dist.*, 411 U.S. at 88–89 (Marshall, J., dissenting) ("It is, of course, true that the Constitution does not require precise equality in the treatment of all persons. . . . But this Court has never suggested that because some 'adequate' level of benefits is provided to all, discrimination in the provision of services is therefore constitutionally excusable. The Equal Protection Clause is not addressed to the minimal sufficiency but rather to the unjustifiable

---

[10] The parties also dispute whether rational basis review or some form of heightened scrutiny applies to Plaintiffs' claims. It is clear from this Court's review of the case law that the Court must apply *Bearden's* four factors to Plaintiffs' Fourteenth Amendment claims, and that the *Bearden* framework requires something more than traditional rational basis review. *See MacFarlane*, 179 F.3d 1141 (explaining that *Bearden* requires "heightened scrutiny" and that the *Bearden* factors must also be weighed); *Buffin*, 2018 WL 424362 at * 9 (applying "heightened review" to wealth-based detention challenge); *see also San Antonio Indep. Sch. Dist.*, 411 U.S. at 117 (Marshall, J., dissenting) (noting that the Supreme Court "has frequently recognized that discrimination on the basis of wealth may create a classification of a suspect character and thereby call for exacting judicial scrutiny.").

inequalities of state action. It mandates nothing less than that all persons similarly circumstanced shall be treated alike." (internal quotations and citation omitted)); *see also MacFarlane*, 179 F.3d at 1141 ("crucial factor" was that additional incarceration was caused solely by the petitioners' indigency).

### b. *Fourth Amendment*

TASC argues that Plaintiffs' claims in Counts Four and Five regarding the urine screenings are solely a Fourteenth Amendment issue, not a Fourth Amendment issue, because Plaintiffs are not challenging the urine tests per se, but the process by which participants are able to complete the tests. (Doc. 36 at 15–16). Plaintiffs contend that they have stated a valid Fourth Amendment claim based on Defendants' policy that requires pay-only participants (who must remain in the program longer than 90 days) to continue to submit to urine screens. Plaintiffs allege this is a suspicionless search that only applies to the indigent because they are unable to pay the program fee.

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (internal quotations and citation omitted); *see also United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2006) ("Under modern Fourth Amendment juris-prudence, whether a search has occurred depends on whether a reasonable expectation of privacy has been violated."). "Usually, Fourth Amendment reasonableness means that a search or seizure must be supported by probable cause, though pat-downs and similar minor intrusions need only be supported by reasonable suspicion." *Scott*, 450 F.3d at 868. However, the court may "relax these requirements when special needs, beyond the need for normal law enforcement, make an insistence on the otherwise applicable level of suspicion impracticable." *Id.* (internal quotations and citations omitted).

In *Scott*, 450 F.3d 863, the court considered whether warrantless searches, including drug testing, imposed as a condition of pretrial release, required a showing of probable

cause, despite the defendant's consent to the search conditions when he signed the pretrial release form. The court noted that "[w]hile government may sometimes condition benefits on waiver of Fourth Amendment rights . . . its power to do so is not unlimited." *Id.* at 867–68. Thus, "Scott's consent to any search is only valid if the search in question (taking the fact of consent into account) was reasonable." *Id.* at 868; *but see Knights*, 534 U.S. at 119 ("a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens). The *Scott* court rejected the government's argument that the drug tests were justified by special needs: (1) protecting the community from criminal defendants released pending trial, and (2) ensuring the defendants appeared at trial. 450 F.3d at 869. As to protecting the community, the court found this was the exact opposite of a special need because the government interest in preventing crime by anyone is legitimate and compelling and is a quintessential general law enforcement purpose. *Id.* at 870. While the court found the second reason—ensuring appearance at trial—more persuasive, the court still found that "the connection between the object of the test (drug use) and the harm to be avoided (non-appearance in court) [was] tenuous." *Id.* The court further found that the search was not reasonable under the totality of the circumstances approach: pretrial releasees have greater privacy and liberty interests than probationers, and "the assumption that Scott was more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence[.]" *Id.* at 872–74; *contra Knights*, 534 U.S. at 120 ("the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law" (internal quotations and citation omitted)). The court thus concluded that because there was no probable cause to test Scott for drugs, the drug test violated the Fourth Amendment. *Scott*, 450 F.3d at 874; *contra Knights*, 534 U.S. 112 (holding that a warrantless search of a probationer's apartment, supported by reasonable suspicion and that the probationer consented to as a condition of his probation, was reasonable under the Fourth Amendment based on the totality of the circumstances).

