1   **WO**

2

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Deshawn Briggs, et al.,                    No. CV-18-02684-PHX-EJM

10               Plaintiffs,                     **ORDER**

11   v.

12   Allister Adel, et al.,

13               Defendants.

14

15          Pending before the Court is Plaintiffs' Motion to Compel Production of Defendant

16   TASC's MDPP Program Files. (Doc. 139). TASC filed a Response (Doc. 143), and

17   Plaintiffs filed a Reply (Doc. 144). The parties then filed supplemental briefs to address

18   the impact of the Public Health Service Act ("PHSA"), 42 U.S.C. § 290dd-2(a), and its

19   implementing regulations, Title 42, Chapter 1, Part 2 of the Federal Register, 42 C.F.R. §§

20   2.1–2.67, to address the restrictions on and procedures for the disclosure of information

21   regarding the history, diagnosis, or treatment of a substance use disorder. (Docs. 162, 168,

22   169).

23          The Court finds that this matter is suitable for decision without oral argument. For

24   the reasons explained below, the Court will grant Plaintiffs' motion in part.

25   **I.      FACTUAL AND PROCEDURAL BACKGROUND**

26          Named Plaintiffs Antonio Pascale[1], Deshawn Briggs, and Lucia Soria[2] filed this

27   ───────────────
[1] The original named plaintiff, Mark Pascale, is now deceased. Upon motion by Plaintiffs,
the Court ordered the substitution of Mark Pascale's son, Antonio Pascale, as the named
28   party and personal representative of Mark Pascale's estate. (Doc. 171).
[2] This action also originally included as named plaintiffs Taja Collier and McKenna

1    class action lawsuit on behalf of themselves and other similarly situated individuals against

2    Defendants Maricopa County, Allister Adel in his official capacity as Maricopa County

3    Attorney,[3] and Treatment Assessment Screening Center, Inc. ("TASC"), under a § 1983

4    theory of liability. (Doc. 110). Plaintiffs filed their initial complaint on August 23, 2018,

5    alleging claims under § 1983 for wealth-based discrimination in violation of Plaintiffs'

6    Fourteenth Amendment rights, (Doc. 1 ¶¶ 351–56, 363–70), and unreasonable search and

7    seizure in violation of Plaintiffs' Fourth and Fourteenth Amendment rights, *id.* ¶¶ 357–62.

8    Defendants conducted the Marijuana Deferred Prosecution Program ("MDPP") in which

9    Plaintiffs were enrolled. (Doc. 110 ¶ 1). Plaintiffs allege that their participation in the

10   program was involuntarily extended solely because they were too poor to pay required

11   program fees, thus violating their constitutional rights. *Id.* ¶¶ 487–522. This case is now

12   proceeding on the second amended complaint filed by Plaintiffs on September 23, 2019.

13   (Doc. 110). Plaintiffs are seeking compensatory damages, punitive damages, damages for

14   pain and suffering, and declaratory and injunctive relief. *Id.* ¶¶ 489–90, 514–15.

15           On September 12, 2019 the Court entered its Scheduling Order in this case

16   bifurcating discovery into two parts: a class certification phase, to culminate in a class

17   certification hearing, and a merits phase. (Doc. 106).

18           On September 16, 2019, Plaintiffs served Defendants with their first set of discovery

19   requests, seeking as relevant to their case for class certification the program files of all

20   individuals who have participated in MDPP since January 1, 2017. (Doc. 139 at 3). TASC

21   responded to this request on October 16, 2019, refusing to produce the program files of

22   MDPP participants other than the named plaintiffs. *Id.* at 5; *see also* Doc. 139-7. Plaintiffs

23   served TASC with a deficiency letter on October 25, 2019, responding to TASC's

24   objections and requesting to meet and confer. (Doc. 139 at 6). The parties held a conference

25   on November 19, 2019 and agreed to narrow the number of case files sought through

26   stipulations. *Id.* Plaintiffs proposed stipulations to TASC on December 13, 2019, but TASC

---

27   Stephens. (Doc. 110 ¶¶ 320–457). Upon stipulation by the parties, Collier and McKenna

28   were dismissed with prejudice. (Docs. 137, 138).
     [3] Allister Adel was substituted as successor for former Maricopa County Attorney William
     Montgomery. (Doc. 115).

1   objected. *Id*. The parties then held a second meet and confer on January 13, 2020. *Id*. TASC

2   proposed a new set of stipulations on January 20, 2020, but Plaintiffs objected that TASC's

3   proposed stipulations failed to obviate their need for discovery of the MDPP participants'

4   program files. *Id*. Plaintiffs then sought relief from the Court during a telephonic discovery

5   dispute call on January 27, 2020, and the Court ordered the parties to brief the issue. *Id*.

6       Plaintiffs filed their motion to compel TASC to produce the requested MDPP

7   program files on February 14, 2020. (Doc. 139). TASC filed its response on February 28,

8   2020 (Doc. 143), and Plaintiffs filed their reply and requested oral argument on March 6,

9   2020 (Doc. 144). On April 1, 2020, TASC filed a motion for supplemental briefing to

10  address the requirements of the PHSA. (Doc. 148). Plaintiffs agreed that supplemental

11  briefing was necessary (Doc. 151), and the Court granted TASC's motion and set a briefing

12  schedule (Doc. 158). TASC filed its supplemental brief on May 18, 2020. (Doc. 162).

13  Plaintiffs filed their response on June 1, 2020 (Doc. 168), and TASC filed its reply on June

14  8, 2020 (Doc. 169).

15      According to Plaintiffs' review of the named plaintiffs' program files, the MDPP

16  program files contain the following information: (1) a participant's program start and end

17  dates, and whether a participant's term of participation was extended; (2) whether a

18  participant was terminated from the program, including whether that termination was due

19  to nonpayment of fees; (3) payments made for drug testing and fees; (4) documents

20  participants provided showing their indigence; (5) case notes and communications between

21  participants and their case managers, including statements by participants that they could

22  not afford the fees and statements by case managers that participants cannot complete the

23  program without paying all required fees; (6) violation and termination letters sent by

24  TASC; (7) client contracts stating that the failure to make minimum monthly payments will

25  result in the case being returned for prosecution; (8) intake forms documenting income and

26  public assistance benefits; and (9) a participant's drug testing history, including whether

27  the participant missed any tests. (Doc. 139 at 4–5).

28  . . .

- 3 -

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 26(b)(1),

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

A party on whom a discovery request is made must make an initial disclosure within 30 days of being served, unless a different time is set by the court. Fed. R. Civ. P. 26(a)(1)(D). After making the initial discovery request, and "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). If the moving party establishes that the requested information is within the permissible scope of discovery, the burden shifts to the opposing party to demonstrate that "the information is being sought to delay bringing the case to trial, to embarrass or harass, is irrelevant or privileged, or that the person seeking discovery fails to show need for the information." *Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 434 (N.D. Cal. 2014). The burden is on the party seeking to compel discovery to demonstrate the relevance of the discovery request. *Sansone v. Charter Commc'ns, Inc.*, 2019 WL 460728, at *3 (S.D. Cal. Feb. 6, 2019). However, it is the "heavy burden" of the party opposing discovery to show why discovery should be denied. *Roehrs v. Minnesota Life Ins. Co.*, 228 F.R.D. 642, 644 (D. Ariz. 2005) (quoting *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)).

Courts have broad discretion to permit or limit discovery, *Andrich v. Arpaio*, 2017 WL 3283386, at *4 (D. Ariz. Aug. 2, 2017), and federal courts generally allow for liberal discovery, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Further, "[i]nformation within [the] scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Courts considering a challenged discovery request broadly construe the request's relevance to a party's claim or defense. *Oppenheimer Fund, Inc. v.*

1    *Sanders*, 437 U.S. 340, 351 (1978). This does not mean, however, that discovery is without

2    boundaries. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *U.S. ex rel. Carter v.*

3    *Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 237 (S.D. Cal. 2015). A discovery request will be

4    denied if it is not "relevant to any party's claim or defense," or if it is not "proportional to

5    the needs of the case." *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 564 (D.

6    Ariz. 2016). A court may also deny a discovery request if the burden on the opposing party

7    outweighs the likely benefit for the requesting party. *U.S. ex rel. Carter*, 305 F.R.D. at 237.

