Timothy J. Eckstein, 018321
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
teckstein@omlaw.com
jbendor@omlaw.com

Katherine Chamblee-Ryan (*pro hac vice*)
Ryan Downer (*pro hac vice*)
Bina Ahmad (*pro hac vice*)
Sumayya Saleh (*pro hac vice*)
CIVIL RIGHTS CORPS
910 17th Street NW, Second Floor
Washington, D.C. 20002
(202) 656-5189
katie@civilrightscorps.org
ryan@civilrightscorps.org
sumayya@civilrightscorps.org

Stanley Young (*pro hac vice*)
Sarah Mac Dougall (*pro hac vice*)
Virginia Williamson (*pro hac vice*)
Nicholas Baer (*pro hac vice*)
COVINGTON & BURLING LLP
5 Palo Alto Sq.
(650) 632-4704
syoung@cov.com
smacdougall@cov.com
vwilliamson@cov.com
nbaer@cov.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs, et al.,<br><br>          *Plaintiffs*,<br>v.<br><br>Allister Adel, in her official capacity as County Attorney of Maricopa County, et al.,<br><br>          *Defendants*. | No. CV-18-2684-PHX-EJM<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' SECOND MOTION TO COMPEL** |

As set out in Plaintiffs' Second Motion to Compel, Doc. 254, a keyword search of the email inboxes of six case managers and three employees who held key managerial roles at Treatment Assessment Screening Center ("TASC")—using a list of terms already negotiated and agreed-upon by the parties for a similar search—is likely to produce information that is both relevant and proportional to the needs of this case. Defendant TASC argues otherwise, primarily asserting that (1) it has already performed sufficient searches of the email inboxes of managerial employees, (2) it has already produced some case manager communications and other case manager communications are not relevant to whether TASC adopted and implemented unconstitutional policies or practices, and (3) Plaintiffs' requested searches are not proportional to the needs of this case and are unduly burdensome.  TASC is mistaken on all three points, and this Court should grant Plaintiffs' motion.[1]

I. **TASC Has Not Conducted Adequate Searches of Managerial Employees' Emails.**

TASC first argues that it has already conducted adequate searches of managerial employees' emails and has already produced "internal communications involving those with decision-making authority over the MDPP." Opp'n at 1, 4.  Not so.  TASC has performed only cursory searches of the ESI of three managerial employees, as the more complete, keyword-based search of ESI belonging to a fourth managerial employee makes clear.

TASC's insistence that it has performed adequate searches of ESI in the custody of three managerial employees—(1) CEO (Douglas Kramer), (2) COO (Marrya Briggs), and (3) Chief Program Officer (Latrice Hickman)—is belied by the history of discovery in this case.  Initially, TASC refused to perform keyword searches of *any* employees'

---

[1] TASC also asserts that it is unclear what relief Plaintiffs seek.  *See* Opp'n at 3.  As set out in Plaintiffs' Motion, Plaintiffs ask this Court to compel Defendant TASC to conduct keyword searches (using previously agreed-upon search terms) of the email inboxes of managerial employees who held four different roles at TASC and six specific case managers and to produce responsive documents.  *See* Mot. at 16–17.

ESI, asserting that "topic-based" searching had adequately identified all relevant documents.[2] *See* Doc. 254-3, Ex. B, Chamblee-Ryan Decl. ¶¶ 20–21. Despite maintaining that its "topic-based" searches were adequate, after months of discussion between the parties, TASC agreed to perform keyword searches as to ESI belonging to *one* managerial employee, Diversion Program Manager Cheyenne Watson, using a list of terms negotiated by the parties.[3] *See* Ex. B, ¶¶ 19–27. That search turned up *hundreds* of additional responsive documents that had not been identified as part of TASC's "topic" search. *See id.* ¶¶ 34–35. Despite this history, TASC still maintains that its "topic" searches—which were plainly inadequate to identify relevant documents in the ESI belonging to Cheyenne Watson—were somehow perfectly adequate to identify emails for three other managerial employees. *See* Opp'n at 4. This cannot be so.

TASC argues that there are "limitations" on keyword searches. *See* Opp'n at 16–17. But the theoretical possibility that keyword searches may not be useful in some cases does not undercut their utility here. As described in detail in Plaintiffs' Motion,

---

[2] Despite Plaintiffs' repeated requests to clarify what TASC meant when it claimed to have searched "by topic," TASC has offered little more than that it searched "by subject matter based on the subjects addressed in the documents at issue." Doc. 254-3, Ex. B, Chamblee-Ryan Decl. ¶ 21 (quoting Ex. 8, Email from Amanda Weaver, at 1 (Jan. 29, 2020)).

