*Briggs, et al. v. Adel, et al.*, No.  CV-18-2684-PHX-EJM

## INDEX OF EXHIBITS TO
## PLAINTIFFS' CONTROVERTING STATEMENT OF MATERIAL FACTS
## <u>AND ADDITIONAL MATERIAL FACTS</u>

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | TASC POM Diversion Program |
| 2 | Averhealth Press Release, August 31, 2020 |
| 3 | Fee Agreement and Financial Hardship Policies |
| 4 | Def's Resp. to Pls.' First Set of Interrogatories, April 24, 2020 |
| 5 | V. Garcia Deposition Excerpts, March 27, 2021 |
| 6 | H. Rojo Deposition Excerpts, April 3, 2021 |
| 7 | Email Exchange between Cheyenne Watson and Latrice Hickman |
| 8 | TASC Email and Lists re: Participants who Received Financial Hardship Applications |
| 9 | TASC Spreadsheet |
| 10 | Amended MOU |
| 11 | Email Exchange re: Proposed MOU Amendment |
| 12 | Email and Attachments re: Diversion Staff Meeting |
| 13 | July 2019 Diversion Staff Meeting Agenda |
| 14 | MCAO Sliding Fee Scale Register |
| 15 | Email Exchange re: Diversion Financial Consideration Scale |
| 16 | D. Briggs TASC Participant File |
| 17 | L. Nugent Deposition Excerpt, March 29-30, 2021 |
| 18 | Misc. TASC Participant Files |
| 19 | M. Pascale Direct Complaint and Release Questionnaire |
| 20 | M. Pascale TASC Participant File |
| 21 | D. Briggs Release Questionnaire |
| 22 | D. Briggs Third Supplemental Interrogatory Resp. |
| 23 | L. Soria Release Questionnaire |
| 24 | Declaration of Lucia Soria |
| 25 | Plaintiffs Fourth Supplemental MIDP Responses |
| 26 | Plaintiffs MIDP Verifications |

| 27 | A. Pascale Deposition Excerpt, Nov. 5, 2020 |
| 28 | M. Pascale JPMorgan Chase Bank Records, Nov. 2017 - July 2018 |
| 29 | M. Pascale Nutrition Assistance Records |
| 30 | A. Pascale's Verified Resp. to Def.'s First Set of Interrogatories |
| 31 | A. Pascale's Amended Responses to Def.'s Second Set of Interrogatories, March 19, 2021 |
| 32 | Excerpts from M. Pacale's 2009-10 TASC Participant File |
| 33 | D. Briggs Deposition Excerpt, Oct. 8-9, 2020 |
| 34 | Declaration of Deshawn Briggs |
| 35 | D. Briggs Checking Account Bank Statements, April 16 – June 16, 2016 |
| 36 | D. Briggs Walmart Employee Summary |
| 37 | D. Briggs Nutrition Assistance Benefits Renewal Application and Summary |
| 38 | Email Exchange between TASC and MCAO, June 28, 2018 |
| 39 | L. Soria Deposition Excerpt, Nov. 13, 2020 |
| 40 | L. Soria Nutrition Assistance Notice and Benefits History |
| 41 | Declaration of Dr. Maninder Kahlon |
| 42 | AHCCCS Letter re L. Soria, Nov. 6, 2019 |
| 43 | L. Soria Misc. Medical Records |
| 44 | Plaintiffs' Deficiency Letter, Sept. 16, 2020 |
| 45 | L. Soria Health-e-Arizona Plus Eligibility Application Summary, Dec. 29, 2020 |
| 46 | L. Soria Application for Supplemental Security Income, December 28, 2018 |
| 47 | Arizona DES Request for Verification of Unearned Income re: L. Soria, March 19, 2019 |
| 48 | Declaration of Tony Cavone |
| 49 | Declaration of Eric Slepian |
| 50 | AHCCCS Letter re D. Briggs, Nov. 6, 2019 |
| 51 | AscensionPoint Letters to the Estate of M. Pascale |
| 52 | Declaration of Dr. Diana Pearce |

# EXHIBIT 1



## TASC POM DIVERSION PROGRAM

**Possession of Marijuana Program:**

-6 month program with option of early release
-All 3 program requirements must be completed for a client to successfully complete the program.
-Clients are generally scheduled to start the program 3-5 weeks from their court date in order to come into the program testing clean and to obtain the required intake fee.
-Clients may call and request an earlier or later date for intake depending on their current situation.

**UA's-**

-Clients are responsible for testing clean and as scheduled (random color system).
-If not testing through TASC (i.e. out of state client), only accredited laboratory based testing will be accepted.
-Clients may be excused from testing with pre-approval from case manager.  Clients will be required to submit supporting documentation.

**3 Hour Drug Education Seminar-**

-Classes are held on Thursdays from 6pm-9pm.  This is a 1 time class per client.

**Fees-**

-All clients are required to make monthly payments.
-Clients will remain on the TASC program until their balance is paid in full
-Clients able to provide verification of financial hardship may be placed on a fee agreement
-Clients providing written documentation of indigent status may be eligible for fee reduction (i.e. DES award letters)

**Substance Abuse Counseling-**

-If a client shows a new usage for marijuana or tests positive for any other illegal substance (including prescription drugs that are not verified with a valid prescription), the client will be referred for substance abuse counseling assessment and services (group or individual sessions).  All clients must successfully complete their recommended hours of substance abuse counseling.

# EXHIBIT 2

# Averhealth Expands Its National Footprint with the Acquisition of Treatment Assessment Screening Center (TASC) Drug Testing Services



NEWS PROVIDED BY
**Averhealth →**
Aug 31, 2020, 08:00 ET

RICHMOND, Va., Aug. 31, 2020 /PRNewswire/ -- On August 28, 2020, Averhealth, a provider of substance use monitoring and treatment services tailored to the unique needs of courts and social service agencies, along with the support of Five Arrows Capital Partners, announced the acquisition of the drug testing services of Treatment Assessment Screening Center (TASC), a private, nonprofit 501(c)(3) headquartered in Phoenix, Arizona.

Since 1977, TASC has developed and implemented innovative drug testing and behavioral health programs. With this acquisition, Averhealth will ensure continuity of substance use monitoring services for TASC's clients and extend enhanced services to TASC's existing customer-base in Arizona, Texas, and Utah.

"This acquisition further advances Averhealth's strategy of uniting people, technology, and science to create and deliver the smartest, most innovative solutions for substance use disorder monitoring and recovery. Together, we will help more individuals safely cross the intersection of criminal justice and healthcare by supporting them to develop lasting coping and refusal skills to new use events, enhancing public safety, and equipping courts and social service agencies with intelligent data and automation," stated Jason Herzog, CEO of Averhealth.

"Averhealth and TASC are a natural fit – the Averhealth mission of "reclaiming lives, uniting families and strengthening communities" perfectly aligns with TASC's mission and values of "together, transforming lives with purpose, passion, and proven practices for healthy people, healthy communities and a healthy world. Our goal was to ensure a continuity of care and provide a good home for TASC employees and Averhealth helped us obtain this goal," said Douglas Kramer, CEO of TASC.

"The combination of Averhealth and TASC is an ideal fit with the management team's long-term growth strategy for the business. This acquisition enhances Averhealth's innovative and differentiated marketplace solutions and broadens the company's ability to help more individuals overcome addiction," stated Michael Langer, Managing Director of Five Arrows Capital Partners.

## About Averhealth

Since 1995, Averhealth has specialized in providing substance use monitoring services tailored to the unique needs of judicial programs that operate at the holistic intersection of justice-involved and behavioral health. Today, Averhealth serves more than 350,000 clients across 30 states. Every element of the Averhealth solution incorporates evidence-based practices, positioning programs and clients for the best possible outcome. Random selection, daily engagement, robust sample collection, and next business day results combine to help clients develop coping and refusal skills to new-use events. With Averhealth's agile and easy-to-navigate software and automation tools, it streamlines your daily workflow and ultimately supports recovery. For more information, please visit: https://www.averhealth.com.

## About TASC

Founded in 1977, TASC of Arizona is nationally known as an innovator in the development and implementation of drug testing and behavioral health programs. TASC is a private, nonprofit 501(c)(3) corporation headquartered in Phoenix, Arizona. TASC is licensed by the Arizona Department of Health Services to provide outpatient behavioral health treatment and counseling including: substance abuse treatment and education; domestic violence treatment; anger management; DUI screening; and clinical laboratory services.

## About Five Arrows Capital Partners

Five Arrows Capital Partners (FACP) is the North American corporate private equity business of Rothschild & Co. Merchant Banking (RMB), the investment arm of Rothschild & Co. With offices in London, Paris, Luxembourg, New York and Los Angeles, RMB has over $12 billion of assets under management. Like RMB's European corporate private equity business, FACP is focused on investing in middle market companies with highly defensible market positions, business models with a proven history of generating attractive returns on invested capital across economic cycles and multiple untapped levers for value creation. Sector focus of FACP is on healthcare; business services; and data, software & technology-enabled services. For more information, please visit https://www.rothschildandco.com/en/merchant-banking/corporate-private-equity.

SOURCE Averhealth

Related Links

https://www.averhealth.com

# EXHIBIT 3



# FEE AGREEMENTS

I.  **Fee Agreements -**
    A.  Fee agreements are done when a client reports they do not have the funds to pay for the program required fees, either testing fees or fines.
    B.  The client must provide documentation and fill out a financial information form prior to consideration.
    C.  Waived testing fees are reserved for individuals on disability or considered indigent
    D.  A lowered testing fee or co-pay for testing fees is for individuals on disability or receiving government assistance
        1.  $14 UA fee ----→ $5 co-pay
        2.  $19 UA fee ----→ $7 co-pay
        3.  $24 UA fee ----→ $12 co-pay
        4.  $29 UA fee ----→ $17 co-pay
    E.  A lowered monthly payment is determined by the documents provided. If a client is on disability they can contribute any amount up to $100 monthly. An individual receiving government assistance (i.e. AHCCCS, FS, ect.) can contribute $50 to $150. An individual who is providing pay stubs, bills, or bank statements can contribute $100 to their full monthly payments.
    F.  TASC Forms for financial assistance
        1. Financial Hardship-financial information form
        2. Financial Hardship fee agreement
        3. Co-Pay financial information form
        4. Co-Pay Fee agreement
        5. Award Letter Financial information form
        6. Award Letter- Fee agreement
        7. Financial Information form POM
        8. Fee agreement POM



## FINANCIAL AGREEMENTS:

✓ If a client is experiencing financial hardship and the client is meeting <u>ALL</u> other program requirements, the client may be eligible for assistance.

✓ The client must fill out the *Financial Information Form* in order to determine if the client is eligible (See Financial Section for example).

   ➢ Remember that the clients have up to 22 months to complete the program. If the client is able to pay off their balance within 22 months, complete a fee agreement, which allows the client a reduction in monthly payments but noted on the fee agreement at the bottom is "client understands that balance must be paid in full for successful completion of the TASC Diversion Program".

   ➢ If a client is "working poor" or "disabled", they must provide documentation such as a minimum of 2 recent pay stubs (needs to be in chronological order so they are not only submitting their lowest paychecks), award letters, and/or copies of bills (rental agreement, car insurance, etc.-must be in client's name).

✓ An *Adjusted Fee Agreement Form* must be filled out and signed by both the client and the case manager (See Financial Section for example).

✓ Fee agreements MUST be reviewed a minimum of every 90 days. If any changes in employment status occur, the fee agreement should be adjusted accordingly.

✓ Clients that are unable to pay program fees because they are unemployed may be placed on a fee agreement but must provide verification of job search. Once the client becomes employed, the fee agreement should be adjusted appropriately (client should be able to pay off fees within the 22 months).

✓ Any client that is not at a zero balance at the time of "possible" successful completion MUST be staffed with the director in order to determine if remaining fees are eligible to be waived or if the client will remain in the program until their balance is paid in full.

✓ If a client is in violation of ANY program requirement (especially if the client is testing positive) the fee agreement may/should be null and void. Client will be responsible for all fees at that time.

✓ **UA FEES MAY NOT BE WAIVED OR ON CO-PAY STATUS IF A CLIENT IS TESTING POSITIVE. UA FEES SHOULD BE REINSTATED EFFECTIVE IMMEDIATELY FOLLOWING A POSITIVE UA.** The client *must* submit 6 consecutive clean UA's before fees can again be reduced.



A.  Fee agreements are completed when a client reports they do not have the funds to pay for the program required fees, either testing fees or fines.

B.  The client must provide documentation and fill out a financial information form prior to consideration.

C.  Waived testing fees are reserved for individuals on disability or considered indigent

D.  A lowered testing fee or co-pay for testing fees is for individuals on disability or receiving government assistance
   1.  $14 UA fee ----→ $5 co-pay
   2.  $19 UA fee ----→ $7 co-pay
   3.  $24 UA fee ----→ $12 co-pay
   4.  $29 UA fee ----→ $17 co-pay

E.  A lowered monthly payment is determined by the documents provided. If a client is on disability they can contribute any amount up to $100 monthly. An individual receiving government assistance (i.e. AHCCCS, FS, ect.) can contribute $50 to $150. An individual who is providing pay stubs, bills, or bank statements can contribute $100 to their full monthly payments.

F.  TASC Forms for financial assistance ( see attached)


1.  Financial Information Form –HARDSHIP  (no money, has a job, too many bills)

   ▪ DOCUMENTS:
       • Must have at least 2 active letters ( 2 pay stubs, bank account info, bills)
   ▪ UA FEE
       • Pays full UA fees/ no copay for UAs ( UAs stay the same)
   ▪ MONTHLY PAYMENTS
       • Just a reduced monthly payment -No less than $100 towards monthly fees
   ▪ LENGTH OF FINANCIAL AGREEMENT
       • Only for 90 days ( full payments resume after 90 days)

2.  Financial Information F0rm-COPAY

   ▪ DOCUMENTS:
       • Must have active letters (SSI,  AHCCCS, food stamps, bank info, bills)
   ▪ UA FEE
       • Reduced UA fee  (SAGE/PINE) ($5)($7)($12)
   ▪ MONTHLY PAYMENTS
       • No less than $75-$100 monthly fees
   ▪ LENGTH OF FINANCIAL AGREEMENT ( Client can renew, but should be encouraged to find employment)
       • Only for 90 days ( full payments resume after 90 days)

3.  Financial Information Form-WAIVED…AWARD LETTER

   i.  DOCUMENTS:



          1. Must have active letters (SSI-DISABILITY, bank statements, bills)
- ii. UA FEE
          1. Waived (Disability (how much are they getting? $700 or $2400) (can renew)
- iii. MONTHLY PAYMENTS
          1. $50- $75 monthly fees
- iv. LENTH OF FINANCIAL AGREEENT
          1. Only for 90 days ( full payments resume after 90 days)
          2. Can renew but try to move to co-pay and then hardship, etc

4. Case Managers are encouraged to **_NOT_** keep clients on a fee agreement for their entire program.
5. ALWAYS refer employment resources.
6. ALWAYS refer to shelters or half-way houses
7. Once client tests positive (non-prescription) remove fee agreement, if they don't follow through with what they sign, remove them off the fee agreement.

8. Must give 8 consecutive clean tests in order to be eligible for another fee agreement.

9. Clients must provide documented proof of all items listed on their Financial Information Form. If they failed to bring documentation, Case Managers need to remove/[postpone the fee agreement

10. Change the box in intake screen is the client is placed on CO-PAY or Fees Waived

Charges:

| | CHARGE | CRNUM | DRNUM |
|---|---|---|---|
| ▶ | POND | CR2013-00... | 1301595 |
| ✳ | | | |

Fees

☑ Full (F)    ☐ Sliding (S)    ☐ Co-Pay (C)    ☐ Fees Waived

11. ALL Financial Information Form with attached documentation must be scanned to the corresponding lead Case Manager before any FEE AGREEMENT can be approved.



## TASC Financial Information Form-Award Letters-Waived Fees
### Please write legibly

Client Name:_____ Donor ID_____ Date:_____

Employment: ☐ Full Time   ☐ Part Time   ☐ Unemployed   ☐ Disabled

If employed, how many hours a week do you work? _____

What is your monthly income? _____

What is your monthly **household** income? _____

Please list **ALL** monthly expenses for household (i.e. rent/mortgage):

| | |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |

TOTAL   $_____

What do you think you are able to pay per month towards your program fees?

_____   _____

Client signature                        Date



## TASC Financial Information Form-Co-Pay/Sliding
*Please write legibly*

Client Name:_____ Donor ID_____ Date:_____

Employment: ☐ Full Time    ☐ Part Time    ☐ Unemployed    ☐ Disabled

If employed, how many hours a week do you work? _____

What is your monthly income? _____

What is your monthly **household** income? _____

Please list **ALL** monthly expenses for household (i.e. rent/mortgage):

| | |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| **TOTAL** | $_____ |

What do you think you are able to pay per month towards your program fees?




_____        _____
Client signature                                      Date

 TASC

### TASC Financial Information Form-Financial Hardship
*Please write legibly*

Client Name:_____ Donor ID_____ Date:_____

Employment: ☐ Full Time    ☐ Part Time    ☐ Unemployed    ☐ Disabled

If employed, how many hours a week do you work? _____

What is your monthly income? _____

What is your monthly **household** income? _____

Please list **ALL** monthly expenses for household (i.e. rent/mortgage):

| | |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| **TOTAL** | $_____ |

Do you have any plans for additional income, if so what are your plans?



What do you think you are able to pay per month towards your program fees?



If monthly fees are reduced, how do you intend on paying off all fees by the end of your program?



_____          _____
Client signature                                     Date



## TASC CLIENT FEE AGREEMENT
## Award Letter-Waived Fees

Date_____          Expiration Date of Fee Agreement_____

|            |           |
|------------|-----------|
| TASC FEE   | $1285.00  |
| CA FUND    | _____ |
| BOOKING FEE| _____ |
| **TOTAL**  | _____ |

Supporting Documentation:
☐ SSI Letter        ☐ AHCCCS Letter       Expiration Date of Letter_____
☐ FS Letter         ☐ CA Letter           ☐ Other _____

_____ I understand that my UA fees will be waived for 90 days, unless otherwise stated by my
           case manager.

_____ I understand that ANY violation of my program requirements may result in termination
           of this fee agreement and/or program participation.  Therefore I understand that if this
           fee agreement is voided due to program non-compliance, I will immediately resume
           responsibility of all program costs including UA fees.  It is strongly encouraged that I
           obtain emergency UA money orders at this time.

_____ I understand that if my fee agreement is terminated, I must be in compliance with ALL
           program requirements prior to reconsideration for fee agreement renewal.

_____ I understand that I am responsible to provide updated records to my case manager
           including but not limited to current award letters, paycheck stubs etc.

_____ I understand that my monthly payment will be reduced to _____.

_____ I understand that I MUST make my monthly payment EACH month in order for my UA's
           to remain waived.

_____ I am responsible to meet with my case manager in 90 days for a fee agreement renewal.


_____          _____

Client Signature              Date         Case Manager Signature     Date

---



## TASC CLIENT FEE AGREEMENT: CO-PAY/SLIDING

Date:                                      Expiration Date of Fee Agreement:

TASC FEE            _____      __

CA FUND            _____      __

BOOKING FEE        _____      __

**TOTAL**            _____      __

Supporting Documentation:

☐ SSI Letter        ☐ AHCCCS Letter      Expiration Date of Letter_____
☐ FS Letter         ☐ CA Letter          ☐ Other_____

_____ I understand that my UA fees will be __       __ for 90 days, unless otherwise stated by
           my case manager.

_____ I understand that ANY violation of my program requirements may result in termination
           of this fee agreement and/or program participation.  Therefore I understand that if this
           fee agreement is voided due to program non-compliance, I will immediately resume
           responsibility of all program including UA fees.  It is strongly encouraged that I obtain
           emergency UA money orders at this time.

_____ I understand that if my fee agreement is terminated, I must be in compliance with
           ALL program requirements prior to reconsideration for fee agreement renewal.

_____ I understand that I am responsible to provide updated records to my case manager
           including but not limited to current award letters, paycheck stubs etc.

_____ I understand that my monthly payment will be reduced to_       _.

_____ I understand that I MUST make my monthly payment EACH month in order for my UA's
           to remain on Co-Pay status.

_____ I am responsible to meet with my case manager in 90 days for a fee agreement renewal.

_____        _____
Client Signature            Date        Case Manager Signature       Date



## TASC CLIENT FEE AGREEMENT
### Financial Hardship

Date_____          Expiration Date of Fee Agreement_____

| | |
|---|---|
| TASC FEE | $1285.00_____ |
| CA FUND | _____ |
| BOOKING FEE | _____ |
| TOTAL | _____ |

Supporting Documentation (must have a minimum of 2):

☐ Paycheck Stubs      ☐ Bills  ☐ Child Support        ☐ W2           ☐ Other

_____ I understand that ANY violation of my program requirements may result in termination of this fee agreement and/or program participation.  Therefore I understand that if this fee agreement is voided due to program non-compliance, I will immediately resume responsibility of all program costs.

_____ I understand that if my fee agreement is terminated, I must be in compliance with ALL program requirements prior to reconsideration for fee agreement renewal.

_____ I understand that if my fee agreement is terminated due to program non-compliance, I may not be eligible for a future fee agreement.

_____ I understand that I am responsible to provide updated records to my case manager including but not limited to employment status, bills, etc.

_____ I understand that my monthly payment will be reduced to _____.

_____ I understand that I MUST make my monthly payment EACH month.  Failure to make my payment as agreed will be considered a program violation.

_____ I am responsible to meet with my case manager in 90 days for a fee agreement renewal.

_____ I understand that all program fees must be paid in full in by _____ in order to obtain a successful completion from the TASC Diversion program.

_____ I understand that I am responsible for all program requirements until the completion of my program (i.e. payments, urinalysis, etc.).

_____          _____
Client Signature                    Date        Case Manager Signature        Date

TASC000032

### TASC CLIENT FEE AGREEMENT: POM

Date_____          Expiration Date of Fee Agreement_____

| | |
|---|---|
| TASC FEE/INTAKE | $300.00 |
| CA FUND | $650.00 |
| BOOKING FEE | _____ |
| **TOTAL** | _____ |

Supporting Documentation:

SSI Letter          AHCCCS Letter     Expiration Date of Letter_____
FS Letter           CA Letter              Other _____

_____ I understand that my UA fees will be $_____ for 90 days, unless
                    otherwise stated by my case manager.

_____ I understand that ANY violation of my program requirements may result in
                    termination of this fee agreement and/or program participation.  Therefore I
                    understand that if this fee agreement is voided due to program
                    non-compliance, I will immediately resume responsibility of all program
                    costs including UA fees.  It is strongly encouraged that I obtain emergency
                    UA money orders at this time.

_____ I understand that if my fee agreement is terminated, I must be in compliance
                    with ALL program requirements prior to reconsideration for fee agreement
                    renewal.

_____ I understand that I am responsible to provide updated records to my case
                    manager including but not limited to current award letters, paycheck stubs
                    etc.

_____ I understand that my monthly payment will be reduced to _____.

_____ I understand that I MUST make my monthly payment EACH month in order
                    to remain in compliance with the program.

_____ I am responsible to meet with my case manager in 90 days for a fee
                    agreement renewal.

_____ I understand that I will be participating in the TASC program for a minimum
                    of 6 months.

_____          _____
Client Signature                              Date          Case Manager Signature          Date

TASC000033

# EXHIBIT 4

1   Robert A. Henry (#015104)
    Kelly A. Kszywienski (#025578)
2   Amanda Z. Weaver (#034644)
    SNELL & WILMER L.L.P.
3   One Arizona Center
    400 E. Van Buren, Suite 1900
4   Phoenix, Arizona 85004-2202
    Telephone:  602.382.6000
5   Facsimile:  602.382.6070
    E-Mail: bhenry@swlaw.com
6            kkszywienski@swlaw.com
             aweaver@swlaw.com
7   *Attorneys for Defendant Treatment Assessment
    Screening Center, Inc.*

8

9                    **IN THE UNITED STATES DISTRICT COURT**

                       **FOR THE DISTRICT OF ARIZONA**

10  Deshawn Briggs, et al.,                No. CV2018-02684-EJM

11                      Plaintiffs,        **DEFENDANT TASC'S RESPONSE TO**
                                           **PLAINTIFF DESHAWN BRIGGS' FIRST**
12         v.                              **SET OF INTERROGATORIES FOR**
                                           **DEFENDANT TASC**
13  Allister Adel, et al.,

14                      Defendants.

15

16         Defendant Treatment Assessment Screening Center, Inc. ("TASC") provides the

17  following responses and objections to Plaintiff Deshawn Briggs' First Set of Interrogatories

18  for Defendant TASC.

