# EXHIBIT 9

| Month | Newly Enrolled | | Total Re-Entry | Total Enrolled | Successful Completions | | Unsuccessful Terminations | | Failed to Appear | No Response | Refused | Other | Number offenders in each tier of FLPs of the MCAO Case Fee Sliding Scale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Prefile | Postfile | | | Prefile | Postfile | Prefile | Postfile | | | | | |
| Jul-18 | 33 | 182 | 11 | 1,675 | 49 | 123 | 19 | 78 | 6 | 2 | 4 | 12 | 0 |
| Aug-18 | 62 | 178 | 7 | 1,630 | 47 | 133 | 15 | 86 | 56 | 142 | 5 | 10 | 0 |
| Sep-18 | 65 | 155 | 7 | 1,585 | 26 | 95 | 14 | 76 | 22 | 49 | 4 | 15 | 0 |
| Oct-18 | 101 | 184 | 11 | 1,576 | 28 | 105 | 11 | 86 | 171 | 104 | 5 | 12 | 0 |
| Nov-18 | 84 | 159 | 6 | 1,524 | 40 | 94 | 19 | 89 | 9 | 70 | 4 | 15 | 0 |
| Dec-18 | 72 | 126 | 12 | 1,570 | 40 | 93 | 10 | 55 | 1 | 0 | 3 | 8 | 0 |
| Jan-19 | 155 | 171 | 9 | 1,547 | 67 | 106 | 13 | 51 | 76 | 1 | 3 | 22 | 0 |
| Feb-19 | 89 | 126 | 13 | 1,565 | 47 | 101 | 19 | 47 | 258 | 216 | 3 | 23 | 0 |
| Mar-19 | 132 | 187 | 24 | 1,589 | 75 | 110 | 15 | 62 | 141 | 489 | 2 | 14 | 0 |
| Apr-19 | 197 | 139 | 11 | 1,650 | 67 | 79 | 6 | 33 | 7 | 6 | 9 | 2114 | 0 |
| May-19 | 119 | 156 | 11 | 1,654 | 61 | 98 | 24 | 63 | 94 | 125 | 7 | | 0 |
| Jun-19 | | | | | | | | | | | | | |

**Newly Enrolled:** Client has attended intake/orientation and has been assigned a TASC client donor ID

**Re-Entry:** Post File clients who have previously enrolled, were terminated as unsuccessful, then re-enrolled a second or third time

Total **Enrolled:** Total number of active program clients enrolled into TASC Drug Diversion on the last day of the month

**Successful Completions:** Client has successfully completed all program requirements and file has been returned to Maricopa County Attorney's Office as successful

**Unsuccessful Termination:** Client has been terminated for failure to participate and/or engage in the program after enrollment. TASC has returned the file to Maricopa County Attorney's Office as unsuccessful

**Failure to Appear:** Post File Referrals who do not appear for intake appointment. TASC has returned referral to Maricopa County Attorney's Office as Failure to Appear to TASC

**No Response:** Pre-File Referrals who do not respond to Pre-File letter and do not respond to TASC offer. TASC has returned referral to Maricopa County Attorney's Office as No Responce

**Refused:** TASC has made contact with pre/post file referral and defendant has refused to enroll into TASC for various reasons.

**Other:** Maricopa Country Attorney's Office has contracted TASC to return referral to Maricopa County Attorney's Office for various reasons

TASC033827

# EXHIBIT 10

## AMENDMENT

This amendment (the "Amendment") is made by the Maricopa County Attorney's Office ("MCAO") and the Treatment Assessment Screening Center, Inc. ("TASC"), parties to the Memorandum of Understanding ("MOU"), dated January 27th, 2009, for the Adult Deferred Prosecution Program ("ADPP").

**Except for Section 9. Term of Memorandum of Understanding, and signatures, the following supersedes the entire MOU Section, MARICOPA COUNTY AND JAIL FEE ACCOUNT:**

The Maricopa County Attorney's Office shall determine the MCAO Case Fee. TASC shall collect the MCAO Case Fee on behalf of the MCAO. The MCAO Case Fee will be collected after all other TASC fees have been paid. At the beginning of each month a check for the amount collected during the previous month shall be sent to the MCAO. Along with the funds, TASC shall electronically submit/import (Excel not PDF) detailed records regarding those collections to include: the name of the offender/case, case number, total amount of monies owed and how much money was collected for the month.

If the offender was booked in the county jail, a $50.00 MCSO Fee will be assessed. TASC shall collect the MCSO Fee from the offender. At the beginning of each month a check for the amount collected shall be sent to the Maricopa County Sheriff's Office (MCSO).

TASC shall implement the MCAO Sliding Scale (See Table 1) which is based on current federal poverty levels, for the $630 MCAO Case Fee and $50 MCSO Fee. Using the standardized financial assessment process specified below, TASC shall determine if the offender qualifies for a waiver or reduction in the MCAO CASE Fee and MCSO Fee by means of the MCAO Sliding Scale.

**The following supersedes the entire MOU Section, TASC ADULT DEFERRED PROSECUTION PROGRAM FEES AND PAYMENT GUIDELINES:**

TASC shall establish and implement a standardized financial assessment process and Sliding Scale based on current federal poverty levels for all treatment and non-treatment fees. Using the standardized financial assessment process specified below, TASC shall determine if the individual qualifies for a waiver or reduction in all treatment and non-treatment fees by means of the TASC Sliding Scale.

The standardized financial assessment process shall occur prior to the commencement of services and implemented as follows:

TASC shall offer the offender a financial assessment application along with application instructions. TASC shall assist the offender with the financial assessment application to further the offender's understanding and completion of the application, while emphasizing it is the responsibility of the offender to complete the application and to provide supporting documentation (e.g.: tax returns, pay stubs, statements showing income from Social Security, Medicaid, SNAP, pension, annuity, veteran's benefits, alimony, child support, military benefits, businesses, rent, interest, dividends, and any other income), by a reasonable date determined by TASC. If the offender fails to provide a completed financial assessment application and

MC-00240

supporting documentation by the date specified, full fees will be assessed. The offender has the responsibility to inform TASC if there is a change in their financial circumstance.

If the offender qualifies for a fee waiver or reduction, it is permissible to offer a fee payment plan. However, the fee payment plan shall be based upon the offender's estimated length of participation, so fee payment completion parallels program service completion. If there are extenuating circumstances, one extension of the fee payment plan, beyond the date of completed program services, may occur. The extension of the fee payment plan shall be based on the offender's assessed ability to pay by an agreed-upon due date. During this extension period, random urinalysis testing may ensue; however, TASC shall consider the offender's ability to pay for continued urinalysis testing when setting a testing schedule. Failure of the offender to pay fees on the agreed-upon extended due date shall result in unsuccessful termination.

TASC shall establish a policy which outlines the financial assessment process. TASC shall provide to MCAO a copy of this policy, a copy of the financial assessment application and instructions and a copy of the established TASC Sliding Scale. TASC shall also provide a listing of treatment and non-treatment service fees. Provision of these documents to MCAO shall occur prior to the effective date of this Amendment.

The TASC and MCAO Sliding Scales shall be revised annually to reflect the federal adjustments in the FPLs, which typically occur in January of each year. Adoption of the revisions shall occur no later than 30 days after the federal publication of the adjusted FPLs.

Except as set forth in this Amendment, the MOU is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the MOU or any other earlier MOU, the terms of this Amendment shall prevail.

This Amendment may be terminated without cause upon (90) days' written notice by either party during the term of this Amendment.


Douglas Kramer     (Date)      06/05/2019
Chief Executive Officer

William G. Montgomery     (Date)     6-5-19
County Attorney

2

| MCAO SLIDING SCALE | | | | |
|---|---|---|---|---|
| | <133% of FPL | 133-149% FPL | 150-174% FPL | 175-199% FPL | At or >200% FPL |
| Discount | 100% | 75% | 50% | 25% | 0% |
| MCAO CASE FEE | $0.00 | $169.00 | $323.00 | $477.00 | $630.00 |
| MCSO FEE | $0.00 | $12.50 | $25.00 | $37.50 | $50.00 |

| TASC SLIDING SCALE | | | | |
|---|---|---|---|---|
| | <133% of FPL | 133-149% FPL | 150-174% FPL | 175-199% FPL | At or >200% FPL |
| Rate Class | Rate A | Rate B | Rate C | Rate D | Rate E |
| Discount | Nominal Pricing | 75% | 50% | 25% | 0% |
| TASC PROGRAM FEE POM | $50.00 | $75.00 | $150.00 | $225.00 | $300.00 |
| TASC PROGRAM FEE POND and PODD | $150.00 | $263.75 | $527.50 | $791.25 | $1055.00 |
| DRUG SEMINAR | $10.00 | $25.00 | $50.00 | $75.00 | $100.00 |
| COMPREHENSIVE ASSESSMENT | $20.00 | $38.75 | $77.50 | $116.25 | $155.00 |
| MANUALIZED GROUP (1 Hour) | $5.00 | $7.50 | $15.00 | $22.50 | $30.00 |
| INDIVIUDAL COUNSELING (1 Hour) as clinically indicated | $10.00 | $12.50 | $25.00 | $37.50 | $50.00 |
| ALCOHOL AWARENESS EDUCATION | $15.00 | $25.00 | $50.00 | $75.00 | $100.00 |
| FEES NOT SUBJECT TO TASC SLIDING SCALE drug testing fees not included | | | | |
| WORKBOOK | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |
| APPLICATION FEE | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 |

1. Monthly payment arrangements are available for non-treatment services only.
2. Payment for treatment is required at the time of service for self-pay status clients.
3. Diversion (POND and PODD) **Treatment** Services include Drug Seminar, Comprehensive Assessment, Treatment Planning, Alcohol Awareness, and twenty-two to twenty-six (22 – 26) hours of structured group counseling as clinically indicated.
4. Diversion (POM) **Treatment** Services include Drug Seminar, Comprehensive Assessment, Treatment Planning, and Alcohol Awareness.
5. If a POM client tests positive for prohibited substances (relapse), an additional assessment may be required plus ten to fourteen (10 – 14) hours of structured group counseling and workbook purchase.

| \*Annual Household Income | | | | | |
|---|---|---|---|---|---|
| Household/ Family Size | 2019 Federal Poverty Levels (FPL) | 133% of FPL | 150% of FPL | 175% of FPL | At or > 200% of FPL |
| 1 | <$12,490 | $16,612 | $18,735 | $21,858 | $ 24,980 |
| 2 | <$16,910 | $22,490 | $25,365 | $29,593 | $ 33,820 |
| 3 | <$21,330 | $28,369 | $31,995 | $37,328 | $ 42,660 |
| 4 | <$25,750 | $34,248 | $38,625 | $45,063 | $ 51,500 |
| 5 | <$30,170 | $40,126 | $45,255 | $52,798 | $ 60,340 |
| 6 | <$34,590 | $46,005 | $51,885 | $60,533 | $ 69,180 |
| 7 | <$39,010 | $51,883 | $58,515 | $68,268 | $ 78,020 |
| 8 | <$43,430 | $57,762 | $65,145 | $76,003 | $ 86,860 |
| \*Monthly Household Income | | | | | |
| Household/ Family Size | 2019 Federal Poverty Levels (FPL) | 133% of FPL | 150% of FPL | 175% of FPL | At or > 200% of FPL |
| 1 | <$1,041 | $1,385 | $ 1,561 | $1,822 | $ 2,082 |
| 2 | <$1,409 | $1,874 | $ 2,114 | $2,466 | $ 2,818 |
| 3 | <$1,778 | $2,365 | $ 2,666 | $3,111 | $ 3,556 |
| 4 | <$2,146 | $2,854 | $ 3,219 | $3,776 | $ 4,292 |
| 5 | <$2,514 | $3,344 | $ 3,771 | $4,400 | $ 5,028 |
| 6 | <$2,883 | $3,834 | $ 4,325 | $5,045 | $ 5,766 |
| 7 | <$3,251 | $4,324 | $ 4,877 | $5,689 | $ 6,502 |
| 8 | <$3,619 | $4,813 | $ 5,429 | $6,333 | $ 7,238 |

\*Refer to the U.S. Department of Health and Human Services Office of the Assistant Secretary for Planning and Evaluation (ASPE) for current U.S. Federal Poverty Guidelines published in the Federal Register: https://aspe.hhs.gov/poverty-guidelines

MC-00243

# EXHIBIT 11

**From:** Latrice Hickman [lhickman@TascSolutions.org]
**Sent:** Monday, April 22, 2019 8:36 PM
**To:** Cordova Patricia; Cheyenne Watson; Douglas Kramer
**CC:** Vick Ken
**Subject:** RE: Proposed MOU Amendment

Ken and Patti,

We are updating forms and will send all docs for your review (prior to execution) this week. In the interim, please contact Cheyenne or I if you have any questions.

Thank you,

**LATRICE S. HICKMAN, MPA**
Chief Program Officer
**WORK |** (602) 254-7328 EXT 104   **FAX |** (602) 255-0851   **CELL |** (480) 416-9561
Corporate Office: 4016 N Black Canyon Highway Phoenix, Arizona 85017



---

**From:** Cordova Patricia [mailto:cordovap@mcao.maricopa.gov]
**Sent:** Friday, April 19, 2019 3:48 PM
**To:** Latrice Hickman <lhickman@TascSolutions.org>; Cheyenne Watson <cwatson@TascSolutions.org>; Douglas Kramer <dkramer@TascSolutions.org>
**Cc:** Vick Ken <VICK@mcao.maricopa.gov>
**Subject:** RE: Proposed MOU Amendment

Doug, Latrice and Cheyenne,

Ken and I reviewed your comments and questions and have provided responses below in red. Noted changes are highlighted in the attached Amendment.  If possible, please provide a feedback within a week.

Thank you.

-Patti

*Patricia Cordova, Bureau Chief*
*Diversion Program Bureau*
*Maricopa County Attorney's Office*
*301 West Jefferson*
*Phoenix, AZ 85003*
*Office: 602-506-5661*
*Cell: 602-619-1244*

---

**From:** Latrice Hickman <lhickman@TascSolutions.org>
**Sent:** Friday, April 19, 2019 11:15 AM
**To:** Cordova Patricia <cordovap@mcao.maricopa.gov>; Cheyenne Watson <cwatson@TascSolutions.org>; Douglas Kramer <dkramer@TascSolutions.org>
**Cc:** Vick Ken <VICK@mcao.maricopa.gov>
**Subject:** RE: Proposed MOU Amendment

Hi Ken and Patti,

If you have any questions in the interim, please let me know.

Sincerely,

**LATRICE S. HICKMAN, MPA**
Chief Program Officer
**WORK |** (602) 254-7328 EXT 104   **FAX |** (602) 255-0851   **CELL |** (480) 416-9561
Corporate Office: 4016 N Black Canyon Highway Phoenix, Arizona 85017



---

**From:** Cordova Patricia [mailto:cordovap@mcao.maricopa.gov]
**Sent:** Friday, April 19, 2019 8:31 AM
**To:** Latrice Hickman <lhickman@TascSolutions.org>; Cheyenne Watson <cwatson@TascSolutions.org>; Douglas Kramer <dkramer@TascSolutions.org>
**Cc:** Vick Ken <VICK@mcao.maricopa.gov>
**Subject:** RE: Proposed MOU Amendment

Good Morning Doug, Latrice, and Cheyenne,

Thank you for your comments. Ken and I will review your questions and commentary and likely get back with you later today or early next week.

-Patti


*Patricia Cordova, Bureau Chief*
*Diversion Program Bureau*
*Maricopa County Attorney's Office*
*301 West Jefferson*
*Phoenix, AZ 85003*
*Office: 602-506-5661*
*Cell: 602-619-1244*

---

**From:** Latrice Hickman <lhickman@TascSolutions.org>
**Sent:** Thursday, April 18, 2019 5:07 PM
**To:** Vick Ken <VICK@mcao.maricopa.gov>; Cordova Patricia <cordovap@mcao.maricopa.gov>
**Cc:** Cheyenne Watson <cwatson@TascSolutions.org>; Douglas Kramer <dkramer@TascSolutions.org>
**Subject:** RE: Proposed MOU Amendment

Hi Ken and Patti,

Below you will find TASC's questions and commentary related to MCAO's proposed MOU amendment. Let me know if you would like to meet (in person or tele-conference) to discuss further. Our goal is to streamline the financial assistance assessment for clients and when possible, align our processes with MCAO operations.

**Page 1**

1. "The MCAO fee will be collected after all other TASC fees have been paid". **Please confirm whether MCAO means all TASC program fees verses TASC fees for the applicable month.  The former is the current practice. If MCAO intends to retain the current practice, can clarifying language be added to the MOU?**

Please follow the current practice – to collect the MCAO Case Fee after all TASC Program Fees have been collected. We believe the Amendment clearly states this; however, if you would like to propose a change in language, let us know.

2. "If the offender was held in the county jail, a $50.00 MCSO Fee will be assessed." TASC collects the MCSO fee if the client self-reports being finger printed or photographed (aka booked) which does always equate to being "held". **Can the MOU narrative reflect the current process; replacing "held" with "booked"?** Although this language is what is in the current MOU, and we did not propose a change, yes, we can change it to "booked" rather than "held." See change in attached Amendment.

3. **Can MCAO include its full sliding fee scale in the MOU (noting the specific FPL amounts by household size; percentage of FPL, percentage of discount, and corresponding MCAO fee)?** Yes. See change in attached Amendment.

4. MCAO's scale indicates participants with an annual income exceeding 200% of the Federal Poverty Level will have 0% discount and pay $630. **Is MCAO's Case Fee (previously called "County Attorney Assessment") amount changed to $630?** Yes. This is the new MCAO Case Fee for all referred offenders to both POM and "Diversion." **If so, can the new Case Fee amount be referenced in the MOU - currently it is listed in the scale only.** Yes. See change in attached Amendment. I also mentioned the $50 MCSO Fee again, following the mention of the $630 MCAO Case Fee. And, both fees are now listed in the MCAO Sliding Scale.

**Page 2**
5. **Does MCAO want the sliding fee scale offered to individuals who have insurance, but do not want the claim sent to their carrier and cannot afford self-pay?** In situations where an individual has insurance (private or public) but does not want to utilize this insurance for TASC Treatment Fees, TASC is not obligated to utilize the TASC sliding scale. That's a decision left to you as the provider. However, for non-treatment fees the TASC Sliding Scale would be used if the participant is eligible for a reduction or waiver in those fees not covered by insurance.

6. "The standardized financial assessment process shall occur prior the commencement of services and implemented as follows…". **Is it MCAO's intent that all clients be provided notice and the financial application; but that clients decide whether to submit the information as their circumstance requires? If so, can this be reflected in the MOU?** We believe the Amendment clearly states that the individual is given a financial application along with a due date to be provided back to TASC. It's the individual's responsibility and/or prerogative to abide by that due date.

7. "Provision of these documents to MCAO shall occur within 5 days calendar days following the effective date of this Amendment". **Is MCAO okay with the paragraph being revised to reflect the documents (policy, financial assessment application and instructions, TASC Sliding Fee Scale, and listing of treatment and non-treatment services) impacting the collection or determination of MCAO fees be added attachments, prior to MOU execution (so MCAO can approve the documents before execution)?** Yes. See change in attached Amendment.
-

**Treatment Related Changes**
8. **Does MCAO have any issue with all ADPP referred clients receiving an assessment?** Currently POM clients receive a screening (versus assessment) unless they test positive for substance use. If the initial assessment indicates clinical treatment, the treatment plan will reflect clinical recommendations <u>and</u> recommendations to satisfy ADPP requirements. No, as long as all assessment fees are clearly listed in the amendment (as you previously provided) and subject to the TASC Sliding scale.

9. **Does MCAO have any issue with TASC adjusting program requirements based on clinical indicators identified in the assessment?** Specifically, POM clients that relapse will be required to complete 10 – 14 hours of treatment, versus the current practice of 12 hours. Diversion (PODD and POND) clients would be required to complete 22 – 26 hours of treatment, versus 24 hours. The treatment plan will reflect specific clinical recommendations within the aforementioned ranges to satisfy ADPP requirements. <span style="color:red">We don't disagree with the premise of addressing the clinical needs of the individuals; however, how does TASC define relapse? Is it necessary to extend treatment in every "relapse situation?" Also, MCAO does not want, nor should we, be clinically directive. Yet, if someone is "relapsing" more than once while in the program, we believe that may be cause for an unsuccessful termination. Also, we can only suspend prosecution up to two years. We can't go beyond that period of time before prosecution must be initiated/reinstated and we want diversion completed in one year. Lastly, we believe all of this should be clearly explained to the individual in writing along with the costs so they understand their obligation.</span>

Sincerely,

**LATRICE S. HICKMAN, MPA**
Chief Program Officer
**WORK |** (602) 254-7328 EXT 104   **FAX |** (602) 255-0851   **CELL |** (480) 416-9561
Corporate Office: 4016 N Black Canyon Highway Phoenix, Arizona 85017



---

**From:** Latrice Hickman
**Sent:** Thursday, April 11, 2019 10:46 AM
**To:** 'Vick Ken' <VICK@mcao.maricopa.gov>
**Cc:** Douglas Kramer <dkramer@TascSolutions.org>; Cheyenne Watson <cwatson@TascSolutions.org>; Cordova Patricia <cordovap@mcao.maricopa.gov>
**Subject:** RE: Proposed MOU Amendment

Good Morning Ken and Patti,

Thank you so much for pulling this together! We will review ASAP and circle back with you; I will compile our questions. However, I do not foresee any reason the amendment cannot be finalized in two weeks or less.

Sincerely,

**LATRICE S. HICKMAN, MPA**
Chief Program Officer
**WORK |** (602) 254-7328 EXT 104   **FAX |** (602) 255-0851   **CELL |** (480) 416-9561
Corporate Office: 4016 N Black Canyon Highway Phoenix, Arizona 85017



---

**From:** Vick Ken [mailto:VICK@mcao.maricopa.gov]
**Sent:** Thursday, April 11, 2019 9:24 AM
**To:** Douglas Kramer <dkramer@TascSolutions.org>; Cheyenne Watson <cwatson@TascSolutions.org>; Latrice Hickman <lhickman@TascSolutions.org>
**Cc:** Cordova Patricia <cordovap@mcao.maricopa.gov>
**Subject:** Proposed MOU Amendment

MC-00790

Good morning.

We have attached a proposed comprehensive amendment to the current MOU.  The main changes involve fees.  First, the amendment requires that all fees be subject to a sliding scale based on the individual's financial circumstances compared to the federal poverty levels.  You will note that MCAO fees are now the same regardless of the type of drug the person possessed.  Also, the amendment does not specify TASC fees so those can be set as needed (presumably similar to the amendment you proposed), but it does require the use of a sliding scale for those with a demonstrated inability to pay the full amount based on the federal poverty guidelines.  Our sliding scale tiers are specified in the amendment and it leaves the creation of your tiers and fees up to you.  Second, it provides some specific guidelines for the financial assessment process that will be used to determine an individual's ability to pay.  Third, there is a change in the way fee payment information will be provided for our fees which requires that payment information be provided to us in an Excel document that ties specific amounts paid to specific defendants.

Please let us know if you have questions.  We would like to get this signed and in place as soon as possible.  Please let us know if you think it will take longer than two weeks to get this finalized.


Ken Vick
Operations Division Chief

# Ex. 12

[This exhibit is being filed under seal.]

# Ex. 13

[This exhibit is being filed under seal.]

