# EXHIBIT 26

I hereby certify that the responses in Plaintiffs' Fourth Supplemental Mandatory Initial Disclosure Responses, served on August 28, 2020, are correct and complete as of the time they were made based on my knowledge, information, and belief after reasonable inquiry.

Executed on: _____4/2/2021_____, 2021

_____
Deshawn Briggs

DocuSign Envelope ID: 68ABAB79-22BE-4688-979D-4D96AAF9147E

I hereby certify that the responses in Plaintiffs' Fourth Supplemental Mandatory Initial Disclosure Responses, served on August 28, 2020, are correct and complete as of the time they were made based on my knowledge, information, and belief after reasonable inquiry.

Executed on: ___4/7/2021___              _____

                                           Lucia Soria

I hereby certify that the responses in Plaintiffs' Fourth Supplemental Mandatory Initial Disclosure Responses, served on August 28, 2020, are correct and complete as of the time they were made based on my knowledge, information, and belief after reasonable inquiry.

Executed on: April 21 , 2021

Antonio Pascale

# EXHIBIT 27

Case 2:18-cv-02684-EJM  Document 278-4  Filed 04/27/21  Page 6 of 123
VIDOERECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


DESHAWN BRIGGS, et al.,            )
                                   )
          Plaintiffs,              )
                                   )
              vs.                  ) No. CV2018-02684-EJM
                                   )
ALLISTER ADEL, et al.,             )
                                   )
          Defendants.              )
_____     )


VIDOERECORDED VIDEOCONFERENCE DEPOSITION OF
ANTONIO PASCALE

(CONFIDENTIAL DESIGNATION AT PAGES 159-160)

Phoenix, Arizona
November 5, 2020
9:04 a.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 2415 E. Camelback Road
Certified Realtime Reporter     Suite 700
Certified Realtime Captioner    Phoenix, AZ 85016
Certified LiveNote Reporter      (480) 429-7573
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

1    for purposes of providing testimony here today?

2        A.    Documents that were filed to the courts.

3        Q.    How do you know they were filed with the courts?

4        A.    I'm only assuming that because it's on the

5    proper format that's for court documents.

6        Q.    They were on the court paperwork with the lines

7    and numbers down the side?

8        A.    Correct.

9        Q.    Okay.  Are those -- are those the only documents

10   regarding income that you reviewed for -- that refreshed

11   your recollection for purposes of providing testimony

12   today?

13       A.    Correct.

14       Q.    You then mentioned TASC notes, if I heard you

15   correctly.  What documents -- what documents are you

16   referring to when you say "TASC notes"?

17       A.    Client and I guess you would call them case

18   manager notes.

19       Q.    And then the interrogatories.  Is there anything

20   else you reviewed in the three and a half hours you spent

21   collectively preparing for your testimony today?

22       A.    No, sir.

23       Q.    Sir, you pled guilty to two felonies in 2007 and

24   served approximately 11 years in prison; correct?

25       A.    Correct.

```
 1        Q.    You were released from prison on March 1, 2017?

 2        A.    Correct.

 3        Q.    When were you originally sentenced?

 4        A.    I believe it was December -- I think it was

 5   26th, maybe, 2007.

 6        Q.    And the original prison term was 12 years and

 7   six months; that's correct?

 8        A.    Correct.

 9        Q.    Are you still on any kind of probation or

10   supervised release?

11        A.    I'm currently on probation.

12        Q.    When does that end?

13        A.    It's kind of tentative.  I have to take a

14   counseling program.  Once completed, I have to wait a

15   certain amount of time before I can petition the courts to

16   get off probation.

17        Q.    Is that -- is that the only term of your

18   probation right now?

19        A.    Yeah, just counseling.

20        Q.    What kind of counseling?

21        A.    It's sex offender counseling.

22        Q.    There are no other terms other than you have to

23   participate in sex offender counseling that you're

24   currently under for your probation?

25        A.    I have sex offender terms such as -- yeah.
```

1    would ask about it.  He would just say, "I'm doing okay,

2    I'm doing okay."  But that did -- that wasn't physically

3    what I would see, so ...

4         Q.    As a member of the proud family in that regard,

5    were you ever aware of your father not being able to work

6    because of this physical ailments?

7         A.    Correct.

8         Q.    He was always able to work?

9         A.    No.  No.  No.  No.

10        Q.    When was he not able to work?

11        A.    It was before my release from incarceration that

12   he had stopped working.

13        Q.    When was that?

14        A.    I would have to say probably -- I got out 2017.

15   I'm only -- I'm only estimating, so I would say 2012,

16   maybe a little -- a little sooner.  Maybe a little later.

17   It would be --

18        Q.    Is it fair to say you --

19        A.    Go ahead.  I interrupted.

20        Q.    Is it fair to say, sir, you do not know -- you

21   do not have personal knowledge as to when exactly your

22   father was unable to work due to physical ailments?

23        A.    Correct.

24             MS. WILLIAMSON:  Objection as to when;

25   vague.

1          MR. HENRY:  He just said he couldn't answer

2   the question, Ms. Williamson.

3          MS. WILLIAMSON:  It -- it -- your

4   question -- it's not clear if you mean when he began being

5   unable to work as opposed to the -- the per- -- periods in

6   which he was unable to work.  Mr. Pascale testified that

7   he -- he knew certain periods his father was unable to

8   work, so I'm trying to clarify that "when" is vague.

9   BY MR. HENRY:

10      Q.    Mr. Pascale, when you did answer that you

11  thought it might be around 2012 that your father might

12  have been unable to work, you est- -- you -- testified

13  that you were estimating that; correct?

14      A.    Correct.

15      Q.    So my question again is:  You do not have any

16  personal knowledge as to when your father was and was not

17  able to work at any time prior to 2017?

18      A.    Based off my estimation, it would be based off

19  of correspondence.

20      Q.    What correspondence?

21      A.    Letters that my dad would write.

22      Q.    Did you keep those letters?

23      A.    No, I don't have anything from incarceration.

24      Q.    So sitting here today, you -- you couldn't

25  testify with certainty as to when your father was and

Case 2:18-cv-02684-EJM Document 278-4 Filed 04/27/21 Page 11 of 123
VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

29

1      *A.*    Correct.

2      *Q.*    Referring you now to page 28 of Exhibit 2, the

3  Second Amended Complaint, in particular paragraph 240,

4  which reads:  "Mr. Pascale lives in Maricopa County,

5  Arizona, with his 15-year-old son for whom he is the sole

6  provider."

7              Did I read that correctly?

8      *A.*    Correct.

9      *Q.*    And who is that referring to, the 15-year-old

10  son?

11      *A.*    His name is Frankie.

12      *Q.*    I presume Frankie is your brother?

13      *A.*    Correct.

14      *Q.*    Doesn't Frankie live with his mother?

15      *A.*    Frankie now lives with his mother, correct.

16      *Q.*    When was the last time Frankie lived with your

17  father?

18      *A.*    Frankie would go one week on, one week off

19  between parents.

20      *Q.*    So Ms. -- your father had joint custody of

21  Frankie?

22      *A.*    Correct.  Well, hold on.  I don't -- I don't

23  want to say legally joint custody because I don't know if

24  any of this was done through courts.

25      *Q.*    Well, but he would spend approximately half of

Case 2:18-cv-02684-EJM   Document 278-4   Filed 04/27/21   Page 12 of 123
VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

30

1   his time with his mother; correct?

2       *A.*     Correct.

3       *Q.*     Paragraph 243, please review that.

4       *A.*     Okay.

5       *Q.*     States:  "It's because" -- "because of his

6   illness, Mr. Pascale has been physically unable to work

7   since 2008."

8               Did I read that correctly?

9       *A.*     Yes, you did, sir.

10      *Q.*     But you don't know based on what you just told

11  me if that date is correct or not, personally; right?

12      *A.*     I don't know that.  That was really close to my

13  incarceration in the Department of Corrections, so I

14  wasn't talking to anybody for the first couple years of my

15  incarceration.

16      *Q.*     What kind of work did your father do before he

17  became disabled, if you know?

18      *A.*     Various.  He was a wholesale car dealer.  A

19  wholesale -- or I think it's wholesale homes, like he'd

20  basically buy foreclosed homes and sell them, flip and --

21  you know, flip and sell.  That's the extent of what I

22  know.

23      *Q.*     Your father filed for bankruptcy in 2008;

24  correct?

25      *A.*     Judging by this paperwork in front of me, he

1   Chase?

2        A.    No.  At the time I --

3        Q.    Any reason?

4        A.    At the time I closed it, I was not -- I was not

5   involved in this case, so I didn't see a reason to get

6   documentation from Chase because -- I was just trying to

7   close the account.  My dad no longer -- my dad no longer

8   exists in the world, so, therefore, I'm just trying to

9   settle all his affairs.  Do you know what I mean?

10       Q.    Sure.  I understand.  But do you have any

11  personal objection to contacting Chase and trying to

12  obtain his records from his time at TASC?

13       A.    No, I have no personal objection to that.

14       Q.    And you testified earlier not a single person

15  has ever asked you to do that; correct?

16       A.    I don't think I've ever had anybody ask me to go

17  to Chase and get his documentation, no.

18       Q.    Okay.  I'm going to ask now about Interrogatory

19  Number 2.

20             Do you see that?

21       A.    Correct.

22       Q.    In the last paragraph, the sentence starting

23  with "during that time."

24             Do you see that?

25       A.    Correct.

1    Q.    It indicates that during the time that your

2    father was participating in the MDPP program at TASC, he

3    received -- well, anyway, this is a summary of the

4    benefits that he received between November 2016 and

5    December 2017; correct?

6    A.    Correct.

7    Q.    Do you remember earlier when we were talking in

8    the deposition about how your father was reportedly

9    claiming to have sole responsibility for supporting

10   Frankie?

11   A.    Correct.

12   Q.    Pulling up what we'll mark as Exhibit 17, Bates

13   labeled TASC000285.

14          (Deposition Exhibit No. 17 was marked for

15   identification by the reporter.)

16   BY MR. HENRY:

17   Q.    Flipping back.  Do you recognize this document?

18   A.    Can't say with 100 percent certainty I have seen

19   it.  Problem is, there's a lot of documents that have this

20   similar kind of format.

21   Q.    I understand.  Do you recognize this to be a

22   summary of benefits that your father received from

23   November 2016 through December of 2017 --

24   A.    This has ben- -- this is benefits in regards to,

25   like, I guess you'd call it AHCCCS.

Case 2:18-cv-02684-EJM  Document 278-4  Filed 04/27/21  Page 15 of 123
VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

84

1          MS. WILLIAMSON:  Yeah, objection --
2     objection that Mr. Pascale answered the question.  Said he
3     couldn't be sure.
4          MR. HENRY:  I understand.
5     BY MR. HENRY:
6       Q.    Do you recognize this to be a summary of
7     benefits that your father received from November 2016
8     through 2017?
9       A.    Benefits of what exactly?  That's what I was
10    trying to ask.
11      Q.    Well, this was a document that your father
12    produced to TASC in connection with his participation in
13    the program.  Do you have any personal knowledge about the
14    information contained in this document?
15      A.    No.
16          MS. WILLIAMSON:  Objection; vague as to
17    "personal knowledge."
18          MR. HENRY:  We've already established,
19    counsel, that he knows what personal knowledge is.  He's
20    signed documents under penalty of perjury --
21          MS. WILLIAMSON:  I just want to be clear --
22          MR. HENRY:  -- based on personal knowledge.
23    So can we please stop that objection?
24          MS. WILLIAMSON:  I'm happy to.  I would just
25    like to be -- just to make sure that we are using

Case 2:18-cv-02684-EJM  Document 278-4  Filed 04/27/21  Page 16 of 123

```
 1   Mr. Pal's -- Mr. Pascale's definition of personal
 2   knowledge; is that right?
 3   BY MR. HENRY:
 4       Q.   Sir -- sir, for purposes of "personal knowledge"
 5   going forward, we'll use personal knowledge as you
 6   understood when you signed the verification under penalty
 7   of perjury.  Is that fair?
 8       A.   Correct.
 9       Q.   Thank you.
10            MS. WILLIAMSON:  Thank you.
11   BY MR. HENRY:
12       Q.   Do you have any personal knowledge of the
13   information set forth in this document marked as
14   Exhibit 17?
15       A.   No.
16       Q.   So you do not have any personal knowledge as to
17   why the household size for your father from November 2016
18   through December 2017 is indicated to be one person?
19       A.   No, I have no knowledge.
20       Q.   Back to Exhibit 16, Interrogatory Number 2,
21   second-to-last sentence on this page reads:  "Mark Pascale
22   also made negligible income from selling items he found at
23   yard sales on eBay."
24            Do you see that?
25       A.   Correct.
```

Case 2:18-cv-02684-EJM   Document 278-4   Filed 04/27/21   Page 17 of 123
VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

86

1    Q.    Do you agree with that statement?

2    A.    That would be correct, sir.

3    Q.    What do you know about your -- what do you have

4  personal knowledge about with regard to your father's eBay

5  sales?

6    A.    That he would go to yard sales and buy things he

7  thought had value and then he would go to eBay and try to

8  sell it.

9    Q.    Have you ever sold anything on eBay?

10   A.    I have not.

11   Q.    Do you know that in order to sell items on eBay,

12 you must have an account into which eBay will deposit the

13 proceeds?

14   A.    Up until you said it, I was not aware of that.

15   Q.    Do you have any documentation of the income your

16 father received from selling items on eBay?

17   A.    No.

18   Q.    The last sentence in the response to

19 Interrogatory Number 2 that you verified reads:  "Further

20 information regarding Mark Pascale's income is contained

21 in the document produced by TASC as TASC000221."

22         Did I read that correctly?

23   A.    Correct.

24         MR. HENRY:  I'll pull up on the screen what

25 we will mark as Exhibit 18, TASC 000221.

1              (Deposition Exhibit No. 18 was marked for
2    identification by the reporter.)
3    BY MR. HENRY:
4         Q.    Do you see this document?
5         A.    Correct.
6         Q.    Can you tell me where in this is there
7    information regarding your father's income?
8         A.    If it's on here, I'm not seeing it.
9         Q.    Do you know if your father ever provided
10   documentation to TASC to verify the amounts of income he
11   received from eBay?
12        A.    I -- I do not know that.
13        Q.    If he did have an account at eBay, are you aware
14   of any reason why you as personal representative would not
15   be able to access that account and obtain historical
16   information?
17        A.    Yes.  I'm not allowed to go on the internet.
18        Q.    You can call eBay, though, sir, can't you?
19        A.    Sure.  I -- I -- I guess so.  But, yeah, I'm not
20   allowed to use the internet, so ...
21        Q.    And to clarify, you're not allowed to use the
22   internet for any purpose, including a bank account?
23        A.    I have to get prior approval to do certain
24   things.  It's not -- it's not out of the realm of
25   possibilities, I just have to get prior approval.

1      Q.    From whom?

2      A.    My probation department.

3      Q.    Is there any reason why you couldn't ask your

4   probation officer for approval to access the internet for

5   purposes of obtaining your father's former financial or

6   eBay records?

7      A.    No, I could -- I could ask.

8      Q.    Are you willing to do that?

9      A.    Yeah.  Sure.

10      Q.    Turning back to Exhibit 16, Interrogatory

11   Number 3, now, please read Interrogatory Number 3 and the

12   response and tell me when you want me to scroll down.

13      A.    Okay.  You can scroll down.

14            Okay.  Go ahead.

15            Okay.

16      Q.    Going to the very first bullet point in

17   Interrogatory Number 3, there's a reference to -- and you

18   verified this interrogatory response; correct?

19      A.    Correct.

20      Q.    What is the reference to "doc 1015, paragraph

21   253 to 54"?

22      A.    I do not know that document.  You'd have to show

23   it to me.

24      Q.    Well, when you verified the response, if you

25   didn't know what that document was, how did you verify

1  under penalty of perjury that that was accurate?

2          MS. WILLIAMSON:  Objection;

3  mischaracterization.

4          THE WITNESS:  That right -- that document --

5  okay.  That document, I would say would be off the case

6  manager notes that were attached at some -- at some

7  document.  And that's only because I vaguely remember that

8  statement right there.  That's -- looks like to me might

9  be case manager notes.

10 BY MR. HENRY:

11     Q.    Sir, you don't know what that document is

12 sitting here today, do you?

13     A.    No, but that statement that's on there is in --

14 is in the case manager notes, so it is quite possible,

15 sir, that I actually had reviewed this document with that.

16 You have shown me quite a few documents, so I'm trying to

17 retain everything that I've seen here so far today, sir.

18     Q.    Understood.

19          Turning back to your father's passing, I

20 understood he passed away in October of 2019.  Isn't that

21 when he passed away?

22     A.    We're in 2020.  Correct, yes, 2019.

23     Q.    So you would have sold his house in February of

24 2020; correct?

