# Ex. 35

[This exhibit is being filed under seal.]

# Ex. 36

[This exhibit is being filed under seal.]

# EXHIBIT 37

# Ex. 37

[This exhibit is being filed under seal.]

# EXHIBIT 38

**From:** Cordova Patricia [cordovap@mcao.maricopa.gov]
**Sent:** Thursday, June 28, 2018 9:00 PM
**To:** Douglas Kramer
**CC:** Latrice Hickman; Vick Ken
**Subject:** RE: Questions
**Attachments:** image001.png

Doug,

Thank you for your follow-up email.

Please know, MCAO has taken TASC's request quite seriously. All information from TASC has been shared with Ken as soon as it was received. (His office is next to mine) He's fully informed. Lots of internal conversations have taken place in preparation for our meeting with the County Attorney and Chief Deputy, Mark Faull, which took place today.

Please know I was aware of your Board of Directors' Meeting, Latrice told me. Although this was considered, setting a meeting with the County Attorney is subject to his availability. The meeting that took place today was the soonest I could get it scheduled.

As for separate conversations with your staff, there was no intent to be circuitous. At first, I was contacting those I felt I could readily reach and obtain needed answers. However, when I was told to direct my questions to Latrice and Cheyenne, I did so. Even today, I only communicated with Latrice and Cheyenne. In fact, my phone conversation with Cheyenne today was quite positive. We discussed ways we could move in new programmatic directions, as proposed by TASC at our meeting in Feb/ March, which would benefit the client and all involved.

I did inquire about office closures because it may or may not be related to the request for funding support. Also, MCAO wanted to know if these office closures impacted service to our diversion population. I have never said explicitly or implicitly that TASC is "imploding." I have never used that language.

As for making a decision on the TASC funding request some time ago, I have always informed Latrice and Cheyenne of the status of the request in our office. I continually communicated every step of the way. I have always respected their interest in obtaining a decision from MCAO.

I will say, some of the information received from TASC has been unclear; hence my series of questions. As mentioned, I shared all information with Ken for a careful review. Often we felt more information was needed. As a result, today's meeting concluded with needing more information from TASC. If you have uncertainty with my ability to convey your request to the County Attorney, know Ken was also in today's meeting.

Ken and I will likely speak about this matter tomorrow morning. I believe a meeting should be set so we thoroughly discuss TASC's request.

My desire is to work collaboratively with TASC. I'm certain we can.

Thank you,

Patti

Get Outlook for Android

From: Douglas Kramer
Sent: Thursday, June 28, 7:25 PM
Subject: RE: Questions
To: Cordova Patricia
Cc: Latrice Hickman, Vick Ken

Hi Patti –

MC-01034

I'm very sorry if my last communication came off as derogatory – I do not have any personal issue with you at all Patti, and I value our collaboration.

The frustration (situation) that I am evidently taking out on Latrice is the inability for us to put forth a clear and concise request for assistance from MCAO  with servicing our indigent population. I have requested that Latrice be the point person on this discussion.  Circuitous or separate conversations between Cheyenne, Marrya and yourself seems to be confusing and possibly misrepresenting her message. Additionally, I when I see discussions wandering off topic such as an office closure in Glendale, or the suggestion of  TASC "imploding" (far from reality),  I get my fur in a rough, and Latrice feels my wrath J.

I was under the understanding  that a  decision would be made on our proposal  (pro or con) some time ago,  prior to a meeting with my Board of Directors today regarding  my FY19 budget. In the end,  we have not been able to give you enough information for you to feel comfortable to bring this  forward to Ken in a timely manner.

I am confident that all questions and concerns could be voiced and addressed in a single  meeting with all parties. This leads to my present intention, which would be to insert myself back into the discussion and go directly to Mr. Vick, assuming he is receptive to the idea.

Thank you for your continued engagement with my staff, and helping me move this discussion forward.

Best Regards

**Douglas k. Kramer**
Chief Executive Officer
**WORK |** (602) 254-7328 ext 102    **FAX |**  (602) 255-0851
Corporate Office: 4016 N Black Canyon Hwy, Phoenix, AZ 85017



**From:** Cordova Patricia [mailto:cordovap@mcao.maricopa.gov]
**Sent:** Thursday, June 28, 2018 5:57 PM
**To:** Douglas Kramer <dkramer@TascSolutions.org>
**Subject:** RE: Questions

I will let Ken know there is a "situation" and you would like to meet with him.
Patti
Get Outlook for Android

On Thu, Jun 28, 2018 at 5:53 PM -0700, "Douglas Kramer" <dkramer@TascSolutions.org> wrote:

    Latrice –

Thank you for your assessment of the patti situation I agree that we need to go to Ron directly. Let's discuss tomorrow

Sent from my mobile phone

**From:** Cordova Patricia
**Sent:** Thursday, June 28, 2018 4:11 PM
**To:** Latrice Hickman
**Cc:** Cheyenne Watson; Douglas Kramer
**Subject:** RE: Questions

Thank you Latrice for this information.  See my questions in red below.

**From:** Latrice Hickman [mailto:lhickman@TascSolutions.org]
**Sent:** Thursday, June 28, 2018 3:51 PM
**To:** Cordova Patricia
**Cc:** Cheyenne Watson; Douglas Kramer
**Subject:** RE: Questions

Hello Patti,

Please see my bulleted responses below.

1.      How does TASC define indigence? Once a person is identified as indigent, are all TASC fees waived or just reduced?

·       Indigent clients are determined by federal poverty guidelines and further substantiated status; unemployed or disabled, received AHCCCS or other entitled benefits.

·       TASC provides assistance by waiving UA's **and/or** lowering payments; determined by the person's circumstance and individualized service plan. Do you lower the TASC fee? Or is the TASC fee not lowered and just the payments are lowered?  Can you provide me an example? – a prototype client identified as indigent – how do you assess UAs TASC fees and MCAO fees? We need to know the "process" used.

2.      Where is TASC in the process of securing contracts through AHCCCS for the seven health plans that will be offered in October? I need true sense of where you are at – even if in the beginning stages, I'd like to know.

·       All TASC locations are registered AHCCCS provider sites (laboratory included).

·       Contracted Magellan provider (laboratory included).

·       Credentialing documents have been submitted to all other MCOs and are under review; I consider this past the beginning stages.

MC-01036

· Not related to AHCCCS, but TASC is also a contracted provider of services for Blue Cross Blue Shield of Arizona (laboratory included).

· TASC's target date roll-out insurance processing insurance is October 1, 2018.

In addition to the items listed above:

· Clinical treatment modalities and services were expanded in January 2018.

· We are streamlining the MCAO data exchange; streamlining activities will further support MCAO operations, as well as, TASC's operations.

Please let us know if you our your colleagues would like us to present or discuss the exciting direction in which TASC is going!

Kindest Regards,

Latrice Hickman

**From:** Cordova Patricia [mailto:cordovap@mcao.maricopa.gov]
**Sent:** Thursday, June 28, 2018 2:47 PM
**To:** Latrice Hickman <lhickman@TascSolutions.org>
**Cc:** Cheyenne Watson <cwatson@TascSolutions.org>
**Subject:** Questions

Hi Latrice,

I have my meeting with the CA and others in about 45 minutes so if you can provide some information to me before that meeting, it would be helpful –

1.      How does TASC define indigence? Once a person is identified as indigent, are all TASC fees waived or just reduced?
2.      Where is TASC in the process of securing contracts through AHCCCS for the seven health plans that will be offered in October? I need true sense of where you are at – even if in the beginning stages, I'd like to know.

Thanks.

-Patti

*Patricia Cordova*
*Bureau Chief*

MC-01037

EXHIBIT 39

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3
  DeShawn Briggs, et al.,            )
4                                    )
         Plaintiffs,                 )
5                                    )
  vs.                                )    No. CV2018-02684-EJM
6                                    )
  Allister Adel, et al.,             )
7                                    )
         Defendants.                 )
8                                    )
  _____   )
9

10

11
              VIDEOTAPED VIDEOCONFERENCE
12             DEPOSITION OF LUCIA SORIA

13

14            CONFIDENTIAL DESIGNATIONS:
             PAGES 42-43; 81-96; 116-120
15
                 Phoenix, Arizona
16              November 13, 2020
                   9:36 a.m.
17

18

19

20  CERTIFIED COPY

21

22  Reported by:                CARRIE REPORTING, LLC
    CARRIE A. CARIATI           Certified Reporters
23  Registered Professional Reporter   2415 East Camelback Road
    Certified Realtime Reporter  Suite 700
24  Certified LiveNote Reporter  Phoenix, AZ 85016
    Arizona CR No. 50355         (480)429-7573
25  carrie@carriereporting.com

1      *A.*   Okay.

2      *Q.*   Great.  Okay.  Have you ever been married

3  before?

4      *A.*   Yes.

5      *Q.*   Okay.  And when was that?

6      *A.*   I am still married, but I have been separated

7  for probably like nine years.

8      *Q.*   Okay.  And when were you first married?

9      *A.*   When was it?  January -- I don't remember the

10  date -- the 10th, 2004.

11     *Q.*   Okay.  So about 16 years?

12     *A.*   Yes.

13     *Q.*   Okay.  And do you have any children?

14     *A.*   Yes, I have two.

15     *Q.*   And what are their ages?

16     *A.*   16 and 19.

17     *Q.*   And are these children with your husband that

18  you are currently separated from?

19     *A.*   We take -- I have them in the week, and he has

20  them on the weekends.

21     *Q.*   Oh, is your current husband, who you are

22  separated from, is he their father?

23     *A.*   Yes.

24     *Q.*   Okay.  Does he provide any child support?

25     *A.*   No, he has not.

1    Q.    Does he contribute financially at all?

2    A.    No, he hasn't.

3    Q.    Okay.  And is your current husband employed?

4    A.    Yes, he is.

5    Q.    And what is his job?  Where does he work?

6    A.    Well, he not my husband.  He is my boyfriend.

7  But he works for -- he puts solar panels on buildings.  I

8  am not sure of the name of the company.  He just started,

9  like, a couple of months ago.  I am not sure of the

10 company.

11   Q.    Okay.  And then I just want to make sure we are

12 clear.  We were talking a moment ago that you said you

13 were married in January of 2004?

14   A.    Yes, that's when I got married with my -- the

15 father of my kids.

16   Q.    Okay.  And what is his name?

17   A.    Guillermo.

18   Q.    Guillermo, okay.  And is Guillermo employed?

19   A.    Yes, he is.

20   Q.    Okay.  And what does he do for a living?

21   A.    He works in Divine Care.

22   Q.    And, I'm sorry, what was that?

23   A.    Divine Care.

24   Q.    Divine Care.  Is that the name of a business?

25   A.    Yes.

1    *Q.* Okay. And what does he do there?

2    *A.* He is a driver.

3    *Q.* And what kind of business is it?

4    *A.* It is taking care of -- well, picks up

5    disability kids that need to go to appointments and stuff.

6    *Q.* Okay. And was he employed at that position

7    throughout the year 2019?

8    *A.* He -- let me think. I am not sure when he got

9    the job. I think he got it this year.

10   *Q.* Okay. Do you know whether or not Guillermo was

11   employed in 2019?

12   *A.* I don't think -- no, he was not.

13   *Q.* Okay. And then you referred a moment ago to

14   someone who was employed installing solar panels, and you

15   referred to that person as your boyfriend. That is a

16   different person than Guillermo, correct?

17   *A.* Yes.

18   *Q.* Okay. And what is that person's name?

19   *A.* Travis.

20   *Q.* Travis, okay. And was Travis your boyfriend in

21   2019 while you were enrolled at TASC?

22   *A.* Yes, he was.

23   *Q.* Okay. And was Travis employed with the solar

24   panel company while you were enrolled at TASC?

25   *A.* No, he was in this company named Clayton.

1      Q.    I'm sorry.  Clayton?

2      A.    Yes.

3      Q.    Okay.  C-L-A-Y-T-O-N?

4      A.    Yes, correct.

5      Q.    Okay.  And do you know what he did at Clayton?

6      A.    He built those motor homes.

7      Q.    And what was his position there?  What exactly

8  was Travis' job at Clayton?

9      A.    He was just -- built the panels and -- I mean,

10  panels, I'm sorry, that's not right.  You know those

11  little motor homes?  They are not a -- he would, like,

12  paint them and put -- install the windows, the doors, just

13  installation I guess.

14      Q.    Okay.  And these are motor homes that a person

15  gets in and drives?

16      A.    No, the ones that are -- they are called motor

17  homes, but they are not the drivable --

18      Q.    Like the trailer that you pull behind a vehicle?

19      A.    Yeah, it is like those.  Yes.

20      Q.    Okay.  And is that here in town?

21      A.    Yes, it is in Buckeye.

22      Q.    Okay.  And he was employed there throughout 2019

23  while you were enrolled in TASC?

24      A.    Yes.

25      Q.    Okay.  Do you and Travis live together?

1    A.    Just barely this year, yes.

2    Q.    Okay.  But you did not live together while you

3 were enrolled at TASC?

4    A.    No.

5    Q.    Okay.  When did you and Travis start dating?

6    A.    2018.  I don't remember the month.

7    Q.    Was it earlier or later in 2018?

8    A.    Later.

9    Q.    Okay.  Do you know about how much Travis made on

10 a monthly basis while he was employed at Clayton?

11    A.    Like a thousand a month.

12    Q.    Okay.  Do you know whether he was employed full

13 time?

14    A.    Yes, he was full time.

15    Q.    Okay.  Do you know if he was paid hourly?

16    A.    Yes.

17    Q.    And do you know how much he made an hour?

18    A.    I think it was 13.50 an hour.

19    Q.    Okay.  And then other than your marriage to

20 Guillermo, have you ever been married to anybody else?

21    A.    No.

22    Q.    Okay.  And I think you already confirmed this,

23 but your two children, their father is Guillermo, correct?

24    A.    Yes.

25    Q.    And their ages are 16 and 19?

1    *A.*    Correct.

2    *Q.*    And do you have full custody of both children?

3    *A.*    Yes.

4    *Q.*    And has that been the case since you and

5    Guillermo separated?

6    *A.*    Yes.

7    *Q.*    And what year did you separate again,

8    approximately?

9    *A.*    Like 2007.

10    *Q.*    Okay.  And in 2019 while you were enrolled in

11    TASC, were both children living with you?

12    *A.*    Yes.

13    *Q.*    And were both -- the 19-year-old, were they --

14    was the 19-year-old still in school while you were

15    enrolled in TASC?

16    *A.*    Yes.

17    *Q.*    Has that child since graduated?

18    *A.*    Yes.

19    *Q.*    So both of your children were enrolled in school

20    while you were enrolled in TASC?

21    *A.*    Yes.

22    *Q.*    And did you live -- you and your children, was

23    there anybody else living in your household in 2019 while

24    you were enrolled in TASC?

25    *A.*    Yes, my parents.

1      Q.    And did you live in a house or an apartment?

2      A.    House.

3      Q.    And was the house owned or rented?

4      A.    My dad owns it.

5      Q.    Okay.  Did anybody else live in the home besides

6  you, your two children, and your parents?

7      A.    My brother.

8      Q.    Okay.  And what is your brother's name?

9      A.    Anthony.

10     Q.    And is his last name Lopez?  Is that right?

11     A.    Yes, Lopez.

12     Q.    And is your brother older or younger than you?

13     A.    Younger.

14     Q.    Okay.  How old is Anthony?

15     A.    33.

16     Q.    And how old are you currently?

17     A.    39.

18     Q.    39, okay.  And so in 2019 when you were enrolled

19  in TASC, you lived in a home owned by your father with

20  your mother, your father, your brother, Anthony, and your

21  two children; is that correct?

22     A.    Yes.

23     Q.    Anybody else live in the home?

24     A.    My grandma -- well, I don't -- she practically

25  lived there, but she leaves, like, on the weekends with my

1   other uncles, but she has a room there, so I don't know if

2   that is considered -- she has been on and off, like, for a

3   couple years already.

4       Q.   Okay.  And do you currently still live with your

5   parents?

6       A.   Yes.

7       Q.   Okay.  I thought you said a moment ago that you

8   -- do you live with Travis currently?

9       A.   Yeah.  He moved in to help out with the bills

10  and stuff.

11      Q.   Okay.  But Travis wasn't living in your parents'

12  home with you in 2019 when you were enrolled in TASC,

13  correct?

14      A.   No -- yes, correct.

15      Q.   Your brother, Anthony, was he employed in 2019

16  while you were enrolled in TASC?

17      A.   Yes.

18      Q.   And what did he do for a living in 2019?

19      A.   He is the -- he works at the same place, Divine

20  Care, as Guillermo.

21      Q.   Okay.  And Anthony worked at Divine Care the

22  entire time you were enrolled in TASC?

23      A.   Yes.

24      Q.   Okay.  Do you know how much Anthony made when he

25  was working at Divine Care in 2019?  Was he paid hourly,

 1  for example?

 2       A.    Yes, hourly.

 3       Q.    And do you know how much he made an hour in

 4  2019?

 5       A.    That, I don't know.

 6       Q.    Okay.  Do you know if it was more than $10 an

 7  hour?

 8       A.    Yes, it was more than 10.

 9       Q.    Okay.  Do you think it was more than $15 an

10  hour?

11       A.    He never would say but probably around there.

12  He was a supervisor, so ...

13       Q.    Okay.  Was Anthony a supervisor at Divine Care

14  in 2019?

15       A.    Yes.

16       Q.    Okay.  And was he employed full time in 2019?

17       A.    Yes.

18       Q.    Okay.  And then let's talk for just a moment

19  about your grandmother.  You said a moment ago I think

20  that in 2019 when you were enrolled in TASC she was living

21  at your parents' house with you at least on the weekdays;

22  was that right?

