Sumayya Saleh (pro hac vice)
Ryan Downer (pro hac vice)
Bina Ahmad (pro hac vice)
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
(202) 656-5189
sumayya@civilrightscorps.org

Timothy J. Eckstein, 018321
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona  85012-2793
(602) 640-9000
teckstein@omlaw.com

Stanley Young (pro hac vice)
COVINGTON & BURLING LLP
5 Palo Alto Square
Palo Alto, California 94306
(650) 632-4704
syoung@cov.com

Olivia Dworkin (pro hac vice)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
odworkin@cov.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs, *et. al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>Treatment Assessment and Screening Center, Inc.,<br>                    Defendant. | No.  CV-18-2684-PHX-EJM<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT WITH INCORPORATED MEMORANDUM OF LAW** |

Plaintiffs Deshawn Briggs, Lucia Soria, and Antonio Pascale (acting for the Estate of Mark Pascale) (collectively, "Named Plaintiffs"), respectfully submit this Unopposed Motion for Preliminary Approval of a Class Action Settlement ("Unopposed Motion"). TASC has reviewed the instant motion as well as the ancillary settlement documents and does not oppose this motion. The parties have conferred and do not believe that a hearing is necessary for the Court to grant this Unopposed Motion, initiate the claims process, and set a final in-person Fairness Hearing.

## I.      Background of Litigation

TASC provided pretrial diversion services to county governments. Beginning in 1990, TASC contracted with the Maricopa County Attorney's Office (MCAO) to operate the Adult Deferred Prosecution Program (ADPP), to include the Marijuana Deferred Prosecution Program (MDPP) for people cited for marijuana possession. The MDPP is the subject of this lawsuit.

After a months-long investigation into the MDPP, Plaintiffs filed this case as a putative class action in August 2018. The essence of Plaintiffs' claims is this: Defendants imposed three requirements for successful completion of the MDPP: 90 days of "clean" urinalysis testing (i.e. not testing positive for drugs or alcohol), a drug education seminar, and the payment of about $1,000 in program fees. Plaintiffs contended that Defendants impermissibly subjected individuals who were unable to afford the program fees to longer terms of diversion supervision solely because of their poverty, in violation of Plaintiffs' rights as set forth in *Bearden v. Georgia*, 461 U.S. 660 (1983). They faulted Defendants' failure to inquire into and make findings regarding participants' ability to pay before extending their time on the program after the non-payment based requirements were complete ("pay-only" extensions). Plaintiffs also contended that invasive urinalysis tests during the pay-only period were unreasonable under the Fourth Amendment.

Defendants immediately moved to dismiss. Docs. 25, 29. On June 18, 2019, this Court denied both Defendants' motions in their entirety, and found that "Plaintiffs have sufficiently pled a prima facie case of wealth discrimination based on the [challenged]

policies." Doc. 89 at 21. The Court then ordered the parties to engage in pre-certification class discovery. Doc. 98 at 2 n. 1.

Approximately one year later, Plaintiffs and Defendant MCAO reached a settlement agreement as to Named Plaintiffs damages claims. Doc. 174. Plaintiffs' claims against MCAO were dismissed in November 2020. Doc. 199.

Plaintiffs and Defendant TASC continued through discovery. Over the course of discovery, the parties exchanged nearly 9,000 documents, including over 7,000 produced by Defendant TASC. This included the court-ordered production of 910 MDPP program participant files after protracted litigation of a motion to compel. *See* Docs. 139, 144, 148, 151, 182. Plaintiffs filed and prevailed on several other discovery motions. *See, e.g.*, Docs. 262, 284, 306. The parties engaged in deposition discovery as well. Defendants deposed Named Plaintiffs and two of Plaintiffs' expert witnesses, and Plaintiffs deposed seven former TASC employees and three TASC expert witnesses. Named Plaintiffs also responded to multiple rounds of interrogatories.

In January 2021, Plaintiffs and Defendant TASC engaged in a settlement conference but were unable to reach a resolution. Doc. 238. Shortly thereafter, in March 2021, Defendant TASC moved for summary judgment, Doc. 246, which Plaintiffs opposed, Docs. 277 & 278.[1] TASC moved to stay discovery during the pendency of the motion, Doc. 252, but the Court denied its request, Doc. 276.

After the close of class discovery, Plaintiffs moved for class certification (in October 2021). Doc. 347. They marshalled voluminous exhibits in support of their request, which included a comprehensive analysis of the participant program files. Doc. 347-5 (Ex. 8). Plaintiffs later filed three separate *Daubert* motions to exclude the opinions of experts proffered by Defendant TASC. Docs. 388-390.

In the meantime, this Court denied TASC's motion for summary judgment. Doc. 375. In so doing, it reaffirmed that the *Bearden* line of cases required that TASC "first

---

[1] Plaintiffs did concede, however, that their injunctive claims were moot and pressed only their claims for money damages. Doc. 277 at 19.

