# EXHIBIT 1

Sumayya Saleh (*Pro Hac Vice*)
Ryan Downer (*Pro Hac Vice*)
Bina Ahmad (*Pro Hac Vice*)
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
(202) 656-5189
sumayya@civilrightscorps.org

Stanley Young (*Pro Hac Vice*)
Olivia Dworkin (*Pro Hac Vice*)
COVINGTON & BURLING LLP
5 Palo Alto Square
Palo Alto, California 94306
(650) 632-4704
syoung@cov.com

Timothy J. Eckstein, 018321
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona  85012-2793
(602) 640-9000
jbendor@omlaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs, *et al.*,<br><br>                         *Plaintiffs*,<br><br>v.<br><br>Treatment Assessment and Screening Center, Inc.<br>                         *Defendants*. | No.  CV-18-2684-PHX-EJM<br><br>**DECLARATION OF SUMAYYA SALEH** |

I, Sumayya Saleh, hereby declare as follows:

1.      I am an attorney at Civil Rights Corps, and I am counsel of record for Plaintiffs and the putative class in the above-referenced action.

2.      I have personal knowledge of the facts stated in this declaration.

3.     This declaration is submitted to set forth: 1) the history of this litigation; 2) the significant work that Named Plaintiffs Deshawn Briggs, Lucia Soria, and Mark Pascale (now through his son, Antonio Pascale, on behalf of his estate)—invested in this Litigation and in representing the interests of absent class members; and 3) the reasonableness of the requested Attorneys' Fees Award in light of the time and effort expended by Plaintiffs' counsel.

**I.     Litigation History**

4.     Plaintiffs' counsel conducted a detailed investigation before they filed this lawsuit. This involved interviewing individuals who had participated in the Possession of Marijuana Deferred Prosecution Program (POM or MDPP) in Maricopa County and speaking with public defenders who had represented individuals who participated in the diversion program.

5.     On August 23, 2018, Named Plaintiffs Deshawn Briggs and Mark Pascale, along with former Named Plaintiff Taja Collier, filed a putative class action complaint against the Maricopa County Attorney's Office (MCAO) and Treatment Assessment and Screening Center, Inc. (TASC) in the United States District Court for the District of Arizona, challenging wealth-based discrimination and illegal searches in the MDPP. Doc. 1. On October 13, 2018, Named Plaintiffs filed their First Amended Complaint, adding former Named Plaintiff McKenna Stephens. Doc. 20. On September 23, 2019, Plaintiffs filed their Second Amended Complaint, adding Named Plaintiff Lucia Soria. Doc. 110. Mark Pascale passed away during the pendency of the Litigation. His son Antonio Pascale, in his capacity as personal representative of the Estate of Mark Pascale, substituted him as Named Plaintiff. Doc. 171. Former Named Plaintiffs McKenna Stephens and Taja Collier were dismissed with prejudice from the Litigation on February 7, 2020. Doc. 138.

6.     The essence of Plaintiffs' claims is this: Defendants imposed three requirements for successful completion of the MDPP: 90 days of "clean" urinalysis testing (i.e. not testing positive for drugs or alcohol), a drug education seminar, and the

payment of about $1,000 in program fees. Plaintiffs contended that Defendants impermissibly subjected individuals who were unable to afford the program fees to longer terms of diversion supervision solely because of their poverty, in violation of Plaintiffs' rights as set forth in *Bearden v. Georgia*, 461 U.S. 660 (1983). They faulted Defendants' failure to inquire into and make findings regarding participants' ability to pay before extending their time on the program after the non-payment based requirements were complete ("pay-only" extensions). Plaintiffs also contended that invasive urinalysis tests during the pay-only period were unreasonable under the Fourth Amendment.

7.     Shortly after Plaintiffs filed this case, Defendants TASC and MCAO moved to dismiss. Docs. 25 & 29. Plaintiffs responded to both motions. Docs. 43 & 45. After conducting oral argument, Doc. 82, the Court found in Plaintiffs' favor and declined to dismiss the case, Doc. 89. The Court found that "Plaintiffs have sufficiently pled a prima facie case of wealth discrimination based on the [challenged] policies." Doc. 89 at 21.

