Sumayya Saleh (pro hac vice)
Bina Ahmad (pro hac vice)
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
(202) 656-5189
sumayya@civilrightscorps.org

Timothy J. Eckstein, 018321
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
teckstein@omlaw.com

Stanley Young (pro hac vice)
COVINGTON & BURLING LLP
5 Palo Alto Square
Palo Alto, California 94306
(650) 632-4704
syoung@cov.com

*Class Counsel*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deshawn Briggs, *et. al.*,<br><br>                Plaintiffs,<br>v.<br><br>Treatment Assessment and Screening Center, Inc.,<br><br>                Defendant. | No. CV-18-2684-PHX-EJM<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF A CLASS ACTION SETTLEMENT WITH INCORPORATED MEMORANDUM OF LAW** |

Plaintiffs Deshawn Briggs, Lucia Soria, and Antonio Pascale (acting for the Estate of Mark Pascale) (collectively, "Named Plaintiffs"), respectfully submit this Unopposed Motion for Final Approval of a Class Action Settlement ("Unopposed Motion"). TASC has reviewed this motion as well as the ancillary settlement documents and does not oppose this motion. The parties are prepared to finalize the settlement at the in-person Fairness Hearing, scheduled for May 7, 2024.

## I. Background of Litigation

Treatment Assessment Screening Center, Inc. ("TASC") provided pretrial diversion services to county governments. Beginning in 1990, TASC contracted with the Maricopa County Attorney's Office (MCAO) to operate the Adult Deferred Prosecution Program (ADPP), to include the Marijuana Deferred Prosecution Program (MDPP) for people cited for marijuana possession. The MDPP is the subject of this lawsuit.

After a months-long investigation into the MDPP, Plaintiffs filed this case as a putative class action against MCAO, the Maricopa County Attorney's Office, and TASC (collectively, "Defendants") in August 2018. The essence of Plaintiffs' claims is this: Defendants imposed three requirements for successful completion of the MDPP: 90 days of "clean" urinalysis testing (i.e. not testing positive for drugs or alcohol), a drug education seminar, and the payment of about $1,000 in program fees. Plaintiffs contended that Defendants impermissibly subjected individuals who were unable to afford the program fees to longer terms of diversion supervision solely because of their poverty, in violation of Plaintiffs' rights as set forth in *Bearden v. Georgia*, 461 U.S. 660 (1983). They faulted Defendants' failure to inquire into and make findings regarding participants' ability to pay before extending their time on the program after the non-payment based requirements were complete ("pay-only" extensions). Plaintiffs also contended that invasive urinalysis tests during the pay-only period were unreasonable under the Fourth Amendment.

Defendants immediately moved to dismiss. Docs. 25, 29. On June 18, 2019, this Court denied both Defendants' motions in their entirety, and found that "Plaintiffs have

2

sufficiently pled a prima facie case of wealth discrimination based on the [challenged] policies." Doc. 89 at 21. The Court then ordered the parties to engage in pre-certification class discovery. Doc. 98 at 2 n. 1.

Approximately one year later, Plaintiffs and Defendant MCAO reached a settlement agreement as to Named Plaintiffs' damages claims. Doc. 174. Plaintiffs' claims against MCAO were dismissed in November 2020. Doc. 199.

Plaintiffs and Defendant TASC continued through discovery. Over the course of discovery, the parties exchanged nearly 9,000 documents, including over 7,000 produced by Defendant TASC. This included the court-ordered production of 910 MDPP program participant files after protracted litigation of a motion to compel. *See* Docs. 139, 144, 148, 151, 182. Plaintiffs filed and prevailed on several other discovery motions. *See, e.g.*, Docs. 262, 284, 306. The parties engaged in deposition discovery as well. Defendants deposed Named Plaintiffs and two of Plaintiffs' expert witnesses, and Plaintiffs deposed seven former TASC employees and three TASC expert witnesses. Named Plaintiffs also responded to multiple rounds of interrogatories.

In January 2021, Plaintiffs and Defendant TASC participated in a settlement conference but were unable to reach a resolution. Doc. 238. Shortly thereafter, in March 2021, Defendant TASC moved for summary judgment, Doc. 246, which Plaintiffs opposed, Docs. 277 & 278.[1] TASC moved to stay discovery during the pendency of the motion, Doc. 252, but the Court denied its request, Doc. 276.