Here, TASC argues that the government's interests in reducing recidivism, rehabilitation, protecting society, and ensuring that program participants are clean from drugs and alcohol at the time they complete the program outweighs Plaintiffs' privacy interests. Plaintiffs counter that there is no legitimate government interest because Defendants have determined that the government interests in punishment, deterrence, and recidivism can be met by successfully completing the program in 90 days, and the only reason Plaintiffs were required to stay on the program beyond 90 days and submit to additional urine screenings was due to their inability to pay the program fees. TASC alternatively argues that Plaintiffs' consent made the searches permissible, but as Plaintiffs note, consent is not the only factor because the Court must also consider whether the consent was voluntary and whether the condition being consented to was constitutional. *See Scott*, 450 F.3d at 866 ("The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." (citation omitted)) and 871 ("Scott's assent to his release conditions does not by itself make an otherwise unreasonable search reasonable."). The Court finds that these are issues of factual dispute that cannot be resolved at this time. Plaintiffs have adequately pled a claim under the Fourth Amendment sufficient to survive Defendants' motion to dismiss. Discovery will reveal evidence that will enable the finder of fact to determine whether the government's interest does outweigh the Plaintiffs' privacy interests, whether the special needs exception applies, and whether Plaintiffs' consent to the urine screens as part of the MDPP's terms made the searches permissible.

c. *Statute of limitations*

TASC argues that Plaintiff Briggs' claims are barred for the reasons set forth in the County Defendants' motion to dismiss. The Court will address this argument in Section B(iii) below.

v. Rule 8

Finally, TASC argues that if the Court does not dismiss Plaintiffs' claim(s) pursuant to Rule 12(b)(6), Plaintiffs should be required to amend and streamline their complaint to

comply with Rule 8(a) and (d)(1). TASC contends that the 480-paragraph, 53-page complaint is "verbose, confusing, contains numerous irrelevant facts . . . citations to news articles . . . and references to an unrelated contract" and that "it is unclear which allegations in the FAC Plaintiffs deem relevant to their claims because each alleged cause of action simply contains conclusory allegations of violations of Plaintiffs' constitutional rights . . ." (Doc. 36 at 20–21). Plaintiffs contend that they have explained the challenged policies in detail (Doc. 20 ¶¶ 120–34, 135–52), that each count specifies the challenged policy that harmed the plaintiff and what relief is sought (*Id.* at ¶¶ 445–80), and that the information Defendants challenge provides background on the policies (*Id.* at ¶¶ 56–61), offers sources for allegations (*Id.* at n.3–6), and explains the relationship between MCAO and TASC (*Id.* at ¶¶ 175–177).

A complaint must contain a "short and plain statement of the grounds for the court's jurisdiction," a "short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought . . ." Fed. R. Civ. P. 8(a); *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' . . . they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996) (the complaint must set forth "who is being sued, for what relief, under what theory, with enough detail to guide discovery"). "[A] dismissal for a violation under Rule 8(a)(2), is usually confined to instances in which the complaint is so verbose, confused and redundant that its true substance, if any, is well disguised." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008) (internal quotations and citations omitted).

The Court declines to require Plaintiffs to amend their complaint. While the FAC is lengthy and includes some extraneous background information that is not material to the claims for relief, the Court will allow this action to proceed forward on the FAC. *See Hearns*, 530 F.3d at 1127 (district court abused its discretion by dismissing FAC with

prejudice solely because of its length; "although each [complaint] set forth excessively detailed factual allegations, they were coherent, well-organized, and stated legally viable claims"); *contra McHenry v. Renne*, 84 F.3d 1172, 1177–78 (9th Cir. 1996) (affirming district court's dismissal of complaint with prejudice where complaint was "argumentative, prolix, replete with redundancy, and largely irrelevant," consisted "largely of immaterial background information," and "Despite all the pages, requiring a great deal of time for perusal, one cannot determine from the complaint who is being sued, for what relief, and on what theory, with enough detail to guide discovery."); *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981) (affirming district court's dismissal where complaint was "verbose, confusing and conclusory"). Here, despite its length, "[t]he [FAC] is logically organized, divided into a description of the parties, a chronological factual background, and a presentation of enumerated legal claims, each of which lists the liable Defendants and legal basis therefor." *Hearns*, 530 F.3d at 1132. While it does contain some "excessive detail", the FAC is "intelligible and clearly delineate[s] the claims and the Defendants against whom the claims are made." *Id.*

Further, the Court's Notice to the Parties of the MIDP project and General Order 17-08 states that the parties are required to provide "information as to facts that are relevant to the claims and defenses in the case," and also allows a party to limit its response as long as the party explains the basis of the objection. (Doc. 5 at 4). General Order 17-08 also specifies exactly what information must be provided in the mandatory initial discovery requests, including documents "that you believe may be relevant to any party's claims or defenses," and requires the parties to state the relevant facts and legal theories supporting their claims and defenses. *Id.* at 7–8. Given these provisions, it should be clear to all parties what information must be disclosed, and exchanging MIDP responses will help clarify the facts and legal theories supporting each party's claims and defenses, to the extent that those may be unclear.

. . .

. . .

**B. Defendants Maricopa County and Maricopa County Attorney William Montgomery's Motion to Dismiss**

### i. *Monell* Claims

Defendants first argue that Plaintiffs' § 1983 *Monell* claims fail because the County Attorney acts on behalf of the State, not the County, when he establishes and implements the MDPP. (Doc. 34 at 12). Thus, Defendants argue that Plaintiffs' claims against Maricopa County and the CA in his official capacity[11] fail as a matter of law and must be dismissed with prejudice. *Id.* at 13.