8    If the court deems information requested in discovery to be irrelevant, "the court should

9    restrict discovery to protect a party from 'annoyance, embarrassment, oppression, or undue

10   burden or expense.'" *Roehrs*, 228 F.R.D. at 644 (quoting Fed. R. Civ. P. 26(c)).

11       Local rules require a party filing a motion to compel discovery to specify the initial

12   discovery request made, the response received, and the deficiency in that response. LRCiv

13   37.1. The motion must also include a certification that the movant has conferred or

14   attempted to confer with the party failing to make disclosure in a good faith effort to obtain

15   the requested information without court action. *Id.*; LRCiv 7.2(j).

16   **III.   DISCUSSION**

17       Plaintiffs seek disclosure of the MDPP program files for all program participants

18   since January 1, 2017. Plaintiffs contend that the files are not only relevant to class

19   certification, but key to their case. (Doc. 139 at 1).

20       Plaintiffs argue that their motion to compel should be granted because the requested

21   discovery is highly relevant and proportional to the needs of the case, and because it will

22   not create an undue burden on TASC. (Doc. 139 at 7). And, to the extent that there are any

23   privacy concerns, Plaintiffs state that disclosure of the MDPP files is already governed by

24   the Protective Order entered in this case. *Id.* In response to TASC's objections, Plaintiffs

25   further state that they do not seek any documents protected by attorney-client privilege or

26   the work product doctrine, and that to the extent such documents might be included in the

27   program files, TASC can excise or redact the information and create a privilege log. *Id.*

28   n.3. Finally, as to TASC's argument that Plaintiffs have failed to make a prima facie

- 5 -

showing that the class action requirements of Rule 23 are satisfied, Plaintiffs note that in denying Defendants' motion to dismiss, the Court found that "the existence of a persistent and widespread practice, policy, or custom will require discovery for Plaintiffs . . . to establish a class," and that the Court then ordered the parties to engage in discovery relating to certification of a class. (Doc. 139 at 7 n.3) (quoting Doc. 89 at 11).

TASC argues that Plaintiffs' motion to compel should be denied as premature because the parties have not made an honest, good faith effort to resolve their discovery dispute without judicial intervention. (Doc. 143 at 2, 5). Alternately, TASC argues that Plaintiffs' motion should be denied on the merits because the request is overbroad and irrelevant to class certification, and because the request is not proportional to the needs of the case and will place an undue burden on TASC. *Id.* at 8, 12. TASC further argues that the requested program files contain information protected under HIPAA, and that the Protective Order entered in this case only allows for production of protected health information without the participant's notice or consent "*to the extent such information is otherwise discoverable.*" *Id.* at 17 (quoting Protective Order § 10.3).

Finally, the parties filed supplemental briefs to address the limits on disclosure of protected health information regarding the history, diagnosis, or treatment of a substance use disorder under PHSA, and request guidance from the Court as to how PHSA applies to the MDPP files at issue.

The Court finds that Plaintiffs' motion to compel should be granted in part for the following reasons. First, the parties have made a reasonable effort to resolve their discovery dispute without judicial intervention. Second, Plaintiffs have made a prima facie showing that the class action requirements of Rule 23 are satisfied and that the information they request is necessary and relevant to prove a pattern or practice of wealth-based discrimination by TASC. Further, Plaintiffs do not seek discovery of any privileged information, and any documents that are protected by attorney-client privilege or the work product doctrine can be redacted by TASC. Fourth, although the requested program files may be protected under HIPAA, disclosure is nonetheless authorized by the terms of the

Protective Order already in place in this case. And, although the requested information identifying patients as having or having had substance use disorders and obtained for the purpose of diagnosis, treatment, or referral is protected under PHSA, TASC may still disclose the files in compliance with PHSA by redacting the applicable documents. However, because TASC persuasively argues that Plaintiffs' discovery request would impose an undue burden of production on it, the Court will order the parties to negotiate a sampling procedure that will allow Plaintiffs access to the information that they need to prove their case for class certification while reducing TASC's burden of disclosure.

## A.  Efforts to Resolve Dispute without Judicial Intervention

Pursuant to both federal and local rules, a motion to compel must be accompanied by a certification that the movant has in good faith conferred, or attempted to confer, with the party failing to make disclosure in an effort to obtain a resolution without judicial intervention. Fed. R. Civ. P. 37(a)(1); LRCiv 7.2(j); *Andrich*, 2017 WL 3283386 at *6. Not only must the parties meet and confer, but they must do so in good faith. *Whiting v. Hogan*, 2013 WL 1047012, at *2 (D. Ariz. Mar. 14, 2013). "[G]ood faith . . . contemplates 'honesty in one's purpose to meaningfully discuss the discovery dispute, freedom from intention to defraud or abuse the discovery process, and faithfulness to one's obligation to secure information without court action.'" *Id.* (quoting *Shuffle Master, Inc. v. Progressive Games, Inc.*, 170 F.R.D. 166, 171 (D. Nev. 1996)). During negotiations, parties must present the merits of their respective positions with candor and specificity, and the moving party must discuss the other party's objections and proposals and answer questions regarding his or her own position. *Id.* at *2–4. Further, parties must strive to be "cooperative, practical and sensible, and should seek judicial intervention 'only in extraordinary situations that implicate truly significant interests.'" *Cardoza v. Bloomin' Brands, Inc.*, 141 F. Supp. 3d 1137, 1145 (D. Nev. 2015) (quoting *In re Convergent Techs. Securities Litig.*, 108 F.R.D. 328, 331 (N.D. Cal. 1985)). Where the court determines that the moving party did not make a good faith effort to negotiate a resolution with the other party prior to filing a motion to compel, the motion will be denied and the court may order sanctions. LRCiv 7.2(j); *Colaco*,

301 F.R.D. at 434.

Here, TASC cites *Whiting* in support of its argument that Plaintiffs' motion to compel is premature because the parties have not adequately sought extrajudicial resolution of their discovery dispute. 2013 WL 1047012 at *2–4 (denying motion to compel where plaintiffs failed to make a sincere effort to resolve the discovery dispute prior to seeking judicial intervention, including failing to attach the certification, refusing to genuinely negotiate a compromise, failing to schedule any conferences, refusing to discuss some areas of contention, and refusing to discuss an extension of the discovery deadline). However, the present case is distinguishable from *Whiting*. First, Plaintiffs attached the proper certification to their motion to compel. (*See* Doc. 139 at 19). More importantly, however, Plaintiffs made extensive efforts to negotiate out of court with TASC a resolution to their discovery dispute, including through a meet and confer that was scheduled for the express purpose of discussing the parties' disagreements regarding discovery. (Doc. 144 at 2, 10–12). At this meet and confer on November 19, 2019, both parties explained their positions and discussed several possible ways they might work to obviate Plaintiffs' need to discover the MDPP participant program files, including through stipulations and sampling. *Id.* ¶ 8–17. Plaintiffs agreed to draft stipulations, which they submitted to TASC on December 13, 2019. *Id.* ¶ 21. Plaintiffs invited TASC to propose changes to their stipulations and offered to discuss those changes in a future meet and confer. *Id.* ¶ 22. In January of 2020, TASC responded with its own proposed stipulations. *Id.* ¶ 34. It was only at this point that Plaintiffs concluded that the parties had reached an impasse in their negotiations and that future meet and confers would be unproductive. *Id.* ¶ 38. Even after Plaintiffs approached the Court to resolve their discovery dispute, Plaintiffs still unsuccessfully asked TASC one more time to discuss stipulations that would reduce Plaintiffs' need for discovery without court intervention. *Id.* ¶ 40.

In sum, the Court finds that Plaintiffs' motion should not be dismissed as premature because Plaintiffs properly attached the required certification to their motion and made a reasonable effort to resolve their discovery dispute with TASC without judicial

1    intervention.

2    **B.  Relevance to Class Certification Requirements**

3            Where a plaintiff requests discovery for the purpose of certifying a class, the

4    plaintiff bears the burden of making a prima facie showing that the requirements for class

5    certification are satisfied or that discovery is likely to produce persuasive information

6    substantiating class allegations. *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985).

7    If the plaintiff fails to satisfy this burden, the court may exercise its discretion to deny the

8    discovery request. *Id.* However, even where the potential viability of a class is unclear, the

9    court may still allow pre-certification discovery to go forward, as "often the pleadings

10   alone will not resolve the question of class certification and . . . some discovery [is]

11   warranted." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).