[3] The parties negotiated the search terms over the course of months, with Plaintiffs first proposing a list of terms in April 2020, Plaintiffs revising the list to address TASC's concerns in May 2020, the parties meeting and conferring about the list in May 2020, TASC agreeing to perform "test" searches using the proposed terms in July 2020, and TASC finally reporting in November 2020 that it would agree to use the search terms to search Cheyenne Watson's ESI, subject to two modifications. *See* Ex. B, ¶¶ 28–33. Four months later, in March 2021, TASC expressed vague "concerns" about the search terms. *See* Doc. 268-1, Ex. A, Decl. of Amanda Weaver, ¶ 18. Given that TASC was an active participant in developing the list of search terms, TASC spent four months "testing" the terms, and TASC has offered few, if any, specifics about modifications that might address its purported concerns, this Court should not credit TASC's belated suggestion that the negotiated terms are now somehow unworkable. *See* Opp'n at 16.

3

the parties' own experience shows that keyword searches *are* appropriate in this case. *See* Mot. at 10–11 (describing newly produced emails identified through keyword searches of Cheyenne Watson's ESI that are central to the policies or practices that Plaintiffs must prove to obtain class certification).

TASC also contends that keyword searches are not "mandatory." Opp'n at 16–17. However, the Federal Rules of Civil Procedure require that TASC conduct a diligent search and reasonably inquire into the existence of requested documents, *see* Fed. R. Civ. P. 34; *see also Guardado v. Nevada Ex Rel*, No. 2:17-cv-00879-JCM-PAL, 2021 WL 1234504, at *2 (D. Nev. Apr. 1, 2021) ("When a party receives a discovery request, the rules require that party to make a reasonable inquiry to determine whether responsive documents exist."), which TASC has not done. TASC does not—and could not—contest that keyword searches are a standard ESI protocol used frequently in this district and elsewhere. *See* MIDP, § E(2)(a) (listing "search terms to be used" as one of the ESI topics on which parties must meet and confer); *see also, e.g.*, *Doe v. Heritage Academy, Inc.*, No. CV-16-03001-PHX-SPL, 2017 WL 6001481, at *13 (D. Ariz. June 9, 2017) (ordering parties to "meet and confer in an effort to reach agreement on a mutually-acceptable search protocol, including search terms").[4] Given that TASC's "topic-based" ESI searches were plainly and demonstrably inadequate and a keyword-based search of one custodian resulted in substantial, relevant additional productions, a keyword-based search is warranted for the other managerial employees' ESI too.

That TASC ultimately searched and has begun producing responsive documents from Cheyenne Watson's ESI does not mean that searches of the ESI of other

---

[4] At least one district in this Circuit goes further, "presum[ing] that the use of search terms . . . will be reasonably necessary to locate or filter ESI likely to contain discoverable information." Model Agreement re: Discovery of Electronically Stored Information, § C. ESI Discovery Procedures, U.S. District Court for the Western District of Washington, available at https://www.wawd.uscourts.gov/sites/wawd/files/ModelESIAgreement.pdf (last visited Apr. 14, 2021).

4

managerial employees will produce only duplicative communications. *See* Opp'n at 8. TASC's CEO, COO, and CFO are precisely the types of custodians likely to have additional, relevant communications about TASC's policies or practices, and TASC has offered no credible reason to think that all or even most relevant documents in the custody of these employees have been produced or will be produced as part of the productions TASC has already agreed to. *Cf. Houston v. Papa Johns Int'l, Inc.*, No. 3:18-cv-00825-CHB, 2020 WL 6588505, at *3 (W.D. Ky. Oct. 20, 2020) ("Defendants . . . cannot credibly claim that these former CEOs do not have any unique, relevant ESI or that their files will be duplicative of those produced by the other custodians.").

## II. Searches of Case Manager Emails Are Likely to Identify Relevant Communications.

As for Plaintiffs' request that this Court require TASC to search six case managers' email inboxes using the same previously negotiated search terms, TASC contends that the case managers' communications are not relevant because these employees "were non-managerial employees at TASC, and who therefore were not responsible for—nor capable of making—any policy." Opp'n at 6. TASC argues that *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), "forecloses the possibility" that TASC could face liability based on these communications. *See* Opp'n at 6–8.