19                           **INTERROGATORIES**

20         1.     Please identify all client-facing documents that were operative at any time

21  from August 23, 2016 to the present and that state, describe, or reference: any fee associated

22  with MDPP; any procedure(s) for the payment of any MDPP-associated fee(s); any

23  consequence(s) of non-payment or delayed payment of any fee(s) associated with MDPP;

24  any process for the waiver or reduction of any fee associated with MDPP; and/or any other

25  form of assistance and/or relief for a participant who has and/or alleges difficulty affording

26  any MDPP-associated fee.  Please include any and all client-facing documents for the ADPP

27  to the extent those documents were operative for the MDPP.  For the purposes of this

28  interrogatory, "fees" includes both program fees and drug-and-alcohol testing fees.  For

*Snell & Wilmer*
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

4832-0284-8185

document provides unique information.  For example, "client-facing documents" setting forth the program fees would include, among other documents, all program violation notices that inform participants who have failed to make payments as agreed of the procedures to follow if they are experiencing a hardship.  Using Plaintiffs' calculations (ECF No. 144 at 7), there were approximately 5,400 MDPP program participants during the time period of this Request whose files would ***all*** have to be searched if TASC is expected to identify ***every*** document setting forth the process for obtaining a fee waiver or reduction, and the time period each such document was in effect.  That task would take weeks, if not longer.

Based on the foregoing, TASC does not believe that the burden associated with providing information responsive to this Request beyond the information Plaintiffs already have reflecting the process for seeking a waiver or reduction of MDPP drug-and-alcohol testing fees is relevant and proportional to the needs of this case.

### 10. Client-Facing Documents Setting Forth Any Other Form of Assistance and/or Relief for a Participant Who Has and/or Alleges Difficulty Affording Any Drug-and-Alcohol Testing Fees for the MDPP

TASC objects to this Request as vague and ambiguous because it is unclear what "assistance" or "relief" this Request could encompass.  Because TASC does not understand the scope of this Request, TASC cannot identify additional objections it may have.  TASC believes, however, that the objections it has asserted to the request for information relating to the process for obtaining fee reductions or waivers would be applicable to this Request.  TASC reserves the right to raise such objections and any other objections that may be applicable once Plaintiffs clarify the scope of this Request.

2.     Please identify all written policy documents that were operative at any time from August 23, 2016 to the present and that state, describe, or reference: any fee associated with MDPP; any procedure(s) for the payment and/or collection of any MDPP-associated fee(s); any consequence(s) for non-payment or delayed payment of any fee(s) associated with MDPP; any process for the waiver or reduction of any fee associated with MDPP;

and/or any other form of assistance and/or relief for a participant who has and/or alleges difficulty affording any MDPP-associated fee(s). Please include any and all written policy documents for the ADPP to the extent those policies also applied to the MDPP. For the purposes of this interrogatory, "fees" includes both program fees and drug-and-alcohol testing fees. For each such document, please include the following information:

a.     The month, day, and year on which that document became operative; and the month, day, and year on which that document ceased to be operative and/or ceased to reflect the most up-to-date version of the policy or policies it addresses;

b.     If you have produced the document, its document number(s); and

c.     To the extent any document is also related to other diversion programs (for example, ADPP documents), please specify which part of the document includes the policy that was or is operative for the MDPP.

In your response, please include, to the extent responsive to this interrogatory, the documents at the following Bates numbers, which you have already produced: TASC000001-4,    TASC000005,    TASC000006-9,    TASC000023,    TASC000024-26, TASC000042-43, TASC000044-46, TASC000732, TASC000733-36, TASC000740-59, TASC001015-16, TASC001017-18, TASC001034, TASC001037-38, TASC001039-42, TASC001046.

**RESPONSE**

TASC interprets this Interrogatory to consist of ten discrete subparts, *see* Fed. R. Civ. P. 33(a)(1), given that Plaintiffs seek five separate categories of documents for both (1) "program fees" and (2) "drug-and-alcohol testing fees," which are distinctly defined in the Instructions and Definitions. The five separate categories of "written policy documents" that Plaintiffs seek for each of the two foregoing categories of fees are:  (1) "any fee associated with MDPP"; (2) "any procedure(s) for the payment of any MDPP-associated fee(s)"; (3) "any consequence(s) of non-payment or delayed payment of any fee(s) associated with MDPP"; (4) "any process for the waiver or reduction of any fee associated with MDPP"; (5) "and/or any other form of assistance and/or relief for a participant who

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    has and/or alleges difficulty affording any MDPP-associated fee."

2         "An interrogatory's subparts are to be counted as separate and discrete subparts 'if

3    they are not logically or factually subsumed within and necessarily related to the primary

4    question.'" *Carpenter v. Donegan*, Civ. No. 1:11–CV–043 (NAM/RFT), 2012 WL 893472,

5    at *2 (N.D.N.Y Mar. 15, 2012) (citation omitted); *see also Safeco of America v. Rawstron*,

6    181 F.R.D. 441, 445 (C.D. Cal.1998) ("'[D]iscrete or separate questions should be counted

7    as separate interrogatories, notwithstanding that they are joined by a conjunctive word and

8    may be related.'" (quoting *Kendall v. GES Exposition Servs., Inc.*, 172 F.R.D. 684, 685 (D.

9    Nev. 1997))).  For example, a document setting forth "program fees" may but will not

10   necessarily also set forth "drug-and-alcohol testing fees."   Requests for documents

11   addressing those distinct items, therefore, are discrete.

12        TASC further objects to the definition of "written policy documents" applicable to

13   all discrete subparts of this Interrogatory for two reasons.  First, the claims Plaintiffs assert

14   against TASC arise under 42 U.S.C. § 1983.   To establish the alleged constitutional

15   violations, Plaintiffs must prove that the actions they challenge were "caused by 'a policy,

16   practice, or custom of [TASC]' … or [were] the result of an order by a policy-making

17   officer."   *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (citations

18   omitted).  In responding to the 10 discrete subparts of this Interrogatory, TASC will use the

19   term "written policy documents" as Plaintiffs have defined it, but, in doing so, TASC does

20   not agree that Plaintiffs' definition is the same as the term "policy" is used in *Tsao*, *Monell*

21   *v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), or any other applicable law.  Second, the

22   definition is vague and overbroad to the extent it includes "any document" that "describes"

23   or "reflects" the enumerated categories of information as such documents could be

24   extremely voluminous and yet add no relevant information to the issues in dispute with

25   respect to class certification.  For example, a calendar entry reflecting a meeting to discuss

26   amendments to the Memorandum of Understanding between TASC and MCAO, entered

27   into on January 27, 2009, attached as Exhibit 3 to TASC's Motion to Dismiss (ECF No. 29-

28   1) ("MOU"), or an agenda of such a meeting could "reflect" terms of the amendment, as

could TASC's related communications with counsel, but such documents would not impact either the terms or adoption of such policies and, therefore, would not add any relevant information.  Given the overbreadth and ambiguity of the use of "describes" and "reflects" in this context, TASC responds to the following Requests by interpreting "written policy document" to apply to the form documents stating or setting forth the information that Plaintiffs identify (subject to TASC's further objections).

Furthermore, for the purposes of this Interrogatory—and to the extent that the Instructions and Definitions reference both TASC and the MCAO Defendants, *see* Para. C, Instructions and Definitions—TASC understands this Interrogatory to seek information only within TASC's possession, custody, or control.

Based on the foregoing objections, TASC responds to each subpart as follows:

**1.      Written Policy Documents Setting Forth Program Fees for the MDPP**

TASC objects to the definition of "written policy document" as vague in this context. As TASC has previously stated, deferred prosecution programs are established and governed by statute.  *See* A.R.S. §§ 11-361-364.  Such programs "shall be administered by the county attorney of each participating county according to guidelines established by the Arizona prosecuting attorneys' advisory council ['APAAC']." A.R.S. § 11-362. APAAC has established guidelines regarding fees, which read: "Program fees may be established pursuant to A.R.S. § 11-251.08 or similar authority. Fees shall be attributable to defray or cover the expense of the Program services for which the fee is assessed. A fee shall not exceed the actual cost of the Program product or service." APAAC-00005-8.  All program fees for the MDPP, therefore, are subject to this limitation.  Moreover, the program fees for the ADPP (including the MDPP) are set forth in the MOU between MCAO and TASC and its amendments.  *See* MCAO-00001-7, TASC000001-5, TASC001074-75.  TASC agreed to the terms of the MOU and the amendments it executed, but TASC does not view the MOU and its amendments as "TASC" policies, nor did TASC have any authority to dictate the amount of the fees set forth therein.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1          TASC further objects to this Interrogatory as overbroad and disproportionate to the

2   needs of the case for two reasons.  First, it is unclear to TASC how the identification of ***all***

3   "written policy documents" setting forth program fees for the MDPP and the specific dates

4   on which ***each*** such document was effective could be important (or even relevant) to

5   resolving any issue for class certification.  *See* Fed. R. Civ. P. 26(b)(1).  As the Court's

6   ruling on Defendants' motions to dismiss (ECF No. 89) stated, "Plaintiffs' claim is not . . .

7   that the indigent are automatically entitled to fee waivers, or that the initial fee

8   determination must consider the individual's financial status."  Ruling at 20.  That is, the

9   Court determined that Plaintiffs pled their wealth discrimination claim sufficiently to

10  support that they were deprived of "the opportunity to complete the program in 90 days like

11  other, wealthier participants and thereby be free of the conditions required for staying on

12  the program."  *Id.* at 22.  As such, class certification of Plaintiffs' claims will turn on

13  whether putative class members suffered purported consequences as a result of failing to

14  pay whatever fee is established (for that person) by the 90th day solely because he or she

15  could not afford to pay.

16          To the extent the amount of program fees charged to Plaintiffs is relevant to class

17  certification,  TASC has already provided that information to Plaintiffs.  Specifically, TASC

18  has produced the above-referenced MOU and its related amendments.  TASC also has

19  produced documents that persons with decision-making authority at TASC have created,

20  approved, or ratified that set forth the program fees that are established in the MOU and its

21  amendments, including TASC001034 and Plaintiffs': (1) signed statements reflecting the

22  program requirements, *see*, *e.g.*, TASC000078, 292; (2) signed "Explanation of Fees," *see*,

23  *e.g.*, TASC000075, 293, 624; (3) executed Client Contracts, *see*, *e.g.*, TASC000073-74,

24  627-28; and (3) ADPP forms, *see*, *e.g.*, TASC000621-22.  Notably, the program fees for

25  the named Plaintiff from the beginning of the alleged class period (DeShawn Briggs) were

26  the same as the program fees for the named Plaintiff most recently in the MDPP (Lucia

27  Soria).  *Compare* TASC000082-83 *with* TASC000615-616.  Because the additional

28  information Plaintiffs seek in this Request does not impact the class certification analysis,

4832-0284-8185

1    requiring TASC to compile such information would not result in any benefit to Plaintiffs.[3]

2          Second, this Request appears to ask TASC to identify *every* "written policy

3    document" provided to *each individual* MDPP participant setting forth the participant's

4    program fees over a time span of almost four years.  To the extent this Request is so

5    intended, it seeks information that is already subject to Plaintiffs' pending Motion to

6    Compel TASC's Production of MDPP Program Files (ECF No. 139), and the Court's ruling

7    on that Motion will bear on any overlapping information Plaintiffs seek in this Request.  In

8    addition to the objections TASC raised in connection with that briefing and the related

9    Request for Production No. 6 regarding relevance, proportionality, overbreadth, attorney-

10   client privilege, and privacy concerns (*see* ECF Nos. 139-1 at 2-3 & 143 at 8-17), the

11   specific burden imposed on TASC in responding to this Request is that "written policy

12   document" is broadly defined to include every conceivable form of document that sets forth

13   "guidance that concerns how TASC conducts its operations and/or how any TASC

14   employee conducts her job-related duties and/or that could otherwise be reasonably

15   construed as a written statement of official policy," regardless of whether any such

16   document provides unique information.  For example, "written policy documents" setting

17   forth the program fees would include, among many other documents, both the "Client

18   Contract" and the "Explanation of Fees."  Using Plaintiffs' calculations (ECF No. 144 at

19   7), there were approximately 5,400 MDPP program participants during the time period of

20   this Request; those participants received identical or substantially identical "Client

21   Contract" and "Explanation of Fees" documents.  Identifying *each* "Client Contract"

22   executed by *each* participant and the date the client contract was in effect would require

23   TASC to compile and review *each* participant's file, identify the applicable documents, and

24   then identify the specific dates the documents were effective (e.g., the date the participant

25   executed the Client Contract until the date the participant completed the MDPP).  That task

26   would take weeks, if not longer.

27   _____

28   [3]  In this set of Requests, Plaintiffs specifically requested information regarding the document TASC produced with the Bates numbers TASC001037-38.  As set forth at the top of each of those pages, the referenced fees were ***proposals***.

4832-0284-8185

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1    Based on the foregoing, TASC does not believe that the burden associated with

2  providing information responsive to this Request beyond the information Plaintiffs already

3  have reflecting the MDPP program fees that were applicable during the relevant time period

4  and to each of the named Plaintiffs (and the former Plaintiffs) is relevant and proportional

5  to the needs of this case.

6

7        **2.    Written Policy Documents Setting Forth Any Procedure(s) for the**

8             **Payment of Any MDPP Program Fee**

9        TASC objects to this Request as vague and ambiguous because it is unclear what

10  Plaintiffs mean by a procedure for paying MDPP program fees.  Are Plaintiffs referring to

11  the manner of payment?  Are Plaintiffs referring to the dates on which such payments are

12  due?  Because this Request is unclear, TASC does not know how to respond.

13       TASC further objects to this Request as overbroad and disproportionate to the needs

14  of the case for two reasons.  First, it is unclear to TASC how the identification of ***all*** written

15  policy documents setting forth procedures for paying program fees for the MDPP, and the

16  specific dates on which ***each*** such document was effective could be important (or even

17  relevant) to resolving any issue for class certification.  *See* Fed. R. Civ. P. 26(b)(1).  As the

18  Court's ruling on Defendants' motions to dismiss (ECF No. 89) stated, "Plaintiffs' claim is

19  not . . . that the indigent are automatically entitled to fee waivers, or that the initial fee

20  determination must consider the individual's financial status."  Ruling at 20.  That is, the

21  Court determined that Plaintiffs pled their wealth discrimination claim sufficiently to

22  support that they were deprived of "the opportunity to complete the program in 90 days like

23  other, wealthier participants and thereby be free of the conditions required for staying on

24  the program."  *Id.* at 22.  As such, class certification of Plaintiffs' claims will turn on

25  whether putative class members suffered purported consequences as a result of failing to

26  pay whatever fee is established (for that person) by the 90th day solely because he or she

27  could not afford to pay.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

4832-0284-8185

1   Because the scope of this Request is unclear, TASC is unsure of the extent to which

2   information it has already produced is responsive to this Request.  TASC notes, however,

3   that it has previously produced the MOU and its amendments, which set forth certain terms

4   regarding fee payments, as well as the MDPP program files of the named Plaintiffs (and

5   former Plaintiffs), which set forth the terms of their participation in the MDPP and

6   presumably include whatever procedures Plaintiffs refer to in this Request.

7       Second, this Request appears to ask TASC to identify *every* "written policy

8   document" provided to *each individual* MDPP participant setting forth the procedures for

9   paying MDPP program fees.  Because this Request is unclear, TASC cannot assess any

10  burden associated with providing a comprehensive substantive response.  TASC reserves

11  the right to do so, however, if Plaintiffs clarify this Request.

12      Based on the foregoing, TASC does not believe that the burden associated with

13  providing information responsive to this Request beyond the information Plaintiffs already

14  have reflecting the terms of the MDPP to which each of the named Plaintiffs (and the former

15  Plaintiffs) agreed is relevant and proportional to the needs of this case.

16

17      **3.    Written Policy Documents Setting Forth Any Consequence(s) of Non-
             Payment or Delayed Payment of Any Program Fees for the MDPP**

18

19      TASC objects to the definition of "written policy document" as vague in this context.

20  As TASC has previously stated, deferred prosecution programs are established and

21  governed by statute.  *See* A.R.S. §§ 11-361-364.  Such programs "shall be administered by

22  the county attorney of each participating county according to guidelines established by the

23  Arizona prosecuting attorneys' advisory council ['APAAC']." A.R.S. § 11-362. APAAC

24  has established guidelines regarding termination procedures and consequences of

25  noncompliance with program procedures.  *See* APAAC-00005-8.  The Arizona Rules of

26  Criminal Procedure also contain rules governing the procedures for deferred prosecution

27  programs offered to defendants after the filing of a complaint, indictment, or information.

28  *See* Ariz. R. Crim. P. 38.1-3.  The MOU between MCAO and TASC and its amendments

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

1    further address consequences for noncompliance with the ADPP's terms, including the

2    payment of program fees.  *See* MCAO-00001-7, TASC000001-5, TASC001074-75.  TASC

3    agreed to the terms of the MOU and its amendments, and has approved documents setting

4    forth consequences for noncompliance that are reflected in the foregoing agreements, rules,

5    and guidelines, but to the extent TASC documents merely acknowledge or convey terms

6    mandated by others, such terms cannot reasonably be construed as "TASC" policies.

7         TASC further objects to this Interrogatory as overbroad and disproportionate to the

8    needs of the case because it appears to ask TASC to identify *every* "written policy

9    document" provided to *each individual* MDPP participant setting forth any consequences

10   of non-payment or delayed payment of the participant's program fees over a time span of

11   almost four years.  To the extent this Request is so intended, it seeks information that is

12   already subject to Plaintiffs' pending Motion to Compel TASC's Production of MDPP

13   Program Files (ECF No. 139), and the Court's ruling on that Motion will bear on any

14   overlapping information Plaintiffs seek in this Request.  In addition to the objections TASC

15   raised in connection with that briefing and the related Request for Production No. 6

16   regarding relevance, proportionality, overbreadth, attorney-client privilege, and privacy

17   concerns (*see* ECF Nos. 139-1 at 2-3 & 143 at 8-17), the specific burden imposed on TASC

18   in responding to this Request is that "written policy document" is broadly defined to include

19   every conceivable form of document that sets forth "guidance that concerns how TASC

20   conducts its operations and/or how any TASC employee conducts her job-related duties

21   and/or that could otherwise be reasonably construed as a written statement of official

22   policy," regardless of whether any such document provides unique information.  For

23   example, "written policy documents" setting forth the consequences for non-payment or

24   delayed payment of any program fees would include, among many other documents, both

25   the "Client Contract" and the "Explanation of Fees."  Using Plaintiffs' calculations (ECF

26   No. 144 at 7), there were approximately 5,400 MDPP program participants during the time

27   period of this Request; those participants received identical or substantially identical "Client

28   Contract" and "Explanation of Fees" documents.  Identifying *each* "Client Contract"

Snell & Wilmer

L.L.P.
———
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1   executed by *each* participant and the date the client contract was in effect would require

2   TASC to compile and review *each* participant's file, identify the applicable documents, and

3   then identify the specific dates the documents were effective (e.g., the date the participant

4   signed the Client Contract until the date the participant completed the MDPP).  That task

5   would take weeks, if not longer.

6       Based on the foregoing, TASC does not believe that the burden associated with

7   providing *all* information responsive to this Request is relevant and proportional to the

8   needs of this case.

9       Subject to the foregoing objections, TASC responds that it has previously produced

10  "written policy documents" responsive to this Request, as set forth below.  Each such

11  document reflects the date it was sent or executed by the corresponding Plaintiff, and the

12  consequences for delayed or non-payment of fees would have concluded upon each

13  Plaintiff's successful completion of the MDPP.  Pursuant to Fed. R. Civ. P. 33(d), therefore,

14  TASC refers to the related records from which Plaintiffs can ascertain the answer to the

15  portion of this Request seeking the dates on which the documents were in effect.

16      **TASC000073-74**: Briggs' Client Contract

17      **TASC000075**: Briggs' Explanation of Fees

18      **TASC000077**: Briggs' Arizona Drug Enforcement Account Agreement

19      **TASC000078**: Briggs' Program Requirements

20      **TASC000286-287**: Program Violation Notices to Pascale (these notices were for

21  program violations *other than* delayed payments or non-payment of fees, but they reference

22  the "[f]ailure to make payments as agreed" as a possible program violation)

23      **TASC000290-91**: Pascale's Client Contract

24      **TASC000293**: Pascale's Explanation of Fees

25      **TASC000295**: Pascale's Arizona Drug Enforcement Account Agreement

26      **TASC000616**: Letter referring Soria to attend a class based on a program violation

27      **TASC000624**: Soria's Explanation of Fees

28      **TASC000626**: Soria's Arizona Drug Enforcement Account Agreement

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    **TASC000627-28**: Soria's Client Contract

2    TASC also produced similar documents for the former Plaintiffs—Taja Collier and

3    McKenna Stephens—plus additional documents specific to their repeated violations, such

4    as the Last Chance Contract for McKenna Stephens, executed on August 26, 2019.  *See*

5    TASC000785.  Stephens and Collier had signed release forms authorizing the disclosure of

6    such information to the Civil Rights Corps, but they reserved the right to withdraw such

7    consent at any time and TASC does not know whether either or both Plaintiffs withdrew

8    their consent in connection with their withdrawal from this case.  Even if Stephens and

9    Collier did not withdraw their consent, TASC understands that the consent forms they

10   signed will expire in July and October of 2020, respectively, which is prior to the deadline

11   for Plaintiffs to move for class certification.   Thus, it is unclear whether any such

12   information can be used in this litigation.  To the extent such information can be used,

13   Plaintiffs have the same (or at least substantially the same) ability to identify the applicable

14   documents from those files that TASC does.

15

16   **4.      Written Policy Documents Setting Forth Any Process for the Waiver or
17            Reduction of Any Program Fees for the MDPP**

18   TASC objects to the definition of "written policy document" as vague in this context.

19   The MOU between MCAO and TASC and its amendments set forth processes and terms

20   for the waiver or reduction of program fees.   *See* MCAO-00001-7, TASC000001-5,

21   TASC001074-75.  TASC agreed to the terms of the MOU and the amendments it executed,

22   and may has approved documents that set forth processes for the waiver or reduction of

23   program fees that are reflected in any one of the foregoing agreements, rules, and guidelines,

24   but to the extent TASC documents merely acknowledge or convey terms mandated by

25   others, such terms cannot reasonably be construed as "TASC" policies.

26   TASC also objects to this Interrogatory as overbroad and disproportionate to the

27   needs of the case for two reasons.  First, it is unclear to TASC how the identification of ***all***

28   written policy documents setting forth any process for the waiver or reduction of program

fees for the MDPP and the specific dates on which **each** such document was effective could be important (or even relevant) to resolving any issue for class certification. *See* Fed. R. Civ. P. 26(b)(1). As the Court's ruling on Defendants' motions to dismiss (ECF No. 89) stated, "Plaintiffs' claim is not . . . that the indigent are automatically entitled to fee waivers, or that the initial fee determination must consider the individual's financial status." Ruling at 20. That is, the Court determined that Plaintiffs pled their wealth discrimination claim sufficiently to support that they were deprived of "the opportunity to complete the program in 90 days like other, wealthier participants and thereby be free of the conditions required for staying on the program." *Id.* at 22. As such, class certification of Plaintiffs' claims will turn on whether putative class members suffered purported consequences as a result of failing to pay whatever fee is established (for that person) by the 90th day solely because he or she could not afford to pay.

To the extent the process for obtaining a waiver or reduction of any program fees is relevant to class certification, TASC has already provided documents setting forth such information to Plaintiffs. Specifically, TASC has produced the following documents setting forth the process for obtaining a waiver or reduction of the MDPP program fees, including:

The Memorandum of Understanding between TASC and MCAO, entered into on January 27, 2009, attached as Exhibit 3 to TASC's Motion to Dismiss (ECF No. 29-1)

**TASC000001-4**: The Amendment to the MOU, executed June 5, 2019

**TASC000005**: The Second Amendment to the MOU, executed June 10, 2019

**TASC00006-20, 737-39, 1043-45, 1047-53**: These documents became effective as of June 5, 2019 and remain effective today, except with respect to the MCAO Case Fee and the MCSO Fee, which MCAO eliminated effective January 1, 2020.

**TASC000023-33, 706-07**: These documents were effective as of the start of the time period relevant to Plaintiffs' claims—August 23, 2016.

**TASC000042-54**: These documents were effective as of the start of the time period relevant to Plaintiffs' claims—August 23, 2016.

**TASC000708**: As stated on the notice, this notice was applicable to clients newly

1    enrolled in the ADPP as of July 15, 2019.  This notice remains effective today.

2        **TASC000709**: This notice has been posted at TASC from July 2019 to today.

3        **TASC000725-28**: These documents were effective from October 2018 until

4    replaced by the applications referenced above that became effective on June 5, 2019.

5        **TASC001061-62**: These documents became effective on June 5, 2019.