# EXHIBIT 14

## MCAO Sliding Fee Scale Register

| Application Approval/Denial Date | Intake Date | Last Name | First Name | Diversion Account Code | Date of Birth | Case Number | % FPL | Approved/Denied | Fee Scale Class Rate | Paid | Balance Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 60.00 |
| 9/4/2019 | | | | | | | 100% | Approved | A | $ (388.75) | $ - |
| 9/4/2019 | | | | | | | 100% | Approved | A | $ (76.00) | $ 289.00 |
| 9/11/2019 | | | | | | | 100% | Approved | A | $ (210.00) | $ - |
| 9/13/2019 | | | | | | | 100% | Approved | A | $ (210.00) | $ - |
| 9/13/2019 | | | | | | | 100% | Approved | A | $ (210.00) | $ - |
| 9/20/2019 | | | | | | | 0% | Denied | E | $ (350.00) | $ 2,953.00 |
| 9/20/2019 | | | | | | | 75% | Approved | B | $ (75.00) | $ 533.75 |
| 9/23/2019 | | | | | | | 300% | Denied | E | $ (750.00) | $ 350.00 |
| 9/24/2019 | | | | | | | 250% | Denied | E | $ (350.00) | $ 2,710.00 |
| 9/24/2019 | | | | | | | 200% | Denied | E | $ (150.00) | $ 1,835.00 |
| 9/25/2019 | | | | | | | 175% | Approved | D | $ (315.00) | $ 1,087.50 |
| 10/1/2019 | | | | | | | 150% | Approved | C | $ (490.00) | $ 847.50 |
| 10/1/2019 | | | | | | | 300% | Denied | E | $ (250.00) | $ 1,735.00 |
| 10/1/2019 | | | | | | | 50% | Approved | C | $ (150.00) | $ 887.50 |
| 10/1/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 60.00 |
| 10/3/2019 | | | | | | | 100% | Approved | A | $ (580.00) | $ - |
| 10/7/2019 | | | | | | | 300% | Denied | E | $ (75.00) | $ 1,010.00 |
| 10/7/2019 | | | | | | | 250% | Denied | E | $ (230.00) | $ 1,535.00 |
| 10/8/2019 | | | | | | | 100% | Approved | A | $ (985.00) | $ - |
| 10/8/2019 | | | | | | | 75% | Approved | B | $ (525.00) | $ 170.00 |
| 10/11/2019 | | | | | | | 100% | Approved | A | $ (423.00) | $ - |
| 10/13/2019 | | | | | | | 100% | Approved | A | $ (450.00) | $ - |
| 10/15/2019 | | | | | | | 100% | Approved | A | $ (190.00) | $ - |
| 10/16/2019 | | | | | | | 100% | Approved | A | $ (350.00) | $ - |
| 10/17/2019 | | | | | | | 100% | Approved | A | $ (75.00) | $ 180.00 |
| 10/17/2019 | | | | | | | 150% | Approved | C | $ (180.00) | $ 435.00 |
| 10/25/2019 | | | | | | | 100% | Approved | A | $ (313.00) | $ 55.00 |
| 10/28/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 105.00 |
| 10/30/2019 | | | | | | | 275% | Denied | E | $ - | |
| 11/1/2019 | | | | | | | 300% | Approved | A | $ (927.00) | |
| N/A | | | | | | | 0% | INCOMPLETE | N/A | $ (430.00) | $ 775.00 |
| 11/12/2019 | | | | | | | 100% | INCOMPLETE | N/A | $ (1,005.00) | $ 55.00 |
| N/A | | | | | | | | INCOMPLETE | | $ - | $ - |
| N/A | | | | | | | | INCOMPLETE | | $ - | $ - |
| 11/4/2019 | | | | | | | 100% | Approved | A | $ (80.00) | $ 275.00 |
| 11/4/2019 | | | | | | | 125% | Approved | A | $ (750.00) | $ 55.00 |
| N/A | | | | | | | | Pending | | $ (154.00) | |
| N/A | | | | | | | | Pending | | $ (150.00) | |
| 11/7/2019 | | | | | | | 100% | Approved | A | $ (1,427.50) | |
| 11/15/2019 | | | | | | | 100% | Approved | A | $ (75.00) | $ 280.00 |
| 11/8/2019 | | | | | | | 100% | Approved | A | $ (75.00) | $ 180.00 |
| 11/8/2019 | | | | | | | 175% | Approved | D | $ (400.00) | $ 1,436.25 |
| 11/7/2019 | | | | | | | 300% | Denied | E | $ (150.00) | $ 1,835.00 |
| 11/8/2019 | | | | | | | 100% | Approved | A | $ (1,332.00) | $ - |
| 11/8/2019 | | | | | | | 133% | Approved | B | $ (250.00) | $ 503.75 |

Redacted



## MCAO Sliding Fee Scale Register

| | Application Approval/Denial Date | Intake Date | Last Name | First Name | Diversion Account Code | Date of Birth | Case Number | % FPL | Approved/Denied | Fee Scale Class Rate | Paid | Balance Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | 11/15/2019 | | | | | | | 125% | Approved | A | $ - | $ - |
| 50 | 11/19/2019 | | | | | | | 185% | Approved | D | $ (300.00) | $ - |
| 51 | 11/19/2019 | | | | | | | 100% | Approved | A | $ (300.00) | $ 55.00 |
| 52 | 11/19/2019 | | | | | | | 125% | Approved | A | $ (150.00) | $ 205.00 |
| 53 | 11/20/2019 | | | | | | | 100% | Approved | A | $ (558.00) | $ 150.00 |
| 54 | 11/25/2019 | | | | | | | 100% | Approved | C | $ (1,760.00) | $ 315.00 |
| 55 | N/A | | | | | | | | PENDING | | $ - | $ - |
| 56 | 12/2/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 105.00 |
| 57 | 12/2/2019 | | | | | | | 185% | Approved | C | $ (150.00) | $ 546.00 |
| 58 | 12/10/2019 | | | | | | | 100% | Approved | A | $ (200.00) | $ 50.00 |
| 59 | 12/13/2019 | | | | | | | 175% | Approved | D | $ (290.00) | $ 1,075.00 |
| 60 | 12/17/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 226.00 |
| 61 | 12/17/2019 | | | | | | | 150% | Approved | C | $ (150.00) | $ 917.50 |
| 62 | 12/17/2019 | | | | | | | 125% | Approved | A | $ (150.00) | $ 60.00 |
| 63 | 12/17/2019 | | | | | | | 138% | Approved | B | $ (150.00) | $ 270.00 |
| 64 | 12/19/2019 | | | | | | | | DENIED | E | $ - | $ - |
| 65 | 12/19/2019 | | | | | | | 100% | Approved | A | $ (75.00) | $ 205.00 |
| 66 | 12/19/2019 | | | | | | | 100% | Approved | A | $ (75.00) | $ 205.00 |
| 67 | 12/30/2019 | | | | | | | 100% | Approved | A | $ (150.00) | $ 105.00 |
| 68 | 12/23/2019 | | | | | | | 185% | Approved | D | $ (225.00) | $ 1,226.25 |
| 69 | 12/25/2019 | | | | | | | 138% | Approved | B | $ (150.00) | $ 441.75 |
| 70 | 12/27/2019 | | | | | | | 130% | Approved | A | $ (765.00) | $ 10.00 |
| 71 | 12/27/2019 | | | | | | | 100% | Approved | A | $ (318.00) | $ 10.00 |
| 72 | 12/27/2019 | | | | | | | 100% | Approved | A | $ (442.00) | $ 10.00 |
| 73 | N/A | | | | | | | | Pending | | $ - | $ - |
| 74 | 12/27/2019 | | | | | | | 100% | Approved | A | $ (250.00) | $ 205.00 |
| 75 | 12/30/2019 | | | | | | | 138% | Approved | B | $ (1,935.00) | $ 157.50 |
| 76 | 1/3/2020 | | | | | | | 149% | Approved | B | $ (150.00) | $ 288.75 |
| 77 | 1/8/2020 | | | | | | | 149% | Approved | B | $ (340.00) | $ 25.00 |
| 78 | EXPIRED APP | | | | | | | | | | $ - | $ - |
| 79 | 1/8/2020 | | | | | | | 135% | Approved | B | $ - | $ 288.75 |
| 80 | 1/8/2020 | | | | | | | 100% | Approved | A | $ - | $ 210.00 |
| 81 | EXPIRED APP | | | | | | | | | | $ - | $ - |
| 82 | EXPIRED APP | | | | | | | | | | $ - | $ - |
| 83 | 1/9/2020 | | | | | | | 100% | Approved | A | $ (150.00) | $ 150.00 |
| 84 | EXPIRED APP | | | | | | | | | | $ - | $ - |
| 85 | 1/15/2020 | | | | | | | 100% | Approved | A | $ (75.00) | $ 225.00 |
| 86 | 1/15/2020 | | | | | | | 100% | Approved | A | $ - | $ - |
| 87 | 1/13/2020 | | | | | | | 100% | Approved | A | $ (740.00) | $ - |
| 88 | EXPIRED APP | | | | | | | | | | $ - | $ - |
| 89 | 1/15/2020 | | | | | | | 100% | Approved | A | $ (125.00) | $ 85.00 |
| 90 | 1/16/2020 | | | | | | | 100% | Approved | A | $ (629.16) | $ 16.00 |
| 91 | 1/16/2020 | | | | | | | 125% | Approved | A | $ (75.00) | $ 135.00 |
| 92 | 1/16/2020 | | | | | | | 100% | Approved | A | $ (300.00) | $ 60.00 |
| 93 | 1/16/2020 | | | | | | | 138% | Approved | B | $ (220.00) | $ 43.75 |
| 94 | 1/16/2020 | | | | | | | 100% | Approved | A | $ (75.00) | $ 135.00 |

# Ex. 15

[This exhibit is being filed under seal.]

# EXHIBIT 16

## MARICOPA COUNTY ATTORNEY/TASC DIVERSION SUBMITTAL FORM

**TASC ID:** Redacted 1365
**DR #:** Redacted 4228
**SUBMITTAL #:** 0131587794
**AGENCY:** GOODYEAR PD
**ATTORNEY:**

**CASE MANAGER:** HENRY ROJO
**OFFENSE:** POM
**ACCEPTANCE DEADLINE:**
<u>6</u> MOS TASC DEADLINE: 08/29/2016
<u>X</u> **EDC** ___ **PRE IA** ___ **SEF** <u>X</u> **PREFILE**
___ **RE-ENTRY** ___ **2ND OFFER** ___ **RCC**

**TASC CLIENT:** BRIGGS, DESHAWN LAMONTE

**AKA:**

**HOME ADDRESS:** 10939 W. MEADOWBROOK AVE

PHOENIX AZ 85037

**BUSINESS PHONE:**
**MESSAGE PHONE:**
**CELLULAR PHONE:**

**HOME PHONE:** 510-375-4134

**DEFENDANT'S DESCRIPTION:**

**RACE:** B
**WEIGHT:**
**SEX:** M
**DOB:** Redacted 39
**HAIR:**
**SOCIAL SECURITY #:**
**EYES:**
**HEIGHT:**

TASC LETTER DATE: 01/13/2016
<u>X</u> PRESCREENING COMPLETION DATE: 4/6/16
<u>X</u> TASC ACCEPTANCE: 2/29/16
___ RESPONDED, FAIL TO APPEAR:
___ FAILED PRESCREEN
___ TASC DENIAL:

<u>X</u> PRESCREENING START DATE: 2/29/16
___ NO RESPONSE:
___ REFUSED TASC:
___ INCORRECT ADDRESS
___ OTHER:

<u>X</u> **TASC COMPLETED IN FULL:** **8/25/16**

<u>X</u> TASC FEE PAID IN FULL: $150.00          MCSO FUND: $0.00
<u>X</u> DRUG FUND ASSESSMENT PAID IN FULL: $650.00 on 8/25/16
<u>X</u> SEMINAR COMPLETED
<u>X</u> DRUG TESTING NEGATIVE

___ **UNSUCCESSFUL TASC TERMINATION:**

___ TASC FEE NOT PAID OR ONLY  PAID          **BALANCE:**          **MSCO FUND BALANCE:**
___ DRUG FUND ASSESSMENT NOT PAID, OR ONLY PAID          **DRUG FUND BALANCE:**
___ SEMINAR NOT ATTENDED/UNEXCUSED ABSENCES
___ DRUG TESTING POSITIVE ON DATES AND FOR THE DRUGS LISTED UNDER COMMENTS
___ NEW ARREST CHARGE
___ MOVED NO FORWARD ADDRESS
___ FAILURE TO PROVIDE URINE TEST
___ FAILURE TO RESPOND TO CONTACT LETTER
___ OTHER:

LAST KNOWN ADDRESS: SAME AS ABOVE

Comments: See page 2

Page 1 of 2

PROTECTED HEALTH INFORMATION          TASC000059

**TASC ID:** Redacted 1365

TASC CLIENT: BRIGGS, DESHAWN LAMONTE

DR #: Redacted 4228

SUBMITTAL #: 0131587794

COMMENTS:

CLIENT HAS SUCCESSFULLY COMPLETED THE TASC POM DIVERSION PROGRAM.

PROTECTED HEALTH INFORMATION     TASC000060

 **TASC**

August 25th, 2016

**RE: 01315887794**

Dear Deshawn Briggs:

You have successfully completed the Maricopa County Attorney/TASC Adult Deferred Prosecution Program. The necessary paperwork has been submitted to the Maricopa County Attorney's Office (MCAO) for processing.

Due to your successful completion of the TASC Diversion program, the County Attorney's office will not be filing charges against you in regards to this offense. If you would like verification of this from the County Attorney's office, you may call 602-372-0048 and request a letter. Your case number has been referenced above for your convenience. Please wait at least 6-8 weeks before calling in order for your paperwork to be processed.

Congratulations and good luck to you in your future endeavors.
Feel free to contact us if we may be of further assistance to you.

Sincerely,

Henry Rojo
POM Case Manager

PROTECTED HEALTH INFORMATION      TASC000061



**TASC**

This certifies that

*Deshawn Briggs*

**has successfully completed**

*The Maricopa County Attorney/TASC Adult*

*Deferred Prosecution Program*

*Presented on August 25, 2016*

CEO

Case Manager

PROTECTED HEALTH INFORMATION     TASC000062

8/26/16                              TASC Diversion Program Payment History

| POM/A | Donor Id | Redacted 365 | BRIGGS, DESHAWN L | | POM |
|---|---|---|---|---|---|

**10014 POM Admission Fee**                          **BALANCE:**   **$0.00**

| | TRANDATE | Receipt No. | AMOUNT |
|---|---|---|---|
| 10014 | 2/29/16 | 160229-004697211 | $75.00 |
| 10014 | 4/14/16 | 160414-004750056 | $75.00 |
| | | Total Payments: | **$150.00** |

**10015 POM Fund**                                   **BALANCE:**   **$0.00**

| | TRANDATE | Receipt No. | AMOUNT |
|---|---|---|---|
| 10015 | 5/5/16 | 160505-004774599 | $115.00 |
| 10015 | 5/11/16 | 160511-004782196 | $16.00 |
| 10015 | 6/16/16 | 160616-004821989 | $170.00 |
| 10015 | 7/14/16 | 160714-004854305 | $70.00 |
| 10015 | 8/18/16 | 160818-004895372 | $50.00 |
| 10015 | 8/25/16 | 160825-004902791 | $229.00 |
| | | Total Payments: | **$650.00** |

**10016 POM MCSO Fund**                              **BALANCE:**   **$0.00**

| | TRANDATE | Receipt No. | AMOUNT |
|---|---|---|---|
| 10016 | 8/25/16 | 160825-004902791 | $50.00 |
| | | Total Payments: | **$50.00** |

**10017 POM TASC Fee**                               **BALANCE:**   **$0.00**

| | TRANDATE | Receipt No. | AMOUNT |
|---|---|---|---|
| 10017 | 4/14/16 | 160414-004750056 | $95.00 |
| 10017 | 5/5/16 | 160505-004774599 | $55.00 |
| | | Total Payments: | **$150.00** |

1

PROTECTED HEALTH INFORMATION      TASC000063



## TASC Individual Payment History

| POM/A | Donor ID: | Redacted 1365 | BRIGGS, DESHAWN  L | |
|---|---|---|---|---|

| | | Transaction History  as of: 8/24/2018   1:31:42PM | | |
|---|---|---|---|---|
| Date | Receipt No. | Location | Transaction | Amount |
| 8/25/2016 | 160825-004902791 | GLEN1 | 10019 Urine Analysis | $0.00 |
| 8/25/2016 | 160825-004902791 | GLEN1 | 10015 POM CA Fund | $229.00 |
| 8/25/2016 | 160825-004902791 | GLEN1 | 10016 POM MCSO Fund | $50.00 |
| 8/23/2016 | 160823-004899636 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 8/18/2016 | 160818-004895372 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 8/18/2016 | 160818-004895372 | GLEN1 | 10015 POM CA Fund | $50.00 |
| 8/8/2016 | 160808-004881917 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 8/2/2016 | 160802-004875544 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 8/2/2016 | 160802-004875544 | GLEN2 | 10020 Debit Card Fee | $1.00 |
| 7/25/2016 | 160725-004866001 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 7/22/2016 | 160722-004864420 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 7/22/2016 | 160722-004864431 | GLEN1 | 10019 Urine Analysis | $0.00 |
| 7/14/2016 | 160714-004854297 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 7/14/2016 | 160714-004854305 | GLEN1 | 10019 Urine Analysis | $0.00 |
| 7/14/2016 | 160714-004854305 | GLEN1 | 10020 Debit Card Fee | $1.00 |
| 7/14/2016 | 160714-004854305 | GLEN1 | 10015 POM CA Fund | $70.00 |
| 7/7/2016 | 160707-004845125 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 6/30/2016 | 160630-004838761 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 6/20/2016 | 160620-004826312 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 6/16/2016 | 160616-004821989 | GLEN2 | 10019 Urine Analysis | $0.00 |
| 6/16/2016 | 160616-004821989 | GLEN2 | 10020 Debit Card Fee | $2.00 |
| 6/16/2016 | 160616-004821989 | GLEN2 | 10015 POM CA Fund | $170.00 |
| 6/15/2016 | 160615-004820253 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 6/15/2016 | 160615-004820253 | GLEN1 | 10020 Debit Card Fee | $1.00 |
| 6/9/2016 | 160609-004813968 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 6/9/2016 | 160609-004813968 | GLEN2 | 10020 Debit Card Fee | $1.00 |
| 5/31/2016 | 160531-004803863 | GLEN2 | 10019 Urine Analysis | $0.00 |
| 5/23/2016 | 160523-004794176 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 5/23/2016 | 160523-004794176 | GLEN1 | 10020 Debit Card Fee | $1.00 |
| 5/20/2016 | 160520-004793500 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 5/11/2016 | 160511-004782196 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 5/11/2016 | 160511-004782196 | GLEN2 | 10015 POM CA Fund | $16.00 |
| 5/5/2016 | 160505-004774599 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 5/5/2016 | 160505-004774599 | GLEN2 | 10020 Debit Card Fee | $2.00 |
| 5/5/2016 | 160505-004774599 | GLEN2 | 10017 POM TASC Fee | $55.00 |
| 5/5/2016 | 160505-004774599 | GLEN2 | 10015 POM CA Fund | $115.00 |
| 4/25/2016 | 160425-004762428 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 4/25/2016 | 160425-004762428 | GLEN2 | 10020 Debit Card Fee | $1.00 |
| 4/22/2016 | 160422-004760681 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 4/14/2016 | 160414-004750051 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 4/14/2016 | 160414-004750056 | GLEN2 | 10019 Urine Analysis | $0.00 |
| 4/14/2016 | 160414-004750056 | GLEN2 | 10020 Debit Card Fee | $2.00 |
| 4/14/2016 | 160414-004750056 | GLEN2 | 10014 POM Admission Fee | $75.00 |
| 4/14/2016 | 160414-004750056 | GLEN2 | 10017 POM TASC Fee | $95.00 |
| 4/8/2016 | 160408-004743388 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 3/21/2016 | 160321-004721074 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 3/21/2016 | 160321-004721074 | GLEN1 | 10020 Debit Card Fee | $1.00 |
| 3/16/2016 | 160316-004717336 | GLEN1 | 10019 Urine Analysis | $14.00 |
| 3/9/2016 | 160309-004708472 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 3/9/2016 | 160309-004708472 | GLEN2 | 10020 Debit Card Fee | $1.00 |
| 3/4/2016 | 160304-004703797 | GLEN2 | 10019 Urine Analysis | $14.00 |
| 2/29/2016 | 160229-004697211 | COLLECT3 | 10019 Urine Analysis | $0.00 |
| 2/29/2016 | 160229-004697211 | COLLECT3 | 10014 POM Admission Fee | $75.00 |
| | | | | $1,350.00 |

l

PO BOX 19009
PHOENIX AZ 85005

HTTP://WWW.AZDES.GOV/FAA

OFFICE NUMBER: (855) 432-7587
CASE NUMBER: (                    ) Redact
NOTICE NUMBER: F702
MAILING DATE: 02/11/16

DESHAWN BRIGGS
10939 W MEADOWBROOK AVE
PHOENIX AZ 85037

**DEAR DESHAWN BRIGGS.**
Este aviso se refiere a la informacion importante acerca de sus beneficios, los plazos cortos para pedir una Audiencia y la manera de seguir recibiendo beneficios si usted esta en desacuerdo con nuestra decision. Llame de inmediato al DES al 1-855-432-7587 y DES le leeran esta aviso a usted en Espanol.

**This Decision Is About Your Nutrition Assistance Benefits**

NUTRITION ASSISTANCE INCREASE: You will get MORE in Nutrition Assistance benefits starting 03/2016.

We made this change because:

A change was reported to our office.

The following persons are included in your household. The income, resources, and expenses of these persons are used to determine if you are eligible for Nutrition Assistance benefits and the monthly amount you will receive.

Name        Date of Birth
BRIGGS, DESHAWN            /89 Redac

PROTECTED HEALTH INFORMATION      TASC000065

8/26/16  9:53:07AM

## Case Notes

### For

### BRIGGS, DESHAWN L

Created on:  3/4/2016          Created by:  jdavis

ROI for email - mixrealsolid at gmail .com & solidweez at icloud . com

Created on:  3/7/2016          Created by:  jdavis

-----Original Message-----From: Juanita DavisSent: Monday, March 07, 2016 1:45 PMTo: 'Deshawn Briggs'Subject: RE: Deshawn Briggs
Deshawn,I will need flight or hotel itinerary for your file. As for your seminar, our next available class is 3/22 or 3/29, same time.
Thank- you,
JUANITA R. DAVISSenior POM Case Manager / Technical Lead
WORK | 602-417-2211 FAX | 602-688-6496 EMAIL | JDAVIS[at]TASCSOLUTIONS.ORG Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, March 03, 2016 9:24 AMTo: Juanita DavisSubject: Deshawn Briggs
Hello Mrs. Davis
My name is Deshawn Briggs your new client from tasc I currently contacting you to inform you I will be leaving on Thursday March 24,2016 through Thursday March31,2016. For visting my family in California. If possible can you contact me back at this email or my other email MixRealSolid[at]Gmail.com  also I would like to change the date for the seminar class instead of March 15 I have to work on March 15 from 11:30am  to 8:30pm thank you for time. I'm looking forward to meeting you. Sincerely Deshawn Briggs
Sent from my iPhone

Created on:  3/23/2016          Created by:  kgambill

CT attended the seminar on 3/22/16.

Created on:  3/24/2016          Created by:  jdavis

Flight itinerary 3/24 - 3/31

Created on:  3/25/2016          Created by:  jdavis

-----Original Message-----From: Juanita DavisSent: Friday, March 25, 2016 4:23 PMTo: 'Deshawn Briggs'Subject: RE: Deshawn Briggs
All tests have been clean & don't worry about testing next week.
Thank- you,
JUANITA R. DAVISLead Case Manager
WORK | 602-417-2211 FAX | 602-688-6496 EMAIL | JDAVIS[at]TASCSOLUTIONS.ORG Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Friday, March 25, 2016 2:14 PMTo: Juanita DavisSubject: Re: Deshawn Briggs
Okay and I was wondering my test results also if my color called next week what you want me do??
Sent from my iPhone

PROTECTED HEALTH INFORMATION     TASC000066

1

8/26/16  9:53:07AM

## Case Notes

For

### BRIGGS, DESHAWN L

---

Created on:  4/6/2016            Created by:  jdavis

Client has been accepted into the TASC Program

---

Created on:  4/14/2016           Created by:  jdavis

File transferred to CM Henry

---

Created on:  4/20/2016           Created by:  hrojo

Hello Deshawn,I am your new case manager, how can I help you?
Thank- you,
HENRY ROJOPOM Case Manager  WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496  Corporate Office:
2234 North 7th Street, Phoenix, AZ 85006
-----Original Message----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Wednesday, April 20, 2016 9:32
AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: New client
Hello Henry
My name is Deshawn I'm your new client

Sent from my iPhone

Created on:  5/5/2016            Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Thursday, May 05, 2016 10:05 AMTo: 'Deshawn Briggs'
<soliddweez[at]icloud.com>Subject: RE: New client
They stop testing at 8:50pm you can get there on time.
Thank- you,
HENRY ROJOPOM Case Manager
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ
85006

----Original Message----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, May 05, 2016 10:03
AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
What time they stop drug testing in the Glendale office
Sent from my iPhone
> On May 5, 2016, at 9:51 AM, Henry Rojo <hrojo[at]TascSolutions.org> wrote:>> They close at 9 as well. Test over
there that's fine>>> Thank- you,>> HENRY ROJO> POM Case Manager>> WORK | (602) 417-2224 EXT 220
FAX | (602) 688-6496> Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006>>>>> -----Original Message---
--> From: Deshawn Briggs [soliddweez[at]icloud.com]> Sent: Thursday, May 05, 2016 9:51 AM> To: Henry Rojo
<hrojo[at]TascSolutions.org>> Subject: Re: New client>> I live close to the Glendale office that's the reason why I
said that>> Sent from my iPhone>>> On May 5, 2016, at 9:03 AM, Henry Rojo <hrojo[at]TascSolutions.org>
wrote:>>>> Deshawn,>>>> We don't close the Phx location until 9pm. You can make it after work. If you miss today
it's a unexcused missed test and a Violation.>>>>>> Thank- you,>>>> HENRY ROJO>> POM Case Manager>>>>
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496>> Corporate Office: 2234 North 7th Street, Phoenix,
AZ 85006>>>>>>> -----Original Message-----> From: Deshawn Briggs [soliddweez[at]icloud.com]>> Sent:
Thursday, May 05, 2016 8:58 AM>> To: Henry Rojo <hrojo[at]TascSolutions.org>>> Subject: Re: New client>>>>
Good Morning>>>> Mr.Henry>>>> My color is called today but I won't be able to make it today because I have to
work from 10:30am and I don't get off until 7:30pm is if possible that I can take the drug test tomorrow??>>

PROTECTED HEALTH INFORMATION      TASC000067

8/26/16  9:53:07AM

## Case Notes

### For

### BRIGGS, DESHAWN L

Created on: 5/12/2016          Created by: hrojo

-----Original Message-----From: Henry RojoSent: Thursday, May 12, 2016 9:09 AMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,

So far so good!
Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, May 12, 2016 8:57 AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Okay have all my test cam back clean
Sent from my iPhone
> On May 12, 2016, at 8:32 AM, Henry Rojo <hrojo[at]TascSolutions.org> wrote:>> My apologies I was an error on my part. I removed the note and your next UA will be waived.>>> Thank- you,>> HENRY ROJO> POM Case Manager>> WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496> Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006>>>> -----Original Message-----> From: Deshawn Briggs [soliddweez[at]icloud.com]> Sent: Wednesday, May 11, 2016 6:48 PM> To: Henry Rojo <hrojo[at]TascSolutions.org>> Subject: Re: New client>> Hello Henry I want to know why I have to pay an extra 16 dollar for me to get tested>> Sent from my iPhone>

Created on: 5/26/2016          Created by: hrojo

-----Original Message-----From: Henry RojoSent: Thursday, May 26, 2016 4:35 PMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
I was looking at your payments and how come you didn't make a payment for march?
Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

Created on: 5/27/2016          Created by: hrojo

-----Original Message-----From: Henry RojoSent: Friday, May 27, 2016 11:45 AMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
I seen you made a payment early april, but not for march. When you get a chance email me your receipt for March please.
Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, May 26, 2016 9:08 PMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
I have a receipt that I made a payment in March I always keep my receipt
Sent from my iPhone

3

PROTECTED HEALTH INFORMATION     TASC000068

8/26/16  9:53:07AM

## Case Notes

### For

### BRIGGS, DESHAWN L

Created on:  5/31/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Tuesday, May 31, 2016 11:40 AMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
Please do. And yes I already put a note in the system to waive your fee for today.
Thank- you,
HENRY ROJOPOM Case Manager
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Tuesday, May 31, 2016 11:34 AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
Okay  I will sent you the receipt of 3/18 and I was wondering are u going to wave my ua today
Sent from my iPhone
> On May 31, 2016, at 8:29 AM, Henry Rojo <hrojo[at]TascSolutions.org> wrote:>> Deshawn,>> Unfortunately they gave you the wrong information. Your first payment was supposed to be due on 03/18. That receipt you gave me was your April payment.>>> Thank- you,>> HENRY ROJO> POM Case Manager>> WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496> Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006>>

Created on:  6/9/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Thursday, June 09, 2016 9:16 AMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
Don't worry about it since you were given a wrong date that is our error. So keep up the good work
Thank- you,
HENRY ROJOPOM Case Manager
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Wednesday, June 08, 2016 8:39 AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
Would a bank statement provide that I paid on the 3/18
Sent from my iPhone

Created on:  6/9/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Thursday, June 09, 2016 10:50 AMTo: 'Deshawn Briggs' <soliddweez[at]icloud.com>Subject: RE: New client
As soon as your paid off you can be done with the program.
Thank- you,
HENRY ROJOPOM Case Manager
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, June 09, 2016 9:48 AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
 Thank you very much and if I pay all fees off for the program what else I have to do??
Sent from my iPhone

PROTECTED HEALTH INFORMATION     TASC000069

4

8/26/16  9:53:07AM

## Case Notes

For

### BRIGGS, DESHAWN L

Created on:  6/27/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Monday, June 27, 2016 10:26 AMTo: 'Deshawn Briggs'
<soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
Yes sir if your paid off I can get you out of here this week.
Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ
85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Monday, June 27, 2016 6:54
AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
 Good morning  did my test come back clean
Sent from my iPhone

Created on:  7/14/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Thursday, July 14, 2016 9:52 AMTo: 'Deshawn Briggs'
<soliddweez[at]icloud.com>Subject: RE: New client
Deshawn,
You can make a minimum payment of $50.00 and just pay the additional next month to get you out of here on time.
Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ
85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Thursday, July 14, 2016 9:31
AMTo: Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
Is it possible if I could make payment arrangement for this month??
Sent from my iPhone

Created on:  7/25/2016          Created by:  hrojo

-----Original Message-----From: Henry RojoSent: Monday, July 25, 2016 11:07 AMTo: 'Deshawn Briggs'
<soliddweez[at]icloud.com>Subject: RE: New client
Hello Deshawn,
If you were paid off then you could have been done 05/29. When your paid off I can get you out of here. If you pay
off today I can get you out of here tomorrow.