25     A.    Correct.  I do apologize.  That is correct, sir.

Case 2:18-cv-02684-EJM   Document 278-4   Filed 04/27/21   Page 21 of 123
VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF ANTONIO PASCALE, 11/05/2020

90

 1   Sorry about that.

 2       Q.    That's okay.  The fourth bullet back to

 3   Inter- -- Interrogatory Number 3 response refers to

 4   finan- -- TASC Financial Information Form-Award

 5   Letters-Waived Fees.

 6                 Do you see that?

 7       A.    TASC Financial -- okay.  Yes, sir.

 8                 (Deposition Exhibit No. 19 was marked for

 9    identification by the reporter.)

10   BY MR. HENRY:

11       Q.    Is this the document you were referring to when

12   you verified that response?

13       A.    Correct.

14       Q.    On the bottom half of this page, do you see the

15   question:  "What do you think you are able to pay per

16   month towards your program fees?"

17                 Do you see that?

18       A.    Correct.

19       Q.    And you recognize that's your father's signature

20   at the bottom dated January 25, 2018; correct?

21       A.    Correct.

22       Q.    Do you know why your father did not provide a

23   specific amount in response to that request?

24       A.    Only speculating, that's all this is, is he

25   wasn't sure of how much money he would have.

1    Q.    And you satisfied other debts that your father

2    had at the time of his passing from the sales proceeds;

3    correct?

4    A.    Correct.

5    Q.    Do you know whether your father tried to get any

6    type of loan or financing based upon the equity he had in

7    his house when he was going through the TASC program?

8    A.    I do not know that.

9    Q.    Going back to Exhibit 16, the interrogatory

10   responses, I'm referring you to the lines starting around

11   10 or 11, in between, through 13, where it states:  "As

12   alleged in the Second Amended Complaint, as a matter of

13   official policy with respect to the program fees, no fee

14   waivers or reductions were available regardless of Mark

15   Pascale's income."

16             Did I read that correctly?

17   A.    Correct.

18   Q.    Do you have any personal knowledge of that

19   alleged, quote, "official policy," end quote, referenced

20   in this response?

21   A.    No.

22   Q.    Then, sir, how did you verify the truth of that

23   statement?

24   A.    This is something in regards to case manager

25   notes as well.  Somewhere in the case -- I don't know

1      *A.*     -- Number 4?

2      *Q.*     I'm sorry.

3      *A.*     I was trying to figure out what am I responding

4  to?

5      *Q.*     That's okay.

6      *A.*     Okay.

7      *Q.*     Okay.  I'd like to draw your attention to the

8  line starting around 24 or 25 where it reads:  "Mark

9  Pascale did not have friends or family with the financial

10 resources to lend money to him."

11              Did I read that correctly?

12     *A.*     Correct.

13     *Q.*     And this was referring, you understand, to when

14 he was going through the TASC program; right?

15     *A.*     Correct.

16     *Q.*     And that would be when you were still

17 incarcerated?

18     *A.*     When was the TASC program again?  What --

19 what -- what month and date?

20     *Q.*     Do you have -- do you know whether your father

21 was still on the TASC program when you were released from

22 prison or not?

23     *A.*     I believe he was -- I believe he was, correct.

24     *Q.*     He was still in the program?

25     *A.*     Correct.

1    Q.    Do you know all the friends your father had at

2  the time he was in the TASC program?

3    A.    No, I don't know all his friends.

4    Q.    Do you know -- do you personally know what the

5  financial resources were of his friends?

6    A.    No, I do not.

7    Q.    Next sentence reads:  "He did on one occasion

8  obtain a cash advance from his bank for the purpose of

9  paying TASC fees."

10            Did I read that correctly?

11   A.    Correct.

12   Q.    What bank gave your father a cash advance?

13   A.    I don't know that answer.

14   Q.    This would be something you'd have to obtain

15 from Chase or any other financial institutions with whom

16 he had accounts; correct?

17   A.    Correct.

18   Q.    Then, sir, how did you verify the truth of that

19 particular allegation?

20   A.    Just based on -- I didn't verify the truth.

21   Q.    Page 6, top line reads:  "Lastly, Mark Pascale

22 limited his expenses as much as he possibly could.  He

23 often skipped paying bills in order to pay for TASC fees."

24            Did I read that correctly?

25   A.    Correct.

Case 2:18-cv-02684-EJM   Document 278-4   Filed 04/27/21   Page 25 of 123

1    Q.   Do you have personal knowledge of what is

2    referred to in that sentence?

3    A.   No, not necessarily personal knowledge.  It's --

4    it's kind of -- it's, I guess, more or less speculated

5    knowledge.  I would believe that my dad would -- would

6    skip paying bills if he had to take -- take care of a fee,

7    so ...

8    Q.   But you're speculating; correct?

9    A.   Correct.

10   Q.   Do you have any supporting evidence to support

11   the accuracy of that statement?

12   A.   No.

13   Q.   I'll turn now to Interrogatory Number 7, which

14   starts at the top of page 7 and carries down -- almost

15   near the bottom of page 7.

16        Do you see that?

17   A.   Okay.  Can I read it, sir?

18   Q.   Please.  Please review it to yourself and tell

19   me when you're ready.

20   A.   Okay.

21        Go ahead, sir.

22   Q.   There's nothing to scroll.  Have you read the

23   interrogatory and the response to Interrogatory Number 7?

24   A.   Correct.

25   Q.   I'd like to direct your attention to the part of

1  the response starting at Line 17:  "While on the MDPP,

2  Mark Pascale spent approximately the following amounts

3  each month" -- and then it lists six or seven different

4  items.

5              Do you see that?

6      A.    Correct.

7      Q.    Do you have any personal knowledge of the

8  figures set forth in those bullets?

9      A.    Yeah.  I have -- in this -- in one of these

10 filings, it has the City of Peoria, SRP, internet for

11 Verizon, and mortgage Chase Bank.  And the Chase Bank

12 mortgage because I was selling my dad's house, I had

13 information about that.

14     Q.    So which ones don't you have personal knowledge

15 about?

16     A.    Car insurance for State Farm.

17     Q.    And I assume the gas for his car?

18     A.    Correct.  Because I -- that's -- that's just an

19 amount that I could say, you know, you're just kind of

20 approximating how much money you spend on gas every --

21 every month, you know.

22     Q.    That's your best guess as to what someone

23 generally might pay for gas?

24     A.    It's probably a good guess.

25     Q.    What -- what -- what type of car did your dad

1    drive when he was enrolled in the TASC program?

2          *A.*    At the time I believe he had a Mazda 626.

3          *Q.*    Did he owe any money on that car?

4          *A.*    No.

5          *Q.*    Approximately how much was that car worth?

6          *A.*    If I were to Kelly Blue Book it, it'd probably

7    be worth like 25 to $3,000.

8          *Q.*    Did -- did -- did he have that car at the time

9    of his passing when you took over as personal

10   representative?

11         *A.*    Correct.

12         *Q.*    And I assume you sold that car as well?

13         *A.*    I did.

14         *Q.*    And what did you sell it for?

15         *A.*    $500.

16         *Q.*    The line -- or the last part of this response on

17   page -- line 25 carried through 27, where it reads:  "Mark

18   Pascale also incurred some expenses such as food,

19   clothing, and educational costs on behalf of his minor

20   son.  He struggled to afford the basic necessities of life

21   for him and his son and sometimes did not pay these

22   expenses so that he could pay TASC fees."

23               Do you see that?

24         *A.*    Correct.

25         *Q.*    Is there any documentation to support that --

1  those statements?

2      A.    Well, there's -- is there documents?  No.  I

3  would just say if you -- if you look at the disability

4  income that he made as well as, you know -- and balance it

5  against the -- the expenses he had right here listed, it

6  would -- it would sound this -- sound to reason that

7  the -- that the money doesn't add up; that your expenses

8  are more than what your actual income was.  And I believe

9  there's a document that actually I did review with my

10 attorneys, I just don't know where and what -- what filing

11 it is, of a breakdown of monthly expenses compared to

12 income.  And it showed that my father was making less than

13 what he owed.

14     Q.    Have you seen that document today so far?

15     A.    I can't 100 percent tell you I've seen it so far

16 today.

17     Q.    Can you describe the document you were referring

18 to with more detail?

19     A.    It's in some -- one of these filings, and it had

20 a breakdown of income versus expenses.

21     Q.    Did it have any supporting documentation for the

22 income and expenses listed on it?

23     A.    I can't 100 percent be certain of that.

24     Q.    Okay.  Back to this list of the six or seven

25 bullets.  Monthly expenses, do you have any personal

1  knowledge as to whether that list is complete?

2      A.   So the expenses you see on the screen right

3  here, this is -- I believe this is all he had as far as

4  expenses.  Well, no, I can't say that because he obviously

5  has credit cards; correct?

6      Q.   I don't know, sir.

7      A.   Well, I would only assume that because I paid --

8  paid credit cards -- or creditors.  Maybe -- it might not

9  have been a credit card.  May have -- might not have been

10  creditor -- credit card, per se, but there was some debt

11  out there that I had to take care of once I sold his

12  house, so ...

13      Q.   Other than the amount he owed for his mortgage

14  and the credit card debt, what other debts did you have to

15  satisfy from the sales proceeds of your father's home?

16      A.   He had a lien on his home from the City of

17  Peoria for $9500.  That was because he had asked -- City

18  of Peoria, some program replaced his roof on his home as

19  well as his A/C.  And the contingency plan on that was he

20  can't sell the home within five years.  And the house was

21  unfortunately sold before five years came up, and so there

22  was a lien on the home for $9500.

23      Q.   And those were the only expenses that he -- you

24  had to pay off to creditors to close out his estate from

25  the proceeds from the sale of his home?

1  have that money, I'm not going to pay that money because I

2  don't have the means to do that.  But I will try my best

3  to take care of it.  And from what I've seen and what I've

4  read and what I've gained from all this is that my dad

5  attempted every possible avenue to -- to complete this

6  program the best way he could.

7              I can't speak for my dad.  I'm -- I mean, I

8  can because I'm here obviously, but I cannot speak and say

9  what my dad was doing or what he was thinking because I

10 don't know.  I only know what I personally know.  And my

11 dad was struggling.  He was on disability, and so I

12 don't -- I don't know of an income that he could have

13 gave.

14 BY MR. HENRY:

15     Q.    Sir, when you closed out -- I'm sorry.

16     A.    Go ahead.  Sorry.

17     Q.    When you closed out the probate for your

18 father's estate, did Frankie receive money?

19     A.    Frankie received half the amount -- half the

20 money that I -- half the amount that we sold the house

21 for.

22     Q.    Approximately how much?

23     A.    It was $49,000.

24     Q.    And did anyone else in the family receive any

25 money on that sale?

1    A.    No, just -- everything comes with my dad is in

2   regard -- it goes to me and my brother.

3    Q.    Okay.  So your brother Frankie got all the

4   money, not you?

5    A.    No, half.

6    Q.    You got 49 as well?

7    A.    Correct.

8    Q.    And when you were testifying about what you

9   presume is the current situation with TASC and its

10  operations, are you basing that entirely on what your

11  attorneys have told you, or do you have personal knowledge

12  about the current status of TASC's operations?

13   A.    I don't have personal knowledge.  I don't -- I

14  don't -- I'm not doing research on TASC.  This is -- this

15  is knowing that TASC is no longer in Arizona, but -- and

16  then -- and all -- and knowing that, you know, TASC --

17  obviously, I feel like it has -- it has to be around.

18  There wouldn't -- there wouldn't be a class action lawsuit

19  against a company no longer around; correct?

20   Q.    If you were told that TASC has ceased

21  operations, is no longer providing any services, would you

22  have any basis to dispute that?

23   A.    Based off Arizona, no, because they no longer

24  exist in Arizona.

25   Q.    Do you have any basis to dispute the contention

1           MR. HENRY:  Objection; form, leading.

2           THE WITNESS:  No.

3  BY MS. WILLIAMSON:

4      Q.   To your knowledge, did your dad own a lot where

5  he sold cars?

6           MR. HENRY:  Objection; form, leading.

7           THE WITNESS:  No.

8  BY MS. WILLIAMSON:

9      Q.   Okay.  Thank you, Antonio.  Thank you.

10          Can you tell us your understanding of your

11 father's self-employment selling cars?

12     A.   Just from what I know about my dad and his --

13 his little car sales business was that he would buy cars

14 from auctions and bring them to his house, fix them up,

15 and then just flip them and sell them.

16     Q.   Did your dad tell you anything about his

17 business selling cars in 2008?

18          MR. HENRY:  Objection; form, leading.

19          THE WITNESS:  As far as 2008?

20          MR. HENRY:  Hearsay.

21          THE WITNESS:  He didn't speak -- he didn't

22 speak anything about 2008.  However, I don't know what

23 year, what date, what month, but he had had a conversation

24 with me about that the longer he -- the only reason why

25 he's no longer doing it anymore is because of the economic

 1  turndown that happened in 2008; that just -- the business

 2  longer -- was no longer viable because economy wasn't --

 3  you know, wasn't there.  Unfortunately, I was incarcerated

 4  so I don't know how the economy was, so ...

 5  BY MS. WILLIAMSON:

 6      Q.    Are you aware of your -- your father making any

 7  money selling cars in 2008 or 2009?

 8      A.    No, I'm not aware.

 9            MR. HENRY:  Objection; foundation, leading.

10  BY MS. WILLIAMSON:

11      Q.    Have you ever heard your father describe himself

12  as self-employed?

13            MR. HENRY:  Hearsay.

14            THE WITNESS:  My dad -- my dad voices like

15  that he's an entrepreneur.  My dad doesn't work for

16  businesses, corporations like that.  He -- if he makes

17  money, it's because he's self making money himself.  So it

18  would be a car dealership, eBay.  He would even

19  consider -- if he was doing eBay full-time, that's a

20  self-employment job.

21  BY MS. WILLIAMSON:

22      Q.    And when he said self-employed, did he mean that

23  he was making money all the time?

24            MR. HENRY:  Foundation, hearsay.

25            THE WITNESS:  Not necessarily.

1              MR. HENRY:  Leading.

2    BY MS. WILLIAMSON:

3         Q.    You can answer.

4         A.    Not necessarily.  Not necessarily.

5         Q.    When were you released from prison?

6         A.    March 1, 2017.

7         Q.    And did you see your father when you were

8    released from prison?

9         A.    I saw my dad approximately -- I want to say it

10   was either second week or third week that I was out.

11        Q.    And approximately when was that?

12        A.    So that would be April or May.

13        Q.    Of what year?

14        A.    I'm sorry.  Not April or May.  I'm sorry.

15   Probably about -- probably about April of 2017.

16        Q.    And what was your father's physical condition at

17   that time?

18        A.    A lot different than he was when I first got

19   arrested.  My dad was a body builder, so he was pretty --

20   I guess you would say pretty stacked, you know, pretty

21   solid, pretty big boy.  Once I -- once I saw him, my dad

22   no longer had muscle mass.  He was pretty skinny.  A lot

23   smaller than me.  And why -- and why -- here's why I bring

24   this up.  When I was younger, you know, I always told my

25   dad that one of these days I'm going to get bigger than

1  you and I'm going to kick your butt, you know.  This was

2  when I was a kid.  And so when I saw my dad, it just kind

3  of made me -- made me laugh a little bit because I came

4  out -- I had been incarcerated for over a decade.  I was

5  working out every day, so I was pretty solid.  And here I

6  am, coming out thinking my dad is still a big boy, and

7  he's no longer a big boy.

8       Q.   To your knowledge, was your father working at

9  that time?

10               MR. HENRY:  Foundation.

11               THE WITNESS:  No, he wasn't working.  He was

12  on disability.  He did have that side business of eBay,

13  but even right now I can't even tell you that I would

14  believe that he made anything out of that.  I think it was

15  so miniscule.  I think my dad was just using that as some

16  kind of income, like just make something to help him out a

17  little bit.

18  BY MS. WILLIAMSON:

19       Q.   To your knowledge, other than disability, was

20  your father bringing in consistent income?

21       A.   No.

22               MR. HENRY:  Form, leading, vague.

23               THE WITNESS:  Disability.  Disability and

24  the -- and the eBay thing.

25               ///

 1  BY MS. WILLIAMSON:

 2      Q.   Was your father repairing cars at that time?

 3              MS. WILLIAMSON:  Objection; form, leading,

 4  foundation.

 5              THE WITNESS:  During what time, if you

 6  might -- if I might ask, Virginia?

 7  BY MS. WILLIAMSON:

 8      Q.   When you -- when you first saw him when you were

 9  released in 2017.

10      A.   Oh, no.  No.  No.

11      Q.   Are you aware of anything that your father did

12  to make money at that time?

13              MR. HENRY:  Form, foundation.

14              THE WITNESS:  eBay.

15  BY MS. WILLIAMSON:

16      Q.   Well, do you know if he made a lot of money

17  doing that?

18              MR. HENRY:  Form, vague, leading.

19              THE WITNESS:  I don't know.  I don't -- I

20  don't believe so.  I -- I mean, that's just -- I mean,

21  that would be speculating on the -- on the amount he made,

22  but I don't believe he made a lot of money.

23  BY MS. WILLIAMSON:

24      Q.   Did you see any evidence of him making money

25  from eBay?

1        A.    No.

2        Q.    Did you sign a retainer with counsel in this

3   lawsuit in February 2020?