23       A.    Yes.

24       Q.    Okay.  Is your grandma employed?

25       A.    No.

1      Q.    No, okay.  So she was not employed at all in
2  2019?
3      A.    No.
4      Q.    Okay.  What about your father?  Was your father
5  employed in 2019?
6      A.    Yes.
7      Q.    And where did he work?
8      A.    He works in the casino.
9      Q.    Oh, okay.  Which one?
10      A.    Vee Quiva.
11      Q.    Okay.  And what is his position?
12      A.    What is it?  Maintenance?  Maintenance.
13      Q.    Did he do, if you know -- in 2019, was he doing
14  building maintenance at the casino or was he working on
15  say, for example, slot machines at the casino?  Do you
16  know what kind of maintenance he was doing?
17      A.    The slot machines.
18      Q.    Oh, okay.  And was he employed full time in
19  2019?
20      A.    Yes.
21      Q.    And do you know about how much your father made
22  at that position in 2019?
23      A.    No, I don't know.
24      Q.    Do you know if he was paid hourly?
25      A.    Hourly, yes.

1    Q.   Okay.  Do you know whether it was more than $15
2    an hour?
3    A.   No, it was less.
4    Q.   Less, okay.  Do you know if it was more than $10
5    an hour?
6    A.   It was less than my brother, so probably, yes,
7    it was a little bit more than 10.
8    Q.   Okay.  But you think that your father in 2019
9    was making less than your brother Anthony, correct?
10   A.   Yes.
11   Q.   And then let's talk about your mom for a second.
12   Was your mom employed in 2019?
13   A.   She baby-sits at home.
14   Q.   Okay.
15        MS. CATERO:  I'm sorry, was there somebody
16   -- who was that that was just talking?
17        (Discussion off the record.)
18   BY MS. CATERO:
19   Q.   Ms. Soria, you were just telling us -- or, I'm
20   sorry, Lucia -- a moment ago that in 2019 your mom did
21   some baby-sitting at her home?
22   A.   Yes.
23   Q.   And did she do anything else to make money in
24   2019?
25   A.   No.

1       Q.    Okay.  And how often -- while you were enrolled

2   in TASC, about how many days per week would your mother

3   baby-sit?

4       A.    Five days a week.

5       Q.    Okay.  On weekdays generally?

6       A.    Not weekends, just weekdays, yes.

7       Q.    Just weekdays, okay.  And about how many

8   children would she baby-sit each day?

9       A.    Sometimes three or four.

10      Q.    Okay.  And were these regular -- she would have

11  the same kids sort of every day?

12      A.    Yes.

13      Q.    And, approximately, what were the ages?

14      A.    There was a seven-year-old, a five-year-old, and

15  two four-year-olds.

16      Q.    Okay.  Little ones.

17      A.    Yes.

18      Q.    And how would she charge for the baby-sitting

19  services?

20      A.    25 a day for each kid.

21      Q.    Okay.  So if she had four kids there on a given

22  day, that would be a hundred dollars per day?

23      A.    Yes.

24      Q.    Okay.  And if that was five days per week, that

25  would be 500 per week?

1      *A.*    Yes.

2      *Q.*    Okay.  And then just rough math, again, assuming

3  she had four kids every day, that would work out to about

4  $2,000 a month.  Does that sound about right?

5      *A.*    Yes.

6      *Q.*    Okay.  And then were there any other sources of

7  income for the family that was living together in your

8  father's home while you were enrolled in TASC in 2019?

9      *A.*    No.

10     *Q.*    Okay.  And you -- you were not employed during

11  that time frame, correct?

12     *A.*    Correct.

13     *Q.*    Okay.  Do you know is there a mortgage payment

14  on the home that your father has to make?

15     *A.*    Yes.

16     *Q.*    Do you know about how much that was?

17     *A.*    Oh, god.  No, I don't.

18     *Q.*    Okay.  Do you have any idea whether it is over a

19  thousand dollars a month?

20     *A.*    He told me.  I think it is 1,200.  That's what

21  he told me, about that.

22     *Q.*    Are you guessing or do you remember him telling

23  you that it was 1,200?

24     *A.*    It is more than a thousand so just put it that

25  way.

1      Q.   Okay.  So other than it is probably over a

2  thousand, you don't have any more specific understanding

3  of what the monthly mortgage payment was?

4      A.   No, I don't.

5      Q.   Okay.  That's okay.  Let's shift gears here and

6  talk about you for a minute.  Did you graduate from high

7  school, Lucia?

8      A.   I did not graduate, but I got my GED.

9      Q.   Okay.  And in what year did you get your GED?

10     A.   2009.

11     Q.   And had you finished high school with the rest

12  of your classmates, what year would you have graduated?

13     A.   Oh, 1999.

14     Q.   '99, okay.  And through what year did you attend

15  high school?  Your freshman year, sophomore year?

16     A.   Yes, freshman and sophomore.

17     Q.   Okay.  And then did you drop out of school at

18  the end of your sophomore year?

19     A.   Yes.

20     Q.   Okay.  And that would have been about 1997.

21  Does that sound about right?

22     A.   Yes.

23     Q.   Okay.  And what did you do when you left high

24  school?

25     A.   Worked at McDonald's.

1      Q.    And did you work full time at McDonald's?

2      A.    Yes.

3      Q.    And how long did you work at McDonald's?

4      A.    Two years.

5      Q.    Okay.  And then what positions did you hold at

6  McDonald's?  Were you ever, like, a supervisor or -- I

7  don't know how they have the different job titles there,

8  but what would you characterize your position as at

9  McDonald's?

10      A.    Just a cashier.

11      Q.    A cashier, okay.  And that was the whole time

12  that you worked at McDonald's?

13      A.    Yes.

14      Q.    Okay.  And so -- let's see.  It looks like you

15  probably left McDonald's sometime in 1999.  Does that

16  sound about right?

17      A.    Yes.

18      Q.    Okay.  And why did you leave the job at

19  McDonald's?

20      A.    Well, I was trying to get another job -- well, I

21  did get it.  I was working for Allstate telemarketing, but

22  I didn't really like that.  I guess I tried it and I left

23  in, like, a month or two.

24      Q.    Okay.  So before you left McDonald's, you had

25  the new job lined up at Allstate; is that correct?

1      A.    Yes.

2      Q.    Okay.  And then you worked there at Allstate for

3   about a month sometime in 1999; is that correct?

4      A.    Yes.

5      Q.    Okay.  And your position there, you were doing

6   telemarketing?

7      A.    Yes.

8      Q.    Okay.  Were you making outbound calls?  Were you

9   calling people?

10     A.    Yes.

11     Q.    You were not answering inbound calls, though,

12  like to answer people's questions, you were making

13  outbound calls?

14     A.    Yes.

15     Q.    Okay.  And were you trying to sell something?

16     A.    The insurance.

17     Q.    Selling insurance, okay.  And did Allstate

18  provide you with any training for that position?

19     A.    Only for two days, yes.

20     Q.    Two days training, okay.  Then after about a

21  month you quit the job at Allstate; is that correct?

22     A.    Yes.

23     Q.    And did you have another job lined up when you

24  left Allstate?

25     A.    No, I did not.

1    Q.   Okay.  How long -- so were you unemployed at

2   that point in time when you left Allstate?

3    A.   Yes.

4    Q.   Okay.  For how long were you unemployed after

5   you left Allstate?

6    A.   I don't remember.  From -- let's see.  I

7   remember working somewhere else, like, five months --

8    Q.   I'm sorry.

9    A.   -- without a job.

10    Q.   I'm sorry, how long?

11    A.   About five months, around there.

12    Q.   And then after about four or five months, did

13   you find another job?

14    A.   Yes.

15    Q.   And where was that?

16    A.   Fashion Q store clothes.

17    Q.   I'm sorry, was it Fashion Q, the letter Q?

18    A.   Yes.

19    Q.   And where was that at?

20    A.   That was around where I lived, like, in another

21   city, though.

22    Q.   Oh, where did you live at that point in time?

23    A.   Oh, I'm sorry, yeah, California.

24    Q.   Oh, okay.  Great.  So this time period we just

25   have been talking about, from your sophomore year in high

1    school up through getting the job at Fashion Q, this was

2    all in California?

3         A.    Yes.

4         Q.    And what city were you in?

5         A.    Winter Park.

6         Q.    Winter Park?

7         A.    Yes.

8         Q.    Okay.  All right.  So you started the job at

9    Fashion Q.  You think that was still in 1999 or would that

10   have been around 2000?  Do you know about what year that

11   was?

12        A.    2000.

13        Q.    Around 2000, okay.  And how long did you work

14   there?

15        A.    Like, five months, six months, around there.

16        Q.    And what was your position at the Fashion Q?

17        A.    Fitting room.

18        Q.    Oh, like a fitting room attendant?

19        A.    Yes.

20        Q.    Okay.  And any other positions while you were at

21   the Fashion Q?

22        A.    No.

23        Q.    Okay.  And let's see.  Did you quit the job at

24   the Fashion Q?

25        A.    Yes.

1      Q.    Okay.  And did you have another job lined up at
2   that point in time?
3      A.    No.
4      Q.    Why did you quit the job at the Fashion Q?
5      A.    I was pregnant.
6      Q.    Oh, okay.  Let's see here.  So -- I'm sorry, I
7   am looking back at my -- were you married at that point in
8   time when you got pregnant?
9      A.    Not married but we were together.
10     Q.    Together, okay.  I am just trying to find the
11   day you all got married.  So you got pregnant, you quit
12   the job.  When was the next time that you were employed
13   after you left the job at Fashion Q?
14     A.    When my baby was, like, six months.
15     Q.    Okay.
16     A.    I am not sure.  I don't know.
17     Q.    And then where did you go to work at that point?
18     A.    Knott's Berry Farm.
19     Q.    Oh, cool.  And what was your position there?
20   What did you do?
21     A.    Concession.  I was personalized jewelry.
22     Q.    And how long did you have that job?
23     A.    I am trying to remember.  Two years.
24     Q.    And did you do the same job the entire two years
25   you were employed at Knott's Berry Farm?

1    *A.*    Yes.

2    *Q.*    Okay.  And did you quit that job at Knott's

3    Berry Farm?

4    *A.*    Yes.

5    *Q.*    Okay.  And did you have another job lined up at

6    that point in time?

7    *A.*    No.

8    *Q.*    And why did you quit the job at Knott's Berry

9    Farm?

10   *A.*    My husband didn't want -- well, my boyfriend

11   didn't want me to work, like, just to stay with the baby I

12   guess.

13   *Q.*    Okay.  After you left the job at Knott's Berry

14   Farm, when was the next time you were employed?

15   *A.*    When I moved here in Arizona I moved here in

16   2006.

17   *Q.*    Okay.  And when you moved to Arizona in 2006,

18   did you get a job?

19   *A.*    Yes.

20   *Q.*    And where was that?

21   *A.*    The cleaners in Buckeye.

22   *Q.*    Like a dry cleaners?

23   *A.*    Dry cleaners, yes.

24   *Q.*    Okay.  And what was your job there?

25   *A.*    Just getting the clothes, counting the clothes

1  and charging.

2      Q.    Okay.  And how long were you employed at the dry

3  cleaners?

4      A.    Maybe two years.

5      Q.    And did you quit the job at the dry cleaners?

6      A.    Yes.

7      Q.    Okay.  And did you have another job lined up

8  when you left the job at the dry cleaners?

9      A.    Yes, Macy's warehouse.

10      Q.    And what was your position at the Macy's

11  warehouse?

12      A.    I was just a picker I guess it is called.

13      Q.    What does that mean?  What did you do?

14      A.    Like, I picked the merchandise and sorted it out

15  or packing.  It was, like, different type of positions.

16  It was just a warehouse associate I guess.

17      Q.    Okay.  So would people place orders with Macy's

18  and then you would pick out the merchandise and package it

19  up to fill their order?  Is that what you were doing?

20      A.    Yes.

21      Q.    Okay.  Great.  And then how long did you do that

22  job?

23      A.    It was only seasonal so it was, like, three

24  months.

25      Q.    Over the holidays?

```
 1        A.    Yes.

 2        Q.    Okay.  And what did you do when you left the job

 3   at the Macy's warehouse?

 4        A.    I was just at home.  I was getting -- that's

 5   when it started getting anxiety attacks and panic attacks.

 6        Q.    Okay.  We are going to talk about some of your

 7   medical issues here in more detail in just a little while,

 8   but -- so in around -- let's see here.  Was it the

 9   holidays around 2008 when you worked at Macy's?

10        A.    I don't remember.  Because I started work --

11   after that, I started working in -- I started working in

12   Dollar Tree, like, in 2008 so -- oh, 2008 -- no, it was

13   2009.  I'm sorry, it was 2009.

14        Q.    Okay.

15        A.    So it was probably 2008 -- sorry.  My pump.  Oh,

16   okay.  Okay.

17        Q.    So you started working in Dollar Tree in about

18   2009?

19        A.    Yes.

20        Q.    Okay.  And what was your position at the Dollar

21   Tree?

22        A.    I was a cashier, and then I was an assistant

23   manager.

24        Q.    And how long were you employed at the Dollar

25   Tree?
```

1      A.    Oh, god, like, seven years.  I left the job

2   November -- I forgot what day but of 2018.

3      Q.    Okay.  So at the time you left the job at Dollar

4   Tree in 2018, was your position assistant manager?

5      A.    Yes.

6      Q.    Okay.  And about how much did you make in 2018

7   in the position of assistant manager at the Dollar Tree?

8      A.    11.95.

9      Q.    And that was hourly?

10      A.    Yes.

11      Q.    Okay.  Were there any benefits?

12      A.    No.

13      Q.    Were you employed full time in 2018?

14      A.    Part time.

15      Q.    Part time.  About how many hours a week were you

16   working?

17      A.    Sometimes 30, sometimes 25.  Only in the

18   holidays they used to give me a little bit more hours.

19      Q.    While you were employed at the Dollar Tree, did

20   they provide you with any skills training in connection

21   with your job?

22      A.    No.

23      Q.    Okay.  And let's see.  What year did you get

24   your -- oh, you got your GED in 2009, right?

25      A.    Yes.

 1  BY MS. CATERO:

 2      *Q.*   Okay.  We will move on.

 3              In 2019, while you were enrolled in TASC,

 4  did you have any credit cards?

 5      *A.*   Yes.

 6      *Q.*   And how many?

 7      *A.*   Three.

 8      *Q.*   And what kind were they?

 9      *A.*   It was, like, from a store, like, Victoria's

10  Secret, Forever 21 --

11      *Q.*   Okay.  I'm sorry.  Go ahead.

12      *A.*   Forever 21.

13      *Q.*   And other than the Victoria's Secret and the

14  Forever 21 credit cards, did you have any other credit

15  cards in 2019?

16      *A.*   I am trying to think.  No, no other credit

17  cards, but I had a credit for Conn's.

18      *Q.*   Oh, so not a card but a -- had you purchased

19  something at Conn's appliances?

20      *A.*   Yes.

21      *Q.*   And did you finance it through them?

22      *A.*   Yes.

23      *Q.*   So you had to make payments to Conn's appliance

24  for the purchase of an appliance?

25      *A.*   Yes.

1       Q.    Okay.  What was it that you purchased?

2       A.    A TV and a computer.

3             MS. CHAMBLEE-RYAN:  Objection, vague as to

4  time.

5  BY MS. CATERO:

6       Q.    In 2019, did you have an account with Conn's

7  appliance that you had to make payments on?

8       A.    I'm sorry, what was that?

9       Q.    In 2019, were you still making payments to

10  Conn's appliance for the purchase of the TV and the

11  computer?

12      A.    Not all the time.  I was giving --

13      Q.    When did you purchase the TV through Conn's

14  appliance?

15      A.    I don't remember.  I was still working at Dollar

16  Tree though so probably 2018.

17      Q.    Okay.  Did you purchase the computer at Conn's

18  appliance at the same time that you purchased the

19  television?

20      A.    No.

21      Q.    Was it before or after you purchased the

22  television?

23      A.    After.

24      Q.    Okay.  And when did you purchase the computer at

25  Conn's appliance?

1      *A.*   Probably, like, a month later from the TV.

2      *Q.*   Do you think you purchased the computer in 2018?

3      *A.*   Yes.

4      *Q.*   Okay.  And you financed both the television and

5   the computer with Conn's appliance?

6      *A.*   Yes.

7      *Q.*   Okay.  So did you have a monthly payment on the

8   TV and computer that you owed to Conn's appliance?

9      *A.*   Yes.

10     *Q.*   Okay.  And do you remember how much that monthly

11  payment was?

12     *A.*   It was 175.

13     *Q.*   Okay.  And did that 178 (sic) monthly payment --

14  that was for both the television and the computer?

15     *A.*   Yes.

16     *Q.*   And do you remember what the term was of that

17  agreement, for how many months total you would have to

18  make the $178 payment?

19     *A.*   No, I don't.

20     *Q.*   Was it for longer than a year?

21     *A.*   Yes.

22     *Q.*   Okay.  So would it be fair to say that in the

23  calendar year of 2019, during that entire calendar year,

24  you owed a monthly payment to Conn's appliance for the TV

25  and the computer?  Is that correct?

1      A.    Yes.

2      Q.    Did you eventually pay off that account with

3  Conn's appliance?

4      A.    No.

5      Q.    Okay.  So you are still carrying a balance on

6  that account?

7      A.    Yes.

8      Q.    Okay.  So we talked a moment ago in 2019, we

9  were talking about your credit and that's how we got to

10  talking about the Conn's Appliances account, and you

11  mentioned a Victoria's Secret credit card, correct?

12      A.    Yes.

13      Q.    Actually, let me back up.  Before I leave the

14  issue of the Conn's Appliance, does Conn's send you a

15  monthly statement?