1   determine the reasons for non-payment and consider alternatives before extending a

2   participant in the MDPP solely because of alleged inability to pay TASC's fees." *Id.* at 5-

3   6.

4        Shortly thereafter, the parties began discussing settlement. *See* Doc. 384. They

5   hired a certified JAMS Mediator, Hon. Peggy Leen (Ret.), and engaged in a successful

6   mediation in June 2022. Doc. 405. At the time, they reached an agreement in principle as

7   to the amount of the total settlement fund. *Id.* at 2. Since that time, the parties have worked

8   collaboratively to iron out the precise terms of the agreement. Doc. 409.

9   **II.    The Terms of the Settlement**

10       In the interest of avoiding protracted and costly litigation, the parties have agreed

11  to a proposed Settlement Agreement requiring the payment of the total sum of two million

12  and six-hundred thousand dollars ($2,600,000.00), one million six-hundred thousand

13  dollars ($1,600,000) of which is to come directly from TASC, and one million

14  ($1,000,000) of which TASC will obtain from its insurer. A copy of the proposed

15  Settlement Agreement (with its exhibits) is attached as Exhibit 2. Subject to court

16  approval, the settlement fund will be allocated as follows:

17       • **Class Member Payments:** As a starting point, each Settlement Class

18         Member[2] will be entitled to receive one thousand dollars ($1,000) plus an

19         additional fifteen dollars ($15) for each day that the Settlement Class

20         Member remained on Pay-Only Extension. Depending on how many

21         Settlement Class Members submit valid claims, this amount may be

22         increased or decreased on a pro rata basis.

23       • **Service Payments to Named Plaintiffs:** $120,000 will be distributed

24         equally among Named Plaintiffs ($40,000 each) as payments for the service

25         they provided in representing the classes in this litigation.

26       • **Attorneys' Fee Award:** Class Counsel may petition, and TASC will not

27         oppose, an initial request for $250,000 in attorneys' fees. If funds remain in

28  _____
[2] Capitalized terms are defined in the proposed Settlement Agreement.

1    the Settlement Fund after the full administration of the claims process,

2    including eligible Settlement Class Members' Cash Awards, Class Counsel

3    may petition the Court for an attorneys' fee award in addition to the initial

4    Attorneys' Fee Award.[3]

5    • **Claims Administration:** Notice and Administration costs will be paid from

6    the Settlement Fund.[4]

7    **III.    Preliminary Settlement Approval Is Appropriate.**

8    In the Ninth Circuit, a "strong judicial policy . . . favors settlements, particularly

9    where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*,

10   955 F.2d 1268, 1276 (9th Cir. 1992). Where, as here, the parties resolve the litigation

11   through a class-wide settlement, they must obtain the Court's approval. *See* Fed. R. Civ.

12   P. 23(e). This "involves a two-step process in which the Court first determines whether a

13   proposed class action settlement deserves preliminary approval and then, after notice is

14   given to class members, whether final approval is warranted." *Natl. Rural Telecomm.*

15   *Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

16   In the first step, "[t]he judge should make a preliminary determination that the

17   proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections

18   of Rule 23(b)." Manual for Complex Litigation (Fourth) § 21.632 (2004). Additionally,

19   "[t]he judge must make a preliminary determination on the fairness, reasonableness, and

20   adequacy of the settlement terms and must direct the preparation of notice of the

21   certification, proposed settlement, and date of the final fairness hearing." *Id.* The

22   "universally applied standard" for approval of a class action settlement is whether "the

23   settlement is fundamentally fair, adequate, and reasonable." *Class Plaintiffs*, 955 F.2d at

24   1276 (citation omitted); *see also* Fed. R. Civ. P. 23(e).

25

26   ---

[3] TASC has agreed not to oppose any additional Attorneys' Fee Award provided that the total Attorneys' Fee Award does not exceed $650,000.

27   [4] Plaintiffs expect this claim administration cost to not exceed $75,000 based on the estimate that they have received from the Settlement Administrator. *See* Ex. 10,

28   Declaration of Christopher Longley at 6-9 (Atticus Estimate).

Rule 23(e) sets forth four factors for the Court to consider when determining the fairness of the settlement. Fed. R. Civ. P. 23(e)(2). The parties believe this is the operative standard for this Court to apply. Recognizing that "each circuit ha[d] developed its own vocabulary for expressing . . . concerns" over fairness, the Rule 23(e) factors were added in 2018 to create uniformity and to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee notes (2018 amendment). Despite this, many courts continue to apply the Ninth Circuit's "*Churchill* factors." *See, e.g.*, *Zwicky v. Diamond Resorts Mgt. Inc.*, 343 F.R.D. 101, 119 (D. Ariz. 2022) (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)); *Young v. County of Contra Costa*, 20-CV-06848-NC, 2021 WL 783583, at *4 (N.D. Cal. Feb. 28, 2021) (same). While these factors naturally overlap with those articulated in Rule 23, they are not an exact match. In an abundance of caution, Plaintiffs briefly explain how the proposed settlement also satisfies the *Churchill* factors.