8.     The Court then ordered the parties to engage in pre-certification class discovery. Doc. 98 at 2 n.1.

9.     Approximately one year later, Plaintiffs and Defendant MCAO reached a settlement agreement as to Named Plaintiffs damages claims. Doc. 174. Plaintiffs' claims against MCAO were dismissed in November 2020.

10.    Plaintiffs and Defendant TASC continued through discovery. Over the course of discovery, the parties exchanged nearly 9,000 documents, including over 7,000 produced by Defendant TASC. This included the court-ordered production of 910 MDPP program participant files after protracted litigation of a motion to compel. *See* Docs. 139, 144, 148, 151, 182. Plaintiffs filed and prevailed on several other discovery motions. *See, e.g.*, Docs. 262, 284, 306. The parties engaged in deposition discovery as well. Defendants deposed Named Plaintiffs and two of Plaintiffs' expert witnesses, and Plaintiffs deposed seven former TASC employees and three TASC expert witnesses. Named Plaintiffs also responded to multiple rounds of interrogatories.

11.     In January 2021, Plaintiffs and Defendant TASC engaged in a settlement conference but were unable to reach a resolution. Doc. 238. Shortly thereafter, in March 2021, Defendant TASC moved for summary judgment, Doc. 246, which Plaintiffs opposed, Docs. 277 & 278.[1] TASC moved to stay discovery during the pendency of the motion, Doc. 252, but the Court denied its request, Doc. 276.

12.     After the close of class discovery, Plaintiffs moved for class certification (in October 2021). Doc. 347. They marshalled voluminous exhibits in support of their request, which included a comprehensive analysis of the participant program files. Doc. 347-5 (Ex. 8). Plaintiffs later filed three separate *Daubert* motions to exclude the opinions of experts proffered by Defendant TASC. Docs. 388-390.

13.     In the meantime, this Court denied TASC's motion for summary judgment. Doc. 375. In so doing, it reaffirmed that TASC was constitutionally required to "first determine the reasons for non-payment and consider alternatives before extending a participant in the MDPP solely because of alleged inability to pay TASC's fees." *Id.* at 5-6.

14.     Shortly thereafter, the parties began discussing settlement. *See* Doc. 384. They hired a certified JAMS Mediator, Hon. Peggy Leen (Ret.), and engaged in a successful mediation in June 2022. Doc. 405. At the time, they reached an agreement in principle as to the amount of the total settlement fund. *Id.* at 2. Since that time, the parties have worked collaboratively to iron out the precise terms of the agreement. Doc. 409.

15.     After months of negotiating with Defendant TASC and consulting with Named Plaintiffs, Plaintiffs' counsel finalized the settlement agreement. The parties signed it in early April, 2023.

**II.     Named Plaintiff Participation**

16.     Named Plaintiffs were deeply involved at every stage of this complex, lengthy litigation. They shared their difficult stories repeatedly, responded to intrusive

---

[1] Plaintiffs did concede, however, that their injunctive claims were moot and pressed only their claims for money damages. Doc. 277 at 19.

discovery requests, and sat for lengthy depositions that delved into highly personal matters. They also remained in regular telephonic communication with Plaintiffs' counsel and actively helped counsel obtain critical information for discovery. They took on these responsibilities on behalf of the class while navigating unemployment, personal tragedies, housing insecurity, and ongoing stress about providing financially for themselves and their families.

17.    Over the course of many years, Named Plaintiffs collaborated closely with Plaintiffs' counsel to complete a tremendous amount of work to advance the litigation.

18.    In November 2019, Defendant TASC served a set of interrogatories (9), requests for production (3), and requests for admission (3).

19.    Named Plaintiffs worked closely with Plaintiffs' counsel to respond. The interrogatories in particular required a lot of work. Over the course of discovery, Plaintiffs supplemented these responses three times. All in all, Named Plaintiffs spent hours meeting with counsel to provide information for the responses and to review and verify them.

20.    Named Plaintiffs also collaborated with counsel to retrieve documents responsive to Defendant TASC's requests for production. This included submitting requests to multiple government agencies for records from the period Plaintiffs were enrolled in TASC to substantiate their poverty (including tax returns and food stamps authorizations).

21.    Named Plaintiffs sat through lengthy and intrusive depositions. Each of them spent several hours with counsel to prepare.