After the close of class discovery, Plaintiffs moved for class certification (in October 2021). Doc. 347. They marshalled voluminous exhibits in support of their request, which included a comprehensive analysis of the participant program files. Doc. 347-5 (Ex. 8). Plaintiffs later filed three separate *Daubert* motions to exclude the opinions of experts proffered by Defendant TASC. Docs. 388–390.

---

[1] Plaintiffs did concede, however, that their injunctive claims were moot and pressed only their claims for money damages. Doc. 277 at 19.

In the meantime, this Court denied TASC's motion for summary judgment, reaffirming that the *Bearden* line of cases required that TASC "first determine the reasons for non-payment and consider alternatives before extending a participant in the MDPP solely because of alleged inability to pay TASC's fees." Doc. 375 at 5–6.

Shortly thereafter, the parties began discussing settlement. *See* Doc. 384. They hired a certified JAMS Mediator, Hon. Peggy Leen (Ret.), and engaged in a successful mediation in June 2022. Doc. 405. At the time, they reached an agreement in principle as to the amount of the total settlement fund. *Id.* at 2. The parties then worked collaboratively to iron out the precise terms of the agreement. Doc. 409.

## II. The Terms of the Settlement

In the interest of avoiding further protracted and costly litigation, the parties agreed to a proposed Settlement Agreement requiring the payment of the total sum of two million and six-hundred thousand dollars ($2,600,000.00), one million six-hundred thousand dollars ($1,600,000) of which comes directly from TASC, and one million ($1,000,000) of which TASC has obtained from its insurer.[2] A copy of the proposed Settlement Agreement (with its exhibits) was filed along with Plaintiffs' motion for preliminary approval. *See* Docs. 416-2–416-9. Subject to the Court's final approval, the Settlement Agreement provides that the settlement fund will be allocated as follows:

- **Class Member Payments:** As a starting point, each Settlement Class Member[3] will be entitled to receive one thousand dollars ($1,000) plus an additional fifteen dollars ($15) for each day that the Settlement Class Member remained on Pay-Only Extension. Depending on how many Settlement Class Members submit valid claims, this amount may be increased or decreased on a pro rata basis. For example, if the Available Cash Award total exceeds the Cash

---

[2] Pursuant to the terms of the Settlement Agreement, Doc. 416, and the Court's preliminary approval thereof, Doc. 419, TASC has already wired these funds to the Settlement Administrator.

[3] Capitalized terms are defined in the Settlement Agreement.

4

Awards, payments shall be increased pro rata up to a maximum of four times of the total amount Settlement Class Members would otherwise be entitled to.

- **Service Payments to Named Plaintiffs:** $120,000 will be distributed equally among Named Plaintiffs ($40,000 each) as payments for the service they provided in representing the classes in this litigation.

- **Attorneys' Fee Award:** Class Counsel may petition for, and TASC will not oppose, an initial request of $250,000 in attorneys' fees. If funds remain in the Settlement Fund after the full administration of the claims process, including eligible Settlement Class Members' Cash Awards, Class Counsel may petition the Court for an attorneys' fee award in addition to the initial Attorneys' Fee Award.[4]

- **Claims Administration:** Notice and Administration costs will be paid from the Settlement Fund.[5]

### III. Preliminary Settlement Approval and Settlement Administration

This court granted preliminary approval of the settlement agreement on July 28, 2023. Doc. 419. This court certified the proposed class for settlement purposes only and found that the settlement agreement was "fair, reasonable, and adequate, [was] entered into in good faith, [and was] free of collusion to the detriment of the Settlement Class . . . ." *Id.* at 1–2. This court appointed Atticus Administration, LLC as the settlement administrator. *Id.* at 3. In accordance with the terms of the settlement agreement, Atticus issued notice of the settlement, received and reviewed claims, and, along with Class Counsel, worked with claimants to cure any deficient claims received. Bridley Decl. ¶¶ 4–14. No putative class members submitted objections to the proposed settlement, and no one sought to opt out of the settlement. *Id.* ¶ 11. TASC also sent the notice required by the Class Action

---

[4] TASC has agreed not to oppose any additional Attorneys' Fee Award so long as the total Attorneys' Fee Award does not exceed $650,000.
[5] The final claim administration cost was $73,010. *See* Declaration of Bryn Bridley (Bridley Decl.) ¶ 20.