"To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority 'concerning the action alleged to have caused the particular constitutional or statutory violation at issue' and (2) was the policymaker for the local governing body for the purposes of the particular act." *Weiner v. San Diego Cty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (quoting *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997)).

### a. Whether the CA acts for the state or the local government

"'Ordinarily, an official designated as an official of a county . . . is a county official for all purposes.'" *Platt*, 2018 WL 2058136, at *17 (quoting *Ceballos*, 361 F.3d at 1182). "Under Arizona law, a county attorney is an officer of the county." *Id.* (citing Ariz. Rev. Stat. § 11-401). "However, some county officials may serve the county and the state." *Id.* "In this situation, the court determines whether the officer is a state or county official by reviewing state law to determine whether the officer's alleged actions fit within the range of his state or county functions." *Id.*[12]

---

[11] "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell*, 436 U.S. at 601 n.55; *see also McMillian*, 520 U.S. at 785 n.2 ("a suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent" and "victory in such an official-capacity suit imposes liability on the entity that [the officer] represents" (internal quotations and citations omitted)).

[12] In *Platt*, the court found that the defendant acted for the state when he pursued uncontested forfeiture of plaintiff's car, and therefore the county was not liable under *Monell* for the officer's actions. The court based this conclusion on Arizona statutes: A.R.S. § 11-532 (county attorneys conduct prosecutions on behalf of the state); § 14-4301(1) ("attorney for the state" is defined as "an attorney designated by . . . a county attorney . . . to investigate, commence, and prosecute" a forfeiture action); and § 13-4309 (attorney for

In *McMillian*, the parties agreed that the sheriff had final policy making authority in the area of law enforcement, but disputed whether the sheriff was a policymaker for the county or for the state when acting in a law enforcement capacity. 520 U.S. at 785. The Court explained that this inquiry is guided by two principles: First, the question is not whether the official acted for the state or the county "in some categorical, 'all or nothing' manner[; o]ur cases . . . instruct us to ask whether government officials are the final policymakers for the local government in a particular area, or on a particular issue." *Id.* "Second, our inquiry is dependent on an analysis of state law." *Id.* at 786.

Thus, in the present matter, "Maricopa County's liability on [Plaintiffs' claims] turns on whether the Maricopa County Attorney was acting 'as a policymaker for the state or for the county' when engaging in the culpable action or inaction." *Milke*, 2016 WL 5339693 at *16 (quoting *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013)); *see also Platt*, 2018 WL 2058136, at *17. "'This determination is made on a function-by-function approach by analyzing under state law the organizational structure and control over the district attorney.'" *Id.* (quoting *Goldstein*, 715 F.3d at 753). "The precise level of control, however, is not dispositive as the determination turns on whether the county attorney 'was acting *on behalf of* the state or the county' when setting the harmful policy." *Id.* (quoting *Goldstein*, 715 F.3d at 755).

The parties vigorously dispute whether the CA was acting on behalf of the state or the county for purposes of the challenged policies. The District of Arizona's decision in *Milke* is instructive:

> Both the Arizona Constitution and Arizona statute describe county attorneys as county officers. Ariz. Const. art. XII, § 3; A.R.S. § 11-401. County attorneys are elected by the voters of each county and county attorneys must reside in the county where they are elected. Ariz. Const. art. XII, § 3; A.R.S. § 11-404. County attorneys' salaries are fixed by the county boards of supervisors. Ariz. Const. art XII, § 4. And the boards of supervisors are responsible for "[s]upervising] the official conduct" of county attorneys. A.R.S. § 11-251. These "structural provisions provide a helpful starting point" indicating county attorneys are local officials but these provisions are not enough on their own. *Goldstein*, 715 F.3d at

the state may make uncontested forfeiture proceedings available).

- 30 -

755. The Court must also conduct a "functional inquiry" regarding actual job duties and identify who exercises control over county attorneys. *Id.*

In Arizona, a county attorney is responsible for the appointment of "deputies, stenographers, clerks and assistants necessary to conduct the affairs of" the county attorney's office. A.R.S. § 11-409. The county board of supervisors must approve all appointments and the board sets the appointees' salaries. *Id.* As for fiscal matters, a county attorney must "[d]eliver receipts" to the board of supervisors "for monies or property received in the county attorney's official capacity." A.R.S. 11-532. A county attorney also acts as a "legal advisor to the board of supervisors" as well as the attorney for school districts and the community college district. *Id.* Arizona counties also have a policy of indemnifying county officers and employees. (Doc. 46 at 20). In terms of prosecutions, a county attorney must "[a]ttend the superior and other courts within the county and conduct, *on behalf of the state*, all prosecutions for public offenses." A.R.S. § 11-532 (emphasis added). Thus, in most situations a county attorney appears to be acting as a local official, reporting to a local board of supervisors and subject to control by the local board of supervisors. A county attorney is, however, explicitly identified as acting on behalf of the state when prosecuting crimes.