12           Here, TASC argues that Plaintiffs' discovery request should be rejected on the

13   grounds that Plaintiffs have not made a prima facie showing that the required elements of

14   a class action have been met. (Doc. 139-7 at 3; Doc. 143). However, TASC also

15   acknowledges that at least "*some* [pre-certification class] discovery is appropriate." (Doc.

16   143 at 14 n.14). In its Order denying Defendants' motion to dismiss, the Court rejected

17   TASC's argument that Plaintiffs had failed to plead a "persistent and widespread custom

18   or practice. . . constitut[ing] a permanent and well-settled entity policy." (Doc. 89 at 11).

19   The Court specifically found that although the complaint stated sufficient allegations to

20   survive a motion to dismiss, "the existence of a persistent and widespread practice, policy,

21   or custom will require discovery for Plaintiffs to prove their claims and to establish a class."

22   *Id.* The Court subsequently issued its Scheduling Order bifurcating discovery in this matter

23   into a class certification phase and a merits phase. (Doc. 106). Thus, the Court has already

24   elected to exercise its discretion to allow Plaintiffs to engage in pre-certification discovery.

25           However, to compel discovery, the Court must find that the requested information

26   is relevant to proving the elements of class certification as enumerated under Fed. R. Civ.

27   P. 23(a):

28
                    One or more members of a class may sue . . . as representative
                    parties on behalf of all members only if: (1) the class is so

1
2
3
4

> numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

5   In addition, one of the following must be true: (1) prosecuting separate actions of individual

6   class members would create a risk of inconsistent adjudications or adjudications that would

7   impede the ability of other individuals not parties to the suit to protect their interests; (2)

8   the party opposing the class acted in a way that is generally applicable to the class and

9   injunctive or declaratory relief is appropriate respecting the class as a whole; or (3)

10  questions of law or fact common to the class predominate over questions specific to

11  individual class members. Fed. R. Civ. P. 23(b).

12              i.   Numerosity

13              To sue as a representative of a class, a named plaintiff must prove that "the class is

14  so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here,

15  Plaintiffs' proposed damages class includes all individuals who, since August 23, 2016 and

16  until the trial in this case, were enrolled in MDPP, satisfied all program requirements in

17  the first 90 days other than payment of fees, and were not considered for successful

18  completion after 90 days solely because they were unable to pay the required fees. (Doc.

19  110 ¶ 459(a)). Plaintiffs' proposed injunctive class includes all individuals who have not

20  yet been formally charged with possession of marijuana, received a pre-filing letter offering

21  participation in MDPP, and are unable to pay the required program fees within 90 days

22  and/or at the rate required by TASC. *Id.* ¶ 459(b).

23              TASC estimates that there were approximately 8,000 MDPP participants during the

24  relevant time period. (Doc. 143 at 11). Because Arizona's poverty rate is around 14%, the

25  number of class members could be approximately 1,120 or even as high as 3,000.[4] *Id.*

26  Based on these estimations, TASC states that it does not dispute that if the Court finds

27

28  _____
[4] The former estimate is equal to 14% of 8,000. The latter estimate is based on TASC's calculation that 37% of MDPP participants over a five-year period received a reduced fee agreement and is thus equal to 37% of 8,000. (Doc. 143 at 11).

Plaintiffs' claims otherwise legally cognizable, the proposed class would be sufficiently numerous. *Id.*

Even if numerosity were to be disputed, the Court finds that Plaintiffs' discovery request is relevant to establishing that the proposed class is sufficiently numerous. In order to make that showing, Plaintiffs must discover how many MDPP participants had their participation terminated or extended due to their inability to pay the required program fees in 90 days. (Doc. 139 at 8). The program files of the named plaintiffs, which TASC has already disclosed, contain documentation of indigence as well as documentation specifically indicating that the named plaintiffs were required to participate in MDPP past 90 days due to nonpayment of program fees. (Doc. 139 at 4–5, 8–9); (Doc. 139-4 at 12, 31); (Doc 139-5 at 11, 23). TASC does not have a list of all indigent persons referred to MDPP; therefore, the program files of all MDPP participants whose participation was terminated or extended due to nonpayment of fees are relevant to establishing numerosity.

### ii.  Commonality, Typicality, and Adequacy

To sue as a representative of a class, a named plaintiff must prove that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 148 (1982)). The claims of putative class members must rest on a "common contention," such as discriminatory bias, and the common contention must be capable of being resolved in a manner that is applicable to all class members. *Id.* at 359. However, the circumstances of class members need not be identical. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). "[W]here the circumstances of each particular class member vary but [class members] retain a common core of factual or legal issues with the rest of the class, commonality exists." *Id.* Where plaintiffs present evidence of a common pattern or practice affecting members of a putative class, the answer to the question of whether such a pattern or practice exists will "help to drive the resolution of the litigation for all class members," thus demonstrating commonality. *Torres v. Mercer*

*Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 352; *Parsons*, 754 F.3d at 683, 685; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011).

A named plaintiff must also prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). In evaluating typicality, courts look at whether named and unnamed parties share common claims or defenses, regardless of any differences in the underlying facts of their cases. *Id.* Although the claims or defenses of named plaintiffs need not be identical to those of unnamed class members, they must be "reasonably co-extensive." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (overruled on other grounds). Courts also examine whether the defendant will need to present unique defenses against each plaintiff and may reject a class as atypical where this is the case. *Ellis*, 657 F.3d at 984.

A named plaintiff must also prove that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of the adequacy requirement is to ensure that the due process right to adequate representation is satisfied as to unnamed class members. *Hanlon*, 150 F.3d at 1020. To determine whether this requirement has been satisfied, courts ask two questions: (1) are there any conflicts of interest between the named plaintiffs and unnamed class members; and (2) will the representative parties pursue the action vigorously on the behalf of all class members? *Id.* at 1020–1021; *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Ellis*, 657 F.3d at 985; *Valenzuela v. Ducey*, 2017 WL 6033737, at *7 (D. Ariz. Dec. 6, 2017).

Courts' analyses of typicality, commonality, and adequacy often merge, as these factors combine to establish "whether the named plaintiff's claim and the class claims are

so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5. Thus, just as the existence of a common pattern or practice affecting all class members serves to establish commonality, it may also demonstrate typicality. *Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001); *Parsons*, 754 F.3d at 685. Further, where named and unnamed class members' interests are aligned because they share a common injury caused by a defendant's common pattern or practice of behavior, it supports a finding that the named plaintiffs will adequately represent the convergent interests of unnamed class members. *See Valenzuela*, 2017 WL 6033737 at *7.

Here, Plaintiffs argue that the elements of commonality, adequacy, and typicality all hinge on whether the putative class members were harmed by a common policy or practice, and that the MDPP program files are necessary to prove TASC's pattern or practice of wealth-based discrimination. (Doc. 139 at 9, 11). TASC notes that the program files of the named plaintiffs all contain the same types of documentation regarding TASC's practices, and that TASC has never contended that the named plaintiffs' experiences were atypical. (Doc. 143 at 11–12). Further, TASC has offered to stipulate to the fact that its written policies—requiring MDPP participants to pay fees and setting out the consequences for nonpayment—are provided to all MDPP participants. *Id.* at 12. Thus, Plaintiffs do not require discovery to prove the existence of a common written policy affecting all members of the putative class.