First, TASC misinterprets *Praprotnik*. Contrary to TASC's arguments, *Praprotnik* made clear that custom or policy need not have been developed in the first instance by a final policymaker. Rather, a municipality may "be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official" where, for example, "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." 485 U.S. at 130. Case manager communications are likely to reveal whether any "persistent and widespread discriminatory practice[s]," *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) (quotation marks omitted), have become TASC policy or custom. These communications are also likely to reveal discussions among case managers about

5

policies handed down by managerial employees that do not appear in TASC's written policy statements.

TASC also contends that its productions of the MDPP program files and of Cheyenne Watson's ESI suffice and render any case manager communications immaterial. *See* Opp'n at 4–5, 9–10. But the MDPP program files feature case notes about individual MDPP participants. These files do not reflect or include all case manager communications concerning broader policies or customs that implicate more than one MDPP participant. Likewise, the MDPP program files do not capture case manager discussions about *how* to implement existing TASC policies or case manager reflections on policies discussed during department meetings, for example. Neither do Cheyenne Watson's emails likely include all key relevant documents.

TASC complains that searching six case managers' email inboxes will result in "substantial duplication" of emails already captured in prior productions. Opp'n at 5. Plaintiffs do not dispute that *some* duplication is possible.[5] But TASC has offered no basis for its suggestion that the email inboxes contain no more than the documents TASC has already produced or agreed to produce. *Id.* As explained above, emails among case managers that did not involve a managerial-level TASC employee may reveal additional relevant information supporting Plaintiffs' claims and forthcoming class certification motion.[6]

---

[5] TASC paints Plaintiffs' suggestion that it may omit duplicative emails from future productions as failing to "acknowledge[]" the purportedly "enormous burden it would be to TASC to search the responsive emails for communications" and compare those emails with MDPP participant files that TASC has already produced. Opp'n at 5. Although Plaintiffs believe that emails between case managers and MDPP program participants are likely to contain new, relevant information about TASC's policies or practices, Plaintiffs suggested that TASC could omit these emails purely to reduce TASC's burden.

[6] Also, TASC has offered no reason why de-duplication techniques would not substantially reduce its burden. *See Sedona Conf. Glossary*, 21 Sedona Conf. J. 263,

TASC's reliance on *Enslin v. Coco-Cola Co.* is misplaced. *See* No. 2:14-cv-06476, 2016 WL 7042206 (E.D. Pa. June 8, 2016)  As TASC acknowledges, Opp'n at 10 n.9, in *Enslin*, the defendant agreed to conduct searches of ten custodians, after which the plaintiff moved to compel searches of the ESI of an additional 38 custodians. *See id.* at *1.  Here, TASC has conducted an adequate search of the ESI of only *one* custodian—and TASC did so more than a year after Plaintiffs made their requests and only after months of negotiation over appropriate search terms.  Moreover, unlike in *Enslin*, Plaintiffs here have explained precisely why searches of particular custodians are likely to produce responsive information that has not already been captured. *See id.* at *3 (explaining that defendant had reviewed ESI of potential custodians and had determined that they "either did not possess any relevant ESI or the information they did possess was likely to be duplicative of ESI collected from other custodians").  The keyword search of Cheyenne Watson's email inbox turned up such information and adequate searches of other custodians' ESI are likely to do the same.  The Court should reject TASC's mere speculation that searches that were not adequate for Cheyenne Watson's ESI are somehow adequate as to other custodians.

**III.     Plaintiffs' Requests Are Proportional And Not Unduly Burdensome.**

Plaintiffs' Motion sets out in detail why the requested searches are proportional for this case and not unduly burdensome. *See* Mot. at 12–16.  Arguing otherwise, TASC first disputes the importance of the issues at stake in this action, asserting that because Plaintiffs have not moved for injunctive relief, "[t]here is no urgency to have any of these issues resolved at this time under the circumstances." Opp'n at 12.  But whether there is "urgency" has nothing to do with whether Plaintiffs' requested searches are designed to reveal documents relevant to class certification.  As set out here and in Plaintiffs' Motion, they are so designed.

---

293 (2020) (describing the automated process that compares ESI files and removes or marks exact duplicate files for the purpose of streamlining review and production).