6        **TASC001074**: The December 19, 2019 letter from Allister Adel to TASC reflecting

7    the elimination of the MCAO Case Fee, effective January 1, 2020

8        **TASC001075**: The January 3, 2020 letter from Allister Adel to TASC reflecting the

9    elimination of the MCSO Jail Fee, effective January 1, 2020

10

11       Second, this Request appears to ask TASC to identify ***every*** "written policy

12   document" provided to ***each individual*** MDPP participant setting forth the process for

13   obtaining a waiver or reduction of any program fees over a time span of almost four years.

14   To the extent this Request is so intended, it seeks information that is already subject to

15   Plaintiffs' pending Motion to Compel TASC's Production of MDPP Program Files (ECF

16   No. 139), and the Court's ruling on that Motion will bear on any overlapping information

17   Plaintiffs seek in this Request.  In addition to the objections TASC raised in connection

18   with that briefing and the related Request for Production No. 6 regarding relevance,

19   proportionality, overbreadth, attorney-client privilege, and privacy concerns (*see* ECF Nos.

20   139-1 at 2-3 & 143 at 8-17), the specific burden imposed on TASC in responding to this

21   Request is that "written policy document" is broadly defined to include every conceivable

22   form of document that sets forth "guidance that concerns how TASC conducts its operations

23   and/or how any TASC employee conducts her job-related duties and/or that could otherwise

24   be reasonably construed as a written statement of official policy," regardless of whether any

25   such document provides unique information.  For example, "written policy documents"

26   setting forth any process for the waiver or reduction of program fees would include, among

27   many other documents, applications individual participants have submitted seeking a fee

28   waiver or reduction.  Using Plaintiffs' calculations (ECF No. 144 at 7), there were

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

1   approximately 5,400 MDPP program participants during the time period of this Request

2   whose files would *all* have to be searched if TASC is expected to identify *every* document

3   setting forth the process for obtaining a fee waiver or reduction, and the time period each

4   such document was in effect.  That task would take weeks, if not longer.

5       Based on the foregoing, TASC does not believe that the burden associated with

6   providing information responsive to this Request beyond the information Plaintiffs already

7   have reflecting the process for seeking a waiver or reduction of MDPP program fees is

8   relevant and proportional to the needs of this case.

9

10      **5.      Written Policy Documents Setting Forth Any Other Form of Assistance
11              and/or Relief for a Participant Who Has and/or Alleges Difficulty
              Affording Any Program Fees for the MDPP**

12      TASC objects to this Request as vague and ambiguous because it is unclear what

13  "assistance" or "relief" this Request could encompass.  For example, the "TASC Client

14  Rights" document sets forth certain rights available to participants in the MDPP, including

15  the right to submit grievances.  *See*, *e.g.*, TASC000567-69.  And TASC has a Grievance

16  Policy relating to behavioral health services.  *See*, *e.g.*, TASC000570-71.  It is unclear to

17  TASC, however, whether such documents are responsive to this Request.  Because TASC

18  does not understand the scope of this Request, TASC cannot identify additional objections

19  it may have.  TASC believes, however, that the objections it has asserted to the request for

20  information relating to the process for obtaining fee reductions or waivers would be

21  applicable to this Request.  TASC reserves the right to raise such objections and any other

22  objections that may be applicable once Plaintiffs clarify the scope of this Request.

23

24      **6.      Written Policy Documents Setting Forth Drug-and-Alcohol Testing Fees
25              for the MDPP**

26      TASC objects to this Interrogatory as overbroad and disproportionate to the needs of

27  the case for two reasons.  First, it is unclear to TASC how the identification of *all* written

28  policy documents setting forth drug-and-alcohol testing fees for the MDPP and the specific

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

dates on which *each* such document was effective could be important (or even relevant) to resolving any issue for class certification. *See* Fed. R. Civ. P. 26(b)(1). As the Court's ruling on Defendants' motions to dismiss (ECF No. 89) stated, "Plaintiffs' claim is not . . . that the indigent are automatically entitled to fee waivers, or that the initial fee determination must consider the individual's financial status." Ruling at 20. That is, the Court determined that Plaintiffs pled their wealth discrimination claim sufficiently to support that they were deprived of "the opportunity to complete the program in 90 days like other, wealthier participants and thereby be free of the conditions required for staying on the program." *Id.* at 22. As such, class certification of Plaintiffs' claims will turn on whether putative class members suffered purported consequences as a result of failing to pay whatever fee is established (for that person) by the 90th day solely because he or she could not afford to pay.

To the extent the amount of drug-and-alcohol testing fees charged to Plaintiffs is relevant to class certification, TASC has already provided that information to Plaintiffs. Specifically, TASC has produced documents that persons with decision-making authority at TASC have created, approved, or ratified setting forth the drug-and-alcohol testing fees, including Plaintiffs': (1) signed statements reflecting the program requirements, *see*, *e.g.*, TASC000078, 292; (2) signed "Explanation of Fees," *see*, *e.g.*, TASC000075, 293, 624; and (3) executed Client Contracts, *see*, *e.g.*, TASC000073-74, 627-28. Because the additional information Plaintiffs seek in this Request does not impact the class certification analysis, requiring TASC to compile it would not result in any benefit to Plaintiffs.

Second, this Request appears to ask TASC to identify *every* "written policy document" provided to *each individual* MDPP participant setting forth the participant's drug-and-alcohol testing fees over a time span of almost four years. To the extent this Request is so intended, it seeks information that is already subject to Plaintiffs' pending Motion to Compel TASC's Production of MDPP Program Files (ECF No. 139), and the Court's ruling on that Motion will bear on any overlapping information Plaintiffs seek in this Request. In addition to the objections TASC raised in connection with that briefing

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    and the related Request for Production No. 6 regarding relevance, proportionality,

2    overbreadth, attorney-client privilege, and privacy concerns (*see* ECF Nos. 139-1 at 2-3 &

3    143 at 8-17), the specific burden imposed on TASC in responding to this Request is that

4    "written policy document" is broadly defined to include every conceivable form of

5    document that sets forth "guidance that concerns how TASC conducts its operations and/or

6    how any TASC employee conducts her job-related duties and/or that could otherwise be

7    reasonably construed as a written statement of official policy," regardless of whether any

8    such document provides unique information.  For example, "written policy documents"

9    setting forth the drug-and-alcohol testing fees would include, among many other

10   documents, both the "Client Contract" and the "Explanation of Fees."  Using Plaintiffs'

11   calculations (ECF No. 144 at 7), there were approximately 5,400 MDPP program

12   participants during the time period of this Request; those participants received identical or

13   substantially identical "Client Contract" and "Explanation of Fees" documents.  Identifying

14   *each* "Client Contract" executed by *each* participant and the date the client contract was in

15   effect would require TASC to compile and review *each* participant's file, identify the

16   applicable documents, and then identify the specific dates the documents were effective

17   (e.g., the date the participant signed the Client Contract until the date the participant

18   completed the MDPP).  That task would take weeks, if not longer.

19          Based on the foregoing, TASC does not believe that the burden associated with

20   providing information responsive to this Request beyond the information Plaintiffs already

21   have reflecting the MDPP program fees that were applicable to each of the named Plaintiffs

22   (and the former Plaintiffs) is relevant and proportional to the needs of this case.

23

24          **7.    <u>Written Policy Documents Setting Forth Any Procedure(s) for the</u>**

25          **<u>Payment of Any MDPP Drug-and-Alcohol Testing Fee</u>**

26          TASC objects to this Request as vague and ambiguous because it is unclear what

27   Plaintiffs mean by a procedure for paying drug-and-alcohol testing fees.  Are Plaintiffs

28   referring to the manner of payment?  Are Plaintiffs referring to the time period in which

1    such payments are made?  Because this Request is unclear, TASC does not know how to

2    respond.

3         TASC further objects to this Request as overbroad and disproportionate to the needs

4    of the case for two reasons.  First, it is unclear to TASC how the identification of **all** written

5    policy documents setting forth procedures for paying drug-and-alcohol testing fees for the

6    MDPP, and the specific dates on which **each** such document was effective could be

7    important (or even relevant) to resolving any issue for class certification.  *See* Fed. R. Civ.

8    P. 26(b)(1).  As the Court's ruling on Defendants' motions to dismiss (ECF No. 89) stated,

9    "Plaintiffs' claim is not . . . that the indigent are automatically entitled to fee waivers, or

10   that the initial fee determination must consider the individual's financial status."  Ruling at

11   20.  That is, the Court determined that Plaintiffs pled their wealth discrimination claim

12   sufficiently to support that they were deprived of "the opportunity to complete the program

13   in 90 days like other, wealthier participants and thereby be free of the conditions required

14   for staying on the program."  *Id.* at 22.  As such, class certification of Plaintiffs' claims will

15   turn on whether putative class members suffered purported consequences as a result of

16   failing to pay whatever fee is established (for that person) by the 90th day solely because

17   he or she could not afford to pay.

18        Because the scope of this Request is unclear, TASC is unsure of the extent to which

19   information it has already produced is responsive to this Request.  TASC notes, however,

20   that it has previously produced the MDPP program files of the named Plaintiffs (and former

21   Plaintiffs), which set forth the terms of their participation in the MDPP and presumably

22   include whatever procedures Plaintiffs refer to in this Request.

23        Second, this Request appears to ask TASC to identify **every** "written policy

24   document" provided to **each individual** MDPP participant setting forth the procedures for

25   paying drug-and-alcohol testing fees.  Because this Request is unclear, TASC cannot assess

26   any burden associated with providing a comprehensive substantive response.  TASC

27   reserves the right to do so, however, if Plaintiffs clarify this Request.

28

4832-0284-8185

1    Based on the foregoing, TASC does not believe that the burden associated with

2 providing information responsive to this Request beyond the information Plaintiffs already

3 have reflecting the terms of the MDPP to which each of the named Plaintiffs (and the former

4 Plaintiffs) agreed is relevant and proportional to the needs of this case.

5

6    **8.    Written Policy Documents Setting Forth Any Consequence(s) of Non-Payment or Delayed Payment of Any Drug-and-Alcohol Testing Fees for**

7    **the MDPP**

8    TASC objects to the definition of "written policy document" as vague in this context.

9 As TASC has previously stated, deferred prosecution programs are established and

10 governed by statute. *See* A.R.S. §§ 11-361-364. Such programs "shall be administered by

11 the county attorney of each participating county according to guidelines established by the

12 Arizona prosecuting attorneys' advisory council ['APAAC']." A.R.S. § 11-362. APAAC

13 has established guidelines regarding termination procedures and consequences of

14 noncompliance with program procedures. *See* APAAC-00005-8. The Arizona Rules of

15 Criminal Procedure also contain rules governing the procedures for deferred prosecution

16 programs offered to defendants after the filing of a complaint, indictment, or information.

17 *See* Ariz. R. Crim. P. 38.1-3. The MOU between MCAO and TASC and its amendments

18 further address consequences for noncompliance with the ADPP's terms, including the

19 payment of program fees. *See* MCAO-00001-7, TASC000001-5, TASC001074-75. TASC

20 agreed to the terms of the MOU and its amendments, and has approved documents setting

21 forth consequences for noncompliance that are reflected in the foregoing agreements, rules,

22 and guidelines, but to the extent TASC documents merely acknowledge or convey terms

23 mandated by others, such terms cannot reasonably be construed as "TASC" policies.

24    TASC further objects to this Interrogatory as overbroad and disproportionate to the

25 needs of the case for two reasons. First, this Request appears to ask TASC to identify *every*

26 "written policy document" provided to *each individual* MDPP participant setting forth any

27 consequences of non-payment or delayed payment of the participant's drug-and-alcohol

28 testing fees over a time span of almost four years. To the extent this Request is so intended,

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1   it seeks information that is already subject to Plaintiffs' pending Motion to Compel TASC's

2   Production of MDPP Program Files (ECF No. 139), and the Court's ruling on that Motion

3   will bear on any overlapping information Plaintiffs seek in this Request.  In addition to the

4   objections TASC raised in connection with that briefing and the related Request for

5   Production No. 6 regarding relevance, proportionality, overbreadth, attorney-client

6   privilege, and privacy concerns (*see* ECF Nos. 139-1 at 2-3 & 143 at 8-17), the specific

7   burden imposed on TASC in responding to this Request is that "written policy document"

8   is broadly defined to include every conceivable form of document that sets forth "guidance

9   that concerns how TASC conducts its operations and/or how any TASC employee conducts

10  her job-related duties and/or that could otherwise be reasonably construed as a written

11  statement of official policy," regardless of whether any such document provides unique

12  information.  For example, "written policy documents" setting forth consequences of non-

13  payment or delayed payment of the drug-and-alcohol testing fees would include, among

14  many other documents, both the "Client Contract" and the "Explanation of Fees."  Using

15  Plaintiffs' calculations (ECF No. 144 at 7), there were approximately 5,400 MDPP program

16  participants during the time period of this Request; those participants received identical or

17  substantially identical "Client Contract" and "Explanation of Fees" documents.  Identifying

18  ***each*** "Client Contract" executed by ***each*** participant and the date the client contract was in

19  effect would require TASC to compile and review ***each*** participant's file, identify the

20  applicable documents, and then identify the specific dates the documents were effective

21  (e.g., the date the participant signed the Client Contract until the date the participant

22  completed the MDPP).  That task would take weeks, if not longer.

23       Based on the foregoing, TASC does not believe that the burden associated with

24  providing ***all*** information responsive to this Request is relevant and proportional to the

25  needs of this case.

26       Subject to the foregoing objections, TASC responds that it has previously produced

27  documents responsive to this Request, including the MOU between TASC and MCAO,

28  attached as Exhibit 3 to TASC's Motion to Dismiss (ECF No. 29-1), and the Amendment

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

to the MOU, executed June 5, 2019 (TASC00001-4).  TASC also has produced documents responsive to this Request in connection with the production of Plaintiffs' MDPP program files, as set forth below.  Each such document reflects the date it was sent or executed by the corresponding Plaintiff, and the consequences for delayed or non-payment of fees would have concluded upon each Plaintiff's successful completion of the MDPP.  Pursuant to Fed. R. Civ. P. 33(d), therefore, TASC refers to the related records from which Plaintiffs can ascertain the answer to the portion of this Request seeking the dates on which the documents were in effect.

**TASC00073-74**: Briggs' Client Contract

**TASC000075**: Briggs' Explanation of Fees

**TASC000078**: Briggs' Program Requirements

**TASC000286-287**: Program Violation Notices to Pascale (these notices were for program violations **other than** delayed payments or non-payment of fees, but they reference the "[f]ailure to make payments as agreed" as a possible violation)

**TASC000290-91**: Pascale's Client Contract

**TASC000293**: Pascale's Explanation of Fees

**TASC000616**: Letter referring Soria to attend a class based on a program violation

**TASC000624**: Soria's Explanation of Fees

**TASC000627-28**: Soria's Client Contract

TASC also produced similar documents for the former Plaintiffs—Taja Collier and McKenna Stephens—plus additional documents specific to their repeated violations. Stephens and Collier had signed release forms authorizing the disclosure of such information to the Civil Rights Corps, but they reserved the right to withdraw such consent at any time and TASC does not know whether either or both Plaintiffs withdrew their consent in connection with their withdrawal from this case.  Even if Stephens and Collier did not withdraw their consent, TASC understands that the consent forms they signed will expire in July and October of 2020, respectively, which is prior to the deadline for Plaintiffs to move for class certification.  Thus, it is unclear whether any such information can be used

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

4832-0284-8185

1   in this litigation.  To the extent such information can be used, Plaintiffs have the same (or

2   at least substantially the same) ability to identify the applicable documents from those files

3   that TASC does.

4

5   **9.    Written Policy Documents Setting Forth Any Process for the Waiver or
        Reduction of Any Drug-and-Alcohol Testing Fees for the MDPP**

6

7       TASC objects to the definition of "written policy document" as vague in this context.

8   The MOU between MCAO and TASC and its amendments set forth processes and terms

9   for the waiver or reduction of fees, including drug-and-alcohol testing fees.  *See* MCAO-

10  00001-7, TASC000001-5.  TASC agreed to the terms of the MOU and the amendments it

11  executed, and may has approved documents that set forth processes for the waiver or

12  reduction of fees that are reflected in the MOU and its amendments, but to the extent TASC

13  documents merely acknowledge or convey terms mandated by others, such terms cannot

14  reasonably be construed as "TASC" policies.

15      TASC further objects to this Interrogatory as overbroad and disproportionate to the

16  needs of the case for two reasons.  First, it is unclear to TASC how the identification of ***all***

17  written policy documents setting forth processes for the waiver or reduction of drug-and-

18  alcohol testing fees for the MDPP and the specific dates on which ***each*** such document was

19  effective could be important (or even relevant) to resolving any issue for class certification.

20  *See* Fed. R. Civ. P. 26(b)(1).  As the Court's ruling on Defendants' motions to dismiss (ECF

21  No. 89) stated, "Plaintiffs' claim is not . . . that the indigent are automatically entitled to fee

22  waivers, or that the initial fee determination must consider the individual's financial status."

23  Ruling at 20.  That is, the Court determined that Plaintiffs pled their wealth discrimination

24  claim sufficiently to support that they were deprived of "the opportunity to complete the

25  program in 90 days like other, wealthier participants and thereby be free of the conditions

26  required for staying on the program."  *Id.* at 22.  As such, class certification of Plaintiffs'

27  claims will turn on whether putative class members suffered purported consequences as a

28  result of failing to pay whatever fee is established (for that person) by the 90th day solely

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    because he or she could not afford to pay.

2         To the extent the process for obtaining a waiver or reduction of any drug-and-alcohol

3    testing fees is relevant to class certification, TASC has already provided documents setting

4    forth such information to Plaintiffs.    Specifically, in addition to the MOU and its

5    amendments identified above, TASC has produced the following "written policy

6    documents" setting forth the process for obtaining a waiver or reduction of fees, including

7    drug-and-alcohol testing fees:

8         **TASC00006-15, 737-39, 1039-48**:  These documents became effective on June 5,

9    2019 and remain effective today.

10        **TASC000023-33, 706-07**: These documents were effective as of the start of the time

11   period applicable to Plaintiffs' claims—August 23, 2016.

12        **TASC000042-54, 1015-18**: These documents were effective as of the start of the

13   time period applicable to Plaintiffs' claims—August 23, 2016.

14        **TASC000708**: As stated on the notice, this notice was applicable to clients newly

15   enrolled in the ADPP as of July 15, 2019.  This notice remains effective today.

16        **TASC000709**: This notice has been posted at TASC from July 2019 to today.

17        **TASC000725-28**:  These documents were effective from October 2018 until

18   replaced by the applications referenced above that became effective on June 5, 2019.

19

20        Second, this Request appears to ask TASC to identify *every* "written policy

21   document" provided to *each individual* MDPP participant setting forth the process for

22   obtaining a waiver or reduction of any drug-and-alcohol testing fees over a time span of

23   almost four years.  To the extent this Request is so intended, it seeks information that is

24   already subject to Plaintiffs' pending Motion to Compel TASC's Production of MDPP

25   Program Files (ECF No. 139), and the Court's ruling on that Motion will bear on any

26   overlapping information Plaintiffs seek in this Request.  In addition to the objections TASC

27   raised in connection with that briefing and the related Request for Production No. 6

28   regarding relevance, proportionality, overbreadth, attorney-client privilege, and privacy

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   concerns (*see* ECF Nos. 139-1 at 2-3 & 143 at 8-17), ), the specific burden imposed on

2   TASC in responding to this Request is that "written policy document" is broadly defined to

3   include every conceivable form of document that sets forth "guidance that concerns how

4   TASC conducts its operations and/or how any TASC employee conducts her job-related

5   duties and/or that could otherwise be reasonably construed as a written statement of official

6   policy," regardless of whether any such document provides unique information.   For

7   example, "written policy documents" setting forth the processes for obtaining a waiver or

8   reduction of any drug-and-alcohol testing fees would include, among many other

9   documents, all program violation notices that inform participants who have failed to make

10  payments as agreed of the procedures to follow if they are experiencing a hardship.  Using

11  Plaintiffs' calculations (ECF No. 144 at 7), there were approximately 5,400 MDPP program

12  participants during the time period of this Request whose files would *all* have to be searched

13  if TASC is expected to identify *every* document setting forth the process for obtaining a fee

14  waiver or reduction, and the time period each such document was in effect.  That task would

15  take weeks, if not longer.

16      Based on the foregoing, TASC does not believe that the burden associated with

17  providing information responsive to this Request beyond the information Plaintiffs already

18  have reflecting the process for seeking a waiver or reduction of MDPP drug-and-alcohol

19  testing fees is relevant and proportional to the needs of this case.

20

21      **10.    Written Policy Documents Setting Forth Any Other Form of Assistance
          and/or Relief for a Participant Who Has and/or Alleges Difficulty
          Affording Any Drug-and-Alcohol Testing Fees for the MDPP**

22

23      TASC objects to this Request as vague and ambiguous because it is unclear what

24  "assistance" or "relief" this Request could encompass.  Because TASC does not understand

25  the scope of this Request, TASC cannot identify additional objections it may have.  TASC

26  believes, however, that the objections it has asserted to the request for information relating

27  to the process for obtaining fee reductions or waivers would be applicable to this Request.

28  TASC reserves the right to raise such objections and any other objections that may be

1  Fed. R. Civ. P. 33(d), TASC further identifies business records that it previously produced

2  on this issue as providing information from which Plaintiffs can ascertain information

3  responsive to this Request.  *See* TASC000637, 643-45.

4        Additionally, to the extent this Request seeks information regarding fee waivers and

5  reductions that have been provided since the date TASC started compiling reports, TASC

6  responds that such information can be obtained from the related business records TASC has

7  produced.  *See* TASC001110-16.  These business records have been redacted to conceal

8  personally identifiable information for the participants who received the fee waivers or

9  reductions, which TASC believes to be appropriate and necessary under the Health

10  Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110

11  Stat. 1936 (1996), the Public Health Service Act, 42 U.S.C. § 290dd-2(a), and Title 42,

12  Chapter 1, Part 2 of the Federal Register, 42 C.F.R. §§ 2.1-2.67.  TASC further believes

13  that disclosure of the personally identifiable information will not help resolve any issue

14  material to class certification and, therefore, that release of this information will provide no

15  benefit to Plaintiffs.