Thank- you,
HENRY ROJOPOM Case Manager
WORK  |  (602) 417-2224 EXT 220    FAX  |  (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ
85006

-----Original Message-----From: Deshawn Briggs [soliddweez[at]icloud.com]Sent: Friday, July 22, 2016 3:54 PMTo:
Henry Rojo <hrojo[at]TascSolutions.org>Subject: Re: New client
Henry,
After I pay my fees off what the next step
Sent from my iPhone

PROTECTED HEALTH INFORMATION     TASC000070

5

8/26/16  9:53:07AM

## Case Notes

### For

### BRIGGS, DESHAWN L

Created on: 8/16/2016          Created by: hrojo

-----Original Message-----From: Henry RojoSent: Tuesday, August 16, 2016 1:33 PMTo: 'Deshawn Briggs' <soliddweez@icloud.com>Subject: RE: New client
Hello Deshawn,
Sounds good as long as its paid by the end of the month your fine.
Thank- you,
HENRY ROJOPOM Case Manager
WORK | (602) 417-2224 EXT 220   FAX | (602) 688-6496 Corporate Office: 2234 North 7th Street, Phoenix, AZ 85006

-----Original Message---–From: Deshawn Briggs [soliddweez@icloud.com]Sent: Tuesday, August 16, 2016 12:59 PMTo: Henry Rojo <hrojo@TascSolutions.org>Subject: Re: New client
Hello Henry,
Hi Henry I will make a payment for 50.00 this week and pay the rest on AuG 25th
Sent from my iPhone

Created on: 8/23/2016          Created by: hrojo

CT came in to see CM re: Paying off on the 25th. CT stated he drank over the weekend but hopes it doesn't show up. CM told CT if he comes up + for ALCOHOL then he would be extended 90 days. CT stated he understands. CM went over requirements and completion. CM told CT to call CM tomorrow to go over results and depending on those results he can be done on 08/25. CT understood.

Created on: 8/24/2016          Created by: hrojo

CT called CM re: last test results. CM confirmed that test came back clean. CM told CT to come down tomorrow around 2:30pm to pick up completion paperwork.

Created on: 8/26/2016          Created by: hrojo

Client successfully completed the program. File was returned to County Attorney to be dismissed.



6

PROTECTED HEALTH INFORMATION     TASC000071

Clients name: _DeShawn Lamonte Briggs_

DOB: _Redacted._ _89_

Letter Sent: _1-13-16_ to respond by: _2-3-16_

Intake Date: _4/22/16 R/S 2/29/16_.

✓ Client to bring in $150.00 Money order or Debit.

_____ OK W/$75.00 (and supporting documentation RE: SSI, AHCCCS Etc.)

✓ Time 8:45 A.M plan on being her until noon (Location: 7th Street and Oak between Thomas and McDowell)

✓ Get Current Contact Number and can we text it_____

_____ Number correct on Submittal.

_____ Client has a MMC (Client told to bring Card as well as Physicians Certification.)

**Notes: (Write and special Instructions, Reschedule, Wrong number client in a wheel chair etc.)**

PROTECTED HEALTH INFORMATION     TASC000072



## MARICOPA COUNTY ATTORNEY / TASC ADULT DEFERRED PROSECUTION PROGRAM
## POSSESSION OF MARIJUANA

### CLIENT CONTRACT

**DB**  1. I will submit to urine testing as scheduled (including as direct by my case manager).

**DB**  2. I understand I must submit a minimum of 90 consecutive days of clean urine testing before I am eligible for early release.

**DB**  3. I will pay the required fee for each urine test and show picture I.D. prior to testing.

**DB**  4. I will report any prescribed medication and bring in my prescription(s) for verification.

**DB**  5. I understand that I may be subjected to additional urinalysis testing which is an additional cost to me as specified in the explanation of fees due to including, but not limited to, positive Urinalysis and prescription program non-compliance.

**DB**  6. Alcohol use is prohibited while participating in the program.
***Including over the counter medications with Alcohol*** (IE: Nyquil)

**DB**  7. I understand that at NO time am I allowed to use any form of synthetic cannabinoids or Salvia while participating in the program.

**DB**  8. I agree to attend the assigned Drug Education Seminar. Failure to attend the seminar without 48 hours notice to my case manager will result in a $75 charge for reassignment.

**DB**  9. I will adhere to the strict confidentiality of all clients.

**DB**  10. I agree to report ANY changes in address/telephone number(s), employment status or living conditions. (I must inform my case manager BEFORE I move).

**DB**  11. I am not permitted to leave the state/relocate out of state without special permission from TASC. I will inform my case manager if leaving Maricopa County for more than one day.

**DB**  12. I will report any police contacts or arrests to my case manager. If felony charges are filed, I understand that I may be unsuccessfully terminated from the Diversion Program.

**DB**  13. I will pay the program costs of ☑ $850.00  ☐ $800.00 and make a minimum payment of ☑ $170.00  ☐ $160.00  per month as stated in the Explanation of Fees. Failure to make payments each month as agreed will result in my case being returned for prosecution.

**DB**  14. If my fees are reduced and I submit a positive/diluted/altered urine test, full fees may be reinstated as outlined in the Explanation of Fees from that point forward until completion of the program.

**DB**  15. Continued positive/diluted/altered urine tests will result in my option to either participate in weekly counseling and urine tests or to have my case returned to the County Attorney's Office for prosecution.

**DB**  16. If placed in counseling: I will attend the assigned sessions weekly, submit a urine sample prior to each group, and pay additional fees as specified in the Explanation of Fees.

PROTECTED HEALTH INFORMATION   TASC000073

TASCSOLUTIONS.ORG

Comprehensive Solutions. Proven Results.
Corporate Office, 2234 North 7th Street, Phoenix, AZ 85006                (602) 254-7328



## MARICOPA COUNTY ATTORNEY / TASC ADULT DEFERRED PROSECUTION PROGRAM
### POSSESSION OF MARIJUANA

#### CLIENT CONTRACT CONT.

17. I understand that failure to test as scheduled, continued positive/diluted/altered tests, missed seminar/counseling, and/or failure to make payments as agreed may result in unsuccessful termination from the program.

18. Unless disability status applies, I must be employed while participating in the program.

The program rules and regulations have been explained to me. I understand these requirements and agree to comply with them. A violation of any of the above provisions can result in program termination. Upon termination a written report of the violation(s) will be submitted to the court.

**I HEREBY CONSENT TO PARTICIPATE IN THE TASC TREATMENT PROGRAM.**

_____          02-29-16
MCAO/ADPP Client                              Date

_____          02 29-16
MCAO/ADPP Case Manager                   Date

Comprehensive Solutions. Proven Results.

PROTECTED HEALTH INFORMATION

Corporate Office, 2234 North 7 Street, Phoenix, AZ 85006

TASC000074     (602) 254-7328



## MARICOPA COUNTY ATTORNEY / TASC ADULT DEFERRED PROSECUTION PROGRAM
## POSSESSION OF MARIJUANA

### EXPLANATION OF FEES

I, DeShawn Bright , do hereby agree to pay a service fee to TASC as follows:
*Print Name*

DB  I understand that the Application Fee of $150.00 must be paid prior to beginning the program and is NOT refundable.

DB  I understand that the fees for participating in the Maricopa County Attorney/Adult Deferred Prosecution Program are:

| | | |
|---|---|---|
| TASC Application Fee | $150.00 | $150.00 |
| TASC Program Fee | $150.00 | $150.00 |
| County Attorney Assessment | $650.00 | $650.00 |
| County Jail Booking Fee *(if applicable)* | $50.00 | -------- |
| **Total Costs** *(urinalysis fees not included)* | **$1,000.00** | **$950.00** |

DB  I understand that the fees and fines are nonrefundable and can be paid in full at any time OR can be paid in monthly payments.

DB  I understand that my monthly payment will be:

☑ 6 Months:     ☑ $170.00/mo *(if booked)*     ☐ $160.00/mo *(if not booked)*

***IF APPROVED.....***
Clients that have completed ALL program requirements may be eligible for early termination.
TASC will contact clients if they are eligible for early termination

### (PAYMENTS MUST BE MADE IN MONEY ORDER OR DEBIT CARD ONLY!)

DB  I understand that I will pay $14.00 for each urine test.

DB  I understand that failure to make monthly payments as agreed may result in mandatory payments each time I test. (Payments will be added to current testing costs. Failure to make payment will result in program violation).

DB  I understand that I can be charged additional fees as follows:
· unexcused absence from the Drug Education Seminar        $75.00
· counseling *(if required, due to continued positive urine tests)*     $20.00 per group/$95.00 assessment
· additional testing (prescription, program non-compliance and/or legal charge)  Market Price/per test

*Service fees (urinalysis, program costs, etc.) are subject to change.  Notice will be provided prior to any fee changes.*

| | |
|---|---|
| _____ | 02-29-16 |
| MCA/ADPP Client | Date |
| _____ | 02-29-16 |
| MCA/ADPP Case Manager | Date |

Comprehensive Solutions. Proven Results.
PROTECTED HEALTH INFORMATION     TASC000075
Corporate Office, 2255 North 7th Street, Phoenix, AZ 85006     (602) 254-7328

# IN THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA

ARIZONA DRUG ENFORCEMENT FUND,
**Plaintiff**

v.

_Deshawn Briggs_
**Defendant**

NO. _____

**CONSENT JUDGMENT**

Defendant, _Deshawn Briggs_ , hereby consents to the entry of judgment against
_Client Name_
him/her in the amount of $650.00.  This consent is freely and voluntarily given.  The amount owed is a just debt
based on consideration given to the defendant by the Maricopa County Attorney's Office.

DONE this _29_ day of _february_ , 20 _16_ .

_Deshawn Briggs_
Defendant Signature



## Maricopa County Attorney / TASC Adult Deferred Prosecution Program
## Possession of Marijuana

### Arizona Drug Enforcement Account Agreement

It is agreed between the Maricopa County Attorney's Office and __DeShawn Briggs__
*Client Name*

that monies in the amount of $650.00 will be paid to the Arizona Drug Enforcement Account by the

MCA/ADPP client as a condition of the client's participation in the Maricopa County Attorney/TASC

Drug Diversion Program. Payment is to be made in full prior to client's completion of the Diversion

program. Failure to make payment as agreed (unless modified in writing) will result in the client

being unsuccessfully terminated from the diversion program and criminal charges will be filed by the

Maricopa County Attorney's Office.

_____
MCA/ADPP Client

_____
MCA/ADPP Case Manager

02-29-16
Date

02-29-16
Date

TASCSOLUTIONS.ORG
Comprehensive Solutions. Proven Results.
PROTECTED HEALTH INFORMATION
Corporate Office, 2234 North 7th Street, Phoenix, AZ 85006
TASC000077
(602) 254-7328



## MARICOPA COUNTY ATTORNEY / TASC ADULT DEFERRED PROSECUTION PROGRAM
## POSSESSION OF MARIJUANA

### PROGRAM REQUIREMENTS

1.  **Urine testing:**
    In order to test you will need to bring: **$14.00 Money Order or Debit Card**, Picture ID, and your Donor ID number.
    ➢ You are to begin calling the colorline tomorrow, **Colorline: 602-258-6652.**

    When you hear your color: _Red_ , you need to provide a urine test that day.

2.  **Drug Education Seminar:**
    Date: _March 15, 2016_
    Time: _6:45pm_
    Location: _Sample_

3.  **Program fees:**
    6 Months:       ☑ **$850.00 payable in monthly installments of $170/mo.**
                           ☐ $800.00 payable in monthly installments of $160/mo.

    If approved, balance paid in full $850.00 (if booked)
    If approved, balance paid in full $800.00 (if not booked)

Your first payment is due _April 15, 2016_ in **MONEY ORDER or DEBIT CARD.**

Payments are due the 3rd FRIDAY of each month and <u>you are required to make a payment each month until the balance is paid in full.</u> Payments can be made at any of our office locations, M - F, during regular business hours. <u>Always keep your receipts.</u> When mailing a payment, please write your Donor ID # on the money order, and mail it to:
**ATTN: Mark Saferite, TASC, Inc., 2234 N. 7th St., Phoenix, AZ 85006.**

## Clients <u>MUST</u> be signed in 30 minutes prior to close of business or they will <u>NOT</u> be allowed to test.

_Deshawn Brewllor_                                            _02-29-2016_
MCA/ADPP Client                                                Date

_\[signature\]_                                                    _02-29-2016_
MCA/ADPP Case Manager                                    Date

PROTECTED HEALTH INFORMATION     TASC000078



## DISCLOSURE WITH PATIENT'S CONSENT AS PER TITLE 42, CHAPTER 1, PART 2
## FEDERAL REGISTER, TUESDAY, JULY 1, 1975 VOLUME 40 #127 PART IV

Name of Client _DeShawn Briggs_

Date of Birth **Redacted** _89_

Social Security Number **Redacted** _2018_

Disclosure of information requested of TASC
Disclosure made to: County Attorney, Court, Judge, Defense Attorney, Probation, TASC

For the purpose of possible entry to the TASC Program.

Extent or nature of information to be disclosed: urinalysis results, drug history information, progress in the TASC Program.

Other information _None_

Duration of Consent: Until termination of the TASC Program.

It is herein understood that this consent for disclosure is subject to revocation by the client at any time except to the extent that action has already been taken on that consent. Without express revocation, consent will expire when the client terminates continuous treatment in the TASC Program. However, for persons on probation or parole, if consent is given for disclosure to the criminal justice system, this consent may not be revoked.

Date signed _02-29-16_          Witness _____

Signature of Client _____
        or
Authorized person as per § 2.15 or § 2.16 _____

Per Federal Regulations: No disclosure can be made on a form which does not conform to Federal Regulations and contain the above data. Further, if the document appears false, information will not be disclosed until the matter is cleared up. IMPORTANT! This information has been disclosed to you from records whose confidentiality is protected by Federal Law. Federal Regulations (42 CFR, Part 2) prohibit you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for release of medical or other information is NOT sufficient consent for this purpose.



**TASC**

<u>Disclosure with Patient's Consent as per Title 42,</u>
Chapter 1, Part 2, Federal Register,
Tuesday, July 1, 1975, Volume 40 #127, Part IV

Name of Client: Deshawn Briggs

Date of Birth: Redacted 84     SS # Redacted 2018

Disclosure of Information Requested of TASC

Disclosure made with: E-Mail Address: Mixrealsolid@gmail.com
Solidbwee2@icloud.com
For the purpose of possible entry to the TASC Program.

Extent or nature of information to be disclosed:     Urinalysis results, drug history information, progress in the TASC program.

Other Information: _____ Communication via e-mail

Duration of Content: _____ Until termination of TASC Program

It is herein understood that this consent for disclosure is subject to revocation by the client at any time except to the extent that action has already been taken on that consent. Without express revocation, consent will expire when the client terminates continuous treatment in the TASC program. However, for persons on probation or parole, if consent is given for disclosure to the criminal justice system, this consent may not be revoked.

Date Signed: 2-24-16     Witness: _____

Signature of Client: _____
   OR
Authorized Person as per § 2.15 or § 2.16: _____
                                    Guardian

Per Federal Regulations: No disclosure can be made on a form which does not conform to Federal Regulations and contain the above data. Further, if the document appears false, information will not be disclosed until the matter is cleared up.

<u>IMPORTANT!!!</u>

This information has been disclosed to you from records whose confidentiality is protected by Federal Law. Federal Regulations (42 CFR, Part 2) prohibit you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for release of medical or other information is NOT sufficient consent for this purpose.


TASC

## MARICOPA COUNTY ATTORNEY / TASC DRUG DIVERSION PROGRAM

### STATEMENT OF FACTS

DATE: 2/29/16

APPLICANT'S NAME: Dashawn Briggs                    DATE OF BIRTH: Redacted 89

APPLICANT'S ADDRESS:

DR #: Redacted 4228                    SUBMITTAL #: CA 0131587794

You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning and to be with you during questioning if you so desire. If you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning.

**Do you understand these rights:** YES DB

1) Offense under investigation?          POSSESSION OF MARIJUANA

2) Date of offense? 12/19/15

3) Location and County Goodyear                    ARIZONA, MARICOPA COUNTY

4) What substance did you possess or use?          MARIJUANA

5) Did you knowingly possess or use the substance? yes

6) Was it a usable amount? yes

7) Did you have a valid doctor's prescription for the substance? NO

8) What are the facts of the offense? Marijuana was found in my possesion

I HAVE MADE THIS STATEMENT WITHOUT COERCION AND OF MY OWN FREE WILL. I FULLY UNDERSTAND THAT WHAT I HAVE WRITTEN HERE MAY BE USED AGAINST ME IN A COURT OF LAW SHOULD I FAIL TO SATISFACTORILY COMPLETE THE TASC PROGRAM. **Do you have a full understanding of this statement?** yes DB

Applicant's Signature: Dashawn Briggs                    Date: 2/29/16

Attorney's Signature: _____                    Date: _____

I HAVE WAIVED MY RIGHT TO AN ATTORNEY AND HAVE ANSWERED ALL QUESTIONS:

Applicant's Signature                    Date 2/29/16

TASC Signature:                    Date: 2/29/16

Comprehensive Solutions. Proven Results.

ASCSOLUTIONS.ORG          Corporate Office, 2234 North 7th Street, Phoenix, AZ 85006          (602) 254-7328

PROTECTED HEALTH INFORMATION          TASC000081

301 WEST JEFFERSON, 8TH FLOOR
PHOENIX, AZ 85003
WWW.MARICOPACOUNTYATTORNEY.ORG

PH. (602) 372-0046
FAX (602) 372-0200
TDD (602) 506-4352



# Maricopa County Attorney

## WILLIAM G MONTGOMERY

January 13, 2016

Deshawn Lamonte Briggs
10939 W Meadowbrook Avenue
Phoenix, Az 85037

Dear Mr. Briggs:

The Maricopa County Attorney's office has received a request from a local law
enforcement agency to file a criminal complaint charging you with the crime of
Possession or Use of Marijuana, a class 6 felony. The Maricopa County Attorney's
office has reviewed that request. You are accused of committing the crime of
possession or use of marijuana, a class 6 felony.

Pursuant to County Attorney policy, this office has made the decision not to file
a criminal complaint against you at this time, and is offering you the following
options:

### OPTION ONE:    CRIMINAL PROSECUTION

If convicted of a class 6 felony, you could receive a maximum sentence of 2 years
in prison and a maximum fine of $150,000.00 plus 80% surcharge. If convicted of a
class 1 misdemeanor, you could receive a maximum sentence of six months in jail
and a maximum fine of $2,500.00 plus 80% surcharge. In either case, you will have
a criminal record.

Also in either case, you would be required to pay a fine of not less than $750.00
plus 80% surcharge. If granted probation, in addition to the mandatory fine you
would be required to perform not less than 24 hours of community service with a
drug rehabilitation agency or attend an 8 hour drug abuse seminar.

### OPTION TWO:    TASC MARIJUANA DIVERSION PROGRAM

You would be required to complete the following:

    1.    Mandatory drug screening.
    2.    Mandatory drug abuse seminar.
    3.    Mandatory TASC enrollment fee of $150.00.
    4.    Mandatory TASC program fee of $150.00.
    5.    Mandatory assessment of $650.00.
    6.    Payment of additional fees for counseling, drug testing, and jail, if
          applicable.

**NOTE:**   If you successfully complete the TASC Marijuana Diversion Program,
criminal charges will <u>not</u> be filed and there will be <u>no record</u> of a criminal
complaint having been filed against you for possession or use of marijuana.

You may have been informed by Justice Court personnel that the charges against you
have been scratched or not filed. This has been done to allow you to participate
in the TASC Marijuana Diversion Program. If you decide to refuse the opportunity
to do so, the charges will be filed against you.

You may wish to consult an attorney regarding your Options.

If you select Option Two, you must call (602) 417-2227, or e-mail
POM@TASCSOLUTIONS.ORG, not later than **February 3, 2016** to schedule an appointment
to enter the TASC Marijuana Diversion Program. The TASC office is located at 2234
North 7th Street, Phoenix, Arizona 85006.

PROTECTED HEALTH INFORMATION     TASC000082

If you select Option One or fail to notify TASC by the above deadline, a criminal complaint will be filed charging you with the crime of Possession or Use of Marijuana, a class 6 felony.

Sincerely,

John Tutelman
Deputy County Attorney

Goodyear Police Department DR# 201544228
Incident Date:  12/19/15

2

PROTECTED HEALTH INFORMATION     TASC000083

# TASC ADULT DEFERRED PROSECUTION PROGRAM
ALL INFORMATION IS KEPT CONFIDENTIAL PER TITLE 42, CHAPTER1, PART2,
FEDERAL REGISTER, TUESDAY JULY1 1, 1975 , VOLUME 40 #127, PART IV

**DIVERSION/POM**   ☐ Re-Entry  ☐ 2nd Offer   ☐ OOS   ☐ OOA

| | |
|---|---|
| Appointment Date: 2/29/10 | ☑ Monday  ☐ Tuesday  ☐ Wednesday  ☐ Other: |
| Case Manager: Markeya | Donor I: Redacted 3165   Color: Red |
| Def Attorney: JT | ☐ PD  ☐ LD  ☐ Priv (Phone): |

## PLEASE PRINT CLEARLY

| | | |
|---|---|---|
| Today's Date: 02-29-2016 | SSN: Redacted 2018 | Amount Paying Today: $ 15.00 |
| Name: Deshawn Briggs | Date of Birth: Redacted 89 | Age: 26 |
| Current address: 10939 W. Meadowbrook Ave | City: Phoenix | |
| State: AZ   ZIP Code: 85037   Cell/HM #: 510-375-4134 | Contact Method: ☑ Call ☑ Text ☐ Email | |
| Email Address: | Other Names Used: | |

Preferred Testing Location:  ☑ GLENDALE   ☐ MESA   ☐ PHOENIX   ☐ OTHER

Are you bilingual:  ☐ YES  ☑ NO   If yes, besides English, what other language do you speak?

**EMERGENCY CONTACT**

| | |
|---|---|
| Name: Debra Briggs | Relationship: Friend of the family |
| Address: Same | City:   State:   ZIP: |
| Daytime Phone: | Other Phone: 602-551-4732 |

**DEMOGRAPHICS**

| | | |
|---|---|---|
| MALE ☑   FEMALE ☐ | Marital Status: ☑ Single ☐ Divorced | ☐ Separated (P) ☐ Married – Spouse Name: |

Ethnicity (Check One):  ☐ White  ☐ Hispanic  ☑ Black  ☐ Native American  ☐ Asian  ☐ Mixed/Other (Specify):

**CRIMINAL HISTORY**

Charge(s) that brought you to TASC today (check all that apply)
☑ Possession of Marijuana        ☐ Possession of Narcotic Drugs
☐ Possession of Dangerous Drugs   ☐ Obtaining a Prescription Drug by Fraud.