4        A.    Retainer as in retainer for you guys?

5        Q.    Right.

6        A.    Correct.

7        Q.    Since that time, have counsel sent you documents

8   related to this case?

9        A.    Yes.  And I've actually -- Olevia Boykin, which

10  is the very first person I ever spoke to when I signed on

11  to this case, I spoke to her, quite frankly, a lot of

12  times when she would just call me just to kind of give me

13  a heads-up on something or, "Hey, I need to send you this

14  document, can you just look at it real quick?"  Or just

15  ask how I was doing, just, you know -- she was very

16  thorough about making sure that, you know, that she was

17  available.  And as well as so far I've had Katie and you

18  as well, Ms. Virginia, you know, very, very welcoming as

19  well as always giving me information, keeping me up to

20  date.  It's been more or less me not being available

21  because I work so much.  So it's more or less kind of

22  working -- working around my hours, I guess you would say.

23       Q.    When you say you spoke with Olevia Boykin a lot,

24  about how much time do you think --

25                  MR. HENRY:  Form, leading.

```
 1 | to continue to waive the privilege, we're going to ask for
 2 | all the privileged communications.
 3 |              MS. WILLIAMSON:  I'm going to -- I'm going
 4 | to continue.  Thank you.
 5 | BY MS. WILLIAMSON:
 6 |     Q.   Is it true that you are willing to obtain
 7 | relevant documents?
 8 |     A.   Yes.
 9 |     Q.   Do you know how to access any relevant
10 | documents?
11 |     A.   I have to figure it out, but I could probably
12 | access those things, maybe.
13 |     Q.   And if you learn, are you willing to do that?
14 |     A.   Yeah.
15 |     Q.   You spoke earlier about your brother Frankie's
16 | custody arrangement with your dad.  Do you remember that?
17 |     A.   Yes.
18 |     Q.   Do you know whether your father was ever the
19 | sole provider for Frankie?
20 |              MR. HENRY:  Foundation.
21 |              THE WITNESS:  I don't know 100 percent, but
22 | here's what -- here's what I know and this is -- this is
23 | just off of personal knowledge.  My brother's --
24 |              MS. WILLIAMSON:  I'm sorry, Antonio.  Before
25 | you answer this, could we have this answer marked
```

1   "confidential," please, in the record?

2   BY MS. WILLIAMSON:

3        Q.    You can keep going.  Go ahead, Antonio.  I'm

4   sorry..

5

6        (PAGES 159-160 HAVE BEEN DESIGNATED CONFIDENTIAL)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (PAGES 159-160 HAVE BEEN DESIGNATED CONFIDENTIAL)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





(THIS CONCLUDES THE CONFIDENTIAL DESIGNATION.)

**CARRIE•REPORTING**llc
CERTIFIED REPORTERS

2415 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Phone 480.429.7573 FAX 602.277.5576
Registered Reporter Firm. No. R1064

November 25, 2020

Mr. Robert A. Henry
Snell & Wilmer, L.L.P.
400 East Van Buren
Suite 1900
Phoenix, AZ 85004

In Re:  Antonio Pascale
        Briggs vs. Adel, et al.
        Case Number: CV2018-02684-EJM
        Date: 11/05/2020

**TRANSMITTAL OF ORIGINAL DEPOSITION**

**VIA FEDEX**

Dear Mr. Henry:

Please find enclosed the original transcript in the above-referenced deposition for filing with the Court at the appropriate time.  The signature of the deponent was not requested.

Thank you for this opportunity to be of service.  If you have any questions regarding this matter, please call our office.

Sincerely,

Michele Durrer

Michele Durrer
Office Assistant

Enclosure

# Ex. 28

[This exhibit is being filed under seal.]

# Ex. 29

[This exhibit is being filed under seal.]

EXHIBIT 30

1   Timothy J. Eckstein, 018321
    Joshua D. Bendor, 031908
2   OSBORN MALEDON, P.A.
    2929 N. Central Ave., Suite 2100
3   Phoenix, Arizona  85012-2793
    (602) 640-9000
4   teckstein@omlaw.com
    jbendor@omlaw.com
5
    Stanley Young
6   COVINGTON & BURLING LLP
    5 Palo Alto Square
7   Palo Alto, California 94306
    (650) 632-4704
8   syoung@cov.com
9   Katherine Chamblee-Ryan
    Olevia Boykin
10  CIVIL RIGHTS CORPS
    1601 Connecticut Ave. NW, Suite 800
11  Washington, D.C. 20009
    (202) 656-5189
12  katie@civilrightscorps.org
    olevia@civilrightscorps.org
13
    Attorneys for Plaintiffs

14

15              IN THE UNITED STATES DISTRICT COURT

16                  FOR THE DISTRICT OF ARIZONA

17   Deshawn Briggs, *et. al.*,

18                      Plaintiffs,          No.  CV-18-2684-PHX-EJM

19   v.                                      **PLAINTIFF ANTONIO PASCALE'S**
                                             **RESPONSES IN HIS CAPACITY AS**
20   Allister Adel, *et. al.*,               **PERSONAL REPRESENTATIVE OF**
                                             **MARK PASCALE'S ESTATE TO**
                        Defendants.          **DEFENDANT TASC'S FIRST SET**
21                                           **OF INTERROGATORIES,**
                                             **REQUESTS**
22                                           **FOR PRODUCTION, AND**
                                             **REQUESTS FOR ADMISSION**
23

24

25        Plaintiff Antonio Pascale ("Plaintiff" or "Plaintiff Pascale"), in his capacity as the

26   personal representative of Mark Pascale's estate, submits these responses to Defendant

27   TASC's First Set of Interrogatories, Requests for Production, and Requests for

28   Admission.  Plaintiff Antonio Pascale notes that the Requests are directed to "you," but

primarily inquire about the conduct of his father, the late Mark Pascale.  Plaintiff Antonio Pascale has endeavored in good faith to provide substantive responses based on his knowledge and/or the documents available to him (all of which have been produced in this case).

## INTERROGATORIES

**INTERROGATORY NO. 1:**  Explain all actions you have taken to preserve or produce documents relevant to this litigation.

**RESPONSE TO INTERROGATORY NO. 1**

Plaintiffs' counsel has produced documentation from the late Mark Pascale relevant to this litigation.  Plaintiff Antonio Pascale does not have personal knowledge of his late father's efforts to preserve and produce documents relevant to this litigation.

**INTERROGATORY NO. 2:** Identify all income you received during the time you participated in the MDPP, including the source and amount of all such income.

**RESPONSE TO INTERROGATORY NO. 2**

Plaintiff objects that this interrogatory is unduly burdensome and that "income" is vague and undefined. Plaintiff further objects to this interrogatory on the basis that discovery is ongoing, and Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff reserves his right to supplement or amend this response. Plaintiff further responds that documents produced in response to Defendant TASC's Requests for Production may contain additional information responsive to this interrogatory.  Subject to these limitations, Plaintiff Pascale responds as follows:

Mark Pascale participated in the MDPP from November 21, 2017 to July 5, 2018. *See* TASC000221. During that time, Mark Pascale's household received approximately $190 per month in nutritional assistance (food stamps) and $750 per month in Social Security Disability payments. *See id*. Mark Pascale also made negligible income from selling items he found at yard sales on EBay, all of which he used to pay TASC fees. Further information regarding Mark Pascale's income is contained in the document produced by TASC as TASC000221.

2

**INTERROGATORY NO. 3:** Identify all documentation and information regarding your financial situation that you provided to TASC while you participated in the MDPP.

**RESPONSE TO INTERROGATORY NO. 3**

Plaintiff objects because this interrogatory is unduly burdensome and vague. Plaintiff further objects that this interrogatory, by its very nature, seeks information over which Defendants have equal or superior access. Plaintiff objects that discovery is ongoing, and Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff reserves his right to supplement or amend this response. Plaintiff further responds that documents produced in response to Defendant TASC's Requests for Production may contain additional information responsive to this interrogatory. Subject to these limitations, Plaintiff responds as follows:

Mark Pascale participated in the MDPP from November 21, 2017 to July 5, 2018. *See* TASC000221.

- At his TASC orientation on November 21, 2017, Mark Pascale told an employee that he could not afford the $150 application fee. An employee allowed Mr. Pascale to pay $74 up front instead of the full $150 to attend the orientation. *See* Doc. 110 ¶ 253-54.
- When Mark Pascale reported for his first mandatory drug and alcohol test on or about January 22, 2018, he told his TASC case manager that he could not afford to pay the $950 in program fees. He also told her he could not afford to pay for GCMS services or drug and alcohol testing weekly or multiple times per week. *See* Doc. 110 ¶ 256-57; TASC000221.
- On December 6, 2017, Mark Pascale provided a SSI award letter to his case manager.
- On January 23, 2018, Mark Pascale completed a document titled "TASC Financial Information Form-Award Letters-Waived Fees" and provided information about his financial circumstances, including income, expenses, and access to additional income. In that document, Plaintiff showed that his monthly expenses, without TASC fees, exceeded his monthly income, and that he worked zero hours per week because he was disabled. Plaintiff also provided, in response to the question "What do you think you are able to pay per month toward your program fees", "I don't know the exact amount. But I will be [sic] pay something." TASC000221.
- On January 29, 2018, after providing the information in the "Financial Information Form" to his case manager, Mark Pascale's case manager informed him he would

3

need to show proof of all the information he provided in that "Financial Hardship" form. TASC000221.

- On January 30, 2018, Mark Pascale provided documentation supporting the income and expenses reported on the "Financial Information Form", including: an award letter from the Social Security Administration Supplemental Security Income showing a monthly payment of $750.00 in SSI; a Chase bill for his Mortgage showing a monthly payment of $688.34; a water bill from the City of Peoria for $49.99; a gas bill from SRP for $54.50 and reflecting back-payments due in the amount of $158.08; a car insurance bill from State Farm in the amount of $59.47; a food stamps award letter for $190 per month; a Verizon bill for phone and internet in the amount of $123.59. *See* TASC000221.

- At some point thereafter, Mark Pascale's case manager told him he did not qualify for reduced drug and alcohol testing fees because he owned a computer and was paying for internet service. Doc. 110 ¶ 263.

- On February 12, 2018, Mark Pascale told his case manager he was struggling to make payments related to drug and alcohol testing with his case manager. *See* TASC000221.

- On March 21, 2018, Mark Pascale called his case manager he was struggling financially, did not have food the week prior, and that he had to go to the food bank. He told his case manager he could not afford to pay $160 and asked if he could just pay for the drug and alcohol tests. TASC000221.

- On March 27, 2018, Mark Pascale asked his case manager if he could pay off his fees by increasing his credit card limit. When his case manager told him TASC only accepts money orders or debit card payments, he told his case manager he would talk to his bank to see if he could take out money to pay off his balance. TASC000221.

- On March 28, 2018, Mark Pascale called his case manager and stated he was able to get a cash advance of $300 and that he hoped he could pay off his balance and complete the program soon. *See* TASC000221.

- On March 30, 2018, Mark Pascale again discussed his balance and difficulty making payments with his case manager. *See* TASC000221; *see* Doc. 110 ¶ 270.

- On April 13, 2018, Mark Pascale told his case manager he was having difficulty paying for and traveling to test three times per week. *See* TASC000221.

- On April 15, 2018, Mark Pascale again discussed that he was working on paying off his outstanding balance with his case manager, who mentioned that the outstanding balance was the only thing keeping him on the program. *See* TASC000221.

- On May 2, 2018, Mark Pascale expressed difficulty paying for fees related to drug testing and a desire to pay off the remaining balance soon. *See* TASC000221.

4

- On June 21, 2018, Mark Pascale's birthday, he requested to be excused from testing and his case manager denied his request. His case manager mentioned that he had been compliant with program requirements and asked when he would be able to pay off the fees to be successfully terminated. Mark Pascale responded he hoped to be able to pay off the fees the following week. *See* TASC000221.
- On July 2, 2018, Mark Pascale called his case manager and informed her that his fees were paid off in full. His case manager stated that Mark Pascale would need to pay another fee associated with drug and alcohol testing, and Mark Pascale complained that it was unfair to continue charging him when he has paid program fees in full and the additional fee was unwarranted because he had a prescription. *See* TASC000221.
- On his final day, July 5, 2018, Mark Pascale expressed to his case manager that he thought he'd never be done with the program. *See* TASC000221.

Moreover, as alleged in the Second Amended Complaint, as a matter of official policy, with respect to the program fees, no fee waivers or reductions were available, regardless of Mark Pascale's income. *See* Doc. 110 ¶ 154.

**INTERROGATORY NO. 4:** Explain in detail the bases for your contention that you could not afford to pay MDPP fees, including any reasons why you could not:

- Borrow money;

- Work additional hours or an additional job; or

- Limit expenses.

**RESPONSE TO INTERROGATORY NO. 4**

Plaintiff objects that this interrogatory is unduly burdensome and vague. Plaintiff further objects that discovery is ongoing, and that Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff reserves her right to supplement or amend this response. Subject to these limitations, Plaintiff Pascale responds:

Mark Pascale did not have friends or family with the financial resources to lend money to him. He did, on one occasion, obtain a cash advance from his bank for the purpose of paying TASC fees, *see* TASC000221. "Work[ing] additional hours" was not an option because Mark Pascale was disabled and could not work, *see* Doc. 110 ¶ 241-

45; 261. Lastly, Mark Pascale limited his expenses as much as he possibly could. He often skipped paying bills in order to pay for TASC fees, *see* Doc. 110 ¶ 265; 272.

**INTERROGATORY NO. 5:** Describe all interactions you had with TASC representatives in which you informed the representatives that you could not afford to pay the required fees through the MDPP.

**RESPONSE TO INTERROGATORY NO. 5**

Plaintiff objects that this interrogatory is unduly burdensome and vague. Plaintiff objects that this interrogatory, by its very nature, seeks information over which Defendants have equal or superior access. Plaintiff further objects that discovery is ongoing, and that Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff further objects that this interrogatory seeks information with a greater specificity than a person could reasonably remember, and that this interrogatory is duplicative of information sought in Interrogatory No. 3. Plaintiff reserves his right to supplement or amend this response. Plaintiff further responds that documents produced in response to Defendants' requests for production may contain additional information responsive to this interrogatory.  Subject to these limitations, Plaintiff directs Defendant to his Response to Interrogatory No. 3, which responds fully to this Interrogatory.

**INTERROGATORY NO. 6:** Explain in detail all instances in which you contacted TASC for the purpose of obtaining information to use in this litigation, including instances in which you contacted TASC prior to the institution of this litigation for the purpose of assessing potential claims.

**RESPONSE TO INTERROGATORY NO. 6**

Plaintiff objects to the extent that this request seeks information protected by attorney-client and/or work product privileges. Such information is not discoverable thus this request will be construed not to seek such privileged documents. Subject to these limitations, Plaintiff responds that he never "contacted TASC prior to the institution of the litigation for the purpose of assessing potential claims" and he has no knowledge indicating that Mark Pascale did so, either.

6

**INTERROGATORY NO. 7:** Identify all expenses you had during your time on the MDPP, including both living and discretionary expenses.  For each such expense, identify the amount or approximate amounts owed or paid, the intervals in which such amounts were paid or owed (e.g., monthly, bi-monthly, etc.) and the persons or entities to which such payments were paid or owed.

**RESPONSE TO INTERROGATORY NO. 7**

Plaintiff objects to this interrogatory as unduly burdensome and vague. As written, it would require Plaintiff, for example, to identify each and every place he paid money for any meal. Plaintiff further objects that this interrogatory seeks information with a greater specificity than a person could can reasonably remember. Plaintiff further objects that discovery is ongoing, and that Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff reserves his right to supplement or amend this response. Plaintiff further objects that this request is duplicative of information sought in Defendant TASC's First Set of Requests for Production, and Plaintiff also notes that information responsive to this request may be found in Plaintiffs' MIDP Responses. Subject to these limitations, Plaintiff Pascale responds as follows:

While on the MDPP, Mark Pascale spent approximately the following amounts each month:

- $688.34 monthly for Mortgage payment to Chase Bank;
- $49.99 monthly for water to the City of Peoria;
- $54.50 monthly for gas to SRP;
- $59.47 monthly for car insurance to State Farm;
- $123.59 monthly for phone and internet to Verizon;
- $90 monthly for gas for his car.

Mark Pascale also incurred some expenses, such as food, clothing and educational costs, on behalf of his minor son. He struggled to afford the basic necessities of life for him and his son, and sometimes did not pay these expenses so that he could pay TASC fees.

**INTERROGATORY NO. 8:** Identify any person or entity who, in any manner and for

any purpose, loaned, gifted, or provided you with any financial assistance in any amount of money over $50 from August 23, 2016 to the present.

**RESPONSE TO INTERROGATORY NO. 8**

Plaintiff objects to this interrogatory as unduly burdensome and vague. Plaintiff further objects that this interrogatory seeks irrelevant information. The information sought does not pertain to any claim or defense. Plaintiff further objects that this interrogatory seeks information with a greater specificity than any person could reasonably remember.  Subject to these limitations, Plaintiff states that Mark Pascale once received a $300 advance from Mark Pascale's bank, which Plaintiff believes was Chase Bank.