16      A.    They used to, but I have -- they have no more.

17  They just call me every day.

18      Q.    In 2019, were they sending you monthly

19  statements?

20      A.    In two thousand -- no, not all the time.  That's

21  why I still owe right now because I owe a lot there.

22      Q.    Is that -- is the Conn's appliance account, is

23  that currently in default?

24      A.    I don't know what that means, but I know they

25  still call for me for it to see if I can still pay -- give

1  a little bit of payment of it.

2      Q.    Okay.  I was not clear a moment ago.  I was

3  asking you in 2019, was Conn's sending you in the mail a

4  monthly statement, do you remember?

5      A.    No, I don't remember.

6      Q.    I know sometimes you can set things up for an

7  auto debit out of an account.  Do you know if you had --

8  your monthly payments to Conn's, were those set up on,

9  like, an automatic deduction every month out of your

10  account?

11      A.    It was at first, but then I discontinued that.

12      Q.    Okay.  Do you remember what time period that

13  that account was set up on an auto debit?

14      A.    2018.

15      Q.    Okay.  Do you remember if in 2019, during the

16  time period you were enrolled in TASC, was the Conn's

17  account set up on an auto debit?

18      A.    No.

19      Q.    Okay.  How would you make the -- in 2019 while

20  you were enrolled in TASC, how would you make the monthly

21  payments on the Conn's account?

22      A.    In what year did you say?

23      Q.    2019.  And that's the year I understand you were

24  enrolled in TASC.  How would you send money to Conn's to

25  make a payment?  Would you write them a check?  Would you

1  call them up and give them an account number?  How did you

2  make those payments if you remember?

3      *A.*    Call them or go to the store.

4      *Q.*    In the instances in which you called them to

5  make a payment, would you give them a credit card or a

6  debit card number?  How did you make the payment over the

7  phone?

8      *A.*    Debit card.

9      *Q.*    Okay.  And then the times that you would go into

10  the store to make a payment in 2019, do you remember how

11  you made the payment?

12      *A.*    Cash.

13      *Q.*    Was it your habit to go to the cash machine to

14  withdraw the cash the same day that you went to Conn's to

15  make the payment in cash?

16      *A.*    No.  That's when I was helping my mom, and she

17  used to pay me in cash.

18      *Q.*    Okay.  And how would you know what amount was

19  due every month if they were not mailing you a monthly

20  statement?

21      *A.*    Well, I never -- I -- at the last moment, I was

22  not giving the whole monthly thing.  I was just doing

23  whatever I had.

24      *Q.*    Oh, okay.  So you would pay sometimes different

25  amounts every month; is that right?

1    *A.*    Yes.

2    *Q.*    Okay.  If you had been paying that Conn's

3  account on time, I think you said you remembered that the

4  amount would have been around 178 per month; is that

5  right?

6    *A.*    Yes.

7    *Q.*    Okay.  Did you sometimes pay them more than 178

8  per month?

9    *A.*    No.

10    *Q.*    Okay.  You sometimes paid them less than 178 per

11  month?

12    *A.*    Yes.

13    *Q.*    Okay.  And let's talk for a moment about the

14  Victoria's Secret card.  Did you have -- in 2019, did you

15  have a credit limit on that card?

16    *A.*    Yes.

17    *Q.*    Okay.  What was the limit, do you remember?

18    *A.*    300.

19    *Q.*    In 2019, while you were enrolled in TASC, do you

20  know if you were carrying a balance on that Victoria's

21  Secret credit card?

22    *A.*    Like if I already owed?

23    *Q.*    Yes.  Did you owe anything on that Victoria's

24  Secret account in 2019 while you were enrolled in TASC?

25    *A.*    Yes, I did.

1     Q.    Okay.  And how much, if you recall,

2   approximately did you owe on the Victoria's Secret account

3   in 2019 while you were enrolled in TASC?

4     A.    I don't remember.

5     Q.    Do you remember if it was less than a hundred?

6     A.    No, it was way more.

7     Q.    Okay.  Was it close to the account limit?

8     A.    Yes.

9     Q.    Okay.  Were you incurring -- if you remember, in

10  2019 when you were enrolled in TASC, were you incurring

11  any late fees on the Victoria's Secret account?

12    A.    Yes, I had late fees.

13    Q.    Okay.  And I know you may not remember

14  specifically, but I thought I heard you say a moment ago

15  that you owed way more than the $300 limit on the

16  Victoria's Secret card in 2019.  I just want to make sure

17  we are clear for the record if you remember.  During the

18  time frame you were enrolled in TASC in 2019, do you

19  remember if you owed more than $300 on the Victoria's

20  Secret account?

21    A.    Yes, because of the late fees, so it went

22  higher.

23    Q.    Okay.  Was it more than $400?

24    A.    Yes, it was around four something because I

25  remember seeing the four there.

1  10:53 a.m.

2                    (Recess ensued from 10:53 a.m. until

3  11:05 a.m.)

4                    VIDEO TECHNICIAN:  We are back on the

5  record at 11:05 a.m.

6  BY MS. CATERO:

7      Q.   Okay.  Lucia, when we took our break, we were

8  talking about a couple of credit accounts that you had in

9  2019.  We talked about I think the Conn's appliances

10 account and then we spent a couple of minutes talking

11 about your Victoria's Secret credit account.  And I think

12 you also mentioned in 2019 while you were enrolled in TASC

13 you had a credit account at Forever 21; is that correct?

14     A.   Yes.

15     Q.   Okay.  And do you remember what the limit was on

16 that account in 2021 -- or I'm sorry, 2019 at Forever 21?

17     A.   300.

18     Q.   Okay.  Do you remember during the time frame you

19 were enrolled in TASC, were you carrying a balance on that

20 Forever 21 account?

21     A.   Yes, I was.

22     Q.   And do you remember approximately what the

23 balance was during the time frame you were enrolled in

24 TASC?

25     A.   No, I don't.

1      Q.    Was it close to the limit, do you remember?

2      A.    Yes.

3      Q.    Was it in excess of the limit while you were

4  enrolled in TASC?

5      A.    No, not in excess, not for that one.

6      Q.    Okay.  So I know we talked a moment ago about

7  the Victoria's Secret account with late fees, et cetera.

8  It got above the $300 limit, but it is your recollection

9  as to the Forever 21 account, at the time frame you were

10 enrolled in TASC the balance was not over the $300 limit?

11     A.    No.

12     Q.    But I think you said it was close to the limit;

13 is that correct?

14     A.    Yes.

15     Q.    Were you making payments on the Forever 21

16 account during the time frame you were enrolled in TASC?

17     A.    I was but just the minimum payment.

18     Q.    Okay.  Do you remember approximately how much

19 that minimum monthly payment was during the time frame you

20 were enrolled in TASC?

21     A.    $25.

22     Q.    Do you remember during the time frame you were

23 enrolled in TASC how you would make that minimum monthly

24 payment?

25     A.    Go to the store.

 1      Q.    Would you make the monthly payment in cash?

 2      A.    Yes.

 3      Q.    Did the Forever 21 account -- did they send you

 4  monthly statements in the mail during the time frame you

 5  were enrolled in TASC?

 6      A.    At that time, yes.

 7      Q.    Okay.  Do you still have copies of those monthly

 8  statements?

 9      A.    I got a bill -- I am not sure if it is

10  Victoria's Secret or Forever 21.  I recently got it, and

11  it says I still owe for that card.

12      Q.    Okay.  And I am sure your lawyer can chime in

13  here if she would like, but I would like you to -- if you

14  could find a copy of that bill -- to send it to your

15  lawyers after the deposition, okay?

16      A.    Okay.

17            MS. CHAMBLEE-RYAN:  Just to be clear,

18  Lucia, is that the one you sent us that we --

19            THE WITNESS:  Oh, yes, the picture I sent

20  you?

21            MS. CHAMBLEE-RYAN:  Yeah.  We produced

22  that.

23            MS. CATERO:  Okay.

24            THE WITNESS:  Oh, I didn't remember which

25  one it was.

1    Q.   So it is your testimony in 2019 on a couple of

2    occasions you made the Forever 21 account -- or payment

3    with your debit card?

4    A.   Yes.

5    Q.   Okay.  And I know you mentioned here you made

6    some of the payments I think on the -- some of these

7    accounts in cash in person.  What was the source of the

8    cash that you used to make statements on these credit

9    accounts?

10    A.   Are you asking where I got it from?

11    Q.   Exactly.

12    A.   Well, the only thing income that was coming in

13    was from my grandma -- sorry, my mom -- that I helped her

14    baby-sit.

15    Q.   And I think we -- the beginning we were talking

16    about your mom and the baby-sitting work that she did and

17    how she was paid for that.  Do you remember that

18    testimony?

19    A.   Yes.

20    Q.   Okay.  And in 2019 while you were enrolled in

21    TASC, did you assist your mom in providing the

22    baby-sitting services?

23    A.   Yes.

24    Q.   And about how many days a week would you help

25    your mom with the baby-sitting job?

1      A.    Like, three days a week, around there, depends

2   how I was feeling.

3      Q.    And then on average during the time frame you

4   were enrolled in TASC, about how much a week in cash would

5   you earn in assisting your mom with providing the

6   baby-sitting?

7      A.    A hundred.

8      Q.    Did your -- during the time frame you were

9   enrolled in TASC, did your mother ever pay you more than a

10  hundred dollars in any week for assisting with the

11  baby-sitting services?

12     A.    No.

13     Q.    During the time frame you were enrolled in TASC,

14  was there ever a week where your mother paid you less than

15  a hundred dollars a week for assisting with the

16  baby-sitting?

17     A.    There was times when the mom -- the kids' mom

18  didn't pay her.

19     Q.    And in those instances, your mom wouldn't pay

20  you then, correct?

21     A.    Yes.

22     Q.    About how often during the time frame you were

23  enrolled in TASC was there ever a week where you didn't

24  earn any cash for assisting with the baby-sitting?

25     A.    When it was summer school, they didn't bring the

1  girls or whatever.

2      Q.   And when you say "bring the girls," I think you

3  mentioned that your mother watched approximately four

4  children, correct?

5      A.   Yes.

6      Q.   And during summer school, how many of those

7  children would your mother watch?

8      A.   It was the same, like, sometimes three or four

9  just because they had different fathers.

10     Q.   And I think you were saying a moment ago that in

11 summer school -- would your mom still be baby-sitting all

12 four of the kids at the same time or were they in summer

13 school?

14     A.   No, they would be -- because the moms were

15 teachers so they didn't really bring them.

16     Q.   Okay.  So this is what I am getting at.  During

17 the summer when their mothers were not teaching, your

18 mother didn't then baby-sit four kids a week?

19     A.   No -- well, like, a month, they didn't -- then

20 she didn't, and then I guess she took care of only, like,

21 two kids.

22     Q.   So in the summertime there was a time period of

23 about a month when your mother only baby-sat two children

24 instead of four; is that correct?

25     A.   Yes.

1    *Q.*    And did that last for, like you said, about a

2    month?

3    *A.*    Yes.

4    *Q.*    Okay.  And during that month when your mother

5    was watching only two children, how much would you be paid

6    per week for assisting with the baby-sitting services?

7    *A.*    She only just gave me like $20.

8    *Q.*    Okay.  And that lasted for about a month?

9    *A.*    Yes.

10    *Q.*    Okay.  And then during the time frame that you

11    were -- that you were enrolled in TASC and you were being

12    paid in cash by your mother for helping with the -- the

13    baby-sitting, would you ever deposit that cash in a bank

14    account?

15    *A.*    Sometimes I did.

16    *Q.*    Okay.  And that would have been the Bank of

17    America account that your attorney produced records for?

18    *A.*    Yes.

19    *Q.*    Okay.  Did you have any accounts at any other

20    banks besides Bank of America?

21    *A.*    No.

22    *Q.*    Did you have any credit accounts with any gas

23    stations?

24    *A.*    No.

25    *Q.*    And I want to talk for a few minutes for just --

1  I am going to limit this next line of questioning about

2  your expenses to just the time frame you were enrolled in

3  TASC so I don't have to keep saying "enrolled in TASC"

4  over and over again.  So do you understand that this next

5  series of questions about your expenses, I am going to be

6  asking you only about the months you were enrolled in

7  TASC, okay?

8      A.    Okay.

9      Q.    Okay.  So during that time frame, let's talk

10 about your monthly expenses.  What all went into your

11 monthly expenses in that time frame?  What did you have to

12 spend money on every month?

13     A.    I -- first of all, my kids, and I -- I was

14 having trouble at the time with my car so money was going

15 towards the car, too, trying to fix it.

16     Q.    Okay.

17     A.    Phone bill.

18     Q.    Okay.  So in addition to spending -- having to

19 spend money on the kids, the car, the phone bill, was

20 there anything else that you had to spend money on every

21 month while you were enrolled in TASC?

22     A.    The last time I was trying to pay the Conn's

23 more than the other cards I guess, because my daughter

24 needed a computer.

25     Q.    Did you have to pay anything every month for

```
 1   rent?
 2        A.    Once in a while I did pay -- I was helping my
 3   dad because it is three of us there, so ...
 4        Q.    Okay.  So -- but while you were enrolled in
 5   TASC, just those couple of months there, did you pay your
 6   -- any money towards the -- towards rent, towards the
 7   mortgage?
 8        A.    I did.  I paid less than what I used to pay.
 9        Q.    And how much would you pay?  And, again, we are
10   talking about just while you were enrolled in TASC, how
11   much would you pay every month towards the mortgage
12   payment?
13        A.    I would give them, like, mostly nothing, like,
14   $80, around there.  It was always different.
15        Q.    Okay.  But to the best of your memory, those
16   months while you were enrolled in TASC, you paid every
17   month about $80 to your father for rent?
18        A.    Yes.
19        Q.    Okay.  Sometimes more, sometimes less?
20        A.    Less.
21        Q.    Okay.  During the time frame you were enrolled
22   in TASC, what was the most in any given month that you
23   would have paid your father for rent?
24        A.    I think I gave him, like, $400, yeah, 400.
25        Q.    And during the time frame you were enrolled in
```

1    TASC, was there ever a month where you did not pay your

2    father any money towards the rent or the mortgage?

3         A.    No.

4         Q.    Okay.  And then how did you make the payment to

5    your father towards the rent or the mortgage?  Did you

6    give him cash?

7         A.    Yes, cash.

8         Q.    Okay.  Was it always cash?

9         A.    Yes.

10        Q.    So expensewise -- excuse me -- we were just

11   talking about all of your monthly expenses during the time

12   frame you were enrolled in TASC, and you mentioned your

13   kids, the car, the phone, the Conn's bill, and rent, were

14   there any other monthly expenses that you had to pay for

15   while you were enrolled in TASC?

16        A.    The car insurance.

17        Q.    Okay.  Anything else?

18        A.    Some medication that my medical didn't cover.

19        Q.    Anything else?

20        A.    No.

21        Q.    Okay.  I want to go over these kind of one by

22   one.  If you think of anything else as we are talking that

23   you had to pay every month, any expenses while you were

24   enrolled in TASC, if you think of anything else other than

25   the ones you've just mentioned, let me know, okay, while

1   we are talking here.

2              But you mentioned that you had to pay

3   expenses every month for your kids while you were enrolled

4   in TASC.  What were those expenses that you had to pay for

5   your kids?

6       A.   Well, I -- I paid for my -- my son was in band

7   so I had to pay some fee on that, and then my daughter was

8   in culinary arts -- culinary -- cooking stuff.

9       Q.   Okay.

10      A.   Like, that -- that type of stuff, and, like, I

11  have always -- I am the one -- only ones that used to

12  provide them with the clothing, the shoes, and the -- any

13  material they needed, like, you know, hygienewise and all

14  of that.  That was just me.  Their dad never helped.

15      Q.   Did your parents help pay any of those expenses

16  for the children?

17      A.   Stuff that -- when I didn't have money, yes,

18  they -- they helped me.

19      Q.   Okay.  Do you remember during the time you were

20  enrolled at TASC, did your parents help pay any expenses

21  for the children, if you remember?

22      A.   Was I enrolled?  Not when I was enrolled.  It

23  was before TASC, so, no.

24      Q.   Okay.  What type of -- you mentioned that your

25  daughter was interested in the cooking and the culinary

1  arts.

2       *A.*    Yes.

3       *Q.*    What type of expenses did she have associated

4  with that interest?

5       *A.*    She had to buy a uniform, and they gave her

6  trips, like, for competition, and I had to pay for that.

7       *Q.*    Was your daughter enrolled in a program for

8  culinary arts?

9       *A.*    Yes.

10      *Q.*    Okay.  Was this through a -- her school?

11      *A.*    Yes.

12      *Q.*    And what school was that?  Do you remember?

13      *A.*    Yonker High School.

14      *Q.*    Okay.  And just on average on a monthly basis

15  while you were enrolled in TASC, do you remember how much

16  you had to spend towards your daughter's culinary arts

17  program?

18      *A.*    150.

19      *Q.*    And how did you pay this?

20      *A.*    Cash.

21      *Q.*    And then what were your son's expenses

22  associated with being a member of the band?

23      *A.*    The uniform, the rental of the trumpet, and his,

24  like, trips to, like, Sedona, Flagstaff, and all of that.

25      *Q.*    And during the time you were enrolled in TASC,

1    about how much did you spend on a monthly basis associated

2    with your son's involvement in the band?

3         *A.*    That one was, like, $200.

4         *Q.*    A month?

5         *A.*    A month was, like -- oh, I'm sorry, that was

6    like 130, around there, like, it depends how far they

7    went, I guess, or how they are going to provide food or

8    not, but the first time was $200, the first time.

9         *Q.*    Do you remember paying any expenses associated

10   with your son's involvement in the band while you were

11   enrolled in TASC?