### A. The Rule 23(e) Factors Are Met.

Rule 23(e) preconditions approval of the settlement on findings that: 1) "the class representatives and class counsel have adequately represented the class;" 2) "the proposal was negotiated at arm's length;" 3) "the relief provided for the class is adequate," considering "the costs, risks, and delay of trial and appeal;" "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3);" and 4) "the proposal treats class members equitably relative to each other."

As explained below, the proposed settlement falls well within the range of possible approval, such that the Court should allow Plaintiffs to disseminate notice apprising class members of their opportunity to participate in, opt out of, or object to the settlement.

### 1. The Class Has Been Vigorously Represented.

For more than four-and-a-half years, Named Plaintiffs and Class Counsel zealously represented the interests of the class. Before Plaintiffs undertook this class action, Class Counsel diligently investigated the claims, researched the applicable law, and crafted cutting-edge claims based on the premise that, under *Bearden*, wealth-based discrimination is prohibited in pretrial diversion programs. During the litigation, Plaintiffs engaged in substantial motion practice—they defeated two motions to dismiss, TASC's motion for summary judgment, prevailed on several motions to compel discovery, and moved for class certification and to exclude TASC's expert witnesses. In fact, the parties renewed settlement discussions only after this Court's summary judgment ruling.

This motion practice was supported by vigorous fact and expert discovery over approximately 18 months. Plaintiffs fought for and received a random sample of participant program files and then spent months conducting a comprehensive review of those files, which undergirded their motion for class certification. Plaintiffs took 10 depositions and defended five others (of these depositions, five were of expert witnesses). They reviewed thousands of documents in discovery and produced hundreds of others. To prepare their case for trial, they worked closely with two experts, including a renowned ability-to-pay expert who adapted her methodology for this case. Taken together, these efforts demonstrate that the settlement is the product of well-informed and vigorous advocacy on behalf of the class.

**2.  The Settlement Agreement Was Negotiated At Arm's Length.**

The settlement was reached after serious, informed, arm's-length negotiations. After nearly three years of significant motion practice and discovery efforts, the parties hired JAMS mediator Judge Peggy Leen (Ret.) for a private mediation session, with follow-up negotiations spanning several months. The involvement of a highly experienced mediator supports a finding that the settlement is "not the result of collusion or bad faith by the parties or counsel." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). Separately, the settlement itself bears none of the traditional signs of collusion, given the majority of the Settlement Fund is designed to go

to Class Members rather than Class Counsel. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-48 (9th Cir. 2011). Plaintiffs possessed a wealth of information before engaging in settlement negotiations. Based on this knowledge and their experience litigating and settling civil rights class actions, Class Counsel believe that the settlement is fair, reasonable, and adequate. *Knight v. Red Door Salons, Inc.*, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness.") (citation omitted).

### 3. The Relief Provided For the Class Members Adequately Compensates Them.

The proposed compensation for settlement class members is adequate given "the costs, risks, and delay of trial and appeal;" "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" and "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C). The relief the settlement will provide to class members is a "central concern." Fed. R. Civ. P. 23(e) advisory committee notes (2018 amendment). Another central concern is the cost and risk of continued litigation, as well as the range of possible recoveries. *Id.* Where a class has not yet been certified, the court may consider the likelihood of class certification if the settlement were not approved. *Id.*

*The Costs and Risks of Trial and Appeal.* While this Court twice affirmed the viability of Plaintiffs' claims, pressing forward to trial carries significant risk to the class: Over the course of the litigation, TASC lost its contract with MCAO and subsequently shut down its operations, with the exception of one staff member who has been retained solely to facilitate the provision of records related to the settlement. The further the litigation wears on, the more TASC's finite pool of financial resources will deplete (to cover the cost of operations, including costly records retention, and attorneys' fees). Defendant TASC has aggressively defended this case, including by moving for summary judgment and opposing class certification. Plaintiffs anticipate that if the case wore on, TASC would continue to do so—including by appealing an order certifying the class, a resource and time-intensive prospect. As such, even if Plaintiffs prevailed on appeal and

at trial, they run the risk of getting a judgment against an insolvent defendant. This settlement ensures that class members will recover a significant portion of the limited funds TASC had remaining at the time of the negotiations.