22.    Named Plaintiff Deshawn Briggs was deposed in October 2021. The deposition experience was difficult for him. Defense counsel asked probing questions about his finances and familial relationships—sensitive topics he had to discuss with a complete stranger. One of the difficult parts of the deposition for Mr. Briggs was questions about why he did not ask his family for money, including his great-great-grandparents. Mr. Briggs is very close to and protective of his family. He knew that they

were all struggling financially, including at the time he was enrolled in the TASC program.

23.     Named Plaintiff Antonio Pascale was deposed in November 2020. He spent several hours preparing for his deposition, and a full day being deposed by counsel for TASC. Because Mr. Pascale was unable to access the internet at the time, he traveled to Plaintiff counsel's office for the deposition. Mr. Pascale describes the deposition as the most emotionally trying experience of his participation in this case, as he was subjected to hours of questions, seemingly the same, that often called into question his credibility and motive for representing his late father.

24.     Plaintiff Lucia Soria, too, sat for a day-long deposition in November 2020. She did so while navigating serious health issues and constant physical pain. She endured extensive and intrusive questioning related to her personal finances and attempts to undermine her credibility.

25.     Finally, Named Plaintiffs also worked with counsel to prepare and submit declarations in support of evidentiary briefing. This includes Plaintiffs' response to Defendant TASC's motion for summary judgment, *see* Doc. 278-3, Ex. 24 at 114; 278-4, Ex. 34 at 121, as well as Plaintiffs' motion for class certification, *see* Doc. 347-4, Ex. 5-7.

26.     Named Plaintiffs were also invested in the attempts to resolve this litigation. Before both mediation sessions, Named Plaintiffs met and discussed with counsel their objectives for any resolution of the case. They were also in contact with counsel during both mediations, asking probing questions and discussing the viability of the offers on the table. In fact, all three attended the second mediation session (though Plaintiff Soria had to leave early due to some health issues). Admirably, all three Named Plaintiffs repeatedly and unambiguously emphasized the importance of achieving a class-wide resolution that would benefit all individuals similarly situated to them.

27.     Named Plaintiffs did all this while navigating a great deal of personal hardship.

28.   Named Plaintiff Deshawn Briggs endured immense personal loss and hardship over the course of the litigation. In fact, in the span of 14 months, Mr. Briggs lost three people who were very close to him: his great-great-grandfather, an ex-girlfriend who was dear to him, and his father.

29.   Mr. Briggs's great-great-grandfather (whom he refers to as his grandfather) passed away in October 2020, days after Mr. Briggs was deposed. The timing was particularly hard on Mr. Briggs because of the deposition questions about his grandparents. Mr. Briggs's grandfather was like a father figure to Mr. Briggs. He raised Mr. Briggs from when he was a two-month-old baby until he was nine years old. Even after that, he played a big role in Mr. Briggs's life. He taught him how to cook, how to plant, and how to change a tire.

30.   A few months later, in March 2021, Mr. Briggs lost a friend and ex-girlfriend who meant a lot to him. She had reached out to him just a few months prior, updating him on serious health issues she was experiencing. She passed away during surgery. In light of their past history and the recent communication, her death took a toll on Mr. Briggs. This coincided with a time period when Mr. Briggs was working closely with Plaintiffs' counsel to respond to discovery requests. Despite the personal hardship, Mr. Briggs always made himself available and took as much time as was needed to respond to the discovery requests.

31.   The toughest loss came in December 2021, when Mr. Briggs's father passed away. At around Thanksgiving, Mr. Briggs learned from his step-mother that a number of family members had contracted COVID-19. The family was particularly concerned about Mr. Briggs's father, because he did not have a spleen—the virus was a potential death sentence. Unfortunately, Mr. Briggs's father contracted COVID-19. Mr. Briggs had planned to come to Tucson for oral argument on summary judgment in this case, which took place on December 2, 2021. Despite his father's illness, Mr. Briggs drove to Tucson and attended the hearing. It was incredibly important for him to be there—as a class representative, he was invested in the case developments, and recognized summary

judgment as a critical stage in the case. Mr. Briggs returned to Phoenix after the hearing, only to learn that his father had been hospitalized and was in a dire situation. He passed away at the hospital from COVID-19 complications the following evening. His death came quickly and was a shock to Mr. Briggs and his entire family. The Court denied TASC's motion for summary judgment at the end of the month. Even though Mr. Briggs was still very much processing his father's passing, he prioritized speaking with Plaintiffs' counsel about this case development.