5

Fairness Act (28 U.S.C. § 1715) to notify the relevant Federal and State officials of the proposed settlement.[6] Plaintiffs now move for final approval of the settlement agreement.

### IV. Final Settlement Approval Is Appropriate.

In the Ninth Circuit, a "strong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Where, as here, the parties resolve the litigation through a class-wide settlement, they must obtain the Court's approval. *See* Fed. R. Civ. P. 23(e). This "involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l. Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

In the first step, "[t]he judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." Manual for Complex Litigation (Fourth) § 21.632 (2004). Additionally, "[t]he judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing." *Id.* The "universally applied standard" for approval of a class action settlement is whether "the settlement is fundamentally fair, adequate, and reasonable." *Class Plaintiffs*, 955 F.2d at 1276 (citation omitted); *see also* Fed. R. Civ. P. 23(e). This court has preliminarily approved of this settlement, and in doing so found that the Settlement Agreement and its exhibits "are fair, reasonable, and adequate." *See* Doc. 419 at 1.

Once the settlement is preliminarily approved and notice to the class members has been given, the court must again find at the second step that the final settlement is still "fair, reasonable, and adequate." Manual for Complex Litigation (Fourth) § 21.634 (2004) (quotations omitted). "The absence of a single objection to the Proposed Settlement

---

[6] TASC will be separately filing a notice outlining its compliance with CAFA's requirements.

6

provides [] support for final approval of the Proposed Settlement . . . [because] the absence of [] objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l. Rural Telecomm. Coop.*, 211 F.R.D at 529 (collecting cases).

Rule 23(e) sets forth four factors for the Court to consider when determining the fairness of the settlement. Fed. R. Civ. P. 23(e)(2). The parties believe this is the operative standard for this Court to apply. Recognizing that "each circuit ha[d] developed its own vocabulary for expressing . . . concerns" over fairness, the Rule 23(e) factors were added in 2018 to create uniformity and to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee notes (2018 amendment). Despite this, many courts continue to apply the Ninth Circuit's "*Churchill* factors." *See, e.g.*, *Zwicky v. Diamond Resorts Mgt. Inc.*, 343 F.R.D. 101, 119 (D. Ariz. 2022) (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)); *Young v. County of Contra Costa*, 20-CV-06848-NC, 2021 WL 783583, at *4 (N.D. Cal. Feb. 28, 2021) (same). While these factors naturally overlap with those articulated in Rule 23, they are not an exact match. In an abundance of caution, Plaintiffs briefly explain how the proposed settlement also satisfies the *Churchill* factors.

### A. The Rule 23(e) Factors Are Met.

Rule 23(e) preconditions approval of the settlement on findings that: 1) "the class representatives and class counsel have adequately represented the class;" 2) "the proposal was negotiated at arm's length;" 3) "the relief provided for the class is adequate;" considering "the costs, risks, and delay of trial and appeal;" "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3);" and 4) "the proposal treats class members equitably relative to each other."

7

As explained below, the proposed settlement falls well within the range of possible approval, such that the Court should enter final approval of the proposed settlement.

**1. The Class Has Been Vigorously Represented.**

For approximately five-and-a-half years, Named Plaintiffs and Class Counsel zealously represented the interests of the class. Before Plaintiffs undertook this class action, Class Counsel diligently investigated the claims, researched the applicable law, and crafted cutting-edge claims based on the premise that, under *Bearden*, wealth-based discrimination is prohibited in pretrial diversion programs. During the litigation, Plaintiffs engaged in substantial motion practice—they defeated two motions to dismiss, TASC's motion for summary judgment, prevailed on several motions to compel discovery, and moved for class certification and to exclude TASC's expert witnesses. In fact, the parties renewed settlement discussions only after this Court's summary judgment ruling.