A county attorney is also subject to a limited degree of control by the Arizona Attorney General. The Arizona Attorney General serves as the "chief legal officer of the state" and has "charge of and direct[s] the department of law." A.R.S. § 41-192. The "department of law" is "composed of the attorney general and the subdivisions of the department" created by law. A.R.S. § 41-193. The department of law is responsible for prosecuting and defending "in the supreme court all proceedings in which the state or an officer thereof in his official capacity is a party." *Id.* In addition, "[a]t the direction of the governor, or when deemed necessary by the attorney general," the department of law must "prosecute and defend any proceeding in a state court other than the supreme court in which the state or an officer thereof is a party or has an interest." *Id.* While the department of law "[e]xercise[s] supervisory powers over county attorneys of the several counties in matters pertaining to that office," the Attorney General can only "require reports [from county attorneys] relating to the public business" of their offices. *Id.* In other words, neither the Attorney General nor the department of law has day-to-day control over the operation of county attorneys' offices.

*Milke*, 2016 WL 5339693 at *16–17; *see also Puente Arizona*, 2016 WL 6873294 at *24

(noting Arizona law provisions indicating generally that CA is an officer of the county, but

that Ariz. Rev. Stat. § 11-532 "provides a clear answer" that CA conducts prosecutions on

behal of the state). In *Milke* the District of Arizona further noted that,

> Viewed as a whole, the foregoing situation is very similar to that presented under California law as explored in *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013). In California, the Attorney General has "direct supervision over every district attorney" but that was deemed evidence of only a "limited" amount of control. *Id.* at 756. The California Attorney General is "limited to requiring a district attorney to make reports," which is "far short of a power to dictate policy to district attorneys statewide." *Id.* In addition, the California "Attorney General is not given the power to force a district attorney to act or adopt a particular policy, but instead may step in and prosecute any violations of law himself or herself." *Id.* at 757. Finally, California law requires counties, not the state, "defend and indemnify the district attorney in an action for damages." *Id.* at 758. Based on all of these provisions, the Ninth Circuit concluded a California "district attorney acts on behalf of the state when conducting prosecutions," but a district attorney "represents the county when establishing administrative policies and training related to the general operation of the district attorney's office." *Id.* at 759-60.

*Milke*, 2016 WL 5339693 at *17. Thus, in *Milke* we concluded that "[b]ased on the substance of Arizona law, and the similarities between the situation in Arizona and California, the Maricopa County Attorney is a local policymaker when it comes to administrative policies such as direct supervision of other prosecutors and official policies." *Id.* Therefore, "[b]ecause Milke's *Monell* claim [was] based on such administrative policies . . . the Maricopa County Attorney can be sued in his capacity as a local policymaker for Maricopa County." *Id.*

Here, Defendants argue that under Arizona law, the CA acts for the state when he prosecutes offenders for felony possession of marijuana, and that state laws authorizing the establishment and implementation of the MDPP depend upon the CA's role as a prosecutor for the state. (Doc. 34 at 13–14). Specifically, the CA decides whether (a) there will be a MDPP, (b) an offender is eligible for the MDPP program, (c) an offender is offered participation in the MDPP, and (d) an offender has completed or failed the program. *Id.* at 14. Defendants contend that "[b]ecause these prosecutorial decisions and actions effectuate the disposition of justiciable criminal charges per § 13-3405 against eligible offenders, they fall entirely within the prosecutorial function of the County Attorney." (Doc. 34 at 14).

While there is no doubt that the CA acts for the state when conducting prosecutions, it does not follow that the CA also acts for the state when he exercises his policymaking authority to establish and implement deferred prosecution programs, or when he set the specific policies at issue in this suit.[13] The difference turns on whether the CA is performing a prosecutorial function or an administrative function. As the court noted in *Goldstein*, "[t]here can be a 'meaningful analytical distinction' between policies and training relating to prosecutorial functions and an index made and maintained as an administrative matter." 715 F.3d at 762 (challenge focused on failure to create index of informants, their reliability, and benefits provided to them, and failure to train prosecutors to use index). Here, like in *Goldstein*, "the local administrative policies challenged by [Plaintiffs] are distinct from the prosecutorial act" and "[t]he conduct at issue . . . does not involve prosecutorial strategy, but rather administrative oversight of systems used to help prosecutors comply with their constitutional duties." 715 F.3d at 759, 762. Stated another way, the issue in this suit is not the CA's decision whether to prosecute an individual for possession of marijuana or refer him or her to the MDPP, but his role in establishing and implementing the MDPP and its allegedly discriminatory policies. As the court noted in *Goldstein*, "several circuits have come to the same conclusion that we reach here, that district attorneys act as county officers when deciding administrative policy and procedures related to training or supervision, even though they act as state officers when conducting prosecutions." 715 F.3d at 765 (Reinhardt, J., concurring) (collecting cases); *see also Weiner*, 210 F.3d at 1031 (finding that under California law, district attorney acts for the state when deciding whether to prosecute, but also noting that district attorney is not a state officer for all purposes); *Del Campo v. Kennedy*, 491 F. Supp. 2d 891, 899 (N.D. Cal. Dec. 5, 2006) ("The role of the prosecutor encompasses all actions in relation to preparing to prosecute, prosecuting crimes and establishing policy and training employees in this area." (internal quotations and citation omitted)).