However, Plaintiffs are not only challenging TASC's written policies, but also TASC's allegedly unconstitutional unwritten policies and customs. (Doc. 144 at 3). Plaintiffs maintain that in order to establish that these unwritten policies are so persistent and widespread as to constitute a permanent and well-settled practice, Plaintiffs must be able to review the evidence across all the MDPP program files to determine how participants were actually treated. *Id.* The requested program files contain communications between TASC participants and their case managers regarding participants' inability to pay fees, documentation of participants' indigence, and participants' program start and end

dates—all of which in combination could indicate a customary practice of terminating or prolonging the participation of MDPP participants solely because they were unable to pay required fees. *Id.* at 3–4. Further, both the program files of participants who timely completed MDPP and the files of those whose participation was terminated or extended are relevant to establishing the existence of a customary pattern or practice. This is because Plaintiffs must prove that TASC's policy was to treat indigent participants differently from affluent participants. *Id.* at 2–3. Therefore, the MDPP program files are relevant to establishing TASC's pattern or practice of wealth-based discrimination and thereby demonstrating the commonality and typicality of the proposed class, as well as to show that Plaintiffs' interests are aligned with the putative class members such that Plaintiffs will adequately represent class interests.

   iii. Fed. R. Civ. P. 23(b)

  In addition to proving numerosity, commonality, typicality, and adequacy under Rule 23(a), class certification also requires that one of the three factors in Rule 23(b) are met:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

- 14 -

1    Fed. R. Civ. P. 23(b). Here, Plaintiffs contend that the proposed injunctive class will satisfy

2    Rule 23(b)(2) and that the proposed damages class will satisfy Rule 23(b)(3).

3          Rule 23(b)(2) serves to ensure that each class member will benefit from a single

4    indivisible declaratory or injunctive remedy. *Wal-Mart Stores, Inc.*, 564 U.S. at 360. A

5    court will deny class certification where class members seek individualized relief requiring

6    individualized adjudication, and a class may only be certified where "the [challenged]

7    conduct is such that it can be enjoined or declared unlawful only as to all of the class

8    members or as to none of them." *Id.* (citation omitted). The requirements of Rule 23(b)(2)

9    "are unquestionably satisfied when members of a putative class seek uniform injunctive or

10   declaratory relief from policies or practices that are generally applicable to the class as a

11   whole." *Parsons*, 754 F.3d at 688.

12         Here, Plaintiffs are seeking injunctive relief on behalf of individuals currently

13   participating or who have been offered to participate in MDPP and who are or will be

14   unable to pay required program fees. (Doc. 139 at 3). Because the existence of a common

15   pattern or practice will show that Plaintiffs' claim satisfies Rule 23(b)(2), for the same

16   reasons discussed above regarding why Plaintiffs' discovery request is relevant to

17   establishing commonality, typicality, and adequacy, the Court finds that Plaintiffs'

18   discovery request is also relevant to Plaintiffs' claim for injunctive relief.[5]

19         Rule 23(b)(3) is comprised of two parts. First, the predominance test asks whether

20   issues common to the class predominate over issues particular to individual class members.

21   *Id.* "When common questions present a significant aspect of the case and they can be

22   resolved for all members of the class in a single adjudication, there is clear justification for

23   handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150

---

24   [5] TASC argues that the issue of class certification is not important with respect to the
25   injunctive class because there are no named plaintiffs currently enrolled in MDPP and
     TASC will soon no longer be operating MDPP; thus, it is unlikely at the time of the Court's
26   decision on the merits of this case that any MDPP participants will be eligible for injunctive
     relief. (Doc. 143 at 12). However, because Plaintiffs are broadly seeking information
27   regarding TASC's treatment of current and former MDPP participants for the purpose of
     establishing TASC's pattern or practice of wealth-based discrimination, the fact that
28   putative class members currently enrolled in MDPP may ultimately be ineligible for
     injunctive relief is not a reason to deny Plaintiffs' request for discovery of the MDPP
     program files.

F.3d at 1022. However, a court may find a lack of predominance where the representative party cannot prove a necessary element of his or her substantive claim on a classwide basis. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). Second, the superiority test asks whether the objectives of class action litigation—including promoting judicial efficiency, limiting the costs incurred by litigants, and ensuring uniformity of decisions—support certifying a class in a particular case. *Hanlon*, 150 F.3d at 1023.

Here, Plaintiffs' proposed damages class includes individuals who were enrolled in MDPP but were not considered for successful completion in 90 days solely because they were unable to pay the required fees. (Doc. 139 at 2–3). Thus, discovery of the MDPP program files is relevant to establishing that the damages incurred by class members stemmed from TASC's written or unwritten discriminatory policies, and that questions of law or fact common to the class predominate over individual questions regarding their damages claims such that a class action is a superior method for resolving the claims. *See Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

iv.   Conclusion

In sum, the Court finds that Plaintiffs' discovery request is relevant to class certification. The program files of MDPP participants contain information that may enable Plaintiffs to prove the existence of an unwritten pattern or practice by TASC of wealth-based discrimination. Because the existence of a policy or practice is relevant to establishing that Plaintiffs' bid for class certification satisfies the requirements of Rule 23(a) and Rule 23(b), the discovery request is relevant to Plaintiffs' claim.

As to TASC's argument that Plaintiffs do not need to discover the program files of all MDPP participants in order to make their case for class certification, as the Court explained above, Plaintiffs must be able to discover more than just the files of the named plaintiffs in order to prove that TASC has an unconstitutional policy or practice so persistent and widespread that it constitutes a well-settled policy of wealth-based discrimination. The Court further rejects TASC's argument that Plaintiffs' discovery request for all MDPP files is overbroad because it includes files for: "(1) participants who

completed all MDPP requirements (including the payment of fees) within 90 days; (2) participants who were terminated for other program violations, such as continued drug use; (3) participants who reported income to TASC that would make the participant ineligible for a fee waiver or reduction; and (4) participants who have been (or were) on the MDPP for less than 90 days." (Doc. 143 at 10). While it is true that Plaintiffs' request includes program files for all participants regardless of their indigence or reasons for successfully completing the program within 90 days or not, TASC has identified no other way to determine which program participants are potentially class members. Indeed, TASC has stated to the Court that it does not keep a list of indigent persons referred to MDPP by Maricopa County, that it "cannot accurately compile a list of persons in the program that are indigent," that it cannot necessarily determine from its files whether participants were extended because they were unable to pay the fees, and that "TASC's process for defining indigence 'was not correct, monitored or implemented consistently over the years.'" (Doc. 139 at 8; Doc. 139 Exs. G and H). Thus, Plaintiffs' discovery request must necessarily include a review of at least some percentage of the MDPP program files in order to discover documentation of indigence and whether Plaintiffs and the putative class members were harmed by a policy or practice of wealth-based discrimination.

### C. Proportionality and Burden of Production

A discovery request must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). This takes into account: (1) the importance of the issues at stake, (2) the amount in controversy, (3) the parties' relative access to information, (4) the parties' relative resources, (5) the importance of discovery to resolving the issues, and (6) whether the burden or expense of the discovery request outweighs its importance to the case. *Id.* "The purpose of the . . . proportionality principle is to permit discovery of that which is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery." *Crystal Lakes v. Bath & Body Works, LLC*, 2018 WL 533915, at *1 (E.D. Cal. Jan. 23, 2018).

. . .

. . .

i.  Importance of the Issues at Stake and Importance of Discovery to Resolving the Issues

In evaluating the importance of the issues at stake, courts not only examine the importance of the issues to the parties involved, but also "the significance of the substantive issues, as measured in philosophic, social, or institutional terms." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. Thus, where free speech or other constitutional issues with broader significance are involved, courts may allow a more broad and burdensome discovery to proceed. *Id.* Courts also consider how useful or necessary discovery is to resolving the issues, and "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.

Here, the issue at stake is class certification. Plaintiffs argue that this issue is important because the proposed class includes at least hundreds, if not thousands, of individuals whose constitutional rights were violated by TASC. (Doc. 139 at 13–14); (Doc. 144 at 9). Further, Plaintiffs contend that their discovery request is critically important to class certification because it is only through the discovery of MDPP participants' program files that it will be able identify TASC's unwritten pattern or practice of wealth-based discrimination, thereby enabling Plaintiffs to certify a class and pursue damages and injunctive relief on behalf of injured class members. (Doc. 139 at 8–13). Because Plaintiffs have demonstrated the importance of class certification to their case, as well as the broader importance of the underlying constitutional issues at stake, and because Plaintiffs specifically identify how discovery will be useful to certifying the proposed class, this factor weighs in favor of allowing discovery of at least some of the requested files.

ii.  Amount in Controversy

There is no bright line rule regarding what amount justifies discovery. Rather, courts require the amount in controversy to outweigh the burden of the request. *See, e.g.*, *Nat.- Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 3110021, at *8 (C.D. Cal. Mar. 19,

2019) (rejecting discovery request because the amount in controversy, $704,899.56, was not "so high as to justify the substantial burden placed on the parties and the Court by the discovery at issue"); *Guerrero v. Wharton*, 2017 WL 7314240, at *4 (D. Nev. Mar. 30, 2017) (granting plaintiff's discovery request where the amount in controversy, $242,675.94, greatly outweighed the defendant's limited burden of disclosure).