7

Second, TASC contends that the amount-in-controversy in this case amounts to only a few thousand dollars sought by the individual Named Plaintiffs. Opp'n at 12–13. Citing no authority, TASC argues that "Plaintiffs should not get the full benefit and TASC should not get the full burden of discovery as though this were a certified class action." *Id.* at 12. But the Ninth Circuit has defined amount-in-controversy as "simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). Said otherwise, "the amount in controversy reflects the *maximum* recovery the plaintiff could reasonably recover." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019); *see also, e.g.*, *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1206 n.4 (E.D. Cal. 2008) ("Plaintiff cannot avoid satisfaction of the amount in controversy by arguing that the class plaintiffs *may* be awarded less than the statutory maximum. The critical inquiry is the amount placed in controversy by the allegations in plaintiff's complaint."). This is a class action with thousands of potential class members, and, as this Court has observed, "the amount in controversy is likely to be very high."[7] Doc. 173 at 18. TASC is therefore mistaken in suggesting that only the individual Named Plaintiffs' alleged damages are in controversy in this litigation.

Third, on the parties' access to relevant information, TASC admits that it has superior access to the emails Plaintiffs seek, but notes that Plaintiffs' counsel "obtain[ed] substantial information about this matter before even filing the Complaint" and asserts that Plaintiffs have "obtained substantial relevant information" in discovery.

---

[7] Plaintiffs have previously estimated that Defendant TASC's damages amount to approximately $7,024,000. *Cf. Rodriguez v. Providence Cmty. Corrections, Inc.*, No. 3:15-cv-1048 (M.D. Tenn.) ($14.3 million settlement fund established to resolve class action challenging private probation company's extensions of supervision terms based on probationers' inability to pay fees); *Luse v. Sentinel Offender Servs., LLC*, No. 2:16-cv-00030-WCO (N.D. Ga.) (settlement awarding restitution and $90 per unauthorized drug test in class action alleging private probation company unlawfully required probationers to submit to urinalysis tests).

8

Opp'n at 13.  TASC's mention of Plaintiffs' access to other discovery information is beside the point.  As TASC admits, it has access to the disputed emails, and Plaintiffs have no access to these communications.

Fourth, TASC disputes that it has substantial resources and asserts that it "has no income to account for the cost of responding to additional discovery."  Opp'n at 14.  As Plaintiffs noted in their Motion, though, TASC was acquired in August 2020 by Averhealth, a national non-profit corporation that has pledged to "ensure continuity" of TASC's services.[8]  TASC has resisted Plaintiffs' efforts to learn about TASC's financial resources, including those concerning the Averhealth acquisition.  Moreover, TASC's opposition to Plaintiff's motion *still* fails to offer any details about the extent to which Averhealth's acquisition of TASC has afforded it resources.  *See* Opp'n at 13–14.  TASC cannot use this change in status to support its burden arguments while simultaneously denying Plaintiffs *any* information about the details of its transaction with Averhealth and current financial status.

Fifth, TASC asserts that the discovery Plaintiffs seek is irrelevant to resolving issues relevant to class certification.  Opp'n at 14–15.  As set out above, TASC is mistaken.  The requested communications are relevant to whether TASC has unwritten policies and practices of wealth discrimination.

Finally, TASC contends that the burden and expense of Plaintiffs' requested discovery outweighs its likely benefit.  TASC first cites the expenses it contends it incurred to search, redact, and produce the sample MDPP program files and the ESI from custodian Cheyenne Watson.  *See* Opp'n 1, 15–16 (asserting that "the MDPP participant file productions incurred a cost of over $150,000 (with over 560 hours) and,

---

[8] "Averhealth Expands Its National Footprint with the Acquisition of Treatment Assessment Screening Center (TASC) Drug Testing Services," PRNewsWire (Aug. 31, 2020), https://www.prnewswire.com/news-releases/averhealth-expands-its-national-footprint-with-the-acquisition-of-treatment-assessment-screening-center-tasc-drug-testing-services-301119943.html.

9

a cost of over $100,000 for Ms. Watson's emails (with nearly 300 hours) to date, with over 40,000 pages reviewed"). TASC also contends that, to facilitate the searches Plaintiffs propose, TASC would need the services of an independent contractor and claims that the process of searching may be "more complicated" because TASC moved to a new email system in 2019. Opp'n at 14.

For three reasons, this Court should reject TASC's burden argument.