16        DATED this 24th day of April, 2020.

17

18             SNELL & WILMER L.L.P.

19        By: /s/Kelly A. Kszywienski

20            Robert A. Henry
          Kelly A. Kszywienski

21            Amanda Z. Weaver
          One Arizona Center

22            400 E. Van Buren, Suite 1900
          Phoenix, Arizona  85004-2202

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

4832-0284-8185

1    ORIGINAL sent via Electronic Mail
2    on this 24th day of April, 2020, to:

3    Ryan Downer
     Katherine Chamblee-Ryan
4    Olevia Boykin
     ImeIme Umana
5    CIVIL RIGHTS CORPS
     910 17th Street NW, Second Floor
6    Washington, D.C. 20006
     ryan@civilrightscorps.org
7    katie@civilrightscorps.org
     olevia@civilrightscorps.org
8    imeime@civilrightscorps.org

9    Timothy J. Eckstein
     Joshua D. Bendor
10   OSBORN MALEDON, P.A.
     2929 N. Central Ave., Suite 2100
11   Phoenix, AZ 85012-2793
     teckstein@omlaw.com
12   jbendor@omlaw.com

13   Stanley Young
     COVINGTON & BURLING LLP
14   5 Palo Alto Square
     Palo Alto, CA 94306
15   syoung@cov.com

16   Sarah Mac Dougall
     Cristina Alvarez
17   Covington & Burling LLP
     The New York Times Building
18   620 Eighth Avenue
     New York, NY 10018-1405
19   smacdougall@cov.com
     calvarez@cov.com
20
     Virginia A. Williamson
21   Nick Baer
     Covington & Burling LLP
22   One CityCenter
     850 Tenth Street, NW
23   Washington, DC 20001-4956
     vwilliamson@cov.com
24   nbaer@cov.com

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

4832-0284-8185

1   Ann T. Uglietta
2   Joseph J. Branco
    Howard Levine
3   MARICOPA COUNTY ATTORNEY
    CIVIL SERVICES DIVISION
4   Security Center Building
    222 North Central Avenue, Suite 1100
5   Phoenix, AZ 85004
    uglietta@mcao.maricopa.gov
6   brancoj@mcao.maricopa.gov
    levineh@mcao.maricopa.gov
7
8   /s/Kelly A. Kszywienski

# EXHIBIT 5

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DESHAWN BRIGGS, et al.,            )
                                   )
      Plaintiffs,                  )
                                   )
v.                                 ) Civil Action No.
                                   ) CV-18-2684-PHX-EJM
ALLISTER ADEL, in her official     )
capacity as County Attorney of     )
Maricopa County, et al.,           )
                                   )
      Defendants.                  )
_____    )

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF VIVIANA GARCIA

Phoenix, Arizona

March 27, 2021

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

Viviana Garcia                                          3/27/2021
            Deshawn Briggs v. Allister Adel

2

```
 1                    I N D E X
 2   WITNESS                                          PAGE
 3   VIVIANA GARCIA
 4   Examination by Ms. Chamblee-Ryan                  6
 5
                    EXHIBITS MARKED
 6
     EXHIBIT            DESCRIPTION                   PAGE
 7
 8   Exhibit 1         9/4/2018 email thread          48
                       TASC033664-665
 9
     Exhibit 2         9/25/2018 email thread         56
10                     TASC034132-34134
11   Exhibit 3         TASC Adult Deferred Prosecution 70
                       Program application, 4/5/18,
12                     and various documents
                       TASC012929-12970
13
     Exhibit 4         TASC Adult Deferred Prosecution 78
14                     Program application, 3-22-18,
                       and various documents
15                     TASC009093-9156
16   Exhibit 5         Memorandum of Understanding    95
                       MC-00001-7
17
     Exhibit 6         TASC Adult Deferred Prosecution 106
18                     Program application, 1-30-18,
                       and various documents
19                     TASC002513-2541
20   Exhibit 7         8/23/2019 Case Notes for       115
                       Soria, Lucia
21                     TASC000631-636
22   Exhibit 8         TASC Adult Deferred Prosecution 127
                       Program application, 6/5/27,
23                     and various documents
                       TASC012971-13001
24
     Exhibit 9         TASC Fee Agreements            157
25                     TASC000023-33
```

**Coash & Coash, Inc.**
www.coashandcoash.com                    602-258-1440

Viviana Garcia                                        3/27/2021
                Deshawn Briggs v. Allister Adel

                                                              3

 1                        EXHIBITS MARKED
 2    EXHIBIT              DESCRIPTION                      PAGE
 3
      Exhibit 10          Maricopa County Attorney/TASC     162
 4                        Diversion Submittal Form
                          TASC000221-302
 5
      Exhibit 11          TASC Adult Deferred Prosecution   173
 6                        Program application, 05/08/18
                          and various documents
 7                        TASC017175-17214
 8    Exhibit 12          October 15, 2019, email thread    205
                          TASC000716-759
 9
      Exhibit 13          12/5/2018 email thread            215
10                        TASC033796
11    Exhibit 14          Spreadsheet, TASC033797           216
12    Exhibit 15          6/25/2019 email with attachment   219
                          TASC033995-33996
13
      Exhibit 16          Amendment and various documents   232
14                        TASC000001-20
15    Exhibit 17          January 28, 2018, email thread    265
                          TASC000864-1073
16
17
                     INSTRUCTIONS TO NOT ANSWER
18
                        Page 10    Line 14
19
20
21
22
23
24
25

Viviana Garcia                                          3/27/2021
            Deshawn Briggs v. Allister Adel

                                                              20

| | | |
|---|---|---|
| 09:25:22 | 1 | manager, did you change jobs -- |
| 09:25:24 | 2 | A    No. |
| 09:25:25 | 3 | Q    -- or did -- so you were a case manager from |
| 09:25:28 | 4 | that time until you stopped working at TASC in about |
| 09:25:29 | 5 | August 2019? |
| 09:25:30 | 6 | A    Correct. |
| 09:25:35 | 7 | Q    Okay.  When you were a case manager, what were |
| 09:25:37 | 8 | your main job responsibilities? |
| 09:25:41 | 9 | A    To manage my caseload. |
| 09:25:44 | 10 | Q    Can you tell me what that involved? |
| 09:25:48 | 11 | A    So checking urinalysis tests, making sure |
| 09:25:51 | 12 | compliances was being completed as well. |
| 09:25:56 | 13 | Q    When you say ensure compliances is being |
| 09:25:56 | 14 | completed, what does that mean? |
| 09:26:01 | 15 | A    So attending a course you have to do and making |
| 09:26:02 | 16 | their payments. |
| 09:26:04 | 17 | Q    Okay.  So the requirements were urinalysis |
| 09:26:06 | 18 | tests? |
| 09:26:07 | 19 | A    Yes. |
| 09:26:09 | 20 | Q    A course? |
| 09:26:09 | 21 | A    Correct. |
| 09:26:10 | 22 | Q    And payments? |
| 09:26:12 | 23 | A    Yes. |
| 09:26:14 | 24 | Q    You were responsible for making sure they |
| 09:26:15 | 25 | complied with all of that? |

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

23

| | | | |
|---|---|---|---|
| 09:28:16 | 1 | A | No. |
| 09:28:19 | 2 | Q | You were looking at them yourself? |
| 09:28:20 | 3 | A | Yes. |
| 09:28:23 | 4 | Q | What were you looking at them for? |
| 09:28:25 | 5 | A | To contact the client. |
| 09:28:28 | 6 | Q | Why would you need to contact the client? |
| 09:28:31 | 7 | A | To let them know if they tested positive or |
| 09:28:33 | 8 | | negative. |
| 09:28:35 | 9 | Q | Okay.  And why did you need to let them know |
| 09:28:36 | 10 | | that? |
| 09:28:39 | 11 | A | So they were aware that they tested either |
| 09:28:40 | 12 | | positive or negative. |
| 09:28:43 | 13 | Q | And why did you need to make them aware of |
| 09:28:43 | 14 | | that? |
| 09:28:47 | 15 | A | Because it's part of their program to be clean. |
| 09:28:51 | 16 | Q | Okay.  So you were telling them if they weren't |
| 09:28:52 | 17 | | meeting the requirements? |
| 09:28:53 | 18 | A | Correct. |
| 09:28:55 | 19 | Q | If someone was behind on payment, you would |
| 09:28:58 | 20 | | contact them about that as well? |
| 09:28:59 | 21 | A | Yes. |
| 09:29:03 | 22 | Q | Okay.  And did you -- if anybody wasn't meeting |
| 09:29:07 | 23 | | a requirement, did you tell anybody else? |
| 09:29:07 | 24 | A | No. |
| 09:29:10 | 25 | Q | Did you save that information anywhere? |

Viviana Garcia                                         3/27/2021
           Deshawn Briggs v. Allister Adel

26

09:31:22  1       Q    The reason that you would pull the report is --
09:31:23  2    why would you pull it?
09:31:25  3       A    To check compliance.
09:31:27  4       Q    Okay.  And the reason you'd check compliance
09:31:28  5    was what?
09:31:31  6            MR. HENRY:  Asked and answered.
09:31:31  7    BY MS. CHAMBLEE-RYAN:
09:31:33  8       Q    You can answer.
09:31:36  9       A    Because it was part of the program.
09:31:43  10      Q    Okay.  And did I understand you correctly, once
09:31:46  11   you found somebody wasn't compliant, you would tell them
09:31:48  12   that?
09:31:48  13      A    Yes.
09:31:53  14      Q    Would you tell them anything else?
09:31:54  15      A    I don't recall.
09:31:56  16      Q    Do you remember if there were any rules that
09:31:59  17   you had to tell them anything else if they weren't in
09:32:01  18   compliance with any requirement?
09:32:01  19      A    I don't remember.
09:32:06  20      Q    Okay.  And did you have to tell anybody else if
09:32:09  21   a participant was out of compliance?
09:32:10  22      A    I don't remember.
09:32:16  23      Q    Okay.  So as the case manager, were you the
09:32:19  24   main point of contact for the participants in the
09:32:22  25   diversion program?

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

                                                      27

| | | |
|---|---|---|
| 09:32:25 | 1 | A    The one I was assigned to. |
| 09:32:27 | 2 | Q    Okay.  So the people who were assigned to you, |
| 09:32:28 | 3 | you were their main point of contact? |
| 09:32:30 | 4 | A    Yes. |
| 09:32:32 | 5 | Q    How many people were assigned to you at any one |
| 09:32:33 | 6 | time? |
| 09:32:34 | 7 | A    I don't remember. |
| 09:32:38 | 8 | Q    Was it one? |
| 09:32:39 | 9 | A    No. |
| 09:32:43 | 10 | Q    Was it less than 500? |
| 09:32:45 | 11 | A    Yes. |
| 09:32:48 | 12 | Q    Was it more than 10? |
| 09:32:49 | 13 | A    Yes. |
| 09:32:51 | 14 | Q    Okay.  Was it more than 50? |
| 09:32:53 | 15 | A    Yes. |
| 09:32:55 | 16 | Q    Oh, that's a lot. |
| 09:32:57 | 17 | Was it more than 100? |
| 09:32:57 | 18 | A    Yes. |
| 09:33:03 | 19 | Q    Was it more than 200? |
| 09:33:06 | 20 | A    Maybe.  I don't remember. |
| 09:33:11 | 21 | Q    Okay.  But -- so several -- is it -- would your |
| 09:33:13 | 22 | estimate -- what's your estimate of about how many |
| 09:33:17 | 23 | people you'd have assigned to you at any one time? |
| 09:33:21 | 24 | A    Like 200. |
| 09:33:23 | 25 | Q    Was it difficult to keep track of that many |

Viviana Garcia                              3/27/2021
           Deshawn Briggs v. Allister Adel

70

| | | |
|---|---|---|
| 10:22:55 | 1 | talked about? |
| 10:22:55 | 2 | A    No. |
| 10:22:57 | 3 | Q    Did they text you? |
| 10:22:57 | 4 | A    No. |
| 10:23:00 | 5 | Q    Never? |
| 10:23:02 | 6 | A    I had a land line. |
| 10:23:07 | 7 | Q    Okay.  And when you communicated with |
| 10:23:11 | 8 | participants, were you required to document those |
| 10:23:13 | 9 | communications? |
| 10:23:13 | 10 | A    Yes. |
| 10:23:25 | 11 | Q    Okay.  I'm going to show you an exhibit just so |
| 10:23:27 | 12 | we can see how this worked in practice.  So this is |
| 10:23:34 | 13 | TASC012929. |
| 10:23:34 | 14 | (The document was marked as Exhibit 3 for |
| 10:23:34 | 15 | identification.) |
| 10:23:34 | 16 | BY MS. CHAMBLEE-RYAN: |
| 10:23:52 | 17 | Q    It's taking its time to load.  Just a moment. |
| 10:23:59 | 18 | While this loads, when you said you documented |
| 10:24:05 | 19 | your communications with participants, did you have to |
| 10:24:07 | 20 | do that? |
| 10:24:07 | 21 | A    Yes. |
| 10:24:16 | 22 | Q    Okay.  And who told you you had to do that? |
| 10:24:18 | 23 | A    When I was trained I was told. |
| 10:24:22 | 24 | Q    Okay.  Do you remember who told you? |
| 10:24:24 | 25 | A    Not specifically. |

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

71

| | | |
|---|---|---|
| 10:24:26 | 1 | Q    Do you remember the names of any of the people |
| 10:24:28 | 2 | who trained you? |
| 10:24:30 | 3 | A    Abigail and Yolonda. |
| 10:24:34 | 4 | Q    Did Cheyenne Watson train you? |
| 10:24:35 | 5 | A    I don't remember if she did. |
| 10:24:38 | 6 | Q    Okay.  So one of them -- Cheyenne, Abigail, or |
| 10:24:41 | 7 | Yolonda -- told you you had to document everything? |
| 10:24:41 | 8 | A    Yes. |
| 10:24:44 | 9 | Q    Did they say -- were there some things you |
| 10:24:46 | 10 | didn't need to bother with or did you have to document |
| 10:24:47 | 11 | it all? |
| 10:24:49 | 12 | MR. HENRY:  Objection; form. |
| 10:24:49 | 13 | THE WITNESS:  I'm sorry.  What was the |
| 10:24:49 | 14 | question? |
| 10:24:49 | 15 | BY MS. CHAMBLEE-RYAN: |
| 10:24:52 | 16 | Q    Were there some things you didn't have to write |
| 10:24:54 | 17 | down or did you really have to document every |
| 10:24:55 | 18 | communication? |
| 10:24:56 | 19 | A    Every communication. |
| 10:24:59 | 20 | Q    Okay.  No matter what it was? |
| 10:25:01 | 21 | A    Yes. |
| 10:25:15 | 22 | Q    Okay.  All right.  So -- okay.  I'm going to |
| 10:25:18 | 23 | share my screen with you so you can see this.  Okay. |
| 10:25:31 | 24 | Can you see that window? |
| 10:25:32 | 25 | A    Yes. |

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

72

10:25:34  1        Q    Okay.  You can't see anything else on my
10:25:37  2    screen; right?
10:25:40  3        A    I can see a -- that document that you put up.
10:25:48  4
10:25:52  5
10:25:52  6               (An off-the-record discussion ensued.)
10:26:38  7    BY MS. CHAMBLEE-RYAN:
10:26:40  8        Q    Okay.  Great.
10:26:40  9
10:26:43  10
10:26:47  11             Okay.  So this says case notes at the top.  Do
10:26:50  12   you know what this is?
10:26:53  13       A    It's notes.
10:26:57  14       Q    What kind of notes?
10:27:03  15       A    Notes that we would do when we saw a client.
10:27:04  16       Q    Okay.  Is this where you documented your
10:27:06  17   communications with the client?
10:27:06  18       A    Yeah.
10:27:11  19       Q    Okay.  So all your communications with the
10:27:12  20   client are documented here?
10:27:13  21       A    Yes.
10:27:20  22
10:27:25  23
10:27:37  24
10:27:46  25

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

73

| Time | Line | |
|---|---|---|
| 10:27:48 | 1 | A    That I created the note. |
| 10:27:51 | 2 | Q    Okay.  And when you say you created it, what |
| 10:27:53 | 3 | did you do to create it? |
| 10:27:55 | 4 | A    I went into the BART system. |
| 10:27:57 | 5 | Q    Okay.  And then you typed this? |
| 10:27:58 | 6 | A    Yes. |
| 10:28:00 | 7 | |
| 10:28:04 | 8 | |
| 10:28:05 | 9 | |
| 10:28:09 | 10 | |
| 10:28:10 | 11 | |
| 10:28:10 | 12 | |
| 10:28:14 | 13 | |
| 10:28:15 | 14 | |
| 10:28:16 | 15 | A    Yes. |
| 10:28:19 | 16 | Q    Okay.  So you said you were required to |
| 10:28:23 | 17 | document all your communications.  If anybody else |
| 10:28:26 | 18 | communicated with your client, did they have to document |
| 10:28:29 | 19 | it in these case notes too? |
| 10:28:29 | 20 | A    Yes. |
| 10:28:31 | 21 | MR. HENRY:  Objection; foundation. |
| 10:28:31 | 22 | BY MS. CHAMBLEE-RYAN: |
| 10:28:34 | 23 | Q    Sorry.  I think -- I just want to make sure we |
| 10:28:36 | 24 | heard your answer.  You said yes, they did? |
| 10:28:37 | 25 | A    Yes. |

Viviana Garcia                                      3/27/2021
        Deshawn Briggs v. Allister Adel

78

| | | |
|---|---|---|
| 10:32:42 | 1 | Q    Okay.  Okay.  I just want to look at another |
| 10:32:51 | 2 | |
| 10:32:57 | 3 | |
| 10:32:57 | 4 | |
| 10:32:57 | 5 | |
| 10:32:57 | 6 | BY MS. CHAMBLEE-RYAN: |
| 10:33:03 | 7 | |
| 10:33:22 | 8 | |
| 10:33:22 | 9 | |
| 10:33:24 | 10 | And just to not waste your time, Ms. Garcia, we |
| 10:33:27 | 11 | were talking about how you have to document all |
| 10:33:31 | 12 | communications and whenever the client signs something. |
| 10:33:34 | 13 | Do you remember anything else that you had to |
| 10:33:34 | 14 | document -- |
| 10:33:37 | 15 | MR. HENRY:  Objection; form. |
| 10:33:37 | 16 | BY MS. CHAMBLEE-RYAN: |
| 10:33:40 | 17 | Q    -- in the case notes? |
| 10:33:40 | 18 | A    [Indiscernible]. |
| 10:33:41 | 19 | THE COURT REPORTER:  I'm sorry.  What was |
| 10:33:42 | 20 | the answer? |
| 10:33:44 | 21 | THE WITNESS:  Not off the top of my head. |
| 10:33:44 | 22 | BY MS. CHAMBLEE-RYAN: |
| 10:33:49 | 23 | Q    Okay.  Do you remember any interactions you had |
| 10:33:53 | 24 | with the client that you didn't have to document or |
| 10:33:57 | 25 | anything that would happen in their case that you didn't |

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

79

| | | |
|---|---|---|
| 10:33:58 | 1 | have to document? |
| 10:34:01 | 2 | A    We had to document everything, any |
| 10:34:02 | 3 | communication. |
| 10:34:10 | 4 | Q    Okay.  Okay.  So the case notes -- and I |
| 10:34:13 | 5 | apologize.  I'm just asking while I'm sharing this. |
| 10:34:19 | 6 | The case notes kind of provide a record of all |
| 10:34:22 | 7 | your communications with that client; is that right? |
| 10:34:24 | 8 | MR. HENRY:  Objection; form, asked and |
| 10:34:28 | 9 | answered, vague. |
| 10:34:28 | 10 | BY MS. CHAMBLEE-RYAN: |
| 10:34:29 | 11 | Q    Is that right, Ms. Garcia? |
| 10:34:31 | 12 | A    Yes. |
| 10:34:31 | 13 | Q    Right. |
| 10:34:34 | 14 | So if it happened, it's in -- it's in these? |
| 10:34:36 | 15 | MR. HENRY:  Objection; form, asked and |
| 10:34:38 | 16 | answered now four times. |
| 10:34:38 | 17 | BY MS. CHAMBLEE-RYAN: |
| 10:34:43 | 18 | Q    So if you had an interaction with a client, |
| 10:34:46 | 19 | it's going to be documented in here? |
| 10:34:46 | 20 | MR. HENRY:  Objection; asked and answered |
| 10:34:49 | 21 | five times. |
| 10:34:52 | 22 | THE WITNESS:  Yes. |
| 10:34:52 | 23 | BY MS. CHAMBLEE-RYAN: |
| 10:34:53 | 24 | Q    Thank you. |
| 10:35:03 | 25 | Okay.  Let's just turn to this page.  This is a |

Viviana Garcia                                    3/27/2021
             Deshawn Briggs v. Allister Adel

                                                        83

10:50:58   1        Q    Did you try to write down everything each of
10:51:00   2    you said?
10:51:01   3        A    Yes.
10:51:04   4        Q    Okay.  And why did you do that?
10:51:07   5        A    So our conversation was there.
10:51:12   6        Q    Okay.  So when you were summarizing your
10:51:18   7    conversation with the client, was there anything you
10:51:20   8    would leave out of that summary?
10:51:20   9        A    I don't remember.
10:51:24  10        Q    Okay.  When you were summarizing your
10:51:27  11    conversation with the client, did you try to include
10:51:30  12    everything that was said?
10:51:33  13                MR. HENRY:  Objection; form.
10:51:34  14                THE WITNESS:  Yeah.
10:51:34  15    BY MS. CHAMBLEE-RYAN:
10:51:35  16        Q    Excuse me?
10:51:36  17        A    Yes.
10:51:38  18        Q    Yes?  Okay.
10:51:39  19             And that -- and is that because you were
10:51:41  20    required to do that?
10:51:42  21        A    Correct.
10:51:43  22        Q    And the people who told you you were required
10:51:46  23    to do that, it was either Cheyenne Watson or one of the
10:51:48  24    leads, Yolonda or Abigail?
10:51:49  25        A    Correct.

Viviana Garcia                                     3/27/2021
        Deshawn Briggs v. Allister Adel

                                                          93

11:02:21   1   perhaps more, times.
11:02:23   2                 THE COURT REPORTER:  Can the witness
11:02:25   3   repeat the answer?  I didn't hear it.
11:02:25   4   BY MS. CHAMBLEE-RYAN:
11:02:33   5        Q    Do you want to repeat your answer, Ms. Garcia?
11:02:34   6        A    What was -- what was the question that I
11:02:36   7   answered again?
11:02:39   8        Q    Now I don't remember.
11:02:39   9                 MS. CHAMBLEE-RYAN:  Do you want to read it
11:02:44  10   back?  Maybe the court reporter could read it back.
11:02:44  11                 (The record was read by the reporter as
11:02:44  12   follows:
11:02:44  13        Q    So just to make sure I understand the
11:02:44  14   rule, was the rule that communications about the
11:02:44  15   client's compliance with program requirements had to be
11:03:00  16   saved?)
11:03:04  17                 THE WITNESS:  Yes.
11:03:04  18   BY MS. CHAMBLEE-RYAN:
11:03:08  19        Q    Okay.  Great.  Thank you.
11:03:12  20             And when -- when you entered an email into
11:03:16  21   BART, do you remember how you did that?
11:03:17  22        A    I would copy and paste it.
11:03:22  23        Q    Oh, that's easy enough.  All right.  Those are
11:03:24  24   all my questions about that.
11:03:39  25             Okay.  And, again, the requirements for what

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

                                                        96

11:06:25   1    time it would take is six months, were you just
11:06:26   2    misremembering?
11:06:26   3          A    Yes.
11:06:32   4          Q    Okay.  So what's the shortest time it can take
11:06:34   5    for someone to complete the program?
11:06:35   6          A    Three months.
11:06:36   7          Q    Three months.  Okay.
11:06:38   8               And what do you have to do to complete the
11:06:40   9    program in three months?
11:06:47   10         A    Clean urinalysis, do the -- the -- that class,
11:06:49   11   and pay their fines.
11:06:51   12         Q    Okay.  And so is that the three-hour drug
11:06:52   13   education seminar?
11:06:53   14         A    Yes.
11:06:56   15         Q    Is that the class you're talking about?  Okay.
11:06:57   16         A    Yes.
11:07:08   17         Q    And so if you've done all those things -- I'm
11:07:10   18   going to stop sharing here.
11:07:12   19              So if you've done all those things and you get
11:07:15   20   through three months, you get to successful completion;
11:07:17   21   is that right?
11:07:17   22         A    Yes.
11:07:20   23         Q    Okay.  And what does successful completion
11:07:21   24   mean?
11:07:25   25         A    Meaning you no longer have to do the program.

Viviana Garcia                                          3/27/2021
             Deshawn Briggs v. Allister Adel

97

11:07:28  1      Q    Okay.  So anyone who's met those requirements
11:07:32  2   in the three months gets successful completion; is that
11:07:33  3   correct?
11:07:34  4      A    Repeat the question.
11:07:40  5      Q    I'm just making clear, Anybody who has met
11:07:43  6   those requirements we talked about -- the seminar, they
11:07:46  7   test clean for three months, they have a zero balance --
11:07:48  8   they can be done with the program --
11:07:49  9      A    Correct.
11:07:53 10      Q    -- after three months?  Okay.
11:07:54 11           Any exceptions to that?
11:07:55 12      A    No.
11:07:59 13      Q    Okay.  And what happens if three months go by
11:08:03 14   and you haven't finished all those things?
11:08:08 15      A    You finish the program until you're done.
11:08:10 16      Q    Okay.  When you say "you finish the program
11:08:13 17   until you're done," what does that mean?
11:08:15 18      A    Meaning you have -- if you can't do it in the
11:08:17 19   three months, then you'll do it in the six months.
11:08:21 20      Q    Okay.  And when you say "do it," does that mean
11:08:24 21   you stay on the POM diversion program?
11:08:25 22      A    Correct.
11:08:28 23      Q    Do you still have to follow all the same
11:08:30 24   requirements as in the first three months?
11:08:30 25      A    Correct.