☐ Attempted Possession of:            ☐ Other:

Were you booked – photographed and/or fingerprinted for this charge?   ☑ YES        ☐ NO

Not including the above charges, have you ever been arrested before? ☐ YES        ☑ NO

   If yes:  Arrested for:                                   Year:                State:

   What was the outcome of this incident?   ☐ Fine          ☐ Probation-Felony
                                             ☐ Jail/Prison     ☐ Other Diversion Program

Have you ever been to TASC Before:   ☐ YES   ☑ NO

   If yes, explain:

**EMPLOYMENT**

Employment Status:  ☐ Full Time  ☑ Part Time       Employer: Walmart
           ☐ Disabled  ☐ Unemployed From:          Employer's Phone:

| List the amount you receive each month from: | $   TANF | $ 3).00 Food Stamps | $ 377.00 Disability |
|---|---|---|---|
| Monthly Gross Income: $ 800.00 | $   Section 8 Housing | $   Unemployment | $   Child Support |
| | $   Social Security (SSI/SSDI) | AHCCCS:  ☐ YES | ☐ NO |

**TREATMENT COUNSELING / MEDICAL HISTORY (not including 12 Step support groups)**

Have you ever received alcohol or drug counseling? ☐ YES  ☑ NO   When & Where:

Have you or are you now seeing a counselor or therapist? ☐ YES  ☑ NO   Name:

Primary Reason:

PROTECTED HEALTH INFORMATION      TASC000084

Are there any health problems TASC should be aware of? (For example: Diabetes, Epilepsy, history of seizures, heart disease, etc.)

Please list any medications you are currently being prescribed (Over-the-counter medications not needed)

| Medication | Strength | Prescribing Doctor |
|---|---|---|
| | | |
| | | |

Do you have a Medical Marijuana card? ☐ Yes ( ☐ Arizona   ☐ Other____ )  ☒ No  ☐ Applied

## DRUG HISTORY

Check those drugs that you have ever tried, experimented, or used:

☐ Alcohol   ☐ Amphetamine (Crystal, Ice)   ☐ Cocaine/Crack   ☐ Marijuana (T)   ☐ Heroin (O)   ☐ PCP   ☐ Denies

Date Last Drug Use: _____   ☐ THC   ☐ Coc   ☐ Meth   ☐ Opiate   ☐ Other:

☐ Prescription (specify)   |   ☐ Other (specify)

Which of the above do you use most often?   |   Your age when first used drugs:

Have you ever injected drugs?  ☐ YES   ☐ NO   |   Last time you injected and what drug?

## DO NOT WRITE BELOW THIS LINE – FOR TASC USE ONLY

Current Offense: ☒ Pre-File   ☐ Post-File   ☐ EDC   ☐ SEF   ☐ RCC   ☐ Trial Group

| | | |
|---|---|---|
| Pre-File: CA# 013/5 87794 | DR# 2615 44228 |
| Post-File: CR# | DR# |
| 2ⁿᵈ Charge CA# | DR# |
| 2ⁿᵈ Charge CR# | DR# |

☐ POM

| | | | | | |
|---|---|---|---|---|---|
| ☐ POND | ☐ APOND | ☐ Crack | ☐ Cocaine | ☐ Heroin/Other | ☐ POM |
| ☐ PODD | ☐ APODD | ☐ Meth | ☐ LSD | ☐ Other, · | ☐ POM |
| ☐ AONDF | ☐ AODDF | ☐ ODDF | ☐ ONDF | ☐ Rx | |

FEES:  ☐ Full (F)   ☐ Sliding (S)   ☐ Co-Pay (C)

| Intake Fee | TASC Fee | CA Fund | Booking Fee | UA Fees |
|---|---|---|---|---|
| $150 | $150 | $650 | $50/$0 | $14 POM |
| $150 | $1285 | $750 | $50/$0 | $14 DIV |
| $175 | $1285 | $1500 | $50/$0 | DIVRX  $19  $24  $29 |

Verification: ☐ AHCCCS Card   ☐ SSI/SSDI Award Letter   ☐ Other

Amt to Pay Now:  $ 75 · 00   |   Amt Paid:  $ 77 · 00   |   Employee Initials: [initials]

| | | |
|---|---|---|
| Office: | Contact Case Manager: | Seminar Date: 3/15/16 |
| | | 1ˢᵗ Payment Due: 4/15/16 |

Comments: Ct braight award letter jk $75.00 pm

PROTECTED HEALTH INFORMATION   TASC000085



**TASC DRUG DETECTION LABORATORY**
**4016 N. Black Canyon Hwy -- Phoenix, AZ 85017**
**CLIA# 03D0938729 / CAP-LAP# 3201701**
**DIRECTOR: Dr. Gerald Clement, Ph.D.**

8/26/2016  8:38AM

## Individual Testing Compliance Summary for the Period:  03/01/16 - 08/31/16

| Name | | DOB | Account | Agency ID | | Current Color | Referred By: | |
|------|--|-----|---------|-----------|--|---------------|--------------|--|
| BRIGGS, DESHAWN L | | Redacted 89 | POM/A | | | TERMINATED | HENRY ROJO | |

| Date | Random Color Match | Accn # | ALC | AMP | BAR | BEN | COC | MDN | OPI | PCP | PRO | THC | BUP | XTC | ETG | OTH | Com |
|------|--------------------|--------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 03/04/16 | RED - Match | 10152681 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 03/09/16 | RED - Match | 10162088 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 03/16/16 | RED - Match | 10180130 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 03/21/16 | RED - Match | 10188405 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 03/29/16 | No Sample Collected (RED) | | | | | | | | | | | | | | | | |
| 04/08/16 | RED - Match | 10233104 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 04/14/16 | RED - Match | 10246973 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 04/22/16 | RED - Match | 10267528 | | neg | | | neg | | neg | | | neg | | | neg | neg** | |
| 04/25/16 | RED - Match | 10270956 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 05/05/16 | RED - Match | 10296614 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 05/11/16 | RED - Match | 10312464 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 05/20/16 | RED - Match | 10335055 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 05/23/16 | RED - Match | 10336602 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 05/31/16 | RED - Match | 10355480 | | neg | | | neg | | neg | | | neg | | | neg | neg** | |
| 06/09/16 | RED - Match | 10375055 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 06/15/16 | RED - Match | 10513215 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 06/20/16 | RED - Match | 10525483 | | neg | | | neg | | neg | | | neg | | | neg | neg** | |
| 06/30/16 | RED - Match | 10550385 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 07/07/16 | RED - Match | 10561574 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 07/14/16 | RED - Match | 10578630 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 07/22/16 | RED - Match | 10598160 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 07/25/16 | RED - Match | 10601006 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 08/02/16 | RED - Match | 10620837 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 08/08/16 | RED - Match | 10631917 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 08/18/16 | RED - Match | 10657821 | | neg | | | neg | | neg | | | neg | | | | neg** | |
| 08/23/16 | RED - Match | 10666450 | | neg | | | neg | | neg | | | neg | | | | neg** | |

| TEST LEGEND: | ALC | – Alcohol | BUP | Buprenorphine | OPI | – Opiates | XTC | – Ecstasy |
|--------------|-----|-----------|-----|---------------|-----|-----------|-----|-----------|
| | AMP | – Amphetamines | COC | – Cocaine | PCP | – Phencyclidine | OTH | – Other |
| | BAR | – Barbiturates | ETG | Ethyl Glucuronide | PRO | – Propoxyphene | Com | – Comments |
| | BEN | – Benzodiazepines | MDN | – Methadone | THC | – Marijuana | | |

** All drugs in "Other" column can be seen in individual's lab

Redacted
Donor I         65

*TASC Recommends that all Positive samples be confirmed by GCMS analysis.*
*If a donor appears as a "No Specimen Collected" on this report,*
*contact a TASC representative to verify compliance before taking any action against the donor.*

Copyright © 2005, TASC, Inc.

PROTECTED HEALTH INFORMATION      TASC000086

3/22/2016                                        Gmail - San Francisco - Mar 24 (Itinerary# 7162454555362)



Sean Briggs <mixrealsolid@gmail.com>

# San Francisco - Mar 24 (Itinerary# 7162454555362)
1 message

**CheapTickets** <support@mailer.cheaptickets.com>                    Tue, Mar 8, 2016 at 7:06 AM
To: mixrealsolid@gmail.com


Cheap is good.

This CheapTickets Itinerary was sent from Deshawn L Briggs. If you have access to this account, you can view the most up-to-date version.

## San Francisco
Mar 24, 2016 - Mar 31, 2016   |   Itinerary # 7162454555362

| Important Information | Total Price | |
|---|---|---|
| | **Phoenix to San Francisco** | $76.10 |
| • Your roundtrip flight consists of two one-way fares which are subject to their own rules and restrictions. If one of your flights is changed or cancelled, it will not automatically change the other flight. You may incur a penalty fee for each flight for additional itinerary changes. | **Oakland to Phoenix** | $99.60 |
| • Remember to bring your itinerary and government-issued photo ID for airport check-in and security. | **Total Price** | **$175.70** |

All prices include taxes & fees and are quoted in US dollars. Your two one-way fares may be processed through multiple transactions.

## Phoenix (PHX) → San Francisco (SFO)
Mar 24, 2016 - Mar 24, 2016 , 1 one way ticket

CONFIRMED
**American Airlines**   **KKHJOY**
**CheapTickets.com**   **ZGZ3G9**
**Booking ID**

Your reservation is booked and confirmed. There is no need to call us to reconfirm this reservation.

### Price Summary

**Traveler Information**

| | | | Price Summary | |
|---|---|---|---|---|
| | | | **Traveler 1: Adult** | $54.10 |
| **Deshawn L Briggs** | No frequent flyer | Ticket # | Flight | $37.21 |
| Adult | details provided | 0017801425205 | **Taxes & Fees** | $16.89 |
| | | | CheapTickets | $22.00 |
| | | | Booking Fee | |

PROTECTED HEALTH INFORMATION   FAASC000087

* Seat assignments, special meals, frequent flyer point awards and

3/22/2016                                   Gmail - San Francisco - Mar 24 (Itinerary# 7162454555362)

special assistance requests should be confirmed directly with the airline.

**Total:   $76.10**

All prices quoted in US dollars.

**Mar 24, 2016 - Departure Nonstop**          Total travel time: 2 h 7 m

| | | |
|---|---|---|
| Phoenix | San Francisco | 2 h 7 m |
| PHX 1:55pm | SFO 4:02pm | |
| Terminal 4 | Terminal 2 | |

**American Airlines 407**
Economy / Coach (O) | Seat 16F | Confirm or change seats with the airline*

**Airline Rules & Regulations**

- This price includes a nonrefundable booking fee.
- We understand that sometimes plans change. We do not charge a cancel or change fee. When the airline charges such fees in accordance with its own policies, the cost will be passed on to you.
- Tickets are nonrefundable, nontransferable and name changes are not allowed.
- Please read the complete penalty rules for changes and cancellations (Opens a new window) applicable to this fare.
- Please read important information regarding airline liability limitations (Opens a new window) .

## Additional Flight Services

- The airline may charge additional fees (Opens a new window) for checked baggage or other optional services.

---

## Oakland (OAK) → Phoenix (PHX)
Mar 31, 2016 - Mar 31, 2016 , 1 one way ticket

CONFIRMED
Delta                          HAPR7L
CheapTickets.com     ZGVV4J
Booking ID

Your reservation is booked and confirmed. There is no need to call us to reconfirm this reservation.

### Price Summary

| | |
|---|---|
| **Traveler 1: Adult** | **$99.60** |
| Flight | $71.63 |
| Taxes & Fees | $27.97 |
| **Total:** | **$99.60** |

**Traveler Information**

| | | |
|---|---|---|
| Deshawn L Briggs | No frequent flyer | Ticket # |
| Adult | details provided | 0067801369325 |

* Seat assignments, special meals, frequent flyer point awards and special assistance requests should be confirmed directly with the airline.

All prices quoted in US dollars.

**Mar 31, 2016 - Departure 1 stop**          Total travel time: 6 h 44 m

| | | |
|---|---|---|
| Oakland | Los Angeles | 1 h 28 m |
| OAK 2:02pm | LAX 3:30pm | |
| Terminal 1 | | |

### Additional Flight Services

- The airline may charge additional fees (Opens a new window) for checked baggage

PROTECTED HEALTH INFORMATION          TASC000088

Delta 5854 Operated by COMPASS DBA DELTA CONNECTION
Economy / Coach (X) | Seat 11C | Confirm or change seats with
the airline*

or other optional services.

Layover: 3 h 45 m

| Los Angeles | Phoenix | 1 h 31 m |
|---|---|---|
| LAX 7:15pm | PHX 8:46pm | |
| Terminal 5 | Terminal 3 | |

Delta 5685 Operated by COMPASS DBA DELTA CONNECTION
Economy / Coach (X) | Seat 11C | Confirm or change seats with
the airline*

**Airline Rules & Regulations**

- We understand that sometimes plans change. We do not
  charge a cancel or change fee. When the airline charges such
  fees in accordance with its own policies, the cost will be
  passed on to you.
- Tickets are nonrefundable, nontransferable and name
  changes are not allowed.
- Please read the complete penalty rules for changes and
  cancellations (Opens a new window) applicable to this fare.
- Please read important information regarding airline liability
  limitations (Opens a new window) .

Need help with your reservation?

**Visit our Customer Support page.**
**Call CheapTickets customer care at 844-700-1006**
**For faster service, mention Itinerary #7162454555362**

Please do not reply to this message. This email was sent from a notification-only email address that cannot accept incoming
email.

You are receiving this transactional email based on a recent booking or account-related update on CheapTickets.com .

© 2002-2016, Trip Network, Inc. (d/b/a CheapTickets) All rights reserved. CheapTickets, CheapTickets.com, and the
CheapTickets logo are either registered trademarks or trademarks of Trip Network, Inc. in the U.S. and/or other countries. Other
logos or product and company names mentioned herein may be the property of their respective owners. CST# 2062836-40

(EMID: PT-ETM-ENSIED:teid70301.0-issu1-testX-lang1033-verX-mcidX-segaX-segbX-segmX-key-paid)(MD: 20160308080616)
(EPID: )(ETID: 1132717)

PROTECTED HEALTH INFORMATION      TASC000089

EXHIBIT 17

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DESHAWN BRIGGS, et al.,            )
                                   )
     Plaintiffs,                   )
                                   )
v.                                 ) Civil Action No.
                                   ) CV-18-2684-PHX-EJM
ALLISTER ADEL, in her official     )
capacity as County Attorney of     )
Maricopa County, et al.,           )
                                   )
     Defendants.                   )
_____    )

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF LETICIA NUGENT

Volume 1

Pages 1 - 144

Phoenix, Arizona

March 29, 2021

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

Leticia Nugent                                    3/29/2021
          Deshawn Briggs v. Allister Adel

2

```
 1                    I N D E X

 2   WITNESS                                    PAGE

 3   LETICIA NUGENT

 4   Examination by Ms. Williamson                 7

 5

 6

 7                  EXHIBITS MARKED

 8   EXHIBIT          DESCRIPTION              PAGE

 9
     Exhibit 1        TASC Client Participation  109
10                    Handbook/Client Contract
                      TASC034010-34037
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Leticia Nugent                                          3/29/2021
Deshawn Briggs v. Allister Adel

12

| | | | |
|---|---|---|---|
| 3:15:04 | 1 | A | Not to my recollection. |
| 3:15:07 | 2 | Q | Did you review anything else on your own? |
| 3:15:08 | 3 | A | No. |
| 3:15:11 | 4 | Q | Did you meet with anyone other than Ms. Catero? |
| 3:15:12 | 5 | A | No. |
| 3:15:16 | 6 | Q | Did you bring any documents with you today? |
| 3:15:21 | 7 | A | Only the deposition that you guys provided me. |
| 3:15:26 | 8 | Q | That's -- that's all I have for very |
| 3:15:28 | 9 | | preliminary questions.  We're going to dive into some |
| 3:15:29 | 10 | | questions about you. |
| 3:15:30 | 11 | A | Okay. |
| 3:15:32 | 12 | Q | Where are you from? |
| 3:15:34 | 13 | A | I'm from Phoenix, Arizona. |
| 3:15:37 | 14 | Q | Were you born and raised there? |
| 3:15:37 | 15 | A | Yes, ma'am. |
| 3:15:40 | 16 | Q | Where did you go to school? |
| 3:15:44 | 17 | A | Where did I go to high school?  College? |
| 3:15:45 | 18 | Q | Where did you go -- we can start with high |
| 3:15:47 | 19 | | school.  Where did you go to high school? |
| 3:15:49 | 20 | A | Maryvale High School. |
| 3:15:51 | 21 | Q | And what year did you graduate? |
| 3:15:52 | 22 | A | In 2015. |
| 3:15:56 | 23 | Q | And then did you go to college after that? |
| 3:15:59 | 24 | A | I went to Glendale Community College.  I |
| 3:16:00 | 25 | | graduated in 2017. |

Leticia Nugent                                    3/29/2021
            Deshawn Briggs v. Allister Adel

                                                      13

3:16:03   1        Q    And when did you -- what year did you start
3:16:04   2    college?
3:16:07   3        A    I started as a sophomore in high school,
3:16:11   4    actually, so I started in 2013.
3:16:14   5        Q    Okay.  And you said you finished in 2017?
3:16:16   6        A    2017, yes.
3:16:18   7        Q    What did you study in college?
3:16:19   8        A    Criminal justice.
3:16:22   9        Q    What sort of classes did you take?
3:16:28   10       A    Administration.  I took forensic, stuff like
3:16:29   11   that.
3:16:33   12       Q    Did you receive a degree from -- after college?
3:16:33   13       A    Yes.
3:16:36   14       Q    What -- what kind of degree?
3:16:37   15       A    Associate of Arts degree.
3:16:39   16       Q    And that was in 2017?
3:16:40   17       A    Yes, ma'am.
3:16:46   18       Q    Have you gone to school beyond that after you
3:16:47   19   received that associate's?
3:16:47   20       A    No.
3:16:54   21       Q    And in -- what month did you finish in 2017?
3:16:57   22   Did you finish college?
3:16:57   23       A    May.
3:17:00   24       Q    And when you finished -- were you working
3:17:02   25   during college?

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

17

| | |
|---|---|
| 3:21:10 | 1 |
| 3:21:15 | 2 |
| 3:21:22 | 3 |
| 3:21:28 | 4 |
| 3:21:29 | 5 |
| 3:21:33 | 6 |
| 3:21:36 | 7 |
| 3:21:37 | 8 |
| 3:21:41 | 9 |
| 3:21:42 | 10 |
| 3:21:44 | 11 |
| 3:21:47 | 12 |
| 3:21:47 | 13 |
| 3:21:50 | 14 |
| 3:21:52 | 15 |
| 3:21:54 | 16 |
| 3:21:56 | 17 |
| 3:21:58 | 18 |
| 3:22:01 | 19 |
| 3:22:26 | 20 |
| 3:22:27 | 21 |
| 3:22:27 | 22 |
| 3:22:30 | 23 |
| 3:22:33 | 24 |
| 3:22:35 | 25 |

1      A    It was a -- it was a -- various jobs, so
2  whatever they needed me to do.  If they needed me to see
3  a client, it was a variety of things.  Basically as a
4  case manager, but I wasn't -- I wasn't a case manager at
5  the time.
6      Q    Were there other assistant case managers
7  working there when you were working there as a --
8      A    No.  I was the only one.
9      Q    How many case managers were you working with at
10  the time?
11      A    At the time --
12            MS. CATERO:  Objection; form.
13  BY MS. WILLIAMSON:
14      Q    You can go ahead and answer.
15      A    Let me count.  There was --
16            MS. CATERO:  Can you clarify what time
17  period you're asking about?
18            MS. WILLIAMSON:  When she -- when she
19  began.
20            THE WITNESS:  There was eight.  About
21  eight.
22  BY MS. WILLIAMSON:
23      Q    And do you remember those -- the names of the
24  case managers with whom you worked?
25      A    I remember some.  Some I only remember faces.

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

18

3:22:39   1      Q     Could you give me the names of the -- the ones
3:22:40   2    you remember?
3:22:46   3      A     Yeah.  It was Theresa Martinez, Viviana Garcia.
3:22:51   4    There was another girl who worked with them, but I don't
3:22:55   5    remember her name.  Then there was Sean; there was Abby;
3:23:07   6    there was Whitney Castleberry.  There was two males who
3:23:11   7    worked at our Tempe location, and I don't remember
3:23:13   8    exactly what their names are.
3:23:15   9      Q     Anyone else?
3:23:17   10     A     No, I don't believe so.
3:23:24   11     Q     Were you assigned a particular caseload as a --
3:23:26   12    as a case management assistant?
3:23:30   13     A     Oh, yes, I was.  So there was another girl.
3:23:34   14    There was a girl named Martha.  So shortly after I
3:23:39   15    started, Martha quit, and I was assigned to her current
3:23:43   16    clients, which I believe was probably less than 80
3:23:46   17    clients.  So I was assigned her caseload until they were
3:23:52   18    able to fulfill that position.
3:23:55   19     Q     And when was that?  When were you assigned
3:23:57   20    Martha's caseload?
3:23:59   21     A     Probably about a month after I started.
3:24:03   22     Q     Okay.
3:24:05   23             THE VIDEOGRAPHER:  And, Counsel, if I may
3:24:11   24    interrupt, I believe one of the microphones -- or excuse
3:24:14   25    me, one of the volumes is turned too high.  So whatever

**Leticia Nugent**                                      3/29/2021
**Deshawn Briggs v. Allister Adel**

19

| | | |
|---|---|---|
| 3:24:18 | 1 | computer is next to the deposed, if you could turn that |
| 3:24:22 | 2 | volume down just slightly, not -- not Ms. Nugent's |
| 3:24:26 | 3 | volume, but the volume of the counsel sitting next to |
| 3:24:27 | 4 | her. |
| 3:24:28 | 5 |           MS. CATERO:  Oh, okay.  Because you -- |
| 3:24:31 | 6 | this is Jennifer Catero.  You had asked me to turn it |
| 3:24:32 | 7 | all the way up.  Is it too high? |
| 3:24:32 | 8 |           (An off-the-record discussion ensued.) |
| 3:24:50 | 9 | BY MS. WILLIAMSON: |
| 3:25:18 | 10 |      Q    Are you all ready? |
| 3:25:18 | 11 |      A    Yes. |
| 3:25:23 | 12 |      Q    Okay.  You were saying that you took on |
| 3:25:26 | 13 | Martha's caseload and that was about a month after you |
| 3:25:26 | 14 | started; is that right? |
| 3:25:27 | 15 |      A    Yes. |
| 3:25:33 | 16 |      Q    So when you began your job as a case management |
| 3:25:36 | 17 | assistant, did you receive any training? |
| 3:25:41 | 18 |      A    Yes.  I received training from the other case |
| 3:25:41 | 19 | managers. |
| 3:25:44 | 20 |      Q    And what -- what training did you receive? |
| 3:25:47 | 21 |      A    Basic training, like how to run a caseload, how |
| 3:25:56 | 22 | to do notes, how to see UAs, how to answer the phone, do |
| 3:26:00 | 23 | my voicemail, answer emails, do kits, do orientation. |
| 3:26:03 | 24 |      Q    Could I -- let's -- let's run through these one |
| 3:26:07 | 25 | by one.  You're giving a lot of great information. |

Leticia Nugent                                    3/29/2021
           Deshawn Briggs v. Allister Adel

3:26:10  1        So you -- first you said how to run a caseload.
3:26:11  2   Tell me about that.
3:26:16  3        A    Like notes, how to run reports, like, see who
3:26:23  4   missed their UAs.  How to read drug tests, see what they
3:26:31  5   tested positive for.  How to look up clients in our
3:26:34  6   systems, navigate through the different systems, learn
3:26:41  7   what different tabs mean.
3:26:45  8        Q    Anything else?
3:26:52  9        You said that you would run reports.  What kind
3:26:55 10   of reports would you run?
3:27:02 11        A    Like, to see, like, who's making payments, see
3:27:04 12   who's testing, who's not testing.  Stuff like that.
3:27:17 13             THE COURT REPORTER:  Ms. Nugent, could you
3:27:20 14   just scoot back a little bit.  Because I'm thinking
3:27:20 15   maybe you're so close that it's -- yeah, just a little
3:27:20 16   bit.  Thank you.
3:27:20 17   BY MS. WILLIAMSON:
3:27:25 18        Q    What information would be included on a report
3:27:27 19   of who's making payments?
3:27:32 20        A    Just the client's name, the client's, like,
3:27:37 21   client ID, the date of birth, I believe, and then just,
3:27:40 22   like, how much they owed.
3:27:45 23        Q    And would you receive reports if clients were
3:27:46 24   not making payments?
3:27:49 25        A    It was all on one.  So we could see who was

Leticia Nugent                          3/29/2021
Deshawn Briggs v. Allister Adel

21

3:27:54  1   making payments.  Basically, like, depending on the
3:27:57  2   amount of time, an -- we would know, like, an estimate
3:27:59  3   of where they're supposed to be as far as payments go,
3:28:03  4   and we could just look at how much they owe and just
3:28:06  5   kind of calculate it.  So it was all on one sheet who
3:28:09  6   paid and who didn't.
3:28:11  7       Q    Was there any other information on that sheet
3:28:14  8   other than what you've just listed?
3:28:17  9               MS. CATERO:  Foundation.
3:28:18  10              THE WITNESS:  I can't recall.
3:28:18  11  BY MS. WILLIAMSON:
3:28:25  12      Q    You also mentioned how to take notes.  What --
3:28:27  13  what notes would you take?
3:28:34  14      A    How to do case notes.  So in the chart, case
3:28:36  15  notes, if we seen a client, we were supposed to write
3:28:41  16  what happened during our visit or interaction.
3:28:48  17      Q    Tell me about the case notes.  Were you -- were
3:28:53  18  you required to write down case notes for all of your
3:28:55  19  interactions with clients?
3:28:57  20      A    Yes.  That was the goal.
3:29:00  21      Q    You say that's the -- what do you mean by
3:29:02  22  that's the goal?
3:29:05  23      A    That's what we were trained to do.  So policy
3:29:08  24  states that whenever we seen a client, we were supposed
3:29:12  25  to do a case note, but that wasn't -- that wasn't the

Leticia Nugent                                      3/29/2021
             Deshawn Briggs v. Allister Adel

22

3:29:15   1    case in some interactions, especially when it was, like,
3:29:17   2    a couple seconds.
3:29:21   3         Q    So what sorts of interactions wouldn't you
3:29:23   4    include in the case notes?
3:29:30   5         A    Like hi/bye, just checking in on a client,
3:29:32   6    like, how are you doing.  If they asked for, like, a
3:29:35   7    financial application, we would just hand it to them.
3:29:37   8    If they asked for the case manager's information, like,
3:29:40   9    a business card, we would just hand it to them real
3:29:43  10    quick.  If they had, like, simple questions, like, hey,
3:29:47  11    what's my next seminar or, you know, am I scheduled for
3:29:50  12    anything?  We would just look it up real quick and just
3:29:53  13    be like, hey, your seminar is this date, this time.  You
3:29:55  14    know, just, like, really quick interactions.
3:29:59  15         Q    One of the quick interactions you listed in
3:30:02  16    that list was if they asked for financial application,
3:30:03  17    you would just hand it.
3:30:04  18         A    Uh-huh.
3:30:10  19         Q    Were you required to list that information that
3:30:14  20    you gave a financial application in the case notes?
3:30:14  21         A    Yeah.
3:30:19  22         Q    But you're saying as a matter of -- would
3:30:21  23    you -- would you list that information?
3:30:22  24         A    Not all the time, no.
3:30:24  25         Q    What would determine whether you list that

**Leticia Nugent**                                        3/29/2021
**Deshawn Briggs v. Allister Adel**

23