**INTERROGATORY NO. 9:** Identify all of your social media accounts for which you had a login and password during your time in the MDPP.

**RESPONSE TO INTERROGATORY NO. 9**

Plaintiff objects that this interrogatory seeks irrelevant information. The information sought does not pertain to any claim or defense and there are no allegations regarding TASC conduct relating to the social media accounts of Mark or Antonio Pascale. No information will be provided in response to this interrogatory.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:** Please produce all documents identified in, or used to prepare, the responses to the interrogatories above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**

With the exception of the documents cited herein, which have already been produced, no documents were used to prepare or identified in the interrogatories above. Accordingly, no additional documents will be produced in response to this request.

**REQUEST FOR PRODUCTION NO. 2:** Please produce all documents supporting your contention that you could not afford to make a payment for the MDPP while you were enrolled in the same, including, but not limited to, documentation reflecting:

a) your income while on the MDPP;

b) any governmental assistance you may have received;

c) your balances and available balances with banks and credit cards;

d) your expenses; and

e) any efforts you made to borrow funds.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

Plaintiff objects to this request as unduly burdensome and vague. Plaintiff further objects that this request for production seeks documents over which Defendants have equal or superior access. Plaintiff further objects that this request is duplicative of information sought in Defendant TASC's First Set of Interrogatories. Subject to these limitations, Plaintiffs have produced responsive documents and any additional responsive documents will be produced.

**REQUEST FOR PRODUCTION NO. 3:** Please produce all documents supporting the damages you are seeking in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

Plaintiff objects to this request as unduly burdensome. Plaintiff further objects that discovery is ongoing and that Plaintiff may adduce further information that may be responsive to this interrogatory. Plaintiff reserves his right to supplement or amend this response. Plaintiffs state that they have produced responsive documents and any additional responsive documents will be produced.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:** Admit that you did not provide any financial documentation confirming income or expense amounts to TASC representatives while enrolled in the MDPP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

Plaintiff denies this request for admission. Mark Pascale provided financial documentation to TASC regarding his income and expenses on or about January 29, 2018,

1    *see* TASC000221. Moreover, as alleged in the Second Amended Complaint, as a matter

2    of official policy, with respect to the program fees, no fee waivers or reductions were

3    available, regardless of a participant's income. *See* Doc. 110 ¶ 154. [1]

4    **REQUEST FOR ADMISSION NO. 2:** Admit that you received documents

5    substantially similar to TASC000047-54 to apply for a fee waiver or reduction with the

6    MDPP.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 2**

8         Plaintiff admits that Mark Pascale received and submitted a "Financial Information

9    Form," *see* TASC000221, a document substantially similar to TASC000047-54 .

10

11        DATED this 23rd day of July, 2020.

12

13                          By /s/Olevia Boykin
                               Olevia Boykin

14                             Katherine Chamblee-Ryan

15                             Olevia Boykin
                               CIVIL RIGHTS CORPS
                               1601 Connecticut Ave. NW, Suite 800

16                             Washington, D.C. 20009

17                             Timothy J. Eckstein

18    _____

19    [1] Because at the time of service there was no party who could respond due to the untimely
      death of the late Mark Pascale, these Responses to Defendant TASC's Requests for

20    Admission are timely made within 30 days of the Court's Order granting Plaintiffs'
      Motion to Substitute, *see* Doc. 171. Alternatively, even if this response is untimely, the

21    trial court may excuse such delay made in good faith and causing no prejudice to
      Defendant TASC, *see French v. United States*, 416 F.2d 1149, 1152 (9th Cir. 1968) ("A

22    trial judge has discretion to permit a late response to a request for admissions made

23    pursuant to Rule 36 F.R.Civ.P. and thus relieve a party of apparent default . . . .Under
      compelling circumstances the District Court may allow untimely replies to avoid the

24    admission . . . Since the purpose of Rule 36 is to expedite trial by removing uncontested
      issues and no delay was caused here, there is no sufficient reason to force the District

25    Court to grant summary judgment here where no prejudice is shown.") (internal citations

26    and quotations omitted) or allow this Response as an amendment, *see* Fed. R. Civ. P.
      36(b) ("the court may permit withdrawal or amendment if it would promote the

27    presentation of the merits of the action and if the court is not persuaded that it would

28    prejudice the requesting party in maintaining or defending the action on the merits.")

1
2
3

Joshua D. Bendor
OSBORN MALEDON
2929 N. Central Ave., Suite 2100
Phoenix, Arizona  85012-2793

4
5
6
7

COVINGTON & BURLING LLP
Stanley Young
5 Palo Alto Sq.
Palo Alto, CA 94306
(650) 632-4704
syoung@cov.com

8
9
10

Sarah Mac Dougall
620 8th Avenue
New York, New York, 10018
(212) 841-1215
smacdougall@cov.com

11
12
13

Virginia Williamson
850 10th St. NW
Washington, D.C. 20001
(202) 662-5983
vwilliamson@cov.com

14

*Attorneys for Plaintiffs*

15

Attorneys for Plaintiffs

16
17
18
19
20
21
22
23
24
25
26
27
28

11

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2020, the attached document was served via electronic mail upon counsel for Defendant TASC.

<u>/s/Olevia Boykin</u>
Olevia Boykin

I declare under penalty of perjury that the information in Plaintiff Antonio Pascale's Amended Response to Defendant's Interrogatory, served December 3, 2020, is true and correct to the best of my knowledge.

Executed on: April 21, 2021

Antonio Pascale

# EXHIBIT 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

DESHAWN BRIGGS, et al.,

        Plaintiff,

        v.

ALLISTER ADEL, et al.,

        Defendant.

Case No. CV 2018-02684-EJM

PLAINTIFF ANTONIO PASCALE'S
AMENDED RESPONSE TO
DEFENDANT'S INTERROGATORY

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT'S INTERROGATORY

COMES NOW, Plaintiff, by and through his undersigned counsel, and pursuant to

Federal Rule of Civil Procedure 33, makes the following Amended Response to Defendant's

Interrogatory.

## GENERAL OBJECTIONS

1. ~~The following responses are based upon information and documents presently available to and located by plaintiffs and their attorneys, except for explicit facts expressly set forth herein, no incidental or implied admissions are intended hereby. The fact that Plaintiffs have responded or objected to any interrogatory or part thereof is not intended to be and should not be construed to be an admission that Plaintiffs accept or admit the existence of any "facts" set forth or assumed by such interrogatory, or that such response or objection constitutes admissible evidence. The fact that Plaintiffs have responded to part or all of any interrogatory is not intended to be and shall not be construed to be a waiver of all or any part of any objection to the interrogatory.~~

2. ~~To the extent that the interrogatory seeks information or documents prepared in~~

~~anticipation or defense of litigation or for trial, or information or documents covered by~~

~~the attorney work product doctrine or protected from disclosure by the attorney-client~~

~~privilege, Plaintiffs object to such request, and thus will not supply or render any~~

~~information protected from disclosure by any applicable privilege.~~

3. ~~Plaintiffs object to Defendant's request to the extent they purport to impose upon~~
   ~~Plaintiff's obligations that are broader than, in addition to, or different from those~~
   ~~imposed by the Federal Rules of Civil Procedure or this Court's scheduling order.~~

4. ~~Plaintiffs object to the requests insofar as any request may be construed to require~~
   ~~Plaintiffs to produce documents from third party sources that are not in or subject to~~
   ~~Plaintiff's control and/or are equally accessible to other parties, such as documents~~
   ~~maintained as public records.~~

5. ~~Plaintiff's General Objections are incorporated into each specific response below.~~

## **INTERROGATORIES**

**INTERROGATORY NO. 10:** Please identify all individuals and entities who provided information used to prepare the responses to Interrogatory Nos. 1-8 that you served on TASC on or about July 23, 2020, and the specific information each such individual and each such entity provided.

**ANSWER:** ~~Plaintiff objects on the grounds that this interrogatory is overbroad and unduly burdensome, and thus not proportional to the needs of the case, to the extent it seeks to require Plaintiff to recall and individually itemize every conversation that he has ever had with anyone related to the case. Plaintiff further objects to the extent the interrogatory seeks information protected by the attorney-client privilege. Plaintiff interprets this interrogatory not to include nor request communications Plaintiff had with Plaintiff's counsel or any counsel (as to interpret it to include such communications would require the disclosure of information protected by attorney-client privilege and attorney work product). Finally, Plaintiff objects to this request as asked and answered. Plaintiff's answers to the referenced interrogatories included citations to documents from which the reported information was derived. Accordingly, the responses in question speak for themselves and provide the information sought by this interrogatory.~~

**Plaintiff asserts that the information provided in response to these interrogatories came from Antonio Pascale, Plaintiffs' counsel at Civil Rights Corps, or Plaintiffs' counsel through Mark Pascale, and documents produced in discovery.  Specifically,**

1. **Interrogatory No. 1: The information in this interrogatory response came from Mark Pascale, Plaintiffs' counsel, and Antonio Pascale.**
   a. **Mark Pascale endeavored to preserve all relevant documents in accordance with his obligations under the federal rules.** *This information came from Plaintiff's counsel through Mark Pascale.*
   b. **He provided many such documents to Plaintiff's Counsel and TASC representatives, and responsive documents have been produced.** *This information came from Plaintiffs' counsel.*
   c. **Upon his death and the resolution of his estate, many documents were lost.** *This information came from Antonio Pascale.*
   d. **Plaintiff Antonio Pascale has access to some financial documents.** *This information came from Antonio Pascale.*

2. **Interrogatory No. 2: The information in this interrogatory response comes from Mark Pascale's TASC participant file.**
   a. **Mark Pascale participated in the MDPP from November 21, 2017 to July 5, 2018.** *This information came from TASC000221.*
   b. **During that time, Mark Pascale's household received approximately $190 per month in nutritional assistance (food stamps) and $750 per month in Social Security Disability payments.** *This information came from TASC000275, TASC000296.*
   c. **Mark Pascale also made negligible income from selling items he found at yard sales on EBay, all of which he used to pay TASC fees.** *This information came from TASC000275.*
   d. **Further information regarding Mark Pascale's income is contained in the document produced by TASC at TASC000221.** *This information came from TASC000221-TASC000302.*

3. **Interrogatory No. 3: The information in this interrogatory came from Mark Pascale, Mark Pascale's TASC Participant file, and Plaintiffs' counsel.**
   a. **At his TASC orientation on November 21, 2017, Mark Pascale told an employee that he could not afford the $150 application fee.** *This information came from Plaintiff's counsel through Mark Pascale.*
   b. **An employee allowed Mr. Pascale to pay $74 up front instead of the full $150 to attend the orientation.** *This information came from Plaintiff's counsel through Mark Pascale and TASC000273.*
   c. **When Mark Pascale reported for his first mandatory drug and alcohol test on or about January 22, 2018, he told his TASC case manager that he could not afford to pay the $950 in program fees. He also told her he could not afford to pay for GCMS services or drug and alcohol testing weekly or multiple times per week.** *This information came from Plaintiff's counsel through Mark Pascale and TASC000229.*
   d. **On December 6, 2017, Mark Pascale provided a SSI award letter to his case manager.** *This information came from TASC000229.*
   e. **On January 23, 2018, Mark Pascale completed a document titled "TASC**

Financial Information Form-Award Letters-Waived Fees" and provided information about his financial circumstances, including income, expenses, and access to additional income. In that document, Plaintiff showed that his monthly expenses, without TASC fees, exceeded his monthly income, and that he worked zero hours per week because he was disabled. Plaintiff also provided, in response to the question "What do you think you are able to pay per month toward your program fees", "I don't know the exact amount. But I will be [sic] pay something." *This information came from TASC000275.*

f.  On January 29, 2018, after providing the information in the "Financial Information Form" to his case manager, Mark Pascale's case manager informed him he would need to show proof of all the information he provided in that "Financial Hardship" form. *This information came from TASC000229.*

g.  On January 30, 2018, Mark Pascale provided documentation supporting the income and expenses reported on the "Financial Information Form", including: an award letter from the Social Security Administration Supplemental Security Income showing a monthly payment of $750.00 in SSI; a Chase bill for his Mortgage showing a monthly payment of $688.34; a water bill from the City of Peoria for $49.99; a gas bill from SRP for $54.50 and reflecting back-payments due in the amount of $158.08; a car insurance bill from State Farm in the amount of $59.47; a food stamps award letter for $190 per month; a Verizon bill for phone and internet in the amount of $123.59. *This information came from TASC000276-285, TASC000228.*

h.  At some point thereafter, Mark Pascale's case manager told him he did not qualify for reduced drug and alcohol testing fees because he owned a computer and was paying for internet service. *This information came from Plaintiffs' counsel through Mark Pascale.*

i.  On February 12, 2018, Mark Pascale told his case manager he was struggling to make payments related to drug and alcohol testing with his case manager. *This information came from TASC000228.*

j.  On March 21, 2018, Mark Pascale called his case manager he was struggling financially, did not have food the week prior, and that he had to go to the food bank. He told his case manager he could not afford to pay $160 and asked if he could just pay for the drug and alcohol tests. *This information came from TASC000227.*

k.  On March 27, 2018, Mark Pascale asked his case manager if he could pay off his fees by increasing his credit card limit. When his case manager told him TASC only accepts money orders or debit card payments, he told his case manager he would talk to his bank to see if he could take out money to pay off his balance. *This information came from TASC000227.*

l.  On March 28, 2018, Mark Pascale called his case manager and stated he was able to get a cash advance of $300 and that he hoped he could pay off his balance and complete the program soon. *This information came from TASC000227.*

m.  On March 30, 2018, Mark Pascale again discussed his balance and difficulty making payments with his case manager. *This information came from TASC000227.*

n. On April 13, 2018, Mark Pascale told his case manager he was having difficulty paying for and traveling to test three times per week. *This information came from TASC000227.*

o. On April 15, 2018, Mark Pascale again discussed that he was working on paying off his outstanding balance with his case manager, who mentioned that the outstanding balance was the only thing keeping him on the program. *This information came from TASC000227.*

p. On May 2, 2018, Mark Pascale expressed difficulty paying for fees related to drug testing and a desire to pay off the remaining balance soon. *This information came from TASC000227.*

q. On June 21, 2018, Mark Pascale's birthday, he requested to be excused from testing and his case manager denied his request. His case manager mentioned that he had been compliant with program requirements and asked when he would be able to pay off the fees to be successfully terminated. Mark Pascale responded he hoped to be able to pay off the fees the following week. *This information came from TASC000226.*

r. On July 2, 2018, Mark Pascale called his case manager and informed her that his fees were paid off in full. His case manager stated that Mark Pascale would need to pay another fee associated with drug and alcohol testing, and Mark Pascale complained that it was unfair to continue charging him when he has paid program fees in full and the additional fee was unwarranted because he had a prescription. *This information came from TASC000226.*

s. On his final day, July 5, 2018, Mark Pascale expressed to his case manager that he thought he'd never be done with the program. *This information came from Plaintiffs' counsel through Mark Pascale.*

t. As a matter of official policy, with respect to the program fees, no fee waivers or reductions were available, regardless of Mark Pascale's income. *This information came from Plaintiffs' counsel.*

4. **Interrogatory No. 4:** The information in this interrogatory came from Mark Pascale and his TASC participant file.

a. Mark Pascale did not have friends or family with the financial resources to lend money to him. *This information came from Plaintiffs' counsel through Mark Pascale.*

b. He did, on one occasion, obtain a cash advance from his bank for the purpose of paying TASC fees. *This information came from TASC000227.*

c. "Work[ing] additional hours" was not an option because Mark Pascale was disabled and could not work. *This information came from Plaintiffs' counsel through Mark Pascale.*

d. Mark Pascale limited his expenses as much as he possibly could. He often skipped paying bills in order to pay for TASC fees. *This information came from Plaintiffs' counsel through Mark Pascale.*

5. **Interrogatory No. 5:** Plaintiff directs Defendant to his Response regarding Interrogatory No. 3.

6. **Interrogatory No. 6:** The information in this interrogatory response came from Antonio Pascale.

7. **Interrogatory No. 7:** The information in this interrogatory response came from Mark Pascale and Mark Pascale's TASC participant file.

   a. While on the MDPP, Mark Pascale spent approximately the following amounts each month:
   - $688.34 monthly for Mortgage payment to Chase Bank;
   - $49.99 monthly for water to the City of Peoria;
   - $54.50 monthly for gas to SRP;
   - $59.47 monthly for car insurance to State Farm;
   - $123.59 monthly for phone and internet to Verizon;
   - $90 monthly for gas for his car.
   *This information came from TASC000276-285.*
   b. Mark Pascale also incurred some expenses, such as food, clothing and educational costs, on behalf of his minor son. *This information came from Plaintiffs' counsel through Mark Pascale.*
   c. He struggled to afford the basic necessities of life for him and his son, and sometimes did not pay these expenses so that he could pay TASC fees. *This information came from Plaintiffs' counsel through Mark Pascale.*

8. **Interrogatory No. 8:** The information in this interrogatory response came from Mark Pascale's TASC participant file (TASC000227) and Antonio Pascale.