12        *A.*    Yes.

13        *Q.*    Okay.  And how did you make those payments

14   toward the band expenses?

15        *A.*    Cash.

16        *Q.*    And while you were enrolled in TASC, remind me

17   again about how much you were receiving a month in cash

18   from your mother for assisting with the baby-sitting.

19        *A.*    Well, she used to give me a hundred a week if it

20   was -- if I helped her with the kids all week.

21        *Q.*    Okay.  So you were looking about $400 a month in

22   cash from your mother?

23        *A.*    Yes.

24        *Q.*    Then you mentioned other expenses obviously for

25   your kids is they need clothes and they need shoes.  You

1  mentioned the hygiene products, et cetera.  About how much

2  a month while you were enrolled in TASC did you spend on

3  those other items you mentioned, the clothing, the shoes,

4  the hygiene items for your children?

5      *A.*    A month, it was, like, a hundred for both.

6      *Q.*    Total for both?

7      *A.*    Yes.

8      *Q.*    Okay.  And how did you pay for those things?

9  Did you use your debit card or you pay cash usually?

10      *A.*    Usually debit.

11      *Q.*    Okay.  And let's talk about -- you mentioned

12  that one of your monthly expenses was a car while you were

13  enrolled in TASC.  Did you own a car while you were

14  enrolled in TASC?

15      *A.*    Yes.

16      *Q.*    Okay.  And what kind of car was it?

17      *A.*    Acura.

18      *Q.*    Okay.  And did you owe car payments on it while

19  you were enrolled in TASC?

20      *A.*    No.

21      *Q.*    No car payments.  So did you own it outright,

22  you didn't have a monthly payment?

23      *A.*    No.

24      *Q.*    Okay.  So I just want to make sure I got that we

25  are not having a double negative here.

1          Did you have a monthly car payment during
2     the time frame you were enrolled in TASC?

3          A.    That is because before that Acura, I had a
4     Nissan Versa and that I was giving payments.  I am just to
5     remember what year I had it if I was in TASC or not.  I
6     don't really remember if it was during that time because I
7     know I had that, and I couldn't -- I couldn't do the
8     payments so I gave it to my brother, and he started paying
9     that car and then I got the Acura.

10         Q.    And so do you remember about when you purchased
11    the Acura?

12         A.    No, I don't.  That's what I am trying to
13    remember if I had the Nissan when I was in TASC or not.  I
14    don't remember.

15         Q.    So as you are sitting here, you don't remember
16    what car you owned during the time frame you were enrolled
17    in TASC?

18         A.    No, because as soon as I quit Dollar Tree, I
19    couldn't give the payments for that car, so I am trying to
20    remember, like, if I got it when I was already enrolled in
21    TASC or not.  Oh, yeah, I think I had the Acura.  I had
22    the Acura, but I was still owing on the other car so
23    that's when my brother took over.

24         Q.    And then how did you -- you still owed money on
25    the Nissan and you acquired the Acura.  Did you buy the

1   Acura?

2         A.    Yes, with the income tax money.

3         Q.    Got it, okay.  Do you remember the purchase

4   price for the Acura?

5         A.    4,000.

6         Q.    And you paid for the Acura all at one time, you

7   didn't finance it and have monthly payments?

8         A.    No, I didn't.  One time.

9         Q.    Okay.  You made one payment and bought the

10  Acura, correct?

11        A.    Yes.

12        Q.    Okay.  But your testimony is that in 2019 while

13  you were enrolled in TASC while you had the Acura, you

14  also still owed payments on the Nissan; is that correct?

15        A.    Yes, I still owed them -- yes.

16        Q.    Okay.  I gotcha.  And I think you mentioned a

17  moment ago that at some point in time your brother started

18  helping you make the payments on the Nissan; is that

19  correct?

20        A.    Yes.

21        Q.    Okay.  And about when was that, if you remember?

22        A.    Maybe -- I don't really remember, but I want to

23  say February of 2019, but I am not sure.

24        Q.    Do you remember how much the monthly payment was

25  on the Nissan?

1      *A.*    350.

2      *Q.*    And now prior to your brother taking over

3    payments for the Nissan, how would you make the payment on

4    the Nissan?

5      *A.*    I wasn't -- well, when I quit Dollar Tree, I was

6    not --

7      *Q.*    Okay.

8      *A.*    -- but when I was in Dollar Tree, I did through

9    a card.

10     *Q.*    Would you use a credit card to make the payments

11   or a debit card?  How did you make the Nissan payment

12   before you quit working at the Dollar Tree?

13     *A.*    Debit -- debit card.

14     *Q.*    Okay.  And then also with the car, the Acura

15   that you were driving while you were enrolled in TASC,

16   about how much a month did you spend on gas?

17     *A.*    Let's see.  Probably, like, a hundred.

18     *Q.*    Is there a particular place where you usually

19   gas up?  Do you stop at the same place all the time?

20     *A.*    No different -- I mean, there is, like, three

21   gas stations around where I live.

22     *Q.*    Yeah.

23     *A.*    They are all different, yeah.

24     *Q.*    Oh, so you would go to -- you don't always go,

25   for example, to, like, a Circle K or a Chevron, you would

1   go to different brands of gas stations?

2       *A.*    Yes.

3       *Q.*    Okay.  And I think you mentioned that you had

4   also the expense while you were enrolled in TASC of paying

5   car insurance?

6       *A.*    Yes.

7       *Q.*    Were you paying the car insurance while you were

8   enrolled in TASC on both the Nissan and the Acura?

9       *A.*    No, just on the Acura.

10      *Q.*    And how much was the car insurance per month on

11  the Acura?

12      *A.*    $96.

13      *Q.*    Do you remember who that car insurance was

14  through?

15      *A.*    GEICO.

16      *Q.*    And how would you make the car insurance payment

17  every month while you were enrolled in TASC?

18      *A.*    Debit card.

19      *Q.*    Debit, okay.  And while you were enrolled in

20  TASC, you were not making payments anymore for the Nissan,

21  correct?

22      *A.*    Correct.

23      *Q.*    Okay.  Got it.  I think you mentioned that you

24  had a monthly expense for the phone.  Can you tell me how

25  much a month while you were enrolled in TASC you paid for

1    your phone?

2        A.    Sometimes it was 200.  Sometimes it was like one

3    seventy something -- I am not sure.  It was always

4    different.  I don't know why it has always been different,

5    yeah.

6        Q.    Yeah, that was going to be my next question.  Do

7    you know why it was different every month?

8        A.    That's what I would like to know.  I would call

9    them and tell them, "Why you guys told me it was going to

10   be a certain amount every time?"  And it was always

11   different, and I would always -- I had been wanting to

12   change Sprint, but I am still there.  I don't know why.

13       Q.    I think you answered my next question.  Who was

14   your provider while you were at TASC?  Was it Sprint?

15       A.    Yes.

16       Q.    Okay.  Were there more than -- was there more

17   than one device or more than one telephone on your monthly

18   cell phone plan?

19       A.    Yeah, it is mine and my two kids.

20       Q.    Okay.  While you were enrolled at TASC, did your

21   kids have a job, were they employed at all while they were

22   in school?

23       A.    No -- well, my son used to go to -- you know how

24   when they have events or anything like that, they use

25   different little concession stands for the school, he used

1  to do and they used to pay him.  My daughter had a -- no,

2  that was 2018.  She didn't have a job just as she started

3  going to college -- was it college -- oh, my God.  I don't

4  remember.  When did she go -- I don't remember where she

5  went to college when she started going to college.

6       Q.    Did either of your kids contribute anything

7  towards the cell phone bill?

8       A.    Yes, my daughter.

9       Q.    Okay.  And how much did she contribute?

10      A.    She used to give me, like, 100 or sometimes she

11  even paid the bill because she was having money because

12  her aunts were giving her money for some help that she was

13  doing.

14      Q.    When you say "her aunts," were these -- these

15  aunts, were they your sisters or her father's sisters?

16      A.    Her father's.

17      Q.    Father's sisters, okay.

18            And then how did you usually pay the cell

19  phone bill on the times you paid it while you were

20  enrolled in TASC?

21      A.    Debit card.

22      Q.    Okay.  Okay.  I think you mentioned a moment

23  ago, too, that you had some expenses associated with

24  medications or prescriptions that were not covered by your

25  insurance.  During the time frame you were enrolled in

1    TASC, do you remember on average how much a month that you

2    had to come out of pocket to pay for prescription

3    medication?

4        A.    Like, $50.

5        Q.    And how would you pay that every month for the

6    prescriptions?

7        A.    Cash at Walgreens.

8        Q.    Okay.  And then the -- during the time frame you

9    were enrolled in TASC, did you have some form of health

10   insurance?

11       A.    Yes, I did.

12       Q.    And who was that through?

13       A.    It was AHCCCS.

14       Q.    AHCCCS, okay.  When you visited a doctor, any

15   kind of doctor, did you have to come out of pocket for any

16   expense while you were enrolled in TASC for any sort of a

17   co-pay or an office visit?

18       A.    It was only the specialists, like, for a special

19   thing.  It was only like $10.

20       Q.    Okay.  And on the occasions you made that $10

21   payment, would you normally make that in cash or would you

22   use some other method of payment?

23       A.    Cash.

24       Q.    Okay.  Let's talk for a minute about I know you

25   mentioned that sometime in late 2018 I think it was you

1    quit your job at the Dollar Tree; is that correct?

2        *A.*    Yes.

3        *Q.*    And why was that?

4        *A.*    Because my -- my doctor kept recommending that I

5    shouldn't work because of my illness and how I felt and

6    all that.  He had told me, like, a couple times already

7    and I just didn't listen, and every time I used to go see

8    him, he was, like, you have to quit until you get better,

9    and so then I did it, and from there -- well, that's why I

10   did it I guess.  He told me to.

11       *Q.*    And what was the name of that doctor that told

12   you you should quit working because of your illness?

13

14               (PAGES 81-96 HAVE BEEN DESIGNATED CONFIDENTIAL.)

15

16

17

18

19

20

21

22

23

24

25

1          (PAGES 81-96 HAVE BEEN DESIGNATED CONFIDENTIAL.)













DEPOSITION OF LUCIA SORIA, 11/13/2020



1    Q.    Okay.  Since you quit the job at the Dollar

2  Tree, have you applied for any other employment?

3    A.    Have I applied?  I have applied, but I have not

4  received a call.

5    Q.    Okay.  Where did you apply?

6    A.    Aldi's -- Aldi's.

7    Q.    Can you spell that, please?

8    A.    A-L-D-I.

9    Q.    And what is that?

10    A.    It is a grocery store.

11    Q.    Oh, okay.  And what type of position did you

12  apply for?

13    A.    Just cashier.

14    Q.    Okay.  And when was that you submitted the job

15  application at Aldi's?

16    A.    It was this year.  I don't recall what month was

17  it, but I know it was this year.

18    Q.    Okay.  So sometime in 2020 you submitted that

19  job application?

20    A.    Yes.

21    Q.    In 2019, did you submit a job application

22  anywhere?

23    A.    I don't know -- I don't remember if I worked or

24  not.  Oh, my gosh.  No, I didn't.

25    Q.    Okay.  Were you actively looking for a job in

1  2019?  Were you, like, reading want ads and things?

2      *A.*    Yeah, I remember being on Indeed.  I have an

3  account for Indeed.

4      *Q.*    Any other job site sources that you referenced

5  in 2019 looking for a job?

6      *A.*    No.

7      *Q.*    And when you were on Indeed, what types of

8  positions were you looking for?

9      *A.*    Just any -- I mean, retail, because that was

10  more experience I had, retail.

11      *Q.*    Did you look for any -- I know you mentioned

12  early on that you had a call center type job with Allstate

13  in 2019.  Did you look for any openings at a call center?

14      *A.*    No, I didn't.

15      *Q.*    Okay.  Anything else that you did in 2019 to try

16  to locate employment?

17      *A.*    I am trying to think.  No.

18      *Q.*    And I know we talked before the lunch break

19  about your expenses that you had in 2019.  Let's talk for

20  a minute about any sources of money that you had.  I know

21  you mentioned that you were making some money helping your

22  mom with the baby-sitting business, right?

23      *A.*    Yes.

24      *Q.*    Did you receive any other money from anyone in

25  2019?

```
 1      A.    Well, just before TASC I did.

 2      Q.    Okay.  And how much did you receive?

 3      A.    It was -- I -- I asked my friend to loan me

 4  money.  How much was it?  I don't remember how much it

 5  was.  400 or --

 6      Q.    Do you remember the name of the friend who

 7  loaned you that money?

 8      A.    Yes.  Noemy.

 9      Q.    Can you spell that for me?

10      A.    N-O-E-M-Y.

11      Q.    Oh, Noemy.  And Noemy's last name?

12      A.    Flores.

13      Q.    Flores, okay.  Did you receive any other money

14  in 2019 from any source?

15      A.    My -- when it was -- well, she used to help me

16  out a little bit, but it was mostly also my cousin.

17      Q.    Okay.  And what is your cousin's name?

18      A.    Paul Diaz.

19      Q.    And how much did you receive from Paul Diaz in

20  2019?

21      A.    He was helping me out sometimes, like, with the

22  -- also with my -- my stuff that I needed for, like, for

23  myself.

24      Q.    Would Paul Diaz give you money?

25      A.    Yes.
```

1      Q.     How much money in 2019?

2      A.     Like, well, he would help me with gas and stuff,

3  so probably, like, $40.

4      Q.     Total in 2019?

5      A.     Oh, probably more.  I am not -- it was not

6  always the same amount, so ...

7      Q.     Yeah.  If you could kind of ballpark a total for

8  2019 that you received from Paul Diaz.

9      A.     Probably $400.

10     Q.     Okay.  And that was in cash?

11     A.     Yes.

12     Q.     Okay.  Was it always in cash from Paul Diaz?

13     A.     When it was gas, he used to, like, use his card.

14     Q.     Okay.  So you would be together at the gas

15 station and Paul would put his card in the gas pump for

16 you?

17     A.     Yes.

18     Q.     Okay.  Is that in addition to the $400 you just

19 mentioned or was that what you included in that $400

20 probably?

21     A.     That's what I included.

22     Q.     Okay.  And then other than cash and buying the

23 cash for you, did Paul Diaz buy anything else for you in

24 2019 to help you out financially?

25     A.     No.

1    Q.   Okay.  And so we mentioned your friend, Noemy

2  Flores, and your cousin, Paul Diaz.  Did anyone else give

3  you financial assistance in 2019?

4    A.   Other than them -- well, my daughter.

5    Q.   Okay.  And how much did your daughter give you

6  in 2019?

7    A.   Like, for the total year?

8    Q.   Yes.  For the year, if you could just ballpark,

9  how much total did your daughter give you?

10    A.   Like, 600.

11    Q.   Would your daughter always give that to you in

12  cash or would she give it to you some other way with like

13  a check or a debit card?

14    A.   Through Zelle.

15    Q.   Zelle?

16    A.   Zelle.

17    Q.   Did she always -- your daughter in 2019 --

18  always transfer money to you through Zelle or did she use

19  any other method?

20    A.   Sometimes she gave me cash but most of the time

21  it was through Zelle.

22    Q.   Okay.  Did she ever write you a check in 2019?

23    A.   No.

24    Q.   Okay.  So anybody else besides Noemy, Paul, or

25  your daughter who gave you financial assistance in 2019?

1     *A.*   No.

2     *Q.*   Okay.  I think you mentioned -- were you dating

3 -- was it Travis?  Is that his name?

4     *A.*   Travis.

5     *Q.*   Were you dating Travis in 2019?

6     *A.*   Yes, I was.

7     *Q.*   Okay.  And Travis was employed?

8     *A.*   He was employed.

9     *Q.*   He was in employed.  And I think you said in

10 2019 while you were applied in TASC he was employed at

11 Clayton out in Buckeye working on the travel homes?

12     *A.*   Yes, but not through the whole year.

13     *Q.*   Okay.  But was he employed, Travis, while you

14 were working -- I'm sorry, while you were enrolled at

15 TASC?

16     *A.*   Let me see.  I am trying to think of the months

17 because I know he -- he was out of work a couple of

18 months.  I just don't remember what months was it.

19     *Q.*   Was Travis laid off part of the time in 2019?

20     *A.*   Yeah, he was.

21     *Q.*   So Clayton laid him off for a period of time?

22     *A.*   Yes, they did.  I just don't remember the

23 months.

24     *Q.*   In 2019, did Travis ever give you or loan you

25 money to help pay for expenses?

1   *A.*   He probably did, just to buy food to go out and

2   eat, but that is pretty much -- not really because he had

3   a place to pay his rent to --

4   *Q.*   Okay.  But once in a while you guys would go out

5   and Travis would pay for the meal?

6   *A.*   Yes.

7   *Q.*   Okay.  Any other sort of financial assistance

8   that you received from Travis in 2019 other than him

9   occasionally buying a meal?

10   *A.*   He also helped with gas.

11   *Q.*   Okay.  About how often would Travis pay for the

12   gas?

13   *A.*   Not that often.  Probably, like, two times a

14   month.

15   *Q.*   Okay.  So we have talked about Noemy, your

16   cousin Paul, your daughter, some assistance from Travis.

17   Anybody else provide you with any sort of financial

18   assistance in 2019?

19   *A.*   No.

20   *Q.*   Okay.  Other than giving you the money for

21   helping her out with the baby-sitting business, did either

22   your mom or your dad give you any financial assistance in

23   2019?

24   *A.*   No.

25   *Q.*   Okay.  What about your brother?  Did he give you

1  any financial assistance in 2019, Anthony?

2       A.    I don't know -- my brother, no.

3       Q.    Do you have any other brothers or sisters

4  besides Anthony?