*The Settlement Administration Process.* The parties have agreed to a settlement administration process that maximizes the likelihood of recovery for class members. Notice will go to *all* individuals who participated in the MDPP during the limitations period. Those who believe they qualify for a cash award (because they were extended on the program past 90 days due to their inability to pay the program fees) will have to fill out a simple form under the penalty of perjury attesting to their inability to pay the program fees. Then, the settlement administrator will review each claimant's eligibility based on the information contained within the program files, in accordance with a protocol agreed upon by the parties. Specifically, the settlement administrator will verify that the claimant was in fact extended pay-only and confirm that there is no financial information contained within the program file that contradicts their asserted inability to pay. The parties designed this process to be minimally burdensome for a class of impoverished individuals with limited access to resources, while also rigorously vetting whether they were extended pay-only.[5]

*The Terms of the Proposed Award of Attorneys' Fees.* The parties negotiated the amount of reasonable attorneys' fees and expenses that Class Counsel could petition for only *after* they reached agreement in principle with respect to the total settlement amount. Class counsel refused to discuss their entitlement to fees until after they ensured they had maximized payment for class members. What's more, the amount class counsel seeks— $250,000 (less than 10% of the total settlement fund) to start—is a fraction of the millions

---

[5] The claim eligibility review process is detailed in Exhibit 4 to the Settlement Agreement. The Court recently entered a protective order for the purpose of settlement administration, which will enable Defendant TASC to provide Plaintiffs with un-redacted participant files. Doc. 413 at 1-2. The parties have agreed that they may mutually agree to modify the instructions in Exhibit 4 based on information Plaintiffs learn from the un-redacted files.

of dollars of fees and costs they incurred in vigorously litigating this case. Class counsel has agreed to seek additional fees only if money remains in the settlement fund after class members have received their cash awards.

### 4.   The Proposal Treats Class Members Equitably Relative To Each Other.

The fourth factor requires the Court to determine whether the settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(D), advisory committee notes (2018 amendment); *see also* 4 William B. Rubenstein, Newberg on Class Actions § 13:56 (5th ed. 2020) ("Put simply, the court's goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated.").

*Equity between class members with different claims.* Plaintiffs structured the cash award model based on their estimate that there are approximately 1,200 class members, Doc. 347 at 3, of whom they conservatively estimate 1,000 would submit valid claims. If 1,000 eligible class members submit valid claims, Plaintiffs approximate that the cash awards will ultimately be distributed based on the baseline payment model with little to no upward or downward modification.[6] Each class member's payment will be proportional to the length of their pay-only extension, which also correlates with the number of urinalysis tests they were subjected to during the pay-only period. Each will recover in excess of the roughly $1,000 they paid in program fees. This means that each

---

[6] Based off their review of the program files, Plaintiffs estimate that the average extension length was 72.5 days. This means the average class member would presumptively receive $2,087.50 ($1,000 base payment + (72.5 days x $15 = $1,087.50)). With 1,000 class members participating, this would amount to $2,087,500.00 of the $2,600,000 Settlement Fund.

1    class member will be adequately compensated individually and in relation to other class

2    members who spent more or less time on pay-only status. If the cash awards need to be

3    increased or decreased depending on the number of eligible class members who do submit

4    valid claims, the treatment will still be equitable, as the modifications will be made on a

5    pro rata basis.

6          *Equity between unnamed class members and class representatives.* The Settlement

7    Agreement allots a service payment for each Named Plaintiff to compensate them for the

8    work they did in this case (e.g., in conferring with counsel, producing documents, being

9    deposed). As explained below, such payments are permitted in the Ninth Circuit and

10   reasonable given the facts of this case. *See infra* at 12-13. Plaintiffs have "adequately

11   supported the basis for [these] payment[s] by demonstrating the work done on behalf of

12   the class," and the fact that the settlement agreement contemplates such a payment "does

13   not render the settlement inequitable." *Loreto v. Gen. Dynamics Info. Tech., Inc.*, 3:19-

14   CV-01366-GPC-MSB, 2022 WL 3013029, at *8 (S.D. Cal. Feb. 2, 2022).

15         **B.  The Ninth Circuit's *Churchill* Factors Are Also Met.**

16         The Ninth Circuit has historically considered eight factors to determine whether a

17   proposed class action settlement warrants approval: 1) "the strength of the plaintiffs'

18   case"; 2) "the risk, expense, complexity, and likely duration of further litigation"; 3) "the

19   risk of maintaining class action status throughout the trial"; 4) "the amount offered

20   in settlement"; 5) "the extent of discovery completed and the stage of the proceedings";

21   6) "the experience and views of counsel"; 7) "the presence of a governmental participant";

22   and 8) "the reaction of the class members to the proposed settlement." *Churchill*, 361

23   F.3d at 575 (citation omitted). "Not all of these factors will apply to every class action

24   settlement," and under some circumstances, one factor alone may be enough. *Natl. Rural*

25   *Telecomm. Coop.*, 221 F.R.D. at 525-26. "The relative degree of importance to be

26   attached to any particular factor will depend upon and be dictated by the nature of the

27   claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances

28

11

1   presented by each individual case." *Officers for Justice v. Civil Service Comm'n of the*
2   *City and County of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982).