32.     Through all of these hardships, Mr. Briggs never wavered in his commitment to serving as a class representative in this case.

33.     Named Plaintiff Antonio Pascale has been actively involved in this litigation since April 2020 as his father Mark Pascale's representative following his father's death in October 2019. *See* Doc. 155. His father Mark Pascale was one of the original Named Plaintiffs in the case.

34.     After his father's death, Antonio Pascale handled all of his father's arrangements, from his father's cremation services, to settling his father's accounts and selling his father's house. In addition, Antonio Pascale paid for nearly all of his father's cremation services, over $7,000.

35.     As the representative of his father's estate, Antonio Pascale also paid several thousand dollars to his probate attorneys handling his father's estate.

36.     Though having no personal stake in the outcome of this case, in honor of his father's efforts and seeking that justice be done, Antonio Pascale stepped into this case as a representative of his father's estate, beginning the onboarding process in early 2020.

37.     While handling his father's postmortem affairs and grieving for this immense loss, Antonio Pascale dedicated a large amount of time to this case and becoming an informed representative of his father. He spoke frequently to Plaintiffs' lawyers about this case, at times spending several hours every week on phone calls with Plaintiffs' lawyers, spent additional hours reviewing lengthy court filings, and additional time coordinating with a roaming notary service to physically sign off on documents.

8

38.     Adding to this labor was the fact that Antonio Pascale did not have access to the internet. Thus, instead of being able to use email, review emailed electronic documents or electronically sign papers, any communications, documents or signatures had to take place through the lengthy process of phone calls, the physical mailing of paper documents and in person signatures.

39.     In addition, during the entire duration of his participation in this case, Antonio Pascale worked between 50 and 60 or more hours per week doing asphalt construction. Asphalt construction is a particularly physically demanding job. It involves manually paving black top on roads via a large industrial machine. The asphalt itself as it comes out of the machine is between 350 and 370 degrees Fahrenheit. Antonio Pascale works this job all year long including in the Arizona summer heat where outside temperatures reach 113 degrees Fahrenheit. Working next to a large, heated, industrial machine producing asphalt at nearly 370 degrees Fahrenheit in Arizona heat of 113 degrees Fahrenheit, workers risk serious heat exhaustion on a daily basis. After working in these conditions for 10 hours per day, Antonio Pascale would come home and work on remodeling his home. After this physically demanding labor of his job and home construction, Antonio Pascale would still make time to speak to Plaintiffs' counsel at length.

40.     Antonio Pascale did not know the full extent of his father's financial struggles until he came onto this case as his father's representative. Antonio Pascale believes Mark Pascale did not communicate the extent of his financial struggles due to his pride. Antonio Pascale went through the painful process of learning of his father's struggles only after his father had passed and after it was clearly too late to help his father.

41.     As for Named Plaintiff Lucia Soria, the last few years of her life have been marked by persisting health issues that lead to a vicious cycle of unemployment and ongoing depression, anxiety, and panic attacks.

42.     In addition to the chronic pain and gastrointestinal and neurological issues Ms. Soria has contended with for years, *see, e.g.*, Doc. 278, CSMF ¶ 100, she contracted

COVID-19 twice. She really thought she was going to die. She was hospitalized around three times. She also lost her grandmother to the pandemic.

43.    Ms. Soria also had a hysterectomy in December 2022 because doctors detected precancerous cells in her uterus. It was a very terrifying experience, especially because two years earlier, she had another cancer scare because of a mass in her stomach. She lost sleep agonizing about the fact that she was going leave her kids behind. Her stress and anxiety were exacerbated by doctors' failure to give her the answers she was looking for about what was happening to her and why.