This motion practice was supported by vigorous fact and expert discovery over approximately 18 months. Plaintiffs fought for and received a random sample of participant program files and then spent months conducting a comprehensive review of those files, which undergirded their motion for class certification. Plaintiffs took 10 depositions and defended five others (of these depositions, five were of expert witnesses). They reviewed thousands of documents in discovery and produced hundreds of others. To prepare their case for trial, they worked closely with two experts, including a renowned ability-to-pay expert who adapted her methodology for this case. Taken together, these efforts demonstrate that the settlement is the product of well-informed and vigorous advocacy on behalf of the class. These efforts continued through the settlement administration process as well: Class Counsel worked with Atticus to resolve issues in the individual claim forms of class members, including by placing phone calls to individual class members, to ensure that as many claimants could have their claims processed as possible.

### 2. The Settlement Agreement Was Negotiated at Arm's Length.

The settlement was reached after serious, informed, arm's-length negotiations. After nearly three years of significant motion practice and discovery efforts, the parties hired JAMS mediator Judge Peggy Leen (Ret.) for a private mediation session, with follow-up negotiations spanning several months. The involvement of a highly experienced mediator supports a finding that the settlement is "not the result of collusion or bad faith by the parties or counsel." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). Separately, the settlement itself bears none of the traditional signs of collusion, given the majority of the Settlement Fund is designed to go to Class Members rather than Class Counsel. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-48 (9th Cir. 2011). Plaintiffs possessed a wealth of information before engaging in settlement negotiations. Based on this knowledge and their experience litigating and settling civil rights class actions, Class Counsel believe that the settlement is fair, reasonable, and adequate. *Knight v. Red Door Salons, Inc.*, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." (citation omitted)).

### 3. Class Members Will be Adequately Compensated.

The proposed compensation for settlement class members is adequate given "the costs, risks, and delay of trial and appeal;" "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" and "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C). The relief the settlement will provide to class members is a "central concern." Fed. R. Civ. P. 23(e) advisory committee notes (2018 amendment). Another central concern is the cost and risk of continued litigation, as well as the range of possible recoveries. *Id.* Where a class has not yet been certified, the court may consider the likelihood of class certification if the settlement were not approved. *Id.*

*The Costs and Risks of Trial and Appeal.* While this Court twice affirmed the viability of Plaintiffs' claims, pressing forward to trial carries significant risk to the class:

1   Over the course of the litigation, TASC lost its contract with MCAO and subsequently
2   shut down its operations, with the exception of one staff member who remained for the
3   purpose of, among other winding up activities, facilitating the provision of records related
4   to the settlement. The longer the litigation wears on, the more TASC's finite pool of
5   financial resources will deplete (to cover the cost of operations, including costly records
6   retention, and attorneys' fees). TASC has vigorously defended this case, including by
7   moving for summary judgment and opposing class certification. Plaintiffs anticipate that
8   if the case wore on, TASC would continue to do so—including by appealing an order
9   certifying the class, a resource and time-intensive prospect. As such, even if Plaintiffs
10  prevailed on appeal and at trial, they run the risk of getting a judgment against an insolvent
11  defendant. This settlement ensures that class members will recover a significant portion
12  of the limited funds TASC had remaining at the time of the negotiations.

13  *The Settlement Administration Process.* The parties agreed to a settlement
14  administration process that maximizes the likelihood of recovery for class members.
15  Notice went to *all* individuals who participated in the MDPP during the limitations period.
16  Bridley Decl. ¶¶ 4–6. Atticus received 407 claim submissions, involving a simple form
17  under the penalty of perjury for claimants to attest that they were extended on the program
18  due to their inability to pay the program fees. *Id.* ¶ 12. Then, Atticus reviewed each
19  claimant's eligibility based on the information contained within the program files, using
20  a protocol agreed upon by the parties. *Id.* ¶ 13. Specifically, Atticus verified that the
21  claimant was in fact extended pay-only and confirmed that there is no financial
22  information contained within the program file that contradicts their asserted inability to
23  pay. *Id.*; *see also* Doc. 416-6 (Ex. 4 to the Settlement Agreement, Process for Determining
24  Claim Eligibility for a Cash Award). The parties designed this process to be minimally
25  burdensome for a class of impoverished individuals with limited access to resources,
26  while also rigorously vetting whether they were extended pay-only.[7]

---

[7] The claim eligibility review process is detailed in Exhibit 4 to the Settlement Agreement.