---

[13] While A.R.S. § 11-365 states that the CA has sole discretion to decide whether to divert or defer prosecution of an offender, which arguably implicates the CA's role as a prosecutor for the state, this case is not about a prosecutorial discretion function.

In *Del Campo*, the court concluded that the district attorney acted as a local policymaker when contracting with a private organization to administrate a bad check writers diversion program. The court looked to the diversion program statutes and noted several important factors in reaching this conclusion: Under California law, the decision to implement diversion programs is left "to the county board of supervisors, conditioned on the approval of the district attorney, in order to meet the individual needs of each county." 491 F. Supp. 2d at 899–90. And, "[t]he purpose of conditioning the program's implementation on the district attorney's approval was to allow the district attorney to retain discretionary power over eligibility requirements, not to couch the entire program within the district attorney's prosecutorial power." *Id.* at 900. Thus, "[t]he history of the statutory scheme leads the Court to conclude that the legislature had no intention of implementing a state-wide diversion program. Instead, the legislature reinforced the local aspect of the diversion program . . ." *Id.* The court found that the district attorney's decisions to contract with a private entity, structure the distribution of work, and run the program were "purely administrative decisions that have no connection to the District Attorney's role as a prosecutor." *Id.* Thus, the alleged factual basis for the lawsuit was not connected to the district attorney's prosecutorial function. *Id.*

Here, like in *Del Campo*, the decision whether to implement a diversion program is left to the local county. *See* A.R.S. § 11-361 (A "deferred prosecution program" is defined as "a special supervision program in which *the county attorney of a participating county may divert or defer*, before a guilty plea or a trial, the prosecution of a person who is accused of committing a crime . . ." (emphasis added)); A.R.S. § 11-362(A) (The program "*shall be administered by the county attorney of each participating county* according to the guidelines established by the Arizona prosecuting attorneys' advisory council." (emphasis added)); *see also* A.R.S. § 11-363 (allowing counties, in their discretion, to establish a county attorney deferred prosecution fund). Had the Arizona legislature wanted to implement a state-wide program, it certainly could have, but it did not. Further, also like *Del Campo*, the decisions at issue here—the CA's decision to contract with a private entity

(TASC), structure the distribution of work, and run the program, including setting and enforcing its policies—are all "purely administrative decisions that have no connection" with the CA's role as a prosecutor.[14]

Defendants also argue that "[b]y requiring county attorneys to follow the APAAC Deferred Prosecution Guidelines, the Legislature intended to impose statewide minimum standards for 'the conduct of any deferred prosecution program as defined by A.R.S. § 11-361 within the State of Arizona.'" (Doc. 34 at 14). However, the state does not actually supervise deferred prosecution programs or the county attorneys' administration of those programs. While the CA is required to provide reports on the MDPP to the Arizona legislature, *see* A.R.S. § 11-362(B), here, as the courts noted in *Milke* and *Goldstein*, this reporting requirement merely reflects a general state oversight, not actual state control or supervision of the day-to-day operations of the CA's office or the MDPP.[15] And, as Plaintiffs note, the APAAC guidelines only provide suggestions about the program's content; "a merely advisory set of guidelines and an obligation to report to the state what the county decides to do in its discretion do not covert county policy into state policy." (Doc. 45 at 5–6; 14).[16]

All of this shows that it is within each county's discretion whether to establish a deferred prosecution program. And while the CA must maintain records and submit reports

---

[14] The cases Defendants rely on to compel the opposite conclusion are out of circuit decisions not binding on this Court. *See Davis v. Grusemeyer*, 996 F.2d 617, 629 (3d Cir. 1993) (finding oversight of bad check restitution program "is by definition intimately related to [DA's] prosecutorial powers, as it concerns who the district attorney will and will not bring criminal charges against."); *Shouse v. Nat'l Corrective Grp., Inc.*, 2010 WL 4942222, at *6 (M.D. Pa. Nov. 30, 2010) (court noted that the Third Circuit uses a "functional approach" to determine whether a prosecutor is entitled to absolute immunity for conduct associated with the judicial phase of the criminal process, or qualified immunity for the prosecutor's administrative or investigative roles; but court did not undertake the kind of detailed analysis required by the Ninth Circuit in examining state statutes to determine the state or local nature of the precise function at issue).

[15] For example, the APAAC guidelines section entitled "Mandated Reporting" states that each county attorney operating a program will maintain statistics on the number of enrollees, number of persons who successfully complete the program, and number of persons who were enrolled and who were subsequently convicted of a felony, and provide this information to APAAC each year.