Here, TASC argues that the amount in controversy is very low, based on the fact that Plaintiffs Briggs and Soria suffered out-of-pocket damages of $1,710 and $825, respectively. (Doc. 143 at 13). TASC also argues that these figures are inflated. *Id.* However, because Plaintiffs are seeking discovery for the purpose of certifying a class, the amount in controversy is not the amount sought by the individual named plaintiffs, but rather the amount recoverable by all members of the proposed class. (Doc. 144 at 9). Further, Plaintiffs' damages claim is not limited to out-of-pocket costs, but also includes noneconomic and other damages not yet calculated. *Id.* at 9 n.4. Thus, because there are potentially thousands of class members, the Court finds that the amount in controversy is likely to be very high.[6]

### iii.  The Parties' Resources and Relative Access to Information

When the requesting party has very little information, and the party receiving the request has vast amounts of information, discovery may be permitted even where the request may be burdensome to the disclosing party. Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment; *see, e.g.*, *Murphy v. Precision Castparts Corp.*, 2018 WL 10561986, at *2–3 (D. Or. Oct. 2, 2018) (granting discovery request where plaintiffs proved that defendant kept track of requested data that plaintiffs did not otherwise have access to); *Woodard v. Labrada*, 2017 WL 10702139, at *4 (C.D. Cal. Apr. 19, 2017) (granting discovery request where the parties' disparate access to information justified the burden placed on the disclosing party).

---

[6] As noted above, there could be between 1,020 and 3,000 members of the putative class. If each class member suffered out-of-pocket damages consonant with those suffered by Soria, the total out-of-pocket damages sought by the class would amount to, at a minimum, $841,500.00. The actual damages sought are likely to be much higher, as this figure does not include noneconomic or other damages.

Here, Plaintiffs contend that that they "have no other way of accessing the information contained in the program files." (Doc. 139 at 14); (Doc. 144 at 9). And, as demonstrated by the documents that TASC has already produced, there is no question that TASC keeps program files on MDPP participants in its regular course of business and thus has access to the requested information. (Doc. 139 at 14); (Doc. 139-4); (Doc. 139-5). The Court is not persuaded by TASC's argument that Plaintiffs already have access to the requested information simply because Plaintiffs were able to identify some MDPP participants prior to discovery. (Doc. 143 at 13). Even if Plaintiffs were able to identify and interview program participants in an attempt to gather the requested information on their own, Plaintiffs would still lack access to many of the internal TASC communications and documents they seek as relevant to establishing an unwritten pattern or practice of wealth-based discrimination. (Doc. 139 at 14 n.8). Thus, Plaintiffs' lack of access to the information sought compared against the wealth of information at TASC's disposal weighs in favor of granting Plaintiffs' discovery request.

### iv.  TASC's Burden

In addition to the above factors, the Court must also consider "whether the burden or expense of [Plaintiffs'] proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). This serves to ensure that the discovery request is "not unreasonable or unduly burdensome or expensive, given the needs of the case." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. Courts have the authority to reduce discovery, even where the request is an otherwise appropriate area of inquiry, where the request is found to be disproportionately burdensome. *Id.* However, generally courts liberally construe Rule 26 and exercise broad discretion to allow pretrial discovery, except where abusive. *Seattle Times Co.*, 467 U.S. at 34; *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) ("[T]he strong policy in favor of liberal discovery is clear.").

Courts consider the monetary expense imposed on the opposing party as well as the relative resources of the parties, and are more likely to find a request burdensome where a party lacks the necessary resources to respond to the request. Fed. R. Civ. P. 26 advisory

committee's note to 2015 amendment. However, a discovery request will not be denied solely because of the impecunity of the party receiving the request, nor will a request addressed to a wealthy party be automatically granted. *Id*. Courts also consider non-financial factors such as whether the requested information is stored electronically, and where there exists a reliable way to search electronically stored information, courts may instruct the parties to use searches to limit discovery and reduce the burden. *Id.* Further, courts consider whether the discovery request is likely to expose a party to unwarranted "annoyance, embarrassment, [or] oppression[,]" Fed. R. Civ. P. 26(c)(1), and whether the request is unduly cumulative or duplicative, Fed. R. Civ. P. 26(b)(2)(C).

Here, the Court finds that Plaintiffs' discovery request for all MDPP participant files is unduly burdensome to TASC. Because TASC is a nonprofit organization with limited resources, Plaintiffs' discovery request is financially burdensome and TASC lacks the resources to adequately respond to Plaintiffs' request. (Doc. 143 at 13–14). TASC states that the organization's resources are largely nonmonetary in nature in the form of land, buildings, and equipment; that its investment assets have declined in value by over 50% in the past three years; that its current liabilities outweigh its monetary assets; and that it has limited staff to what is necessary to perform day-to-day services. *Id.* Although the parties disagree on precisely how much time it would take and how expensive it would be for TASC to comply with Plaintiffs' discovery request,[7] it is clear that requiring TASC to produce all of the program files for MDPP participants during the relevant time period would be expensive, time-consuming, and burdensome to TASC due to its limited financial means and resources.

Plaintiffs imply that TASC's burden of disclosure is limited by the fact that TASC maintains program files on MDPP participants in its regular course of business and does so electronically. (Doc. 139 at 15–16). However, the fact that the requested information is

---

[7] TASC estimates that Plaintiffs' request for all of the MDPP program files encompasses some 400,000 pages and that TASC's counsel would have to spend 400 hours reviewing the files. (Doc. 143 at 3). Plaintiffs contend that TASC overestimates the number of files it would need to review by 45% and also overestimates the length of the program files, thus inflating the amount of time TASC's attorneys would need to spend reviewing the files. (Doc. 144 at 8).

stored electronically does not necessarily reduce the burden on the party opposing disclosure where the electronically stored information is not readily accessible. *Banas v. Volcano Corp.*, 2013 WL 5513246, at *2 (N.D. Cal. Oct. 4, 2013) ("In the age of electronically-stored information . . . production of all relevant, not privileged and reasonably accessible documents in a company's custody and control is easier said than done. This discovery can be extremely expensive and burdensome."); *see also* Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. TASC argues that because of the software it uses, identification of potential class members, retrieval of their files, and examination of the files for private or privileged information would take a significant amount of time. (Doc. 143 at 3, 16). TASC further explains that files for each participant can exist in three different systems and that some documents may only exist in hard copy, and that only a few of its staff understand the systems well enough to perform a search and identify any deficiencies. *Id.* at 3.Thus, the fact that TASC maintains files electronically does not eliminate its burden of disclosure.

Finally, TASC argues that Plaintiffs' request is unduly cumulative and that Plaintiffs could support their claim through more narrow discovery. (Doc. 143 at 14). TASC suggests as an alternative to Plaintiffs' request for *all* MDPP participants' program files that it provide a random sampling of 10% of the files. *Id.* at 4, 15. Plaintiffs state that they "have never refused to consider sampling," and indeed request that the Court order the parties to negotiate a sampling procedure if the Court finds that Plaintiffs' discovery request is unduly burdensome. (Doc. 144 at 11–12). Plaintiffs have also offered to exclude several documents commonly found in MDPP participants' program files from their discovery request entirely. (Doc. 168 at 8–9). Both parties have also suggested that Plaintiffs may be able to narrow their discovery request with stipulations, and the Court has encouraged the parties to do so. However, the parties have thus far been unable to come to an agreement, resulting in Plaintiffs' motion to compel.

In sum, although the Court finds that Plaintiffs' discovery request is relevant to their case for class certification, requiring TASC to produce the program files for all MDPP

participants would create a disproportionate burden on TASC. The Court finds that this burden can be reduced by Plaintiffs' agreement to exclude certain documents from their discovery request and by negotiating a sampling procedure, as discussed more in Section G below.

### D. Privileged Information

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). When a party responding to a discovery request withholds information on the grounds that it is privileged and therefore undiscoverable, "the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Fed. R. Civ. P. 26(b)(5).

Here, TASC argues that the MDPP participants' program files include communications between TASC and its counsel that are protected by attorney-client privilege and/or the work product doctrine. (Doc. 139-7 at 3); (Doc. 143 at 3, 9); *see also United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011) (defining the law in the Ninth Circuit regarding attorney-client privilege and the work product doctrine). However, Plaintiffs state that they have no intention to discover any privileged documents, and suggest that if there is privileged information in the files they have requested, TASC should excise or redact this information and submit a privilege log pursuant to Fed. R. Civ. P. 26(b)(5). (Doc. 139 at 7 n.7); (Doc. 144 at 5). TASC has made no argument as to why it would be unable to remove privileged information from the program files. Accordingly, the Court finds that TASC may protect privileged communications, if they exist, by removing the information from the participants' program files and submitting a privilege log.