First, this Court should give no weight to TASC's argument that the email communications are difficult to access because of a system change that occurred in 2019. At that point, the parties were in the midst of this litigation. TASC could have and should have elected to store its ESI in a way that rendered it reasonably accessible. It should not be exempt from providing relevant discovery because it elected to store its email communications in a more difficult to access system. *See, e.g., U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-cv-00295-LRH-VPC, 2015 WL 5056726, at *5 (D. Nev. Aug. 25, 2015) (finding that a $136,000 restoration cost was not undue since "ESI is now a common part and cost of business" and businesses should give "thought to the risk of litigation and corresponding discovery obligations" when deciding how to store ESI); *see also, e.g., Wesley v. Muhammad*, No. 05 Civ. 5833 (GEL) (MHD), 2008 WL 4386871, at *5 (S.D.N.Y. Sept. 17, 2008) (rejecting defendants' argument that "an institution may shield itself from discovery by utilizing a system of recordkeeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them, thus rendering the production of documents an excessively burdensome and costly expenditure" (internal quotation marks and citation omitted)).[9]

Second, Plaintiffs have repeatedly attempted to work with TASC to reduce the cost and burden of redacting its productions. In particular, Plaintiffs have repeatedly

---

[9] Additionally, given that TASC's productions of Cheyenne Watson's emails include messages sent and received before 2019, TASC must have already contracted with a professional to secure emails stored on the former email system. Curiously, TASC offers no indication of how much those specific efforts cost.

urged that there are criteria the parties can use to identify MDPP program files that are not subject to the Public Health Services Act and that therefore would not require redaction.  TASC has refused all of these invitations, insisting that it needed to redact files in the production and that no such criteria could be identified.  The additional expenses TASC incurred by using its preferred methods of production do not offer persuasive reasons why this Court should prevent further discovery.  *Cf., e.g.*, *Lou v. Ma Labs., Inc.*, No. 12-cv-05409 WHA(NC), 2013 WL 12328278, at *2 (N.D. Cal. Apr. 15, 2013) (rejecting burden argument where "the burden defendants claim[ed] excuse[d] them from producing . . . documents [wa]s of their own making").

Third, TASC offers no basis why this Court should conclude that the searches and productions Plaintiffs request in their Second Motion to Compel will require the same efforts or expense as prior searches.  For the requested productions from TASC's CEO, COO, and CFO, in particular, because those employees did not likely directly interface with MDPP program participants, their communications are less likely to contain information about particular MDPP program participants who may be patients under the Public Health Services Act and therefore those documents less likely to require redactions.

**CONCLUSION**

For the reasons discussed above and the reasons set out in Plaintiffs' Motion, Doc. 254, this Court should grant Plaintiffs' Second Motion to Compel.

DATED this 14th day of April, 2021.

Respectfully submitted,

/s/ *Virginia Williamson*

Timothy J. Eckstein
Joshua D. Bendor
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona  85012-2793

11

Katherine Chamblee-Ryan (*pro hac vice*)
Ryan Downer (*pro hac vice*)
Bina Ahmad (*pro hac vice*)
Sumayya Saleh (*pro hac vice*)
CIVIL RIGHTS CORPS
910 17th Street NW, Second Floor
Washington, D.C. 20002

COVINGTON & BURLING LLP
Stanley Young (*pro hac vice*)
5 Palo Alto Sq.
Palo Alto, CA 94306

Sarah Mac Dougall (*pro hac vice*)
620 8th Avenue
New York, New York, 10018

Virginia Williamson (*pro hac vice*)
Nicholas Baer (*pro hac vice*)
850 10th St. NW
Washington, D.C. 20001

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2021 I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Honorable Eric J. Markovich
United States District Court
Evo A. DeConcini U.S. Courthouse
405 West Congress Street, Suite 3160
Tucson, Arizona 85701

Robert Arthur Henry
Jennifer Hadley Catero
Kelly Ann Kszywienski
Amanda Z. Weaver
Snell & Wilmer LLP - Phoenix, AZ
1 Arizona Center
400 East Van Buren
Phoenix, Arizona 85004-2202
bhenry@swlaw.com
jcatero@swlaw.com
kkszywienski@swlaw.com
aweaver@swlaw.com
Phxecf@swlaw.com

*Attorneys for Defendant Treatment Assessment Screening Center, Inc.*

Ann Thompson Uglietta
Joseph Branco
Deputy County Attorneys
Maricopa County Attorney's Office
CIVIL SERVICES DIVISION
Security Center Building
222 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
uglietta@mcao.maricopa.gov
brancoj@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov

*Attorneys for Defendants Maricopa County and Maricopa County Attorney Adel*

/s/ *Virginia Williamson*
Virginia Williamson (admitted *pro hac vice*)

13