Viviana Garcia                                    3/27/2021
          Deshawn Briggs v. Allister Adel

98

```
11:08:38   1        Q    Okay.  And as a case manager, could you decide
11:08:41   2   on your own whether somebody had reached successful
11:08:44   3   completion?
11:08:48   4        A    As long as they completed all three things.
11:08:54   5        Q    Okay.  Could you decide just not to require
11:08:56   6   them to do one of those things?
11:08:57   7        A    No.
11:09:04   8        Q    Okay.  And how do you know about those
11:09:05   9   requirements?
11:09:11  10        A    What do you mean, how do I know?
11:09:13  11        Q    Did somebody train you that somebody has to
11:09:17  12   meet all three requirements to be done in three months?
11:09:18  13        A    Yes.
11:09:21  14        Q    Who was that?
11:09:23  15        A    Abigail, Yolonda, and Cheyenne.
11:09:27  16        Q    Okay.  All three of them?
11:09:30  17        A    Yes.
11:09:33  18        Q    Okay.  And when you get to successful
11:09:35  19   completion, when you're about to give a client a
11:09:37  20   successful completion, do you have to ask for approval
11:09:41  21   from a supervisor or a lead?
11:09:42  22        A    No.
11:09:46  23        Q    Okay.  And what if you want to terminate them,
11:09:48  24   do you have to ask for approval for that?
11:09:50  25        A    No.
```

Viviana Garcia                                        3/27/2021
            Deshawn Briggs v. Allister Adel

                                                              106

| 11:17:32 | 1 | (The document was marked as Exhibit 6 for |
| 11:17:32 | 2 | identification.) |
| 11:17:32 | 3 | BY MS. CHAMBLEE-RYAN: |
| 11:18:08 | 4 | ████████████████████████████████████ |
| 11:18:11 | 5 | ████████████████████████████████████ |
| 11:18:13 | 6 | ████████████████████████████████████ |
| 11:18:13 | 7 | A    Okay. |
| 11:18:15 | 8 | Q    I'm looking at this first one. |
| 11:18:19 | 9 | A    Okay.  So just the top one? |
| 11:18:21 | 10 | ████████████████████████████████████ |
| 11:18:24 | 11 | ████████████████████████████████████ |
| 11:18:25 | 12 | A    Okay. |
| 11:18:26 | 13 | Q    Do you see that? |
| 11:18:27 | 14 | A    Yes. |
| 11:18:35 | 15 | Q    Okay.  So here -- I'll skip the first sentence. |
| 11:18:36 | 16 | I'm just going to read this. |
| 11:18:39 | 17 | ████████████████████████████████████ |
| 11:18:42 | 18 | ████████████████████████████████████ |
| 11:18:45 | 19 | ████████████████████████████████████ |
| 11:18:48 | 20 | ████████████████████████████████████ |
| 11:18:50 | 21 | ████████████████████████████████████ |
| 11:18:51 | 22 | Did I read that correctly? |
| 11:18:52 | 23 | A    Yes. |
| 11:18:56 | 24 | ████████████████████████████████████ |
| 11:19:01 | 25 | ████████████████████████████████████ |

Viviana Garcia                                    3/27/2021
          Deshawn Briggs v. Allister Adel

| | | |
|---|---|---|
| 11:19:05 | 1 | A    So if they didn't test, it would be a -- |
| 11:19:08 | 2 | considered as a positive test. |
| 11:19:12 | 3 | Q    Okay.  Does that mean you treat it the exact |
| 11:19:15 | 4 | same way you would treat it if they test positive for |
| 11:19:15 | 5 | marijuana? |
| 11:19:18 | 6 | MR. HENRY:  Objection; form. |
| 11:19:19 | 7 | THE WITNESS:  Yes. |
| 11:19:19 | 8 | BY MS. CHAMBLEE-RYAN: |
| 11:19:22 | 9 | Q    It has the same effect as a positive test? |
| 11:19:22 | 10 | A    Yes. |
| 11:19:24 | 11 | Q    Okay.  So when we were talking earlier about |
| 11:19:27 | 12 | someone has to test clean for three months, if they |
| 11:19:33 | 13 | missed a test, that would count as a positive and mean |
| 11:19:37 | 14 | they hadn't tested clean for three months?  Is that -- I |
| 11:19:38 | 15 | asked that really badly, but is that -- is that your |
| 11:19:40 | 16 | understanding? |
| 11:19:42 | 17 | MR. HENRY:  Objection; form. |
| 11:19:43 | 18 | THE WITNESS:  I can barely hear you.  What |
| 11:19:44 | 19 | was that? |
| 11:19:44 | 20 | BY MS. CHAMBLEE-RYAN: |
| 11:19:47 | 21 | Q    Sorry about that. |
| 11:19:50 | 22 | So we talked earlier about how you have to test |
| 11:19:52 | 23 | clean for three months. |
| 11:19:53 | 24 | A    Yes. |
| 11:19:56 | 25 | Q    Can you meet that requirement if you miss a |

Viviana Garcia                                    3/27/2021
          Deshawn Briggs v. Allister Adel

108

| | | |
|---|---|---|
| 11:19:58 | 1 | test within that three-month period? |
| 11:20:01 | 2 | MR. HENRY:  Objection; form. |
| 11:20:04 | 3 | THE WITNESS:  I think you can.  I don't |
| 11:20:04 | 4 | remember. |
| 11:20:04 | 5 | BY MS. CHAMBLEE-RYAN: |
| 11:20:05 | 6 | Q    What was that? |
| 11:20:07 | 7 | A    I think you can. |
| 11:20:11 | 8 | Q    Can you explain? |
| 11:20:15 | 9 | A    So maybe if it was just one missed test, we |
| 11:20:18 | 10 | could complete them if it didn't happen again. |
| 11:20:26 | 11 | Q    Okay.  So sometimes if they miss one test, you |
| 11:20:29 | 12 | can just give them a break that time? |
| 11:20:33 | 13 | MR. HENRY:  Objection; form, foundation. |
| 11:20:35 | 14 | THE WITNESS:  I would say yes. |
| 11:20:35 | 15 | BY MS. CHAMBLEE-RYAN: |
| 11:20:39 | 16 | Q    Was there a limit to how many times you could |
| 11:20:45 | 17 | let them get away with missing a test without kind of |
| 11:20:47 | 18 | affecting successful completion time? |
| 11:20:49 | 19 | MR. HENRY:  Objection; form. |
| 11:20:50 | 20 | THE WITNESS:  I don't remember. |
| 11:20:51 | 21 | BY MS. CHAMBLEE-RYAN: |
| 11:20:55 | 22 | Q    Okay.  What if they missed 10 tests in a row, |
| 11:20:59 | 23 | could they still do successful completion after that? |
| 11:21:04 | 24 | A    After the missed tests? |
| 11:21:04 | 25 | Q    Yeah. |

Viviana Garcia                                           3/27/2021
            Deshawn Briggs v. Allister Adel

                                                              112

11:24:03   1       Q    Okay.  And maybe it will be easier if we just
11:24:11   2    look at an example.  So actually, we can look at the one
11:24:13   3
11:24:19   4
11:24:22   5
11:24:25   6
11:24:28   7
11:24:28   8
11:24:36   9
11:24:40  10
11:24:45  11
11:24:47  12
11:24:47  13
11:24:48  14       A    Yes.
11:24:58  15       Q    Okay.  I think we have that.  So I'm just going
11:25:09  16
11:25:15  17
11:25:16  18
11:25:17  19
11:25:21  20
11:25:21  21
11:25:28  22       Q    Okay.  And whenever you issued a violation,
11:25:30  23    would you always send a letter like this?
11:25:32  24               MR. HENRY:  Objection; form.
11:25:34  25               THE WITNESS:  Yes.

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

                                                      115

| | | |
|---|---|---|
| 11:27:44 | 1 | A    Yes. |
| 11:27:44 | 2 | Q    Everything that applied? |
| 11:27:45 | 3 | A    Yes. |
| 11:28:01 | 4 | Q    Okay.  Okay.  And when you issued a violation, |
| 11:28:04 | 5 | we talked earlier about what the consequences of that |
| 11:28:05 | 6 | were. |
| 11:28:10 | 7 | If somebody has a violation letter within the |
| 11:28:13 | 8 | last week, can they complete the program? |
| 11:28:16 | 9 | MR. HENRY:  Objection; form. |
| 11:28:17 | 10 | THE WITNESS:  I don't remember. |
| 11:28:17 | 11 | BY MS. CHAMBLEE-RYAN: |
| 11:28:25 | 12 | Q    Okay.  Okay.  I'm just going to pull up another |
| 11:28:37 | 13 | one.  This is -- let me get to the right page and |
| 11:28:49 | 14 | everything.  Okay.  This is TASC631. |
| 11:28:49 | 15 | (The document was marked as Exhibit 7 for |
| 11:28:49 | 16 | identification.) |
| 11:28:49 | 17 | BY MS. CHAMBLEE-RYAN: |
| 11:28:53 | 18 | Q    Are you able to see that? |
| 11:28:54 | 19 | A    Yes. |
| 11:28:58 | 20 | Q    Okay.  Can you see the entry that's dated |
| 11:29:04 | 21 | 4/24/2019, about halfway down the page? |
| 11:29:05 | 22 | A    Yes. |
| 11:29:07 | 23 | Q    Okay.  Created by V. Garcia? |
| 11:29:08 | 24 | A    Yes. |
| 11:29:13 | 25 | Q    Okay.  So I'm just going to read part of this. |

Viviana Garcia                                          3/27/2021
         Deshawn Briggs v. Allister Adel

116

| | | |
|---|---|---|
| 11:29:18 | 1 | It says, CT stated has some wine on Sunday.  CM informed |
| 11:29:21 | 2 | CT per contract -- |
| 11:29:22 | 3 | A    Sorry.  Can I stop you?  Where are you reading |
| 11:29:23 | 4 | at?  424? |
| 11:29:33 | 5 | Q    424.  Okay.  Let me find the right part of it. |
| 11:29:37 | 6 | Right here, it's this -- |
| 11:29:37 | 7 | A    Okay. |
| 11:29:39 | 8 | Q    It looks like it's the third sentence. "CC |
| 11:29:41 | 9 | stated," do you see that? |
| 11:29:41 | 10 | A    Yes. |
| 11:29:44 | 11 | Q    Maybe it's the fourth.  Okay.  Okay. |
| 11:29:47 | 12 | [Reading] CC -- CT stated had some wine on |
| 11:29:50 | 13 | Sunday.  CM informed CT, per contract, CT is to avoid |
| 11:29:54 | 14 | any form of ALC, including OTC medication.  CT |
| 11:30:01 | 15 | acknowledged.  CM informed CT when pos, 90 days start |
| 11:30:03 | 16 | over. |
| 11:30:06 | 17 | Okay.  A few questions about this. |
| 11:30:07 | 18 | A    Okay. |
| 11:30:11 | 19 | Q    What is ETG positive? |
| 11:30:12 | 20 | A    That was for alcohol. |
| 11:30:17 | 21 | Q    Okay.  Is -- does ALC stand for alcohol? |
| 11:30:18 | 22 | A    Yes. |
| 11:30:20 | 23 | Q    What's OTC? |
| 11:30:21 | 24 | A    Over-the-counter. |
| 11:30:27 | 25 | Q    Okay.  So when you say, CM informed CT when |

Viviana Garcia                                    3/27/2021
           Deshawn Briggs v. Allister Adel

                                                        117

11:30:33   1   pos, 90 days start over, what does that mean?
11:30:37   2        A    So their -- their three-month program starts
11:30:41   3   over.
11:30:44   4        Q    What does it mean for it to start over?
11:30:48   5        A    So if they were in the program for a month,
11:30:52   6   that means their time starts over after -- after that
11:30:54   7   positive.
11:30:58   8        Q    Okay.  So after that positive, they need to go
11:31:02   9   three complete months --
11:31:02  10        A    Yes.
11:31:07  11        Q    -- with clean tests?
11:31:10  12        A    Yes.
11:31:15  13        Q    And so if you test positive after a month and
11:31:17  14   then you go three months with complete -- with clean
11:31:22  15   tests, and you've taken the seminar and you paid all
11:31:24  16   your fees, can you be successfully completed at that
11:31:26  17   point?
11:31:28  18             MR. HENRY:  Objection; form.
11:31:29  19             THE WITNESS:  Yes.
11:31:29  20   BY MS. CHAMBLEE-RYAN:
11:31:31  21        Q    Excuse me.  What was your answer?
11:31:31  22        A    Yes.
11:31:40  23        Q    Okay.  And does the 90 days start over from the
11:31:44  24   date they tested positive or do they start from the next
11:31:46  25   time you test negative?

Viviana Garcia                                    3/27/2021
            Deshawn Briggs v. Allister Adel

                                                        118

11:31:47  1            MR. HENRY:  Objection; foundation.
11:31:49  2            THE WITNESS:  I don't remember.
11:31:49  3   BY MS. CHAMBLEE-RYAN:
11:31:57  4      Q    Okay.  Let's look -- I just want to look at
11:32:00  5   this next page, because I just want to understand how
11:32:02  6   the timeline works.
11:32:05  7            So -- okay.  So the positive is here at 4/22/19
11:32:12  8   -- oh, and I'm at -- I'm sorry.  I'm at page 634.  So do
11:32:15  9   you see this positive here, 4/22/19?
11:32:17 10      A    Yes.
11:32:23 11      Q    Okay.  And then what's the date of their next
11:32:24 12   negative test?
11:32:27 13      A    4/29.
11:32:33 14      Q    Okay.  So I just want to turn back up to your
11:32:37 15   case notes to see what you said about this.  I'm going
11:32:40 16   back to 632.
11:32:51 17            So in this entry on July 15, 2019, I'm just
11:32:53 18   going to read what you said.  You said, Your anticipated
11:32:57 19   -- I'm reading -- tell me if you don't see where I'm
11:32:57 20   reading.
11:32:58 21      A    I -- I see it.
11:33:00 22      Q    [Reading] Your anticipated completion date is
11:33:04 23   on 7/29/19 as long as you have a zero balance and are
11:33:07 24   not required to test that day.
11:33:18 25            So looking back at this, it looks like 7/29/19.

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

| | |
|---|---|
| 11:33:24 | 1 |
| 11:33:28 | 2 |
| 11:33:29 | 3 |
| 11:33:35 | 4 |
| 11:33:40 | 5 |
| 11:33:42 | 6 |
| 11:33:44 | 7 |
| 11:33:45 | 8 |
| 11:33:45 | 9 |
| 11:33:48 | 10 |
| 11:33:49 | 11 |
| 11:33:50 | 12 |
| 11:33:55 | 13 |
| 11:33:58 | 14 |
| 11:34:02 | 15 |
| 11:34:05 | 16 |
| 11:34:16 | 17 |
| 11:34:19 | 18 |
| 11:34:23 | 19 |
| 11:34:23 | 20 |
| 11:34:26 | 21 |
| 11:34:30 | 22 |
| 11:34:34 | 23 |
| 11:34:35 | 24 |
| 11:34:37 | 25 |

1   It looks like that's three months after she first tested
2   negative after the positive test; is that correct?
3        A    Yes.
4        Q    Okay.  And that makes sense because they have
5   to go three months with all clean tests and no
6   violations for tests; right?
7                    MR. HENRY:  Form.
8                    THE WITNESS:  Yes.
9   BY MS. CHAMBLEE-RYAN:
10        Q    So it would start when they start testing
11   negative again?
12        A    Yes.
13        Q    Right?  Okay.  Just making sure I understand.
14            So if this person got to July 29 without
15   missing any tests and all the tests are clean and
16   everything else, you know, and she's done the seminar,
17   would she have to stay on the program?
18        A    So as long as she did the seminar, paid her
19   fines, and did the negative test, she can be off the
20   program.
21        Q    Okay.  What if she did the seminar and tested
22   clean all the way up to July 29, but she hadn't finished
23   paying her fees, can she be successfully completed then?
24        A    No.
25        Q    Okay.  And the reason for that is that she

Viviana Garcia                                   3/27/2021
**Deshawn Briggs v. Allister Adel**

120

| | | |
|---|---|---|
| 11:34:38 | 1 | hadn't paid her fees? |
| 11:34:40 | 2 | A    Correct. |
| 11:34:42 | 3 | Q    Okay.  And at that point the only reason she's |
| 11:34:45 | 4 | still on is the fees; is that correct? |
| 11:34:46 | 5 | A    Correct. |
| 11:34:48 | 6 | Q    At that point it doesn't have anything to do |
| 11:34:49 | 7 | with that violation; is that correct? |
| 11:34:53 | 8 | A    Which violation? |
| 11:34:56 | 9 | Q    The one we were talking about from this |
| 11:34:58 | 10 | positive test here, 4/22/19. |
| 11:35:03 | 11 | A    Okay. |
| 11:35:06 | 12 | Q    So just to walk through that again, she tests |
| 11:35:08 | 13 | positive 4/22/19? |
| 11:35:09 | 14 | A    Yes. |
| 11:35:12 | 15 | Q    She starts testing negative on 4/29/19? |
| 11:35:14 | 16 | A    Correct. |
| 11:35:17 | 17 | Q    If she continued to test negative and not |
| 11:35:21 | 18 | missed any tests and she took the seminar but hadn't |
| 11:35:23 | 19 | paid her fees -- |
| 11:35:25 | 20 | A    She would stay on the program. |
| 11:35:31 | 21 | Q    And would this violation on 4/22 have anything |
| 11:35:33 | 22 | to do with that? |
| 11:35:35 | 23 | A    I don't remember. |
| 11:35:44 | 24 | Q    Okay.  Well, so -- and we just kind of talked |
| 11:35:46 | 25 | through it.  So -- |

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

121

11:35:49  1        A    So let me take that back.  So I guess it -- it
11:35:55  2    would -- it -- that positive test wouldn't affect it.
11:35:57  3        Q    It wouldn't affect it.
11:36:01  4             Why not?
11:36:06  5        A    Because her positive test was on the 22nd and
11:36:08  6    she started testing negative on the 29, so that's when
11:36:10  7    everything starts over.
11:36:21  8        Q    Okay.  So after July 29, as long as she tested
11:36:24  9    clean for three months and done the seminar, the only
11:36:27  10   reason she would still be on the program is the fees --
11:36:28  11       A    Yes.
11:36:28  12       Q    -- is that right?  Okay.
11:36:29  13       A    Yes.
11:36:42  14       Q    Okay.  Okay.  I just want to look at another
11:36:47  15   one.  And this is helpful.  It's easier just to look at
11:36:47  16   the examples.
11:36:58  17             Okay.  So now I'm going to look at the one --
11:37:00  18
11:37:07  19
11:37:09  20
11:37:16  21
11:37:30  22
11:37:42  23
11:37:45  24
11:38:04  25

Viviana Garcia                              3/27/2021
        Deshawn Briggs v. Allister Adel

                                                127

11:44:44   1        A    I don't know.  I didn't have anything to do
11:44:45   2    with the counseling.

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

128

| | | |
|---|---|---|
| 11:46:33 | 1 | information," are we talking about POM clients? |
| 11:46:34 | 2 | A     Yes. |
| 11:46:42 | 3 | Q     Did you complete this form as part of your job? |
| 11:46:45 | 4 | A     When I was -- sometimes I would when I would do |
| 11:46:46 | 5 | orientation. |
| 11:46:50 | 6 | Q     Okay.  So this form was completed at |
| 11:46:52 | 7 | orientation? |
| 11:46:52 | 8 | A     Yes. |
| 11:47:02 | 9 | Q     Okay.  Did you complete this particular form? |
| 11:47:03 | 10 | A     I don't know. |
| 11:47:06 | 11 | Q     Is this your handwriting? |
| 11:47:07 | 12 | A     It doesn't look like it. |
| 11:47:14 | 13 | Q     Okay.  Do you see the box that's titled case |
| 11:47:16 | 14 | manager? |
| 11:47:17 | 15 | A     Yes. |
| 11:47:19 | 16 | Q     And it says Viviana? |
| 11:47:19 | 17 | A     Yes. |
| 11:47:22 | 18 | Q     Is that you? |
| 11:47:23 | 19 | A     That's me. |
| 11:47:27 | 20 | Q     Okay.  And that means you worked as a case |
| 11:47:29 | 21 | manager for this participant? |
| 11:47:29 | 22 | A     Yes. |
| 11:47:35 | 23 | |
| 11:47:40 | 24 | |
| 11:47:41 | 25 | |

Viviana Garcia                                3/27/2021
        Deshawn Briggs v. Allister Adel

| 11:47:44 | 1 | |
| 11:47:45 | 2 | |
| 11:47:48 | 3 | |
| 11:47:52 | 4 | |
| 11:47:56 | 5 | |
| 11:47:58 | 6 | |
| 11:48:00 | 7 | |
| 11:48:02 | 8 | |
| 11:48:04 | 9 | |
| 11:48:05 | 10 | |

11:48:07  11         MR. HENRY:  Objection; form.

11:48:08  12         THE WITNESS:  I don't know.

11:48:08  13  BY MS. CHAMBLEE-RYAN:

11:48:11  14     Q    Okay.  Did you use this information for

11:48:13  15  anything as part of your job?

11:48:14  16     A    Not that I remember.

11:48:19  17     Q    There's also blanks here that asks if the

11:48:24  18  person's on AHCCCS?

11:48:24  19     A    Yeah.

11:48:25  20     Q    Do you see that blank here?

11:48:26  21     A    Yes.

11:48:29  22     Q    What is AHCCCS?

11:48:31  23     A    AHCCCS.

11:48:31  24     Q    What is that?

11:48:38  25     A    AHCCCS is an insurance that the state gives.

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

130

| | | |
|---|---|---|
| 11:48:47 | 1 | Q    Okay.  Do you know why that information was |
| 11:48:48 | 2 | being collected? |
| 11:48:49 | 3 | A    No. |
| 11:48:53 | 4 | Q    Did you ever use this as part of your job? |
| 11:48:55 | 5 | A    The AHCCCS? |
| 11:48:58 | 6 | Q    This -- this check box, information about |
| 11:49:00 | 7 | whether or not the person was on AHCCCS. |
| 11:49:01 | 8 | A    No. |
| 11:49:07 | 9 | Q    Okay.  And here it says Social Security |
| 11:49:12 | 10 | SSI/SSDI; is that correct? |
| 11:49:12 | 11 | A    Yes. |
| 11:49:16 | 12 | Q    With a dollar amount; is that right? |
| 11:49:17 | 13 | A    I see the dollar sign, yes. |
| 11:49:19 | 14 | Q    Do you know why that information was being |
| 11:49:20 | 15 | collected? |
| 11:49:20 | 16 | A    No. |
| 11:49:23 | 17 | Q    Did you ever use the information in this box as |
| 11:49:24 | 18 | part of your job? |
| 11:49:25 | 19 | A    No. |
| 11:49:31 | 20 | Q    Okay.  And just to give a shortcut, I'll just |
| 11:49:34 | 21 | look at -- going through all these boxes, the one that |
| 11:49:37 | 22 | says TANF, food stamps, disability, Section 8 housing, |
| 11:49:42 | 23 | unemployment, child support.  Did you ever use the |
| 11:49:45 | 24 | information that participants included in these boxes as |
| 11:49:46 | 25 | part of your job? |

Viviana Garcia                                          3/27/2021
Deshawn Briggs v. Allister Adel

135

| | | |
|---|---|---|
| 11:54:33 | 1 | it's always this fee in the top row that applied with |
| 11:54:36 | 2 | the exception of the booking fee, which depends on |
| 11:54:37 | 3 | whether they were booked or not; is that correct? |
| 11:54:38 | 4 | A    Yes. |
| 11:54:42 | 5 | Q    Okay.  Any exceptions to that? |
| 11:54:42 | 6 | A    Not that I recall. |
| 11:54:48 | 7 | Q    Okay.  Did you ever check these little boxes |
| 11:54:54 | 8 | here that say full, sliding, copay? |
| 11:54:54 | 9 | A    Not that I remember. |
| 11:54:57 | 10 | Q    Do you know what they mean? |
| 11:55:00 | 11 | A    Full, that they paid in full; sliding, I don't |
| 11:55:01 | 12 | know; and I don't know what copay means. |
| 11:55:09 | 13 | Q    Okay.  Okay.  I just want to go to another page |
| 11:55:23 | 14 | here.  We're scrolling. |
| 11:55:26 | 15 | Okay.  Do you know what this -- do you know |
| 11:55:28 | 16 | what this document is? |
| 11:55:29 | 17 | |
| 11:55:35 | 18 | |
| 11:55:35 | 19 | |
| 11:55:38 | 20 | Q    Do you know what this is? |
| 11:55:40 | 21 | A    It's a submittal form. |
| 11:55:42 | 22 | Q    What's that? |
| 11:55:44 | 23 | A    It's -- well, I -- because I read submittal |
| 11:55:46 | 24 | form, that's why I said submittal form.  It's a form |
| 11:55:49 | 25 | that we complete. |

Viviana Garcia                                    3/27/2021
           Deshawn Briggs v. Allister Adel

                                                        136

11:55:50  1        Q    Have you seen this before?
11:55:51  2        A    Yes.
11:55:54  3        Q    When you say "it's a form that we complete,"
11:55:58  4   does that mean it was something you completed as part of
11:56:00  5   your job as a case manager?
11:56:00  6        A    Correct.
11:56:11  7        Q    Okay.  So this is your name at the top;
11:56:12  8   right --
11:56:12  9        A    Yes.
11:56:14  10       Q    -- as the case manager?
11:56:15  11            And does that mean you were the case manager
11:56:17  12   for this participant?
11:56:17  13       A    Yes.
11:56:25  14       Q    Okay.  Does anybody other than case manager
11:56:28  15   fill out this form?
11:56:29  16       A    Yes.
11:56:33  17       Q    Who else?
11:56:36  18       A    I don't remember what their names are or what
11:56:39  19   their titles are, but there was other people that would
11:56:40  20   be able to complete it.
11:56:44  21       Q    Do you remember: Were they people who worked
11:56:48  22   with you at the orientation?
11:56:52  23       A    People that worked with me at TASC.
11:56:55  24       Q    Okay.  Did these people work directly with
11:56:57  25   clients?