```
3:30:26   1   information?
3:30:29   2        A    Like, during orientation, it was kind of --
3:30:31   3   because it -- because it was a big group.  I mean,
3:30:35   4   sometimes it was like 30 people, 40 people.  We couldn't
3:30:38   5   necessarily remember who -- who we gave an extra
3:30:42   6   application to and who we didn't or, you know --
3:30:44   7   especially if we were at the front desk and it was just
3:30:47   8   a busy day and it was just a quick interaction, it was
3:30:50   9   just hard to remember, you know, who did I talk to that
3:30:58  10   day that I gave a financial application to.  So that
3:30:59  11   was --
3:31:08  12        Q    Okay.  You -- you said that you would also
3:31:14  13   facilitate orientation.  Can you tell me about that?
3:31:20  14        A    Yeah.  So I would do it for our POM program.  I
3:31:23  15   would do it for our diversion program.  So I would be
3:31:26  16   the one to introduce the clients to the program.  I
3:31:31  17   would be the one to go over what they were signing in
3:31:34  18   the program, including their client expectations, their
3:31:39  19   financial requirements, introduce them to their case
3:31:41  20   manager, let them know -- know that their -- this is the
3:31:44  21   person that's going to be their point of contact
3:31:49  22   throughout the whole program.  I would go over program
3:31:55  23   expectations, including seminars, the treatment aspects,
3:31:57  24   and the financial aspects.
3:32:05  25        Q    In your role as case manager assistant, did you
```

**Leticia Nugent**                                    **3/29/2021**
**Deshawn Briggs v. Allister Adel**

| | | |
|---|---|---|
| 3:32:06 | 1 | have a supervisor? |
| 3:32:06 | 2 | A    Yes. |
| 3:32:09 | 3 | Q    Who was your supervisor? |
| 3:32:09 | 4 | A    Cheyenne Watson. |
| 3:32:13 | 5 | Q    Did you have any other supervisors? |
| 3:32:14 | 6 | A    Supervisors, no. |
| 3:32:22 | 7 | Q    And -- okay.  You -- the first thing you |
| 3:32:25 | 8 | listed, I believe, was financial requirements was one of |
| 3:32:28 | 9 | the things you went over at orientation.  Tell me about |
| 3:32:29 | 10 | the financial requirements you went -- you would go over |
| 3:32:31 | 11 | during orientation. |
| 3:32:34 | 12 | MS. CATERO:  Can you clarify what time |
| 3:32:36 | 13 | period you're asking about, Virginia?  I just want to |
| 3:32:36 | 14 | make sure we've got a clear record here. |
| 3:32:36 | 15 | MS. WILLIAMSON:  Yes. |
| 3:32:36 | 16 | BY MS. WILLIAMSON: |
| 3:32:40 | 17 | Q    When you first began as a case manager -- as a |
| 3:32:42 | 18 | case manager assistant in -- in April 2018. |
| 3:32:47 | 19 | A    Yeah.  It's kind of hard to remember everything |
| 3:32:52 | 20 | without the documents in front of me, but basically |
| 3:32:58 | 21 | there was the UA requirements, which is a $15 fee -- I |
| 3:33:00 | 22 | believe at the time it was 14, actually, because they |
| 3:33:03 | 23 | raised the prices on me.  So I believe it was $14 when I |
| 3:33:08 | 24 | first began and then they raised it to 15. |
| 3:33:10 | 25 | I would let the clients know that there was a |

3:33:14  1    debit card fee for that.  I believe at the time it was 1
3:33:18  2    or $2.  They did raise those as well throughout my time
3:33:22  3    at TASC.  There was the TASC fee, which I believe was
3:33:29  4    $350.  There was Maricopa County attorney's fee, which
3:33:35  5    was $650, I believe.  And then if you were booked or
3:33:42  6    charged for -- for the offense at the police department,
3:33:47  7    that was a $50 charge.  So altogether, it was about
3:33:52  8    1,000 -- it was, like, 950 to a 1,050 or something like
3:33:52  9    that.
3:33:59  10       Q    You also listed program expectations as one of
3:34:01  11   the things you would do at orientation when you first
3:34:04  12   began in April 2018.  Tell me about those.
3:34:09  13       A    It was -- it was about a list of -- for the POM
3:34:15  14   program, it was about a list of 16 to 19 program
3:34:21  15   expectations, including testing as scheduled.  If you
3:34:25  16   didn't, you know, provide 90 consecutive days of clean
3:34:28  17   UA testing and testing as scheduled, that that time
3:34:30  18   would restart.
3:34:35  19            It went over that you weren't allowed to do
3:34:39  20   illicit substance, including alcohol and including not
3:34:42  21   taking cough medication because some cough medication
3:34:43  22   does have alcohol in it.
3:34:48  23            It -- it would introduce the financial
3:34:50  24   application, that if you are having financial
3:34:53  25   difficulties, that you can fill out a financial

Leticia Nugent                              3/29/2021
        Deshawn Briggs v. Allister Adel

26

| | |
|---|---|
| 3:34:58 | 1 |
| 3:35:05 | 2 |
| 3:35:15 | 3 |
| 3:35:18 | 4 |
| 3:35:20 | 5 |
| 3:35:21 | 6 |

3:34:58   1   application.  It had a -- like, a list of 17 things in
3:35:05   2   it.  Travel, that you weren't permitted to travel out of
3:35:15   3   Maricopa County without TASC permission.  That you're
3:35:18   4   required to keep in contact with your case manager.
3:35:20   5   You're required to do a seminar.  It was a whole bunch
3:35:21   6   of stuff.
3:35:23   7        Q    Anything else?
3:35:26   8        A    That's all that I can remember right now.
3:35:33   9        Q    You also mentioned that you would introduce a
3:35:36  10   participant to his or her case manager.
3:35:36  11        A    Uh-huh.
3:35:39  12        Q    Did you assign case managers?
3:35:40  13        A    Uh-huh.  Yes, ma'am.
3:35:44  14        Q    And how did you assign case managers?
3:35:47  15        A    It was typically based off of either
3:35:54  16   availability.  So if one case manager had -- and I would
3:35:56  17   get this from my manager.  So if they had a lower case
3:36:01  18   load count, we would put them on the board and say, you
3:36:04  19   know, this case manager is -- is accepting new clients,
3:36:08  20   or if we were relatively straight across the board, it
3:36:11  21   would go off last name.  So all clients between A
3:36:14  22   through, you know, N get this case manager; all clients
3:36:18  23   through N through Z get this case manager type thing.
3:36:22  24        Q    You said if some case managers had a lower
3:36:26  25   caseload you would assign directly to them.  What --

Leticia Nugent                                    3/29/2021
          Deshawn Briggs v. Allister Adel

27

| | | |
|---|---|---|
| 3:36:28 | 1 | what number of cases is a lower caseload? |
| 3:36:31 | 2 | A   I have no idea.  I would just get it from my |
| 3:36:31 | 3 | manager. |
| 3:36:36 | 4 | Q   Okay.  How many cases did each case manager |
| 3:36:40 | 5 | approximately have at a particular time? |
| 3:36:41 | 6 | A   I have no idea. |
| 3:36:48 | 7 | Q   Okay.  Okay.  When -- did you receive training |
| 3:36:50 | 8 | on how to conduct orientation? |
| 3:36:51 | 9 | A   Yes. |
| 3:36:53 | 10 | Q   Who trained you? |
| 3:36:53 | 11 | A   Yolonda. |
| 3:36:58 | 12 | Q   Is that Yolonda Brooks? |
| 3:36:59 | 13 | A   Yolonda Brooks, yes. |
| 3:37:02 | 14 | Q   Was Yolonda Brooks one of your supervisors? |
| 3:37:03 | 15 | A   She was a manager. |
| 3:37:11 | 16 | Q   Okay.  And what training did she give you? |
| 3:37:14 | 17 | A   She basically did a step by step.  She also |
| 3:37:18 | 18 | gave me, like, on paper, like, how -- how it's supposed |
| 3:37:22 | 19 | to go, what things you can say.  And then she also had |
| 3:37:26 | 20 | me sit in on, like, two to four orientations to see how |
| 3:37:29 | 21 | she did it.  And really it was just learning the |
| 3:37:32 | 22 | paperwork, so as long as you memorized what was on the |
| 3:37:36 | 23 | paperwork and answered any questions, that was pretty |
| 3:37:36 | 24 | much it, so ... |
| 3:37:41 | 25 | Q   What -- what paperwork would you -- what |

Leticia Nugent                                          3/29/2021
          Deshawn Briggs v. Allister Adel

3:37:41  1   paperwork are you referring to?

3:37:44  2        A    The same paperwork that the clients were given.

3:37:47  3   So if she gave me the -- the same packets that the

3:37:49  4   clients got.

3:37:52  5        Q    And what was in the packets the clients would

3:37:53  6   get?

3:37:57  7        A    When I first started, it was the -- the first

3:38:01  8   page was a list of TASC locations.  They could test at

3:38:06  9   any TASC location within our business hours listed, the

3:38:08  10  office phone numbers, and which hours would be testing

3:38:09  11  hours.

3:38:16  12       The next page was a reminder page.  So we would

3:38:21  13  have them write out their PIN number for the portal, the

3:38:24  14  testing portal.  We would have them write out their

3:38:29  15  monthly payments.  We would have them write out their

3:38:31  16  seminar date and then sign at the bottom.

3:38:37  17       And then the next page was -- just went into

3:38:45  18  fees, the county attorney's fees, program requirements

3:38:48  19  that was the contract.  They had to sign all these

3:38:49  20  documents.

3:38:52  21       Then the last two page was basically a

3:38:55  22  duplicate of the first two page, and they would rip

3:38:59  23  those two out and take it with them.

3:39:00  24       Q    Got it.

3:39:02  25            Any -- anything else?

Leticia Nugent                                    3/29/2021
Deshawn Briggs v. Allister Adel

29

| | | |
|---|---|---|
| 3:39:06 | 1 | A     No. |
| 3:39:08 | 2 | Q     Did -- other than those papers, did you hand -- |
| 3:39:10 | 3 | did -- did clients receive anything else during |
| 3:39:12 | 4 | orientation? |
| 3:39:13 | 5 | A     A financial application. |
| 3:39:16 | 6 | Q     And what was a financial application? |
| 3:39:19 | 7 | A     It was just an application for clients to fill |
| 3:39:24 | 8 | out should they need financial assistance. |
| 3:39:28 | 9 | Q     And was that application given to everyone who |
| 3:39:30 | 10 | participated in orientation? |
| 3:39:33 | 11 | A     When I first started, it was only given to |
| 3:39:37 | 12 | those who asked for it.  So we would say, you know, |
| 3:39:38 | 13 | we're going to let it -- you know, raise your hand if |
| 3:39:40 | 14 | you want some, give it to clients, and then we would |
| 3:39:43 | 15 | leave a stack at the front door.  When they signed out, |
| 3:39:46 | 16 | they could grab on the way out. |
| 3:39:49 | 17 | Q     Okay.  Let's -- let's back up a little bit. |
| 3:39:51 | 18 | Did you -- what did you tell -- during your -- |
| 3:39:57 | 19 | when you first started in 2018, what did you tell |
| 3:40:01 | 20 | clients about the application -- about the financial |
| 3:40:04 | 21 | application? |
| 3:40:07 | 22 | A     That if they needed financial assistance, they |
| 3:40:12 | 23 | can go ahead and fill it out and submit it to their case |
| 3:40:14 | 24 | managers to see if they qualify for financial |
| 3:40:15 | 25 | assistance. |

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

30

3:40:19  1        Q     Anything else?

3:40:25  2        A     No.  That was it.

3:40:26  3        Q     Okay.  And at some point you said that changed.

3:40:30  4    When did -- when did the rule change about when to give

3:40:31  5    out financial applications?

3:40:35  6        A     Shortly after.  We just figured that some

3:40:38  7    clients might be embarrassed to raise their hand during

3:40:42  8    a group orientation and say, yeah, I need financial

3:40:45  9    assistance, so we just started handing it out to

3:40:46 10    everybody.

3:40:51 11        Q     Okay.  When you say "shortly after," when do

3:40:51 12    you mean?

3:40:56 13        A     Probably -- maybe, like, four months after I

3:40:57 14    started.

3:41:02 15        Q     So you started, you said, in -- I'm sorry?

3:41:06 16        A     Like August, September of 2018.

3:41:09 17        Q     Okay.  So you estimate -- tell me if I have

3:41:10 18    this right.

3:41:13 19              You estimate that from April to about August

3:41:16 20    you would have participants raise their hand if they

3:41:19 21    wanted an application; is that right?  Raised their hand

3:41:21 22    during orientation; is that right?

3:41:22 23        A     Uh-huh.

3:41:25 24        Q     And then starting in about August 2018 you

3:41:29 25    would hand out financial applications to everyone --

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

31

| | | |
|---|---|---|
| 3:41:29 | 1 | A    Uh-huh. |
| 3:41:29 | 2 | Q    -- is that right? |
| 3:41:30 | 3 | A    Yeah. |
| 3:41:34 | 4 | Q    And what prompted that change? |
| 3:41:38 | 5 | A    It was just best practice.  Like, if people |
| 3:41:41 | 6 | were embarrassed, we -- we didn't want to make that |
| 3:41:45 | 7 | happen or we just wanted to hand them out to everybody. |
| 3:41:48 | 8 | We just figured that that was best practice. |
| 3:41:51 | 9 | Q    When you say "we," who's "we"? |
| 3:41:52 | 10 | A    Management. |
| 3:41:54 | 11 | Q    And who is management? |
| 3:41:58 | 12 | A    Just Cheyenne, my managers that included Abby |
| 3:42:02 | 13 | and Yolonda. |
| 3:42:07 | 14 | Q    In -- in or about August 2018, did someone tell |
| 3:42:10 | 15 | you to start handing them out to everyone? |
| 3:42:12 | 16 | A    Yeah.  Cheyenne did. |
| 3:42:14 | 17 | Q    Cheyenne told you to -- in about August 2018 |
| 3:42:17 | 18 | Cheyenne told you to hand them out to everyone? |
| 3:42:19 | 19 | A    Uh-huh. |
| 3:42:22 | 20 | Q    Do you -- to your knowledge, why did Cheyenne |
| 3:42:29 | 21 | tell you in August 2018 specifically to hand -- to hand |
| 3:42:30 | 22 | financial applications out to everyone? |
| 3:42:33 | 23 | A    She just said it was best practice that we |
| 3:42:36 | 24 | should be handing them out to everyone, give everybody |
| 3:42:37 | 25 | the opportunity. |

32

3:42:40  1        Q     Okay.

3:42:41  2              THE VIDEOGRAPHER:  Counsel, if I may

3:42:44  3    interrupt, could we have the witness turn her volume

3:42:48  4    down about ten points and see if that doesn't make a

3:42:50  5    difference.  Occasionally we're still experiencing some

3:42:53  6    echo.

3:42:57  7              THE WITNESS:  I adjusted it.

3:42:59  8              THE VIDEOGRAPHER:  Okay.  Thank you both.

3:42:59  9    BY MS. WILLIAMSON:

3:43:03  10       Q     Okay.  So you said in August 2018 Cheyenne

3:43:08  11   Watson instructed you to hand out financial applications

3:43:14  12   to everyone at orientation.  And your understanding is

3:43:17  13   that she just decided that was best practice --

3:43:18  14       A     Yes.

3:43:18  15       Q     -- is that right?

3:43:18  16       A     Uh-huh.

3:43:22  17       Q     Do you -- to your knowledge, what made her

3:43:28  18   change what was the best practice?

3:43:30  19              MS. CATERO:  Foundation.

3:43:31  20              THE WITNESS:  I don't know.

3:43:31  21   BY MS. WILLIAMSON:

3:43:35  22       Q     To your knowledge, did anything happen in

3:43:38  23   August 2018 that might have triggered a change?

3:43:39  24       A     No.

3:43:44  25       Q     And were you -- at this time were you the only

Leticia Nugent                                        3/29/2021
          Deshawn Briggs v. Allister Adel

                                                           49

4:06:13  1   orientations around May and June 2018, can you estimate
4:06:18  2   how many people per orientation would take a financial
4:06:19  3   aid application?
4:06:23  4        A    Quite a few.  I did quite a few.  I would
4:06:29  5   always -- I would always see how many people were
4:06:34  6   expected to attend the orientation and print, like, 10
4:06:38  7   to 20 more because a lot of people took a financial
4:06:43  8   application and took duplicates for somebody else to
4:06:47  9   look at.  Some people said their lawyer was going to
4:06:49  10  look at it.  Some people said, you know, they were going
4:06:51  11  to have their mom look at it or whoever.
4:06:58  12       Q    And in April 2018, about how many people would
4:07:03  13  you say participated in orientation per week for the POM
4:07:04  14  program?
4:07:05  15       A    For the POM program?
4:07:06  16       Q    Yes.
4:07:07  17       A    In May or April?
4:07:11  18       Q    In -- in -- yeah, in April 2018.
4:07:13  19       A    Probably around the same.  Probably around the
4:07:13  20  same.
4:07:19  21       Q    And at that time, about how many people would
4:07:23  22  take financial aid applications?
4:07:26  23       A    Quite a few.  Quite a few.
4:07:29  24       Q    And how many is quite a few?
4:07:32  25       A    I -- I wouldn't be able to tell you an exact

Leticia Nugent                                    3/29/2021
              Deshawn Briggs v. Allister Adel

50

| | | |
|---|---|---|
| 4:07:33 | 1 | number. |
| 4:07:36 | 2 | Q    Was it about -- was it everyone in the room, |
| 4:07:41 | 3 | all -- half of the participants? |
| 4:07:49 | 4 | A    If I had to -- I don't want to guess, so I |
| 4:07:51 | 5 | wouldn't be able to say. |
| 4:07:53 | 6 | Q    Would you estimate -- could you estimate that |
| 4:07:58 | 7 | it was about half? |
| 4:07:59 | 8 | MS. CATERO:  Asked and answered. |
| 4:07:59 | 9 | BY MS. WILLIAMSON: |
| 4:08:03 | 10 | Q    You can answer that. |
| 4:08:08 | 11 | A    I want to say it was more than half. |
| 4:08:09 | 12 | Q    Could you -- would you estimate that it was |
| 4:08:12 | 13 | more than three-quarters? |
| 4:08:17 | 14 | A    Probably not three-quarters, no. |
| 4:08:19 | 15 | Q    Okay.  So would you estimate somewhere between |
| 4:08:23 | 16 | half and 75 percent of -- |
| 4:08:23 | 17 | A    Yes. |
| 4:08:27 | 18 | Q    -- of the participants would take a financial |
| 4:08:27 | 19 | application? |
| 4:08:30 | 20 | A    Yes. |
| 4:08:31 | 21 | Q    And this is in April 2018? |
| 4:08:32 | 22 | A    Uh-huh. |
| 4:08:36 | 23 | Q    And at that time, would -- my understanding |
| 4:08:40 | 24 | of -- is it -- am I right to say that you've said that |
| 4:08:46 | 25 | those half would take an application and at that time, |

Leticia Nugent                                        3/29/2021
Deshawn Briggs v. Allister Adel

51

| | | |
|---|---|---|
| 4:08:49 | 1 | you weren't recording who would take applications? |
| 4:08:50 | 2 | A    No.  At that time I wasn't. |
| 4:08:53 | 3 | Q    And no one else was recording it? |
| 4:08:53 | 4 | A    No. |
| 4:08:56 | 5 | MS. CATERO:  Foundation. |
| 4:08:56 | 6 | BY MS. WILLIAMSON: |
| 4:09:00 | 7 | Q    Okay.  And at that time in April 2018, was |
| 4:09:04 | 8 | anyone following up with any of the people who took |
| 4:09:05 | 9 | applications about those applications? |
| 4:09:06 | 10 | MS. CATERO:  Foundation. |
| 4:09:07 | 11 | THE WITNESS:  The clients were told to |
| 4:09:10 | 12 | follow up with their case managers. |
| 4:09:10 | 13 | BY MS. WILLIAMSON: |
| 4:09:19 | 14 | Q    Okay.  And then in -- in -- excuse me -- in |
| 4:09:23 | 15 | June 2018, you started keeping track of participants, |
| 4:09:31 | 16 | and you started emailing a list of -- a list of who took |
| 4:09:33 | 17 | financial applications to the case managers; is that |
| 4:09:33 | 18 | right? |
| 4:09:34 | 19 | A    Yes. |
| 4:09:40 | 20 | Q    And at that time, did -- were -- were there any |
| 4:09:45 | 21 | changes in policy or were all of these changes things |
| 4:09:47 | 22 | you were doing because, as you said, you were an |
| 4:09:48 | 23 | overachiever? |
| 4:09:50 | 24 | MS. CATERO:  Form and foundation. |
| 4:09:51 | 25 | THE WITNESS:  Yeah, it was just something |

**Leticia Nugent**                                    **3/29/2021**
**Deshawn Briggs v. Allister Adel**

| | | |
|---|---|---|
| 4:09:51 | 1 | I did, just to include with my email that I was already |
| 4:09:51 | 2 | sending. |
| 4:09:51 | 3 | BY MS. WILLIAMSON: |
| 4:10:03 | 4 |    Q   When you -- after you sent your first email |
| 4:10:07 | 5 | with this information, did you receive any response from |
| 4:10:10 | 6 | your supervisor about why you collected that |
| 4:10:10 | 7 | information? |
| 4:10:13 | 8 |    A   I don't believe so. |
| 4:10:17 | 9 |    Q   Did anybody else ask why you collected that |
| 4:10:18 | 10 | information? |
| 4:10:20 | 11 |    A   No. |
| 4:10:26 | 12 |    Q   Okay.  So in -- then in August 2018, you said |
| 4:10:35 | 13 | that Cheyenne Watson then asked for a list of who took |
| 4:10:36 | 14 | applications; is that right? |
| 4:10:40 | 15 |        MS. CATERO:  Objection; misstates the |
| 4:10:44 | 16 | witness's prior testimony. |
| 4:10:45 | 17 |        THE WITNESS:  Yeah, I don't know.  But |
| 4:10:48 | 18 | there was a point in time where I did start giving her a |
| 4:10:50 | 19 | list. |
| 4:10:50 | 20 | BY MS. WILLIAMSON: |
| 4:10:58 | 21 |    Q   Okay.  In -- in August 2018, did anything |
| 4:11:02 | 22 | change about how you ran orientation? |
| 4:11:04 | 23 |        MS. CATERO:  Form, foundation. |
| 4:11:09 | 24 |        THE WITNESS:  In August?  No.  We started |
| 4:11:15 | 25 | giving, like I said, applications to everybody.  It got |

Leticia Nugent                                    3/29/2021
Deshawn Briggs v. Allister Adel

67

| | | |
|---|---|---|
| 4:31:17 | 1 | MS. CATERO:  Okay.  Thank you very much. |
| 4:31:21 | 2 | We'll be back in ten minutes max. |
| 4:31:22 | 3 | MS. WILLIAMSON:  Ten minutes is great. |
| 4:31:23 | 4 | MS. CATERO:  All right.  Thank you. |
| 4:31:25 | 5 | THE VIDEOGRAPHER:  We are now off the |
| 4:31:30 | 6 | record.  The time on the video monitor is 4:31 p.m. |
| 4:31:30 | 7 | (A recess ensued.) |
| 4:42:16 | 8 | THE VIDEOGRAPHER:  We are now on the |
| 4:42:21 | 9 | record.  The time on the video monitor is 4:42 p.m. |
| 4:42:21 | 10 | BY MS. WILLIAMSON: |
| 4:42:26 | 11 | Q    Before we went off the record, we were talking |
| 4:42:29 | 12 | about case notes.  Do you remember that? |
| 4:42:31 | 13 | A    Yes. |
| 4:42:34 | 14 | Q    If a -- if a client followed up with a case |
| 4:42:37 | 15 | manager about his or her financial application, would |
| 4:42:40 | 16 | that be documented in the case notes? |
| 4:42:40 | 17 | A    Yes. |
| 4:42:55 | 18 | Q    Okay.  You said that when you -- when you first |
| 4:43:00 | 19 | began working at TASC in April 2018, one of your jobs |
| 4:43:04 | 20 | was to fill in for case managers who were on vacation; |
| 4:43:05 | 21 | is that right? |
| 4:43:10 | 22 | A    Yes.  Or, you know, if they took the day off, |
| 4:43:11 | 23 | whatever the case may be. |
| 4:43:14 | 24 | Q    When you filled in for other case managers, did |
| 4:43:18 | 25 | you review the case notes that those case managers had |

Leticia Nugent                                    3/29/2021
        Deshawn Briggs v. Allister Adel

| | | |
|---|---|---|
| 4:43:24 | 1 | entered before you started filling in new notes? |
| 4:43:26 | 2 | A    Not typically, no. |
| 4:43:33 | 3 | Q    Would you -- for any -- any times you were |
| 4:43:36 | 4 | covering for another case manager who was out of the |
| 4:43:45 | 5 | office, would you fill in case notes for those clients |
| 4:43:48 | 6 | as if they were your own clients? |
| 4:43:51 | 7 | Would your -- would your case note practice |
| 4:43:53 | 8 | change at all based on the fact that you were taking |
| 4:43:56 | 9 | over for somebody as opposed to having somebody who was |
| 4:43:59 | 10 | assigned to your caseload? |
| 4:43:59 | 11 | A    No. |
| 4:44:08 | 12 | Q    Okay.  If you saw that a case manager had |
| 4:44:12 | 13 | recorded something wrong in one of their earlier |
| 4:44:17 | 14 | entries, would you do anything to -- would you take any |
| 4:44:19 | 15 | action? |
| 4:44:20 | 16 | MS. CATERO:  Form, foundation. |
| 4:44:24 | 17 | THE WITNESS:  No.  That's never happened |
| 4:44:26 | 18 | to me. |
| 4:44:26 | 19 | BY MS. WILLIAMSON: |
| 4:44:35 | 20 | Q    If you saw that a case manager's notes showed |
| 4:44:40 | 21 | that they had done something that was against TASC's |
| 4:44:42 | 22 | policy, would you do anything -- would you take any |
| 4:44:45 | 23 | action? |
| 4:44:45 | 24 | MS. CATERO:  Form, foundation. |
| 4:44:49 | 25 | THE WITNESS:  That's never happened to me. |

Leticia Nugent                                    3/29/2021
           Deshawn Briggs v. Allister Adel

71

4:48:02   1    have to pay either 150 or 75 when they were scheduled
4:48:03   2    for orientation?
4:48:04   3         A    Yes.
4:48:07   4         Q    To your knowledge, was the orientation fee ever
4:48:08   5    waived?
4:48:15   6         A    To my knowledge, in a couple instances they
4:48:16   7    were, yes.
4:48:18   8         Q    Tell me about those instances.
4:48:20   9              MS. CATERO:  Form.
4:48:23  10              THE WITNESS:  The one that I could
4:48:27  11    remember was it was a male and it was -- it was done by
4:48:32  12    my manager, Cheyenne Watson.  They would agree to take
4:48:38  13    them into the program and give them a certain amount of
4:48:46  14    time to pay it.  The client needed to pay the -- the
4:48:49  15    intake form -- I mean payment eventually.  It was just
4:48:52  16    part of the balance.
4:48:52  17    BY MS. WILLIAMSON:
4:48:58  18         Q    Okay.  Was this one instance that you know of?
4:49:01  19         A    No.  There was many instances where Cheyenne
4:49:05  20    would let the clients into the program without them
4:49:07  21    paying the intake fee.
4:49:11  22         Q    Okay.  And when you say would let them into the
4:49:15  23    program without paying the intake fee, do you mean that
4:49:20  24    they would -- would they still owe that intake fee?
4:49:21  25         A    It was part of their balance.

Leticia Nugent                                    3/29/2021
Deshawn Briggs v. Allister Adel

72

4:49:24   1      Q    Okay.  It was -- when you say it was part of
4:49:26   2   their balance, what do you mean?
4:49:29   3      A    It was something they would need to pay off in
4:49:29   4   order to complete the programs.
4:49:30   5               THE COURT REPORTER:  I'm sorry.  Can you
4:49:31   6   repeat that?
4:49:32   7               THE WITNESS:  It was something they needed
4:49:36   8   to pay off in order to complete the program.
4:49:36   9   BY MS. WILLIAMSON:
4:49:40   10     Q    To your knowledge, what circumstances -- to
4:49:46   11  your knowledge, when did -- what reasons did Cheyenne
4:49:53   12  Watson give for letting some participants do orientation
4:49:56   13  without having first paid the intake fee?
4:49:57   14              MS. CATERO:  Foundation.
4:50:00   15              THE WITNESS:  It was more so of a promise
4:50:04   16  to pay agreement.  So let's say the client entered the
4:50:08   17  program on a Tuesday, but they won't get paid until
4:50:11   18  Friday, then they'll pay it the following Monday.  And
4:50:15   19  there was a couple of financial hardships that they --
4:50:18   20  she agreed for them to get into the program just to
4:50:21   21  start the financial application and then see if we could
4:50:26   22  work with them on getting them -- if, you know, maybe it
4:50:30   23  comes out to they might not have to pay the -- the
4:50:33   24  intake fee if they filled out the application and they,
4:50:37   25  you know, were -- they did have a really bad financial

Leticia Nugent                                    3/29/2021