9. **Interrogatory No. 9:** Plaintiff did not provide any information in response to this interrogatory.

**Plaintiff is not withholding any information in responding to this interrogatory.**

DATED this 19th day of March, 2021.

*/s/ Sumayya Saleh*
Sumayya Saleh
(*pro hac vice*)*
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
sumayya@civilrightscorps.org
(202) 932-1278

*Not admitted in the District of Columbia;
practice limited pursuant to App. R 49(c)(8),
with supervision by Ryan Downer.

I declare under penalty of perjury that the information in Plaintiff Antonio Pascale's Amended Response to Defendant's Interrogatory, served December 3, 2020, is true and correct to the best of my knowledge.

Executed on: April 21, 2021

Antonio Pascale

EXHIBIT 32

2/18/09    Melissa    West    Nandi    3533    7908

| Intake Date | Interviewer | Office | Case Mgr | Program ID  Donor ID |
|---|---|---|---|---|

Redacted

Pascale, Mark

Client Name – Last Name, First Name, M.I.

D.O.B. 58    Age 50

13051 N 75th Dr.

Mailing Address     APT #

Peoria AZ 85054

City/State/Zip

602-419-5970

Home Phone #     Cell/Other #

---

Employer     Work #

**ETHNICITY:** (X)W ( )H ( )B ( )N ( )O    **GENDER:** (X)M ( )F

**MARITAL STATUS:** ( )Single[S] ( )Married [M] (X)Separated [P] ( )Divorced [D]

**Current Offense:** ( )Pre-File (X)Post-file (X)EDC ( )SEF ( )Re-entry ( )Pre-IA

**Defense Attorney:** Jeff Roth    (X)PD ( )LD ( )PRIVATE (ph#_____)

**Submittal/CR#** 2008-170090    2nd charge-Submittal/CR#_____

| | | | | | |
|---|---|---|---|---|---|
| (X)APOND | ( )APOND | ( )Crack | ( )Cocaine | ( )Heroin/other_____ | ( )POM |
| ( )PODD | ( )APODD | ( )Meth | ( )LSD | ( )Other_____ | ( )POM |
| ( )ONDF | (X)AONDF | ( )ODDF | ( )AODDF Rx Hydrocodone | | |

**Employment:** (X)[U]Unemployed    ( ) [P]Part-Time    ( ) [F] Full-time ( )[D]Disabled

**Fees** ( )Full[F]

(X)Sliding[S]

( )Copay[C]

| | Intake Fee | TASC Fee | CA Fund | Booking Fee | UA Fees |
|---|---|---|---|---|---|
| | (X)150 | (X)285 | ( )750 | (X)50 | ( )14 DIV |
| | ( )175 | ( )____ | (X)1500 | ( )0 | (X)19 DIVRX |

**Verification:** (X)AHCCCS Card    ( )SSI/SSDI Award Letter    ( )Other_____

**Prior Treatment:** (X)No[N]    ( )Yes[Y] if Y/# of times/dates/location_____

**Counseling:** (X)TASC    ( )PRIVATE-Name/Phone_____

**Support Groups** 12 Step: (X)AA ( )CA ( )MA ( )NA ( )CMA ( )PA
( )Other_____ Or ( )Smart Recovery    ( )Other_____

**Primary Drug Use (√ all Applicable):** ( )Meth[M] ( )Coc[C] ( )Marij[T] ( )Club Drugs [E]
( )Opiates(Heroin/Rx) [O] ( )Polydrug (3+drugs) [P] (X)Denied drug problem[D] {(X) Alcohol}

**Priors:** ( )Misdo    ( )Fel #/dates/charge_____

**COLOR:** Sage    **CONTACT CM:** 3/16/09    **SEMINAR:** 3/14/09 @ 8AM

**FIRST PAYMENT DUE:** 3rd Friday (3/20/09)    **COMMENTS:** PAID FEB 1 8 2009

TASC000090

*J - Roth*



TREATMENT ASSESSMENT SCREENINGCENTER, INC.
2234 N. 7th Street
Phoenix, AZ 85006

## MARICOPA COUNTY ATTORNEY / TASC DRUG DIVERSION PROGRAM

### STATEMENT OF FACTS

**INSTRUCTIONS:** All information on this form is to be completed in defendant's handwriting. Those participants with attorneys must be sure that the attorney signs the Statement of Facts Form and the attorney must complete the DR # and Submittal # / CR #. Statement of Facts which are not complete in either content or any areas of this form will cause a rejection and a new form will be given to the defendant.

DATE: __1/22/09__

APPLICANT'S NAME: __Mark A - Pascale__    DATE OF BIRTH: __Redacted 58__

APPLICANT'S ADDRESS: __13051 N. 78th Dr Peoria AZ 85381__

DR # __Redacted 4968__    SUBMITTAL #: __CR 2008-170090-001 DT__

You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning and to be with you during questioning if you so desire. If you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning.
Do you understand these rights? __Yes__

1) Offense under investigation? __Attempted acquisition OF NARCOTIC DRUGS__
2) Date of offense? __5/29/08__
3) Location and County? __Glendale                  AZ, Maricopa County__
4) What substance did you possess or use? __Hydrocodone__
5) Did you knowingly possess or use the substance? __Yes__
6) Was it a usable amount? __Yes__
7) Did you have a valid doctor's prescription for the substance? __NO__
8) What are the facts of the offense?
   __I attempted to # obtain Hydrocone with a false__
   __Prescription__

I HAVE MADE THIS STATEMENT WITHOUT COERCION AND OF MY OWN FREE WILL. I FULLY UNDERSTAND THAT WHAT I HAVE WRITTEN HERE MAY BE USED AGAINST ME IN A COURT OF LAW SHOULD I FAIL TO SATISFACTORILY COMPLETE THE TASC PROGRAM.

Applicant's Signature: _____   Date: __1/22/09__

Attorney's Signature: _____   Date: __1/22/09__

I HAVE WAIVED MY RIGHT TO AN ATTORNEY AND HAVE ANSWERED ALL QUESTIONS:

_____   _____
Applicant's Signature              Date

TASC Signature: __Stella Garcia__   Date: __1/22/09__

TASC000092

## TASC Financial Information Form-Co-Pay
*Please write legibly*

Client Name: Mark Pascale       Donor ID _____       Date: 11|18|09

Employment:    Full Time      Part Time      Unemployed      Disabled

If employed, how many hours a week do you work? _____ Self _____

What is your monthly income? _____ $1,000.00 _____

What is your monthly **household** income? _____ Ø _____

Please list **ALL** monthly expenses for household (i.e. rent/mortgage):

| Expense | Amount |
|---|---|
| Mortgage | $1,300.00 |
| E/c. | $150.00 |
| water | $60.00 |
| Phone | $100.00 |
| Food | $300.00 |
| Gas | $100.00 |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
| **TOTAL** | $2,150.00 |

What do you think you are able to pay per month towards your program fees? $150.00

_____          11/18/09
Client signature                 Date

CC-227 (11-02)

# ARIZONA DEPARTMENT OF ECONOMIC SECURITY

# SELF-EMPLOYMENT LOG

CALENDAR MONTH (Mo./Yr.) 1-1-10

CLIENT'S NAME (Last, First, M.I.) ___ # 01365690

CLIENT'S SOC. SEC. NO. 283

CLIENT'S ADDRESS (No., Street, City, State, ZIP) 13051 N. 75th Dr. Peoria AZ

CLIENT'S PHONE NO. 602-619-5900

PHONE NO. ___ Same

| DATE JOB PERFORMED | TOTAL HOURS WORKED | GROSS $ AMOUNT PAID | DATE PAID | METHOD OF PAYMENT | TYPE OF WORK | EMPLOYER'S NAME, ADDRESS, PHONE NO. (Or location of self-employed registry) |
|---|---|---|---|---|---|---|
| 1. | 1/8 | $ 600.00 | 1/8 | ☐ Check ☒ Cash ☐ Money Order ☐ Other | Repairs ? | M.S. Investments |
| 2. | | $ | | ☐ Check ☒ Cash ☐ Money Order ☐ Other | Cont Sales | M.S. Investments |
| 3. 1/14 | | $ 10.82 | 1/14 | ☐ Check ☒ Cash ☐ Money Order ☐ Other | Car sales | MdS   Investments |
| 4. 1/24 | | $ 100 | 1/24 | ☐ Check ☒ Cash ☐ Money Order ☐ Other | CH SALES | M.S Investments |
| 5. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 6. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 7. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 8. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 9. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 10. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 11. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 12. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 13. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| 14. | | $ | | ☐ Check ☐ Cash ☐ Money Order ☐ Other | | |
| TOTAL → | | $ 800.00 | | | | |

Under the Americans with Disabilities Act (ADA), the Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service, or activity. For example, this means that if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. This document is available in alternative formats by contacting: 602-542-4248.

Equal Opportunity Employer/Program ♦ Disponible en español en la oficina local.

TASC000097

ARIZONA DEPARTMENT OF ECONOMIC SECURITY

# SELF-EMPLOYMENT LOG

CC-227 (11-02)

CLIENT'S NAME (Last, First, M.I.): MIAK R TASCALE

CLIENT'S SOC. SEC. NO.: ~283

CLIENT'S ADDRESS (No., Street, City, State, ZIP): 305 W. 75 Dr. Peok,A AZ 85381

CLIENT'S PHONE NO.: 622-619-59

PHONE NO.: Same

CALENDAR MONTH (Mo., Yr.): 12-1-09

12/09

| DATE JOB PERFORMED | TOTAL HOURS WORKED | GROSS $ AMOUNT PAID | DATE PAID | METHOD OF PAYMENT | TYPE OF WORK | EMPLOYER'S NAME, ADDRESS, PHONE NO. (Or location of self-employed agent) |
|---|---|---|---|---|---|---|
| 1. 12/4 | | $ 400.00 | 12/4 | ☑Cash ☐ Check ☐ Money Order ☐ Other | one sale | MVS Investments |
| 2. 12/16 | | $ 200.00 | 12/16 | ☑Cash ☐ Check ☐ Money Order ☐ Other | one sale | MVS Investments |
| 3. 12/30 | | $150.00 | 12/30 | ☑Cash ☐ Check ☐ Money Order ☐ Other | one sale | MVS Investments |
| 4. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 5. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 6. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 7. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 8. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 9. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 10. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 11. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 12. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 13. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| 14. | | $ | | ☐ Cash ☐ Check ☐ Money Order ☐ Other | | |
| TOTAL → | | $750.00 | | | | |

Equal Opportunity Employer/Program ◆ Disponible en español en la oficina local.

Under the Americans with Disabilities Act (ADA), the Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service, or activity. For example, this means that if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. This document is available in alternative formats by contacting: 602-542-4248.

TASC000098

## TASC CLIENT FEE AGREEMENT: CO-PAY

Date __8/10/09__                     Expiration Date of Fee Agreement __11/14/09__

|  |  |  |
|---|---|---|
| TASC FEE | $1285.00 |  |
| CA FUND | 1500 |  |
| BOOKING FEE | 50 |  |
| **TOTAL** | $2835.00 |  |

Supporting Documentation:

SSI Letter          AHCCCS Letter          Expiration Date of Letter_____
FS Letter           CA Letter                 Other _____

_____WP_____ I understand that my UA fees will be $ _7.00_ for 90 days, unless otherwise stated by my case manager.

_____WP_____ I understand that ANY violation of my program requirements may result in termination of this fee agreement and/or program participation.  Therefore I understand that if this fee agreement is voided due to program non-compliance, I will immediately resume responsibility of all program costs including UA fees.  It is strongly encouraged that I obtain emergency UA money orders at this time.

_____WP_____ I understand that if my fee agreement is terminated, I must be in compliance with ALL program requirements prior to reconsideration for fee agreement renewal.

_____WP_____ I understand that I am responsible to provide updated records to my case manager including but not limited to current award letters, paycheck stubs etc.

_____WP_____ I understand that my monthly payment will be reduced to $50.00 .

_____WP_____ I understand that I MUST make my monthly payment EACH month in order for my UA's to remain on Co-Pay status.

_____WP_____ I am responsible to meet with my case manager in 90 days for a fee agreement renewal.

$25 towards GCMS monthly pmt. $25 *(W)*

_____  8/10/09          _____  8/10/09
Client Signature              Date              Case Manager Signature   Date

TASC000099

## TASC Financial Information Form-Co-Pay

*Please write legibly*

Client Name: _MARK PASCALE_   Donor ID _9081_ Redacted Redacted   Date:_____

Employment:   Full Time   Part Time   Unemployed   Disabled

If employed, how many hours a week do you work? _____

What is your monthly income? _0 Food Stamps $300 00 Family Help_

What is your monthly **household** income? _$2100 00_

Please list **ALL** monthly expenses for household (i.e. rent/mortgage):

| | |
|---|---|
| House 1st & 2nt | $ 1300 00 |
| E/c. | $ 300 00 |
| S&P | $ 51 |
| Phone | $ 50 |
| Inc. | $ 120 |
| Gas | $ 100 00 |
| | $ |
| | $ |
| | $ |
| | $ |
| **TOTAL** | $ 1971.00 |

What do you think you are able to pay per month towards your program fees?

_$50 00_

_____
Client signature

_8-10-06_
Date

TASC000100

1 of 2

**Bank of America**

**Home Loans**

Customer Service
PO Box 5170
Simi Valley, CA 93062-5170

Post-Petition Billing Cycle/
Statement Period
07/01/2009 - 07/31/2009

**Account Number** (Redacted) 3813

Property address
13051 N 75th Dr



0237880 01 AT 6.357 **AUTO T8 0 8651 85381-4005
H H0 AG .8..2......... 500 IN 1 P38119 DT109
MARK A PASCALE
13051 N 75th Dr
Peoria AZ 85381-4005

ldllllllllllllllllllllllllllllllllllllllllllll

**IMPORTANT NOTICE**

If you do not want us to send you monthly statements in the future, please contact us at 1-800-669-5864.

This statement is being furnished for informational purposes only and should not be construed as an attempt to collect against you personally. While your obligation to BAC Home Loans Servicing, LP may be discharged, by operation of law, BAC Home Loans Servicing, LP has retained the ability to enforce its rights against the property securing this loan should there be a default.

If you are presently involved in a Chapter 13 proceeding, please be advised that you are required to obey all orders of the Court, including those confirming or modifying the terms of your repayment plan. You may disregard the payment information/coupon below to the extent it conflicts with any order or requirement of the Court.

This is not a statement of the amount necessary to payoff your loan.

| ACCOUNT SUMMARY | Loan Summary | |
|---|---|---|
| | Average daily balance | $28,910.68 |
| | Corresponding ANNUAL PERCENTAGE RATE | 5.7500% |
| | Daily periodic rate | 0.01575% |
| | Historical ANNUAL PERCENTAGE RATE | 5.7500% |
| | Days in Cycle | 31 |
| | FINANCE CHARGE | $141.19 |

| Payment Details(1) | |
|---|---|
| Periodic FINANCE CHARGE | $141.19 |
| Minimum(1) payment due: 08/15/2009 | $141.19 |
| (see next page for transaction details) | |

(1) The references are to account details after (post-petition) you file your bankruptcy petition.
(2) Under the terms of your loan documents and federal law, a loan servicer may prohibit additional extensions of credit or reduce the credit limit.