5       A.    Yes, I have an older brother.

6       Q.    Okay.  And what is his name?

7       A.    Ernesto Lopez.

8       Q.    And in 2019, was your brother Ernesto employed?

9       A.    I don't remember -- I don't really talk to him.

10      Q.    Okay.

11      A.    So I am not sure about that.

12      Q.    Oh, okay.  When was the last time you talked to

13  Ernesto?

14      A.    Well, last time I spoke to him was August of

15  this year --

16      Q.    Oh, okay.

17      A.    -- which is --

18      Q.    Yeah.  Does he live here in town?

19      A.    Yes, he lives in Glendale.

20      Q.    In Glendale.  And you just don't know whether or

21  not he was employed in 2019?

22      A.    Yeah, I am not sure.  He doesn't last in jobs so

23  I am not sure.

24      Q.    And Ernesto didn't provide you with any

25  financial assistance in 2019?

1    *A.*    No.

2    *Q.*    No, he did not?

3    *A.*    No.

4    *Q.*    Okay.  Then, again, I don't want you, with these

5    next couple of questions, to tell me anything that was

6    said between you and a lawyer, but when was the first time

7    that you were contacted to be a party -- to be a plaintiff

8    in this case?

9    *A.*    I want -- March.  No.  April.  I think it was

10   April.

11   *Q.*    Of 2019?

12   *A.*    Yes, in two thousand --

13   *Q.*    And is that the same month I think that you

14   enrolled in TASC?

15   *A.*    I think -- I enrolled in March.

16   *Q.*    Okay.  Were you currently enrolled in TASC the

17   first time you were contacted by an attorney to be a

18   plaintiff in this case?

19   *A.*    Yes, I was.

20   *Q.*    Okay.  And do you recall if it was towards the

21   beginning of your enrollment in TASC or towards the end?

22   *A.*    Like, in the middle -- oh, I guess towards more

23   the end.

24   *Q.*    Okay.  And I think you mentioned a moment ago

25   that you enrolled in TASC in March of 2019?

1      (PAGES 116-120 HAVE BEEN DESIGNATED

2  CONFIDENTIAL.)

3



1    A.    Yes, that's how I remember about the guy.

2    Q.    Okay.  Did he handle the sign-in process?

3    A.    Yes.

4    Q.    Okay.  Did you just have to sign your name on a

5  sheet or did you have to fill out other paperwork?

6    A.    There was my name -- there was other paperwork,

7  yes.

8    Q.    Okay.  And I will be showing you some things

9  here in a little bit that might refresh your memory, but

10  do you remember specifically what the paperwork was that

11  you had to fill out?

12    A.    It was why was the reason I was there.

13    Q.    Okay.  Do you remember if you were given copies

14  of that paperwork that you filled out?

15    A.    No, I don't remember.

16    Q.    Okay.  At the orientation, were you given any

17  sort of information packet?

18    A.    I -- I -- yeah, they did give me a packet.

19    Q.    Okay.  Was it in an envelope or in a folder?

20  What kind of packet was it?

21    A.    Well, it was papers -- just papers.  There was

22  no envelope.

23    Q.    Okay.  About how many pages?  Do you remember?

24    A.    No, I don't remember.

25    Q.    Okay.  Were those pages loose or were they

1   stapled together?

2       A.    Stapled.

3       Q.    You sound unsure.  Do you remember?

4       A.    Could I see if this is the signing -- no, you

5   know what, I don't remember.  I don't remember.

6       Q.    Okay.  Do you remember what kind of information

7   was in that packet that they gave you?

8       A.    I only remember the -- the options that I had,

9   like, how to pay it and what I have to do, like -- like,

10  every -- like, they have to -- they gave me the number I

11  have to call TASC every day to see if I have to go test or

12  not.  That's pretty much what I remember.

13      Q.    Okay.  You said you remember there was some

14  information in there with the options about how to pay it.

15  What do you remember about that information?

16      A.    Oh, like, I can pay it in full or give payments.

17      Q.    Okay.  Was there any information given to you in

18  this packet about financial assistance?

19      A.    No, there was not.

20      Q.    So we talked about a minute ago you said when

21  you came in, you had to sign in with the man and fill out

22  some paperwork.  What happened next at the orientation?

23      A.    Well, from there, the lady that was sitting down

24  started talking about the program and then they put a

25  video of the consequences of smoking marijuana.

1    A.    I had to go -- well, I had to pass the test, the
2  drug test, and I think I went to another orientation --
3  another class.
4    Q.    Okay.  Do you remember, were any of the other
5  people in the room -- did anybody ask any questions during
6  the presentation during the orientation?
7    A.    The only person I remember asking was if they
8  were sick of a cough and if they took Nyquil would that
9  come in their test.
10    Q.    Okay.  Do you remember anybody else in the
11  orientation group asking any questions?
12    A.    No, I don't.
13    Q.    You said I think the lady in the red dress also
14  spoke.  Do you remember what she said?
15    A.    She was the one that -- well, she talked about
16  the video that we were going to watch.
17    Q.    Okay.  And do you remember anybody at this
18  orientation at all talking about financial assistance?
19    A.    No.
20    Q.    Did anybody talk about what would happen if
21  somebody couldn't make any of the required payments?  Was
22  that discussed at orientation?
23    A.    No.
24    Q.    You don't remember anybody saying what happens
25  if I can't pay?

1      A.    No, the -- I asked that lady because the person
2   that was sitting next to me had done that program before
3   and said that that was, like, something they offered so
4   that's why I asked that lady that if I could -- if there
5   was any help, and she said that she -- it was not up to
6   her or nothing like that.
7      Q.    Okay.  So when you were at the orientation -- I
8   just want to make sure we have a clear record -- there was
9   somebody sitting next to you that told you that they had
10  gotten financial assistance with the TASC payments
11  previously; is that correct?
12     A.    Yes.
13     Q.    Okay.  Do you remember that lady?  What she
14  looked like?
15     A.    All I remember is that she was blond.
16     Q.    Okay.  Did you ever get her name?
17     A.    No.
18     Q.    Do you remember about how old she was?
19     A.    Like in her 20s.
20     Q.    Okay.  So younger gal?
21     A.    A lot younger.
22     Q.    Did she have long hair or short hair?
23     A.    She had it in a bun.
24     Q.    Okay.  Do you remember what ethnicity she was?
25     A.    Caucasian.

1      Q.    Okay.  And so she said to you that she had been
2  in the program previously?
3      A.    Yes.
4      Q.    And she had obtained financial assistance with
5  making the payments?
6      A.    Yes.
7      Q.    Okay.  Did she tell you anything else with
8  respect to paying for the program?
9      A.    She also said if you -- like, you just have to
10  provide them that you get food stamps with that like, they
11  would help you out.  That's all she -- that's all I
12  remember she telling me.
13      Q.    Okay.  Did she tell you that she -- that she
14  filled out an application to get financial assistance with
15  the TASC payments?
16      A.    Yes.
17      Q.    Okay.  And so then did this prompt you to ask
18  the question that is in paragraph 294 of the second
19  amended complaint there, you asked somebody about you
20  having no income and not being able to afford the fees; is
21  that correct?
22      A.    Yes.
23      Q.    Okay.  And that happened at the orientation
24  class?
25      A.    Yes.

 1     *Q.*    And of the four people we have been talking
 2  about here that we have been trying to describe who were
 3  the TASC employees, which one of those people was it that
 4  you asked that question to?
 5     *A.*    The lady that was sitting down with the curly
 6  hair.
 7     *Q.*    Okay.  The curlied hair lady?
 8     *A.*    Yes.
 9     *Q.*    Do you remember her name at all?
10     *A.*    No, I don't.
11     *Q.*    What exactly was it that you said to her if you
12  can remember?
13     *A.*    I said that I heard you guys offer assistance to
14  people that get food stamps or any government program
15  thing.  So I told her would you be able to help me with,
16  that and that's when she responded it was not up to her.
17     *Q.*    Did you ask her if there was anything anybody
18  else at TASC you could speak to about getting the
19  financial assistance?
20     *A.*    No.
21     *Q.*    Did you say anything else to her in this
22  conversation?
23     *A.*    Just, "Okay.  Thank you."
24     *Q.*    And what exactly was it again that she said back
25  to you?

1     A.    "It is not up to me."

2     Q.    And that's all she said?

3     A.    Yes.

4     Q.    Okay.  So -- so we have a clear record, she --

5  she did not say that financial assistance was not

6  available, correct?

7     A.    No, she didn't.

8     Q.    She just said it was not up to her?

9     A.    Yes.

10    Q.    Okay.  After that, when was the next time that

11 you asked a TASC employee about financial assistance?

12    A.    Well, from that, I didn't go to -- until, like,

13 another three-hour class.  From there, I was just, like --

14 I just -- like, I mean, they see it as my fault, so, I

15 mean, I thought the girl next to me that told me about

16 that was probably lying or something, I don't know, so I

17 didn't try again.

18    Q.    So after that orientation, you did not ask any

19 representative of TASC at any point whether there was

20 financial assistance available?

21    A.    No, just like towards the -- well, I am not sure

22 if it was end or not.  That is when I told my case manager

23 about it, that I was not being -- that I cannot come up

24 with the income that -- and, like, she -- I don't remember

25 exactly what she responded, but she also didn't really

 1    I have her -- Garcia?  Oh, my god.  I don't know.

 2         Q.    You think her name was Veronica, though?

 3         A.    Veronica or -- yeah, it was Garcia, though.  It

 4    was the last name Garcia.

 5         Q.    Garcia, okay.  And how often did you, while you

 6    were enrolled in TASC, did you communicate with

 7    Ms. Garcia?

 8         A.    How often?

 9         Q.    Yeah.

10         A.    Oh, not that often.  It was not that much.

11         Q.    Like, once a week, once a month?

12         A.    Probably once a month.

13         Q.    Okay.  And did you communicate with Ms. Garcia

14    by e-mail?

15         A.    Yes.

16         Q.    Okay.  We talked about that a little bit

17    earlier.  I will show you another paragraph of the

18    complaint, if I could here.  Can you take a look at

19    paragraph 301 up on the screen?  It is on page 33 of the

20    second amended complaint.  It says there that when you

21    first started on the Marijuana Diversion Program, the

22    closest location where you could test was approximately a

23    45-minute drive each way from your home if there was no

24    traffic.

25                   Do you see that paragraph?

1     *A.*   Yes.

2     *Q.*   Is that a true statement?

3     *A.*   Yes.

4     *Q.*   And do you know what TASC location that was that

5   you were driving to for the tests?

6     *A.*   7th Street or 7th Avenue.  I get them confused

7   but one of those 7s.

8     *Q.*   Okay.  And where were you living at the time?

9     *A.*   Buckeye.

10    *Q.*   Okay.  And we are going to look at paragraph 304

11  of the second amended complaint.  There you say:

12  Ms. Soria borrows money from her parents or her daughter

13  when she has to submit to drug and alcohol tests because

14  she fears that if she cannot pay for the test, she will

15  not be allowed to test and will be terminated from the

16  program.

17             Is that a true and accurate statement?

18    *A.*   Yes.

19    *Q.*   Okay.  How often when you were enrolled in TASC

20  did you borrow money from your parents to pay for the

21  testing fee?

22    *A.*   Well, let's see.  Like, it was mostly my

23  daughter but they did also help me but probably, like,

24  twice a month that they kind of helped.

25    *Q.*   Okay.  And I know we talked a moment ago about

1          MS. CATERO:  Okay.  Well, let me clarify

2   with her on the record.

3   BY MS. CATERO:

4          Q.   Did you borrow money from your parents in order

5   to pay the TASC testing fees?

6          A.   Sometimes it was for that but not all the time.

7          Q.   Okay.  And then did you borrow money from your

8   daughter to pay for the TASC testing fees?

9          A.   It is the same, like, sometimes it was for that

10   like, it was different -- just enough to ask the same

11   person all the time so it was different.

12          Q.   And can you tell me how much total you borrowed

13   from your parents to pay for the TASC testing fees?

14          A.   Maybe, like, $60.

15          Q.   Okay.  And it was $17 per test, correct?

16          A.   Yes.

17          Q.   Okay.  And then about how much money total did

18   you borrow from your daughter to pay for the TASC testing

19   fees?

20          A.   Maybe like a hundred dollars.

21          Q.   Okay.  And when you borrowed the $60 from your

22   parents to pay for the testing fees, did they give it to

23   you in cash?

24          A.   Yes.

25          Q.   How did you pay your TASC testing fees?  Did you

1    pay those in cash?

2        A.    No.  I put it in my bank and paid it with a

3    card.

4        Q.    Okay.  Same question with respect to your

5    daughter, when she lent you the money to help pay the

6    testing fees, how did she give the money to you?

7        A.    Through Zelle.

8        Q.    Okay.  And then you would, again, pay the

9    testing fees with your debit card; is that correct?

10       A.    Yes.

11       Q.    Let's see here.  Did you ever borrow money from

12   anybody other than your parents and your daughter to help

13   pay for the TASC testing fees?

14       A.    My cousin.

15       Q.    Is this -- is it Paul, your cousin?

16       A.    Yes.

17       Q.    I'm sorry, what was Paul's last name again?

18       A.    Diaz.

19       Q.    Diaz, yes, Paul Diaz.  And how much money did

20   you borrow from your cousin, Paul Diaz, to pay for the

21   TASC testing fees?

22       A.    Like, just for the tests?  Because he used to

23   help me out with gas to get to the place so I don't know

24   if you want me to include that, too.

25       Q.    Yes.  My first question was anybody besides your

1  parents or your daughter that you borrowed money from to

2  pay the TASC testing fees.  So did Paul loan you money to

3  pay the TASC testing fee?

4       A.    Yes, he did.

5       Q.    Okay.  And so how much did Paul loan you to pay

6  the TASC testing fees?

7       A.    Like, I don't remember.  Like, 200 or 300.

8       Q.    Okay.  And did Paul loan you to pay the TASC

9  testing fees -- did he give it to you in cash?

10      A.    Yes.

11      Q.    Okay.  And would you deposit that money into

12  your bank account?

13      A.    Yes.

14      Q.    Okay.  And then when you made payments to TASC,

15  whether it was for the program fee or the testing fee, did

16  you always make your payments to TASC with your debit

17  card?

18      A.    I am trying to think.  I am trying to remember.

19  I don't remember if I ever did it in cash or not.  I don't

20  remember that.

21      Q.    Other than potentially cash, would there have

22  been any other way that you would have paid TASC other

23  than with your debit card?

24      A.    No, that's -- that would be it, just the debit

25  card or cash.

1    *Q.*    So you never wrote TASC a check for any of the
2  fees?

3    *A.*    No.

4    *Q.*    Okay.  Anybody else besides your mom and dad and
5  your daughter and Paul that lent you money to pay any of
6  the TASC testing fees?

7    *A.*    No.

8    *Q.*    Okay.  So we have been talking for the last
9  couple of minutes about paragraph 304 there where you talk
10  about paying for the tests.  Did you borrow money from
11  anybody to pay for any of the other program fees besides
12  the testing fee?

13    *A.*    Noemy.

14    *Q.*    Okay.  And that was your friend Noemy?

15    *A.*    Yes.

16    *Q.*    Okay.  And her name was Noemy Flores; is that
17  correct?

18    *A.*    Yes.

19    *Q.*    Okay.  And how much did you borrow from Ms.
20  Flores to pay the TASC program fees?

21    *A.*    She let me borrow -- what was it -- $400.

22    *Q.*    Okay.  And did Ms. Flores give you that money in
23  cash?

24    *A.*    Yes.

25    *Q.*    And did you deposit that cash into your B of A

1          Sorry.  You can answer, Lucia.

2          THE WITNESS:  Like not -- not -- just to

3    help out for the -- I mean, it was not the testing, to get

4    to the TASC and stuff.

5    BY MS. CATERO:

6    Q.    Okay.  I am talking about the allegation that is

7    here in this paragraph -- and it uses the word "family" so

8    I don't want to be vague so I am going to ask you

9    questions here about specific people, but the paragraph

10   says that your family that helped you pay off a portion of

11   the program fees in the past with money they received from

12   tax refunds, and I think that's -- correct me if I'm

13   wrong, but that is what we were just talking about about

14   all these people loaning you money to help pay the fees;

15   is that right?

16   A.    Yes.

17   Q.    Okay.  But the rest of the this sentence says

18   that "they currently cannot afford to give her money to

19   pay off any more of the program fees."  Do you see that

20   there?

21   A.    Oh, yes, I'm sorry.  I am still in the test

22   area, so, no, they -- nobody can -- was able to help me no

23   more.

24   Q.    Okay.  And this complaint, again, up at the top

25   of the page here, this was in September of 2019.  Do you

 1  see that?

 2      *A.*    Yes.

 3      *Q.*    So is it a true statement that in September of

 4  2019 your daughter could not afford to lend you any more

 5  money to pay off the program fee?

 6      *A.*    Yes, that is correct.

 7      *Q.*    Okay.  And I want to clarify person by person

 8  who you asked.  So before this was filed in

 9  September 2019, did you ask your daughter Jazlyn if she

10  could afford to give you any more money to pay off the

11  program fee?

12              MS. CHAMBLEE-RYAN:  Objection.  Vague.

13  Asked and answered.

14              THE WITNESS:  What?

15              MS. CHAMBLEE-RYAN:  You can respond, Lucia.

16              THE WITNESS:  Because I don't know what is

17  going on.

18              Yes, I did ask her.

19  BY MS. CATERO:

20      *Q.*    Okay.  And then what did she say?

21      *A.*    She said:  No.

22      *Q.*    Okay.  And then in 2019, when this complaint was

23  filed, did you ask your father, Alfredo Lopez, if he could

24  loan you some more money to pay off the TASC program fee?