3       As explained, settling the case mitigates the risk of continued litigation given
4   TASC's financial situation, and the amount offered in settlement will fairly compensate
5   class members (factors 2 and 4). The parties have completed extensive discovery, and
6   Plaintiffs have already defeated summary judgment and moved for class certification
7   (factor 5). The strength of Plaintiffs' case is evidenced by this Court's multiple rulings on
8   the merits in their favor (factor 1). Factors 3 and 7 do not apply here, and it is premature
9   to consider the eighth factor at the preliminary approval stage. Accordingly, even under
10  the *Churchill* factors, the proposed settlement is fair and reasonable.

11  ### IV.    The Attorneys' Fees Are Reasonable.

12      At present, Class Counsel seek to recover $250,000 in attorneys' fees and costs.[7]
13  In a common fund case like this one, the court has discretion to apply either the percentage
14  or lodestar method to evaluate the reasonableness of this request. *In re Hyundai & Kia*
15  *Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019). The fees must be reasonable. *In re*
16  *Optical Disk Drive Products Antitrust Litig.,* 959 F.3d 922, 929 (9th Cir. 2020). Under
17  either standard, $250,000 in attorneys' fees is reasonable.

18      A "reasonableness" standard governs both the percentage and lodestar methods. A
19  "reasonable" result using the percentage method is between 20%-30% of the total
20  settlement, with 25% being the "benchmark." *Vizcaino v. Microsoft Corp.,* 290 F.3d
21  1043, 1047 (9th Cir. 2002) (citations omitted). The Court should consider all the
22  circumstances of the case to arrive at a reasonable percentage. *Id.* at 1048. Here, Plaintiffs'
23  request constitutes less than 10% of the overall settlement fund. And the circumstances
24  of the case—including Plaintiffs' successful litigation results on dispositive and discovery

---

[7] If funds remain in the Settlement Fund after the full administration of the claims process, Class Counsel may move the Court for additional attorneys' fees. TASC agrees not to oppose any additional award provided that the total attorneys' fee award does not exceed $650,000.

motions alike—certainly entitle them to well over 10%. *See id.* (considering the exceptional results counsel achieved, among other factors).

As for the lodestar method, a "reasonable" multiplier when using the lodestar method is between 1.0 and 4.0. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002). Class Counsel estimate that they incurred approximately $5 million in time value over the course of litigation. Ex. 1, Declaration of Sumayya Saleh ¶ 49. Their proposed fee award is the equivalent of a .05 multiplier to the accrued fees, a significant downward departure from the lower reasonableness limit. Even if the Court were to significantly reduce the applicable rate, the request would be considered reasonable.

## V.      The Service Payments to Named Plaintiffs Are Fair and Reasonable.

In accordance with the Settlement Agreement, Named Plaintiffs will each get $40,000 to compensate them for the work they did representing the class over three years of litigation. The Ninth Circuit approves of such payments, noting that they are "fairly typical in class action cases . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action," as well as "to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (citations omitted).

Named Plaintiffs have earned the award they seek. They provided substantial support to Class Counsel throughout the course of litigation over more than three years. This includes providing a significant amount of documents, including detailed personal financial information; participating in the investigation and litigation, helping counsel identify potential witnesses and substitute class representatives when necessary; preparing for and sitting for lengthy depositions, which included invasive questions about their personal finances, life choices, and criminal history; and having numerous conversations with Class Counsel about their experiences and proposed relief. Saleh Decl. ¶¶ 16-26. They divulged intimate details of their impoverished financial situations, and went public with that information, to help prove their claims. Named Plaintiffs remained

1   committed to their roles in this case, even as they dealt with personal tragedy,

2   unemployment, and medical issues, and juggled immense familial responsibility. *Id.* ¶¶

3   27-47.

4       The total amount that will be awarded in Service Payments is $120,000. This

5   amounts to 4.6% of the total settlement, with each Named Plaintiffs' payment

6   representing 1.5% of the total settlement. This small percentage is reasonable in light of

7   the efforts Named Plaintiffs expended and the immense personal sacrifice they endured

8   to make possible the monetary compensation that will inure to the benefit of the entire

9   class. *See, e.g.*, *Loreto*, 2022 WL 3013029, at *8 (approving of a plaintiff's service

10  payment that accounted for about 2% of the net settlement amount); *see also Rodriguez*,

11  563 F.3d at 959 (indicating that the amount of work done, the risks undertaken, and the

12  time spent on the litigation are appropriate factors to consider).

13      Conversely, there are no markers of impropriety with respect to how the agreement

14  was reached: Class Counsel did not discuss the amount of the service payment with

15  Named Plaintiffs (or with Defendant TASC) until after they had reached an agreement as

16  to the size of the settlement fund. *Cf. id.* (disapproving of an incentive agreement where

17  plaintiffs' compensation was tied in advance to a sliding scale based on the amount

18  recovered); *Staton v. Boeing Co.,* 327 F.3d 938, 977 (9th Cir. 2003) (declining to approve

19  a settlement agreement where the awards request indicated that the class representatives

20  were "more concerned with maximizing [their own] incentives than with judging the

21  adequacy of the settlement as it applies to class members at large).