44.    These health issues have had a ripple effect on other parts of Ms. Soria's life, particularly when it comes to financial stability. Ms. Soria stopped working in 2018 at the advice of her doctor. Doc. 278-3, Ex. 24 ¶ 4. She has gone through the process of trying to get disability benefits, so she can support herself and her family. *See* Doc. 278-6, Ex. 49. Ms. Soria was not approved. She attended a telephonic hearing at the beginning of 2022. Her understanding is that she has not been approved for disability benefits because they feel like there is still some work she can do, like cleaning houses. But she can barely clean her own house—she works very slowly and takes numerous breaks throughout so she can manage the pain. This adds to her stress.

45.    Even though Ms. Soria is unemployed, she does not get food stamps anymore because her boyfriend supports her, and his income disqualifies her. But he does not make a lot of money and uses his income to pay their rent, car insurance, and other fixed expenses. And food has gotten very expensive. Ms. Soria is diabetic and has kidney issues. So she has to watch what she eats, and healthy foods cost a lot of money.

46.    Neither can Ms. Soria afford the type of medication or healthcare that she believes would really help her. For example, she tried going to a naturopathic doctor, where she once had a really good experience and got much better care than she is accustomed to. But insurance does not cover this type of medicine, so she was not able to sustain it. If she had access to better healthcare, she thinks her depression and anxiety would be much less severe.

47.     Despite her chronic medical issues, Ms. Soria has remained a committed class representative. For instance, during the June 2022 mediation, Ms. Soria had a flare-up of her chronic gastrointestinal issues. Still, she attended several hours of the mediation and was engaged in discussing the settlement proposals with counsel.

**III.     Reasonable Hours and Costs Expended by Class Counsel**

48.     As set forth above, this litigation required a significant expenditure of time and resources by Plaintiffs' counsel.

49.     Over the four-and-a-half years that Plaintiffs have litigated this case, Plaintiffs' counsel have spent more than 9,000 hours litigating it, conservatively estimated at $5 million in time value applying reasonable hourly rates.

50.     For Civil Rights Corps, this includes approximately 6,000 hours (estimated at more than $3.3 million in time value) by Sumayya Saleh, Katie Chamblee-Ryan, Ryan Downer, and Bina Ahmad of Civil Rights Corps, and at least $500,000 worth of time expended by other CRC attorneys and investigators who worked on the case.

51.     As for Covington, it includes over 3,000 hours by attorneys and support staff (worth more than $1 million in time value from counsel of record alone, in addition to countless hours expended by support staff and other firm lawyers).

52.     Civil Rights Corps and Covington have also spent over $100,000 in costs, including deposition costs, transcript costs, expert costs, filing fees, legal research fees, postage and mailings, and travel costs.

53.     In addition, as of June 2022, local counsel from Osborn Maledon had also expended hard costs and attorney hours in excess of $80,000.

**IV.     Exhibits In Support of Motion for Preliminary Approval**

54.     Exhibit 2 is a true and correct copy of the Settlement Agreement entered into by Plaintiffs and Defendant TASC in April 2023.

55.     Exhibit 3 is a true and correct copy of Exhibit 1 to the Settlement Agreement, a Proposed Order Granting Preliminary Approval.

11

56.     Exhibit 4 is a true and correct copy of Exhibit 2 to the Settlement Agreement, a short-form notice to potential class members about the terms of the proposed settlement.

57.     Exhibit 5 is a true and correct copy of Exhibit 3 to the Settlement Agreement, a long-form notice to potential class members about the terms of the proposed settlement.

58.     Exhibit 6 is a true and correct copy of Exhibit 4 to the Settlement Agreement. These are instructions for the Settlement Administrator to determine claimants'' eligibility for a Cash Award.

59.     Exhibit 7 is a true and correct copy of Exhibit 5 to the Settlement Agreement, a verification-of-income form that claimants must submit.

60.     Exhibit 8 is a true and correct copy of Exhibit 6 to the Settlement Agreement, an authorization for release of medical information to the Settlement Administrator and Class Counsel that claimants must submit.

61.     Exhibit 9 is a true and correct copy of Exhibit 7 to the Settlement Agreement. It is a form that will be available to putative class members to update their contact information.

62.     Exhibit 10 is a true and correct copy of Exhibit 8 to the Settlement Agreement. It is the declaration of the Settlement Administrator.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: April 6, 2023

/s/ *Sumayya Saleh*
Sumayya Saleh

12