10

Of the 407 claims, 252 had an issue with their medical release form and 24 had an issue with their verification of income form. Bridley Decl. ¶ 15. Atticus, with the support of Class Counsel, engaged in targeted, individualized outreach to these individuals in an effort to cure the infirmity, and most of them cured the issue. *Id.* Following the agreed-upon protocol for reviewing all Valid Claims, Atticus determined that 122 claimants had been extended pay-only and were eligible for a Cash Payment. *Id.* ¶ The median length of extension was 45 days. *Id.* ¶ 17.

Atticus received a total of 53 files from TASC from which Atticus was initially unable to determine claim eligibility. Bridley Decl. ¶ 14. Atticus notified TASC of the deficiencies, and they worked together to resolve the issue. *Id.* Ultimately, there were 19 claims that Atticus was unable to assess because of missing documentation. *Id.* ¶ 14. In fairness to the claimants—since Atticus was unable to assess the validity of their claims through no fault of their own—the parties agreed to treat these claims as valid and to award them the median payout amount. *See id.*

Finally, there is a small minority of claims (approximately 21) that Atticus has yet to review. Bridley Decl. ¶ 13. Because of TASC's limited staffing and delays attendant to needing a subset of claimants to cure issues in their medical release form before TASC could provide their files to Atticus, Atticus was unable to complete its review process before the filing of this motion. But once this review is complete, Atticus will prepare a supplemental declaration outlining the final results. Given that the vast majority of claims have already been reviewed, the parties do not anticipate that this will affect the fairness of the settlement. And the Court will have the final breakdown of eligible claims and payment amounts well before the final fairness hearing.

*The Terms of the Proposed Award of Attorneys' Fees.* The parties negotiated the amount of reasonable attorneys' fees and expenses that Class Counsel could petition for only *after* they reached agreement in principle with respect to the total settlement amount. Class counsel refused to discuss their entitlement to fees until after they ensured they had maximized payment for class members. What's more, the amount the settlement

agreement authorizes—$250,000 (less than 10% of the total settlement fund) to start—is a fraction of the millions of dollars of fees and costs they incurred in vigorously litigating this case. Class counsel agreed to seek additional fees only if money remains in the settlement fund after class members have received their cash awards.[8]

### 4. The Proposal Treats Class Members Equitably Relative to Each Other.

The fourth factor requires the Court to determine whether the settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(D), advisory committee notes (2018 amendment); *see also* 4 William B. Rubenstein, Newberg on Class Actions § 13:56 (5th ed. 2020) ("Put simply, the court's goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated.").

*Equity between class members with different claims.* Plaintiffs structured the cash award model in a way that ensures equity between class members with different claims. The formula in the settlement agreement provides that each Settlement Class Members will be entitled to $1,000, plus $15 for every day of pay-only extension. *See* Doc. 416-2 at 13–14. Each class member's payment will be proportional to the length of their pay-only extension, which also correlates to the number of urinalysis tests they were subjected to during the pay-only period. Each will recover in excess of the roughly $1,000 they paid in program fees and the money they spent on urinalysis testing during the pay-only period.

The results of the settlement administration practice demonstrate this in practice. 122 claimants have been deemed eligible for a cash award so far, with the median length

---

[8] As noted below, Class Counsel anticipates seeking additional fees because money will remain in the settlement fund after class members receive their cash awards.

of extension based on the claims reviewed to date being 45 days. Bridley Decl. ¶¶ 12–13. Applying the formula in the settlement agreement, Doc. 416-2 at 13-14, the baseline median payment per class member is $1,675.00 and the total amount is $244,535.00. Bridley Decl. ¶ 17. But because this is less than the $2,600,000 in the settlement pot, the payments will be increased pro rata by four times, for a median payment amount of $6,700.00 and total of $978,140.00.[9] This means that each class member will be adequately compensated individually and in relation to other class members who spent more or less time on pay-only status.

*Equity between unnamed class members and class representatives.* The Settlement Agreement allots a service payment for each Named Plaintiff to compensate them for the work they did in this case (e.g., in conferring with counsel, producing documents, being deposed). As previously explained, such payments are permitted in the Ninth Circuit and reasonable given the facts of this case. Doc. 416 at 12–13. Plaintiffs have "adequately supported the basis for [these] payment[s] by demonstrating the work done on behalf of the class," and the fact that the settlement agreement contemplates such a payment "does not render the settlement inequitable." *Loreto v. Gen. Dynamics Info. Tech., Inc.*, 3:19-CV-01366-GPC-MSB, 2022 WL 3013029, at *8 (S.D. Cal. Feb. 2, 2022).