[16] For example, the guidelines state that they are intended to provide minimum standards and that they do not prevent individual prosecutors from adding provisions. Section B is entitled "Suggested Program Content" and notes that every effort should be made to include the suggested components, within the discretion of the prosecutor.

to the state, and follow APAAC guidelines in establishing a program, there is no direct state involvement in establishing, administering, or otherwise operating a deferred prosecution program. To the contrary, the statutes specifically state that only on request of the CA, APAAC may provide technical assistance to develop or refine the program. A.R.S. § 11-362(C). Taken all together, the statutes show an intent by the state legislature that deferred prosecution programs are local programs, that it is up to each county/CA to determine whether to have such a program and how the program will be established and administered, and that the state has only general oversight over the programs of the counties that decide to participate. In sum, the Court rejects the County Defendants' argument that Plaintiffs' claims are predicated upon the CA's function as a prosecutor on behalf of the state. The Court finds that Plaintiffs' claims are specific to the CA's administrative role, acting on behalf of Maricopa County, in developing, implementing, authorizing, or otherwise adopting the three policies that Plaintiffs challenge. Plaintiffs' damages claims are not based on the CA's decision to refer individuals to the MDPP, or on his decision to prosecute participants who are terminated from the MDPP. Thus, the Court concludes that that CA acts as a local policymaker for purposes of the challenged conduct in this suit.

b. Policymaking authority

As explained above, pursuant to § 1983 and *Monell*, "a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner*, 210 F.3d at 1028. "'[A] policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Puente Arizona*, 2016 WL 6873294 at *23 (quoting *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994)). "These policies may be set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" *McMillian*, 520 U.S. at 784–85 (quoting *Monell*, 436 U.S. at 694).

Here, Defendants appear to argue that Maricopa County lacks policymaking authority concerning the MDPP: "the FAC does not allege any specific facts showing that

the County engaged in any decision-making or actions to establish, administer, control, fund, or supervise the MDPP or the decisions and actions of the County Attorney and his prosecutors. Thus, the FAC lacks any allegations that the County Attorney's policies, practices, and customs undertaken in connection with the MDPP are subject to § 1983 *Monell* liability. Instead, the FAC's allegations point only to decisions and actions undertaken by the County Attorney and his prosecutors in their capacity as prosecutors on behalf of the State." (Doc. 34 at 17).[17] The Court rejects this argument. As explained above, the Court finds that the CA acts for the county, not the state, in administering the MDPP program. Second, the FAC names the CA as a defendant in his official capacity, which is in essence a suit against the County. Plaintiffs allege that the CA acts on behalf of and is the final policymaker for the County with respect to the MDPP, (Doc. 20 at ¶ 45, n.7), and Defendants admit that the CA is the MDPP's relevant policymaker (Doc. 34 at 13). Plaintiffs further allege that the County is liable for the CA's administration of the program and of TASC's administration and supervision of participants in the program. (Doc. 20 ¶ 46; Doc. 45 at 9).[18]

---

[17] Defendants' argument in their motion is not so much about policymaking authority of the County or the CA, but that the board of supervisors has not taken any action regarding the MDPP. (Doc. 34 at 17). Defendants cite A.R.S. § 11-201(A) for the proposition that the powers of the county may only be exercised by the board of supervisors. However, the full sentence of the statute specifically states that "[t]he powers of a county shall be exercised only by the board of supervisors *or by agents and officers acting under its authority and authority of law*." (emphasis added). The CA is clearly an agent or officer of the county. *See* A.R.S. § 11-532 (the county attorney is the public prosecutor of the county).

[18] Plaintiffs further state that the evidence they have gathered thus far suggests that Maricopa County has delegated its policymaking authority for the MDPP to the CA, and either directly or through the CA, to TASC as well. (Doc. 45 at 9 n.9).

As to Plaintiffs' argument that the County is liable for TASC's administration and supervision of MDPP participants, Plaintiffs state that the Court need not reach the issue if it determines that Maricopa County is liable for the CA's unlawful administration of the program. (Doc. 45 at 21–22); *see Lemmons v. Cty. of Sonoma*, 2018 WL 452108, *3 (N.D. Cal. Jan. 17, 2018) ("By ceding control and final decision making to [private entity] as it relates to providing adequate healthcare to prisoners, [private entity's] policies effectively become the policies of Sonoma County" and county can be liable for constitutional injuries); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 n.9 (11th Cir. 1985) (county was liable for any constitutional deprivations caused by policies or customs of private entity that county contracted with to provide medical services in county jail; "where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy."); *Herrera v. Cty. of Santa Fe*, 213 F. Supp. 2d 1288, 1292 (D. N.M. July 18, 2002) (where county contracted with private company to manage and operate detention center, county delegated final policy-making authority to private entity and any custom or policy of entity with respect to operation of detention center