### E. HIPAA Considerations

TASC argues that the MDPP program files of putative unnamed class members contain highly confidential health information protected under HIPAA, and that because

the participants have not consented to the disclosure of this information, the Court should reject Plaintiffs' discovery request. (Doc. 139-7 at 3, 5–6); (Doc. 143 at 17). While Plaintiffs admit that the program files contain private information protected under HIPAA, Plaintiffs contend that this information may nonetheless be disclosed under the terms of the Protective Order already in place in this case. (Doc. 139 at 3, 16); (Doc. 144 at 10).

HIPAA protects the privacy of personal health information by making it a crime to knowingly "disclose[] individually identifiable health information to another person." Health Insurance Portability and Accountability Act, Pub. L. No. 104–191, § 1320d-6, 110 Stat. 1936 (1996). The law protects all "individually identifiable health information," including all information "relat[ing] to the past, present, or future physical or mental health or condition of an individual, [or] the provision of health care to an individual." HIPAA § 1320d. HIPAA applies to "covered entities" including health plans, healthcare clearinghouses, and healthcare providers, as well as "business associates" of HIPAA-covered entities, including individuals or companies that store protected health information and transmit it to a health plan or healthcare provider. 45 C.F.R. § 160.103; 42 U.S.C § 1395x(u).

HIPAA privacy protections come into play any time there is a "disclosure" of protected health information, meaning "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103. Covered entities and business associates may disclose protected health information only with the patient's consent or in response to a court order or discovery request. *Elder-Evins v. Casey*, 2012 WL 2577589, at *5 (N.D. Cal. July 3, 2012). When disclosing protected health information in response to a discovery request, a covered entity or business associate must ensure "that reasonable efforts have been made . . . to ensure that the individual who is the subject of the protected health information . . . has been given notice of the request; or . . . reasonable efforts have been made . . . to secure a qualified protective order." 45 C.F.R. §§ 164.512(e)(1)(ii)(A)–(B). A qualified protective order prohibits the parties from using or disclosing protected health information for any purpose

1  other than the litigation at hand and requires the parties to return or destroy the protected

2  information at the end of proceedings. 45 C.F.R. § 164.512(e)(1)(v).

3  Here, although the parties agree that HIPAA's privacy protections apply to the

4  MDPP participants' program files, the Court finds that the information is nonetheless

5  subject to disclosure under the terms of the Protective Order already in place. The parties

6  filed a stipulation to enter into a Protective Order on September 20, 2019 (Doc. 111), which

7  this Court granted on October 10, 2019 (Doc. 116). The parties stated that "discovery in

8  this matter will involve production of sensitive information . . .  requir[ing] a heightened

9  level of confidentiality, including protected health information," and specifically identified

10  the program files of MDPP participants as subject to the order. (Doc. 111 at 1–2). The

11  Protective Order contains agreed-upon procedures governing the "use, handling, and

12  disclosure" of protected health information for the purposes of this litigation, which the

13  Court finds are adequate to protect the information to be produced. (Doc. 116). Therefore,

14  even if HIPAA otherwise restricts TASC from disclosing the requested program files,

15  TASC is nonetheless authorized pursuant to 45 C.F.R. § 164.512 to disclose these files

16  under the Protective Order already entered into by the parties. *See* 45 C.F.R. §

17  164.512(e)(1)(ii)(B); *Chickadaunce v. Minott*, 2014 WL 4980547, at *6–7 (S.D. Ind. Oct.

18  6, 2014) (finding that "the State's suggestion that additional training or monitoring would

19  be required to protect the privacy interests of the individuals whose case files will be

20  produced is a red herring. First, the production in question is pursuant to this Court's order.

21  Second, and more importantly, the production can and should be made pursuant to the

22  Stipulated Protective Order Governing Confidential Health Information, which was

23  negotiated by the parties and issued by this Court.").

24  **F.  PHSA Considerations**

25  TASC also argues that compliance with Plaintiff's discovery request would require

26  TASC to violate PHSA and its restrictions on the disclosure of information regarding the

27  history, diagnosis, or treatment of substance use disorders. (Doc. 148 at 1–2). Plaintiffs

28  contend that much of the information in the requested program files is not protected under

PHSA, but that to the extent that any information is protected, TASC can comply with PHSA and protect participants' privacy through redactions or by following the procedures for notice provided under 42 C.F.R. § 2.64. (Doc. 168 at 2–3, 10–12).

The Public Health Services Act provides that:

> Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance use disorder education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any [federal] department or agency . . . shall . . . be confidential.

42 U.S.C. § 290dd-2(a). Specifically, PHSA restricts the disclosure of: (1) information "about patients receiving diagnosis, treatment, or referral for treatment for a substance use disorder," (2) "obtained by a federally assisted drug abuse program," which (3) was obtained "for the purpose of treating a substance use disorder, making a diagnosis for that treatment, or making a referral for that treatment," and which (4) "[w]ould identify a patient as having or having had a substance use disorder." 42 C.F.R. §§ 2.12(a)(1), (e)(1).

A record protected by PHSA may only be disclosed under certain circumstances: (1) where the patient on whom the record is maintained gives prior written consent; (2) to medical personnel in the event of an emergency; (3) for research or auditing purposes provided the individual patient is not identifiable; (4) to a public health authority provided the individual patient is not identifiable; (5) in a civil or criminal proceeding brought by the government against the patient; or (6) where a court issues an order on a showing of good cause. 42 U.S.C. §§ 290dd-2(b)(1)–(2), (c). Where a party with a legally recognized interest in disclosure seeks a court order authorizing disclosure of patient records for a noncriminal purpose, both the entity holding the records and the patient must be provided with "[a]dequate notice in a manner which does not disclose patient identifying information to other persons; and . . . [a]n opportunity to file a written response to the application, or to appear in person, for the limited purpose of providing evidence on the statutory and regulatory criteria for . . . the court order." 42 C.F.R. § 2.64(b).

. . .

i.   Defining "Covered Program"

PHSA restricts disclosure of "drug abuse information obtained by a federally assisted drug abuse program." 42 C.F.R. § 2.12(a)(1)(ii). A "program" is an entity that "holds itself out as providing, and provides, substance use disorder diagnosis, treatment, or referral for treatment." *Id.* § 2.11. Further, a program is considered to be "federally assisted" if it is conducted by a federal agency, is authorized by a federal agency, receives federal funding, or "is assisted by the Internal Revenue Service of the Department of the Treasury through the allowance of income tax deductions for contributions to the program or through the granting of tax exempt status to the program." *Id.* § 2.12(b).

Here, the Court finds that TASC constitutes a federally assisted program under the PHSA definition. First, because TASC is a nonprofit organization that has been granted a 501(c)(3) tax exemption by the federal government, it is federally assisted. (Doc. 148 at 3); (Doc. 162 at 5–6). Plaintiffs stipulate to this fact. (Doc. 151 at 8). Second, TASC holds itself out as providing substance use diagnosis, treatment, or referral for treatment. (Doc. 148 at 3); (Doc. 162 at 5–6). For example, in the organization's mission statement, TASC states that it "provide[s] outpatient behavioral health treatment and counseling, including: substance use treatment." (Doc. 148 at 3). Specifically regarding the MDPP, the Memorandum of Understanding TASC entered into with Maricopa County states that "[i]f a client . . . submit[s] positive urine tests, the case will be examined for . . . counseling." (Doc. 162-1 at 10). Third, regardless of how routinely diagnoses and referrals are made, TASC at least sometimes diagnoses participants with substance use disorders and provides referrals for treatment. (Doc. 162 at 5).

ii.   Defining "Patient"

PHSA restricts disclosure of information "about patients receiving diagnosis, treatment, or referral for treatment for a substance use disorder." 42 C.F.R. § 2.12(e)(1). A patient is "any individual who has applied for or been given diagnosis, treatment, or referral for treatment for a substance use disorder."[8] *Id.* § 2.11. The regulations explicitly state that

---

[8] The definition of "patient" has shifted over time. Prior to March 21, 2017, PHSA defined "patient" to include "any individual who has applied for or been given diagnosis or

1    this includes individuals who, after being arrested on criminal charges, are identified as

2    having a substance use disorder for the purpose of identifying the individual's eligibility

3    for a treatment program. *Id.*

4         Here, TASC states that "[p]articipants who are unable to abstain from unlawful drug

5    use or who consume alcohol despite their commitment not to do so while in MDPP . . .