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

143

| | | |
|---|---|---|
| 12:04:46 | 1 | And then it has 25 per group, 100 assessment. |
| 12:04:46 | 2 | Are those the fees we were -- or is that the counseling |
| 12:04:49 | 3 | we were discussing before? |
| 12:04:50 | 4 | A    Yes. |
| 12:04:54 | 5 | Q    Okay.  And your understanding is that these are |
| 12:04:56 | 6 | the fees for that? |
| 12:04:58 | 7 | A    I'm -- yes. |
| 12:05:06 | 8 | |
| 12:05:28 | 9 | |
| 12:05:29 | 10 | |
| 12:05:30 | 11 | |
| 12:05:32 | 12 | |
| 12:05:35 | 13 | |
| 12:05:38 | 14 | Q    And what does that show? |
| 12:05:39 | 15 | A    Everything that they paid. |
| 12:05:43 | 16 | Q    Okay.  Is this broken up by fee? |
| 12:05:44 | 17 | A    Yes. |
| 12:05:51 | 18 | Q    So how much did they pay for the admission fee? |
| 12:05:52 | 19 | A    150. |
| 12:05:55 | 20 | Q    Okay.  And that's the full price? |
| 12:05:56 | 21 | A    Yes. |
| 12:05:59 | 22 | Q    What about the CA fund? |
| 12:06:01 | 23 | A    Shows a total payment of 650. |
| 12:06:03 | 24 | Q    And what are these kind of payments that |
| 12:06:06 | 25 | they're adding up to get to -- |

Viviana Garcia                                      3/27/2021
             Deshawn Briggs v. Allister Adel

160

| | | |
|---|---|---|
| 12:55:10 | 1 | going to give you remote control.  Let's see if that |
| 12:55:14 | 2 | worked.  Can you control this? |
| 12:55:48 | 3 | A    Yes.  Okay. |
| 12:55:57 | 4 | Q    Okay.  So does this reflect the policies you |
| 12:56:00 | 5 | followed while you worked as a case manager at TASC? |
| 12:56:01 | 6 | MR. HENRY:  Objection; form. |
| 12:56:02 | 7 | THE WITNESS:  I don't remember seeing this |
| 12:56:05 | 8 | document. |
| 12:56:05 | 9 | BY MS. CHAMBLEE-RYAN: |
| 12:56:10 | 10 | Q    Do you remember: When you were a case manager |
| 12:56:20 | 11 | at TASC, was there ever a system for reducing the |
| 12:56:26 | 12 | monthly payment amount somebody owed from 160 or 170 to |
| 12:56:28 | 13 | something else? |
| 12:56:30 | 14 | MR. HENRY:  Objection; form. |
| 12:56:31 | 15 | THE WITNESS:  So, I mean, they would |
| 12:56:34 | 16 | provide their proof, but I wouldn't make a |
| 12:56:36 | 17 | determination.  I would just collect. |
| 12:56:36 | 18 | BY MS. CHAMBLEE-RYAN: |
| 12:56:41 | 19 | Q    Okay.  Did you have to collect any information |
| 12:56:44 | 20 | or documents from the client before you let them pay |
| 12:56:48 | 21 | less than 160 or 170 for their monthly payment? |
| 12:56:54 | 22 | A    If they apply for the hardship.  And I would |
| 12:56:58 | 23 | just collect, like, their bank statements or whatever |
| 12:57:03 | 24 | information they provided, their bills. |
| 12:57:10 | 25 | Q    But you didn't make the decision? |

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

161

12:57:13  1        A    For it to be lowered, no.

12:57:16  2        Q    Okay.  And just to be clear, when you say if

12:57:21  3    they applied for a hardship, when a client applied for a

12:57:30  4    hardship, were they applying to get a reduction of the

12:57:36  5    monthly payments that they owed towards their TASC fees?

12:57:37  6        A    They can for their urinalysis.

12:57:43  7        Q    Okay.  But that wouldn't lower the total amount

12:57:46  8    that they owed?

12:57:47  9        A    Not that I'm aware of.

12:57:50  10       Q    Okay.  Are you aware of any policy that lowered

12:57:53  11   the actual total amount that they owed?

12:57:54  12              MR. HENRY:  Object to form.

12:57:55  13              THE WITNESS:  No.

12:57:55  14   BY MS. CHAMBLEE-RYAN:

12:58:13  15       Q    Okay.  Okay.  I'm just going to look at a

12:58:47  16   different document.  This is going to be TASC221.  Okay.

12:58:52  17   It's giving -- it's making me take a minute.

12:59:16  18       A    Do we have a lot more to go over?

12:59:19  19       Q    I think that we're a little over halfway

12:59:43  20   through.  Okay.  Sorry.  This one is being

13:00:12  21   temperamental.  Okay.  I finally got it.  Okay.  So I'm

13:00:16  22   at page 228.

13:00:21  23              MR. HENRY:  It's not on the screen.

13:00:22  24              MS. CHAMBLEE-RYAN:  I'm just pulling it up

13:00:25  25   right now.  Do you have it now?

Viviana Garcia                                        3/27/2021
               Deshawn Briggs v. Allister Adel

                                                          162

```
13:00:25   1              (The document was marked as Exhibit 10 for
13:00:25   2     identification.)
13:00:27   3              THE WITNESS:  Yes.
13:00:27   4     BY MS. CHAMBLEE-RYAN:
13:00:27   5        Q    Great.
13:00:28   6             Are these case notes?
13:00:30   7        A    Yes.
13:00:35   8        Q    Okay.  So I'm going to go to the bottom of this
13:00:42   9     page.  I'm looking at the entry dated 3/21/18, created
13:00:50  10     by V. Garcia.  Do you see that?  Can you see that?
13:00:50  11        A    I can.
13:00:53  12        Q    Okay.  So I'm just to read you the first couple
13:00:53  13     sentences.
13:00:58  14             So you say, Please be advised that our records
13:01:00  15     indicate that you are behind on your monthly payments.
13:01:03  16     Per your signed client contract, you are responsible to
13:01:06  17     make your designated payment of 160 every third Friday
13:01:09  18     of the calendar month until your balance is paid in
13:01:13  19     full.  If you are unable to make your monthly payment,
13:01:16  20     you must make a minimum payment of $50 each month in
13:01:20  21     order to stay in program compliance.
13:01:22  22        A    Okay.
13:01:32  23        Q    So are you -- are you lowering his minimum
13:01:35  24     payment amount to $50 here?
13:01:36  25             MR. HENRY:  Object to the form.
```

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

                                                      163

13:01:37  1              THE WITNESS:  I'm pretty much saying if he
13:01:41  2    can't pay the full 160 that's due every third Friday of
13:01:42  3    the month, that he needs to at least pay $50.
13:01:42  4    BY MS. CHAMBLEE-RYAN:
13:01:46  5        Q    Okay.  And did you make the decision to do
13:01:46  6    this?
13:01:49  7        A    So that's not an email that I wrote.  It was an
13:01:53  8    -- like, a general email that we would have, and I can
13:01:55  9    just attach it there.
13:01:57  10       Q    Okay.  So --
13:02:00  11       A    It's not my writing -- my word for word what
13:02:01  12   I'm saying.
13:02:06  13       Q    Okay.  So it says, From Viviana Garcia; right?
13:02:08  14   So you sent it to him?
13:02:09  15       A    Correct.
13:02:12  16       Q    But you didn't write it?
13:02:15  17       A    So let me explain.  So I had, like, a little
13:02:18  18   thing that was given to me that instead of me having to
13:02:21  19   type this to every single client, it was already given
13:02:25  20   to me.  So I would just send it like that.
13:02:29  21       Q    Okay.  Who gave it to you?
13:02:31  22       A    One of my leads.  I can't recall which one
13:02:31  23   specifically.
13:02:34  24       Q    And when you say a little thing that they gave
13:02:36  25   to you, what was it that they gave to you?

Viviana Garcia                                    3/27/2021
               Deshawn Briggs v. Allister Adel

                                                        165

13:03:54  1   email anytime a client was struggling to pay?
13:03:57  2        A    So I would send that email when they were
13:03:59  3   behind on their -- their payments.
13:04:08  4        Q    Okay.  And did they have to show why they were
13:04:10  5   behind?
13:04:10  6        A    I don't remember.
13:04:16  7        Q    Okay.  And so just to make sure I understand
13:04:21  8   what this means, it means instead of paying 160, if he
13:04:25  9   can't pay that, he can pay 50 against his balance each
13:04:25 10   month; is that right?
13:04:28 11        A    That's what the email is saying.
13:04:31 12        Q    And, again, that doesn't change his overall
13:04:32 13   balance?
13:04:35 14        A    That's what I said.
13:04:37 15        Q    Okay.  Because there wasn't a way to change
13:04:38 16   your overall balance?
13:04:40 17        A    Yeah.
13:04:41 18             MR. HENRY:  Object to the form.
13:04:43 19             THE WITNESS:  So you're just kind of
13:04:46 20   asking the same question over that I already answered.
13:04:46 21   BY MS. CHAMBLEE-RYAN:
13:04:53 22        Q    Okay.  Well, I'll try not to do that.
13:05:26 23             Okay.  I'm going to go to page 227.  So I'm
13:05:50 24   looking at -- sorry.  Where did it go?  Here we go.
13:05:55 25   This is on page -- yeah, it is 227.  Okay.

Viviana Garcia                                    3/27/2021
           Deshawn Briggs v. Allister Adel

166

| | | |
|---|---|---|
| 13:05:58 | 1 | So I'm looking at the entry 3/27/18, created by |
| 13:06:00 | 2 | V. Garcia. |
| 13:06:00 | 3 | A    Okay. |
| 13:06:14 | 4 | Q    So about in the middle of this note it says, If |
| 13:06:18 | 5 | CT is able to pay balance and not test on 3/29/18, CT |
| 13:06:20 | 6 | can be done. |
| 13:06:22 | 7 | What does that mean? |
| 13:06:25 | 8 | A    So if -- if the client is able to pay off his |
| 13:06:28 | 9 | balance and is not required to test on the 29th of March |
| 13:06:31 | 10 | of 2018, the client can be done from the program. |
| 13:06:37 | 11 | Q    Okay.  And then I'm looking on the same page, |
| 13:06:43 | 12 | the entry for -- I'm scrolling too fast -- April 16, |
| 13:06:45 | 13 | 2018. |
| 13:06:54 | 14 | So here it says, Case manager asked client how |
| 13:06:56 | 15 | client is doing with balance.  Client stated is working |
| 13:07:00 | 16 | on it.  Aware that is only thing that is keeping client |
| 13:07:05 | 17 | on program.  Case manager acknowledged. |
| 13:07:09 | 18 | What does that mean? |
| 13:07:12 | 19 | A    So I was just asking him how he was doing with |
| 13:07:14 | 20 | him paying his balance, and he's pretty much saying he's |
| 13:07:17 | 21 | working on it, that he knows that this is the only thing |
| 13:07:20 | 22 | that's keeping him on his program to pay the balance. |
| 13:07:21 | 23 | And I agreed. |
| 13:07:23 | 24 | Q    Okay.  What does that mean that it's the only |
| 13:07:26 | 25 | thing keeping him on the program was to pay the balance? |

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

                                                        167

| | | |
|---|---|---|
| 13:07:28 | 1 | A    That's the only thing that he has to comply |
| 13:07:30 | 2 | with.  So he's already pretty much completed with his |
| 13:07:33 | 3 | urinalysis and his seminar, and all he has to do is pay |
| 13:07:34 | 4 | for his fines. |
| 13:07:42 | 5 | Q    Okay.  All right.  All done with that one. |
| 13:07:52 | 6 | Okay.  I think we can skip -- I think we can |
| 13:07:55 | 7 | skip a few questions. |
| 13:08:04 | 8 | Okay.  I'm now looking at -- I'm -- I'm going |
| 13:08:11 | 9 | to go to TASC631.  And this one -- |
| 13:08:15 | 10 | THE COURT REPORTER:  You froze again.  Ms. |
| 13:08:28 | 11 | Chamblee, you froze.  And you were saying "TASC631.  And |
| 13:08:28 | 12 | this one --" |
| 13:08:33 | 13 | MS. CHAMBLEE-RYAN:  Is already entered. |
| 13:08:38 | 14 | Did you hear that? |
| 13:08:39 | 15 | THE COURT REPORTER:  Yes.  Thank you. |
| 13:08:39 | 16 | BY MS. CHAMBLEE-RYAN: |
| 13:08:39 | 17 | Q    Okay.  Great. |
| 13:08:43 | 18 | So I'm just turning to page 633 in this |
| 13:08:53 | 19 | document.  I'm going to share it now.  Okay.  Can you |
| 13:08:56 | 20 | see that? |
| 13:08:57 | 21 | A    Yes. |
| 13:08:59 | 22 | Q    Are these case notes? |
| 13:08:59 | 23 | A    Correct. |
| 13:09:04 | 24 | Q    Okay.  I'm just looking at the entry on July |
| 13:09:10 | 25 | 25, 2019 -- apologies. |

Viviana Garcia                                          3/27/2021
            Deshawn Briggs v. Allister Adel

168

13:09:19   1          So here the client -- well, first of all, does
13:09:22   2   this show an email to you from a client?
13:09:22   3      A    Yes.
13:09:25   4      Q    And does it show your response to the client?
13:09:26   5      A    Correct.
13:09:30   6      Q    Okay.  So I'm just going to read from the
13:09:30   7   client's emails.
13:09:34   8          It says, But what could I do if I can't pay the
13:09:37   9   440 I still owe by the 29th?  I currently still don't
13:09:38  10   have a job.
13:09:40  11          And then you responded, If you are unable to
13:09:43  12   pay your fees in full by 7/29/19, you will continue to
13:09:46  13   comply with the program.
13:09:47  14      Q    Can you tell me what that means?
13:09:51  15      A    To mean they're still going to be in the
13:09:51  16   program.
13:09:54  17      Q    Okay.  And the reason for that is what?
13:09:56  18      A    Because she's saying that she has -- won't be
13:09:58  19   -- possibly be able to pay it in full.
13:10:08  20      Q    Okay.  And could you have made the decision to
13:10:11  21   just release her from the program even though she hasn't
13:10:14  22   -- even if she didn't pay off her fees?
13:10:14  23      A    No.
13:10:18  24      Q    Okay.  Why?
13:10:22  25      A    Because she has to meet all of her requirements

Viviana Garcia                                    3/27/2021
            Deshawn Briggs v. Allister Adel

                                                        169

| | | |
|---|---|---|
| 13:10:24 | 1 | before she's able to be released. |
| 13:10:27 | 2 | Q    Okay.  That was TASC's policy? |
| 13:10:27 | 3 | A    Yes. |
| 13:10:30 | 4 | Q    That your supervisors explained to you? |
| 13:10:30 | 5 | A    Correct. |
| 13:10:34 | 6 | Q    That Cheyenne Watson, Yolonda Brooks, and Abby |
| 13:10:36 | 7 | -- Abigail Pacheco? |
| 13:10:36 | 8 | A    Correct. |
| 13:10:37 | 9 | MR. HENRY:  Object to the form. |
| 13:10:37 | 10 | BY MS. CHAMBLEE-RYAN: |
| 13:10:38 | 11 | Q    Thank you. |
| 13:10:44 | 12 | All right.  Okay.  Moving along. |
| 13:10:47 | 13 | So we've been talking about the urinalysis |
| 13:10:49 | 14 | test.  Did those cost money? |
| 13:10:50 | 15 | A    Yes. |
| 13:10:54 | 16 | Q    Okay.  Do you know how much they cost? |
| 13:10:59 | 17 | A    So we already went over that. |
| 13:11:03 | 18 | Q    Okay.  Did you collect the testing fees |
| 13:11:04 | 19 | personally? |
| 13:11:05 | 20 | A    No. |
| 13:11:09 | 21 | Q    Do you know who collects them? |
| 13:11:12 | 22 | A    The customer -- I -- I don't know -- I don't |
| 13:11:15 | 23 | know exactly the name, but they were called CSTs. |
| 13:11:16 | 24 | Q    CSTs? |
| 13:11:17 | 25 | A    Yes. |

| | | |
|---|---|---|
| 13:49:30 | 1 | says UA -- |
| 13:49:30 | 2 | THE COURT REPORTER:  You froze up. |
| 13:49:30 | 3 | THE WITNESS:  She froze. |
| 13:49:34 | 4 | THE COURT REPORTER:  You froze up, Ms. |
| 13:49:35 | 5 | Chamblee. |
| 13:49:36 | 6 | MS. CHAMBLEE-RYAN:  Okay.  Am I back now? |
| 13:49:40 | 7 | THE COURT REPORTER:  Yes.  You said, "at |
| 13:49:41 | 8 | the bottom of the page it says". |
| 13:49:44 | 9 | MS. CHAMBLEE-RYAN:  Thank you.  I wish you |
| 13:49:46 | 10 | can come to all of my meetings when this happens. |
| 13:49:46 | 11 | BY MS. CHAMBLEE-RYAN: |
| 13:49:49 | 12 | Q    Okay.  UA fees -- I'm -- I'm just reading from |
| 13:49:52 | 13 | the bottom of the page on 24. |
| 13:49:52 | 14 | A    Okay. |
| 13:49:54 | 15 | Q    In bold, it says, UA fees may not be waived or |
| 13:49:58 | 16 | on copay status if a client is testing positive.  UA |
| 13:50:00 | 17 | fees should be reinstated effective immediately |
| 13:50:03 | 18 | following a positive UA. |
| 13:50:08 | 19 | What do you understand that to mean? |
| 13:50:11 | 20 | A    That their fees were reduced, and if they |
| 13:50:14 | 21 | tested positive, that they're going to go back to their |
| 13:50:16 | 22 | normal rate. |
| 13:50:22 | 23 | Q    Okay.  And was this your understanding of what |
| 13:50:25 | 24 | the policy was at TASC at the time you worked as a case |
| 13:50:26 | 25 | manager? |

Viviana Garcia                                        3/27/2021
            Deshawn Briggs v. Allister Adel

200

13:50:27  1      A    Yes.

13:50:34  2      Q    Okay.  And how did you learn about this policy?

13:50:36  3      A    I must have been told.

13:50:38  4      Q    Who would have told you?

13:50:41  5      A    My leads or supervisor.

13:50:43  6      Q    Okay.  Anybody else who might have told you

13:50:46  7  this policy?

13:50:48  8      A    Not that I can recall.

13:50:51  9      Q    Okay.  And then it says, The client must submit

13:50:55  10 six consecutive clean UAs before fees can again be

13:50:55  11 reduced.

13:50:57  12          What's your understanding of that?

13:50:59  13     A    That they can go ahead and get their fees

13:51:04  14 reduced if they submit six clean tests.

13:51:10  15     Q    Okay.  So just to understand how this works, if

13:51:14  16 a person has gotten their fees waived or reduced, they

13:51:18  17 filled out that application, it was granted, but then

13:51:27  18 they turn in a positive UA, that waiver or reduction

13:51:32  19 will be removed and they will have to pay the full fees

13:51:33  20 immediately; is that correct?

13:51:36  21     A    That's what it sounds like.

13:51:42  22     Q    Okay.  And then after that happens, they can't

13:51:44  23 get another waiver or reduction until they've tested

13:51:48  24 clean six consecutive times; is that correct?

13:51:51  25     A    That's what the document says.

Viviana Garcia                                3/27/2021
        Deshawn Briggs v. Allister Adel

205

13:56:22  1    these decisions?

13:56:25  2        A    I don't know if she -- if it was just all her.

13:56:30  3        Q    Do you actually -- do you actually know whether

13:56:33  4    she was involved in those decisions or not?

13:56:35  5        A    I don't know.  I -- I don't remember.

13:56:39  6        Q    It's okay.  If you don't remember, you don't

13:56:40  7    remember.  That's --

13:56:41  8        A    Yeah, I don't.

13:56:45  9        Q    That's a perfectly good answer.

13:57:02 10             Okay.  All right.  So -- okay.  I'm about to

13:57:08 11

13:57:16 12

13:57:16 13

13:57:16 14

13:57:17 15

13:58:10 16

13:58:26 17

13:58:29 18

13:58:32 19

13:58:41 20

13:58:49 21

13:58:52 22

13:58:53 23

13:59:04 24

13:59:05 25

| | | |
|---|---|---|
| 14:11:21 | 1 | I'll let you know if I have a -- a better estimate.  But |
| 14:11:26 | 2 | if -- if anyone needs a break, we're happy to take one. |
| 14:11:27 | 3 | MR. HENRY:  Let's take a short break. |
| 14:11:31 | 4 | Maybe it will help move things along. |
| 14:11:33 | 5 | THE VIDEOGRAPHER:  We are now off the |
| 14:11:38 | 6 | record.  The time on the video monitor is 2:10 p.m. |
| 14:11:38 | 7 | (A recess ensued.) |
| 14:24:01 | 8 | THE VIDEOGRAPHER:  We are now on the |
| 14:24:06 | 9 | record.  The time on the video monitor is 2:23 p.m. |
| 14:24:06 | 10 | BY MS. CHAMBLEE-RYAN: |
| 14:24:14 | 11 | Q    Okay.  All right.  I'm going to show you |
| 14:24:22 | 12 | another exhibit.  And it's ready to go.  Can you see |
| 14:24:23 | 13 | that? |
| 14:24:23 | 14 | A    Yes. |
| 14:24:32 | 15 | Q    So this is TASC033796. |
| 14:24:36 | 16 | THE COURT REPORTER:  I'm going to show |
| 14:24:38 | 17 | that as being marked now. |
| 14:24:41 | 18 | MS. CHAMBLEE-RYAN:  Yes.  That's new. |
| 14:24:41 | 19 | (The document was marked as Exhibit 13 for |
| 14:24:41 | 20 | identification.) |
| 14:24:42 | 21 | BY MS. CHAMBLEE-RYAN: |
| 14:24:44 | 22 | Q    Okay.  I'm scrolling down to this email about |
| 14:24:48 | 23 | halfway down the page dated December 5, 2018, from |
| 14:24:55 | 24 | Cheyenne Watson.  And was this sent to you, Ms. Garcia? |
| 14:24:58 | 25 | A    Yeah.  I see my name in there. |

Viviana Garcia                                          3/27/2021
Deshawn Briggs v. Allister Adel

216

14:25:03  1      Q    Okay.  So in the first sentence she says,
14:25:05  2   Please send me your financial agreement spreadsheets
14:25:08  3   today by noon.
14:25:11  4          Do you know what a financial agreement
14:25:12  5   spreadsheet is?
14:25:15  6      A    I don't remember what she's referring to.
14:25:21  7      Q    Okay.  And she says, Please continue to collect
14:25:22  8   this information.
14:25:26  9          Again, do you remember what she's referring to?
14:25:33 10      A    To continue to collect the spreadsheet -- the
14:25:38 11   financial agreement spreadsheet.  It's just speculation
14:25:39 12   from the email.
14:25:44 13      Q    Okay.  That's helpful to know.
14:25:48 14          Okay.  Let me show you -- let me show you an
14:25:49 15   example and see if that helps.
14:25:52 16
14:25:54 17
14:25:54 18
14:25:54 19
14:26:02 20
14:26:16 21
14:26:17 22
14:26:20 23
14:26:21 24
14:26:26 25



Coash & Coash, Inc.
www.coashandcoash.com                          602-258-1440

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

217



14:26:27  1

14:26:33  2

14:26:45  3

14:26:48  4

14:26:53  5

14:26:56  6

14:26:57  7

14:27:09  8      Q    Okay.  So now thinking back on that email, do

14:27:11  9  you have a better understanding of what Cheyenne Watson

14:27:13  10 was asking you to do?

14:27:13  11      A    Yes.

14:27:14  12           MR. HENRY:  Objection.

14:27:14  13 BY MS. CHAMBLEE-RYAN:

14:27:15  14      Q    And what was that?

14:27:17  15      A    To turn in this spreadsheet.

14:27:21  16      Q    Okay.  And do you know if you followed those

14:27:24  17 instructions?

14:27:25  18      A    I don't remember.

14:27:27  19      Q    Did you normally do what Cheyenne Watson told

14:27:29  20 you to do?

14:27:29  21      A    Yes.

14:27:31  22      Q    Why is that?

14:27:32  23      A    I would say -- I would say yes, I would give

14:27:35  24 her this sheet.

14:27:37  25      Q    Why is that?

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

218

14:27:38  1        A     Because she asked for it.

14:27:43  2        Q     And so you'd follow those instructions because
14:27:45  3    why?

14:27:48  4        A     Because I was advised to do so.

14:27:50  5        Q     By your boss?

14:27:50  6        A     Correct.

14:27:59  7        Q     Okay.  Do you know if you used these
14:28:03  8    spreadsheets for the entire time you worked as a case
14:28:04  9    manager at TASC?

14:28:05 10        A     I don't remember.