            Deshawn Briggs v. Allister Adel

                                                  79

4:59:28   1              THE COURT REPORTER:  Ms. Nugent, if you
4:59:30   2   could scoot back a little bit, that may help with some
4:59:30   3   of the echo.  Thank you.
4:59:30   4   BY MS. WILLIAMSON:
4:59:33   5      Q    And was -- is -- are these conversations you
4:59:37   6   would have in person or through email or through some
4:59:39   7   other method?
4:59:41   8              MS. CATERO:  Form, foundation.
4:59:42   9              THE WITNESS:  It was a mix.  I would say
4:59:49   10  primarily face to face, one on one.  Sometimes through
4:59:54   11  email, but most of the time it was just a walk, like,
4:59:57   12  next door, go next door and staff it.
4:59:57   13  BY MS. WILLIAMSON:
5:00:01   14     Q    If you -- when you had conversations face to
5:00:05   15  face, did you -- did you make any written record of
5:00:07   16  those conversations?
5:00:08   17             MS. CATERO:  Form, foundation.
5:00:10   18             THE WITNESS:  No.
5:00:10   19  BY MS. WILLIAMSON:
5:00:16   20     Q    Okay.  You said that you staffed -- those
5:00:19   21  matters would -- when someone disclosed hardship, that
5:00:24   22  those matters would be staffed to Cheyenne to see if she
5:00:27   23  can make an exception, I believe, were your words; is
5:00:27   24  that right?
5:00:28   25     A    Yes.

Leticia Nugent                                    3/29/2021
        Deshawn Briggs v. Allister Adel

                                                        80

5:00:32   1        Q    And what did you mean by "make an exception"?
5:00:35   2        A    Like, let them in the program without paying or
5:00:38   3    make, like, a promise to pay if that was something the
5:00:45   4    client was able to do.
5:00:51   5        Q    Any -- to your knowledge, were there -- did
5:00:58   6    TASC have written policies about exceptions for starting
5:01:02   7    the program without paying the intake fee?
5:01:03   8        A    To my knowledge, no.
5:01:09   9        Q    To clarify, are you saying, to your knowledge,
5:01:13   10   there wasn't such a policy?  Is that right?
5:01:14   11               MS. CATERO:  Form.
5:01:14   12               THE WITNESS:  Correct.
5:01:14   13   BY MS. WILLIAMSON:
5:01:21   14       Q    And to your knowledge, how was Cheyenne Watson
5:01:27   15   making decisions about when to allow exceptions?
5:01:30   16       A    It was based off the need of the client.
5:01:33   17   Obviously our goal as a treatment facility is to assist
5:01:38   18   this client in any way and to prevent any further
5:01:41   19   barriers of treatment.  If this client was, you know,
5:01:44   20   about to be sent to the Maricopa County Attorney's
5:01:47   21   Office, well, we could prevent that with a promise to
5:01:51   22   pay or, you know, whatever we needed to do.  The client
5:01:55   23   was -- our goal is to help them in whatever way we
5:01:55   24   could.
5:02:09   25       Q    And would the case notes -- would you or

Leticia Nugent                                    3/29/2021
Deshawn Briggs v. Allister Adel

81

| | | |
|---|---|---|
| 5:02:12 | 1 | Cheyenne -- did you or Cheyenne Watson record in the |
| 5:02:16 | 2 | case notes when you were making these exceptions? |
| 5:02:18 | 3 | MS. CATERO:  Form, foundation. |
| 5:02:20 | 4 | THE WITNESS:  If they weren't considered a |
| 5:02:24 | 5 | client of ours, there was -- there was really no way for |
| 5:02:27 | 6 | us to put a case note in because, like I said, they |
| 5:02:32 | 7 | weren't in our system yet where we can do a case note, |
| 5:02:34 | 8 | so no. |
| 5:02:34 | 9 | BY MS. WILLIAMSON: |
| 5:02:39 | 10 | Q    Were -- was the fact that someone got an |
| 5:02:42 | 11 | exception and were -- you know, somebody was allowed to |
| 5:02:45 | 12 | be in the program without first paying the intake fee, |
| 5:02:49 | 13 | was that ever recorded in case notes after they became |
| 5:02:51 | 14 | participants in the program? |
| 5:02:51 | 15 | A    I don't know. |
| 5:02:52 | 16 | MS. CATERO:  Form, foundation. |
| 5:02:53 | 17 | THE WITNESS:  I don't know. |
| 5:02:55 | 18 | BY MS. WILLIAMSON: |
| 5:03:15 | 19 | Q    If -- if someone could not get -- did not have |
| 5:03:23 | 20 | or told you they did not have $150 or $75 within the 90 |
| 5:03:27 | 21 | days, could they enroll in the program? |
| 5:03:30 | 22 | A    If someone didn't tell me they couldn't get |
| 5:03:33 | 23 | $150 or $75? |
| 5:03:36 | 24 | Q    I'm sorry.  If somebody -- if someone came to |
| 5:03:42 | 25 | you toward the end of the 90-day period and they still |

Leticia Nugent                          3/29/2021
        Deshawn Briggs v. Allister Adel

                                              82

| | |
|---|---|
| 5:03:48 | 1 |
| 5:03:50 | 2 |
| 5:03:51 | 3 |
| 5:03:54 | 4 |
| 5:04:00 | 5 |
| 5:04:00 | 6 |
| 5:04:03 | 7 |
| 5:04:06 | 8 |
| 5:04:10 | 9 |
| 5:04:13 | 10 |
| 5:04:17 | 11 |
| 5:04:19 | 12 |
| 5:04:19 | 13 |
| 5:04:19 | 14 |
| 5:04:22 | 15 |
| 5:04:22 | 16 |
| 5:04:25 | 17 |
| 5:04:28 | 18 |
| 5:04:31 | 19 |
| 5:04:35 | 20 |
| 5:04:37 | 21 |
| 5:04:37 | 22 |
| 5:04:47 | 23 |
| 5:04:51 | 24 |
| 5:04:56 | 25 |

didn't have $75 or $150, could they enroll in the program?

                MS. CATERO:  Form, foundation.

                THE WITNESS:  Okay.  You're saying towards their 90 days of enrollment; right?

BY MS. WILLIAMSON:

    Q    Let me -- let me back up.

        How -- so from the time that someone was referred to the TASC program, how long -- how long could they be in this sort of limbo where they weren't yet enrolled in the program, but they were referred to the program?  Was there a --

                MS. CATERO:  Form.

BY MS. WILLIAMSON:

    Q    Was there a specific time period that they had to be enrolled?

    A    When I first started, it was 90 days.  Like I said, they changed that later on in the program.  I'm not sure when.  But when I first started, it was -- they had to -- they needed to be in the program within 90 days to avoid getting sent back to Maricopa County Attorney's Office.

    Q    Okay.  So if -- if -- toward the end of that 90-day period, is the only way that someone could enroll -- if they still didn't have the money, is the

Leticia Nugent                                    3/29/2021
         Deshawn Briggs v. Allister Adel

83

| | | |
|---|---|---|
| 5:05:00 | 1 | only way they could enroll getting an exception from |
| 5:05:01 | 2 | Cheyenne Watson? |
| 5:05:01 | 3 | MS. CATERO:  Form, foundation. |
| 5:05:04 | 4 | THE WITNESS:  We would -- we would extend |
| 5:05:07 | 5 | the 90 days one to two weeks.  In some cases they were |
| 5:05:11 | 6 | extended, you know, up to a full month and a half |
| 5:05:15 | 7 | depending on what the client's situation was.  So we |
| 5:05:18 | 8 | would try to work with them as far as, you know, |
| 5:05:23 | 9 | extending that 90-day period and try to see, you know, |
| 5:05:28 | 10 | maybe in two weeks you're in a better situation. |
| 5:05:31 | 11 | But ultimately, if they didn't disclose that |
| 5:05:34 | 12 | they had a financial hardship or there was some sort of |
| 5:05:38 | 13 | other barrier to getting into their treatment program, |
| 5:05:43 | 14 | then unfortunately, yes, they were sent away and their |
| 5:05:46 | 15 | file was sent back to Maricopa County Attorney's Office. |
| 5:05:46 | 16 | BY MS. WILLIAMSON: |
| 5:05:51 | 17 | Q    Was there any sort of application process for |
| 5:05:53 | 18 | asking for an exception to the normal rule that you have |
| 5:06:00 | 19 | to pay either 75 or $150 to join the program? |
| 5:06:01 | 20 | MS. CATERO:  Form, foundation. |
| 5:06:03 | 21 | THE WITNESS:  No.  It was all based off of |
| 5:06:08 | 22 | what the clients disclosed to us and us just trying to |
| 5:06:12 | 23 | adapt to their circumstances and meet them where they're |
| 5:06:17 | 24 | at so that we're able to provide the treatment for them. |
| 5:06:17 | 25 | BY MS. WILLIAMSON: |

Leticia Nugent                                    3/29/2021
            Deshawn Briggs v. Allister Adel

                                                        84

5:06:23  1      Q    Was there any -- were you instructed to ask --
5:06:32  2   ask those people who were referred to the program about
5:06:36  3   their financial situation so they could be considered
5:06:39  4   for this sort of exception?
5:06:39  5                MS. CATERO:  Form.
5:06:41  6                THE WITNESS:  When I was doing intakes
5:06:46  7   personally, I didn't ask.  I kind of just would just go
5:06:49  8   over the program and then ask them, are there any
5:06:52  9   questions that you have for me?  Are there any concerns?
5:06:56 10   And then I would leave it up to the client to tell me,
5:07:01 11   yes, I can't afford the -- the $150.
5:07:01 12   BY MS. WILLIAMSON:
5:07:05 13      Q    So am I -- is it right that -- am I right to
5:07:11 14   say that if a client -- if a potential client, someone
5:07:15 15   who was trying to schedule orientation but didn't have
5:07:18 16   the money, if that person didn't -- didn't tell you that
5:07:23 17   they didn't have the money, there was no way to -- was
5:07:28 18   there any way at that point for the person to enroll
5:07:31 19   after 90 days?
5:07:32 20                MS. CATERO:  Form.
5:07:34 21                THE WITNESS:  If they didn't tell me they
5:07:37 22   didn't have the money or they didn't have any barriers
5:07:40 23   to treatment, then there was no way for me to, on his
5:07:46 24   behalf, request an extension of the 90 days or do a
5:07:50 25   staffing with my manager.  So it was just always hard to

86

| | |
|---|---|
| 5:09:35 | 1 |
| 5:09:42 | 2 |
| 5:09:46 | 3 |
| 5:09:46 | 4 |
| 5:09:47 | 5 |
| 5:09:50 | 6 |

5:09:35  1   information you learned about a client's financial

5:09:42  2   status between intake and orientation, was that

5:09:46  3   information you learned because of a client volunteered

5:09:46  4   it?

5:09:47  5             MS. CATERO:  Form.

5:09:50  6             THE WITNESS:  Not necessarily.  If we seen

5:09:55  7   the client and -- you know, and we would -- and they

5:10:00  8   look, you know, unshowered, you know, their hair is a

5:10:04  9   mess, we would ask them, you know, are you -- are you

5:10:07 10   having a financial hardship?  What's going on?  You

5:10:10 11   know, some clients -- some clients would cry when they

5:10:13 12   found out about the fees, and we would go over there and

5:10:15 13   be like, what's going on?  It's -- it's lot of

5:10:17 14   information.

5:10:21 15             And so it's -- it was -- if we seen the client

5:10:24 16   face to face, we could pick up on those cues, you know.

5:10:29 17   This client needs a financial application, or we could

5:10:33 18   ask them those questions to try to let them, you know,

5:10:38 19   get up to tell us that they're in a financial hardship,

5:10:41 20   because some clients won't disclose that information to

5:10:42 21   you.

5:10:45 22             And some clients are homeless and they look

5:10:50 23   like me.  They look very well groomed.  So it's just --

5:10:53 24   it's just picking up on those -- on those little things.

5:10:57 25   So it's not necessarily that all the information that we

Leticia Nugent                                    3/29/2021
        Deshawn Briggs v. Allister Adel

                                                        90

5:15:46   1   away or added was the booking fee because not all

5:15:52   2   clients were booked.  So pretty much the POM program,

5:15:53   3   they had the [indiscernible].

5:15:57   4           THE COURT REPORTER:  I'm sorry.  "The POM

5:15:58   5   program" what?

5:16:01   6           THE WITNESS:  The had the same fee layout.

5:16:01   7   BY MS. WILLIAMSON:

5:16:07   8       Q   Do you know of any time where a person didn't

5:16:13   9   have to pay the 150 and they also didn't have to pay

5:16:20  10   that later as part of their balance?  This is when you

5:16:23  11   started in -- in April 2018.

5:16:26  12       A   In April 2018, I wouldn't know of those cases

5:16:30  13   because Cheyenne would make those exceptions, and I

5:16:34  14   wouldn't be -- I was just a case manager assistant.

5:16:36  15   I -- I wouldn't -- I wouldn't even follow up with the

5:16:39  16   client because that was their case manager's

5:16:40  17   responsibility.

5:16:48  18       Q   To your knowledge, did Cheyenne Watson consult

5:16:53  19   with anybody else about when to make an exception?

5:16:55  20       A   To my knowledge, I wouldn't know.  I wouldn't

5:16:58  21   know.

5:17:05  22       Q   To your knowledge, did -- for -- for clarity,

5:17:12  23   when -- when these exceptions were made, this is before

5:17:16  24   intake, after orientation -- or I'm sorry, after intake,

5:17:19  25   before orientation; is that right?

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

102

| | | |
|---|---|---|
| 5:33:39 | 1 | A    Yes. |
| 5:33:40 | 2 | Q    No one else? |
| 5:33:41 | 3 | A    No. |
| 5:33:43 | 4 | Q    Okay.  And you said you got information at that |
| 5:33:46 | 5 | meeting about the -- the federal poverty guidelines; is |
| 5:33:47 | 6 | that right? |
| 5:33:48 | 7 | A    Yes. |
| 5:33:51 | 8 | Q    Had you ever gotten information about the |
| 5:33:56 | 9 | federal poverty guidelines from anyone in TASC before |
| 5:33:56 | 10 | that meeting? |
| 5:34:03 | 11 | A    No. |
| 5:34:07 | 12 | Q    Did you -- before that August 2018 meeting, did |
| 5:34:08 | 13 | you -- were you ever told anything about the federal |
| 5:34:09 | 14 | poverty guidelines? |
| 5:34:11 | 15 |           MS. CATERO:  Form. |
| 5:34:12 | 16 |           THE WITNESS:  Well, I would.  I would |
| 5:34:18 | 17 | collect the income and the dependents based off of |
| 5:34:19 | 18 | the -- they had told me that it was going to be based |
| 5:34:22 | 19 | off of the federal timelines, but they never handed me, |
| 5:34:25 | 20 | you know, this is -- this is how we're going do it kind |
| 5:34:26 | 21 | of thing. |
| 5:34:26 | 22 | BY MS. WILLIAMSON: |
| 5:34:59 | 23 | Q    Okay.  Okay.  Let's see, when you -- when did |
| 5:35:03 | 24 | you -- you -- when you first started at TASC, you were |
| 5:35:04 | 25 | an assistant case manager; right? |

Leticia Nugent                                    3/29/2021
Deshawn Briggs v. Allister Adel

130

| | | |
|---|---|---|
| 6:38:45 | 1 | participant who didn't have to do substance abuse |
| 6:38:50 | 2 | counseling -- or rather, one category of people who did |
| 6:38:53 | 3 | have to do substance abuse counseling is participants |
| 6:38:59 | 4 | who, after -- who did not have a medical marijuana card |
| 6:39:07 | 5 | on file and who, after eight weeks or ten weeks or some |
| 6:39:11 | 6 | number determined by case managers, continued to test |
| 6:39:14 | 7 | positive for THC; is that right? |
| 6:39:16 | 8 | MS. CATERO:  Form. |
| 6:39:17 | 9 | THE WITNESS:  Correct. |
| 6:39:17 | 10 | BY MS. WILLIAMSON: |
| 6:39:22 | 11 | Q    And then you mentioned that there were a couple |
| 6:39:27 | 12 | of other categories.  One, I believe you said, was |
| 6:39:33 | 13 | participants who test positive for alcohol twice; is |
| 6:39:33 | 14 | that right? |
| 6:39:34 | 15 | A    Yes. |
| 6:39:39 | 16 | Q    If a participant tests positive for alcohol |
| 6:39:42 | 17 | once, would he or she have to do substance abuse |
| 6:39:43 | 18 | counseling? |
| 6:39:45 | 19 | A    No.  But they would have to do an extra |
| 6:39:49 | 20 | seminar.  So they would have to do an alcohol education |
| 6:39:54 | 21 | seminar that was an additional fee of, I want to say, |
| 6:39:55 | 22 | $75. |
| 6:40:03 | 23 | Q    Okay.  And to your knowledge, do you know who |
| 6:40:05 | 24 | ran the alcohol -- that alcohol seminar? |
| 6:40:08 | 25 | A    Myself and Abby. |

Leticia Nugent                                          3/29/2021
Deshawn Briggs v. Allister Adel

132

6:41:39  1       A    Yes.

6:41:44  2       Q    And to your knowledge, did anyone else lead the
6:41:46  3   alcohol awareness seminar?

6:41:56  4       A    No, not since I was there.  Or since I started.
6:42:00  5   Oh, actually Whitney Castleberry, when I first -- first
6:42:04  6   got there, before she left us, she was doing it too.

6:42:20  7       Q    To your knowledge, were you -- when you led
6:42:29  8   the -- the alcohol seminar, did you have -- what --
6:42:37  9   what -- how did you -- did you have materials that --
6:42:44 10   that you used to -- like, scripts, PowerPoints, any
6:42:48 11   materials that you used to conduct the class?

6:42:49 12              MS. CATERO:  Form.

6:42:50 13              THE WITNESS:  Not necessarily a script.
6:42:54 14   It was a PowerPoint.  And then I did my own research and
6:42:57 15   incorporated some of my own [indiscernible] on the
6:42:57 16   class.

6:42:57 17              THE COURT REPORTER:  I'm sorry.
6:43:00 18   "Incorporated my own" what?  We're having a bad
6:43:00 19   connection.

6:43:04 20              THE WITNESS:  Research.

6:43:04 21              THE COURT REPORTER:  You said, "I
6:43:07 22   incorporated some of my own" --

6:43:10 23              THE WITNESS:  Research.

6:43:10 24   BY MS. WILLIAMSON:

6:43:20 25       Q    And was the alcohol awareness seminar a form of

Leticia Nugent                                    3/29/2021
            Deshawn Briggs v. Allister Adel

                                                        133

| | | |
|---|---|---|
| 6:43:23 | 1 | counseling? |
| 6:43:23 | 2 | A    No. |
| 6:43:24 | 3 | MS. CATERO:  Foundation. |
| 6:43:25 | 4 | THE WITNESS:  It wasn't a form of |
| 6:43:26 | 5 | counseling. |
| 6:43:26 | 6 | BY MS. WILLIAMSON: |
| 6:43:30 | 7 | Q    Okay.  To your -- to your understanding, was |
| 6:43:33 | 8 | the alcohol seminar something other than counseling? |
| 6:43:34 | 9 | MS. CATERO:  Foundation. |
| 6:43:35 | 10 | THE WITNESS:  It was just an educational |
| 6:43:41 | 11 | course and a -- just a -- like a reminder of what we |
| 6:43:46 | 12 | need to do in order to be successful for the program. |
| 6:43:46 | 13 | BY MS. WILLIAMSON: |
| 6:43:51 | 14 | Q    And if someone tested positive for alcohol |
| 6:44:00 | 15 | once, that participant would have to take this course, |
| 6:44:04 | 16 | this alcohol awareness course.  How much -- how much did |
| 6:44:07 | 17 | you say the alcohol awareness course was? |
| 6:44:08 | 18 | A    I believe it was $75. |
| 6:44:17 | 19 | Q    And if a participant completed the alcohol |
| 6:44:27 | 20 | awareness course and did not get any more positive tests |
| 6:44:36 | 21 | of any kind, would the one alcohol positive cause his or |
| 6:44:39 | 22 | her time in the program to be extended? |
| 6:44:41 | 23 | A    Yes. |
| 6:44:44 | 24 | Q    Explain that. |
| 6:44:45 | 25 | MS. CATERO:  Form. |

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

139

6:53:02  1    And yes, that only happened if you were -- that you
6:53:09  2    completed orientation and you accepted the program.
6:53:14  3        Q    Okay.  So when you say when you first started
6:53:20  4    assessments were only given to participants who tested
6:53:28  5    positive, what period of time do you mean?
6:53:31  6        A    Yeah, so when I first started, which was April
6:53:39  7    of 2018 to maybe somewhere in 2019, it was only a
6:53:45  8    requirement for -- for my clients basically in the POM
6:53:48  9    program that tested positive for an illicit substance to
6:53:52  10   get assessments.  Then they changed the policy to
6:53:56  11   include all clients, all POM clients needed to undergo
6:54:00  12   an assessment for treatment, and then they have the
6:54:04  13   opportunity to seek treatment at that point or they can
6:54:05  14   decline the treatment at that point.
6:54:09  15       Q    Okay.  You said that the policy changed
6:54:12  16   sometime in -- in 2019 --
6:54:12  17       A    Yes.
6:54:13  18       Q    -- is that right?
6:54:14  19       A    Yes, I believe so.
6:54:18  20       Q    When in 2019 did the policy change?
6:54:21  21       A    Probably late 2019.  Probably October or
6:54:23  22   November of 2019.
6:54:28  23       Q    To your knowledge, why did the policy change?
6:54:32  24       A    I don't know.
6:54:46  25       Q    Okay.  When you -- when you conducted the

Leticia Nugent                                    3/29/2021
            Deshawn Briggs v. Allister Adel

140

6:54:51   1    alcohol awareness course, you mentioned that you would

6:54:56   2    do your own research.  What did you mean by that?

6:54:59   3        A    Well, if you look at the alcohol education

6:55:03   4    awareness class, I believe it was dated for information

6:55:08   5    in either -- I want to say 2017.  So I just wanted to

6:55:12   6    give my clients more factual information that was more

6:55:18   7    up to date.  And also just to incorporate, because most

6:55:21   8    of -- you know, most of the clients who test positive --

6:55:25   9    and most of the clients in the POM program are younger,

6:55:29  10    so I wanted to be able to give them information that I

6:55:34  11    felt they would be more relatable toward and not make --

6:55:39  12    make it so boring, basically.  I wanted them to relate

6:55:42  13    to the information that I was giving them, find it

6:55:45  14    interesting, and also more up to date.

6:55:50  15        Q    Okay.  What -- what kind of things did you

6:55:58  16    change in the -- the sort of template materials you got?

6:56:02  17        A    I would discuss studies, like, the fact that,

6:56:06  18    you know, you eat more when you drink alcohol than

6:56:10  19    somebody who's not drinking alcohol, and that's why bars

6:56:14  20    typically sell food in addition to alcohol because it's,

6:56:19  21    you know, more money, plus I -- you're just more

6:56:23  22    susceptible to eating when you're drunk.  Stuff like

6:56:29  23    that.  I would just incorporate some fun quote/unquote

6:56:33  24    studies on alcohol.

6:56:39  25        Q    Did anybody supervise what -- what you taught

Leticia Nugent                                    3/29/2021
         Deshawn Briggs v. Allister Adel

141

| | | |
|---|---|---|
| 6:56:41 | 1 | during the alcohol awareness class? |
| 6:56:45 | 2 | A    No.  When I first began, I -- I was supervised |
| 6:56:49 | 3 | maybe, like, once or twice, and then they kind of left |
| 6:56:51 | 4 | it up to me. |
| 6:56:55 | 5 | Q    When you -- you said you and Abby taught this |
| 6:56:55 | 6 | course -- |
| 6:56:56 | 7 | A    Yes. |
| 6:56:57 | 8 | Q    -- did you teach it together? |
| 6:56:58 | 9 | A    No. |
| 6:57:01 | 10 | Q    Okay.  So it would just be one instructor -- |
| 6:57:02 | 11 | A    Yes. |
| 6:57:04 | 12 | Q    -- at the course? |
| 6:57:08 | 13 | Okay.  So you had -- you could -- you could add |
| 6:57:13 | 14 | or -- were you -- were you given instructions on adding |
| 6:57:18 | 15 | or supplementing the alcohol awareness course materials? |
| 6:57:22 | 16 | A    Was I given instruction?  I was given |
| 6:57:26 | 17 | permission to put my [indiscernible] on the class. |
| 6:57:26 | 18 | THE COURT REPORTER:  I'm sorry. "Put my" |
| 6:57:26 | 19 | what?  Twist? |
| 6:57:31 | 20 | THE WITNESS:  My own twist -- my own twist |
| 6:57:38 | 21 | on the class.  and then other than that, I was given a |
| 6:57:39 | 22 | base of the PowerPoint. |
| 6:57:39 | 23 | BY MS. WILLIAMSON: |
| 6:57:43 | 24 | Q    Got it.  Okay. |
| 6:57:45 | 25 | We went over your -- your educational |

Leticia Nugent                                    3/29/2021
        Deshawn Briggs v. Allister Adel

142

| | | |
|---|---|---|
| 6:57:48 | 1 | background.  But remind me, do you have -- do you have |
| 6:57:54 | 2 | any educational training in substance abuse counseling? |
| 6:57:57 | 3 | A    Just what I would get at TASC.  So I would go |
| 6:58:03 | 4 | to supervision in TASC, and we would also do training in |
| 6:58:09 | 5 | counseling, but that's the extent of my training as far |
| 6:58:13 | 6 | as counseling goes, but it wasn't a counseling seminar. |
| 6:58:17 | 7 | Q    Okay. |
| 6:58:20 | 8 | MS. CATERO:  And, Virginia, we're just |
| 6:58:25 | 9 | about almost at 7:00.  We've gone a half-hour past 6:30. |
| 6:58:26 | 10 | MS. WILLIAMSON:  Yes.  I -- I appreciate |
| 6:58:31 | 11 | it.  I'm -- yeah, we can certainly stop for the day. |
| 6:58:31 | 12 | MS. CATERO:  Okay.  I didn't mean to |
| 6:58:33 | 13 | interrupt. |
| 6:58:33 | 14 | MS. WILLIAMSON:  No, no, no.  I appreciate |
| 6:58:36 | 15 | you calling attention to the time.  And thank you so |
| 6:58:39 | 16 | much for -- for sticking around for the extra hour.  I |
| 6:58:42 | 17 | know you likely planned to leave at 6, so I do |
| 6:58:43 | 18 | appreciate it. |
| 6:58:44 | 19 | MS. CATERO:  Sure.  Are we -- are we off |
| 6:58:45 | 20 | the record? |
| 6:58:45 | 21 | THE COURT REPORTER:  We will be. |
| 6:58:49 | 22 | MS. CATERO:  Okay.  I was wondering if we |
| 6:58:53 | 23 | could get a count on the time for today. |
| 6:58:53 | 24 | (An off-the-record discussion ensued.) |
| 6:59:05 | 25 | THE VIDEOGRAPHER:  We are off the record. |

**Leticia Nugent**                                    3/29/2021
**Deshawn Briggs v. Allister Adel**

144

STATE OF ARIZONA   )
COUNTY OF MARICOPA )

     BE IT KNOWN that the foregoing deposition was taken

by me pursuant to stipulation of counsel; that I was

then and there a Certified Court Reporter in the State

of Arizona, and by virtue hereof authorized to

administer an oath; that the witness before testifying

was duly sworn by me to testify to the whole truth;

pursuant to request, notification was provided that the

deposition is available for review and signature; that

the questions propounded by counsel and the answers of

the witness thereto were taken down by me in shorthand

and thereafter transcribed into typewriting under my

direction; that the foregoing pages are a full, true and

accurate transcript of all the proceedings had upon the

taking of said deposition, all done to the best of my

skill and ability.

          I FURTHER CERTIFY that I am in no way related

to nor employed by any parties hereto; nor am I in any

way interested in the outcome thereof.

          Dated at Phoenix, Arizona, this 13th day of

April, 2021.


                    _____
                    CINDY MAHONEY, RPR, RMR NO. 50680

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


DESHAWN BRIGGS, et al.,          )
                                 )
     Plaintiffs,                 )
                                 )  Civil Action No.
v.                               )  CV-18-2684-PHX-
                                 )  EJM
ALLISTER ADEL, in her official   )
capacity as County Attorney of   )
Maricopa County, et al.,         )
                                 )
     Defendants.                 )
_____)




VIDEO-RECORDED DEPOSITION OF LETICIA NUGENT


Volume 2

Pages 145 Through 289, Inclusive



Phoenix, Arizona

March 30, 2021




                         Prepared by:

                         Meri Coash, RMR, CRR
                         Certified Reporter
                         Certification No. 50327

Leticia Nugent                                    3/30/2021
              Deshawn Briggs v. Allister Adel

                                                          146