**HOW TO MAKE A PAYMENT**

**1. Please**
- don't send cash
- don't staple your check to the payment coupon
- don't include correspondence
- include coupon with payment

2. Write your account number on your check or money order.

3. Make your check payable to **BAC Home Loans Servicing, LP** PO Box 10287 Van Nuys, CA 91410-0287

Redacted

Account number   1813 ,   (8)
Mark A Pascale
13051 N 75th Dr

SEE OTHER SIDE FOR IMPORTANT INFORMATION   8851

ldlllllllllllllllllllllllllllllllllllllllll

BAC Home Loans Servicing, LP
PO Box 10287
Van Nuys, CA 91410-0287

**HOME EQUITY LOAN**

Payment(1) Due Date Aug 15, 2009   $141.19

| | |
|---|---|
| Additional Principal | |
| N/A | |
| Check Total | |

0221688138000000141119000000000

Redacted   3813

TASC000117



**T**asc

This certifies that

*Mark Pascale*

**has successfully completed**

*The Maricopa County Attorney/TASC*
*Adult Deferred Prosecution Program*

Presented on <u>February 18, 2010</u>

Executive Director

Case Manager

TASC000133

NAME: **PASCALE, MARK**
DONOR ID   Redacted   **9081**
DOB:
Phone: **602-619-5970**
Color: OPAL
Seminar:

| DATE | SUBJECT |
|---|---|
| 11/20/09 | CT called re missing test.  CT put back on OPAL and will test today.  Per PC, any more missing test, CT will be u-term.  FINAL VL PREPARED AND MAILED |
| 11/30/09 | CT called to discuss VL.  Reviewed program requirements.  CM told CT he needs to pay $50 and $25 for GCMS.  CT stated he will try to scrape up the $50 and pay today, and get the $25 by end of week. |
| 1/6/10 | Reviewed program requirements with CT.  CT will pay for GCMS in the next week or two.  Color changed to GOLD. |
| 1/11/10 | Called CT re missing test on 1/8.  Reviewed program requirements.  CM told CT since he had color change, won't term him for this one.  Must test today. |
| 1/26/10 | Called CT to discuss copay.  CT stated he is self employed but not making much money right now.  He said he goes to a lot of doc appts.  CT will submit ledger that he gives to DES showing how much he makes every month.  CT will bring it in this week.  Reviewed program requirements. |
| 1/29/10 | CT turned in work verification |
| 2/9/10 | CM called Ct to tell him it's time for GCMS.  Reviewed program requirements. CT will get color change when he pays for it.  CT stated he would like to be complete at his one year, but probably won't be.  Will do 90 day review if not s-term. |
| 2/17/10 | CT called and stated he got a settlement check from his mortgage company and he will come in and pay off fees and complete the program. |

**PASCALE, MARK**          **602-619-5970**          **DONOR-** Redacted **9081**          **SAGE**

**11/18/09:  Called CT re missing test yesterday.  Left VM that CT needs to call and to test today.  Completed 90 day review and FA. PC explained to CT that he needs to make his monthly payments.  Reviewed program requirements.**

**11/20/09:  CT called re missing test.  CT put back on OPAL and will test today.  Per PC, any more missing test, CT will be u-term.**
**FINAL VL PREPARED AND MAILED**

**11/30/09:  CT called to discuss VL.  Reviewed program requirements.  CM told CT he needs to pay $50 and $25 for GCMS.  CT stated he will try to scrape up the $50 and pay today, and get the $25 by end of week.**

TASC000136

**PASCALE, MARK**          **602-619-5970**          **DONOR-** ~~Redacted~~ **)081**          **SAGE**

**8/3/09:** Called CT.  He stated that he "spaced it" and forgot to call.  CM reviewed program requirements. CT stated that he does not have the money right now to go back on full fees.  He is a single dad with no job and medical problems.  CM requested conference call with CM, CT and PC.  PC advised CT that if he has one more miss, misses group one more time, doesn't make a payment, etc. then FA revoked and back on full fees.
2nd VL prepared and mailed

**8/10/09:** Completed 90 day review and updated FA.  Review program requirements. CT will fax bills and turn in updated award letter for FS when he gets it in the mail.

**8/24/09:** CT left VM stating he did not call the color line on Friday and his color was up.  He said he had a procedure done on his neck and was under anesthesia. CT stated he will come in to office and talk with CM.  CT came into office and gave PPW for missed test.  CT will test today.  Reviewed program requirement.  CT asked about reducing his fees.  PC told him he needs to make payments per fee agreement in order for C.A. to consider reducing fees at the end.  PC discussed GCMS with CT and CT paid for test.

**9/22/09:** Called CT re payment.

**9/28/09:** Called CT re GCMS payment.  Told him to get the money in within the next couple of weeks.  Ct stated he needs to have surgery on the nerve in his neck and he will let CM know.

**10/13/09:** CT came into office and asked about a color change.  CM told CT to finish his SH and then he can have his color changed.  CT will pay for GCMS in the next few weeks.  Reviewed all program requirements.  CT stated that he is going to Jewish Families to speak with a doctor about changing meds and getting off the RX that he is taking.

**10/22/09:** Color changed to GOLD.

**10/26/09:** Called CT to remind him of GCMS payment, due by Wed.  CT stated that the doc changed his meds.  Will bring in new RX.

**10/27/09:** 10/26 was not a missed test.  Color was changed.

**11/5/09:** CT stated he borrowed money from his brother to make the $500 payments.

TASC000137

**Metro Surgery Center**

3131 West Peoria Avenue    Phoenix, Arizona 85029
Telephone: (602) 375-1083    FAX: (602) 789-6833

## PROCEDURE NOTE

**PATIENT NAME:**      PASCALE, MARK                    **MR#** 36201
**DATE OF SERVICE:**   February 24, 2009
**SURGEON:**           Bogdan Anghel, M.D.

**INDICATIONS FOR PROCEDURE:** Lumbar spinal stenosis, degenerative disc disease, bilateral lower extremity radiculitis.

**PROCEDURE:** Fluoroscopically-guided bilateral L5 and S1 selective transforaminal epidural steroid injection.

**HISTORY:** The patient is a pleasant 50-year-old, right-hand dominant male who developed chronic progressive pain in the lumbar area radiating into both hips, side of the thighs and calves, mostly when he stands and bends, increased also with squatting. Lumbar spine MRI without contrast demonstrates degenerative disc disease, degenerative spondylolisthesis of L4 on L5 and spinal stenosis. The patient had been through extensive physical therapy with limited success. He had tried various other forms of conservative care including medication, which did not provide any significant relief. Based on the lack of response to conservative care, he is a candidate for interventional pain control and I would like to proceed with fluoroscopically-guided epidural injections targeting the L4 and L5 nerve roots, respectively, on each side.

**DESCRIPTION OF PROCEDURE:** I reviewed with the patient the rationale behind the procedure, the risks, benefits and possible complications of the procedure, and he is willing to go ahead. He was brought to the fluoroscopy suite and placed in prone position on the fluoroscopy table. An IV was started. Conscious IV sedation was given to the patient by a registered nurse under continuous vital sign monitoring. The patient's lumbosacral area was prepped and draped in a sterile fashion.

Under oblique fluoroscopic guidance 30 degrees with 10-degree Ferguson view first to the left and then to the right, two separate pairs of 5-inch, 23-gauge spinal needles were placed intraforaminally first into the left L4 and L5 foramen and then into the right L4 and L5 foramen, respectively, using the standard bony landmarks. Position of each needle separately was checked by injection of 0.5 cc of Omnipaque 300, which outlined the respective epidurograms without active vascular uptake. Following negative aspiration of blood and/or CSF, injection of 20 mg of Kenalog and 0.5 cc of lidocaine 1% preservative-free at each level bilaterally completed the procedure.

TASC000162

# EXHIBIT 33

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF ARIZONA

3

4
       DeShawn Briggs, et al.,          )
5                                       )
             Plaintiffs,                )
6                                       )
       vs.                              )    No. CV2018-02684-EJM
7                                       )
       Allister Adel, et al.,           )
8                                       )
             Defendants.                )
9                                       )
       _____)
10

11

12

13              VIDEOTAPED VIDEOCONFERENCE DEPOSITION
                      OF DESHAWN L. BRIGGS
                           Volume I

14

                          Phoenix, Arizona
15                        October 8, 2020
                             2:03 p.m.

16

17

18

19

20    CERTIFIED COPY

21

22    Reported by:                    CARRIE REPORTING, LLC
      CARRIE A. CARIATI               Certified Reporters
23    Registered Professional Reporter    2415 East Camelback Road
      Certified Realtime Reporter     Suite 700
24    Certified LiveNote Reporter     Phoenix, AZ 85016
      Arizona CR No. 50355            (480)429-7573
25    carrie@carriereporting.com

1    *A.*    Truthfully, you want me to answer that that I

2    can remember it?  The only thing I can remember for the

3    orientation was that we have to attend the program, we was

4    given a color to call the phone number every week to come

5    in to the TASC program if the color was called.

6    *Q.*    Is that the only thing you can remember about

7    the first meeting of your orientation at TASC?

8    *A.*    Yes, and also the fees and -- the fees to be on

9    the program.

10    *Q.*    Are you saying you did not know about the

11    program requirements and fees before attending the

12    orientation?

13                   MR. DOWNER:  Object to the form.

14                   THE WITNESS:  Repeat that again.  I can't

15    hear you right.

16                   MR. DOWNER:  I just objected.

17                   THE WITNESS:  Okay.

18    BY MR. HENRY:

19    *Q.*    Sir, are you saying that you did not know about

20    the program requirements and fees before you attended your

21    orientation with TASC?

22    *A.*    No.  I was given a letter by Maricopa County.

23    *Q.*    Please review paragraphs 160 through 162.

24                   Have you done that?

25    *A.*    Yes, I did.

1              Where did you get the money for the
2    payment?
3        A.    You are asking me where did I get the money to
4    make the $175 which is a money order?
5        Q.    You got it through a money order?
6        A.    Yes.
7        Q.    On March 14th, if you can read it here, excuse
8    me, March 10th, you see that, there is a transfer to
9    someone named Ethel Powell?  Do you see that?
10       A.    Yeah.
11       Q.    Who is Ethel Powell?
12       A.    My grandmother, my great grandmother.
13       Q.    Why were you loaning -- you loaning her money?
14       A.    You are saying was I loaning her money?  I don't
15   remember.
16       Q.    There is a transfer of $40 from you to Ethel
17   Powell March 10, 2014.  Why would you have been giving
18   your grandmother $40 on March 10th?
19       A.    Because that is my grandmother, dude.
20       Q.    Was it a gift?  Did she need the money?  Was it
21   a loan?
22       A.    I don't remember.  I am going to help my great
23   grandmother.  I am going to help my family -- I'm sorry
24   that I am being -- I'm sorry, I apologize if I am being
25   offensive.  I am big on family.

1    *Q.*   I understand, sir, and I am just asking you

2   questions.  I didn't know that was your grandmother.

3    *A.*   Yeah.

4    *Q.*   It sounds to me on March 10th you were

5   transferring money to your grandmother, and to the best of

6   your recollection, it was to provide her with financial

7   assistance, correct?

8    *A.*   To my -- to my knowledge, she needed it.  I

9   don't remember why -- the reason why or anything else like

10   that, but yeah.

11    *Q.*   And on March 14th, there is a transfer to --

12   let's find it here.  Here it is.  Somebody named Totiana

13   White.  Who is that person?

14    *A.*   Totiana White?

15    *Q.*   Yes, sir.

16    *A.*   Yes, you are correct.  That is a friend back in

17   California.

18    *Q.*   Were you transferring money to a friend back in

19   California to provide financial help to her?

20    *A.*   She asked to borrow that.

21    *Q.*   So that was a loan?

22    *A.*   It was just -- yeah.

23    *Q.*   Okay.  This statement for that period shows $758

24   and some change for withdrawals.  Do you remember earlier

25   when we talked about basic necessities?

1   groceries, rent, and a vacation -- or, no, no, I'm sorry,
2   I apologize.  Half of that goes with the plane ticket and
3   the expenses of being in California, that means staying at
4   my relative's house, food and groceries and everything
5   else.
6         Q.   We will talk about that trip in a moment.
7              How did you pay your rent every month to
8   your parents?
9         A.   How?
10        Q.   In what form?
11        A.   In what form?  Probably a money order.
12        Q.   Where would you get your money orders typically?
13        A.   I don't remember.  Probably at Wells -- Wells
14  Fargo.
15        Q.   You indicated that part of the tax refund went
16  towards your vacation to visit family in March of 2016,
17  correct?
18        A.   Yes.
19        Q.   Was there any special purpose for that trip?
20        A.   My grandmother and my auntie's birthday, I
21  wanted to see my family.
22        Q.   Understood.  So you wanted to visit your family
23  including your grandmother on her birthday?
24        A.   Yes.
25        Q.   You wanted to use a portion of your tax refund

1    to pay for that trip, correct?

2        A.    I didn't have no choice.

3        Q.    Well, did you or did you not have a choice?  Did

4    you have to visit your family?

5        A.    I have to visit my family.

6        Q.    Isn't it fair to say you chose to visit your

7    family because you like to support and visit your family?

8        A.    No, I just -- I had to go.

9        Q.    And could you --

10       A.    It was mandatory for me to go.

11       Q.    Who made it mandatory for you to go?

12       A.    My dad.

13       Q.    How did he make it mandatory?

14       A.    Because every year -- every year we -- when it

15   is around her birthday or my auntie's birthday we make it

16   mandatory to go see her.

17       Q.    I understand.  So it was an annual family visit,

18   and you made the trip to go visit your aunt and

19   grandmother in California?

20       A.    Yes.

21       Q.    Did you explain to your father that you owed

22   money to TASC at the time and it would be financially

23   difficult to take that trip?

24       A.    At the time -- at the time he knew it was about

25   the TASC program.  Yeah, I am not going to run nothing

1  passed him.

2     Q.   Okay.

3     A.   You know what I am saying?

4     Q.   I understand.  Sometimes you cannot afford a

5  trip.  You would agree with that, right?

6     A.   Sometimes you can, and sometimes you can't.  But

7  at the same time, it has to be mandatory.

8     Q.   It is a family obligation; that's what you mean

9  by "mandatory"?

10    A.   What do you mean by "family obligation"?

11    Q.   You say "mandatory," and I -- what do you

12  understand "mandatory" means?

13    A.   Man, like mandatory -- like it is mandatory to

14  go see my grandmother every time.  I didn't have no choice

15  but to use that money -- to use -- if I had it -- if I had

16  a choice to finish TASC, that's what it would have been,

17  but at the same time, that money -- that money right there

18  was going to be spent anyway because I have to go.  There

19  was no other choice for me to do that.

20              You don't understand -- for not to put a

21  pause on my -- on my -- on -- on what I -- what I need to

22  do and what I wanted to do, it is no choice.  It is

23  staying right there.

24    Q.   Between March 25th -- starting here, do you see

25  this?

1    BY MR. HENRY:

2        Q.    I understand.  Do you consider going to the

3    movie to be a basic necessity?

4        A.    I can't really remember that -- what you are

5    trying to refer, sir.

6        Q.    My question was not this movie this time.  I am

7    talking about generally.  Going to a movie, do you

8    consider that to be a basic necessity of life?

9        A.    What does that have to do with anything that you

10   are -- I am not understanding.  What does that have to do

11   with anything me going to the movies if I tell you I

12   cannot remember --

13       Q.    No, no.  I am not asking about this trip.  I am

14   talking about generally.  Do you consider going to the

15   movie and the expenses incurred to go to a movie to be

16   expenses for basic necessities of life?

17       A.    To be honest, I cannot answer that because I am

18   still not -- I am still not understanding where you are

19   trying to get at.  Basically --

20       Q.    Don't worry -- sorry to interrupt you, sir.

21       A.    No, yeah.  It is okay.  Basically that is I am

22   trying to tell you if I don't remember anything of that

23   trip and it was so long ago that I cannot tell you -- you

24   are trying to mix with the past to the future.  So that's

25   where you are trying to confuse me at as present and as in

```
 1  past?
 2              THE WITNESS:  Ryan, can you please help me
 3  understand that?
 4              MR. DOWNER:  If you understand the
 5  question, then you can answer it.
 6              THE WITNESS:  Okay.
 7              MR. DOWNER:  If you don't understand, you
 8  can ask him to clarify.
 9              THE WITNESS:  Yeah.
10  BY MR. HENRY:
11      Q.   All right.  Sir, we are going to pull up what we
12  will be marked as Exhibit 10.
13              (Deposition Exhibit No. 10 was marked for
14  identification by the reporter.)
15  BY MR. HENRY:
16      Q.   This is your savings account with Wells Fargo
17  from March 1st to March 31st.  You had a savings accounts
18  with Wells Fargo during that period, right?
19      A.   Yes, it was connected to my checking account.
20      Q.   Sir, when you would get money orders from Wells
21  Fargo, typically wouldn't they charge you a money order
22  fee?
23      A.   I don't remember.
24      Q.   All right.  So --
25      A.   From that, I can get money orders from the gas
```

1  station.  Personally at the time from my memory was a

2  money order at Quiktrip.

3      Q.    All right.  We are going to look at your savings

4  account statement for the March 2016 when you were in the

5  TASC program.  I am going to refer to two ATM withdrawals

6  in the amounts of $200 each for $400 when you were in

7  Richmond, California, for your family visit.

8      A.    Okay.

9      Q.    What were those withdrawals for?

10     A.    I don't remember.

11     Q.    Back to the TASC program, ultimately you

12  understood, sir, that if you didn't end up paying all the

13  fees -- or otherwise you didn't meet the requirements of

14  the program, you could be sent back to the Maricopa County

15  Prosecutor's Office, correct?

16     A.    Yes.

17     Q.    And you could then be prosecuted, correct?

18     A.    Yes.

19     Q.    And if the prosecution was successful, you could

20  end up having to go to jail, correct?

21     A.    Correct.  To be honest -- to be honest, if I --

22  if I didn't pass the program -- the TASC program or I

23  didn't pay the whole thing even on -- even if I didn't

24  have the full financial -- financially stable as what I

25  can say, I don't know what would happen, but I know it

1    would lead me to conviction and probation and plus a fine.

2        Q.    Give me a second here.  I apologize.

3        A.    To make it easy for you, you should have closed

4    them out.  Just close them out at the window so you will

5    be on track.

6        Q.    Thank you.

7        A.    You're welcome.

8        Q.    Okay.  Going back to Exhibit 9, which was the

9    March 16th through April 15, 2016, checking account

10   statement, do you remember we talked about the $985 IRS

11   tax refund?

12       A.    Yeah.

13       Q.    Okay.  You that same day made a $350 cash

14   withdrawal from your account, correct?