25              MS. CHAMBLEE-RYAN:  Objection.  Vague.

1          Do you mean on the day it was filed?

2          MS. CATERO:  It says "currently" -- uses

3    the word "currently," so --

4          MS. CHAMBLEE-RYAN:  You are asking if she

5    asked him on the day it was filed?

6          MS. CATERO:  Did she ask him before this

7    was filed on September -- it was filed --

8          MS. CHAMBLEE-RYAN:  Before it was filed --

9          MS. CATERO:  Right.

10   BY MS. CATERO:

11       Q.   So before this was filed, did you ask your

12   father if he could lend you more money to finish paying

13   off the program fee?

14       A.   Yes, I did.

15       Q.   Okay.  A moment ago, you said you didn't ask

16   because you knew he couldn't afford it.  Do you --

17          MS. CHAMBLEE-RYAN:  Objection.

18   Mischaracterization of testimony.

19   BY MS. CATERO:

20       Q.   So do you remember whether or not you asked your

21   father before this complaint was filed if he could lend

22   you some more money so you could finish paying off the

23   program fees?  Do you remember?

24       A.   No, I don't.

25       Q.   Okay.  So you don't remember whether or not you

 1  asked him?

 2      A.    No, I don't remember.

 3            MS. CHAMBLEE-RYAN:  Can you please clarify

 4  the time period on that question again?

 5  BY MS. CATERO:

 6      Q.    Before this was filed in September of 2019, did

 7  you ask your father if he could afford to lend you more

 8  money so that you could pay off the program fees at TASC?

 9      A.    So before it was filed -- I asked him before,

10  but that time, you are saying in September if I asked?

11      Q.    Okay.  Let's make this easier.  At the time you

12  completed TASC, did you still owe money?

13      A.    Yes, I did -- well, no.  When I completed it?

14      Q.    This complaint alleges that you could not -- you

15  cannot afford to pay off the fee.  So at the time the

16  complaint was filed, did you still owe a fee to TASC?

17      A.    I am trying to make -- like the -- the county

18  finished paying for it.  I didn't.

19            MS. CHAMBLEE-RYAN:  I'm sorry.  Can you

20  clarify?  First, you asked when she completed TASC did she

21  owe and then you said when the complaint was filed did she

22  owe.  I think the record reflects how much money she owed

23  and when and in --

24            MS. CATERO:  I want to ask her if she knows

25  when this complaint was filed did she still owe money to

 1  TASC, to her knowledge.

 2              THE WITNESS:  Yes, I did.

 3  BY MS. CATERO:

 4       *Q.*    Okay.  I'm sorry.  Can you repeat that?

 5       *A.*    That I owed money to TASC, yes, I did.

 6       *Q.*    Okay.  And do you remember how much money you

 7  owed to TASC at the time this complaint was filed?

 8       *A.*    I don't remember how much was it.

 9       *Q.*    Was it around $400?

10       *A.*    I think it was a little more.

11       *Q.*    Was it $440?

12       *A.*    I don't really remember.

13       *Q.*    Do you remember if it was less than 500?

14       *A.*    I believe so.

15       *Q.*    Okay.  So you just testified that at the time

16  this complaint was filed, you owed between four and five

17  hundred dollars to TASC, correct?

18              MS. CHAMBLEE-RYAN:  Objection,

19  mischaracterization of testimony.  She said she couldn't

20  remember exactly what she owed.

21              MS. CATERO:  She said it was around $400

22  and she thinks it was less than 500.

23              MS. CHAMBLEE-RYAN:  She said she was

24  estimating based on your questions, but she said she

25  couldn't remember.

 1          MS. CATERO:  Now you are mischaracterizing

 2   her testimony.

 3   BY MS. CATERO:

 4       Q.   So let's try this again.  At the time the

 5   complaint was filed, you -- do you recall that you owed a

 6   balance still to TASC?

 7       A.   Yes, I still owed to TASC.

 8       Q.   Okay.  And do you remember approximately how

 9   much you still owed to TASC at the time the complaint was

10   filed?

11       A.   I don't actually remember exactly.

12          MS. CHAMBLEE-RYAN:  Objection --

13   BY MS. CATERO:

14       Q.   But you owed -- at least the complaint alleges

15   that you still owed a balance to TASC at the time the

16   complaint was filed, correct?

17       A.   Yes.

18       Q.   Okay.  And at the time the complaint was filed

19   -- pardon me.  Prior to filing this complaint, did you ask

20   your father if you could borrow any more money to pay off

21   the balance that was owed?

22       A.   No, I did not.

23       Q.   You did not ask him?

24       A.   No, I did not ask him.

25       Q.   Okay.  And then at the time that -- prior to the

*DEPOSITION OF LUCIA SORIA, 11/13/2020*

1  filing of this complaint, had you asked your mother,

2  Esther Lopez, whether or not you could borrow any money to

3  pay off the balance owed to TASC?

4       *A.*    No, I didn't.

5       *Q.*    And then prior to filing this complaint, had you

6  asked your cousin Paul Diaz whether or not you could

7  borrow anymore money to pay off the balance owed to TASC?

8       *A.*    No, I did not ask him.

9       *Q.*    Okay.

10              MS. CHAMBLEE-RYAN:  Sorry, Jennifer, I

11  apologize.  I think we are little unfair as to time.  When

12  you say "prior to filing the complaint," do you mean at

13  any time prior to filing the complaint?

14              MS. CATERO:  Right, did she ask anybody to

15  help her pay the balance prior to when this complaint was

16  filed.

17              MS. CHAMBLEE-RYAN:  Any time before the

18  complaint was filed?

19              MS. CATERO:  Yeah.

20              MS. CHAMBLEE-RYAN:  Okay.  Was that clear

21  to you, Ms. Soria?

22              THE WITNESS:  So it was -- what I am

23  understanding is that, like, before the -- any lawyers

24  came to speak to us --

25

1   BY MS. CATERO:

2       *Q.*    No, regardless -- this is not about the lawyers.

3   This is about when this complaint was filed here in

4   September, had you asked for help to pay off the balance

5   that was owed to TASC from these people that I am

6   referencing in the question?

7               I know we talked about each of them had

8   lent you money at different points in time to help pay the

9   fees, and then you testified a moment ago that even with

10  that help you got from them, at the time this complaint

11  was filed you still owed some balance; is that correct?

12      *A.*    Oh, yes, I -- yes, yes.

13      *Q.*    Okay.  So I am talking about that balance.

14      *A.*    Okay.

15      *Q.*    And we have already gone through your daughter,

16  your father and your mother, and I just asked you prior to

17  this complaint being filed, did you ever ask Paul Diaz

18  whether he could loan you any more money so that you could

19  pay off the balance owed to TASC?

20      *A.*    No, I didn't ask him.

21              MS. CHAMBLEE-RYAN:  Objection.

22              Jennifer, from what point are you referring

23  to this balance?

24              MS. CATERO:  He lent her money to pay off

25  testing fees.  She has already testified to that.  She has

1  testified to the fact that at the time this complaint was

2  filed she still owed a balance.  So all I am asking is did

3  she ask any of these people prior to the -- to this

4  statement being made in this complaint to help her pay off

5  that balance.  It is pretty straightforward.

6              MS. CHAMBLEE-RYAN:  During what -- during

7  what time period?

8              MS. CATERO:  To pay the balance owed.

9              MS. CHAMBLEE-RYAN:  Okay.  But a balance

10  implies an amount remaining.  So you are asking if before

11  she filed the complaint if she asked them for help paying

12  the balance that remained as of the time of filing?  I

13  think that is a little -- it is unclear what the time

14  period is.

15              MS. CATERO:  She is seeming to understand

16  the question.  She asked them for help to pay fees

17  throughout her involvement with TASC.  At the time this

18  complaint was filed, though, she has testified she still

19  owed a balance to TASC.  So I am asking -- she doesn't

20  remember the exact balance that she owed, but she knows

21  she still owed a balance to TASC at the time the complaint

22  was filed, so at any point in time prior to this -- filing

23  of this complaint, did she specifically ask anybody, any

24  of these people we are talking about, whether they could

25  loan her more money so she could pay off the balance owed.

1          MS. CHAMBLEE-RYAN:  Okay.  I will leave the

2    objection.  Vague.

3    BY MS. CATERO:

4          Q.    All right.  Lucia, sorry, hon.  Anytime -- I

5    know you testified that you already borrowed some money

6    from your friend Noemy to help you pay some of your fees

7    to TASC -- and that is correct, right?

8          A.    Yes.

9          Q.    So at the time -- before this complaint was

10   filed, did you ever go back to Noemy and ask her if you

11   could borrow some more money so you could help pay off the

12   current -- the past due balance owed?

13         A.    No, I didn't ask her no more.

14         Q.    Okay.  Did you ask your boyfriend Travis for

15   help prior to this complaint being filed to help pay off

16   any past due balance owed to TASC?

17         A.    No, I didn't.

18         Q.    Okay.  Okay.  Let's see.  Okay.

19              And then this actually spans two pages

20   here, so I am going to ask you about paragraphs 307 to

21   310, and I think you were referring to this a little bit

22   earlier.  I am going to go ahead and read them out loud

23   for the record here.  Paragraph 307 alleges that "On

24   July 15, 2019, Ms. Soria asked her caseworker, Viviana

25   Garcia, when her 90 days would be over and she would be

1  remember that at all?

2      *A.*   No, I don't.

3      *Q.*   If I told you that on August 28, 2019, your

4  lawyers attached this complaint to a motion asking the

5  court for permission to file it, would you have any reason

6  to disagree with me?

7      *A.*   No.

8      *Q.*   Okay.  Is it true that on August 28th -- end of

9  August 2019 that you did not have enough money to pay the

10  $440 owed to TASC?

11     *A.*   Oh, I don't remember, but I didn't have a job so

12  I am pretty sure.

13     *Q.*   Okay.  But you had money in your bank account,

14  correct, in August of 2019?

15     *A.*   I don't remember how much money I had at the

16  time.

17     *Q.*   Okay.

18             MS. CHAMBLEE-RYAN:  I will object.  Having

19  money in a bank account is not the same thing as being

20  able to afford something.

21             MS. CATERO:  That's testimony, Counsel,

22  sorry.  It is not an objection.

23             MS. CHAMBLEE-RYAN:  No problem.  I'm just

24  trying to help with the record.  Sorry about that.

25

1  when I had money, yes, I would give it.  If not, I

2  couldn't give nothing.  I just help them out with the --

3  buying them food with the food stamps.

4      Q.    Did you provide assistance to your father in

5  making the mortgage payment on the house you were living

6  in?

7      A.    Just what I had said earlier, just whatever I

8  can when I gave him -- it was towards whatever he needed

9  for the bills.

10     Q.    Okay.  So at the time when you submitted this

11 application, you were not paying anything for the housing

12 costs, correct?

13     A.    I guess not if I put that.  I don't remember

14 about the application.

15     Q.    Okay.  And then it says under that, also on line

16 6, it says the total utility costs that you were paying,

17 electric, gas, telephone, water and garbage was only $120

18 a month.  Was that correct?

19     A.    I guess.  I don't remember what I -- how I

20 filled it out, but I guess that is what I --

21     Q.    But were you actually paying -- at the time you

22 submitted the application in May of 2019, were you paying

23 $120 a month for a total for all of those items?

24     A.    I guess I was paying them -- every month I was

25 giving something so I probably was 120.  I don't really

1      Q.    Okay.  And this is on the same bank statement.

2    It shows here on April 8, 2019, a $202 cash deposit -- or

3    deposit actually.  Do you know where that money came from?

4      A.    I don't remember.  Probably if somebody let me

5    borrow money, I mean, I don't remember a deposit.  No, I

6    don't remember.

7      Q.    Okay.  And then it says here at the top of that

8    list of deposits, it shows $350 there, and that is from

9    your brother Anthony, correct?

10      A.    Yes.

11      Q.    And that is a Zelle transfer?

12      A.    Um-hum.  Yes.

13      Q.    So that would have been from Anthony's bank

14    account to your B of A account, correct?

15      A.    Yes.

16      Q.    And what was that $350 for from Anthony?

17      A.    For the car payment that he took over.

18      Q.    Okay.  And on what date did Anthony day over

19    making the car payments?

20      A.    I don't remember exactly what date was it.

21    Probably -- I don't remember.

22      Q.    This was on the Nissan, correct?

23      A.    Yes.

24      Q.    Okay.  And so when Anthony would transfer the

25    payment to your bank account, how would you then make the

1    car payment?

2         *A.*    I had the app on my phone.

3         *Q.*    Okay.  And then the app, would that money

4    company come out of this B of A account and then go to the

5    lender for the Nissan?

6         *A.*    Yes.

7         *Q.*    Okay.  And do you remember the name of that

8    lender?

9         *A.*    It was Nissan Coulter -- Coulter -- Coulter,

10   C-O-U-L-T-E-R.

11        *Q.*    Coulter, the car dealership?

12        *A.*    Yes.

13        *Q.*    Okay.  Then we will just take a quick look here

14   at -- and this is what we were talking about a moment ago,

15   purchases here at Circle K.  We have got one here on

16   April 5th for $15.  We have another one April 7th for $14.

17   We got another one April 8th for $26.  Another one the

18   next day April 9th for $14, and then again April 10th for

19   $14.  So we got five days in a row we are at Circle K.

20   That was just for gas and snacks; is that correct?

21        *A.*    Yeah, that is not another thing I can buy there.

22        *Q.*    Okay.  I am showing you what we are going to

23   mark as Exhibit 7 to your deposition.

24             (Deposition Exhibit No. 7 was marked for

25   identification by the reporter.)

```
1   BY MS. CATERO:
2       Q.   Okay.  This is another bank statement from B of
3   A.  This is the next month.  This is from April 12th of
4   '19 to May 13th of '19.  Do you see that?
5       A.   Yes.
6       Q.   And for the record, the total balance in your
7   B of A on that statement is $6,995.42, correct?
8       A.   Yes.
9       Q.   Okay.  And got a couple of deposits again this
10  month.  Is that $350 there from Anthony on April 23rd.  Is
11  that again for a Nissan payment?
12      A.   Yes.
13      Q.   And we got another $10 from Anthony.  Do you
14  remember what that was for?
15      A.   That, I don't remember.
16      Q.   Okay.  We go -- the next page, let's see here,
17  on April 25th, a payment that posted on April 26th,
18  PayPal, it looks like Francis M. for $216.60.  Do you know
19  what that was for?
20      A.   That one, I don't remember.  And I don't know
21  nobody named Francis or whatever that -- I don't remember
22  about that one.
23      Q.   Did you ever dispute that charge that you
24  remember?
25      A.   Did I?  I just don't -- I have been trying to
```

1    remember that, but I don't remember nothing about that

2    Francis whatever PayPal thing.

3        Q.    Okay.  Under that there is another PayPal

4    purchase.  It says Trendy Woo for $12.  Do you remember

5    what that is?

6        A.    No, I don't.

7        Q.    Okay.  So you have no idea what those two

8    transactions are for?

9        A.    No, I don't.

10       Q.    Would they have been for food?

11       A.    I don't think the Francis one, but maybe the

12   Trendy Woo one.

13       Q.    Okay.  What would you consider to be a basic

14   necessity?

15       A.    Clothes.

16       Q.    Um-hum.

17       A.    Like, maybe, what, shampoo, or that stuff.

18       Q.    Um-hum.

19       A.    Like, toilet paper, toothpaste.

20       Q.    Okay.  We have got a transaction here on the

21   next page here, a Glam Bag on May 1st, would you consider

22   that a basic necessity?

23       A.    No, it is not.  And really, I e-mail them like

24   crazy because I wanted to cancel that a long time ago, and

25   it kept doing that.  It keeps taking ten dollars off my

1  thing.

2      Q.    What is that for?

3      A.    It is makeup.  It is a little bag you get every

4  month.

5      Q.    Okay.  And then underneath that a couple lines

6  down we have got a purchase at Five Below for 38.91.  That

7  is a shopping site, isn't it, or a store?

8      A.    Yeah, it is, like, a five-dollar place.  It is a

9  store in Phoenix.

10     Q.    Oh, okay.  And what kind of stuff did you buy

11  there?

12     A.    I -- I remember getting stuff for the kids.

13     Q.    Okay.  And it looks like -- got a bunch of food

14  purchases here, KFC, Boba House, Chipolte, Carl's, Jr.  It

15  looks like in the same day there.  Are these in addition

16  to the $505 a month that you were getting in nutrition

17  assistance?

18     A.    No, the only place they accepted the KFC -- I

19  mean, the KFC -- the EBT was at KFC.

20     Q.    Okay.  But these purchases were not made with

21  that nutrition assistance card, correct?

22     A.    Yes.  Oh, yes.  Oh, yeah, yeah, yeah.

23     Q.    Okay.  So in addition to having the $505 of

24  nutrition assistance, we are also seeing a bunch of

25  restaurant charges, correct?

1    *A.*    Yes.

2    *Q.*    And on this one here, we have got three in the

3    same day, correct?

4    *A.*    Yes, I see that.

5    *Q.*    Do you consider it a basic necessity to eat out

6    at restaurants?

7    *A.*    Not all at time, but, like, once in a while, but

8    that's why I am saying I don't know how three times a day

9    happened.

10   *Q.*    Okay.  Let's see here.  We will look at -- we

11   also got here, it looks like on May 4th, a PayPal charge

12   for Fandango, of $60.50.  Was that for movie tickets?

13   *A.*    Yes, that was movie tickets, but my daughther

14   gave me cash to buy popcorn and stuff in there because

15   they wanted to go.

16   *Q.*    But you paid for -- the $60 there was for the

17   tickets to go to the movie?

18   *A.*    Yes, I paid for them online.