22      The service payments sought are also in line with similar awards given in other

23  cases. *See In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679, 694 (N.D. Ohio

24  2015) (approving $35,000 per named plaintiff where "the representative Plaintiffs

25  responded to document requests and were deposed"); *In re Skelaxin (Metaxalone)*

26  *Antitrust Litig.*, 2014 WL 2946459, at *4 (E.D. Tenn. June 30, 2014) (collecting cases

27  awarding $50,000 or more to each named plaintiff); *Boynton v. Headwaters, Inc.*, 2012

28  WL 12546853, at *3 (W.D. Tenn. Mar. 27, 2012) (approving $100,000 for each of two

named plaintiffs and $10,000 each for other named plaintiffs); *see also* Final Order And Judgment Granting Approval of Class Settlement at 4*, McNeil v. Giles Cnty.*, No. 18-00033 (M.D. Tenn. Feb. 1, 2022), Doc. 470 (finding that awards ranging from $5,000 to $25,000 per named plaintiff, depending on their length and depth of participation in the case, were fair and reasonable in suit against private probation companies); Order Granting Final Approval to Class Settlement at 10, *Rodriguez v. Providence Cmty. Corr., Inc.*, No. 15-01048 (M.D. Tenn. July 5, 2018), Doc. 228 (approving $10,000 per named plaintiff in suit against private probation companies as "just compensation for the time and effort spent on bringing this action to a successful conclusion" where the case was stayed just seven months after filing and settlement occurred before discovery opened).

## VI.    The Proposed Class Should Be Certified For Settlement Purposes.

Before preliminarily approving the settlement, the Court must certify the class for settlement purposes. Plaintiffs have previously briefed in great detail why this case is suitable for certification. Docs. 347, 387. They will not rehash those arguments in detail, but the parties agree on the following basic premises that support certification under Rule 23(b)(1) & (3).

### A. This Case Meets The Requirements of Rule 23(a).

### 1. Numerosity

Rule 23 requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, demonstrating that a putative class contains "40 or more members will satisfy" numerosity. *Ely v. Saul*, No. CV-18-0557-TUC-BGM, 2020 WL 2744138, at *13 (D. Ariz. May 27, 2020) (internal citations omitted). There is no need, however, "to establish the precise number of class members, as long as common sense and reasonable inferences from the available facts show that the numerosity requirement is met." *Id.* (internal citations omitted).

About 6,000 individuals participated in the MDPP program during the limitations period. Based on Plaintiffs' analysis of a random sample of program files, they estimate that about 20% (or roughly 1,100 people) were extended pay only. Doc. 347 at 20-21.

1    And by TASC's estimates, about 14% of MDPP participants (approximately 850

2    individuals) fell below the Federal Poverty Guidelines, Doc. 143 at 11, which is a less

3    permissive standard than the Self-Sufficiency Standard the parties have agreed to apply

4    to determine inability to pay. The class is sufficiently numerous.

5        **2. Commonality**

6        The second prerequisite for class certification is that "there are questions of law or

7    fact common to the class." Fed. R. Civ. P. 23(a)(2). This means that Plaintiffs' claims

8    "'must depend upon a common contention'" such that "'determination of [their] truth or

9    falsity will resolve an issue that is central to the validity of each one of the claims in one

10   stroke.'" *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Wal-Mart Stores,*

11   *Inc. v Dukes*, 564 U.S. 338, 350 (2011)). Most fundamentally, class members must "have

12   suffered the same injury." Order, Doc. 173 at 11 (quoting *Wal-Mart*, 564 U.S. at 349-50).

13   "However, the circumstances of class members need not be identical." Order, Doc. 173

14   at 11. "[W]here the circumstances of each particular class member vary but class

15   members retain a common core of factual or legal issues with the rest of the class,

16   commonality exists." *Parsons*, 754 F.3d at 675 (internal citations omitted).

17       *Bearden Claim*. Plaintiffs' Fourteenth Amendment claims turn on *Bearden v.*

18   *Georgia*'s hybrid Equal Protection and Due Process analysis. 461 U.S. 660 (1983). Under

19   the *Bearden* line of cases, a state actor cannot impose liberty-restricting punishment for

20   nonpayment without first "inquir[ing] into the reasons for the failure to pay." *Id.* at 672.

21   If this inquiry reveals that the person "could not pay despite sufficient bona fide efforts"

22   to do so, the government may impose the penalty "[o]nly if alternative measures are not

23   adequate to meet the State's interests." *Id.*; *accord* Order, Doc. 89, at 17-18. Plaintiffs

24   allege that TASC imposed "pay-only" extensions without satisfying *Bearden's*

25   requirements and that this violated their constitutional rights.