### B. The Ninth Circuit's *Churchill* Factors Are Also Met.

The Ninth Circuit has historically considered eight factors to determine whether a proposed class action settlement warrants approval: 1) "the strength of the plaintiffs' case"; 2) "the risk, expense, complexity, and likely duration of further litigation"; 3) "the risk of maintaining class action status throughout the trial"; 4) "the amount offered in settlement"; 5) "the extent of discovery completed and the stage of the proceedings"; 6) "the experience and views of counsel"; 7) "the presence of a governmental participant"; and 8) "the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575 (citation omitted). "Not all of these factors will apply to every class action

---

[9] These numbers will likely change slightly once Atticus completes its review of the remaining forms.

settlement," and under some circumstances, one factor alone may be enough. *Nat'l. Rural Telecomm. Coop.*, 221 F.R.D. at 525-26. "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982).

As explained, settling the case mitigates the risk of continued litigation given TASC's financial situation, and the amount offered in settlement will fairly compensate class members (factors 2 and 4). The parties have completed extensive discovery, and Plaintiffs defeated summary judgment and moved for class certification (factor 5). The strength of Plaintiffs' case is evidenced by this Court's multiple merits rulings in their favor (factor 1). Factors 3 and 7 do not apply here. And with respect to the eighth factor, no putative class members objected to the proposed settlement. Bridley Decl. at ¶ 11. This "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l. Rural Telecomm. Coop.*, 211 F.R.D at 529. So even under the *Churchill* factors, the proposed settlement is fair and reasonable.

**V.    The Attorneys' Fees Are Reasonable.**

In accordance with the terms of the Settlement Agreement, at this juncture, Class Counsel seek to recover $250,000 in attorneys' fees and costs.[10] In a common fund case like this one, the court has discretion to apply either the percentage or lodestar method to evaluate the reasonableness of this request. *In re Hyundai & Kia Fuel Econ. Litig.*, 926

---

[10] Class Counsel reserved the right to move for additional attorneys' fees if funds remain in the Settlement Fund after the full administration of the claims process, and TASC agreed not to oppose any additional award provided that the total attorneys' fee award does not exceed $650,000. Doc. 416 at 5 n.3. Class Counsel anticipates seeking additional fees. This anticipated fee petition does not affect the fairness of the settlement agreement and should not inhibit final approval. Whether the Court grants or denies the request for additional fees will not affect how much money will go to Settlement Class Members: the money remaining in the settlement fund will either be awarded to Class Counsel, or it will be distributed to the *cy pres* organizations identified in the settlement agreement. Doc. 416-2 at 19.

14

F.3d 539, 570 (9th Cir. 2019). The fees must be reasonable. *In re Optical Disk Drive Products Antitrust Litig.*, 959 F.3d 922, 929 (9th Cir. 2020). Under either standard, $250,000 in attorneys' fees is reasonable.

A "reasonableness" standard governs both the percentage and lodestar methods. A "reasonable" result using the percentage method is between 20%-30% of the total settlement, with 25% being the "benchmark." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citations omitted). The Court should consider all the circumstances of the case to arrive at a reasonable percentage. *Id.* at 1048. Here, Plaintiffs' request constitutes less than 10% of the overall settlement fund. And the circumstances of the case—including Plaintiffs' successful litigation results on dispositive and discovery motions alike—certainly entitle them to well over 10%. *See id.* (considering the exceptional results counsel achieved, among other factors).

As for the lodestar method, a "reasonable" multiplier when using the lodestar method is between 1.0 and 4.0. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002). Class Counsel estimate that they incurred approximately $5 million in time value over the course of litigation. Doc. 416-1, Declaration of Sumayya Saleh ¶ 49. Their proposed fee award is the equivalent of a .05 multiplier to the accrued fees, a significant downward departure from the lower reasonableness limit. Even if the Court were to significantly reduce the applicable rate, the request would be considered reasonable.