The Court also looks to the January 27, 2009 Memorandum of Understanding Between Maricopa County Attorney and TASC ("MOU") to guide its analysis on this issue. The MOU appears to use the terms "county attorney" and "MCAO" interchangeably. While the document is entitled MOU between "Maricopa County Attorney" and is signed by former CA Andrew Thomas, the first line of the document states that "The Maricopa County Attorney's Office ("MCAO"), and TASC, Inc., ("TASC") entered into a Memorandum of Understanding effective 16 April 1990 to clarify and set forth initial guidelines for the implementation of the Maricopa County Attorney/TASC Adult Deferred Prosecution Program ("ADPP") for first time felony drug offenders." The very next line states that "MCAO and TASC agree that the 1990 MoU should be replaced with this Memorandum of Understanding . . . to reflect the current understanding and practice[.]" The remainder of the document refers to the CA, the County Attorney's Office, and the MCAO. While Defendants offer this document as evidence of Maricopa County's lack of involvement in the MDPP, this is a distinction without a difference. For all intents and purposes, Maricopa County and the MCAO are essentially the same thing when it comes to entity liability, as is a claim against the CA in his official capacity.[19]

Further, the substance of the MOU makes clear that the CA/MCAO worked jointly with TASC to "create a structured program" and "hold the offender accountable." The MOU states, among other terms, that "TASC's operation of the ADPP has successfully

constitutes a policy of the county for purposes of § 1983 liability).
Here, Plaintiffs argue that the County is responsible for establishing the MDPP and has authorized TASC to design and run the day-to-day operations of the program; the County is therefore liable for any custom or policy established by TASC in the course of that operation. (Doc. 45 at 22). Plaintiffs state that "[d]iscovery will allow Plaintiffs and this Court to determine which policies the County is responsible for based on its delegation of policymaking authority to Montgomery and TASC and/or its acquiescence in their unconstitutional practices." (Doc. 45 at 23) (footnote omitted). The Court agrees. While Plaintiffs make a number of allegations in the FAC, as the pleadings make clear, this case involves many disputed issues of fact that the Court cannot resolve at this juncture and that require discovery.
[19] This is made clear in the Behavior Specific Adult Diversion Program Contract that Plaintiffs attach to their Response. Although not the contract governing the MDPP, Plaintiffs offer this as evidence of what they believe may be a similar contract existing that does govern the MDPP. The behavior contract states that it is entered into and between "Maricopa County ("County"), a political subdivision of the State of Arizona, through the Maricopa County Attorney's Office ("MCAO"), and TASC[.]"

implemented the County Attorney's objectives"; that "TASC through the County Attorney Submittal Form ("submittal") will report to MCAO the status of each offender's participation and/or compliance with ADPP requirements"; "The County Attorney will receive a submittal from TASC documenting the successful completion"; "Documentation of all areas of non-compliance will be sent to the County Attorney's Office"; "Documentation of all program failures will be sent to the County Attorney"; "TASC agrees to provide MCAO with a report showing program success rates"; and "TASC will arrange a payment plan with the defendant and collect payments on behalf of MCAO . . . TASC will send the County Attorney a list of those defendants who have paid along with a check for the collected amount."

In sum, based on the pleadings and this Court's reading of the MOU, the Court finds that the FAC has adequately pled policymaking authority by the county sufficient to survive the motion to dismiss.

### ii. Eleventh Amendment Sovereign Immunity

Defendants next argue that because the CA acts on behalf of the State in establishing and implementing the MDPP, Eleventh Amendment sovereign immunity bars Plaintiffs from recovering damages against the State or a State official in his official capacity. (Doc. 34 at 19).

Because the Court finds that the CA acts on behalf of the county in establishing and implementing the MDPP and the specific policies at issue in this suit, this argument is moot. *See Eason v. Clark Cty. Sch. Dist.*, 303 F.3d 1137, 1141 (9th Cir. 2002) ("the Eleventh Amendment does not extend to counties and municipal corporations"); *Del Campo v. Kennedy*, 491 F.Supp.2d 891 (N.D. Cal. Dec. 5, 2006) (district attorney acts as county policymaker in implementing certain aspects of misdemeanor diversion program for bad check writers and thus is not a state actor entitled to Eleventh Amendment immunity).

### iii. Statute of Limitations

Finally, Defendants argue that Arizona's two-year statute of limitations bars

Plaintiff Briggs' claims. (Doc. 34 at 23).

"The defendant . . . bears the burden of proof as to each element of a statute of limitations based affirmative defense." *Lopez v. Bans*, 2016 WL 6821860, *3 (E.D. Cal. Nov. 18, 2016). The Court may dismiss a claim as untimely under Rule 12(b)(6) "when the running of the statute of limitations is apparent on the face of the complaint." *Id.* (internal quotations and citation omitted).

"Actions brought pursuant to 42 U.S.C. § 1983 are governed by the forum state's statute of limitations for personal injury actions." *Knox v. Davis*, 260 F.3d 1009, 1012 (9th Cir. 2001). "In Arizona, the courts apply a two-year statute of limitations to § 1983 claims." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). "'Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues.'" *Knox*, 260 F.3d at 1013 (quoting *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153–54 (9th Cir. 2000)). "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers*, 174 F.3d at 991. "Once a claim accrues, the limitations period begins to run, and any suits filed outside the limitations period will be time barred." *Lopez*, 2016 WL 6821860 at *3.