6    receive additional screening and assessment for a possible substance use disorder and may

7    be referred for treatment or counseling." (Doc. 162 at 5). Thus, these individuals are

8    "identified as having a substance use disorder for the purpose of [referral to] a substance

9    abuse treatment program," making them "patients" under the PHSA definition. *See* 42

10   C.F.R. § 2.11.[9] However, not all MDPP participants either seek or receive a substance

11   abuse assessment, and thus not all qualify as patients. (Doc. 162 at 5). For example, the

12   named plaintiffs state that they enrolled in MDPP not because they were seeking treatment

13   for a substance use disorder, but because they were threatened with prosecution if they

14   refused to enroll. (Doc. 151 at 6). Further, Plaintiffs note that the files TASC produced for

15   treatment for *alcohol or drug abuse*," whereas the current definition defines "patient" as
     "any individual who has applied for or been given diagnosis, treatment, or referral for
16   treatment for *a substance use disorder*." 42 C.F.R. § 2.11 (originally enacted May 5, 1995)
     (emphasis added). TASC argues that the Court should apply the earlier definition of
17   "patient" in determining whether Plaintiffs may discover the program files of individuals
     who participated in MDPP between January 1, 2017 and March 20, 2017. (Doc. 162 at 2–
18   5). Because the Supreme Court has held that applying statutes retroactively is heavily
     disfavored, the Court will apply the earlier definition of "patient" to this 79-day subset of
19   Plaintiffs' discovery request. *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994)
     ("Since the early days of this Court, we have declined to give retroactive effect to statutes
20   burdening private rights unless Congress had made clear its intent."); *TwoRivers v. Lewis*,
     174 F.3d 987, 993 (9th Cir. 1999) ("Absent clear legislative intent to the contrary, a
21   presumption exists against retroactive application of new statutes."). However, this
     distinction will have only a slight impact on Plaintiffs' discovery request because only a
22   small number of records from a limited period of time are likely to be impacted. In addition,
     regardless of whether a MDPP participant would be classified as an "alcohol or drug
23   abuse[r]," per the former definition, or a "substance use[r]" under the present definition,
     the information collected by TASC on that individual is only subject to privacy protections
24   under PHSA if it is collected "for the purpose" of diagnosis, referral, or treatment. TASC
     only collects this information on those individuals who test positive for substances or self-
25   report problematic substance use. These individuals would likely qualify both as drug
     abusers—using drugs for other than medicinal purposes—and substance users—engaging
26   in "risky use" of substances. Therefore, because the only information TASC collects for
     the purpose of diagnosis, referral, or treatment is collected on individuals who would
27   qualify as patients under both the former and current definitions of the term, it is unlikely
     that any information would be subject to disclosure upon application of one definition but
28   not the other.
     [9] Plaintiffs stipulate to this fact. (Doc. 168 at 5–6).

the named plaintiffs do not contain any of the three forms TASC uses for substance use disorder screening, and that TASC itself advertises that only participants who test positive while in the program will be referred for substance use disorder screening. (Doc. 168 at 2–3, 5–6). Finally, TASC admits that not all MDPP participants have even been charged with drug use, and some participants have only been charged with possession. (Doc. 162 at 9 n.12) (Doc. 151 at 6–7). Thus, just because someone is a MDPP participant does not mean he or she is necessarily a substance user, is seeking treatment for substance use, or receives a substance use diagnosis or referral for substance use treatment, and thus not every participant qualifies as a patient.

iii.   Documents at Issue

PHSA restricts disclosure of information that "[w]ould identify a patient as having or having had a substance use disorder" and that was obtained "for the purpose of treating a substance use disorder, making a diagnosis for that treatment, or making a referral for that treatment." 42 C.F.R. § 2.12(a)(1)(i), (ii). PHSA defines "substance use disorder" as "a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems such as impaired control, social impairment, risky use, and pharmacological tolerance and withdrawal." 42 C.F.R. § 2.11. Information is not protected under PHSA unless it both identifies its subject and identifies the subject as having or having had a substance use disorder, and is obtained for the purpose of treatment, diagnosis, or referral for treatment.

Here, the MDPP participants' program files personally identify the subjects of those files by name. (*See, e.g.*, Doc. 139-4, Doc. 139-5). TASC states that the program files contain several types of records that could reflect a MDPP participant's current or former substance use and that the information is used at least in part for diagnosis, treatment, or referral for treatment. (Doc. 162 at 6–7). First, all incoming MDPP participants complete a general information form, which includes questions about participants' histories of drug use and counseling. *Id.* at 7. These forms are compiled for the purpose of identifying individuals who may need referrals for treatment. *Id.* at 5 n.5. Second, some participants

complete a TCU Drug Screen 5 form, which tracks the DSM-5 criteria for assessing substance use disorders, and would likely indicate non-medicinal drug use. *Id.* at 7–8. TASC also uses a Substance Abuse Subtle Screening Inventory ("SASSI-4") form containing questions designed to reveal a substance use disorder. *Id.* at 8. Third, Substance Use Assessment forms completed by TASC clinicians can include a diagnosis of current or prior substance use disorder. *Id.* Fourth, some MDPP participants receive letters referring them to treatment. *Id.* Fifth, some participants' program files contain records of payments made for substance use counseling. *Id*. Sixth, participants' program files contain various records of urine tests, which TASC compiles in part to identify participants in need of more intensive counseling options. *Id.*; (Doc 162-1 at 10). And seventh, program files can contain records of email correspondence between participants and their case managers discussing failed drug tests and referrals to substance use treatment.

Some of these documents such as treatment referral letters, certain correspondence between MDPP participants and their case managers, clinician Substance Abuse Assessment forms, and documentation of payments made for substance use treatment, directly identify some participants as having substance use disorders or having been referred for treatment. (Doc. 162 at 7–8). In addition, the general information forms, TCU Drug Screen 5, and SASSI-4 forms are all designed to elicit information that would reveal a participant's substance use disorder, thereby indirectly identifying MDPP participants as having substance use disorders. *Id*. Accordingly, the Court finds that because these documents are both personally identifying and identify their subjects, either directly or indirectly, as having substance use disorders, where TASC collects these documents on patients for the purpose of diagnosis, treatment, or referral, PHSA protects the documents against disclosure.

### iv.   Disclosure of Protected Information

Although some information in the MDPP program files is protected against disclosure under PHSA, TASC may still disclose the information by making appropriate redactions. Courts in the Ninth Circuit have generally held that a medical patient's right to

1    privacy may be protected while still allowing the disclosure of private medical records if

2    the records are properly redacted. *Conant v. McCoffey*, 1998 WL 164946, at *4 (N.D. Cal.

3    Mar. 16, 1998) ("[T]hough there is a significant privacy interest in medical information,

4    the redaction will adequately safeguard the privacy rights of . . . patients."); *Lucy Chi v.*

5    *Univ. of S. California*, 2019 WL 3315282, at *9 (C.D. Cal. May 21, 2019) ("[S]imple

6    redactions of those documents under seal . . . would be sufficient to protect those patients'

7    privacy interests."). In addition, at least one federal court has specifically ordered the

8    disclosure of information regarding a patient's substance use disorder—otherwise

9    protected under PHSA—where all patient-identifying information was redacted from the

10   records. *Beard v. City of Chicago*, 2005 WL 66074, at *5–6 (N.D. Ill. Jan. 10, 2005).

11        Here, the Court finds that redaction will sufficiently protect MDPP participants'

12   privacy interests and comply with the requirements of PHSA. There are several ways that

13   TASC can identify the files and information to be redacted. First, TASC can redact the

14   personally identifying information of all participants who qualify as patients and for whom

15   TASC collected information for the purpose of substance use diagnosis, treatment, or

16   referral. Second, Plaintiffs previously suggested as a possible solution to the parties'

17   discovery dispute that TASC "redact the personal identifying information from *all* of the

18   [requested] files[,]" which would eliminate the need for TASC to identify which program

19   files are subject to PHSA's protections and which are not. (Doc. 168 at 10–11). Thus, all

20   participant personal identifying information would be obscured, and no file would identify

21   a particular individual as having a substance use disorder. Finally, TASC could redact the

22   specific information in each participant's file that is protected under PHSA, but the Court

23   presumes that this would be a more burdensome and time-intensive undertaking than

24   simply redacting the personally identifying information.