14:28:11 11

14:28:13 12

14:28:14 13

14:28:14 14

14:28:17 15

14:28:19 16

14:28:21 17

14:28:22 18

14:28:22 19

14:28:23 20

14:28:25 21

14:28:26 22

14:28:33 23

14:28:44 24

14:29:01 25

Viviana Garcia                                      3/27/2021
        Deshawn Briggs v. Allister Adel

14:37:27   1    you've already given me today, those were the same for

14:37:30   2    the whole time you worked at TASC unless we specified

14:37:31   3    otherwise; is that right?

14:37:33   4             MR. HENRY:  Object to the form.

14:37:34   5             THE WITNESS:  From what I recall, yes.

14:37:34   6    BY MS. CHAMBLEE-RYAN:

14:37:39   7        Q    Okay.  Great.  Okay.

14:37:54   8

14:37:59   9

14:37:59  10

14:38:02  11

14:38:03  12

14:38:07  13

14:38:07  14

14:38:16  15

14:38:19  16

14:38:21  17

14:38:28  18

14:38:36  19

14:38:38  20

14:38:40  21

14:38:41  22

14:38:45  23

14:38:47  24

14:38:49  25

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

226

14:38:49  1
14:38:49  2
14:38:59  3
14:38:59  4
14:39:01  5          MR. HENRY:  Asked and answered.
14:39:01  6          THE WITNESS:  I don't remember it.
14:39:02  7  BY MS. CHAMBLEE-RYAN:
14:39:03  8     Q    Okay.  I'm just making -- I'm just making clear
14:39:07  9  what you're saying.  Because it seems like some things
14:39:10 10  that were kind of routine parts of your job, you
14:39:11 11  remember those.  So I guess I'm wondering if you have
14:39:16 12  any idea why you didn't remember it.  If you think it's
14:39:19 13  because you didn't use it, you didn't deal with it, or
14:39:21 14  if you just don't know why you don't remember.
14:39:22 15     A    I don't -- I don't remember.
14:39:36 16
14:39:46 17
14:39:49 18
14:39:52 19
14:39:55 20
14:39:57 21
14:40:00 22
14:40:03 23
14:40:07 24
14:40:11 25

Coash & Coash, Inc.
www.coashandcoash.com                    602-258-1440

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

227

14:40:12  1

14:40:13  2

14:40:13  3

14:40:13  4   BY MS. CHAMBLEE-RYAN:

14:40:20  5       Q    Okay.  Do you remember whether you ever

14:40:23  6   documented that charges had been waived in the client's

14:40:24  7   file?

14:40:26  8       A    I don't recall.

14:40:28  9       Q    You don't recall doing it?

14:40:30  10      A    I don't remember if I did or didn't.

14:40:42  11

14:40:46  12

14:40:51  13

14:40:59  14

14:41:00  15

14:41:01  16

14:41:02  17

14:41:04  18

14:41:07  19

14:41:08  20

14:41:10  21

14:41:13  22

14:41:13  23

14:41:16  24

14:41:17  25

Viviana Garcia                              3/27/2021
          Deshawn Briggs v. Allister Adel

228

14:41:54  1
14:42:03  2
14:42:05  3
14:42:07  4
14:42:19  5
14:42:24  6
14:42:26  7
14:42:28  8
14:42:29  9
14:42:29  10
14:42:42  11
14:42:45  12
14:42:54  13
14:42:58  14
14:43:00  15
14:43:01  16
14:43:08  17
14:43:12  18
14:43:13  19
14:43:14  20
14:43:16  21
14:43:20  22
14:43:23  23
14:43:25  24
14:43:26  25

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

231

```
14:46:07   1            Okay.  I'm going to show you a new exhibit.
14:46:11   2    It's MC -- or actually, we might have entered this one,
14:46:24   3    so I want to be cautious about that.  It's MC-00001.
14:46:25   4            MS. AHMAD:  This is Bina Ahmad.  Yes, this
14:46:27   5    was entered previously.
14:46:28   6            MS. CHAMBLEE-RYAN:  Thank you.
14:46:29   7            MS. AHMAD:  And it was Exhibit Number 5.
14:46:30   8            MS. CHAMBLEE-RYAN:  When I started to say
14:46:37   9    it, I knew we had done it.  Different page.
14:46:37  10    BY MS. CHAMBLEE-RYAN:
14:46:54  11        Q   Okay.  Okay.  I'm just going to turn to page 3.
14:47:12  12    And that's -- just to be clear, MC-00003.  Give me one
14:47:17  13    second.  Oh, I apologize.  I put the wrong document.
14:47:19  14    This is not the exhibit I'm going to use.  I'm sorry
14:47:26  15    about that.  I'm going to use TASC005 -- five zeroes --
14:47:32  16    1.
14:47:33  17            MS. AHMAD:  And just for the record, this
14:47:33  18    has not been used and has not been admitted yet.  And
14:47:41  19    this is Exhibit Number 16.
14:47:41  20            MS. CHAMBLEE-RYAN:  Sorry about that.
14:47:41  21            (The document was marked as Exhibit 16 for
14:47:41  22    identification.)
14:47:46  23    BY MS. CHAMBLEE-RYAN:
14:47:51  24        Q   Okay.  But I am turning to page 3 of this
14:48:14  25    document, TASC000003.  Okay.  Okay.  Can you see this,
```

Viviana Garcia                                    3/27/2021
         Deshawn Briggs v. Allister Adel

                                                       232

14:48:14  1    Ms. Garcia?

14:48:15  2        A    Yes.

14:48:19  3        Q    Do you see where it says, MCSO sliding scale?

14:48:23  4    And then below that it says, TASC sliding scale?

14:48:27  5        A    Correct.

14:48:27  6        Q    Have you ever seen this before?

14:48:28  7        A    So we already went over this document, and I

14:48:30  8    said I didn't recall it.

14:48:31  9        Q    Okay.  This is different than the document we

14:48:33  10   looked at before.

14:48:33  11       A    Oh.

14:48:36  12       Q    You want to just take a minute to look?  They

14:48:38  13   look really similar, though, so I know why you think

14:48:39  14   that.

14:48:39  15       A    Yeah, and I don't -- I've never seen this

14:48:40  16   document.

14:48:42  17       Q    Okay.  You haven't seen something that just

14:48:43  18   even looks like this?

14:48:47  19       A    No, I don't recall this document.

14:48:49  20       Q    Do you recall using the term sliding scale as

14:48:53  21   part of your job at TASC?

14:48:58  22       A    I don't recall me using the word sliding scale.

14:49:02  23   I recall me using reduction of fees.

14:49:06  24       Q    To refer to reduction of UA fees?

14:49:06  25       A    Yes.

Viviana Garcia                                    3/27/2021
          Deshawn Briggs v. Allister Adel

233

| | | |
|---|---|---|
| 14:49:09 | 1 | Q    And reduction of the monthly payments? |
| 14:49:09 | 2 | A    Correct. |
| 14:49:15 | 3 | Q    Okay.  And that's the only thing you mean when |
| 14:49:17 | 4 | you say reduction of fees; is that right? |
| 14:49:18 | 5 | A    Correct. |
| 14:49:23 | 6 | Q    Okay.  Okay.  I don't think I've got anything |
| 14:49:59 | 7 | else on this one.  Okay.  So that's it with that. |
| 14:50:06 | 8 | Okay.  So just a few more questions.  We're getting |
| 14:50:12 | 9 | very close now.  So maybe we were going -- |
| 14:50:17 | 10 | A    Let's aim for 3:00. |
| 14:50:17 | 11 | Q    What'd you say? |
| 14:50:17 | 12 | A    I said let's aim for 3:00. |
| 14:50:21 | 13 | Q    I'll have my fingers crossed.  I think it will |
| 14:50:23 | 14 | probably be a bit longer than that, but I don't -- I |
| 14:50:24 | 15 | don't think it should be -- I don't think it should be |
| 14:50:24 | 16 | too much longer. |
| 14:50:26 | 17 | MR. HENRY:  Just get a question. |
| 14:50:26 | 18 | MS. CHAMBLEE-RYAN:  Sorry, Mr. Henry. |
| 14:50:28 | 19 | What was that? |
| 14:50:31 | 20 | MR. HENRY:  Just submit a question. |
| 14:50:32 | 21 | MS. CHAMBLEE-RYAN:  Sorry.  What? |
| 14:50:35 | 22 | MR. HENRY:  Submit a question. |
| 14:50:37 | 23 | MS. CHAMBLEE-RYAN:  Oh, okay.  Sure.  I'm |
| 14:50:38 | 24 | happy to continue. |
| 14:50:38 | 25 | BY MS. CHAMBLEE-RYAN: |

Viviana Garcia                                    3/27/2021
            Deshawn Briggs v. Allister Adel

                                                       236

14:52:46  1        Q    Okay.  That's different than what you said
14:52:52  2    before.  So are you changing your answer to that?
14:52:53  3        A    Yes.
14:52:56  4        Q    Okay.  Why are you changing your answer to
14:52:56  5    that?
14:52:59  6        A    Well, because now that I'm refreshing and
14:53:03  7    trying to, you know, go back on thinking, I don't -- I
14:53:06  8    don't remember if I -- everything was on there or -- or
14:53:08  9    there was a policy where every single little thing had
14:53:10  10   to be in there.
14:53:17  11       Q    Okay.  Do you know what -- what -- can you tell
14:53:20  12   me all the things you remember that you did have to
14:53:24  13   document in the case notes?
14:53:27  14       A    My communication.
14:53:32  15       Q    Okay.  Any particular types of communications?
14:53:36  16            So you said if a client called and said hi,
14:53:37  17   maybe you don't have to put that.  You don't know about
14:53:39  18   that?  But if --
14:53:40  19       A    So I don't think he had -- I don't think a
14:53:44  20   client calling and saying hi had anything to do with our
14:53:44  21   caseload.
14:53:49  22       Q    Okay.  But if it had to do with their program
14:53:50  23   requirements, did you have to document that
14:53:51  24   communication?
14:53:51  25       A    Yes.

Viviana Garcia                              3/27/2021
Deshawn Briggs v. Allister Adel

237

| | | |
|---|---|---|
| 14:53:57 | 1 | Q   If it had to do with a violation, did you have |
| 14:53:58 | 2 | to document that communication? |
| 14:53:58 | 3 | A   Yes. |
| 14:54:01 | 4 | Q   If it had do with a warning, did you have to |
| 14:54:02 | 5 | document that communication? |
| 14:54:03 | 6 | A   Correct. |
| 14:54:04 | 7 | Q   If you were collecting information from the |
| 14:54:09 | 8 | client, did you have to document that communication? |
| 14:54:12 | 9 | A   Collecting what information? |
| 14:54:14 | 10 | Q   Information about their finances, for example, |
| 14:54:15 | 11 | like we've talked about? |
| 14:54:16 | 12 | A   I don't remember that. |
| 14:54:20 | 13 | Q   You don't remember whether you had to document |
| 14:54:20 | 14 | that or not? |
| 14:54:21 | 15 | A   Correct. |
| 14:54:26 | 16 | Q   Okay.  If you talked to them about reasons why |
| 14:54:28 | 17 | they hadn't complied with something, would that be |
| 14:54:30 | 18 | documented? |
| 14:54:30 | 19 | A   Yes. |
| 14:54:35 | 20 | Q   Okay.  And you said before if you offered them |
| 14:54:37 | 21 | a hardship application, you would have documented that |
| 14:54:39 | 22 | in the case notes.  Is that still right? |
| 14:54:40 | 23 | A   I want to say yes. |
| 14:54:48 | 24 | Q   Okay.  You want to say yes or -- pretty sure? |
| 14:54:49 | 25 | A   I'm going to speculate to a yes. |

**Viviana Garcia**                                         **3/27/2021**
**Deshawn Briggs v. Allister Adel**

248

| | | |
|---|---|---|
| 15:06:55 | 1 | those fees? |
| 15:06:57 | 2 | A    To get a what? |
| 15:07:00 | 3 | Q    Could afford those fees? |
| 15:07:02 | 4 | A    No.  I pretty much just asked him how he's |
| 15:07:04 | 5 | doing with paying off the balance. |
| 15:07:07 | 6 | Q    Oh, okay.  Did you ask whether he was able to |
| 15:07:10 | 7 | pay off the balance financially? |
| 15:07:12 | 8 | A    I don't recall.  From reading the note, all I |
| 15:07:15 | 9 | can see is that I asked him how -- how he was doing with |
| 15:07:16 | 10 | paying off his balance. |
| 15:07:18 | 11 | Q    Okay.  Did you ask him for any more information |
| 15:07:21 | 12 | about his finances, anything like that? |
| 15:07:24 | 13 | A    From reading the note, all I asked him was how |
| 15:07:26 | 14 | he was -- how he was doing with his balance.  I don't |
| 15:07:27 | 15 | recall anything else. |
| 15:07:32 | 16 | Q    And did you do anything based on what you |
| 15:07:34 | 17 | remember and based on reading these notes -- and feel |
| 15:07:41 | 18 | free to look through them -- to figure out whether he |
| 15:07:46 | 19 | hadn't paid off his fees because he had the money but |
| 15:07:50 | 20 | just wasn't paying it off on purpose or whether he just |
| 15:07:52 | 21 | didn't have the money to pay? |
| 15:07:52 | 22 | A    I don't remember. |
| 15:07:54 | 23 | Q    Did you ever figure that out? |
| 15:07:56 | 24 |         MR. HENRY:  Form. |
| 15:07:59 | 25 | BY MS. CHAMBLEE-RYAN: |

Viviana Garcia                                          3/27/2021
             Deshawn Briggs v. Allister Adel

                                                            249

15:07:59   1        Q      Excuse me?

15:08:00   2        A      I said I don't remember.

15:08:04   3        Q      Okay.  If -- if you did, would that be

15:08:08   4   reflected in the case notes?

15:08:10   5                    MR. HENRY:  Form.

15:08:10   6                    THE WITNESS:  If I -- if I would have

15:08:14   7   asked him, it -- if it would be reflected on the case

15:08:15   8   notes?

15:08:15   9   BY MS. CHAMBLEE-RYAN:

15:08:16  10        Q      Yes.

15:08:19  11        A      I'm guessing yes.

15:08:22  12        Q      Okay.  Do you remember any time that you asked

15:08:28  13   a client or -- or made any kind of effort to figure out

15:08:33  14   whether the reason they hadn't paid off their fees was

15:08:37  15   on purpose or whether it wasn't their fault?

15:08:37  16        A      I don't remember.

15:08:40  17        Q      Okay.  You can't remember ever doing that?

15:08:41  18        A      I don't remember -- I don't remember if I

15:08:44  19   asked.

15:08:47  20        Q      And does that also mean you can't ever remember

15:08:49  21   a time that you did that?

15:08:53  22        A      I don't remember at all if I ever asked or if I

15:08:56  23   didn't.  If it was that they weren't paying it on

15:08:58  24   purpose or -- I don't remember that.

15:08:59  25        Q      And do you remember any kind of rule about

Viviana Garcia                                    3/27/2021
             Deshawn Briggs v. Allister Adel

                                                        250

15:09:01  1    having to ask that?
15:09:03  2                MR. HENRY:  Asked and answered.
15:09:04  3                THE WITNESS:  I don't remember.
15:09:04  4    BY MS. CHAMBLEE-RYAN:
15:09:18  5         Q    Okay.  I'm just going to go to -- all the way
15:09:51  6    down to 274.  Okay.  Darn it.  Okay.  Do you know what
15:09:53  7    this is?
15:09:55  8         A    From reading it, it's a payment history.
15:10:00  9         Q    Have you seen this kind of document before?
15:10:03 10         A    I'm looking at it real quick to see if I
15:10:03 11    remember.
15:10:05 12         Q    That's okay.
15:10:11 13         A    I want to say yes.
15:10:15 14         Q    Okay.  It looks familiar?
15:10:15 15         A    Yeah.
15:10:18 16         Q    Do you know what this shows?
15:10:20 17         A    All the payments they've done.
15:10:22 18         Q    Okay.  And the dates of the payments?
15:10:23 19         A    Yes.
15:10:29 20         Q    Okay.  Can you tell from this document whether
15:10:37 21    after April 29, 2018, when you told this client that his
15:10:40 22    outstanding balance was the only thing keeping him on
15:10:45 23    the program, whether he continued to come in to test?
15:10:48 24         A    After what date?  April what?
15:10:50 25         Q    29th, 2018.

Viviana Garcia                                          3/27/2021
                Deshawn Briggs v. Allister Adel

251

15:10:53  1      A    2019?

15:11:00  2      Q    2018.  April 29, 2018.

15:11:09  3      A    I don't see April 29.  I see April 28, April

15:11:11  4   28, and then I see April 19 of 2018.

15:11:14  5      Q    Can you tell from this whether he took UAs

15:11:16  6   after that date?

15:11:18  7      A    After April 28?

15:11:20  8      Q    After April 29, 2018.

15:11:23  9      A    I mean, I don't see that date on here at all.

15:11:26  10     Q    But do you see dates after that?

15:11:30  11     A    After April 28 -- 29, yes.

15:11:34  12     Q    Can you tell from this document whether he

15:11:38  13  tested on dates after April 29, 2018?

15:11:48  14     A    I'm looking.  Yes, I do.

15:11:50  15     Q    And -- and what does this show?

15:11:55  16     A    That he did test after April 28.

15:11:56  17     Q    2018?

15:11:57  18     A    Correct.

15:12:05  19     Q    Okay.  And can you tell from this whether he

15:12:09  20  also paid for tests during that time period?

15:12:11  21     A    Well, it shows right there that -- the dates

15:12:14  22  that he paid.

15:12:16  23     Q    Okay.  Great.  Thank you.

15:12:32  24          Okay.  All right.  I'm going to pull something

15:13:02  25  else.  This is going to be TASC631.  And we've already

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

252

| | | |
|---|---|---|
| 15:13:10 | 1 | entered this.  Just working on grabbing it for you. |
| 15:13:50 | 2 | Okay.  All right.  So I'm going to start just |
| 15:14:00 | 3 | on the first page at 631.  All right.  Can you see that? |
| 15:14:00 | 4 | A    Yes. |
| 15:14:02 | 5 | Q    Are these case notes? |
| 15:14:03 | 6 | A    Yes. |
| 15:14:13 | 7 | Q    For a client where you were their case manager? |
| 15:14:17 | 8 | A    I'll say yes to that.  Those are case notes. |
| 15:14:19 | 9 | Q    Okay.  Entered by you? |
| 15:14:21 | 10 | A    Yes.  It has my name on it. |
| 15:14:26 | 11 | Q    Okay.  So this first one I'm looking at, |
| 15:14:33 | 12 | created 4/10/2019.  So here that means -- it says |
| 15:14:36 | 13 | payment 160.  That's the monthly payment; right? |
| 15:14:36 | 14 | A    Yes. |
| 15:14:52 | 15 | Q    And then the notes continue all the way to the |
| 15:14:59 | 16 | end.  And I just want to confirm -- I don't think we see |
| 15:15:12 | 17 | the -- oh, here it is.  This is where it says, Client |
| 15:15:18 | 18 | has been accepted.  Prescreening period extended due to |
| 15:15:19 | 19 | program non-compliance. |
| 15:15:21 | 20 | I think we talked about the prescreening period |
| 15:15:24 | 21 | and we -- you didn't know what it meant.  Does this |
| 15:15:26 | 22 | refresh your memory of what that was at all? |
| 15:15:26 | 23 | A    I don't. |
| 15:15:27 | 24 | Q    Okay.  That's okay. |
| 15:15:30 | 25 | And the same thing with being accepted into |

Viviana Garcia                                      3/27/2021
        Deshawn Briggs v. Allister Adel

253

| | | |
|---|---|---|
| 15:15:31 | 1 | TASC? |
| 15:15:32 | 2 | A    Yeah, I don't remember. |
| 15:15:37 | 3 | Q    Okay.  I'm going to just let you look at this a |
| 15:15:43 | 4 | little bit.  So I just gave you the remote control.  So |
| 15:15:46 | 5 | you don't have to read through the whole thing, but I |
| 15:15:49 | 6 | was hoping you could just scan through it and just tell |
| 15:15:53 | 7 | me if you have any reason to believe these aren't your |
| 15:15:55 | 8 | complete case notes for this client.  You know, just if |
| 15:15:58 | 9 | there's -- anything looks off or obviously missing, |
| 15:16:01 | 10 | anything like that. |
| 15:16:04 | 11 | A    I mean, everything looks like what I put. |
| 15:16:07 | 12 | Q    Okay.  These look like your complete notes? |
| 15:16:09 | 13 | A    I'm going to guess yes. |
| 15:16:11 | 14 | Q    Okay.  Thanks. |
| 15:16:33 | 15 | Oh, one last thing in that file.  Let me just |
| 15:16:53 | 16 | get that back.  One second.  Okay.  That's the wrong |
| 15:16:54 | 17 | one. |
| 15:16:57 | 18 | Well, actually, we can talk about this one |
| 15:17:02 | 19 | instead.  We can go back to that one.  Almost done. |
| 15:17:05 | 20 | Okay. |
| 15:17:07 | 21 | A    I can't see any document. |
| 15:17:10 | 22 | Q    Oh, it's not working? |
| 15:17:10 | 23 | A    No. |
| 15:17:11 | 24 | MR. HENRY:  No. |
| 15:17:11 | 25 | BY MS. CHAMBLEE-RYAN: |

Viviana Garcia                                    3/27/2021
              Deshawn Briggs v. Allister Adel

                                                         254

15:17:30   1        Q    Okay.  I'll try again.  Is that working again?
15:17:32   2        A    There.
15:17:33   3        Q    Now is it working?  Okay.  So this is -- this
15:17:37   4   is the same exhibit we were just looking at.
15:17:47   5             Okay.  So we talked about this entry before.
15:17:58   6   This is on 633.  It's the entry from 7/25/19 where you
15:18:01   7   say, If you are unable to pay off your fees in full by
15:18:10   8   7/29/19, you will continue to comply with the program.
15:18:12   9             And what does that mean to you?  I think you
15:18:12  10   explained --
15:18:14  11             MR. HENRY:  Asked and answered.
15:18:16  12             MS. CHAMBLEE-RYAN:  Okay.
15:18:16  13   BY MS. CHAMBLEE-RYAN:
15:18:19  14        Q    Can you answer again?
15:18:21  15        A    That if she is unable to pay it by the 29, that
15:18:23  16   she'll continue to be in the program.
15:18:26  17        Q    Okay.  And that means complying with everything
15:18:28  18   in the client contract; right?
15:18:29  19             MR. HENRY:  Asked and answered.
15:18:29  20   BY MS. CHAMBLEE-RYAN:
15:18:29  21        Q    Excuse me?
15:18:30  22        A    Yes.
15:18:36  23        Q    Okay.  And do you know if you asked this person
15:18:41  24   whether they were able to pay their fees?
15:18:43  25        A    I don't remember.