```
1                    I N D E X
     WITNESS                                         PAGE
2
      LETICIA NUGENT
3
           Examination by Ms. Williamson            150
4
5
6
7
                  EXHIBITS MARKED
8
     EXHIBITS            DESCRIPTION                 PAGE
9
     Exhibit 2     Case file                        249
10                 TASC024349 - 24411
                   Protected Health Information
11
     Exhibit 3     Fee Agreements                   269
12                 TASC000023 - 33
13   Exhibit 4     Email string, Subject:  Diversion  273
                   Financial Consideration Scale
14                 TASC000716 - 759
                   Confidential
15
     Exhibit 5     Case file                        278
16                 TASC029490 - 29529
                   Protected Health Information
17
18
19
     2-5
20              PREVIOUSLY MARKED EXHIBITS
21                 Exhibit 1     Page 154
22
23
                INSTRUCTIONS NOT TO ANSWER
24
                   Page 154     Line 7
25
```

**Coash & Coash, Inc.**

Leticia Nugent                                    3/30/2021
            Deshawn Briggs v. Allister Adel

                                                      148

 1    APPEARANCES (CONTINUED):

 2         For the Defendant TASC:
               SNELL & WILMER, LLP
 3             By:  Jennifer Hadley Catero, Esq.
                    Marsha Cotton, Esq.
 4                  Amanda Weaver, Esq.
                    One Arizona Center
 5                  400 East Van Buren Street
                    Phoenix, Arizona  85004
 6                  602-382-6000
                    jcatero@swlaw.com
 7                  mcotton@swlaw.com
                    aweaver@swlaw.com

 8
           Also present (via videoconference):  Sumayya Saleh,
 9         Esq.; Andre Brice, videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Leticia Nugent                                    3/30/2021
Deshawn Briggs v. Allister Adel

149

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|          | 1  | TRANSCRIPT OF PROCEEDINGS                            |
| 15:06:48 | 2  |                                                     |
| 15:06:48 | 3  | THE VIDEOGRAPHER:  We are on the record.            |
| 15:07:12 | 4  | The time on the video monitor is 3:07 p.m.  Here begins |
| 15:07:17 | 5  | Volume 2, Media Number 1, in the deposition of Leticia |
| 15:07:22 | 6  | Nugent, in the matter of Deshawn Briggs versus Allister |
| 15:07:26 | 7  | Adel, in the United States District Court, for the  |
| 15:07:28 | 8  | District of Arizona, Case Number CV-18-2684-PHX-EJM. |
| 15:07:42 | 9  | Today's date is Tuesday, March 30th, 2021.          |
| 15:07:46 | 10 | Our court reporter is Meri Coash.  My name is Andre Brice, |
| 15:07:50 | 11 | legal videographer, representing Coash & Coash.  This |
| 15:07:54 | 12 | video deposition is taking place at 400 East Van Buren |
| 15:07:59 | 13 | Street, Phoenix, Arizona 85004.                     |
| 15:08:04 | 14 | Counsel, please identify yourselves and             |
| 15:08:06 | 15 | state whom you represent.                           |
| 15:08:07 | 16 | MS. WILLIAMSON:  My name is Virginia                |
| 15:08:12 | 17 | Williamson, of Covington and Burling, and I'm an attorney |
| 15:08:16 | 18 | for plaintiffs in this lawsuit.                     |
| 15:08:17 | 19 | MS. CATERO:  And this is Jennifer Catero.           |
| 15:08:20 | 20 | I'm with the law firm of Snell & Wilmer, and I represent |
| 15:08:23 | 21 | the Defendant Treatment Assessment Screening Centers. |
| 15:08:28 | 22 | THE VIDEOGRAPHER:  And would the court              |
| 15:08:31 | 23 | reporter please swear in the witness.               |
|          | 24 | (The witness was sworn.)                            |
| 15:08:48 | 25 | THE VIDEOGRAPHER:  Please proceed.                  |

Leticia Nugent                                              3/30/2021
                  Deshawn Briggs v. Allister Adel

                                                          150

15:08:48   1              MS. WILLIAMSON:  Thanks very much.

15:08:48   2

           3                      LETICIA NUGENT,

           4    the witness herein, having been first duly sworn by the

           5    Certified Reporter, was examined and testified as follows:

           6

           7                      EXAMINATION

           8    BY MS. WILLIAMSON:

15:08:51   9         Q.   Please state your name for the record.

15:08:53  10         A.   My name?  Leticia Nugent.

15:08:58  11         Q.   As I said yesterday, I'm Virginia Williamson, one

15:09:03  12    of the attorneys for plaintiffs in the lawsuit Briggs v.

15:09:08  13    Adel.

15:09:08  14              We are continuing your deposition, which

15:09:10  15    began yesterday, March 29, 2020.  Do you understand that

15:09:13  16    you're back again today to testify in connection with the

15:09:17  17    lawsuit Briggs v. Adel?

15:09:19  18         A.   Yes.

15:09:20  19         Q.   And yesterday we went through some ground rules

15:09:23  20    and some agreements for your deposition.  Do you remember

15:09:24  21    that?

15:09:25  22         A.   Yes.

15:09:25  23         Q.   Just like yesterday, I'm going to go through some

15:09:28  24    ground rules before we start.  Will you do that with me?

15:09:30  25         A.   Yes.

Leticia Nugent                                    3/30/2021
             Deshawn Briggs v. Allister Adel

                                                        151

15:09:31   1        Q.    Okay.   Do you understand that you're under oath
15:09:34   2    today?
15:09:34   3        A.    Yes, ma'am.
15:09:35   4        Q.    And do you understand that means you're swearing
15:09:38   5    that every answer you provide here today is true and
15:09:40   6    correct?
15:09:41   7        A.    Yes, ma'am.
15:09:42   8        Q.    I mentioned yesterday that I'm here to find out
15:09:45   9    everything you know about the facts and events related to
15:09:48  10    the lawsuit Briggs v. Adel, and I asked you to give
15:09:51  11    answers that were as complete as possible.   Will you do
15:09:54  12    that today too?
15:09:55  13        A.    Yes, ma'am.
15:09:56  14        Q.    And yesterday I used -- we both used "TASC" to
15:10:01  15    refer to Treatment Assessment Screening Center, and you
15:10:05  16    said that you understood that that -- when I said "TASC,"
15:10:08  17    I meant Treatment Assessment Screening Center.   Is that
15:10:11  18    true today as well?
15:10:13  19        A.    Yes, ma'am.
15:10:13  20        Q.    And yesterday we referred to the Possession of
15:10:18  21    Marijuana Program as "P-O-M" or "POM."   If I refer to
15:10:21  22    "POM" or "P-O-M," you understand that means the Possession
15:10:27  23    of Marijuana Program?
15:10:27  24        A.    Yes, ma'am.
15:10:28  25        Q.    And yesterday I asked you to let me know if you

Leticia Nugent                                    3/30/2021
        Deshawn Briggs v. Allister Adel

16:02:03   1   the only ones that had a written assessment and a written
16:02:06   2   treatment plan with -- with their goals?  Then yeah, those
16:02:12   3   are the clients who had, you know --  And typically, those
16:02:15   4   clients had higher goals to meet such as getting clean,
16:02:21   5   going to detox, you know, so those -- those were our
16:02:24   6   higher -- that's why we call them high-needs, high-risk
16:02:29   7   clients.  They need a higher level of care.
16:02:32   8        Q.   When you say TASC is a treatment program, what do
16:02:35   9   you mean by that?
16:02:36  10        A.   Well, it's in the name, Treatment Assessment
16:02:42  11   Screening Center.  So we were -- we primarily -- the
16:02:45  12   diversion and the counseling --  We treated the clients
16:02:49  13   who are referred to us by the Maricopa County attorney's
16:02:52  14   office by giving them, you know, structure.  We have them
16:02:58  15   on -- on a structured, you know, program.  And based off,
16:03:06  16   you know, their needs or their goals --  And sometimes the
16:03:08  17   goal was, "Hey, I just want to, you know, get this -- get
16:03:12  18   this charge done."  Then we would help them meet those
16:03:16  19   goals.
16:03:16  20        Q.   Okay.  When you -- when you started as a case
16:03:22  21   manager in -- you said yesterday, I believe, mid-2018.  Is
          22   that right?
16:03:29  23        A.   When I started as a case manager, April -- it was
16:03:32  24   about June 2018, yes.
16:03:34  25        Q.   Okay.  So in -- in about June 2018, POM

Leticia Nugent                                    3/30/2021
            Deshawn Briggs v. Allister Adel

180

16:03:42  1   participants who were not -- who did not have a positive

16:03:48  2   test of any kind, what were their program requirements?

16:03:53  3        A.   It was the base program, so it was --  You needed

16:03:57  4   to attend a three-hour drug education seminar.  You needed

16:04:01  5   to provide 90 days of clean UA testing with no miss, no

16:04:06  6   positive, no diluted testing.  And then you would have

16:04:11  7   your program fees, which was about, you know, $950.

16:04:14  8        Q.   Were there any other requirements at that time?

16:04:17  9        A.   No.  It was just the three.

16:04:21  10        Q.   Okay.  What was the three-hour drug education

16:04:31  11   seminar?

16:04:32  12        A.   It was just like it sounded.  It was a three-hour

16:04:35  13   educational seminar where clients -- a group of clients

16:04:40  14   would come into a group room and then we would -- it was

16:04:44  15   basic drug education.  It was also --  We used that as an

16:04:49  16   opportunity to go over program requirements.  We -- we

16:04:51  17   used that as an opportunity to address any of the concerns

16:04:54  18   that the client had.  We used that opportunity to give

16:04:57  19   them, you know, additional resources, like financial

16:05:00  20   applications or let them know, you know, what other

16:05:04  21   resources they could use in the community in order to get

16:05:07  22   additional assistance.  We would --  That was pretty much

16:05:13  23   it.  We would use that --  We would go over the -- a

16:05:18  24   little bit of, you know, treatment.  And that was it.

16:05:21  25        Q.   Anything else?

Leticia Nugent                                    3/30/2021
                Deshawn Briggs v. Allister Adel

211

16:49:06   1        A.   Well, because the financial application was
16:49:08   2   implemented into the TASC program before I started.
16:49:11   3   And -- and, you know, there was -- before --  At some
16:49:14   4   point, you know, there was even more benefits before I
16:49:21   5   started that, unfortunately, they had to take away because
16:49:26   6   of -- there was a financial application fee -- the
16:49:29   7   financial application there, so it was -- you know, it was
16:49:33   8   said that if the clients had a financial hardship, they
16:49:36   9   needed to fill out the financial application in order to
16:49:38   10  benefit from -- from financial assistance.
16:49:43   11       Q.   If a -- if a client's --  If a POM participant's
16:49:50   12  TASC fee was waived, would that appear in the case notes?
16:49:55   13       A.   I guess not.  When -- before Dimitrius was
16:50:04   14  hired --  Because Dimitrius would be the one to put that
16:50:07   15  note in.
16:50:12   16       Q.   If -- if a POM participant's TASC fee was waived
16:50:15   17  or reduced, would that appear anywhere in a -- in the
16:50:19   18  participant's case file?
16:50:20   19       A.   Well, it would in their -- in their fees tab.  So
16:50:26   20  it -- it would show how much they actually paid for the
16:50:28   21  program.
16:50:30   22       Q.   And was that --  Is that true before Dimitrius
16:50:34   23  started?
16:50:35   24       A.   Yes.
16:50:35   25       Q.   And was that also true after Dimitrius started?

Leticia Nugent                                  3/30/2021
            Deshawn Briggs v. Allister Adel

240

17:28:46  1   either request, situation, if we have a concern with that
17:28:55  2   client.  If we feel like the client needs, you know, a
17:28:59  3   higher level of care, we would staff it with her and say,
17:29:04  4   you know, "What can we do in order to meet this client's
17:29:05  5   needs because this is what's happening?"  Stuff like that.
17:29:09  6       Q.   And when you say the -- a client would be staffed
17:29:19  7   with Cheyenne, is that -- is that client's file, like,
17:29:26  8   now -- from that point on, is the client's file
17:29:31  9   permanently staffed with Cheyenne or is there some end
17:29:33  10  period to Cheyenne staffing the file?
17:29:36  11      A.   No, no.  Staffing is just, like, a quick or long,
17:29:39  12  depending on the situation, conversation about how do we
17:29:43  13  handle this client or what is the best way to address this
17:29:47  14  certain situation.  And then once we come to an agreement
17:29:50  15  on how we're going to address it or if we're going to get
17:29:53  16  more people involved -- sometimes, you know, we have to
17:29:56  17  bring a clinician into it or, you know, we have to get
17:30:00  18  lawyer into -- Loree into it or -- in some cases, you
17:30:03  19  know, you got to get higher entities, like, you know, CPS
17:30:07  20  involved in -- in a certain situation.  Then we would do
17:30:11  21  that.
17:30:11  22      Q.   So when you say Cheyenne would staff a file, does
17:30:16  23  that mean you would have -- you would involve Cheyenne in
17:30:19  24  the decision about what to do with that participant's
17:30:23  25  file?

Leticia Nugent                                      3/30/2021
          Deshawn Briggs v. Allister Adel

                                                        252

18:14:46   1        Q.   And does this page also contain case notes?

18:14:49   2        A.   Yes.

18:14:50   3        ████████████████████████████████████████

18:14:53   4        ████████████████████████████████████████

18:14:55   5        A.   Yes.

18:14:55   6        Q.   And does this page indicate who created the case

18:14:59   7   note?

18:14:59   8        A.   Yes.

18:15:00   9        ████████████████████████████████████████

18:15:05  10        ████████████████████████████████████████

18:15:07  11        A.   Yes.

18:15:07  12        ████████████████████████████████████████

18:15:13  13        A.   Yes.

18:15:15  14        Q.   Ms. Nugent, could a take a moment to review this

18:15:24  15   case note and tell me when you're ready?

18:15:49  16        A.   Okay.

18:16:21  17             Yes.  I'm ready.

18:16:22  18   ████████████████████████████████████████████

18:16:30  19   ████████████████████████████████████████████

18:16:33  20   ████████████████████████████████████████████

18:16:35  21   ████████████████████████████████████████████

18:16:37  22   ████████████████████████████████████████████

18:16:42  23   ████████████████████████████████████████████

18:16:45  24   ████████████████████████████████████████████

18:16:51  25   ████████████████████████████████████████████

Leticia Nugent                                    3/30/2021
        Deshawn Briggs v. Allister Adel

                                                      253

| | | |
|---|---|---|
| 18:16:57 | 1 | ████████████████████████ |
| 18:17:00 | 2 | ████████████████████████ |
| 18:17:01 | 3 | Q.   Do you see that? |
| 18:17:02 | 4 | A.   Yes. |
| 18:17:04 | 5 | Q.   And there's also a "To" line.  Was this a |
| 18:17:08 | 6 | message? |
| 18:17:09 | 7 | A.   Yes.  This was sent to me. |
| 18:17:11 | 8 | Q.   And who was this sent from?  Not --  Was this |
| 18:17:17 | 9 | sent from a -- from a -- from a POM participant? |
| 18:17:19 | 10 | A.   Yes. |
| 18:17:20 | 11 | Q.   Okay.  Can you read the first sentence of this -- |
| 18:17:26 | 12 | A.   It says -- |
| 18:17:27 | 13 | Q.   -- email message? |
| 18:17:29 | 14 | ████████████████████████ |
| 18:17:31 | 15 | ████████████████████████ |
| 18:17:34 | 16 | ████████████████████████ |
| 18:17:38 | 17 | ████████████████████████ |
| 18:17:42 | 18 | ████████████████████████ |
| 18:17:46 | 19 | ████████████████████████ |
| 18:17:51 | 20 | ████████████████████████ |
| 18:17:56 | 21 | ████████████████████████ |
| 18:17:58 | 22 | Q.   Did you receive this message? |
| 18:18:00 | 23 | A.   Yes. |
| 18:18:01 | 24 | Q.   And copied above, is -- is this your response to |
| 18:18:09 | 25 | that message? |

Leticia Nugent                                3/30/2021
           Deshawn Briggs v. Allister Adel

                                                        254

18:18:10   1        A.    Yes.

18:18:10   2        Q.    And this message says "From."  And whose name is

18:18:16   3   on the "From" line?

18:18:18   4        A.    From --  My name, Leticia Nugent.

18:18:21   5        Q.    And you sent this to that same case participant.

18:18:24   6   Is that right?

18:18:24   7        A.    Correct.

18:18:24   8        Q.    Program participant, excuse me.

18:18:28   9              Can you read starting at "Hello"?



18:18:49  14        Q.    Was it TASC policy in -- on April 20th, 2020, to

18:18:54  15   shred unfinished financial applications after a two-week

18:18:58  16   period?

18:18:58  17        A.    No.  It was --  We didn't necessarily shred it,

18:19:02  18   but we -- we weren't -- per HIPAA regulation, we weren't

18:19:06  19   supposed --  Like Cheyenne had let us know that we weren't

18:19:12  20   supposed to hold on to that information.  So sometimes I

18:19:17  21   would put it in the file just for documentation purposes.

18:19:19  22   And then, yes, we were told that if an application was

18:19:23  23   unfinished, that we weren't supposed to hold on to it,

18:19:26  24   that the client needed to submit a new application.

18:19:31  25   And -- and looking at this file, I mean, it was a

Leticia Nugent                                   3/30/2021
**Deshawn Briggs v. Allister Adel**

255

| | | |
|---|---|---|
| 18:19:33 | 1 | two-month period before she gave me information to now |
| 18:19:39 | 2 | asking about it again. |
| 18:19:40 | 3 | Q.   So where did you -- who did you learn --  Who |
| 18:19:49 | 4 | told you that TASC would shred unfinished financial |
| 18:19:55 | 5 | applications after a two-week period? |
| 18:19:58 | 6 | A.   Well, nobody told me.  That's -- that's what we |
| 18:20:01 | 7 | did.  But Cheyenne was the one who told me that after two |
| 18:20:05 | 8 | weeks has passed, if the financial application was still |
| 18:20:08 | 9 | unfinished, that the client needed to, you know, resubmit |
| 18:20:11 | 10 | a financial application with updated information. |
| 18:20:14 | 11 | Q.   And did -- did TASC shred unfinished financial |
| 18:20:20 | 12 | applications the entire time that you were an employee at |
| 18:20:28 | 13 | TASC? |
| 18:20:28 | 14 | A.   Like I said, sometimes it would go in the file |
| 18:20:32 | 15 | just for documentation purposes, and then yes, it would |
| 18:20:35 | 16 | get shredded. |
| 18:20:36 | 17 | Q.   When you say "sometimes," what do you mean? |
| 18:20:38 | 18 | A.   Like, just to document that the client -- this is |
| 18:20:42 | 19 | what the client submitted.  So it's in the actual file. |
| 18:20:48 | 20 | You know what I mean?  So the -- the way I was trained is |
| 18:20:51 | 21 | that your notes are supposed to match the file.  So if, |
| 18:20:54 | 22 | you know, the file says client submitted X, Y, Z, then, |
| 18:20:59 | 23 | you know, ideally you were supposed to have X, Y, Z in the |
| 18:21:03 | 24 | file. |
| 18:21:03 | 25 | Q.   To your knowledge, is there a written -- any |

**Leticia Nugent**                                    3/30/2021
**Deshawn Briggs v. Allister Adel**

256

| | | |
|---|---|---|
| 18:21:07 | 1 | written policy of any sort about shredding financial |
| 18:21:11 | 2 | applications after a two-week period? |
| 18:21:17 | 3 | A.   I think it says it in the financial application |
| 18:21:20 | 4 | itself.  Like, you know, "You have two weeks to get your |
| 18:21:24 | 5 | paperwork to us or else, you know, this is what's going to |
| 18:21:26 | 6 | happen; it's going to be voided." |
| 18:21:28 | 7 | Q.   When you say "shred," what do you mean? |
| 18:21:31 | 8 | A.   Well, when I say "shred," I mean shred it, like, |
| 18:21:39 | 9 | ripped up into little pieces. |
| 18:21:40 | 10 | Q.   And -- and put in the trash can? |
| 18:21:43 | 11 | A.   Yes. |
| 18:21:43 | 12 | Q.   And if a file was shredded, would there be any |
| 18:21:51 | 13 | paper record of that file? |
| 18:21:56 | 14 | A.   It depends on if there was copies made.  Other |
| 18:21:59 | 15 | than that, no. |
| 18:22:00 | 16 | Q.   When would there be copies made of a financial |
| 18:22:03 | 17 | application that was incomplete? |
| 18:22:06 | 18 | A.   I would --  If -- if it was staffed, it would |
| 18:22:10 | 19 | have been something that was sent to Cheyenne, like copied |
| 18:22:14 | 20 | and then sent in an email or copied and put on her desk. |
| 18:22:19 | 21 | So it really depends on if that happened. |
| 18:22:22 | 22 | Q.   To your knowledge, were any unfinished financial |
| 18:22:25 | 23 | applications shredded during your time working for TASC? |
| 18:22:29 | 24 | A.   Unfinished? |
| 18:22:31 | 25 | Q.   Yes. |

**Leticia Nugent**                                    3/30/2021
**Deshawn Briggs v. Allister Adel**

257

| | | |
|---|---|---|
| 18:22:31 | 1 | A.   Absolutely, yeah. |
| 18:22:37 | 2 | Q.   And to your knowledge, were any unfinished |
| 18:22:40 | 3 | financial applications shredded in 2019 during the time |
| 18:22:44 | 4 | you worked for TASC? |
| 18:22:46 | 5 | A.   Yes. |
| 18:22:47 | 6 | Q.   And to your knowledge, were there unfinished |
| 18:22:50 | 7 | financial applications that were shredded in 2020 while |
| 18:22:53 | 8 | you worked for TASC? |
| 18:22:54 | 9 | A.   Yes. |
| 18:22:55 | 10 | Q.   And who would --  To your knowledge, who would do |
| 18:23:02 | 11 | the shredding? |
| 18:23:03 | 12 | A.   The case manager --  Well, we -- we put it in the |
| 18:23:07 | 13 | shred bin.  So I don't know -- I don't know who actually |
| 18:23:11 | 14 | did the shredding, but we put it in a bin to be shredded. |
| 18:23:15 | 15 | Q.   And who -- who instructed you to shred unfinished |
| 18:23:18 | 16 | financial applications? |
| 18:23:20 | 17 | A.   Like I said, Cheyenne was the one who instructed |
| 18:23:23 | 18 | us after a two-week period if the client hasn't submitted |
| 18:23:27 | 19 | their documents, then it was considered voided. |
| 18:23:31 | 20 | Q.   And did she tell you to shred those unfinished |
| 18:23:35 | 21 | applications? |
| 18:23:36 | 22 | A.   I don't recall exactly what she said, but she |
| 18:23:40 | 23 | said we can get rid of it, which I assume would be shred. |
| 18:23:44 | 24 | Because of HIPAA violation, it needed to be shredded. |
| 18:23:48 | 25 | Q.   When did she give you that instruction? |

**Leticia Nugent**                                        3/30/2021
**Deshawn Briggs v. Allister Adel**

258

18:23:50  1      A.   It was at a -- it was at a case manager meeting.
18:23:53  2  Viviana made the comment, "Hey, I'm getting a lot of, you
18:23:56  3  know, unfinished financial documentation, and, you know,
18:23:58  4  these clients are not following up with what they're
18:24:00  5  telling me to, so what do I do with the financial, you
18:24:06  6  know, applications after so long?"
18:24:07  7           And Cheyenne had just said, you know, "After
18:24:10  8  two weeks, you know, if the client's not -- there's no
18:24:12  9  follow-up, you know, that you could go ahead and get rid
18:24:16 10  of the financial application."
18:24:18 11      Q.   And do you remember when that meeting was?
18:24:20 12      A.   No, I don't remember.  It was just --  It was at
18:24:24 13  one of the meetings.  I remember all the case managers
18:24:27 14  were there, but I don't know exactly when.
18:24:29 15      Q.   Was that meeting in 2018?
18:24:30 16      A.   It could have been.  I mean, we did have a lot of
18:24:39 17  questions regarding the financial application then, so
18:24:42 18  yeah, it could have been in 2018, yeah.
18:24:45 19      Q.   Was it -- you -- you said --  You testified that
18:24:50 20  you started working at TASC in April 2018.  Is that right?
18:24:54 21      A.   Uh-huh.
18:24:54 22      Q.   Was it in the first month when you started?
18:24:57 23      A.   No.  No, it wasn't.
18:25:00 24      Q.   Was it in May of 2018?
18:25:04 25      A.   I don't know.  I don't know.

Leticia Nugent                                    3/30/2021
Deshawn Briggs v. Allister Adel

259

18:25:07  1        Q.    Was it after -- toward the end of 2018?

18:25:13  2        A.    Could have been.

18:25:14  3        Q.    When you say it "could have been," what do you

18:25:16  4   mean?

18:25:17  5        A.    I mean I don't -- I don't know.  I wish I could

18:25:20  6   give you an exact date, but I -- I'm not sure.

18:25:27  7        Q.    Okay.  You mentioned -- you testified earlier

18:25:29  8   that you didn't know of a time when you had -- when one of

18:25:32  9   your -- one of the POM participants assigned to your

18:25:37 10   caseload hadn't turned in financial application materials

18:25:43 11   after two weeks.  Do you remember that?

18:25:46 12        A.    Yeah.  I remember it.  I thought you were

18:25:48 13   discussing it when it's already been -- it was never --  I

18:25:53 14   mean, it was submitted to me, but I'm not the final point

18:25:56 15   of contact; Dimitrius was.  So if it got to Dimitrius and

18:26:03 16   he asked for documentation -- I don't know of a time like

18:26:06 17   that.  So submitting it to me it was just a review.  It

18:26:09 18   was just to review the application, but it wasn't -- it

18:26:12 19   was nothing more than that.  It wasn't --  You know, I

18:26:16 20   wasn't the one making that decision.  It was, "Hey,

18:26:21 21   this -- this application's incomplete.  These are the

18:26:24 22   documents that you need."

18:26:25 23              And then I don't know if you can recall, I

18:26:27 24   said I don't know of a situation like that, because if

18:26:31 25   Dimitrius got it, he -- he wouldn't --  I don't recall a

Leticia Nugent                                    3/30/2021
            Deshawn Briggs v. Allister Adel

                                                       260

18:26:35   1   situation where it would have got all the way to him
18:26:38   2   without it being complete, because I was the first point
18:26:40   3   of contact and I would let the client know, you know,
18:26:43   4   "This is the documents that you need."  And if it got to
18:26:46   5   Cheyenne, she would definitely make sure that it was
18:26:48   6   completed.  But for it to get all the way to Dimitrius,
18:26:51   7   I -- I never heard of a situation like that where it would
18:26:54   8   get all the way to him without it being completed.
18:26:56   9           But yes, I -- I received -- personally I
18:26:59  10   received a lot of incomplete financial applications, and
18:27:02  11   the same email would go out to all the clients who gave me
18:27:06  12   an incomplete application.  So I hope that makes sense.
18:27:12  13       Q.   When you -- when you say "the same email would go
18:27:15  14   out," what are you referring to?
18:27:17  15       A.   Basically a similar email letting them know,
18:27:20  16   like, "Hey, I did receive your financial application.
18:27:23  17   However, I'm unable to submit it, you know, to the next
18:27:27  18   phase.  I'm unable to submit it because it's missing a
18:27:31  19   couple documents," and I would list the documents it
18:27:34  20   needed.  I would attach, if needed, another financial
18:27:39  21   application and just let them know, like, "Hey, just so
18:27:43  22   you know, it says in the financial application that you
18:27:46  23   need -- it needs to be completed in order for me to submit
18:27:49  24   it to the next step," you know, to submit it for approval
18:27:55  25   or denial I mean.

**Leticia Nugent**                                    3/30/2021
**Deshawn Briggs v. Allister Adel**

261

18:27:56   1       Q.   So the two-week period you refer to in this email
18:27:59   2   after which an appli- -- an unfinished financial
18:28:02   3   application is shredded, when does that two-week clock
18:28:05   4   start?
18:28:06   5       A.   From the time that the -- the case manager
18:28:08   6   reviews it and, like -- something like --  So when I sent
18:28:13   7   her the email the first time, when I said, "Hey, I did
18:28:17   8   receive, you know, the financial application.  These are
18:28:20   9   the things I'm needing," she would have two weeks from
18:28:24   10  that date to -- to get in those documentation.
18:28:30   11      Q.   So if a client submitted to you an unfinished
18:28:34   12  financial application, you testified before that you would
18:28:41   13  assist that client in getting application materials.
18:28:47   14      A.   Yes.
18:28:47   15      Q.   Is that right?
18:28:48   16      A.   Yes.
18:28:48   17      Q.   How did that --  Did that assistance affect the
18:28:56   18  two-week period at all?
18:28:58   19      A.   It depend on what the situation was.  Like I
18:29:03   20  said, most these clients' case --  You're not going to
18:29:07   21  find, you know, the same case in every -- in two people,
18:29:10   22  you know.  They were all different.  So, like, my client
18:29:14   23  who was out of state, that took, you know, quite a while
18:29:16   24  to get his information to Arizona and us to figure out a
18:29:19   25  solution for him.  So, I mean, yeah, it -- it would be

Leticia Nugent                                3/30/2021
**Deshawn Briggs v. Allister Adel**

264

18:32:28  1      Q.   When you say in this email an unfinished
18:32:33  2   financial application would be shredded, would -- if
18:32:38  3   someone -- if a participant submitted a pay stub, would
18:32:42  4   that be something that was shredded along with the
18:32:46  5   financial application?
18:32:48  6      A.   Only -- only a pay stub and the financial
18:32:51  7   application?
18:32:52  8      Q.   Yes.
18:32:52  9      A.   It depends on the situation.  Now, if the client
18:32:57  10  said, you know, "These are -- this is the only thing that
18:32:58  11  I have that I could get you out of this list," then we can
18:33:03  12  go ahead and submit it to Cheyenne or staff it with
18:33:06  13  Cheyenne.  But if the client said, you know, "Here's my
18:33:10  14  financial application," you know, and I say, "Hey, you're
18:33:14  15  missing, you know, pretty much the whole list," and, you
18:33:19  16  know, they don't tell me that these are their barriers or,
18:33:23  17  you know, anything else, they just go ghost on me, then
18:33:26  18  yeah, it would be shredded after two weeks.
18:33:29  19     Q.   And if a client submitted, let's say, a food
18:33:32  20  stamps award and the application form and that was it,
18:33:36  21  would that be shredded after two weeks?
18:33:38  22     A.    It's the same answer.  So, I mean, it doesn't
18:33:43  23  show income.  It just shows that, you know, you -- you
18:33:45  24  qualify for financial assistance.  You know, that's --
18:33:48  25  that's a good -- that's a good point.  "Could you get me

**Leticia Nugent**                                          3/30/2021
**Deshawn Briggs v. Allister Adel**

265

18:33:51  1   any of these documents?  What's going on here?"  If the
18:33:56  2   answer is no, "No, no, this is -- this is all I have," you
18:33:59  3   know, then, again, staff with Cheyenne, see if this is
18:34:03  4   enough, and then Cheyenne would let me know, you know,
18:34:06  5   "Can this client get me X, Y, Z?"  I mean, because to get
18:34:10  6   food stamps, to be quite honest with you, you need ID, you
18:34:14  7   know.  You need pay stubs -- you know, your last pay
18:34:17  8   stubs.  You need that stuff to get food stamps.  So we
18:34:20  9   would ask about that for sure.  And then if, you know, the
18:34:24  10  answer is "No.  You know, I threw it away," or, you know,
18:34:27  11  "That was --  I've been on food stamps for, you know, five
18:34:32  12  years.  I had a job five years ago," then -- well, then
18:34:34  13  it'll get staffed with Cheyenne.
          14       Q.   To your knowledge, did other case managers shred
18:34:39  15  unfinished financial applications after a two-week period?
          16            MS. CATERO:  Foundation.
18:34:45  17            THE WITNESS:  I don't know.  I can only
18:34:46  18  assume.  And I can --  You know, I don't know if that's a
18:34:51  19  good answer.
          20  BY MS. WILLIAMSON:
18:34:51  21       Q.   What makes you assume?
18:34:53  22       A.   Well, because at the staffing, when -- when we
18:34:55  23  had the case manager meeting and Viviana had asked that
18:34:58  24  question, it was --  You know, all the case managers was
18:35:01  25  there, so it was our understanding that, yes, we could get

**Leticia Nugent**                                          3/30/2021
**Deshawn Briggs v. Allister Adel**

266

| | | |
|---|---|---|
| 18:35:04 | 1 | rid of financial applications that were unfinished after a |
| 18:35:11 | 2 | two-week period. |
| 18:35:12 | 3 | Q.   So you were told at a case manager meeting that |
| 18:35:16 | 4 | you could get rid of unfinished financial applications |
| 18:35:20 | 5 | after a two-week period? |
| 18:35:21 | 6 | A.   Yes. |
| 18:35:22 | 7 | Q.   And were you told to shred those files? |
| 18:35:25 | 8 | A.   Well, get rid of, I'm -- I assumed meant shred |
| 18:35:32 | 9 | because it is, you know, sensitive information on whatever |
| 18:35:36 | 10 | they're giving us, whether it's pay stubs, tax records, if |
| 18:35:42 | 11 | they just filled out the financial application, then yes. |
| 18:35:45 | 12 | And it wasn't just shred unfinished documents.  It was if |
| 18:35:49 | 13 | this client is not following up with you after you told |
| 18:35:51 | 14 | them, you know, this is what you need and there's no |
| 18:35:53 | 15 | follow-through, then yes, go ahead and shred it, because, |
| 18:35:56 | 16 | otherwise, it's just a stack of paperwork. |
| 18:36:01 | 17 | Q.   Were there any other documents or any other |
| 18:36:04 | 18 | paperwork that you received from clients that you were |
| 18:36:10 | 19 | told you could get rid of at some point? |
| 18:36:12 | 20 | A.   No.  It was only the financial application. |
| 18:36:18 | 21 | Q.   So the only type of document you were told you |
| 18:36:22 | 22 | could get rid of instead of keep was unfinished financial |
| 18:36:31 | 23 | applications? |
| 18:36:32 | 24 | A.   Correct.  I want to say that we were allowed to |
| 18:36:37 | 25 | get rid of releases of information.  If the client didn't |

Leticia Nugent                                    3/30/2021
             Deshawn Briggs v. Allister Adel

                                                        267

18:36:42   1   want another individual to have access to their file
18:36:46   2   anymore, we just, you know, voided and shredded.  But
18:36:51   3   other than that, I want to say that that was a case for
18:36:54   4   voided otherwise.  But I believe that that's it.
18:36:58   5   Everything else was supposed to go in the file.
18:37:00   6       Q.   Were you ever at any point during the time you
18:37:03   7   worked at TASC -- TASC instructed that you needed to keep
18:37:10   8   unfinished financial applications?
18:37:14   9       A.   To keep them?  Well, before Viviana had asked
18:37:21  10   that question, we were holding on to them, and they
18:37:24  11   were --  You know, that was the issue.  We were
18:37:26  12   responsible for all this sensitive information, and there
18:37:30  13   was no follow-through, and it was, you know, an eyesore on
18:37:34  14   our desk, so what are we doing with all of this sensitive
18:37:38  15   information that the clients aren't following up on?  So,
18:37:42  16   I mean, initially yes, we were keeping them.  And then,
18:37:48  17   you know, after that meeting, it was our understanding
18:37:51  18   that if it was unfinished for two weeks, we could just get
18:37:55  19   rid of them, and then the clients -- it would be the
18:37:56  20   client's responsibility to resubmit a new application at
18:38:01  21   that point.
18:38:02  22       Q.   As a case manager, did you have a location where
18:38:06  23   you stored information, documents, anything you received
18:38:14  24   from particular clients?
18:38:17  25            MS. CATERO:  Form.

Leticia Nugent                                    3/30/2021
         Deshawn Briggs v. Allister Adel

268

18:38:18   1              THE WITNESS:  It would be in a locked filing
18:38:20   2    cabinet.
18:38:21   3    BY MS. WILLIAMSON:
18:38:22   4        Q.   And were you ever told to put unfinished
18:38:25   5    financial applications that locked filing cabinet?
18:38:29   6        A.   Unfinished?
18:38:31   7        Q.   Yes.
18:38:31   8        A.   We were never specifically told.  But like I
18:38:36   9    said, we were holding on to unfinished financial
18:38:38  10    applications until it was, you know, not the case anymore.
18:38:42  11        Q.   Did you --  Were you ever told why you should get
18:38:47  12    rid of unfinished financial applications instead of
18:38:51  13    putting them in the locked filing cabinet?
18:38:55  14        A.   Because they were unfinished and there was no
18:38:58  15    follow-through.
18:39:00  16        Q.   Okay.  I'm going to move to a different exhibit.
18:39:13  17    Let's see if this --  Did that switch over to a different
18:39:14  18    exhibit on my screen?
18:39:16  19        A.   Yes.
18:39:16  20        Q.   Okay.  This --  Are you looking at, Ms. Nugent,
18:39:22  21    an exhibit that says at the top "Fee Agreements"?
18:39:25  22        A.   Yes.
18:39:25  23        Q.   And do you see in the corner -- in the bottom
18:39:29  24    right-hand corner TASC000023?
18:39:34  25        A.   Yes.

**Leticia Nugent**                                    3/30/2021
**Deshawn Briggs v. Allister Adel**

269

| | | |
|---|---|---|
| 18:39:35 | 1 | Q.   And I think you still have control of my -- of my |
| 18:39:44 | 2 | document.  Take a -- take a minute, if you'd like, to |
| 18:39:47 | 3 | glance at this. |
| | 4 | (Deposition Exhibit 3 was marked for |
| | 5 | identification.) |
| 18:40:13 | 6 | THE WITNESS:  I'm assuming this is a |
| 18:40:15 | 7 | training. |
| | 8 | BY MS. WILLIAMSON: |
| 18:40:18 | 9 | Q.   Yes.  I think so. |
| 18:41:19 | 10 | A.   Okay. |
| 18:41:19 | 11 | Q.   Have you seen this document before? |
| 18:41:25 | 12 | A.   Most of them, no. |
| 18:41:27 | 13 | Q.   Okay.  I am --  Is it -- is it possible you've |
| 18:41:43 | 14 | seen this document? |
| 18:41:44 | 15 | A.   I know for a fact I haven't seen the document |
| 18:41:48 | 16 | because when I started, the UAs were $15; they weren't |
| 18:41:53 | 17 | $14. |
| 18:41:56 | 18 | Q.   Okay.  When you started, the UAs were 14 -- were |
| 18:42:04 | 19 | $15? |
| 18:42:04 | 20 | A.   Yes. |
| 18:42:04 | 21 | Q.   And --  Okay.  So do you have -- do you have any |
| 18:42:12 | 22 | idea when this document is from? |
| 18:42:16 | 23 | MS. CATERO:  Foundation. |
| 18:42:17 | 24 | THE WITNESS:  I don't. |
| | 25 | /// |

**Coash & Coash, Inc.**
**www.coashandcoash.com**                    **602-258-1440**

Leticia Nugent                                    3/30/2021
              Deshawn Briggs v. Allister Adel

                                                        270

18:42:17  1    BY MS. WILLIAMSON:
18:42:19  2        Q.    Okay.   I'm scrolling down to TASC0000025.   I
18:42:34  3    think I read that right.   Do you see that, Ms. Nugent?
18:42:37  4        A.    Yes.
18:42:37  5        Q.    Can you read paragraph E aloud?
18:42:45  6        A.    Let's see here.   "A lowered monthly payment is
18:42:54  7    determined by the documents provided.   If a client is on
18:42:57  8    disability, they can contribute any amount up to a hundred
18:43:01  9    dollars monthly.   An individual receiving government
18:43:04  10   assistance (AHCCCS, FS, et cetera) can contribute 50 to
18:43:12  11   $150.   An individual who is providing pay stubs, bills,
18:43:17  12   and bank statements can contribute $100 to their full
18:43:21  13   monthly payment."
18:43:24  14       Q.    To your understanding, what does that mean?
18:43:27  15              MS. CATERO:   Objection.   Foundation.
18:43:28  16              THE WITNESS:   I can only say that it means
18:43:32  17   what it says.   It means that if you are on disability,
18:43:36  18   that your monthly payment is up to a hundred dollars a
18:43:39  19   month.   If you are receiving government assistance, your
18:43:43  20   monthly payment is up to 50 to $150 a month.   Or if you
18:43:48  21   provide pay stubs, bills, et cetera, your monthly payment
18:43:52  22   is up to $100 a month.
18:43:54  23   BY MS. WILLIAMSON:
18:43:55  24       Q.    You -- you mentioned earlier that you remember
18:44:00  25   that in some circumstances, a client's total fees would be

**Leticia Nugent**                                    **3/30/2021**
**Deshawn Briggs v. Allister Adel**

272