15       A.    That's what it says.  That's what it shows.

16       Q.    And you said earlier, if I heard you correctly,

17   that the cash withdrawal and the funds from your tax

18   refund were used for purposes of your upcoming California

19   trip, right?

20       A.    If I can recall it, yes, I think so.

21       Q.    I am going to pull up what will be marked as

22   Exhibit 11.

23              (Deposition Exhibit No. 11 was marked for

24   identification by the reporter.)

25

1                        CERTIFICATE

2          I HEREBY CERTIFY that the foregoing deposition
   was taken by me pursuant to notice; that I was then and
3  there a Certified Court Reporter for the State of Arizona,
   and by virtue thereof authorized to administer an oath;
4  that the witness before testifying was duly sworn by me to
   testify to the whole truth and nothing but the truth;
5  pursuant to request, notification was provided that the
   deposition is available for review and signature; that the
6  questions propounded by counsel and the answers of the
   witness thereto were taken down by me in shorthand and
7  thereafter transcribed through computer-aided
   transcription under my direction, and that the foregoing
8  typewritten pages contain a full, true, and accurate
   transcript of all proceedings had upon the taking of said
9  deposition, all done to the best of my skill and ability.
           I FURTHER CERTIFY that I am in no way related to
10 nor employed by any of the parties hereto, nor am I in any
   way interested in the outcome hereof.
11         I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA Sections
12 (J)(1)(g)(1) and (2).
           DATED at Phoenix, Arizona, this 6th day of
13 November, 2020.

14                         _____
                          CARRIE A. CARIATI
15                        Registered Professional Reporter
                          Certified Realtime Reporter
16                        Certified LiveNote Reporter
                          Certificate No. 50355
17

18         I CERTIFY that this Registered Reporting Firm
   has complied with the ethical obligations set forth in
19 ACJA Sections (J)(1)(g)(1) and (2).

20
           DATED at Phoenix, Arizona, this 6th day of
21 November, 2020.

22
                          _____
23                        Registered Reporting Firm R1064
                          CARRIE A. CARIATI, Owner
24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3
   DeShawn Briggs, et al.,              )
4                                       )
          Plaintiffs,                   )
5                                       )
   vs.                                  )    No. CV2018-02684-EJM
6                                       )
   Allister Adel, et al.,               )
7                                       )
          Defendants.                   )
8                                       )
                                        )
9    _____   )

10

11

12
              VIDEOTAPED VIDEOCONFERENCE DEPOSITION
13                   OF DESHAWN L. BRIGGS
                        Volume II
14

15
                    Phoenix, Arizona
16                  October 9, 2020
                      1:03 p.m.
17

18

19

20   CERTIFIED COPY

21

22   Reported by:                    CARRIE REPORTING, LLC
     CARRIE A. CARIATI                Certified Reporters
23   Registered Professional Reporter 2415 East Camelback Road
     Certified Realtime Reporter     Suite 700
24   Certified LiveNote Reporter     Phoenix, AZ 85016
     Arizona CR No. 50355            (480)429-7573
25   carrie@carriereporting.com

1    Q.    And it indicates next to that that you were

2    receiving, if I can read your handwriting correctly, $377

3    a month in disability income.  Is that the amount you were

4    receiving in the form of disability income in

5    February 2016?

6    A.    Yeah, that's what my stepmother told me to put

7    down because we was not really too sure what I was

8    actually getting because I was still -- I was still moved

9    out here.  Basically we was trying to get everything

10   transferred from California.

11   Q.    Were you receiving disability income or was

12   somebody else receiving disability income?

13   A.    My stepmother gets that pay.  I never see that

14   money.

15   Q.    So Debra Briggs, who at the time you understood

16   to be a friend of the family, was in February 2016

17   receiving $377 per month in disability income?

18   A.    Yes.

19   Q.    So that was disability income for her, not you,

20   right?

21   A.    That's for me.

22   Q.    I don't -- sir, I apologize.  I don't understand

23   how it can be disability income being paid to her for you.

24   A.    You want me to explain?

25   Q.    Yes, please.

1      *A.*   My stepmother is my payee.  Because I have a

2   disability, I never touch that money.  The way my

3   grandmother set it up when I was younger as a child, she

4   put me on disability.  So the way she set it up was

5   somebody over me or -- over me, either it was my

6   grandmother or my stepmother or whoever -- whoever,

7   friends of the family, has to -- has to receive that

8   money.  I never see that money at all.

9              I don't get a check, I don't see the check

10  or whatever, because we do -- we do have a -- she does

11  have an account, but I never see it.

12     *Q.*   It is your understanding that it is money that

13  someone is receiving for your disability, right?

14     *A.*   Yes.

15     *Q.*   But you never receive it yourself?

16     *A.*   No.

17              MR. HENRY:  All right.  Why don't we take a

18  quick break.  And how much -- off the record.

19              VIDEO TECHNICIAN:  We are off the record at

20  2:04 p.m.

21              (Recess ensued from 2:04 p.m. until

22  2:15 p.m.)

23              (Ms. Chamblee-Ryan now present.)

24              VIDEO TECHNICIAN:  We are back on the

25  record at 2:16 p.m.

1   BY MR. HENRY:
2       Q.   Thank you.  Back on the record, Mr. Briggs, I
3   understand from something you said off the record that
4   Katie has joined you in the room there?
5       A.   Yes.
6                MR. DOWNER:  No, no, she is not --
7                MS. CHAMBLEE-RYAN:  I am not in the room.
8   I am just here virtually.  I am not planning to speak.
9                MR. HENRY:  Thank you.  That was confusing.
10  BY MR. HENRY:
11      Q.   Before we move on, on the disability, sir, I am
12  confused about one thing.  This disability income,
13  whatever amount it was, was for your disability, right?
14      A.   Yes, sir.
15      Q.   What is your disability?
16      A.   Spinal meningitis.
17      Q.   And your understanding through what Debra Briggs
18  told you in February 2016, $377 a month was being paid for
19  your disability, correct?
20      A.   That is correct.
21      Q.   But you never were given any of that disability
22  income?
23      A.   No, that is towards rent -- that is towards
24  food, rent, around the time that she was receiving it from
25  Social Security.

 1      Q.    That answers my question.  So your father and

 2  stepmother were, your understanding, taking your

 3  disability income and applying that to your rent, among

 4  other things?

 5      A.    Yes.

 6      Q.    You also said that some of information on this

 7  form marked as Exhibit 21 was information, if I heard you

 8  correctly, provided to you at the orientation by Debra for

 9  this form.  Did I hear you correctly?

10              MR. DOWNER:  Object to the form.

11              THE WITNESS:  What happened?

12  BY MR. HENRY:

13      Q.    Let me ask you this way.  You indicated that

14  Debra told you, for example, to write down "friend of the

15  family" on Exhibit 21, right?

16      A.    Yes, around that time.

17      Q.    Did you call her at the orientation?

18      A.    Before it -- I texted her actually before it

19  started from my knowledge.

20      Q.    So you were asking --

21      A.    Yeah, it has been so long -- yeah, it has been

22  so long ago with that orientation.  She just told me put

23  down emergency -- I asked:  What do you want me to put as

24  emergency contact?

25              She said:  Just put friend of the family.

1      Q.    Let me see if I can perhaps understand it this
2    way.  Before you filled out the form at the orientation,
3    you had this in your possession and you were texting
4    Ms. Briggs about some of the information you should put on
5    this form, right?
6      A.    Yes.
7      Q.    And she was the one that told you to put down
8    "friend of the family" for her, right?
9      A.    Yes.
10      Q.    And she is the one that told you how much you
11    are receiving in disability income, right?
12      A.    Yes, roughly what -- what I should've put down,
13    and that was -- she told me what to put because we wasn't
14    too sure.  We wasn't too sure how much we was actually
15    getting from Social Security.
16      Q.    Have you ever asked your stepmother or anyone
17    else how much, in fact, was being paid on a monthly basis
18    for your disability?
19      A.    No.
20      Q.    Are you still to this day not receiving any of
21    that disability income?
22      A.    No.  That's going towards rent.
23      Q.    Whose rent?  Where are you living now?
24      A.    I live by myself.
25      Q.    How is it going towards rent?

1 know nothing -- I don't deal with that.

2     Q.     Understood.   But based on the fact that you are

3 now handed cash every month from your stepmother in the

4 amount of approximately $600, is it your understanding

5 that that was the amount she was receiving back in 2016

6 and applying to your rent?

7     A.     No, sir.  I didn't have no knowledge of that at

8 the time at all.  Whatever she has received from Social

9 Security, that what she sees.  I never see that money at

10 all.  All I know is that goes towards rent and goes

11 whatever else that needs to be done where I am staying at

12 my family members' house in 2016 -- from 2014 to 2016.

13     Q.     But to your knowledge, your disability payments

14 have not increased since 2016?

15     A.     To my knowledge, I don't know because I don't

16 deal with that.  Anything that has something to do with

17 government, I don't deal with it.  I don't touch it.

18     Q.     And to finalize this topic, you have never asked

19 Ms. Briggs or anyone else whether some of that disability

20 income could be used to pay some of your TASC fees?

21     A.     No.

22     Q.     Okay.  I put up on the screen what I will ask be

23 marked as Exhibit 22, a document filed on your behalf in

24 this lawsuit titled Plaintiff DeShawn Briggs' Responses to

25 Defendant TASC's First Set of Interrogatories, Requests

```
 1   for Production, and Requests for Admission -- I will
 2   scroll down -- January 16, 2020.  Do you see that
 3   document?
 4        A.   Yes, I see it.
 5             (Deposition Exhibit No. 22 was marked for
 6   identification by the reporter.)
 7   BY MR. HENRY:
 8        Q.   Have you ever seen this document before?
 9        A.   Not until today.
10        Q.   Let's go back down to page 6, line 18 through
11   20.  Do you see that?
12        A.   Yes, I am reading it right now.
13        Q.   We will break it down.  It says:  Plaintiff
14   Briggs estimates that while on the MDPP, he spent $500 per
15   month in rent.
16             Do you see that?
17        A.   Yes.
18        Q.   And yesterday and a bit today we spent time
19   looking at your bank statements.  We didn't see anything
20   related to rent payments on your bank statements.  You
21   just a moment ago, though, you testified that your rent
22   was being paid out of your disability income, right?
23        A.   And also my work -- my work checks.
24        Q.   How were -- how much were you paying out of your
25   work checks for rent per month?
```

1    A.   I can't recall how much, but I know for a fact I
2  have to pay -- I have to pay some -- whatever they asked
3  me, if it is $200, $300, that's what they are going to do
4  towards -- what they are going to tell me towards rent,
5  towards clothes, you know, food, laundry, and the rest of
6  the stuff they are not -- and the rest of it would be for
7  bills and transportation and stuff like that.
8    Q.   Let me see if I understand it.  Some of your
9  rent was being paid, to your understanding, out of your
10  disability income payments, right?
11    A.   My work checks, too.
12    Q.   Sure.  And the rest, to your understanding, was
13  being paid out of your work checks, right?
14    A.   Yes.
15    Q.   And the amount you would pay every month out of
16  your work checks was the amount that your stepmother and
17  father told you you owed?
18    A.   Yes, however much they -- they need, like,
19  for -- like, towards food for anything else, I can't
20  remember how much they was -- they told me, but all I know
21  is it is at least half of my check.
22    Q.   Okay.  And you would -- how would you make that
23  payment to your father and stepmother?
24    A.   Cash.  In cash.
25    Q.   So you would go get an ATM cash withdrawal and

1    hand them the cash?

2        A.    Yes.

3        Q.    And those ATM cash withdrawals for rent and

4    other expenses back in 2016 would have been withdrawals

5    from your Wells Fargo checking account?

6        A.    Yes.

7        Q.    Any other checking or bank accounts?

8        A.    No.  No, sir.

9        Q.    Did you have an actual lease with your father

10   and stepmother for your use of the home they were renting?

11       A.    No.  And what -- elaborate a little bit more.

12       Q.    Sure.

13       A.    Like, do I have a lease agreement, like, on

14   paper, on file, or anything like that?

15       Q.    Yeah.

16       A.    No.

17       Q.    Correct?

18       A.    No.

19       Q.    You said you are currently living by yourself at

20   an apartment or a house, right?

21       A.    Yes, apartment.

22       Q.    And where you living right now, you have a lease

23   agreement, right?

24       A.    Yes.

25       Q.    And it is a document in writing that you and the

1  landlord had signed, right?

2      A.    Yes.

3      Q.    You didn't have any written document regarding

4  your lease agreement with your father and stepmother back

5  in 2016?

6      A.    No, no.

7      Q.    And the amounts that you, in fact, would pay

8  them every month would be just be the amounts they tell

9  you that you owed, right?

10     A.    Yes.

11     Q.    And it varied, correct?

12     A.    Yeah.

13     Q.    They would tell you this month you owe $100 and

14  you would go and withdraw $100 and hand them cash, right?

15     A.    Yes.

16     Q.    Other than ATM withdrawals on your Wells Fargo

17  Bank statements, do you have any documents of the fact

18  that you did pay any rent to your father and stepmother in

19  2016?

20     A.    Rephrase the question, please.

21     Q.    Do you have any documentation showing the

22  amounts you paid and when to your father and

23  stepmother for rent --

24     A.    No.

25     Q.    -- in 2016?

1    *A.*    No.

2    *Q.*    Have you made any effort to go back and find out

3    how much, in fact, you paid them in rent in 2016?

4    *A.*    No.  I trust my family.

5    *Q.*    Is the only reason you have not done that is

6    because you trust your family?

7    *A.*    Yeah, I trust my family.  My family would not

8    lie to me.

9    *Q.*    Sir -- but if you did have to find out how much

10   you paid in rent for a tax form or something, how would

11   you go about doing that?

12   *A.*    I wouldn't, because I wouldn't question it.

13   *Q.*    Sure.  But if somebody who demanded to know --

14   that's why I used tax, someone for taxes, for example --

15   how much you paid for rent in 2016, how would you go about

16   finding how much you, in fact, did pay?

17   *A.*    I can't really answer that question truthfully.

18   *Q.*    Is it because you don't believe you could go

19   back and find out?

20   *A.*    I don't -- all I know is that I trust my family

21   with anything that they say.  Hold on.  They are not going

22   to steer me wrong about anything so I wouldn't -- if it

23   was mandatory, if it was, like, mandatory, like, I have to

24   do that, then I will try to figure out when or where, but

25   it is not really mandatory like that.

1  was still paying that off, and I finished that the same

2  year, 2016.

3      Q.   Which credit card was that and how were you

4  paying it off?

5      A.   Oh, that was a Wells Fargo account credit card.

6      Q.   And how were you paying off your Wells Fargo

7  credit card account in 2016?

8      A.   They usually take it out of my checking account.

9      Q.   So any payments relating to your Wells Fargo

10  credit card would have been coming straight out of your

11  Wells Fargo credit cards we have been talking about here

12  during your deposition?

13      A.   Yes.

14      Q.   Was anyone else helping you pay off your Wells

15  Fargo credit card account?

16      A.   No.  Like I said, I had no access to that credit

17  card or anything.  That was froze -- that was it.

18      Q.   I think we will get into this in more detail in

19  a bit here, but the interrogatory No. 7 in line 20 also

20  refers to cell phone service.  Back in 2016, if I

21  understand correctly, you were paying between 120 and 130

22  dollars a month for cell phone service?

23      A.   Yes, sir.

24      Q.   Was that just for service or was that to pay off

25  the phone as well?

1       A.    It is -- everything is included.

2       Q.    You understand sometimes you pay for the phone

3   and you just pay service, right?

4       A.    No, that is all included.  T-Mobile includes all

5   of that.  That's why it calculates to the 125 or 200.

6       Q.    Back in 2016, did you ever ask the cell phone

7   service provider whether you could lower the monthly costs

8   by using a different plan?

9       A.    No, I liked the plan I had.

10      Q.    You liked the plan you had?

11      A.    Yeah.

12      Q.    Is that the only reason you didn't ask the cell

13  phone provider whether you could reduce your monthly cell

14  phone service?

15      A.    Yeah, that is the only reason.  I just liked it.

16  I didn't want to change it.

17      Q.    What did you like about it?

18      A.    Unlimited everything, hot spot.

19      Q.    Pardon me?

20      A.    Unlimited everything, like, unlimited minutes,

21  all that, hot spot.

22      Q.    Okay.  Did you consider it a top tier plan?

23      A.    Huh?

24      Q.    You considered it a top tier plan that you

25  liked, right?

1          A.    Because I was a part-time employee.

2          Q.    Did you ever ask Wal-Mart whether you could

3     become a full-time employee?

4          A.    No.

5          Q.    Is there any reason why you never asked Wal-Mart

6     if you could become a full-time employee?

7          A.    No, I was just grateful to have a job.

8          Q.    Well, would you have liked to have become a

9     full-time employee?

10         A.    Back then?

11         Q.    Yes, sir.

12         A.    Yeah.

13         Q.    But you never asked anyone at Wal-Mart whether

14    you could take on an additional role as a full-time

15    employee?

16         A.    No, sir, everybody whatever -- how we got hired

17    at the time.  We was -- some people was full time, some

18    people was part time, and I was part time.