19   *Q.*    Okay.

20            MS. CHAMBLEE-RYAN:  And objection to "paid

21   for."  Do you mean she actually used her card to purchase

22   them or do you mean that she was the one buying them?

23   Because she just said her daughter gave her money for

24   them.

25            MS. CATERO:  She said her daughter gave her

 1   money for snacks not the tickets.  I can clarify.
 2   BY MS. CATERO:
 3       *Q.*   Lucia, did your daughter give you money for the
 4   movie tickets?
 5       *A.*   Like, she gave me back the 60, but for that, we
 6   used it for popcorn and stuff in the thing.
 7       *Q.*   So --
 8       *A.*   She gave --
 9       *Q.*   So you purchased the movie tickets with your
10   debit card, correct?
11       *A.*   Yes.
12       *Q.*   And then Jazlyn gave you $60 cash to pay you
13   back, correct?
14            MS. CHAMBLEE-RYAN:  I'm sorry, Jennifer, I
15   think Lucia was trying to respond.
16            MS. CATERO:  I'm sorry --
17            MS. CHAMBLEE-RYAN:  I know it is hard to
18   see over Zoom.  I do it all the time.
19            THE WITNESS:  Yes, like, she -- I paid them
20   online, and then she gave me cash, and with the money --
21   that cash she gave me, we got popcorn, you know, and a
22   drink.
23   BY MS. CATERO:
24       *Q.*   So is it fair to say that you paid for the movie
25   tickets and Jazlyn paid for the snacks?

1    *A.*   Well, it was only one bag of popcorn and one

2   drink so I guess she paid half of it -- or more than half

3   of the tickets.

4    *Q.*   I see what you are saying.  That helps.  Thank

5   you.

6              Let's go to -- okay.  I am showing you what

7   we are going to mark as Exhibit 8 to your deposition.

8   This is another bank statement.  This one is for the

9   period from May 14th through June 11, 2019.  Do you see

10  that?

11   *A.*   Yes.

12              (Deposition Exhibit No. 8 was marked for

13  identification by the reporter.)

14  BY MS. CATERO:

15   *Q.*   And is it true that your balance in your B of A

16  accounts as of this statement was $5,768.41?

17   *A.*   Yes.

18   *Q.*   Okay.  And we have got here -- I think there is

19  two Zelle transfers there from your brother Anthony, one

20  looks like 365 and one looks like 350.  Do you see both of

21  those?

22   *A.*   Oh, yes, okay.

23   *Q.*   Were both of those for the car payments for the

24  Nissan?

25   *A.*   I believe so.  Let me -- it was either that or

 1  he was giving me payments for -- no, but that was that
 2  same month.
 3       Q.   Was there something else that Anthony was giving
 4  payments for by Zelle?
 5       A.   Like, he was getting a ticket for him, like, to
 6  go to California.
 7       Q.   That you purchased, like, a plane ticket?
 8       A.   No, it was not -- it is like a -- god, like, a
 9  festival, like, a music festival.
10       Q.   Did it cost -- was it $365?
11       A.   It was more than that, but I guess it was
12  towards that or -- I don't really remember what it was
13  for, but he -- he never helped out by giving me money.
14       Q.   Are you saying -- I am just trying to be clear.
15  Are you saying that Anthony sometimes transferred you
16  money so that you could pay for a ticket to a festival?
17       A.   Yes.
18       Q.   Okay.  Why didn't Anthony just buy it himself?
19       A.   Because there was a time that his card got fraud
20  or something like that, and he canceled it.
21       Q.   Would this have been his credit card or his
22  debit card?
23       A.   I don't -- I don't remember, but I know -- like,
24  I don't remember why he sent me that -- I am trying to
25  remember, but I don't.

 1        *Q.*    Anthony had his own bank account, correct?

 2        *A.*    He did, but then, like, he had Bank of America,

 3   but then he stopped that and he was just getting -- I

 4   don't know how you call it, like, Chime -- something like

 5   that, those cards.  I don't really ask him all that stuff

 6   so I am not sure.  I don't remember.

 7        *Q.*    So you don't know why he was asking you to buy

 8   tickets for him, why he didn't do it himself?

 9        *A.*    Yes.  For -- for that, he said, "Well, I got

10   fraud."  So I was doing it because, I mean, he was giving

11   me the money for it so I was doing it.

12        *Q.*    But his bank account was not frozen at that

13   point in time because he could still transfer you money

14   via Zelle, correct?

15             MS. CHAMBLEE-RYAN:  Objection, vague, at

16   that time.

17   BY MS. CATERO:

18        *Q.*    Let's look at -- there is an ATM deposit here at

19   the top of this list for 250 -- $250 on May 16th.  Do you

20   remember what the source was of that money?

21        *A.*    I don't remember.

22        *Q.*    And then there was another one here at the

23   bottom of the list for $85 on June 9.  Do you see that?

24        *A.*    Yes.

25        *Q.*    And do you remember what the source was for that

1      Q.   Okay.  This was the first time -- we have bank

2  statements from you for February, March, April of 2019,

3  and this May 20th -- I will represent to you -- is the

4  first time we see an entry to the NMAC to Irving, Texas.

5  Did you start making the Nissan payments in May of '19?

6      A.   No, I was -- since March -- no.  Well, yeah,

7  March I think, I believe.  I don't know why it does not

8  show here, but, I mean, all those transactions for my

9  brother that were more than 300 was for the car.

10     Q.   And how were you making those payments in, for

11  example, February, March, April of 2019?

12     A.   Through the app.

13     Q.   Out of your -- out of this bank account?

14     A.   Yes.

15     Q.   Okay.  And then let's see here, on the next

16  page, 4261, we have a number of charges here.  Were all of

17  the charges on this page of this bank statement -- would

18  these have all been for the basic necessities?

19     A.   Oh, I don't know if -- I have to go through --

20  let's see.

21          MS. CHAMBLEE-RYAN:  I'm sorry, Jennifer,

22  are you referring just to the charges that are things she

23  purchased for herself and her kids or also things other

24  people paid for?

25          MS. CATERO:  I don't care who paid for

1   them, but are all of these charges for things that she

2   would consider -- the purchases themselves, what she was

3   buying -- would she consider all of these things if she

4   remembers to be basic necessities.

5               THE WITNESS:  I mean, the Ross, clothing,

6   usually not for me, for my kids; Goodwill, also for them.

7   Oh, god, I cannot -- Sprint.  The Circle K, well, it was

8   mostly gas.  Then the one I don't think it could have been

9   -- like, I mean, I always -- like, when we go out to eat

10  -- not my small one, but the big one always gives me

11  something.  It is not, like, I always pay for the whole

12  thing, for example, like, Red Robin and stuff.

13  BY MS. CATERO:

14      Q.    Okay.  Are you trying to say were your children

15  with you when you ate at these restaurants?  Is that what

16  you are saying?

17      A.    Yes.

18      Q.    Okay.  And you remember that?

19      A.    I -- well, I remember -- I have not gone to Red

20  Robin, so the last time I went was probably with them.

21      Q.    Okay.  Is the same true with respect to the

22  Denny's charge at the top of the page, were your children

23  with you?

24      A.    Yes.

25      Q.    Okay.  Okay.  And this is the same statement.

1  It says here that as of June 11, 2019, you had $5,655.48

2  in your savings account.  Do you see that?

3      *A.*   Yes, I do.

4      *Q.*   Why didn't you pay off the TASC fees at that

5  point in time?

6      *A.*   Well, since I didn't have a job and I didn't

7  know when I was going to get a job, like, I wanted to save

8  in case of emergency or anything in the future because, I

9  mean, I am not going to spend every single thing, and,

10 like, I can't predict when I am going to get a job or not.

11     *Q.*   And the -- but the total TASC fees you owed were

12 less than a thousand dollars, correct?

13     *A.*   Yes.

14     *Q.*   So you still would have had $4,600 left over if

15 you would have paid the TASC fees at that point in time,

16 correct?

17     *A.*   Yes.

18     *Q.*   Yeah.  So there was enough money in that savings

19 account at that point in time to pay off your TASC fees in

20 full, correct?

21            MS. CHAMBLEE-RYAN:  Objection, vague, as to

22 "enough," and she has already answered whether or not she

23 could afford the TASC fees.

24 BY MS. CATERO:

25     *Q.*   Did you -- you owed less than a thousand dollars

 1  at that point in time to TASC, correct?

 2                  MS. CHAMBLEE-RYAN:  Asked and answered.

 3  Objection.

 4                  THE WITNESS:  What was --

 5                  MS. CHAMBLEE-RYAN:  You can answer it

 6  again, but I was just saying you already answered it.

 7                  MS. CATERO:  I'm sorry, Carrie, can you

 8  read back her answer to the question when I asked her

 9  whether or not -- or if she answered whether or not she

10  had more than enough money in her account -- can you read

11  back that question and answer, please?

12                  (The following requested portion of the

13  record was read back by the reporter.)

14                  "QUESTION:  So there was enough money in

15  that savings account at that point in time to pay off your

16  TASC fees in full, correct?"

17                  MS. CATERO:  And did she answer the

18  question?

19                  THE REPORTER:  No, there was an objection.

20                  MS. CATERO:  So I am going to ask the

21  question -- can you read back the question again for the

22  witness, please?

23                  (The following requested portion of the

24  record was read back by the reporter.)

25                  "QUESTION:  So there was enough money in

1  that savings account at that point in time to pay off your
2  TASC fees in full, correct?"
3                    THE WITNESS:  Yes.
4  BY MS. CATERO:
5      Q.   Okay.  Just to be clear, at the point in time,
6  June 11, 2019, that this statement reflects your balance
7  of $5,655.48, correct?
8      A.   Yes.
9      Q.   And --
10                   MS. CHAMBLEE-RYAN:  Asked and answered --
11  objection, asked and answered.
12                   MS. CATERO:  She didn't answer it.  Carrie
13  just read it back and she didn't answer it.
14                   MS. CHAMBLEE-RYAN:  I believe that was the
15  previously when you asked if that reflected her balance.
16  BY MS. CATERO:
17     Q.   So was the answer "yes" then to the question?
18     A.   Yeah, I answered, "Yes."  I don't know to who
19  then.  I have to guess.
20     Q.   Yeah, I keep getting an objection and not an
21  answer.
22                   As of June 11th the 5,655, that was more
23  than enough money to pay off what was owed to TASC,
24  correct?
25                   MS. CHAMBLEE-RYAN:  Objection, vague, as to

1 | what it means to be enough money to pay what is owed to

2 | TASC.

3 | Lucia, you can answer based on how you

4 | understand the question.

5 | THE WITNESS: Okay. What was the question

6 | again? Now I am going to have a certain amount after

7 | paying --

8 | BY MS. CATERO:

9 | Q. As of June 11, 2019, did you have enough money

10 | in your account with which to pay off the balance owed to

11 | TASC?

12 | MS. CHAMBLEE-RYAN: Objection, vague, as to

13 | what it means to have enough money to pay off the balance.

14 | THE WITNESS: What?

15 | BY MS. CATERO:

16 | Q. Did you understand my question, Soria -- or

17 | Lucia, sorry.

18 | A. Like, did I have enough, like, to -- I don't --

19 | I don't -- I get the question you are saying that if I had

20 | paid it off, I would still have money left, right?

21 | Q. Correct.

22 | A. Okay. Well, like, I was thinking a lot of --

23 | for that, I was -- a lot of people let me borrow money, so

24 | with that money I was just thinking of just paying them

25 | back and stuff, like -- I mean, TASC, I know I was -- I

*DEPOSITION OF LUCIA SORIA, 11/13/2020*

1 | had to.  That's why I tried to see if they could help me
2 | out, but they -- I guess there was no help for that.  So
3 | -- but, I mean, if there would be money left over, yeah,
4 | it would be there, but -- like, who can live under what,
5 | $4,000?  Like, I still don't have a job right now neither.
6 |     *Q.*  But as of June 11th, you had available to you
7 | $5,655.48, correct?
8 |     *A.*  Yes, I did.
9 |         MS. CHAMBLEE-RYAN:  Objection, vague as
10 | what it means to have available.
11 |         I'm sorry, Lucia, I didn't mean to step on
12 | your answer.  You can answer.
13 |         THE WITNESS:  Oh, I just said:  Yes, I did.
14 | BY MS. CATERO:
15 |     *Q.*  And you could have used some of that money to
16 | pay off the balance owed to TASC, correct?
17 |     *A.*  Yes.
18 |         MS. CHAMBLEE-RYAN:  And I am objecting as
19 | to vague again.
20 | BY MS. CATERO:
21 |     *Q.*  Let's go to -- let's see here.  I am going to
22 | not introduce the next statement as an exhibit.  I am
23 | going to ask you a couple questions without it.
24 |         Do you recall in about June of 2019 buying
25 | tickets to Coachella?

1      A.   I bought them.  They were not for me.

2      Q.   Right.  Is that what you were talking about a

3  moment ago for Anthony?

4      A.   Yes.

5      Q.   And your testimony is that Anthony paid you back

6  for those tickets?

7      A.   Yes.

8      Q.   And how did he do that?

9      A.   I don't remember.

10     Q.   Okay.  And then did you also buy tickets to

11  Ariana Grande concert in June of 2019?

12     A.   My brother -- my brother -- my son, Guillermo,

13  gave me that money.

14     Q.   Okay.  Do you see another document up on the

15  page?

16     A.   Yes.

17     Q.   And do you recognize this document?

18     A.   That's the one they gave me at orientation.

19          (Deposition Exhibit No. 9 was marked for

20  identification by the reporter.)

21  BY MS. CATERO:

22     Q.   Okay.  Is that your signature there at the

23  bottom where it says "Applicant's Signature" in two

24  places?

25     A.   I guess so.  I sign so different now.  Like,

1    BY MS. CATERO:

2        Q.    Lucia, have you seen this document before?  Do

3    you remember it?  I can make it bigger.  Does that look

4    familiar?

5        A.    Oh, yes, yes.

6        Q.    Is that your handwriting?  Do you recognize the

7    handwriting?

8        A.    Yes.

9        Q.    And so -- looks like you didn't have to sign it.

10   Sorry.  Towards the bottom here -- I am going to blow it

11   up a little bigger -- it says food stamps and the number

12   handwriting in there is $300.  Do you see that?

13       A.    Yes.

14       Q.    And -- but we talked about earlier you were

15   actually getting about $505 a month; is that right?

16       A.    Yes, but it changed with time.  It was not

17   always -- like, right now, I am not getting 500.

18       Q.    Okay.  But at the time you filled out this form,

19   how much were you getting?

20       A.    I guess that -- I don't remember why did I

21   put --

22       Q.    This is -- it is dated up here at the top.  It

23   is dated April 9, 2019.  Do you see that?

24       A.    Yes.

25       Q.    So in April of 2019, how much were you getting

```
 1        Q.    It says, "MCA/ADPP Client."  Do you see that?
 2        A.    Yes.
 3        Q.    Okay.  And is that your signature on that line?
 4        A.    Like, I don't really recognize it, but I guess,
 5   yes.  Yeah, it is, it is.
 6        Q.    Okay.  And then we've got initials out here on
 7   the left-hand side.  It looks like seven sets of initials.
 8   Do you see those?
 9        A.    Yes.
10        Q.    And do all of those look like your initials?
11        A.    Yes.
12        Q.    Okay.  And then it says here -- in the middle,
13   it says:  Clients that have completed all program
14   requirements may be eligible for early termination.
15              Do you see that?
16        A.    Yes.
17        Q.    Why didn't you try to pay the TASC fees early so
18   you could be eligible for early termination?
19        A.    Because I was not sure what -- I mean, like I
20   said, like, I know this is -- was important to pay, but
21   the -- I thought, like, financial and futurewise that I
22   thought I could, you know, with stuff that I -- like,
23   important things for my kids that they needed for school
24   and stuff was more -- like, I didn't really think of
25   paying this off, like, that, like, I was not -- I didn't
```

 1 | have income coming every month so that's why I just didn't
 2 | do this.
 3 |     Q.    Okay.  Is there a document on the screen now?
 4 |     A.    Yes.
 5 |     Q.    This is going to be Exhibit 12.
 6 |            (Deposition Exhibit No. 12 was marked for
 7 | identification by the reporter.)
 8 | BY MS. CATERO:
 9 |     Q.    And it says "Client Contract" at the top.  Do
10 | you see that?
11 |     A.    Yes.
12 |     Q.    And do you recognize this document?  Have you
13 | seen it before?  It is a two-pager.
14 |     A.    I don't remember.
15 |     Q.    You don't remember this one?
16 |     A.    No.
17 |     Q.    Do those look like your initials there on the
18 | left-hand side?  Do you recognize your initials?
19 |     A.    Yes.
20 |     Q.    Do you remember initialing the document?
21 |     A.    No, I don't.
22 |     Q.    Okay.  Do you have any reason to believe that
23 | those are not your initials?
24 |     A.    No.
25 |     Q.    Okay.  We are going to go to the next page here.

 1  answer?

 2              MS. CATERO:  Yes, let's go off the record

 3  for just two seconds here.

 4              VIDEO TECHNICIAN:  We are off the record at

 5  5:21 p.m.

 6              (Recess ensued from 5:21 p.m. until

 7  5:32 p.m.)

 8              VIDEO TECHNICIAN:  We are on the record at

 9  5:33 p.m.

10  BY MS. CATERO:

11      Q.   Okay.  Lucia, a little while ago we were looking

12  at an exhibit and it was the case notes where Ms. Garcia

13  had entered some of the e-mail correspondence she had had

14  with you.  Do you remember that exhibit?

15      A.   Oh, the e-mails, yes.

16      Q.   Okay.  I can put it back up if you need to look

17  at it, but do you remember the one e-mail where you told

18  her you were going to try to get a loan to pay off the

19  $440 balance.  Do you remember that e-mail?