26       This claim gives rise to core common questions of fact and law: Under *Bearden*,

27   was TASC required to inquire into and make findings regarding the willfulness of

28   nonpayment before extending participants pay-only? Did TASC systematically extend

16

participants' time on diversion solely due to nonpayment of fees without assessing whether their nonpayment was willful? Were these participants unable to pay the program fees? Did this practice violate participant's rights under *Bearden*? Did class members suffer harm because of TASC's practices? Any of these questions would be sufficient to establish commonality. *See Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 544 (9th Cir. 2013) ("So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement." (quoting *Wal–Mart,* 564 U.S. at 359)).

*Fourth Amendment Claim*. In their Fourth Amendment claim, Plaintiffs contend that suspicionless urinalysis testing during the pay-only period constituted an unreasonable search. This gives rise to additional common questions: Did TASC maintain a practice of randomized urinalysis testing for pay-only program participants? Does mandatory urinalysis testing during the pay-only period violate the Fourth Amendment? Did "the government's interest . . . outweigh the Plaintiffs' privacy interests," did "the special needs exception appl[y]," and did "Plaintiffs' consent to the urine screens as part of the MDPP's terms ma[k]e the searches permissible"? Order, Doc. 89, at 26. These too are common legal questions "best addressed with respect to the entire class." *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 392 (D. Ariz. 2013), *amended in part sub nom. Estrada v. Bashas' Inc.*, No. CV-02-00591-PHX-RCB, 2014 WL 1319189 (D. Ariz. Apr. 1, 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 (N.D. Cal. 2012)).

### 3.  Typicality

Under Rule 23(a)(3), the claims or defenses of the representative parties must be "typical" of those of the class. "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *6 (D. Ariz. Dec 6, 2017) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011)). Accordingly, "just as the existence of a common pattern or practice

affecting all class members serves to establish commonality, it may also demonstrate typicality." Order, Doc. 173, at 13 (citing cases).

There is here, at minimum, substantial similarity between Named Plaintiffs' injuries and those suffered by putative class members. Like the unnamed plaintiffs, TASC automatically extended Named Plaintiffs on the MDPP solely because of their failure to pay on time. TASC did not inquire into their ability to pay before extending them. And Named Plaintiffs suffered harm as a result: they remained under supervision longer than necessary and each endured and paid for suspicionless urine testing during the pay-only period. In sum, the same unlawful practices affected Named Plaintiffs and injured them in the same way as the putative class members. *See* Doc. 347 at 27-28.

### 4. Adequacy of Representation

To satisfy Rule 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class." Generally, this requires an inquiry into whether there are "any conflicts of interest between the named plaintiffs and unnamed class members" and whether "the representative parties [will] pursue the action vigorously on the behalf of all class members." Order, Doc. 173 at 12 (citing cases). As this Court has recognized, "[c]ourts' analyses of typicality, commonality, and adequacy often merge, as these factors combine to establish 'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* at 12-13 (quoting *Wal-Mart*, 564 U.S. at 349 n.5).

As Plaintiffs have already explained, *see supra* at 6-7 & 13-15, Named Plaintiffs and Class Counsel have vigorously represented the class. They clear Rule 23's adequacy bar.

### B. This Case Meets The Requirements of Rule 23(b)(3).

Under Rule 23(b)(3), Plaintiffs must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**1. Predominance.**

Before a class is certified under Rule 23(b)(3), a district court must find that common questions—those "susceptible to generalized, classwide proof"—predominate over individual questions, which require "evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453. As described above, Plaintiffs allege injuries from a common set of policies and practices that are applicable to the class as a whole. These common issues ensure predominance of common questions over individual issues. The common questions of law and fact listed above are dispositive questions in the case of every member of the Class and can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method to determine the content and legality of Defendants' policies and practices than individual suits by hundreds or thousands of people. The question of damages is suitable for class-wide determination because it will be driven by common considerations, such as Defendant TASC's policies and practices. Under the terms of the settlement, class members will receive a lump sum payment that is proportional to the length of their pay-only extension and that will likely compensate them at minimum for the amount of money they spent on program fees.

**2. Superiority.**

The Court's final consideration in applying Rule 23(b)(3) is whether a class action is the superior method for adjudicating the case. Fed. R. Civ. P. 23(b)(3) lists the factors pertinent to the superiority determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

The first factor supports certification where, as here, the "monetary damages that each [c]lass [m]ember suffered individually are relatively modest," *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 444 (E.D. Cal. 2013), and litigation costs would "dwarf" potential recovery, *Gonzalez-Tzita v. City of Los Angeles*, No. CV 16-0194 FMO

(EX), 2019 WL 7790440, at *8 (C.D. Cal. Dec. 9, 2019); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) (noting that the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action" and that "a class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."). The class action mechanism is meant to afford remedies to claimants who cannot otherwise prosecute their claims in a cost-effective manner. *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 338 n.9 (1980). The claims at issue here are such that class relief is the only realistic option for the vast majority of class members.