**VI.    The Service Payments to Named Plaintiffs Are Fair and Reasonable.**

Under the Settlement Agreement, Named Plaintiffs will each get $40,000 to compensate them for the work they did representing the class over three years of litigation. The Ninth Circuit approves of such payments, noting that they are "fairly typical in class action cases . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action," as well as "to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (citations omitted). Plaintiffs incorporate by reference they arguments they made in the

motion for preliminary approval regarding the fairness and reasonableness of the service payments. *See* Doc. 416 at 13–15.

### VII. The Proposed Class Should Be Certified For Settlement Purposes.

The Court preliminarily certified the proposed classes. Doc. 419 at 1–2. For the reasons previously explained, Doc. 416 at 15–20, the Court should certify the proposed Settlement Classes. Plaintiffs incorporate the arguments set forth in that memorandum.

### VIII. The Notice Provided to Class Members is Sufficient.

Under Rule 23(e), the Court must direct notice in a reasonable manner to all class members who would be bound by the proposal. Fed. R. Civ. P. 23(e)(1); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 157 (1974) ("Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."). "The Court has 'broad power and discretion vested in it by [Rule 23]' to determine the contours of appropriate class notice." *Ang v. Bimbo Bakeries USA, Inc.*, 13-CV-01196-HSG, 2020 WL 5798152, at *5 (N.D. Cal. Sept. 29, 2020) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979)); 7B Fed. Prac. & Proc. Civ. § 1797.6 (3d ed.). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill,* 361 F.3d at 575 (citation omitted).

The notice must "concisely and clearly state in plain, easily understood language: the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through counsel if the class member so desires, that the court will exclude from the class any member who requests exclusion, the time and manner for requesting exclusion, and the binding effect of a class judgment on class members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). It need not "set forth every ground on which class members might object." *Rodriguez*, 563 F.3d at 962 n.7 (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 630 (6th Cir. 2007)). It must only "fairly apprise the prospective members of the class of the terms of the proposed settlement" so they can

16

decide whether the settlement serves their interests. *UAW*, 497 F.3d at 630. It is not necessary for all of the details of the settlement to be included, "as long as sufficient contact information is provided to allow the class members to obtain more detailed information." 7B Fed. Prac. & Proc. Civ. §1797.6 (3d ed.).

Plaintiffs and Defendant TASC jointly crafted a notice that complies with Rule 23(c)(2)(B) and provides clear information to putative class members in plain language. *See* Bridley Decl. Ex. A–D. A Notice Packet was mailed to the last known address of every individual who participated on the MDPP program during the limitations period. Bridley Decl. ¶ 6. Of the 7,960 Notice Packets mailed, 2,454 were returned as undeliverable. *Id*. ¶ 7. Fifteen of the undeliverable pieces included forwarding address information and were promptly re-mailed to the addresses provided by the USPS. *Id*. 2,408 of the remaining 2,439 undeliverable records were sent to a professional service for address tracing; of these undeliverable records, new addresses were received for 1,492. *Id*. Notice Packets were promptly re-mailed to the 1,492 trace results, 263 of which were returned to Atticus a second time. *Id*. Ultimately, 1,210 Class Members did not receive the Notice Packet by mail and 6,750 Class Members (84.80% of the Settlement Class) were successfully sent notice. *Id*. Notice was also posted on social media and in local newspapers. *Id*. ¶¶ 8–9. All the methods of Notice included a link to a settlement website with additional information, through which Class Members could—and did—submit claims. *Id*. ¶ 10. This variety of notice methods reasonably ensured that each putative class member received notice, as evidence by the number of claims submitted. In short, Class Members were given comprehensive information about the terms of the Proposed Settlement and a fair opportunity to submit claims.

### IX. Conclusion

For these reasons, Plaintiffs respectfully request that the Court grant final approval of the proposed class action settlement and certify the proposed settlement class at the Final Fairness Hearing.

DATED this 25th day of March, 2024.

s/ *Sumayya Saleh*
Sumayya Saleh
Bina Ahmad
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009

Timothy J. Eckstein
OSBORN MALEDON
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793

Stanley Young
COVINGTON & BURLING LLP
5 Palo Alto Sq.
Palo Alto, CA 94306

*Class Counsel*