"The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's rights up to a point in time that falls within the applicable limitations period." *Douglas v. Cal. Dept. of Youth Authority*, 271 F.3d 812, 822 (9th Cir. 2001). In *Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997), the court held that the continuing violations theory applies to § 1983 actions. The court noted that a *Monell* § 1983 municipal liability claim must allege "'execution of a government's policy or custom . . . [that] inflicts the injury.'" *Id.* (quoting *Monell*, 436 U.S. at 694). Thus, "[i]f the continuing violations doctrine were inapplicable to *Monell* actions, it is difficult to ascertain exactly when such claims would accrue[.]" *Id.*

> [There are] two methods by which a plaintiff may establish a continuing violation. First, the plaintiff may show a serial violation by pointing to a series of related acts against one individual, of which at least one falls within the relevant period of limitations . . . Second, a plaintiff may show a systematic policy or practice of discrimination that operated, in part,

within the limitations period—a systematic violation.

*Douglas*, 271 F.3d at 822 (internal quotations and citations omitted); *see also Gutowsky*, 108 F.3d at 259 ("a continuing violation may be established through a series of related acts against one individual, or by a systematic policy or practice of discrimination"; court found plaintiff's "papers were replete with evidence of an ongoing practice and policy that denied [employment advancement] opportunity to women"). Further, for a systemic violation claim, "if both discrimination and injury are ongoing, the limitations clock does not begin to tick until the invidious conduct ends." *Douglas*, 271 F.3d at 822 (quotations and citation omitted). "However, . . . a mere continuing *impact* from past violations is not actionable." *Knox*, 260 F.3d at 1013 (internal quotations and citations omitted) (finding continuing violation theory did not apply where plaintiff received permanent and complete suspension letter withdrawing her legal mail and visitation privileges; plaintiff failed to establish that a new violation occurred each time she was denied visitation or mail privileges, and subsequent denials were merely continuing effect of original suspension); *see also Shannon v. Babb*, 103 F. App'x 201 (9th Cir. 2004); *Poole v. City of Los Angeles*, 41 F. App'x 60 (9th Cir. 2002).

Plaintiffs filed their original complaint on August 23, 2018. (Doc. 1). Briggs took his final urine test on August 23, 2016 and completed the program on August 25, 2016. (Doc. 45 at 25).

Defendants argue that Briggs' "latest plausible accrual date is August 8, 2016, when Briggs knew or had reason to know of his injury stemming from his inability to pay at the time of his first of fifteen urinalysis tests occurring beyond the initial 90 days of the program." (Doc. 34 at 23–24) (citation omitted). Thus, Defendants conclude that, "[w]orking backwards from Briggs' last test on August 23, 2016, accrual occurred at the latest on August 8, 2016 if Briggs was subject to one test each day for the fifteen days directly prior to his last test." *Id.* at 24.

Conversely, Plaintiffs contend that Briggs' claims did not begin to accrue until he completed the diversion program on August 25, 2016. (Doc. 45 at 24). Because Briggs was

subject to Defendants' "systematic violations until he completed the program . . . the limitations clock to challenge that continuing series of violations relating to his unlawful supervision in the diversion program did not begin to tick until he completed the program." *Id.*

The Court finds that Briggs' claims may fall within either or both of the two methods for establishing a continuing violation set forth in *Douglas*. First, Briggs has pointed to a series of related acts—multiple drug tests occurring past the 90-day period that he alleges were conducted in violation of the Fourth Amendment and only because he was unable to pay the program fee. Second, Briggs also alleges Defendants have a policy, practice, and/or custom that discriminates against the poor; indeed, Briggs brings his Fourth and Fourteenth Amendment claims not just on his own behalf, but also on behalf of a class of others similarly situated. Finally, because Briggs alleges a systemic violation claim, "the limitations clock does not begin to tick until the invidious conduct ends"—in this case, on August 25, 2016, when Briggs completed the program. *Douglas*, 271 F.3d at 822. Accordingly, the Court finds that Plaintiff Briggs' claims are not barred by the statute of limitations.

## IV. CONCLUSION

"Complaints under the Civil Rights Act are to be liberally construed." *Thomas v. Younglove*, 545 F.2d 1171, 1172 (9th Cir. 1976). The Court "cannot say with certainty at this early stage in the litigation that plaintiffs can prove no set of facts which would entitle them to relief." *Id.* Accordingly, for the reasons explained above,

**IT IS HEREBY ORDERED** denying the motions to dismiss. (Docs. 34 and 36).

**IT IS FURTHER ORDERED** Defendants shall file their responsive pleadings within fourteen (14) days of the date of this order. Fed. R. Civ. P. 12(a)(4); *see* (Doc. 79).

Dated this 18th day of June, 2019.

Eric J. Markovich
United States Magistrate Judge