25        TASC does not argue that it cannot protect the privacy rights of MDPP participants

26   through redactions, but contends that requiring it to identify *all* applicable program files

27   containing information protected under PHSA and redacting that information would be

28

unduly burdensome, requiring thousands of hours of work. (Doc. 162 at 9–11).[10] As the Court explained above, the requested program files are highly relevant to Plaintiffs' case for class certification. However, because requiring TASC to produce all of the files from the relevant time period and then redact those files to exclude information protected under PHSA would present a substantial burden, the Court will order the parties to negotiate a sampling procedure and enter stipulations to reduce TASC's burden. The Court notes that Plaintiffs have already agreed to exclude certain documents from their discovery request in an effort to reduce TASC's burden, including the CT One files, TCU Drug Screen 5, SASSI-4, and TASC's substance abuse assessment forms. (Doc. 168 at 11; (Doc. 169 at 9).[11]

. . .

---

[10] The parties dispute TASC's burden in identifying and redacting files protected under PHSA. TASC states that there were over 6000 MDPP participants during the relevant time period, that a significant portion could qualify as patients under PHSA, and that each file can be 100–200 pages. (Doc. 169 at 2). TASC estimates that it would take 300 hours just to identify which records are subject to PHSA disclosure requirements, and that even if only 20% of the 2017–2019 MDPP files have to be redacted, it would require thousands of hours of work. (Doc. 162 at 9–11). Plaintiffs contend that TASC overstates its burden because a substantial portion of MDPP participants were not "patients" under PHSA, and that TASC has not assessed its redaction time accurately. (Doc. 168 at 7, 10).

[11] As an alternative to redacting the protected information, Plaintiffs suggest that the Court require the parties to follow the procedures set forth in 42 C.F.R. § 2.64, which provides specific "procedures and criteria" designed to safeguard the unconsented-to disclosure of patients' private substance use disorder information when disclosure is compelled by a court order. 42 U.S.C. § 290dd-2(g). First, all patients whose records are to be disclosed must be provided with "[a]dequate notice in a manner which does not disclose patient identifying information." 42 C.F.R. § 2.64(b)(1). Second, patients must be provided with "[a]n opportunity to file a written response to the application or to appear in person for the limited purpose of providing evidence on the statutory and regulatory criteria for the issuance of the court order." *Id.* § 2.64(b)(2). Third, any hearing in which patient identifying information is discussed must be held in some manner that ensures the requested information is not disclosed to any unauthorized individuals. *Id.* § 2.64(c). Fourth, the court must have good cause to compel disclosure. *Id.* § 2.64(d). And fifth, the order must limit disclosure to the parts of the record that are needed to fulfill the objective of the order. *Id.* § 2.64(e).

The Court finds that requiring the parties to comply with these procedures in this case would create even more of a burden on TASC. TASC estimates that the parties would be required to identify and provide notice and an opportunity to be heard to over 1,000 MDPP participants. (Doc. 169 at 2). The Court is persuaded that following the procedures outlined in 42 C.F.R. § 2.64 would be incredibly burdensome and time-consuming. Further, because there exists a much less burdensome way for TASC to proceed with disclosure in compliance with PHSA—by redacting the applicable program files—this Court rejects Plaintiffs' proposal that the Court should order the parties to discuss a way to comply with 42 C.F.R. § 2.64.

v.  Conclusion

In sum, although not all of the documents encompassed in Plaintiffs' discovery request are protected under PHSA, the MDPP program files do contain some information that is subject to privacy protections. However, TASC may still disclose the information without violating PHSA by making appropriate redactions. Further, although it would be unduly burdensome to require TASC to identify all documents within the requested program files that might contain protected information and to redact the entirety of Plaintiffs' discovery request, Plaintiffs have agreed to narrow the scope of their request by excluding certain documents. Finally, as discussed further below, the Court will require the parties to negotiate a sampling procedure so as to provide Plaintiffs with sufficient access to information to support their case for class certification while reducing TASC's burden of disclosure.

**G. Sampling**

"Sampling is a methodology based on inferential statistics and probability theory . . . [whereby] one may confidently draw inferences about the whole from a representative sample." *DeLuca v. Farmers Ins. Exch.*, 2019 WL 4307940, at *5 (N.D. Cal. Sept. 11, 2019) (quoting *Duran v. U.S. Bank Nat'l Assn.*, 325 P.3d 916, 938 (Cal. 2014)). In class actions, a representative sample can be used to prove class-wide liability. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) ("A representative or statistical sample, like all evidence, is a means to establish or defend against liability."); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("circuit courts including this one have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability"). Sampling may also be useful at the pre-class certification phase of discovery. *See Halvorsen v. Credit Adjustments Inc.*, 2016 WL 1446219, at *2 (N.D. Ill. Apr. 11, 2016) ("It may be that a party responding to discovery before a class is certified can make a good argument that only a sample of the requested materials should be produced because of concerns about undue burden and proportionality, but it is not necessarily true that all discovery that touches the merits as well as class issues should be

halted unless and until a class is certified."). In determining whether a sample is representative of a class, courts ask whether each member of the class could have relied on the evidence obtained from the representative sample to establish liability in his or her own individual action. *Tyson Foods*, 136 S. Ct. at 1046. Where class members' claims require fact-intensive individual analyses, sampling is inappropriate. *Vinole*, 571 F.3d at 947.

Here, the parties do not dispute the general fairness and utility of using the program files of a representative sample of MDPP participants for the purposes of certifying a class. However, because Plaintiffs have maintained in their pleadings that they are entitled to all of the MDPP program files and that producing the files will not be unduly burdensome, the parties have not agreed on a specific sampling procedure. There is no bright line rule as to a specific number of putative class members who must be sampled for the purpose of class certification. Courts consider both the benefits and the burden of discovery in relation to the size and complexity of the case. *See Arredondo v. Delano Farms Co.*, 2014 WL 5106401, at *9 (E.D. Cal. Oct. 10, 2014).

As explained throughout this Order, the Court finds that the information Plaintiffs seek to have disclosed is both relevant and necessary to their case for class certification. However, producing all of the MDPP program files from the relevant time period would create a substantial burden on TASC in terms of time, resources, and costs. Accordingly, the Court will order the parties to negotiate a sampling procedure to reduce TASC's burden of production while still providing Plaintiffs access to the documents that they need to prove a pattern or practice of wealth-based discrimination.

## IV.    CONCLUSION

Accordingly, for the reasons explained herein,

**IT IS HEREBY ORDERED** granting Plaintiffs' Motion to Compel (Doc. 139) in part as follows:

1. The Court finds that the information sought in Plaintiffs' discovery request is both necessary and relevant to Plaintiffs' case for class certification.

2. The Court further finds that to the extent the MDPP program files contain any

1   privileged communications, TASC can protect the privileged information by

2   redacting it and submitting a privilege log.

3   3.  The Court further finds that while information in the program files is protected

4   under HIPAA, the information can still be disclosed pursuant to the Protective

5   Order already entered in this case.

6   4.  The Court further finds that although some of the program files contain

7   information protected under PHSA, TASC can still lawfully disclose the

8   information by making appropriate redactions.

9   5.  The Court further finds that requiring TASC to disclose all of the program files

10  from the relevant time period would be unduly burdensome. This burden is

11  partially alleviated by Plaintiffs' agreement to exclude certain documents from

12  their discovery request. To further reduce TASC's burden, the Court will require

13  the parties to negotiate a sampling procedure that will provide Plaintiffs with a

14  representative sample of the MDPP program files sufficient to prove their case

15  for class certification.

16  **IT IS FURTHER ORDERED** that Plaintiffs and Defendant TASC shall meet and

17  confer within fourteen (14) days of the date of this Order to negotiate a sampling procedure

18  for TASC's production of the MDPP program files.

19  **IT IS FURTHER ORDERED** that if the parties are unable to agree to a sampling

20  procedure, the parties shall notify the Court within thirty (30) days of the date of this Order

21  and the Court shall impose a sampling procedure.

22  Dated this 14th day of July, 2020.

23

24

25

26  Eric J. Markovich
    United States Magistrate Judge

27

28