Viviana Garcia                                    3/27/2021
        Deshawn Briggs v. Allister Adel

257

| | | |
|---|---|---|
| 15:23:13 | 1 | A     No. |
| 15:23:22 | 2 | Q     Okay.  Okay.  So right now I'm on 223.  Have |
| 15:23:24 | 3 | you seen this document before? |
| 15:23:24 | 4 | A     Yeah. |
| 15:23:26 | 5 | Q     What's that? |
| 15:23:28 | 6 | A     It's a certificate we will give them when they |
| 15:23:29 | 7 | complete the program. |
| 15:23:34 | 8 | Q     Okay.  And did you personally give this to the |
| 15:23:35 | 9 | participant? |
| 15:23:38 | 10 | A     To this client? |
| 15:23:40 | 11 | Q     To -- to any -- to participants in general. |
| 15:23:41 | 12 | Did you give these out yourself? |
| 15:23:47 | 13 | A     Sometimes. |
| 15:23:52 | 14 | Q     Okay.  Now I'm on the next page, 224.  Do you |
| 15:23:56 | 15 | know what this document is? |
| 15:23:58 | 16 | A     It's a letter we would give them along with |
| 15:24:00 | 17 | their certificate. |
| 15:24:02 | 18 | Q     Okay.  So you remember this document? |
| 15:24:03 | 19 | A     Yeah. |
| 15:24:09 | 20 | Q     Okay.  Okay.  I'm just going to go through |
| 15:24:11 | 21 | these case -- we're just going to get past the case |
| 15:24:12 | 22 | notes. |
| 15:24:18 | 23 | Have you seen this before -- this document |
| 15:24:23 | 24 | before?  I'm on 230. |
| 15:24:28 | 25 | A     It looks like test results. |

Coash & Coash, Inc.
www.coashandcoash.com                    602-258-1440

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

258

| | | |
|---|---|---|
| 15:24:31 | 1 | Q    Have you seen it before or documents like it? |
| 15:24:32 | 2 | A    Yes. |
| 15:24:37 | 3 | Q    And what does this show? |
| 15:24:39 | 4 | A    It shows his test results. |
| 15:24:41 | 5 | Q    Okay.  And just to be clear, you saw documents |
| 15:24:44 | 6 | like this when you worked as a case manager at TASC? |
| 15:24:45 | 7 | A    Correct. |
| 15:24:45 | 8 | MR. HENRY:  Asked and answered. |
| 15:24:45 | 9 | BY MS. CHAMBLEE-RYAN: |
| 15:24:47 | 10 | Q    Part of your job? |
| 15:24:47 | 11 | A    Yes. |
| 15:24:49 | 12 | Q    Did you create these documents? |
| 15:24:49 | 13 | A    No. |
| 15:24:53 | 14 | Q    Okay.  How -- then how did you end up seeing |
| 15:24:53 | 15 | them? |
| 15:24:55 | 16 | MR. HENRY:  Asked and answered. |
| 15:24:56 | 17 | THE WITNESS:  I would -- they were |
| 15:25:00 | 18 | generated by I don't know who. |
| 15:25:00 | 19 | BY MS. CHAMBLEE-RYAN: |
| 15:25:03 | 20 | Q    Where would you see them? |
| 15:25:04 | 21 | MR. HENRY:  Asked and answered. |
| 15:25:06 | 22 | THE WITNESS:  In BART. |
| 15:25:06 | 23 | BY MS. CHAMBLEE-RYAN: |
| 15:25:08 | 24 | Q    Excuse me? |
| 15:25:09 | 25 | A    In BART. |

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

259

| | | |
|---|---|---|
| 15:25:11 | 1 | Q    Okay.  You would see it in the BART system? |
| 15:25:11 | 2 | A    Correct. |
| 15:25:14 | 3 | Q    Is that because you'd be looking through your |
| 15:25:16 | 4 | client's file? |
| 15:25:19 | 5 | A    Because I -- if I needed to, yes. |
| 15:25:21 | 6 | Q    Okay.  So this was available -- this was |
| 15:25:25 | 7 | something you could see in the client file on BART? |
| 15:25:25 | 8 | A    Yes. |
| 15:25:33 | 9 | Q    Okay.  And while we're talking about BART, when |
| 15:25:35 | 10 | we were talking earlier about the case notes, you know, |
| 15:25:37 | 11 | when different individuals might make different notes, |
| 15:25:40 | 12 | so some might be by you, some might be by Yolonda |
| 15:25:42 | 13 | Brooks.  If you were working with a client, would you go |
| 15:25:45 | 14 | back and read the notes the other case managers had put |
| 15:25:45 | 15 | in? |
| 15:25:46 | 16 | A    Would I what? |
| 15:25:49 | 17 | Q    Would you go back and read the notes the other |
| 15:25:51 | 18 | case managers put in other than you? |
| 15:25:52 | 19 | A    Not that I recall. |
| 15:25:54 | 20 | Q    Okay.  Do you -- so you don't recall being |
| 15:25:56 | 21 | required to do that? |
| 15:25:57 | 22 | A    No. |
| 15:26:12 | 23 | Q    Okay.  Okay.  Do you know what this is, this |
| 15:26:16 | 24 | form is?  We're on 233. |
| 15:26:20 | 25 | A    It says -- well, by looking at it, it looks |

Viviana Garcia                                    3/27/2021
            Deshawn Briggs v. Allister Adel

                                                        260

15:26:21   1   like a confirmation request for --
15:26:23   2        Q    Do you remember this form?
15:26:24   3        A    I'm sorry?
15:26:26   4        Q    Just -- do you remember it?
15:26:26   5        A    Yes.
15:26:31   6        Q    Okay.  You remember it from your job as a case
15:26:31   7   manager?
15:26:31   8        A    Correct.
15:26:36   9        Q    Okay.  Is this something you created?
15:26:37  10        A    I want to say yes.
15:26:42  11        Q    Okay.  What does this show?
15:26:48  12        A    It shows the client's name.  It shows my name.
15:26:52  13   It shows the requesting agency, which was that I worked
15:26:57  14   for TASC diversion.  It -- it says here the drug that
15:27:01  15   we're -- they're going to confirm, it says OPI.
15:27:05  16        Q    Okay.  And do you know what this form was used
15:27:07  17   for?
15:27:13  18        A    For the GGMS [sic] test.
15:27:14  19        Q    Okay.  What did it do?
15:27:18  20        A    So this form we would send -- give it to the
15:27:18  21   lab.
15:27:24  22        Q    Okay.  Did you ever interact with anybody in
15:27:27  23   the financial and accounting department at TASC?
15:27:29  24        A    Not that I recall, no.
15:27:31  25        Q    Okay.  Don't know the names of anyone who

Viviana Garcia                                    3/27/2021
          Deshawn Briggs v. Allister Adel

261

15:27:32  1    worked there?

15:27:33  2         A    I don't remember.

15:27:45  3         Q    Okay.  I'll go through a few more of these.

15:28:09  4              All right.  My scroll is being slow.  Okay.

15:28:23  5    All right.  We talked about that one.  All right.

15:28:27  6              Actually, let me just quickly ask about these

15:28:30  7    documents.

15:28:36  8              Do you see this benefit document here at 281,

15:28:47  9    there's a Verizon bill, 282, SSI payments form at 283?

15:28:50  10   I -- you can still scroll, by the way.  You still have

15:28:52  11   the power to look through them, if you want to look at

15:28:53  12   them.

15:28:56  13             Do you know why these were in the file?

15:28:59  14        A    I'm guessing because they submitted a -- an

15:29:02  15   application.

15:29:07  16        Q    Okay.  When you were working as a case manager,

15:29:13  17   did you see these kinds of documents in the file if they

15:29:13  18   were submitted?

15:29:15  19        A    What was the question?

15:29:17  20        Q    When you were a case manager, would you see

15:29:20  21   these kinds of documents that had been submitted in case

15:29:20  22   files?

15:29:23  23        A    I don't remember.

15:29:37  24        Q    Okay.  All right.  Now we're at 288.  Do you

15:29:40  25   remember this form?

Viviana Garcia                                    3/27/2021
              Deshawn Briggs v. Allister Adel

                                                          262

15:29:44   1        A     Yeah.  It's a release of information.

15:29:50   2        Q     What was it used for?

15:29:53   3        A     Him pretty much releasing that he can

15:29:58   4   communicate with me or anybody via email.

15:30:02   5        Q     Okay.  And was this a form that you dealt with

15:30:04   6   directly?

15:30:05   7        A     Yes.

15:30:09   8        Q     Okay.  What did you do?

15:30:12   9        A     Well, if they wanted to communicate, you know,

15:30:18   10   through email, we would give them this form to go ahead

15:30:21   11   and fill out.

15:30:27   12        Q     Okay.  All right.  Now I'm at 289.  Do you

15:30:29   13   recognize this form?

15:30:42   14        A     I don't remember it.  Yeah, I don't remember

15:30:43   15   it.

15:30:56   16        Q     Okay.  Okay.  And now we're at 292.  Do you

15:30:59   17   recognize this form?

15:31:00   18        A     Yes.

15:31:03   19        Q     What's this?

15:31:06   20        A     So it's a form that's filled out by them to

15:31:11   21   give them the summary of when, like, their seminar is

15:31:14   22   due and their first payments and what their pin number

15:31:18   23   is.  And that's by me looking at the document.

15:31:22   24        Q     So do you remember it, though, just to be

15:31:22   25   clear?

Viviana Garcia                                    3/27/2021
Deshawn Briggs v. Allister Adel

263

| | | | |
|---|---|---|---|
| 15:31:23 | 1 | A | Yes. |

15:31:23   1        A    Yes.

15:31:26   2        Q    You remember this form from when you were

15:31:27   3    working as a case manager?

15:31:29   4        A    Correct.

15:31:50   5        Q    Okay.  Now I'm on 298.  Do you remember this

15:31:52   6    form?

15:31:52   7        A    Yes.

15:31:55   8        Q    What's this?

15:31:56   9        A    Their statement of facts.

15:31:59   10       Q    What was this for?

15:32:02   11       A    It was a form that they would have to fill out,

15:32:05   12   but I don't remember exactly what was the reason for.

15:32:08   13       Q    Did you work directly with this form?

15:32:09   14       A    Yes.

15:32:12   15       Q    What did you do?

15:32:15   16       A    I just made sure that they filled out this

15:32:17   17   form.

15:32:20   18       Q    Okay.  What did that involve?  You gave it to

15:32:21   19   them?

15:32:21   20       A    Yes.

15:32:24   21       Q    Anything else you did?

15:32:24   22       A    Not that I remember.

15:32:27   23       Q    Did you look at their answers?

15:32:28   24       A    I don't remember.

15:32:32   25       Q    Okay.  Just something you gave to them?

Viviana Garcia                                           3/27/2021
                 Deshawn Briggs v. Allister Adel

                                                              275

STATE OF ARIZONA   )
COUNTY OF MARICOPA )

     BE IT KNOWN that the foregoing deposition was taken

by me pursuant to stipulation of counsel; that I was

then and there a Certified Court Reporter in the State

of Arizona, and by virtue hereof authorized to

administer an oath; that the witness before testifying

was duly sworn by me to testify to the whole truth;

pursuant to request, notification was provided that the

deposition is available for review and signature; that

the questions propounded by counsel and the answers of

the witness thereto were taken down by me in shorthand

and thereafter transcribed into typewriting under my

direction; that the foregoing pages are a full, true and

accurate transcript of all the proceedings had upon the

taking of said deposition, all done to the best of my

skill and ability.

          I FURTHER CERTIFY that I am in no way related

to nor employed by any parties hereto; nor am I in any

way interested in the outcome thereof.

          Dated at Phoenix, Arizona, this 12th day of

April, 2021.


          _____
          CINDY MAHONEY, RPR, RMR NO. 50680


**Coash & Coash, Inc.**
www.coashandcoash.com                        602-258-1440

# EXHIBIT 6

```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3

 4   DESHAWN BRIGGS, et al.,           )
                                       )
 5        Plaintiffs,                  )
                                       )
 6   v.                                ) Civil Action No.
                                       ) CV-18-2684-PHX-EJM
 7   ALLISTER ADEL, in her official    )
     capacity as County Attorney of    )
 8   Maricopa County, et al.,          )
                                       )
 9        Defendants.                  )
     _____)

10

11

12

13

14
          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF HENRY ROJO

15
                       Phoenix, Arizona

16
                        April 3, 2021

17

18

19

20

21

22

23                             Prepared by:

24                             CINDY MAHONEY, RPR, RMR
                               Certified Court Reporter
25                             Certificate No. 50680
```

```
 1                    I N D E X

 2   WITNESS                                      PAGE

 3   HENRY ROJO

 4   Examination by Ms. Ahmad                     7

 5                 EXHIBITS MARKED

 6   EXHIBIT           DESCRIPTION                PAGE

 7
     Exhibit 1          TASC documents             30
 8                      TASC000055-TASC000089

 9   Exhibit 2          TASC documents             100
                        TASC021593-TASC021622
10
     Exhibit 3          TASC Adult Deferred Prosecution  109
11                      Program
                        TASC006102
12
     Exhibit 4          TASC Adult Deferred Prosecution  113
13                      Program
                        TASC018912-TASC018945
14
     Exhibit 5          TASC Adult Deferred Prosecution  118
15                      Program
                        TASC020561-TASC020596
16
     Exhibit 6          TASC Adult Deferred Prosecution  122
17                      Program
                        TASC005872-TASC005944
18
     Exhibit 7          TASC Adult Deferred Prosecution  138
19                      Program
                        TASC014963-TASC015008
20
     Exhibit 8          TASC Adult Deferred Prosecution  141
21                      Program
                        TASC032741-TASC032781
22
     Exhibit 9          TASC fee agreements        144
23                      TASC000023-TASC000033

24   Exhibit 10         TASC Adult Deferred Prosecution  148
                        Program
25                      TASC015535-TASC015572
```

Henry Rojo - April 03, 2021                              3

```
 1                         EXHIBITS MARKED

 2
     EXHIBIT              DESCRIPTION                    PAGE
 3
     Exhibit 11           TASC Adult Deferred Prosecution  161
 4                        Program
                          TASC007211-TASC007261
 5

 6

 7                     INSTRUCTIONS TO NOT ANSWER

 8                        Page 10    Line 8

 9                        Page 80    Line 11

10                        Page 80    Line 20

11                        Page 81    Line 8

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Henry Rojo - April 03, 2021                    84

10:44:15  1    reporter, Exhibit 1, going to Bates 70.

10:44:18  2    BY MS. AHMAD:

10:44:19  3        Q    Okay.  So that was a document we started after

10:44:21  4    the break discussing, Mr. Rojo.

10:44:22  5        A    Uh-huh.

10:44:28  6        Q    Do you see the email dated -- it's the -- it's

10:44:33  7    the last entry dated July 25, 2016.  Do you see the

10:44:36  8    entry?  And it says, Created by H. Rojo?

10:44:36  9        A    Yes.

10:44:43  10       Q    Okay.  Now, do you see that you had written an

10:44:48  11   email to a client in the box below that?

10:44:49  12       A    I see that, yeah.

10:44:51  13       Q    You do see that.  Okay.

10:44:53  14            Can you read the email that you wrote to the

10:44:55  15   client?  It's at the top of the box.

10:44:59  16       A    [Reading] Hello, Deshawn.  If you were paid

10:45:04  17   off, you could have been done 5/29.  When you're paid

10:45:07  18   off, I can get you out of here.  If you pay off today, I

10:45:11  19   can get you out of here tomorrow.

10:45:14  20       Q    And so can you elaborate on what you're

10:45:16  21   communicating to this client here?

10:45:19  22            What do you mean by, If you paid off, you could

10:45:22  23   have been done by 5/29?

10:45:25  24       A    I'm assuming his fees, I guess.

10:45:29  25       Q    Okay.  And the next part, when you say, When

Henry Rojo - April 03, 2021                               85

10:45:32  1    you're paid off, I can get you out of here; if you pay
10:45:40  2    today, I can get you out tomorrow, does that mean all
10:45:43  3    the client needed to do here was pay the fees and you
10:45:44  4    could get him out of here?
10:45:47  5         A    I would assume so.  I don't -- I don't -- yeah,
10:45:48  6    I think so.
10:45:51  7         Q    Well, so when you assume so, what -- can you
10:45:53  8    say why you assume so?
10:45:55  9         A    Just because the note says it.
10:45:56 10         Q    Okay.
10:46:01 11         A    I'm not denying that I didn't write that, so
10:46:03 12    I'm assuming that that's what it means.
10:46:06 13         Q    Whether or not you recall the specific --
10:46:09 14    writing these specific emails or notes, do you have any
10:46:14 15    reason to -- to doubt the accuracy of -- of the notes
10:46:16 16    that you entered?
10:46:21 17         A    Can you clarify that again?
10:46:22 18         Q    Sure.
10:46:26 19              Do you have any reason to doubt that this page
10:46:31 20    here, this page of notes on Bates 70, are -- are the
10:46:36 21    authentic notes that you had entered in this case file?
10:46:39 22         A    That they're -- you're asking me if they're not
10:46:39 23    authentic?
10:46:42 24         Q    I'm asking if you -- do you have any reason to
10:46:43 25    doubt that they're authentic, that they're -- that you

Henry Rojo - April 03, 2021                    86

10:46:46  1    did enter these?  Do you have any reason to think that

10:46:49  2    they're not accurate or missing something?

10:46:51  3        A    I don't doubt -- I don't doubt them.

10:46:55  4        Q    So whether you recall having entered or written

10:47:00  5    these emails -- these specific emails, you vouch for

10:47:03  6    the -- for the accuracy of -- of these case notes?

10:47:04  7                MR. HENRY:  Object to the form; asked and

10:47:05  8    answered.

10:47:05  9    BY MS. AHMAD:

10:47:09 10        Q    You can answer.

10:47:11 11        A    Yeah, I would say that's -- they're accurate, I

10:47:12 12    would say.

10:47:18 13        Q    Okay.  So going back to the email that -- that

10:47:24 14    we discussed, the 7/25/2016, we were talking about the

10:47:27 15    second sentence.  You said, When you're paid off, I can

10:47:29 16    get you out of here.

10:47:30 17                And I'm sorry.  I don't recall your answer.

10:47:32 18                Does that mean that the -- all the client

10:47:34 19    needed to do was -- the last thing they had left to do

10:47:37 20    was to pay fees and they'd be done?

10:47:38 21                MR. HENRY:  Objection; form, asked and

10:47:39 22    answered.

10:47:43 23                THE WITNESS:  I believe so.  I don't

10:47:45 24    really recall, but I believe so.

10:47:45 25    BY MS. AHMAD:

10:47:48   1        Q    Okay.  The next sentence is, If you pay off

10:47:52   2   today, I can get you out of here tomorrow.

10:47:55   3             Just -- just pointing your attention to that.

10:47:59   4   So if -- is anything missing -- sorry.  Withdrawn.

10:48:03   5             If you had other things that the client needed

10:48:08   6   to complete, would you have put it in the notes?

10:48:08   7                  MR. HENRY:  Form.

10:48:12   8                  THE WITNESS:  I think so, I would say.  I

10:48:15   9   mean, I don't think you can complete it without, I

10:48:19  10   guess, not doing what he's supposed to do, I guess.  I

10:48:21  11   would think so.

10:48:21  12   BY MS. AHMAD:

10:48:24  13        Q    So if there were other requirements that

10:48:26  14   they -- this client needed to complete, you would have

10:48:28  15   included that in the email?

10:48:30  16                  MR. HENRY:  Form.

10:48:33  17                  THE WITNESS:  Yeah, I think so.

10:48:33  18   BY MS. AHMAD:

10:48:55  19        Q    Okay.  And so this client -- this email was

10:49:01  20   written July 25, 2016.  And in the email you're saying

10:49:07  21   he could have been done on May 29.  So does that mean

10:49:12  22   that this client was still on the program on July 25?

10:49:13  23                  MR. HENRY:  Object to the form,

10:49:13  24   foundation.

10:49:20  25                  THE WITNESS:  I -- I believe so.  I don't

10:49:21  1    recall, but --

10:49:21  2    BY MS. AHMAD:

10:49:23  3        Q     And why do you believe so?

10:49:27  4        A     Because it says it right there in the notes.

10:49:30  5        Q     Okay.  So he -- so you're saying he could have

10:49:34  6    been done on May 29, so that means that he remained from

10:49:37  7    May 29 to July 25 on the program --

10:49:38  8                    MR. HENRY:  Form, foundation.

10:49:38  9    BY MS. AHMAD:

10:49:40 10        Q     -- is that correct?

10:49:43 11                    MR. HENRY:  Same.

10:49:44 12                    THE WITNESS:  I mean, I would -- I would

10:49:45 13    think so.

10:49:45 14    BY MS. AHMAD:

10:49:47 15        Q     Just looking at your -- what you wrote in your

10:49:52 16    email, just trying to understand -- to unpack it,

10:49:54 17    what -- what this means for that -- to this client, what

10:49:57 18    you were communicating.

10:50:01 19               So does this mean that at May 29, all the

10:50:05 20    client needed to do at that point was pay off, and they

10:50:07 21    had not paid off their program fees?

10:50:07 22                    MR. HENRY:  Same objection; asked and

10:50:09 23    answered several times.

10:50:09 24    BY MS. AHMAD:

10:50:09 25        Q     Go ahead, Mr. Rojo.

10:50:13 1     A     Yeah, like I said, I feel like I -- I answered

10:50:14 2  the question already.

10:50:17 3     Q     Even if you feel it's repetitive, you still

10:50:18 4  need to answer.

10:50:20 5          MR. HENRY:  There is a limit, Counsel.

10:50:20 6  BY MS. AHMAD:

10:50:21 7     Q     Go ahead, Mr. Rojo.

10:50:24 8     A     Yeah, so if he would have paid it off, he'd be

10:50:27 9  done.

10:50:37 10    Q     Going to Bates 64 in the same exhibit, at the

10:50:41 11 top you see on this page, TASC individual payment

10:50:42 12 history?

10:50:44 13    A     Yes.

10:50:49 14    Q     Okay.  So we were talking about the date May 29

10:50:53 15 before as the date the client, if he had paid, he would

10:50:56 16 have been done.  Is that -- that your recollection?

10:50:59 17    A     Yes.  Yes.

10:51:03 18    Q     Okay.  So drawing your attention to the column

10:51:08 19 on the very left, at the top it says date, and it has a

10:51:10 20 list of dates.  Do you see that?

10:51:10 21    A     Yes.

10:51:19 22    Q     Okay.  Do you see on the very right-hand side

10:51:23 23 it says, Amount.  Is that -- is this a record of what

10:51:27 24 the client paid and when they paid?

10:51:28 25         MR. HENRY:  Form, foundation.

| | |
|---|---|
| 10:52:37 1 | payments associated with dates after 5/31/2016? |
| 10:52:38 2 | A    Yes. |
| 10:52:43 3 | Q    Okay.  So the client, for instance, paid on -- |
| 10:52:48 4 | paid for a urinalysis test on June 9, 2016? |
| 10:52:49 5 | MR. HENRY:  Form, foundation. |
| 10:52:49 6 | BY MS. AHMAD: |
| 10:52:54 7 | Q    Do you see that? |
| 10:52:56 8 | A    Yeah, I see -- I see that. |
| 10:53:00 9 | Q    Okay.  So does this mean that this client kept |
| 10:53:06 10 | paying for urinalysis fees or program fees after May 29, |
| 10:53:06 11 | 2016? |
| 10:53:09 12 | MR. HENRY:  Same objection. |
| 10:53:13 13 | THE WITNESS:  Yes.  That's what it says on |
| 10:53:14 14 | the paper. |
| 10:53:14 15 | BY MS. AHMAD: |
| 10:53:17 16 | Q    And how long did they keep paying?  What's the |
| 10:53:21 17 | last date that we have here for a payment? |
| 10:53:24 18 | A    8/25. |
| 10:53:29 19 | Q    Okay.  So based on the email that you have |
| 10:53:32 20 | written that we reviewed and this history, what is your |
| 10:53:36 21 | understanding then of why this client then stayed on |
| 10:53:40 22 | TASC after May 29, 2016? |
| 10:53:42 23 | MR. HENRY:  Form. |
| 10:53:44 24 | THE WITNESS:  I answered the question |
| 10:53:47 25 | already.  He remained testing until he paid off. |

10:53:47 1   BY MS. AHMAD:

10:53:49 2       Q    He remained testing.

10:53:52 3            But why was -- why was he staying on TASC after

10:53:54 4   May 29, 2016?  What is your understanding of why he

10:53:56 5   stayed on it?

10:53:59 6       A    I'm assuming he has fees still that he had to

10:54:00 7   pay.

10:54:04 8       Q    Okay.  And based on what is in this case file

10:54:08 9   here, what we reviewed, is that the only reason why he

10:54:10 10  remained on TASC after May 29, 2016?

10:54:12 11                  MR. HENRY:  Form, foundation.

10:54:13 12                  THE WITNESS:  I don't recall, but I

10:54:16 13  would -- I would think so.  That's what it says on the

10:54:16 14  paper.

10:54:16 15  BY MS. AHMAD:

10:54:19 16      Q    Yeah, not asking your specific recollection for

10:54:21 17  an individual client; asking based on the email that

10:54:25 18  we've reviewed and in this payment history.

10:54:27 19                  MR. HENRY:  Same objection.

10:54:30 20                  THE WITNESS:  Yeah, he -- he stayed

10:54:33 21  testing until he paid his stuff.

10:54:33 22  BY MS. AHMAD:

10:54:38 23      Q    So when you say stayed testing, when he paid

10:54:42 24  the stuff -- so stayed testing, is that different from

10:54:45 25  having to pay -- when you say "the stuff," meaning the

```
 1  STATE OF ARIZONA    )
    COUNTY OF MARICOPA )
 2
        BE IT KNOWN that the foregoing deposition was taken
 3
    by me pursuant to stipulation of counsel; that I was
 4
    then and there a Certified Court Reporter in the State
 5
    of Arizona, and by virtue hereof authorized to
 6
    administer an oath; that the witness before testifying
 7
    was duly sworn by me to testify to the whole truth;
 8
    pursuant to request, notification was provided that the
 9
    deposition is available for review and signature; that
10
    the questions propounded by counsel and the answers of
11
    the witness thereto were taken down by me in shorthand
12
    and thereafter transcribed into typewriting under my
13
    direction; that the foregoing pages are a full, true and
14
    accurate transcript of all the proceedings had upon the
15
    taking of said deposition, all done to the best of my
16
    skill and ability.
17
        I FURTHER CERTIFY that I am in no way related
18
    to nor employed by any parties hereto; nor am I in any
19
    Way interested in the outcome thereof.
20
        Dated at Phoenix, Arizona, this 16th day of
21
    April, 2021.
22
23
24  _____
    CINDY MAHONEY, RPR, RMR NO. 50680
25
```

# Ex. 7

[This exhibit is being filed under seal.]

# Ex. 8

[This exhibit is being filed under seal.]