```
                1          yourself, if you'd like -- the rest of this
                2          page, which --  Is there anything on this page
                3          or this next page saying anything about total
18:46:33        4          fees being reduced?)
18:46:33        5                  MS. CATERO:  Objection.  Foundation.
18:46:35        6                  THE WITNESS:  I don't want . . .  Okay.  I'm
18:50:43        7   ready.
18:50:43        8   BY MS. WILLIAMSON:
18:50:45        9      Q.   Did you find anything on any of these pages
18:50:50       10   saying anything about total fees being reduced?
18:50:54       11                  MS. CATERO:  Objection.  Foundation.
18:50:57       12                  THE WITNESS:  No, I didn't see anything.
18:50:58       13   BY MS. WILLIAMSON:
18:51:01       14      Q.   Okay.  I'm going to turn to another exhibit.
18:51:09       15                  THE VIDEOGRAPHER:  Excuse me, Counsel.  I do
18:51:10       16   want to interrupt as you're looking.  I wanted to make
               17   sure that Meri got that objection because it was really
               18   quiet.
               19                  THE COURT REPORTER:  I did.
               20                  THE VIDEOGRAPHER:  Okay.
18:51:22       21                  THE COURT REPORTER:  Yes.  Thank you.
18:51:22       22   BY MS. WILLIAMSON:
18:51:23       23      Q.   Ms. Nugent, do you see a different document on my
18:51:26       24   screen?
18:51:26       25      A.   Yes.
```

**Coash & Coash, Inc.**
**www.coashandcoash.com**                    **602-258-1440**

Case 2:18-cv-02684-EJM   Document 278-2   Filed 04/27/21   Page 126 of 126
Leticia Nugent                                         3/30/2021
Deshawn Briggs v. Allister Adel

290

STATE OF ARIZONA    )

COUNTY OF MARICOPA  )

        BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

        I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

        DATED at Phoenix, Arizona, this 12th day of April 2021.

        _____

        Meri Coash, RMR, CRR
        Certified Reporter #50327