19         Q.    Did you ever go look for any other work in

20    addition to your part-time employment at Wal-Mart in 2016?

21         A.    No, sir.

22         Q.    Why not?

23         A.    Because that is the only job I wanted to work

24    at.

25         Q.    The only reason you didn't look for any

```
 1   additional employment is because you only wanted to be a
 2   part-time employee at Wal-Mart?
 3        A.    Yeah.
 4        Q.    More shifts or becoming a full-time employee or
 5   on additional job, though, you would agree would provide
 6   you with more income, right?
 7        A.    Yes.
 8        Q.    Were there any limitations on the time you had
 9   available back in 2016 that would have prohibited you from
10   taking on more work at Wal-Mart or anywhere else?
11        A.    Social Security.
12        Q.    What -- explain that answer for me.
13        A.    Social Security, they only allow you for a
14   certain amount of hours -- they only allow you at -- to
15   work, so I have to be on Social Security, it was set up
16   the way it was set up for the rest of my life so if I
17   would have went over it any time that was given to me, I
18   would have been cut off with Social Security.
19        Q.    When you are referring to Social Security, are
20   you referring to the disability income or something else?
21        A.    Yes.
22        Q.    Are you referring to the disability income or
23   something else?
24        A.    No, that's what -- Social Security is disability
25   income.
```

1      Q.    That's what I understood.  I wanted to make sure
2   we were talking about the same thing.
3      A.    Yes, sir.
4      Q.    Okay.  So one of the reasons you never asked to
5   become a full-time employee or anything other than a
6   part-time employee at Wal-Mart was that you wanted to
7   continue to be entitled to the disability income, right?
8      A.    Correct.
9      Q.    No other reason, right?
10     A.    No.  And plus Wal-Mart only offers part-time and
11  full-time employees so I was applying at Wal-Mart as part
12  time.
13     Q.    I understand what you applied for and what you
14  did, but no one ever said you cannot apply for a different
15  job at Wal-Mart, right?
16     A.    Yeah.
17     Q.    No one did, right?
18     A.    Huh?
19     Q.    No one ever told you at Wal-Mart you cannot
20  apply for a different job, right?
21     A.    No.  I mean, no, no, no, nobody ever told me
22  anything else.  I was not looking for a job.  I was
23  grateful for that job, at least I had a job.
24     Q.    This goes on to indicate in the last line:  In
25  fact, in some months, his income did not even cover basic

1    A.    Yeah, close friends and everything.

2    Q.    Okay.  We will use the friend as an example.

3    A.    Okay.

4    Q.    You have borrowed money from friends in the

5    past, right?

6    A.    Yeah, that is in the past.

7    Q.    Sure.  And you understand that when you borrow

8    money, you are getting money from that person with the

9    agreement that you will pay that person back, right?

10   A.    Yes.

11   Q.    So you understand that.

12              I want to focus now on page 4.  Let me blow

13   this up.  I am reading this line starting at the sentence

14   on line 20:  It is unclear what Defendant TASC meant when

15   it asked why plaintiffs could not, quote, borrow money,

16   end quote, or, quote, limit expenses, end quote.

17   A.    Okay.

18   Q.    You know what "borrow money" means, right?

19   A.    Yes, but you are trying to elaborate have I ever

20   borrowed some money from anybody during when I was on

21   TASC, and the answer is no.

22   Q.    Okay.  Let's go back to the actual request here

23   above on line 13.  The question is:  Explain in detail the

24   basis for your contention you could not afford to pay MDPP

25   fees, including any reasons why you could not, first

1    reason given, borrow money.

2                    Do you see that?

3        A.    Yes.

4        Q.    You understand what that question means, right?

5        A.    Explain in detail what that -- what is the

6    question you asked?

7        Q.    You understand when someone says, "Explain all

8    the reasons why you could not borrow money," you

9    understand what that means, right?

10       A.    Yeah, because at the time I didn't have no

11   friends, like, to ask to borrow money, and I feel, like I

12   said, the same answer I am going to answer you again prior

13   to, I don't know when we did, but I have to learn my own

14   consequences.

15       Q.    That's where I am going.  Is the same reason you

16   didn't ever ask your father whether you could borrow money

17   for TASC's fees, the reason why you didn't ask any of your

18   friends whether you could borrow any money to pay TASC

19   fees?

20       A.    Once again, I didn't have no friends at the time

21   to be borrowing no money, and also, I want to learn from

22   my own mistakes.

23       Q.    The second one we talked about.  You didn't want

24   to borrow money from friends because you wanted to learn

25   from your own mistakes.  I understand that.

```
 1        A.    I didn't have no friends at the time.
 2        Q.    That's where I am going next.  In 2016, you had
 3   been living in Arizona for, what, at least two years,
 4   right?
 5        A.    Yes, sir.
 6        Q.    And you didn't have any friends in Arizona?
 7        A.    No.
 8        Q.    When you were arrested that night in
 9   December 2015, who were you riding around with that night?
10        A.    My coworker's brother and her baby daddy.
11        Q.    And her what?
12        A.    Her baby daddy, the person that was driving.
13        Q.    And forgive me, what does a baby daddy mean?
14        A.    Oh, the child's father, I'm sorry.  I'm sorry.
15   I'm sorry -- I forgot where I was at.  I'm so sorry.
16        Q.    And you didn't consider any of those people in
17   the car --
18        A.    No, no.
19        Q.    How about coworkers?  Did you have any friends
20   at Wal-Mart?
21        A.    No, I was anti-social.  I was anti-social.
22        Q.    But then you didn't ask any of your coworkers
23   whether you could borrow money from them either, right?
24        A.    No, sir.
25        Q.    Let me just ask it very, very directly.  During
```

1  the six months or so when you were involved with the TASC

2  program, you didn't ask any person to borrow money to help

3  you with the fees owed for the TASC program?

4      *A.*   No, I asked my dad can I have $20 and no later

5  -- no greater than $50 to pay for my urine test because I

6  didn't have the money at the time.

7      *Q.*   Aside from that --

8      *A.*   To have -- to have and borrow is two different

9  things, so I am just saying that.  I didn't choose to say,

10 "Hey, dad, I want to borrow it."  I just say, "Can I have

11 $20 to pay for my urine test?"

12             And at the time some of the times he can't

13 and couldn't do it.

14     *Q.*   But my question again was very general.  You

15 never asked anyone --

16     *A.*   No.

17     *Q.*   -- whether you could borrow money to pay your

18 TASC fees?

19     *A.*   No, sir.

20     *Q.*   Because you wanted to take responsibility for

21 it, right?

22     *A.*   Yes, sir.

23     *Q.*   No other reason?

24     *A.*   No other reason.

25             MR. DOWNER:  Object to the form.

```
 1                  THE WITNESS:  Yes.
 2   BY MR. DOWNER:
 3        Q.   Can you answer again, Mr. Briggs?
 4        A.   Yes.
 5        Q.   Have you given other documents to your lawyers
 6   in this case?
 7        A.   Yes.
 8        Q.   Do you remember the exact dates that you gave
 9   documents to your lawyers in this case?
10        A.   No, sir.
11        Q.   Mr. Henry also asked you about whether back in
12   2016 there was anyone who could loan you money.  Do you
13   remember those questions?
14        A.   Yes, sir.
15        Q.   And part of your answer was that you wanted to
16   do it on your own, so to speak; is that right?
17        A.   Yes, sir.
18                  MR. HENRY:  Objection.  Form.
19   BY MR. DOWNER:
20        Q.   Did you know anyone back in 2016 who could loan
21   you money?
22        A.   No.
23                  MR. HENRY:  Objection.  Form.
24   BY MR. DOWNER:
25        Q.   And I believe you testified yesterday in 2016
```

1   record at 4:41 p.m.

2               MR. HENRY:  I would like the record to

3   reflect that at 4:28 counsel for the plaintiff asked for

4   one final break.  It is now 4:41, and we have not heard

5   from him or his co-counsel and his witness has left the

6   room.  Thank you.

7               MR. DOWNER:  Okay.  We can go back on.

8   BY MR. DOWNER:

9       Q.   So, Mr. Briggs, yesterday you testified about

10  the high school you went to.  Do you remember that?

11      A.   Yes.

12      Q.   What type of high school did you go to?

13      A.   What I was trying to explain yesterday, a

14  transitional learning school is not a -- is an education

15  for people that has special needs, basically the people --

16  the kids back in Richmond, California, it is them -- the

17  kids kicked out of the county -- not the county, the

18  school district when I was asked, so that school is

19  basically for a person like me that doesn't understand

20  that needs one-on-one attention.

21               That's what I was trying to explain

22  yesterday.  That's what the school is.  It is a school

23  district which is now -- it has been shut down for --

24  since -- I don't know, like 2010, I believe, but it is

25  north campus and it is called -- and also it is mixed with

 1  north campus that has the kids that has a one-on-one

 2  teacher that has all kids that has special needs and

 3  everything else to get to high school -- to get through

 4  high school.  I graduated.  I did.  I graduated.  I have a

 5  high school diploma.

 6      *Q.*    Earlier today you testified about your

 7  disability.  Do you remember that?

 8      *A.*    Yes, sir.

 9      *Q.*    What is your disability?

10      *A.*    Spinal meningitis.

11      *Q.*    Does that affect anything about your ability to

12  learn or read the written word?

13      *A.*    Yes.  Going into details --

14              MR. HENRY:  Objection.  Leading.

15              THE WITNESS:  Huh?

16              MR. HENRY:  I am just adding a leading

17  objection.

18              THE WITNESS:  Oh.  Basically when I go into

19  full details is basically my mother didn't know that I was

20  having an illness, and it was a significant illness and it

21  is called spinal meningitis.  So it makes me -- I am deaf

22  in one ear and my learning disability, so basically it

23  damaged part of my brain.  So some of the things that you

24  was asking me or the capability of reading, so, yes, I

25  understood it when somebody is explaining it to me and

 1    *A.*    You want me to check the phone?

 2    *Q.*    Please.

 3    *A.*    Yes, sir?

 4    *Q.*    Yes, sir.

 5    *A.*    All right.  If it is just all right with

 6  everybody, I am just asking.

 7                  Five minutes, sir.

 8    *Q.*    And during that break, were the questions you

 9  just answered discussed?

10                  MR. DOWNER:  Object to the form.

11                  THE WITNESS:  No, sir.

12                  MR. DOWNER:  Instructing my client not to

13  answer what was discussed.

14  BY MR. HENRY:

15    *Q.*    Sir, with respect to this learning disability

16  that you just discussed, have you ever been diagnosed with

17  a learning disability?

18    *A.*    What -- rephrase that question, "diagnosed."

19    *Q.*    Has a doctor ever declared you to have a

20  learning disability?

21    *A.*    Yes, to my knowledge.

22    *Q.*    Which doctor and when?

23    *A.*    That is -- I was younger at the time, my

24  grandmother and him.

25    *Q.*    But sitting -- okay.  With respect to the

1                          CERTIFICATE

2              I HEREBY CERTIFY that the foregoing deposition
   was taken by me pursuant to notice; that I was then and
3  there a Certified Court Reporter for the State of Arizona,
   and by virtue thereof authorized to administer an oath;
4  that the witness before testifying was duly sworn by me to
   testify to the whole truth and nothing but the truth;
5  pursuant to request, notification was provided that the
   deposition is available for review and signature; that the
6  questions propounded by counsel and the answers of the
   witness thereto were taken down by me in shorthand and
7  thereafter transcribed through computer-aided
   transcription under my direction, and that the foregoing
8  typewritten pages contain a full, true, and accurate
   transcript of all proceedings had upon the taking of said
9  deposition, all done to the best of my skill and ability.
              I FURTHER CERTIFY that I am in no way related to
10 nor employed by any of the parties hereto, nor am I in any
   way interested in the outcome hereof.
11            I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA Sections
12 (J)(1)(g)(1) and (2).
              DATED at Phoenix, Arizona, this 8th day of
13 November, 2020.

14                      _____
                        CARRIE A. CARIATI
15                      Registered Professional Reporter
                        Certified Realtime Reporter
16                      Certified LiveNote Reporter
                        Certificate No. 50355
17

18            I CERTIFY that this Registered Reporting Firm
   has complied with the ethical obligations set forth in
19 ACJA Sections (J)(1)(g)(1) and (2).

20
              DATED at Phoenix, Arizona, this 8th day of
21 November, 2020.

22

23                      _____
                        Registered Reporting Firm R1064
                        CARRIE A. CARIATI, Owner
24

25

# EXHIBIT 34

## Declaration of Deshawn Briggs

I, Deshawn Briggs, hereby declare as follows:

1. I am a 31-year-old man.

2. I am a Named Plaintiff in *Briggs, et al. v. Adel, et al.*

3. I participated in Defendant Treatment Assessment Screening Center, Inc's (TASC) Possession of Marijuana (POM) Diversion program. I started the program on February 29, 2016, and successfully completed it on August 25, 2016.

4. As a part of the program, I had to pay $1000 in program fees. I also had to pay for regular drug tests. By my 90th day on the program, I had no program violations and I had finished all requirements other than paying the program fees. I tried my best to pay the whole amount in my first three months, but with my other expenses, I could not afford to.

5. I wanted to be done with TASC supervision as soon as possible because I had to call every day to find out if I needed to take a drug test, and I never knew when or how many times a week I'd need to test. I was given a card with a number that I had to call to see if the color I was assigned was selected for testing. Not only would I have to come up with $15 each time, but the unpredictability was really disruptive, especially with my work schedule. I would sometimes have to ask to leave work early to test and I would either lose out on those hours or come into work the next day extra early.

6. TASC kept me on the program until I had finished paying the $1000 fees. My case manager never asked me why I was behind on my monthly payments or whether I could afford to pay for the program fees and drug tests.

7. I lived in my parents' house, with my dad, step-mom, sister, and nephew, when I was doing the TASC program. I was 26 years old at the time. Because of all the money I had to pay for TASC supervision, I was unable to get my own place until after I finished the program.

8. I had a part-time job at Walmart when I was in the TASC program, and I also got monthly disability income. Social security puts limits on how much money I can earn from another source, and I can lose my disability income if I make too much money from another job. Every time I start a new job, I

call the social security office to make sure that my income won't cause a problem with my disability benefits.

9. At Walmart, I had an application on my cell phone that gave me my work schedule every pay period. I worked when managers asked me to work based on the needs of the store. I did not control how many hours I worked per pay period, and part-time workers could not work more than a certain number of hours. At best, I could get my hours moved around. So, for example, I gave two-weeks' notice before I went to California in March 2016. Managers adjusted the hours they assigned me during that two-week pay period to make up for the days I would be out of town.

10. My schedule would sometimes fluctuate if managers assigned me to cover the shifts of people who got fired or were taking time off, which is why I sometimes worked more hours during a single pay period than others. But it was not up to me to decide when I would get to work more hours. It would have been pointless to request additional hours, because my understanding and experience was that requests like that were never granted.

11. I paid my parents rent (about $500 a month) using my disability income and money I earned from Walmart. I also helped pay for household costs like groceries and laundry.

12. My dad gave me a little bit of money to help me pay for some of the drug tests I had to take as part of the TASC program. I didn't think he could help me pay the program fees because he was in between jobs at the time. My stepmom did not have a reliable income at the time and I did not think she would be able to lend me any money either.

13. I typically withdraw money that I do not immediately spend, and carry cash in case I end up needing it. I regularly used to use cash to pay for rent, household expenses, and transportation. When I was in the TASC program, I used to pay about $60 in cash per month for a monthly bus pass.

14. I would make small purchases with my debit card at stores like Walmart, CVS, Quiktrip, A1 Food Store, Dollar General, Walgreens, and Frys Food and Drug. Typically, I would buy hygiene necessities and food for in between work shifts. I also used to get money orders to pay for TASC program fees.

15. I went on a trip to see family in California while enrolled in the TASC program. This trip was planned before I started diversion or knew the details of the program, including that there was a deadline for payment, that TASC

didn't give financial assistance, and if I didn't pay within 90 days TASC would keep me on the program until I did.

16. Before I went, I withdrew $350 in emergency cash in case I was unable to use my card while traveling.  I redeposited it, and other cash I already had with me, when I realized I was not going to need it in California. I received no money from family members while in California. Any money I deposited during that time would have been cash I had previously withdrawn.

17. I also withdrew $400 cash when I was in California. I previously testified that I do not remember why I withdrew this money. But I now realize that I withdrew part of the money to pay someone I owed for doing my taxes for me and my family that year, as I typically had done even before I was enrolled in TASC. The other part of the money I withdrew was likely because I was traveling back to Arizona around this time and tend to keep emergency cash on me while traveling.

18. When I was in the TASC diversion program, my T-Mobile cell phone plan included unlimited talk, text, and data. I don't remember exactly when I got on this phone plan, but it was around the time I moved from California to Arizona, about two years before I started the TASC program.

I declare under penalty of perjury that the foregoing is true and complete to the best of my knowledge.

Dated: 4/26/2021

DocuSigned by:

*DeShawn Briggs*
30D845D453724A8...

Deshawn Briggs