20      A.   Yes.

21      Q.   Okay.  Did you try to get a loan to pay off the

22  $440 balance?

23      A.   No.  That's when I stopped asking for my people

24  to loan me the money.

25      Q.   Okay.  At the time you sent that e-mail to

1  Ms. Garcia, did you intend to try to get a loan?

2      *A.*   Did I?  I don't remember if I asked anybody

3  else.

4      *Q.*   Okay.  But I am asking, though, about the time

5  that you sent the e-mail to Ms. Garcia, was it your intent

6  -- was it your plan to try to get a loan to pay off the

7  440?

8      *A.*   Yes.

9      *Q.*   Okay.  So that was a true statement, right?

10     *A.*   Yes.

11     *Q.*   Okay.  And then is it true that that remaining

12  balance, that $440, that that was eventually waived?

13     *A.*   Yes.

14     *Q.*   Okay.  And then you also received a refund of

15  the $420 that we were talking about a moment ago, right?

16     *A.*   Yes.

17     *Q.*   Okay.  We talked a little bit about over the

18  course of today various people putting money in your bank

19  account so that you would then buy tickets for them and

20  various things.  Do you remember that testimony?

21     *A.*   Yes.

22     *Q.*   Okay.  Do you remember whether or not you would

23  have sent any texts to any of those people back and forth

24  about those transactions?

25     *A.*   Let me see.

1    *Q.*    For example -- like, for example, did your

2  brother Anthony maybe perhaps send you a text about those

3  Coachella tickets?  Would you have texted back and forth

4  about that?

5    *A.*    No, because we live together, so not to text.

6    *Q.*    Okay.  Would you -- I know we talked a little

7  bit about your cousin Paul and then your friend Noemy

8  loaning you some money to pay the TASC fees.  Do you

9  remember that testimony?

10    *A.*    Yes.

11    *Q.*    Would you have sent any texts or any e-mails to

12  either Paul or Noemy about those loans?

13    *A.*    I think my cousin.

14    *Q.*    Okay.  You think you might have texted Paul

15  about those loans?

16    *A.*    Yes.

17    *Q.*    Okay.  Do you think you would have texted -- I

18  am not pronouncing her name right -- Noemy about those

19  loans?

20    *A.*    Only by telling her to pay -- when I was going

21  to give her some -- part of the loan, like, pay her back.

22    *Q.*    Oh, okay.  You would have done that by text?

23    *A.*    Yes.

24    *Q.*    Do you remember whether or not you would have

25  had any texts with your daughter about using her debit

 1    *A.*    For my daughter -- well, for both of my kids but
 2   mostly for her.
 3    *Q.*    Why did they need a computer?
 4    *A.*    For school.  A lot of printing.  A lot of all
 5   that stuff.
 6    *Q.*    Why did you purchase a television?
 7    *A.*    Well, because they -- we didn't have a TV.
 8   There was only one TV in that house and there was always,
 9   like, 20 people in that house so we wanted to see our own
10   shows so I got, you know, entertainment.  In Buckeye there
11   is nothing to do, so -- yeah.
12    *Q.*    And you testified you discontinued your auto
13   debit account for those; is that right?
14    *A.*    Yes.
15    *Q.*    Why did you discontinue that?
16    *A.*    So they wouldn't get the money from the bank,
17   just in case I didn't, like, have that money to pay those
18   things.
19    *Q.*    Is that after you started -- you stopped
20   working?
21    *A.*    Yes.
22    *Q.*    I just want to ask you a few questions about the
23   baby-sitting you did for your mom.  Did you baby-sit every
24   week?
25    *A.*    Not every week, only because -- there was times

 1  that I felt like I was going to pass out so those -- those

 2  times were not good for me so I did not.

 3       Q.   And even when you did baby-sit during the week,

 4  did you baby-sit every day that week?

 5       A.   No.

 6       Q.   And so you said you could get $100 a week for

 7  baby-sitting.  Did you always get $100 a week?

 8       A.   Not always.  No, not all the time, because there

 9  was, like, some days were, like, three days, four days, or

10  less, she didn't give me a hundred.  And not all the time

11  she gave me cash.  She also, like, you know, like, well, I

12  helped you with this, now, like, you know, just leave it

13  as that with that.

14       Q.   So just to make that clear, sometimes the money

15  you would get for baby-sitting your mom didn't put that

16  directly into your hand; is that right?

17       A.   Correct.

18       Q.   What did she do instead?

19       A.   Just keep it and say that's for whatever she had

20  helped me or whatever I needed to help in the house.

21       Q.   Do you mean bills?

22       A.   Yes.

23       Q.   Money you owed her?

24       A.   Yes.

25       Q.   Okay.  And then, of course, when you didn't

1  baby-sit, did you get any money during those weeks from
2  that when you couldn't baby-sit?
3      A.    Only sometimes.  Sometimes.  Not all the time.
4      Q.    Is that only when you could do it?
5      A.    Yes.
6      Q.    Okay.  And you said you could get up to 400 a
7  month.  Did you actually get that much every month?
8      A.    No, not -- not -- no, not -- I didn't really get
9  it.  It was mostly -- because I hardly did the whole week,
10 and like I said, she didn't give me, like, the money in my
11 hand, like, no, she didn't do that.  It was just towards
12 whatever I owed her or whatever -- you know, to help out,
13 I don't want to live there for free, you know.
14     Q.    Okay.  And this -- so during the time you were
15 on TASC, did you have consistent income from baby-sitting?
16     A.    No.
17     Q.    Okay.  And all the things we just talked about,
18 were those true during the time you were on TASC as well?
19     A.    Yes.
20     Q.    Okay.  You mentioned you deposited money into
21 your daughter's account once, used it to pay for TASC; is
22 that right?
23     A.    Yes.
24     Q.    Did you do that one time or other times as well?
25     A.    Just one time.

1  with your lawyers?

2      A.   Reading it.

3      Q.   And is that it takes more time to read it --

4      A.   Yes.  For me, yes.

5      Q.   -- than to have us explain it?  Okay.

6              And do you remember it better when you talk

7  about it or when you read it?

8      A.   Talk about it.

9      Q.   And why is that?

10     A.   I don't know.  That is the way my head works,

11 but I feel, like, that's the -- I remember more what you

12 are telling me than when I am reading.

13     Q.   I think a lot of people are in the same boat

14 with you.

15             When was the first time your doctor told

16 you to stop working?  Do you remember?

17     A.   It was September of 2018.

18     Q.   Did you stop right after he told you to stop?

19     A.   No.

20     Q.   Why not?

21     A.   Because -- well, I asked him:  Are you going to

22 support me?

23             If he is telling me to stop working, I

24 mean, he is, like -- and he said:  Oh, don't worry, you

25 know.  I will help you with disability.

1          So -- but I didn't believe it so I just
2     kept going.
3          Q.    And when you did stop working, why did you stop?
4          A.    Because he said I was going to get worse.
5          Q.    Did you experience that?
6          A.    Yes, with my back.
7          Q.    What happened?
8          A.    Well, it was most -- during the holidays coming
9     and it was very busy.  Dollar Tree gets crazy in the
10    holidays, and I was -- I got this box from the back to be
11    the super -- super employee, but that messed up my back
12    even more so from there I am, like, okay, I guess I should
13    stop.
14         Q.    Do you mind describing just kind of what the
15    physical experience you had at that time was when your
16    back was sore?
17         A.    My -- it was -- well, it was painful in the
18    lower back, and it hurt all the way to my legs.
19         Q.    Do you mind just kind of describing a little bit
20    about what it is about your conditions that makes it hard
21    for you to work?
22         A.    It hurts when I stand for a long period of time.
23    When I walk, I can walk an hour and then it starts
24    hurting.  And then if I take medication, it gets me sleepy
25    so that is not really going to work.  Like, sitting down

1   it hurts too, like, now it is killing me too, so, yeah, it

2   is kind of hard.

3       Q.   And is that your pain medication that you are

4   referring to that makes you sleepy?

5       A.   Yes, yes.

6       Q.   One second.  When you applied for disability,

7   did you know how long it would take for you to get

8   disability?

9       A.   They had told me it can take two years.

10      Q.   And so you were anticipating maybe not being

11  able to work for two years; is that right?

12      A.   Yes.

13      Q.   Is that what you were planning for?

14      A.   What -- what was that?

15      Q.   Were you -- did you plan -- were you planning

16  for that possibility?

17      A.   For the disability?

18      Q.   Well, I just mean when they told you it could

19  take up to two years, was that something you kept in mind

20  when you were deciding --

21      A.   Yes.

22      Q.   And you mentioned you recently applied to work

23  at Aldi's.  Did your doctor tell you that you are well

24  enough to work?

25      A.   No.

1    Q.    Did your doctor tell you you are not okay to
2    work?
3    A.    Yes.
4    Q.    What -- what did your doctor say?
5    A.    Well, he -- he doesn't know about me applying at
6    the place, but he is, like:  You are still not working,
7    right?
8              I mean, I wanted to work just because I
9    feel like I am going crazy in the house, but, I mean, it
10   is kind of hard for me.
11   Q.    Okay.  So you applied for the job even though
12   medically your doctor doesn't think you are okay to work?
13   A.    Yes.
14   Q.    Can you explain why I did that if there is
15   anything else you would add?
16   A.    Just because they are taking forever with the
17   disability.
18   Q.    Okay.  And when was that exactly that you
19   applied for that job?
20   A.    It was before November because the store was not
21   open yet, and they opened it on November 3rd, but I am not
22   sure what month.  It was this year.
23   Q.    This year.  And when you said you looked for
24   jobs on Indeed, when was that, around the same time?
25   A.    Yes.

1      Q.   Is that November of this year, around?

2      A.   Months back, like, starting of this year.

3      Q.   Okay.  And I am almost done.

4           We talked about some clothes that you

5 bought.  Were those clothes just for you?

6      A.   No, they were for my kids.

7      Q.   Did you buy a lot of clothes for yourself or any

8 clothes for yourself while you were on TASC?

9      A.   Only the important things, like, underwear,

10 under stuff, but not no fancy -- not no nothing like that.

11 First it is them, and then I will be last.

12     Q.   You mentioned you sometimes buy snacks or

13 something to drink at --

14     A.   You froze.

15          "QUESTION:  You mentioned you sometimes buy

16 snacks or something to drink at --"

17          (Record read.)

18 BY MS. CHAMBLEE-RYAN:

19     Q.   -- at Circle K.  Why did you do that?

20     A.   Yes.

21     Q.   My question was just why do you sometimes do

22 that?

23     A.   Well, it is not really for me.  I can hardly

24 have candy so -- because I am diabetic, but I mean to

25 treat my kids.

1      Q.   Okay.  And why did you decide to become a

2   plaintiff and represent the class in this case?

3      A.   Why?  Just, I mean, I am not sure why.  I did

4   this -- just because I -- I -- I knew what they -- well,

5   not knew, but, like, what I went through, I figured, oh,

6   well, I feel they are -- how do you say -- pain, what they

7   had gone through, too, like, if they were in the same

8   situation.

9              MS. CHAMBLEE-RYAN:  All right.  I think

10   that is it.  I don't have anymore questions.

11              MS. CATERO:  I just have a couple to

12   clarify some of your redirect.

13

14                       EXAMINATION

15   BY MS. CATERO:

16      Q.   At the start there when Katie was asking you

17   some questions, you guys were talking about when you

18   deleted some of the communications with Ms. Garcia.  Do

19   you remember that?

20      A.   Yes.

21      Q.   Yeah.  And you two were referring -- you and

22   Katie -- to text messages, but those communications were

23   e-mails, correct?

24      A.   The ones that I deleted was through text.

25      Q.   With Ms. Garcia?

1    A.   Yes.

2    Q.   Okay.  I thought you had said earlier that you

3  -- you only texted -- you didn't text Ms. Garcia, that you

4  only e-mailed her.

5    A.   Yeah, I texted her once, the one that I deleted.

6  Yeah.

7    Q.   Okay.  So there was one text to Ms. Garcia that

8  you deleted, and then we walked through and that one

9  document I showed you a couple of e-mail exchanges that

10 you had with Ms. Garcia in July.  Do you remember that

11 document?

12   A.   Yes.

13   Q.   And did you delete those e-mail exchanges as

14 well?

15   A.   No, I think I still have those.

16   Q.   Okay.  So I just wanted to clarify that when you

17 and your attorney were talking here just a moment ago

18 about the timing of you deleting some communications, you

19 were not referring to the e-mails with Ms. Garcia, you

20 were only referring to the one text?

21   A.   Yes.

22   Q.   Okay.  Great.  And then your lawyer asked you a

23 couple of questions about the baby-sitting income and that

24 it did vary depending upon how many days you actually

25 helped your mom with the baby-sitting.  Do you remember

1    that testimony?

2        *A.*    Yes.

3        *Q.*    During the time frame you were on TASC, do you

4    remember what was the most in a month that you made

5    baby-sitting?

6        *A.*    The most?  I am not sure.  Like, 250.

7        *Q.*    And then during the time that you were enrolled

8    in TASC, do you remember what was the least that you made

9    in a particular month baby-sitting?

10       *A.*    Like, a hundred.

11       *Q.*    Okay.  And then you also talked with your lawyer

12   a moment ago about how you like to talk about your answers

13   to the -- to the discovery requests in this case as

14   opposed to reading them.  Do you remember that testimony?

15       *A.*    Yes.

16       *Q.*    Do you know whether or not -- and you don't have

17   to tell me about the substance of those answers, but would

18   your lawyers read to you the text of the answer to the

19   question in order to get your approval?

20       *A.*    Well, I am not sure they read it, but they -- it

21   is always through the phone, so whatever they told me.  I

22   don't know if they were reading it.

23       *Q.*    Okay.  So you just don't know one way or the

24   other if in talking about those answers with your lawyers

25   if they read to you what the proposed answer was going to

 1  be?

 2      A.   Yes.

 3      Q.   Okay.  When your doctor told you to stop working

 4  at the end of 2018, you said a moment ago that he told you

 5  to stop working or your condition would get worse.  Do you

 6  remember that testimony?

 7      A.   Yes.

 8      Q.   What condition was it that your doctor said

 9  would get worse if you didn't stop working?

10      A.   My wrist and my back and then the tingling --

11  what I feel in my legs.

12      Q.   Okay.  Did he tell you that you had to stop

13  working at the Dollar Tree job because you were standing

14  or did he tell you that you couldn't work any job?

15      A.   He said any job.

16      Q.   Okay.  And was it Dr. Kahlon that said that?

17      A.   Yes.

18              MS. CATERO:  Okay.  And that's all I have.

19              MS. CHAMBLEE-RYAN:  Great.

20              MS. CATERO:  You guys want read and sign?

21              MS. CHAMBLEE-RYAN:  We made it.

22              Yes.  So when we get the transcript, I

23  think we have 30 days, right?

24              MS. CATERO:  I think that's true, right,

25  Carrie?

1                          CERTIFICATE

2          I HEREBY CERTIFY that the foregoing deposition
   was taken by me pursuant to notice; that I was then and
3  there a Certified Court Reporter for the State of Arizona,
   and by virtue thereof authorized to administer an oath;
4  that the witness before testifying was duly sworn by me to
   testify to the whole truth and nothing but the truth;
5  pursuant to request, notification was provided that the
   deposition is available for review and signature; that the
6  questions propounded by counsel and the answers of the
   witness thereto were taken down by me in shorthand and
7  thereafter transcribed through computer-aided
   transcription under my direction, and that the foregoing
8  typewritten pages contain a full, true, and accurate
   transcript of all proceedings had upon the taking of said
9  deposition, all done to the best of my skill and ability.
          I FURTHER CERTIFY that I am in no way related to
10 nor employed by any of the parties hereto, nor am I in any
   way interested in the outcome hereof.
11         I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA Sections
12 (J)(1)(g)(1) and (2).
          DATED at Phoenix, Arizona, this 1st day of
13 December, 2020.

14                          _____
                           CARRIE A. CARIATI
15                         Registered Professional Reporter
                           Certified Realtime Reporter
16                         Certified LiveNote Reporter
                           Certificate No. 50355
17

18         I CERTIFY that this Registered Reporting Firm
   has complied with the ethical obligations set forth in
19 ACJA Sections (J)(1)(g)(1) and (2).

20
          DATED at Phoenix, Arizona, this 1st day of
21 December, 2020.

22
                           _____
23                         Registered Reporting Firm R1064
                           CARRIE A. CARIATI, Owner
24

25

# Ex. 40

[This exhibit is being filed under seal.]

# EXHIBIT 41

<u>Declaration of Dr. Maninder Kahlon</u>

1. My name is Dr. Maninder Kahlon. I am a neurologist based at AZ Integrated Neuro Spine & Pain in Phoenix, Arizona.

2. I have been a licensed physician in Arizona since 1995. I am a member of the American Medical Association, the American Academy of Neurology, and the American Association of Electrodiagnostic Medicine.

3. Lucia Soria was my patient.

4. Her first appointment with me was on October 1, 2018.

5. Ms. Soria also had appointments with me on October 30, 2018 and November 13, 2018.

6. I do not recall what specific advice I gave Ms. Soria at those appointments.

7. However, based on the conditions I diagnosed during those appointments, I believed Ms. Soria was unable to work and her conditions were likely to worsen if she continued to work. Any advice that I gave her to that effect was consistent with my findings.

8. My opinion on this matter has never changed. I continue to believe that Ms. Soria is unable to work because of her conditions and that working will worsen those conditions.

04/26/2021
Date

Maninder Kahlon, MD

1

# Ex. 42

[This exhibit is being filed under seal.]

# Ex. 43

[This exhibit is being filed under seal.]