The second and third factors favor certification as well. There is no indication that any class member is involved in any other litigation concerning these claims. And Arizona residents brought this suit against an Arizona-based organization about a diversion program based in Arizona. This forum is obviously appropriate.

The fourth factor is met as well. "In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims. Thus, class certification is also the superior method of adjudication." *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013). Nor is manageability a concern here. The Supreme Court confirmed in *Amchem* that the manageability of a class action at trial is an irrelevant consideration in the context of a proposed settlement class, because the proposal is that there be no trial. *Amchem*, 521 U.S. at 620. Therefore, the Court need not consider manageability *at trial* as part of its settlement approval calculus. The settlement class, as described above, will be easily manageable, in accordance with the protocol the parties have agreed to. This factor supports certifying the settlement.

**VII.   The Proposed Notice to Class Members is Sufficient.**

1    Under Rule 23(e), the Court must direct notice in a reasonable manner to all class

2   members who would be bound by the proposal. Fed. R. Civ. P. 23(e)(1); *see also Eisen*

3   *v. Carlisle & Jacquelin*, 417 U.S. 156, 157 (1974) ("Individual notice must be sent to all

4   class members whose names and addresses may be ascertained through reasonable

5   effort."). "The Court has 'broad power and discretion vested in it by [Rule 23]' to

6   determine the contours of appropriate class notice." *Ang v. Bimbo Bakeries USA, Inc.*, 13-

7   CV-01196-HSG, 2020 WL 5798152, at *5 (N.D. Cal. Sept. 29, 2020) (quoting *Reiter v.*

8   *Sonotone Corp.*, 442 U.S. 330, 345 (1979)); 7B Fed. Prac. & Proc. Civ. § 1797.6 (3d ed.).

9   "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient

10   detail to alert those with adverse viewpoints to investigate and to come forward and be

11   heard.'" *Churchill,* 361 F.3d at 575 (citation omitted).

12    The notice must "concisely and clearly state in plain, easily understood language:

13   the nature of the action, the definition of the class certified, the class claims, issues or

14   defenses, that a class member may enter an appearance through counsel if the class

15   member so desires, that the court will exclude from the class any member who requests

16   exclusion, the time and manner for requesting exclusion, and the binding effect of a class

17   judgment on class members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). It need not

18   "set forth every ground on which class members might object." *Rodriguez*, 563 F.3d at

19   962 n.7 (quoting  *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of*

20   *Am. v. Gen. Motors Corp.,* 497 F.3d 615, 630 (6th Cir. 2007)). It must only "fairly apprise

21   the prospective members of the class of the terms of the proposed settlement" so they can

22   decide whether the settlement serves their interests. *UAW*, 497 F.3d at 630. It is not

23   necessary for all of the details of the settlement to be included, "as long as sufficient

24   contact information is provided to allow the class members to obtain more detailed

25   information." 7B Fed. Prac. & Proc. Civ. §1797.6 (3d ed.).

26    Plaintiffs and Defendant TASC have jointly crafted a notice that complies with

27   Rule 23(c)(2)(B) and provides clear information to putative class members in plain

28   language. *See* Ex. 4-5 (Short- & Long-Form Notice). Postcard notice will be mailed to

1    the last known address of every individual who participated on the MDPP program during

2    the limitations period. Longley Decl. ¶¶ 8-9. It will also be posted on social media and in

3    local newspapers. *Id.* ¶ 10. This variety will reasonably ensure that each putative class

4    member receives notice.

5    **VIII.  Conclusion**

6            For these reasons, Plaintiffs respectfully request that the Court (1) grant

7    preliminary approval of the proposed class action settlement; (2) preliminarily certify the

8    proposed settlement class; (3) authorize the publication of class notice; and (4) schedule a

9    final approval hearing as soon as practicable. *See* Proposed Preliminary Approval Order.

10

11

12           DATED this 6th day of April, 2023.

13                                             s/ *Sumayya Saleh*
                                               Ryan Downer
14                                             Bina Ahmad
                                               Sumayya Saleh
15                                             CIVIL RIGHTS CORPS
                                               1601 Connecticut Ave. NW, Suite 800
16                                             Washington, D.C. 20009

17                                             Timothy J. Eckstein
18                                             OSBORN MALEDON
                                               2929 N. Central Ave., Suite 2100
19                                             Phoenix, Arizona  85012-2793

20                                             Stanley Young
                                               COVINGTON & BURLING LLP
21                                             5 Palo Alto Sq.
                                               Palo Alto, CA 94306

22                                             Olivia Dworkin
23                                             COVINGTON & BURLING LLP
                                               1999 Avenue of the Stars
24                                             Los Angeles, CA 90067

25                                             *Attorneys for Plaintiffs*

26

27

28